## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

                    Plaintiffs,

          v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

                   Defendants.

**No. 2:20-cv-4096**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This lawsuit challenges Defendants' unlawful actions designed to undermine the effective operation of the United States Postal Service ("USPS" or "Postal Service") and impede the efforts of the Plaintiff States to conduct free and fair elections in the manner Plaintiff States have chosen. The Plaintiff States bring this action to remedy the harm caused by Defendants' actions and to protect their constitutional authority to conduct their elections in the manner their respective legislatures have chosen.

2.    Specifically, the States challenge several of USPS's recent operational and policy changes, some implemented by USPS for the stated purpose of reducing the agency's operating costs, but which have led to significant delays in mail delivery across the country.

3.    These changes—which include prohibiting late or extra trips by postal workers that are often necessary to keep the mail moving forward in the mailstream; requiring carriers to

adhere rigidly to start and stop times regardless of whether all mail for their route has arrived or been delivered; and limiting the use of overtime—were made without due regard to their likely impact on mail service and in violation of the procedural requirements of the Postal Reorganization Act.

4.     These policy changes also are inconsistent with the Postal Service's longstanding practice: Keep every piece of mail moving each day toward its final destination and deliver every piece of mail ready for delivery.

5.     These changes were made despite the ongoing COVID-19 pandemic, which has imposed significant and unanticipated burdens that make it more challenging for the Postal Service to meets its objective. Postal employees, as essential workers, remain at increased risk of contracting the virus; indeed, nearly 10 percent of the 630,000 postal workers nationwide have contracted it as of August 2020.[1] Increased rates of absence due to illness and the need to quarantine workers who may have been exposed require other postal workers to work additional hours, making the limitation of overtime and the Postal Service's other policy changes particularly ill-advised.

6.     What is more, USPS has implemented these unlawful policy changes just months before the November 3, 2020, general election. In this election, far more Americans will cast their ballots by mail than have ever done so before. In 28 states—including Plaintiff Commonwealth of Pennsylvania, Plaintiff State of Delaware, Plaintiff State of Maine, Plaintiff Commonwealth of Massachusetts, and Plaintiff State of North Carolina—voters will be able to apply for and cast a mail-in ballot for any reason. Voters in six other states will be able to invoke

---

[1] Jason Knowles and Ann Pistone, *USPS workers concerned agency isn't doing enough to protect essential workers from COVID-19*, ABC7 Chicago (Aug. 14, 2020), https://abc7 chicago.com/usps-covid-illinois-postal-service/6360074/

the COVID-19 pandemic to vote by mail. Plaintiff District of Columbia and nine additional states—including Plaintiff State of California—will send mail-in ballots to every eligible voter. And in seven other states, voters may request a mail-in ballot if they will not be able to vote in person on the day of the election.

7.      Many of these states are already seeing record numbers of mail-in ballot requests. As of this week, North Carolina has received more than 10.8 times the number of absentee ballot requests than the state had at the same time in 2016.

8.      Many states have only recently expanded their use of mail-in ballots. In California and the District of Columbia, for the first time, all registered active voters will automatically be sent a mail-in ballot for the November 2020 general election. In Pennsylvania and Delaware, all voters were given the option of voting by mail for the first time in the 2020 primary election. In that election, the number of mail-in votes in Pennsylvania was nearly eighteen times what it had been in 2016.

9.      While mail-in ballots are a convenience for some voters, they are a necessity for others. For voters with disabilities or those who are unable to get to the polls, casting a mail-in ballot may be the only realistic means of voting. Furthermore, given the strong likelihood that the COVID-19 pandemic will not have abated by November, in-person voting will present an increased risk of infection. This risk is only exacerbated for elderly voters and others who are particularly vulnerable to the illness. For such voters, the ability to cast a ballot by mail is essential.

10.      Despite the many benefits of mail-in voting—and the necessity of relying on mail-in voting during the current health crisis—President Trump has repeatedly sought to undermine confidence in voting by mail, falsely asserting that mail-in votes are subject to

widespread fraud. In fact, the States take numerous steps to protect against fraud, through techniques such as matching signatures, requiring witnesses, and providing each voter with an individually identified return envelope in which to place the voter's sealed ballot.

11.     Contrary to President Trump's claims, there is no evidence that mail-in ballots contribute to fraud.

12.     President Trump's attacks on mail-in voting have only escalated recently, as he has stated that he opposes providing USPS with additional funding because he believes that, without such funding, "USPS will not be able to have universal mail-in voting because they're not equipped to have it."

## JURISDICTION AND VENUE

13.     This action arises under the Postal Reorganization Act, 39 U.S.C. § 3661, and the United States Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1339, and 39 U.S.C. § 409.

14.     In addition, this Court has the authority to issue the declaratory relief sought pursuant to 28 U.S.C. § 2201.

15.     Venue is proper in this Court because Plaintiff Commonwealth of Pennsylvania resides in this district and because a substantial part of the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(e)(1).

## THE PARTIES

16.     Plaintiff Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1.

17.     Plaintiff State of California is a sovereign state of the United States of America. This action is brought on behalf of the State of California by Attorney General Xavier Becerra, the "chief law officer of the State." Cal. Const. art. V, § 13.

18.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings as the "chief law officer of the State," charged with protecting public rights and enforcing public duties in court. *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority to represent the State and its instrumentalities in all legal proceedings. Del. Code Ann. tit. 29, § 2504.

19.     Plaintiff the District of Columbia (the "District") is a sovereign municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.

20.     Plaintiff State of Maine is a sovereign state of the United States of America. This action is brought by and through the State of Maine's Attorney General, Aaron M. Frey. The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business. Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.* The Attorney General's powers and duties include acting on behalf of the State and the

people of Maine in the federal courts on matters of public interest. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

21.     Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by its Attorney General, Maura Healey. Attorney General Healey is the chief law enforcement officer in Massachusetts and has both statutory and common-law authority to bring lawsuits to protect the interests of the Commonwealth of Massachusetts and the public interest of the people. *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1265-66 (Mass. 1977); Mass. Gen. Laws ch. 12, §§ 3, 10.

22.     Plaintiff State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by its Attorney General, Joshua H. Stein, who is the chief law enforcement officer of the State. The Attorney General brings this lawsuit under his constitutional, statutory, and common-law authority.

23.     Defendant Louis DeJoy is the United States Postmaster General and is sued in his official capacity. His principal address is 475 L'Enfant Plaza S.W., Washington, D.C. 20260.

24.     Defendant Robert M. Duncan is the Chairman of the Postal Service Board of Governors and is sued in his official capacity. His principal address is 475 L'Enfant Plaza S.W., Washington, D.C. 20260.

25.     Defendant United States Postal Service is "an independent establishment of the executive branch" of the U.S. government. 39 U.S.C. § 201. Its principal address is 475 L'Enfant Plaza S.W., Washington, D.C. 20260. Congress has waived the Postal Service's immunity from suit. 39 U.S.C. § 401.

## BACKGROUND

### I. Elections in the United States

26.     The Constitution invests the States with primary authority for regulating elections for federal office.

27.     Under the Elections Clause, each State's legislature shall prescribe "The Times, Places and Manner of holding Elections for Senators and Representatives" to represent that State. U.S. Const., art. I, § 4, cl. 1. That clause further provides that Congress—and only Congress— "may at any time by law make or alter such regulations." *Id.*

28.     The exercise of State power under the Elections Clause is necessary for elections "to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Consequently, "States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.*

29.     Each State also possesses the constitutional prerogative, under the Electors Clause, to "appoint" presidential electors "in such Manner as the Legislature thereof may direct." U.S. Const. art. II § 1, cl. 2. The Electors Clause "'convey[s] the broadest power of determination' over who becomes an elector" to the States. *Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020) (quoting *McPherson v. Blacker*, 146 U.S. 1, 27 (1892)).

30.     The 26th Amendment further guarantees that the "right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI.

## II. Voting in the Plaintiff States

### *Pennsylvania*

31.     For several decades, Pennsylvania has allowed for absentee voting by, among

others, individuals serving in the military and anyone who would be away from his or her polling

place on Election Day for business or occupational reasons. 25 Pa. Stat. § 3146.1.

32.     In October 2019, Pennsylvania enacted Act 77, the most significant change to the

Commonwealth's elections code in more than 80 years. *See* Act of October 31, 2019, P.L. 552

No. 77 (Act 77). Among other reforms, Act 77 gave Pennsylvanians more time to register to

vote; instituted no-excuse mail-in voting for all Pennsylvania voters; extended mail-in and

absentee submission deadlines; allowed Pennsylvanians to request placement on a permanent

mail-in or absentee ballot list for all elections held in a calendar year; and provided funding for

local election board to implement more secure voting procedures, including machines with a

voter-verifiable paper ballot.

33.     Act 77 took effect for the 2020 primary election and will govern the November

2020 general election in Pennsylvania. As a result, any registered Pennsylvania voter is entitled

to vote by an official mail-in ballot in the 2020 election. 25 Pa. Stat. § 3150.11.

34.     The deadline to register to vote in Pennsylvania is 15 days before the election. 25

Pa. Stat. § 3071. For the November 2020 general election, this deadline is October 19, 2020.

35.     Voters apply for a mail-in or absentee ballot by mailing or hand-delivering a

paper form to the county board of elections. 25 Pa. Stat. § 3150.12(f); 25 Pa. Stat. § 3146.2.

Voters with qualifying state identification can also submit an application for a mail-in or

absentee ballot entirely online. 25 Pa. Stat. § 3150.12(f); 25 Pa. Stat. § 3146.2(k); Pa. Dep't of State, *Ballot Request Application*.[2]

36.     Applications for mail-in and absentee ballots must be submitted one week before the election and received by county board of elections "not later than five o'clock P.M. of the first Tuesday prior to the day of" any election. 25 Pa. Stat. § 3150.12a(a); 25 Pa. Stat. § 3146.2a(a). For the November 2020 general election, the deadline to apply for a mail-in or absentee ballot is 5 p.m. on Tuesday, October 27.

37.     Voters who satisfy an exception, such as voters with a disability or who were unable to apply for business or occupational reasons, may apply for an absentee ballot until polls have closed. 25 Pa. Stat. § 3146.2a.

38.     Beginning 50 days before the election, the county board of elections must begin mailing mail-in and absentee ballots as soon as the ballot is certified and the ballots are available. 25 Pa. Stat. §§ 3150.12a(a), 3150.15; 25 Pa. Stat. §§ 3146.2a(a), 3146.5(b)(1). Once delivery of mail-in and absentee ballots has begun, the county board of elections must mail or deliver mail-in and absentee ballots to voters within 48 hours of receiving and approving an application for a mail-in ballot. 25 Pa. Stat. § 3150.15; 25 Pa. Stat. § 3146.5(b)(1). Because applications can be submitted until a week before the election, the latest a Pennsylvania county board can mail a ballot for the November 2020 general election is Thursday, October 29.

39.     Act 77 provides that, except for overseas military ballots, mail-in and absentee ballots will be counted only if they are received by the county board of elections by 8 p.m. on the day of the election. 25 Pa. Stat. §§ 3150.16; 3511; 25 Pa. Stat. § 3146.6. Voters must mail the

---

[2] https://www.pavoterservices.pa.gov/OnlineAbsenteeApplication/#/OnlineAbsentee Begin.

completed ballot or deliver it in person to the county board of elections. 25 Pa. Stat. § 3150.16; 25 Pa. Stat. § 3146.6.

40.     In response to the COVID-19 pandemic and the significant increase in mail-in voting applications, Pennsylvania will provide funding to allow counties to send a postage-paid ballot-return envelope with each ballot for the November 2020 general election. The Pennsylvania Department of State is working with individual counties to identify the easiest manner of implementing pre-paid postage for November's returned ballots—whether it be reimbursed metered postage, funding Business Reply Mail postage costs, or reimbursement for stamps.

41.     Pennsylvania voters at any time can request to be placed on a permanent mail-in or absentee ballot list. 25 Pa. Stat. § 3150.12(g); 25 Pa. Stat. § 3146.2(e.1). Voters on this list will receive a mail-in or absentee ballot application every year. If the voter completes the application and requests to receive a mail-in or absentee ballot for all other elections during that calendar year, then the voter will automatically receive a mail-in or absentee ballot for the remainder of the calendar year. More than 1.1 million Pennsylvania voters signed up for the permanent mail-in ballot list for elections in calendar year 2020.

42.     On June 2, 2020, Pennsylvania conducted its first election under Act 77. "Nearly 1.5 million voters cast their vote by mail-in or absentee ballot, 17 times the number that voted absentee in the 2016 primary, when approximately 84,000 absentee ballots were cast." Pa. Dep't of State, *Pennsylvania 2020 Primary Election Act 35 of 2020 Report* 4 (Aug. 1, 2020) ("2020 Report").[3] The 2020 Report explained that four "unprecedented conditions" occurred for the 2020 primary: (1) all 67 counties implemented new voting systems with a voter-verifiable paper

---

[3] https://www.dos.pa.gov/VotingElections/Documents/2020-08-01-Act35Report.pdf

ballot; (2) the expansion of mail-in voting to all eligible voters; (3) the COVID-19 global pandemic; and (4) civil unrest in response to the death of George Floyd, leading to curfews, travel restrictions, and office closures. *Id.* at 4. Nearly 1.5 million Pennsylvanians voted by mail and more than 1.3 million voted in person, resulting in "overall turnout . . . far higher than in 2012," the last election in which a presidential primary was not contested in either party. *Id.* The ability to cast a mail-in ballot was particularly important in larger counties where hundreds of poll sites were consolidated for reasons related to COVID-19 and civil unrest. *See id.* at 31-32 (Allegheny consolidated 830 polling places into 211; Delaware consolidated 151; Montgomery consolidated 212; and Philadelphia consolidated 850 into 190).[4]

43.     Older individuals, those 65 and over, make up 18.7 percent of Pennsylvania's population, compared to 14.9 percent nationally.

44.     As of August 17, 2020, more than 8.67 million Pennsylvanians have registered to vote. Of these, more than 1.68 million voters have requested a mail-in or absentee ballot for the November 2020 general election and more than 1.34 million voters have been approved. By comparison, only 356,300 absentee ballot requests were approved for the 2008 general election; 311,477 for the 2012 general election; and 322,467 for the 2016 general election.

### *California*

45.     California has a decades-long history of safely and securely administering mail-in elections. California began tracking the use of absentee mail-in voting in 1962, and it has allowed absentee mail-in voting for any registered voter, for any reason, since 1979.

---

[4] *See also, e.g.*, Julian Routh, *County announces consolidated voting places for June 2 Pa. primary*, Pittsburgh Post-Gazette (May 15, 2020), https://www.post-gazette.com/news/vote 2020/2020/05/15/allehgeny-County-announces-consolidated-voting-places-for-June-2-Pa-primary/stories/202005150141.

46.     In June 2020, in response to COVID-19, the California Legislature enacted, and Governor Gavin Newsom signed, Assembly Bill 860, which requires that all active registered voters in California receive a vote-by-mail ballot in the mail prior to the November 2020 general election. 2020 Cal. Stat. ch. 4 (AB 860).

47.     For the November 2020 general election, the California elections officials shall, no later than 29 days before the day of the election, begin mailing ballots and required election materials to every active registered voter in each county. The county elections official shall have five days to mail a ballot to each person who is registered to vote on the 29th day before the day of the election and five days to mail a ballot to each person who is subsequently registered to vote. Cal. Elec. Code § 3000.5. This must include a ballot, and all supplies necessary for the use and return of the ballot, including an identification envelope with prepaid postage for the return of the vote by mail ballot. Cal. Elec. Code § 3010.

48.     California voters may return completed ballots by mail (with postage prepaid by the State); by returning the ballot in person to a polling place, vote center or early voting location, or office of county elections official; by dropping the ballot into one of the county's ballot drop boxes; or authorizing someone to return the ballot on the voter's behalf. Cal. Elec. Code § 3017, subds. (a), (b). The State accepts completed ballots that are postmarked no later than Election Day or received by other means no later than the time the polls close on Election Day. Cal. Elec. Code § 3020.

49.     County election officials must examine the postmark on the return envelope and signature on the declaration before processing the ballot. Signatures are also reviewed to ensure that a voter's signature on the ballot declaration matches the signature of that voter in the registration files. Cal. Elec. Code §§ 3020, 3019.

50.     County election officials may begin to process vote by mail ballot return envelopes beginning 29 days before the election. Processing vote by mail ballot return envelopes may include verifying the voter's signature on the vote by mail ballot return envelope pursuant to Section 3019 and updating voter history records. Cal. Elec. Code § 15101(a). For the statewide general election to be held on November 3, 2020, any jurisdiction having the necessary computer capability may start to process vote by mail ballots on the 29th day before the election. Processing vote by mail ballots includes opening vote by mail ballot return envelopes, removing ballots, duplicating any damaged ballots, and preparing the ballots to be machine read, or machine reading them, including processing write-in votes so that they can be tallied by the machine. However, under no circumstances may a vote count be accessed or released until 8 p.m. on the day of the election. All other jurisdictions shall start to process vote by mail ballots at 5 p.m. on the day before the election. Cal. Elec. Code § 15101(b)(2). Results of any vote by mail ballot tabulation or count shall not be released before the close of the polls on the day of the election. Cal. Elec. Code § 15101(c).

51.     For the November 2020 general election, county election officials must accept as timely cast any ballot received by the voter's elections official via USPS or a bona fide private mail delivery company by the 17th day after Election Day as long as the ballot is either (1) postmarked on or before election day, is time stamped or date stamped by a bona fide private mail delivery company on or before election day or it is otherwise indicated by USPS or a bona fide private mail delivery company that the ballot was mailed on or before election day; or (2) if the ballot has no postmark, a postmark with no date, or an illegible postmark, and no other information is available from USPS or the bona fide private mail delivery company to indicate the date on which the ballot was mailed, the vote by mail ballot identification envelope is date

stamped by the elections official upon receipt of the vote by mail ballot from USPS or a bona

fide private mail delivery company, and is signed and dated prior to or on Election Day. Cal.

Elec. Code § 3020(d).[5]

52.     For prior elections, California has paid USPS Marketing Mail rate for distributed

ballots and Business Reply Mail rate (First-Class equivalent) for returned ballots.

53.     For elections other than the November 2020 general election, voters can request

to be placed in permanent vote-by-mail status. Cal. Elec. Code. § 3000, *et seq*. Voters can

complete a one-time application through their elections office online or by mail. Voters who

complete the application to become a permanent vote-by-mail voter will automatically receive a

mail-in ballot for all subsequent elections. A voter's permanent vote-by-mail status will end if

the voter cancels their status or if the voter does not vote in four consecutive statewide general

elections. As of filing, 14.4 million California voters are currently on the permanent mail-in

ballot list.

54.     Between tracking of individual ballots, verification of individual signatures, and

other safeguards, California's vote-by-mail system has proven to be secure and, historically,

there is no evidence of significant levels of voter fraud related to vote-by-mail ballots in

California.

---

[5] For purposes of this section, "bona fide private mail delivery company" means a courier service that is in the regular business of accepting a mail item, package, or parcel for the purpose of delivery to a person or entity whose address is specified on the item. Cal. Elec. Code § 3020(c). Notably, about 3,000 routes in California are only covered by rural carriers, meaning that residents along these routes heavily rely on USPS to send and receive mail. Erika D. Smith, *Column:Trump is so dumb trying to sabotage USPS, Democrats. He's hurting his own voters*, L.A.Times (Aug. 14, 2020), https://www.latimes.com/california/story/2020-08-14/trump-usps-fight-hurts-voters-before-november-election.

55.     California's vote-by-mail system is widely and increasingly used by California voters. In the 2020 primary election, over 9.6 million ballots were cast, considerably above the 7.1 million ballots cast for the most recent similar election, the 2018 primary election. And the percentage of total ballots cast by voting by mail increased as well, from 67.7 percent of the total ballots cast in the 2018 primary election to 72.08 percent of the total ballots cast in the 2020 primary election.

56.     California's expansive vote-by-mail system allowed the state to run elections during the COVID-19 pandemic without the danger of voters congregating at overcrowded polling stations. In two special elections held in May 2020 , in which all active status, registered voters in those districts were automatically sent mail-in ballots, voter participation remained about the same or increased compared to the March 3, 2020, primary, in which mail-in ballots were not automatically sent to all active voters, except in Los Angeles County. In California's 25th Congressional District, there was 41.06 percent voter participation in the May special election, an increase from 38.95 percent voter participation in the March primary. In California's 28th State Senate District, there was 38.95 percent voter participation in the May special election, compared to 44.84 percent in the March primary.

57.     Approximately 14.8 percent of California's population is aged 65 years or older.

58.     As of filing, 20.9 million active California voters will automatically be receiving a mail-in ballot for the November 2020 general election.

### *Delaware*

59.     Delaware has allowed absentee voting for decades. Article V, § 4A of the Delaware Constitution directs the Delaware General Assembly to enact laws allowing for absentee voting for certain specified categories of individuals. Today, Delaware law allows qualified, registered voters who are unable to appear at their polling place to vote absentee if,

among other listed reasons, they are sick, physically disabled, absent from the State due to public or military service, or because they are living abroad or on vacation. Del. Code Ann. tit. 15, § 5502. Delaware subsequently permitted some of these classes of individuals to obtain permanent absentee status and receive an absentee ballot for every election. Del. Code Ann. tit. 15, § 5503(k).

60.     Absentee voting eligibility for Delaware's 2020 presidential primary was expanded due to the COVID-19 pandemic through an executive order issued by Delaware Governor John C. Carney, Jr., which allowed any otherwise duly-registered voter to vote by absentee ballot using the "sick or physically disabled" qualification under Delaware law if the individual was abiding by Centers for Disease Control & Prevention and Delaware Division of Public Health guidelines by exercising self-quarantine or social distancing to avoid potential exposure to (and community spread of) COVID-19. *See* Sixth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (Mar. 24, 2020).[6] More than 56,000 individuals utilized this expanded absentee voting eligibility to cast an absentee ballot for the 2020 presidential primary, compared to 5,046 individuals who voted by absentee ballot for the 2016 presidential primary.

61.     On July 1, 2020, Delaware enacted legislation to allow any registered voter to vote by mail-in ballot for the non-presidential primary election scheduled for September 15, 2020, the general election on November 3, 2020, and any special election to be called in 2020 due to a vacancy in a statewide office, the Delaware General Assembly, or an office of United States Representative, Senator, or Presidential Elector. Del. Code Ann. tit. 15, § 5601.

---

[6] http://governor.delaware.gov/health-soe/sixth-state-of-emergency/.

62.     Under the new mail-in voting law, the State Election Commissioner is required to send an application to receive a mail-in ballot to every qualified, registered voter no less than 60 days before an applicable election. Del. Code Ann. tit. 15, § 5603(a). For each registered voter who requests a mail-in ballot, the Delaware Department of Elections must send that voter a mail-in ballot, instructions for completing the ballot, and a postage-paid envelope marked "BALLOT ENVELOPE" to return it. Del. Code Ann. tit. 15, § 5604(b). These materials must be sent to the requesting registered voter not more than 30 days nor less than 4 days prior to the applicable election, and within 3 days of the materials becoming available to the Department of Elections. *Id.* As a matter of practice, the Department of Elections sends outbound election materials by First-Class Mail, except for the mail-in voting application, which is sent Business Reply Mail. The postage-paid ballot envelopes sent to voters are marked First-Class.

63.     Delaware voters may return completed ballots to the Department of Elections in one of three ways: depositing the ballot envelope in a United States postal mailbox; delivering the ballot envelope to the Department of Elections; or placing the ballot envelope in a secure drop-box located in a publicly accessible portion of a Department of Elections office either before or on the day of election. Del. Code Ann. tit. 15, § 5607(a)(4). In each case, the Department of Elections must receive a mail-in ballot before the polls close on the day of election in order for it to be counted. Del. Code Ann. tit. 15, § 5608.

64.     Approximately 19.4 percent of Delaware residents, and 24.2 percent of all registered Delaware voters, are 65 years of age or older.

65.     As of filing, 727,968 Delaware voters have registered to vote. Of these, 81,677 voters have requested an absentee or mail-in ballot for the November 2020 general election.

66.     As of filing, 24,552 Delaware voters are on the permanent absentee ballot list.

*District of Columbia*

67.    In the District of Columbia, voters may cast an absentee ballot via mail without an excuse, or cast a ballot in person during early voting or on Election Day.

68.    Ballots cast by mail must be postmarked or otherwise demonstrated to have been sent on or before Election Day and must arrive no later than the tenth day after Election Day.

69.    Due to the COVID-19 pandemic, the District of Columbia Board of Elections (DCBOE) encouraged voters to cast their ballots by mail for the June 2, 2020, primary election. For that election, all active registered voters received an absentee ballot application and a postage-paid return envelope. D.C. Code § 1-1001.05(a)(9A).

70.    Tens of thousands of voters submitted that application and participated in the election via mail-in ballot. Of the nearly 115,000 ballots cast in that election, 67 percent were cast by mail. By comparison, in the 2016 primary, just 5.5 percent of ballots were cast by mail.

71.    To protect the public and election workers, DCBOE is strongly encouraging voters to vote by mail for the November 2020 general election. For that election, all active registered voters will receive an absentee ballot and a postage-paid return envelope at their registered address or mailing address. D.C. Code § 1-1001.05(a)(9A-i). Voters will not be required to request a mail-in ballot.

72.    Due to COVID-19, and in comparison to previous presidential elections, there will be diminished availability to cast a ballot early in person or in person on Election Day. For example, while there were 143 Election Day precinct-based polling places for the November 8, 2016 election, there will be just 89 Election Day Vote Centers on November 3, 2020.

73.    As of 2019, 12.4 percent of District residents were age 65 or older.

74.     As of July 31, 2020, there were 503,093 registered voters in the District of Columbia.

### *Maine*

75.     Before 1999, Maine voters could vote absentee when the voter was unable to cast a ballot due to: absence from the municipality during the time the polls are open on election day; physical incapacity; confinement in a penal institution; or unreasonable distance from the polls, if the voter is a resident of a township, coastal island ward or district. Me. Rev. Stat. Ann. Tit. 21-A § 751 (1999). Since 1999, Maine voters also have been able to vote absentee with no excuse. Me. Rev. Stat. Ann. Tit. 21-A § 751 (2020).

76.     To vote absentee, a voter must request a ballot. A request for a no excuse absentee ballot must be made no later than 5 p.m. on the Thursday before Election Day, which is October 29, 2020, for the upcoming election. Voters can still obtain an absentee ballot after that deadline if they can invoke one of the reasons listed in Me. Rev. Stat. Ann. Tit. 21-A § 753-B(2)(D) (2020).

77.     Voters may choose between three methods of absentee voting: voters may mail their completed ballot to the municipal office for the municipality where they are registered to vote; voters may carry their completed ballot to that same municipal office, or have a family member or authorized third person do so; and voters may complete their ballot prior to Election Day in the presence of the clerk in their municipality.

78.     With an exception for communities with fewer than 100 residents, absentee ballots must be received in the municipal office before 8 p.m. on Election Day to be counted. Me. Rev. Stat. Ann. Tit. 21-A §§ 626(2), 755 (2020).

79.     The need for an effective vote-by-mail option is critical in Maine because the electorate includes relatively high levels of individuals unable to vote in person and individuals at risk of severe illness from COVID-19, particularly disabled and elderly voters.

80.     Maine has among the highest rates of disability in the nation: According to the Maine Center for Disease Control, 22.1 percent of adults in Maine have some form of disability. Disabled Mainers vote at extremely high rates. In the November 2016 election, for example, 70.2 percent of disabled Mainers voted, the third-highest figure in the country.

81.     Additionally, certain conditions which can result in disability, such as obesity and cancer, place individuals at an increased risk of severe illness from COVID-19. Maine has the highest obesity rate in New England, as well as the ninth-highest cancer rate in the country. According to the Maine Center for Disease Control, about half of Maine adults over the age of 18 are at risk of serious illness from COVID-19 due to age and pre-existing medical conditions.

82.     Moreover, Maine is the oldest state in the nation. As of July 2019, approximately 21 percent of the population was over 65 years old. Older voters are also disproportionately represented in the Maine electorate. Of the approximately 693,000 Mainers who voted in the November 2018 election, more than a third were over the age of 65 (approximately 273,000 voters, or 79 percent of potential voters in that age group). Maine's older voters are particularly susceptible to harm from COVID-19. Over 27 percent of COVID-19 cases identified in Maine are among Mainers aged 60 or older.

83.     Voting by mail is especially beneficial for Maine voters who are homebound, such as the elderly and members of the disabled community; those who are economically disadvantaged and have limited access to transportation and childcare that would enable them to vote in person during a set timeframe; overseas and military voters; those who are temporarily

away from home for work or family reasons; those who provide care for individuals must vulnerable to COVID-19; and those who may not have time to get to the polls during set hours, such as shift workers, caregivers, single parents, and those without childcare or time off from work.

84.     Maine's most recent primary, held on July 14, 2020, shows the importance of allowing voters to vote by mail. The percentage of ballots voted by mail increased significantly over prior years. Historically, the rate at which Maine voters voted by mail has been lower than 10 percent in general elections and less than 3 percent in primaries. Based upon final figures for the July 2020 primary, there were 111,139 ballots cast by mail, which equates to about 35 percent of ballots cast. This represents at least a 10 fold increase over primaries in the last four election cycles.

85.     As of August 3, 2020, there are 1,063,383 residents are registered to vote. Between August 17, 2020 (when it was launched) and August 20, 2020, 45,976 voters have applied for an absentee or mail-in ballot through the online ballot request service, more than the total for the 2016 general election.

*Massachusetts*

86.     Massachusetts has a long history of safely and securely accepting absentee ballots by mail. *See* Mass. Gen. Laws ch. 54, §§ 89-100. In 2014, Massachusetts law was changed to allow "early voting" for biennial state elections only, beginning with the 2016 election. The law provided for early voting in person or by mail, but only during the early voting period, which was limited to 10 days before the election. *See* Mass. Gen. Laws ch. 54, § 25B. The two systems (absentee voting and early voting) overlap in several ways, but the most important difference is that the state constitution requires that absentee voters must have an excuse (for example, a voter

can vote absentee if he is away from his city or town on Election Day), *see* Mass. Const. amend. art. CV, but no excuse is needed in order to vote early.

87.     In 2020, in response to the ongoing COVID-19 pandemic, Massachusetts expanded its early voting program to permit voters to vote by mail without an excuse for an extended period of time over the previous law. Every registered voter is now eligible to vote early by mail in Massachusetts this year. A registered voter need only complete a timely application for a mail-in ballot to vote by mail this year in the State Primary or the State Election. *See* Mass. Stat. 2020, ch. 115, § 6

88.     The deadline to register to vote in the State Primary (to be held on September 1, 2020) is August 22. The deadline to register to vote in the State Election (to be held on November 3, 2020) is October 24. Mass. Stat. 2020, ch. 115, § 18. A voter can register online, by mail, or in person at any city or town hall in Massachusetts. *See* Mass. Gen. Laws ch. 51, §§ 3, 26

89.     In order to vote by mail, a registered voter must send a signed application for a mail-in ballot to a local election office. The voter will then be mailed a ballot to vote and return. *See* Mass. Stat. 2020, ch. 115, § 6

90.     In order to make a timely request for a mail-in ballot, the voter's application for a ballot must be received by local election officials at least 4 business days before the relevant election. Local election officials mail ballots to voters as soon as they are available; this year, state law requires that ballots be made available to local election officials for the State Election no later than October 5, 2020. *See* Mass. Stat. 2020, ch. 115, § 6.

91.     Each voter that makes a timely request for a mail-in ballot will receive a ballot, instructions, a security envelope in which to conceal the ballot after voting which contains an

affidavit that the voter must sign, and a larger envelope in which to return the security envelope.

Once a voter receives a mail-in ballot, it can be completed and returned to local election officials

either by mail or, where available, to a secure drop box. To be counted, the completed ballot

must be received by a particular time by local election officials. For the State Primary on

September 1, the ballot needs to be returned by 8 p.m. on September 1. For the State Election on

November 3, a ballot, if mailed, needs to be postmarked by November 3 and it must reach the

local election office by November 6. Hand-delivered ballots must be returned by 8 p.m. on

November 3 for the State Election. *See* Mass. Stat. 2020, c. 115, § 6(h)(3).

92.     For mail-in ballots, the envelopes provided to voters from Massachusetts are

postage prepaid First-Class Mail rate for returned ballots.

93.     Approximately 14 percent of the Massachusetts population is age 65 or older.

94.     As of August 19, 2020, Massachusetts had 4,642,444 registered voters, of whom

1,081,089 have requested mail-in ballots for the September 1 primary election.

### *North Carolina*

95.     North Carolina has been safely and securely administering elections, including by

giving voters the option to vote by mail for any reason, since 1999.

96.     To vote by mail, voters must first be registered to vote. N.C. Gen. Stat. § 163-

82.1. To vote in the 2020 general elections in North Carolina, voters who wish to register online

or in-person must do so by October 9, 2020. N.C. Gen. Stat. § 163-82.6(d). Voters who wish to

register by mail must ensure that their registration application is postmarked by October 9, 2020.

*Id.*

97.     To vote by mail, the voter must first request an absentee ballot by filling out a

form provided by the North Carolina State Board of Elections. N.C. Gen. Stat. § 163-230.2. This

form is available for download at the State Board's website and is also available for pickup at all

county board of elections offices. *Id.* The form can also be mailed to the interested voter upon request. *Id.* Absentee ballots may be requested until 5 p.m. on October 27, 2020. N.C. Gen. Stat. § 163-230.1(a). If the voter is requesting her absentee ballot by mail, the county board of elections office to which the voter sends her request must receive the request by 5 p.m. on October 27, 2020. *Id.*

98.     County boards of elections will begin mailing absentee ballots to voters who have requested them using the request form beginning on September 4, 2020.

99.     Voters may return completed ballots by mail. N.C. Gen. Stat. § 163-231(b). Alternatively, they may return completed ballots in-person to a county board of elections office or to early-voting sites during the early-voting period. *Id.* Absentee ballots must be returned to the county board of elections no later than 5 p.m. on Election Day. *Id.* Absentee ballots received after 5 p.m. on Election Day will be counted only if they are postmarked on or before Election Day *and* are received by mail no later than 5 p.m. three days after Election Day (in 2020, November 6). *Id.*

100.     In a recent survey, 48 percent of likely voters in North Carolina said that they were "likely to vote by mail" in the 2020 General Election, compared to the 3 percent who voted by mail in 2016.[7] In 2016, 4,769,640 voters cast ballots. Assuming a similar number of voters cast ballots in 2020, North Carolina is preparing for approximately 2.29 million voters to cast absentee ballots.

101.     Approximately 16.7 percent of North Carolina residents are senior citizens, age 65 or older.

_____

[7] Charles Duncan, *Can North Carolina Handle Record Numbers of Absentee Ballots?*, Spectrum News1 (Aug. 1, 2020), https://spectrumlocalnews.com/nc/charlotte/news/2020/07/31/north-carolina-sees-record-number-of-absentee-ballot-requests.

102.     As of August 19, 2020, North Carolina has received 295,959 requests for absentee ballots.

### III. The United States Postal Service

103.     The Constitution empowers Congress to "establish Post Offices and post Roads." U.S. Const., art. I, § 8, cl. 7. The importance of the postal service "was prefigured by the Continental Congress' appointment of Benjamin Franklin to be the first Postmaster General, on July 26, 1775 . . . . From those beginnings, the Postal Service has become the nation's oldest and largest public business." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004) (internal citations and quotation marks omitted).

104.     The Postal Service has played "a vital yet largely unappreciated role in the development of" the United States. *U. S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 121 (1981). During the early years of this country's development, "the Post Office was to many citizens situated across the country the most visible symbol of national unity." *Id.* at 122.

105.     Today, the Postal Service's policy is to be "operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). Its services are "to bind the Nation together through the personal, educational, literary, and business correspondence of the people," which it does through "prompt, reliable, and efficient services to patrons in all areas." *Id.* The costs of "maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people." *Id.*

106.    The Postal Service touches the lives of virtually every American.[8] Eighteen percent of Americans, and 40 percent of senior citizens, pay their bills via the mail. Nearly 20 percent of Americans who receive tax refunds do so through the mail. The Department of Veterans Affairs (VA) fills about 80 percent of veterans' prescriptions by mail, sending 120 million prescriptions a year. Every day, more than 330,000 veterans receive a package of prescriptions in the mail. More than half of the people who receive medication by mail are over the age of 65. Small businesses rely heavily on the Postal Service: 40 percent send packages via USPS every month and 25 percent fear that a post office closing would harm their business. In rural areas, where more than a third of post offices are located, the Postal Service provides a vital link to more than 14 million people without broadband access. In 2018, the Postal Service helped 42 million Americans securely vote in the midterm elections.

107.    The Postal Service's critical role as an essential public service for all Americans is reflected in public opinion. According to the Pew Research Center, 91 percent of Americans have a favorable view of the Postal Service—higher than any other federal agency.

### The Modern Postal Service

108.    Postal service in the United States took its current form in 1970, when Congress passed the Postal Reorganization Act (PRA). *See* Pub. L. No. 91-375, 84 Stat. 719.

109.    The PRA mandated that it "shall be the responsibility of the Postal Service to maintain an efficient system of collection, sorting, and delivery of the mail nationwide." 39 U.S.C. § 403(b)(1).

---

[8] Sam Berger & Stephanie Wylie, *Trump's War on the Postal Service Hurts All Americans*, Ctr. For Am. Progress (Aug. 19, 2020), https://www.americanprogress.org/issues/democracy/news/2020/08/19/489664/trumps-war-postal-service-hurts-americans/.

110.    Under the PRA, the "Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C. § 403(a).

111.    When "determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

112.    The PRA effected several changes designed "to increase the efficiency of the Postal Service and reduce political influences on its operations." *Flamingo Indus.*, 540 U.S. at 740.

113.    First, the PRA gave the Postal Service its current name and made it "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201.

114.    Second, the PRA created a board of governors, consisting of 11 members, to oversee the exercise of the Postal Service's power. 39 U.S.C. § 202(a). The President appoints nine of those governors with the advice and consent of the Senate. *Id.* Those nine appoint the tenth governor, who serves as the Postmaster General. *Id.* § 202(c). Those ten appoint the eleventh governor, who serves as the Deputy Postmaster General. *Id.* § 202(d).

115.    Third, the PRA created the Postal Rate Commission—now called the Postal Regulatory Commission—as another "independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 501.[9] The Commission has five presidentially appointed members, all to "be chosen solely on the basis of their technical qualifications,

---

[9] The sections of the PRA that created the Commission were initially codified at 39 U.S.C. §§ 3601-3604. In 2006, Congress transferred and modified certain provisions relating to the Postal Service, including those that established the Commission. Pub. L. No. 109-435, 120 Stat. 3198, 3238 (2006).

professional standing, and demonstrated expertise in economics, accounting, law, or public administration." *Id.* § 502.

116.     The Commission has numerous responsibilities set forth in the PRA and the Postal Accountability and Enhancement Act. *See* Pub. L. No. 109-435, 120 Stat. 3198 (2006). Among them, anytime "the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" it must first "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). Before the Commission issues an advisory opinion, it must hold a hearing on the record. *Id.* § 3661(c). The public is entitled to submit comments in proceedings before the Commission. 39 C.F.R. § 3010.140.

117.     Prior to certain organizational changes implemented on August 7, 2020, the Postal Service maintained a headquarters and a field office structure composed of seven area offices (Eastern, Northeastern, Capital Metro, Great Lakes, Pacific, Southern, and Western), which themselves contained a total of 67 district offices that oversaw approximately 31,000 facilities. Post offices, branches, carrier stations, mail processing and distribution centers, network distribution centers, and other postal service facilities within a district reported up to the district office, which in turn reported up to the area office. District offices were responsible for implementing national policy and procedures within their districts.

118.     Following operational changes implemented on August 7, 2020, retail and delivery operations are now divided into four areas (Atlantic, Southern, Central, and Western Pacific) and mail processing is divided into two areas (Eastern and Western).

*Postal Service Operations*

119.     The Postal Service has formally adopted several classes of mail, including First-Class Mail and Marketing Mail, which are transported with different delivery standards and with different postage rates.

120.     The Postal Service also offers Business Reply Mail, which enables the sender to provide a recipient with a prepaid method for replying to a mailing. Mail sent with a Business Reply Mail envelope is often not postmarked.

121.     The processing and delivery of mail in the Postal Service network is a highly integrated and complex system through which an average of 470 million mailpieces move every day.

122.     The Postal Service operates on a 24-hour clock, and every step of the mail processing and delivery stream leads into the next.

123.     The majority of incoming mail—including letters, flats, and parcels—is processed overnight by postal workers and mail handlers at mail processing facilities, otherwise known as plants. Processing mail involves applying a postmark and sorting and arranging the mail for transportation and delivery. Most mail processing is now automated, with processing machines ultimately sorting the vast majority of mail into "delivery point sequence," i.e., into the delivery order that will be used by the letter carrier on her route. Processed mail is dispatched in trucks from the plants in the very early morning (often 5 or 6 a.m.), where it travels either to non-local destinations for further processing or to delivery units (e.g., a post office or carrier station) for delivery to local destinations.

124.     Processed mail ready for delivery normally arrives at the delivery unit in the morning (often 8 or 9 a.m.), where any final sequencing is carried out by clerks and letter

carriers. Carriers deliver the processed mail and collect new mail on foot or by vehicle in a prescribed area during general business hours (i.e., between approximately 9 a.m. and 6 p.m.). In the evening, mail collected by carriers on their routes and mail collected by clerks at post offices is sent from the delivery unit by truck to the processing plant; this process is known as the final dispatch of value. When the collected mail arrives at the processing plant, the cycle begins again.

125.    Because the Postal Service has long embraced a philosophy that every piece of mail goes out of the plant or delivery unit every day, regardless of conditions, overtime is necessary. If a tray of mail is not ready when the truck is scheduled to depart the processing plant, the truck would ordinarily wait. Likewise, if the processed mail has not arrived at the delivery unit when the carrier arrives for work, the carrier would ordinarily wait for the mail to arrive before departing on her route. If additional mail arrives while the carrier is out on her route or if that day's mail was too much to carry in one trip, the carrier would ordinarily make a second trip to ensure every piece was delivered that day.

126.    For the last decade, the Postal Service has experienced a decline in letter mail but an increase in parcels. Parcels can be bulkier and heavier and may require additional time to process and deliver. Recently, COVID-19 has caused a spike in parcels as Americans spend more time at home and avoid going out.

127.    COVID-19 has caused staffing shortages at USPS and exacerbated the use of overtime, especially among letter carriers. If a letter carrier is sick, quarantining, dealing with the absence of child care, or otherwise unable to complete her route, then another carrier would need to work on an off-shift to ensure that the mail is delivered.

### IV. Role of USPS in Ensuring Free and Fair Elections

128.    Over the past several decades, voting by mail has steadily expanded nationwide. In 1996, 7.8 percent of Americans mailed in their votes; in 2016, 20.9 percent did.[10] Today, every state offers some form of voting by mail.

129.    A growing number of states conduct all-mail elections, in which every registered voter is mailed a ballot. Oregon conducted the first presidential election completely by mail in 2000.[11] Washington allowed counties to hold all-mail elections in 2005; by 2011, after 38 of 39 counties were conducting all-mail elections, the Washington Legislature implemented mail-in voting statewide.[12] In Utah, jurisdictions have been permitted to conduct elections by mail since 2012; all jurisdictions have done so since 2019.[13] Colorado has been sending all voters mail-in ballots since 2013[14] and Hawai'i will be conducting elections entirely by mail for the first time in 2020.[15] In response to the national health crisis caused by the COVID-19 pandemic, four

---

[10] Pew Research Center, *Share of voters casting ballots by mail has steadily risen since 1996* (June 23, 2020), https://www.pewresearch.org/fact-tank/2020/06/24/as-states-move-to-expand-the-practice-relatively-few-americans-have-voted-by-mail/ft_2020-06-24_votebymail_01/.

[11] J. Edward Moreno, *Here's where your state stands on mail-in voting*, The Hill (June 9, 2020), https://thehill.com/homenews/state-watch/501577-heres-where-your-state-stands-on-mail-in-voting.

[12] Wash. Sec'y of State, *Washington Vote-By-Mail Fact Sheet*, https://www.sos.wa.gov/_assets/elections/wa_vbm.pdf.

[13] Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options* (July 10, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

[14] Moreno, *supra* note 11.

[15] Nat'l Conf. of State Legislatures, *supra* note 13.

additional states—California, New Jersey, Nevada, and Vermont—and the District of Columbia adopted laws that will automatically mail ballots to all eligible registered voters.[16]

130.    An additional 28 states allow voters to vote by mail without an excuse. Six others allow voters to cite the COVID-19 pandemic to vote by mail. And in seven other states, voters may request a mail-in ballot if they will not be able to vote in person on the day of the election.[17]

131.    To accommodate the widespread adoption of mail-in balloting, USPS has in recent years adopted a number of policies and procedures to ensure the speedy and efficient processing of "Election Mail."

132.    "Election Mail" is a term of art within USPS, used to describe any item mailed to or from authorized election officials that enables citizens to participate in the voting process, such as balloting materials, voter registration cards, absentee ballot applications, and polling place notifications.

133.    The Postal Service has traditionally given Election Mail its highest priority, regardless of the class of mail.

134.    In an August 14, 2008, Postal Bulletin (PB 22239), the Postal Service stated that it "stands ready to do everything it can to make sure voters experience a smooth, well-organized process—one that provides them with the highest levels of trust and confidence when they cast their ballots by mail." It was "critical" that "Postal Service employees be ready to provide reliable service and delivery for this very important and time-sensitive mail," which "must be

---

[16] Kate Rabinowitz & Brittany Renee Mayes, *At least 77% of American voters can cast ballots by mail in the fall*, Wash. Post. (last updated Aug. 14, 2020), https://www. washingtonpost.com/graphics/2020/politics/vote-by-mail-states/; Juliette Love, et al., *Where Americans Can Vote by Mail in the 2020 Elections*, N.Y. Times (last updated Aug. 14, 2020) https://www.nytimes.com/interactive/2020/08/11/us/politics/vote-by-mail-us-states.html.

[17] *See supra* note 16.

handled promptly and receive equal care and attention." The Bulletin reminded employees that "[w]illful delay of absentee balloting material or other election material is a violation of policy, ethics, and law."

135.    In a July 26, 2012, Postal Bulletin (PB 22342), the Postal Service stated that in the lead up to the November 2012 election, "Vote-by-Mail ballots and other mail prepared by election officials will be entering the mailstream" and "Postal Service employees need to watch for this important time-sensitive mail and do their part to ensure each mailing receives the highest level of service." The Bulletin provided detailed standard operating procedures for the acceptance of Election Mail. The Bulletin also explained that the Postal Service would suspend its network consolidations from September through December 2012 "[d]ue to the volume of high-priority mail predicted for the election as well as the holiday mailing seasons."

136.    In 2016, the Postal Service began providing an Election Mail communications plan in multiple issues of the Postal Bulletin. (PB 22437, 22443, 22449).

137.    In a September 1, 2016, Postal Bulletin (PB 22449), the Postal Service acknowledged that the "U.S. Mail is an important part of the U.S. election process." It reminded employees that in the lead up to the November 2016 election, "Vote-by-Mail ballots and other mail prepared by election officials will be entering the mailstream" and "Postal Service employees need to watch for this important time-sensitive mail and do their part to ensure each mailing receives the highest level of service." In response to concerns that "changes in delivery standards could require additional time for Election Mail" to reach voters, the Postal Service announced that "plans [were] in place from coast to coast to ensure the timely receipt, processing, and delivery of election and political mail."

138.     Among the key objectives of USPS's Election Mail communications plan for
2016 were to "[a]ssure election officials that ballots will be handled correctly" and "[i]ncrease
attentiveness among employees that when they encounter official Election Mail . . . to always
handle it promptly and provide it with equal care and attention." Among the key messages was
that "the Postal Service can be trusted to deliver ballots in a timely manner." Because the Postal
Service had made service standard changes in the last year, "Postal Service representatives
[were] working closely with local and federal election officials to address and alleviate any
concerns."

139.     The Department has so far issued three Postal Bulletins that address Election Mail
ahead of the November 2020 general election. (PB 22539, 22546, 22551).

140.     In its July 30, 2020, Postal Bulletin (PB 22551), the Postal Service expressed its
commitment "to fulfilling its role in the electoral process for those public policy makers who
chose to use our organization as a part of their election system." It acknowledged that "voting by
mail is increasing in popularity across broad segments of the American electorate, and the
Coronavirus (COVID-19) pandemic has accelerated this trend." The Postal Service indicated that
it expected more than a quarter of all voters to cast ballots by mail in light of recent changes
related to COVID-19.

141.     Among the key objectives of its Election Mail plan for 2020 are to "[i]nform
election officials that ballots will be delivered according to USPS® service standards" and
"[e]nsure Postal Service employees know that they must always promptly and efficiently handle
Election Mail . . . with equal care and attention." Among the key messages is that "[c]ustomers
can trust the Postal Service to deliver their mailed ballots in a timely manner."

142.    Due to the importance of Election Mail, the Postal Service has historically delivered ballots even if they lack sufficient postage.

143.    For example, an August 14, 2008, Postal Bulletin (PB 22239) stated that: "It is critical that this mail is handled correctly to avoid any negative impact on election results or the Postal Service. *Employees need to be aware that absentee balloting materials are handled differently than other unpaid or short-paid mailpieces.* ***ABSENTEE BALLOTING MATERIALS ARE NOT TO BE RETURNED FOR ADDITIONAL POSTAGE OR DETAINED!*** The postage is collected from the election office. Any delay of absentee ballots is a violation of Postal Service policy" (emphasis in original).

144.    Likewise, in its July 26, 2012, Postal Bulletin (PB 22342), the Postal Service stated that "short-paid and unpaid absentee balloting materials must never be returned to the voter for additional postage. Postage is collected from the election office upon delivery or at a later date."

145.    On April 22, 2020, Postal Service spokesperson Martha Johnson reaffirmed that it "is the postal service's policy not to delay the delivery of completed absentee or vote-by-mail ballots even if no postage has been affixed or if the postage is insufficient."

146.    The Postal Service has developed the Official Election Mail logo, a unique registered trademark "used on any mailpiece created by an election official that is mailed to or from a citizen of the United States for the purpose of participating in the voting process." Use of the logo "serves to identify Official Election Mail for Postal Service workers and distinguish it from the thousands of other mailpieces that are processed daily." The Postal Service issues Publication 631 to aid state and local election officials in using the logo.

147.    The Postal Service also issues Publication 632, which provides state and local election officials with guidance on how to send Election Mail. The Postal Service has issued Publication 632 since at least September 2005.

148.    In November 2007, the Postal Service developed the green Tag 191 to provide greater visibility to ballot mail during Postal Service handling. Election officials can use Tag 191 to identify trays and sacks of ballot mail destined for either domestic or international addresses. Tag 191 is not used for all Election Mail; instead it helps identify only actual ballots.

149.    As part of its priority treatment of Election Mail, the Postal Service has historically delivered Election Mail at First-Class Mail delivery standards regardless of the class of mail used.

150.    In its audit of the 2018 elections, the Postal Service Office of Inspector General (OIG) concluded, based on interviews with management at audited mail facilities, that Election Mail is generally handled as First-Class Mail. OIG found that 95.6 percent of Election Mail in 2018 met the 1-3 day service standard for First-Class Mail.

151.    The highest performing mail facilities audited by OIG took affirmative steps to ensure that Election Mail be given priority attention, including: having personnel separate and identify Election Mail from other mail in the facility and facilitating timely and frequent communications with all levels of plant staff about policies and procedures for Election Mail.

152.    The 2018 audit recommended Postal Service management take several key steps to ensure timely delivery of Election Mail, which "is necessary to ensure the integrity of the U.S. election process." These steps included ensuring "sufficient mail processing staff are assigned to appropriately process peak" Election Mail volume.

## V. The Administration's Efforts to Undermine Voting by Mail

### President Trump's Campaign Against Mail-in Voting

153.    In November 2017, President Trump appointed Robert M. Duncan to the Postal Service Board of Governors; he was confirmed by the Senate the following year and currently serves as the Board's Chairman.

154.    Duncan had previously served as Chairman of the Republican National Committee (RNC) from 2007 to 2009. His official USPS biography states, "As RNC Chairman, he raised an unprecedented $428 million and grew the donor base to 1.8 million – more donors than at any time in RNC history."[18]

155.    In May 2020, the Board of Governors selected Louis DeJoy to serve as the 75th Postmaster General and Chief Executive Officer. DeJoy had no prior experience working at the Postal Service. He began serving as Postmaster General on June 15, 2020.

156.    DeJoy, a longtime Republican fundraiser, had donated more than $1.2 million to the Trump Victory Fund, millions more to Republican organizations and candidates, and, at the time of his appointment, was overseeing fundraising for the 2020 Republican National Convention.[19] DeJoy also continues to own at least $30 million in USPS competitor XPO and stock options in Amazon.[20]

---

[18] USPS, *Postal Leadership: Robert M. Duncan* (last updated Dec. 2019), https://about. usps.com/who/leadership/board-governors/robert-duncan.htm.

[19] Brian Naylor, *New Postmaster General Is Top GOP Fundraiser*, NPR (May 7, 2020), https://www.npr.org/2020/05/07/851976464/new-postmaster-general-is-top-gop-fundraiser.

[20] Marshall Cohen, *Financial disclosures reveal postmaster general's business entanglements and likely conflicts of interest, experts say*, CNN (Aug. 12, 2020), https:// www.cnn.com/2020/08/12/politics/postal-service-dejoy-conflicts-amazon-trades-xpo-stake/index.html.

157.    Shortly before DeJoy's appointment, President Trump began a campaign of false claims about mail-in voting, alleging repeatedly that it is vulnerable to widespread fraud.

158.    During this time, President Trump has made the following false and unsubstantiated statements regarding mail-in voting:

  a.  On March 30, 2020, the President stated that he was opposed to a bill that would reform voting by mail because the bill would have allowed for "levels of voting that if you'd ever agreed to it, you'd never have a Republican elected in this country again."[21]

  b.  On April 11, 2020, the President tweeted, "Mail in ballots substantially increases the risk of crime and VOTER FRAUD!"[22]

  c.  On May 24, 2020, the President tweeted, "The United States cannot have all Mail In Ballots. It will be the greatest Rigged Election in history. People grab them from mailboxes, print thousands of forgeries and 'force' people to sign. Also, forge names. Some absentee OK, when necessary. Trying to use Covid for this Scam!"[23]

  d.  On May 28, 2020, the President tweeted, "MAIL-IN VOTING WILL LEAD TO MASSIVE FRAUD AND ABUSE. IT WILL ALSO LEAD TO THE

---

[21] Sam Levine, *Trump says Republicans would 'never' be elected again if it was easier to vote*, The Guardian (Mar. 30, 2020), https://www.theguardian.com/us-news/2020/mar/30/trump-republican-party-voting-reform-coronavirus.

[22] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 11, 2020, 8:29 p.m.), https://twitter.com/realDonaldTrump/status/1249132374547464193.

[23] Donald J. Trump (@realDonaldTrump), Twitter (May 24, 2020, 10:08 a.m.), https://twitter.com/realDonaldTrump/status/1264558926021959680.

END OF OUR GREAT REPUBLICAN PARTY. WE CAN NEVER LET

THIS TRAGEDY BEFALL OUR NATION . . . ."[24]

e.  On June 22, 2020, the President tweeted, "RIGGED 2020 ELECTION:

MILLIONS OF MAIL-IN BALLOTS WILL BE PRINTED BY FOREIGN

COUNTRIES, AND OTHERS. IT WILL BE THE SCANDAL OF OUR

TIMES!"[25]

f.  Also on June 22, 2020, the President tweeted, "Because of MAIL-IN

BALLOTS, 2020 will be the most RIGGED election in our nations [sic]

history – unless this stupidity is ended. We voted during World War One &

World War Two with no problem but now they are using Covid in order to

cheat by using Mail-Ins!"[26]

g.  On June 28, 2020, the President tweeted, "Absentee Ballots are fine. A person

has to go through a process to get and use them. Mail-In Voting, on the other

hand, will lead to the most corrupt Election is [sic] USA history. Bad things

happen with Mail-Ins. Just look at Special Election in Patterson, N.J. 19% of

Ballots a FRAUD!"[27]

---

[24] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:00 p.m.), https://twitter.com/realDonaldTrump/status/1266172570983940101.

[25] Donald J. Trump (@realDonaldTrump), Twitter (June 22, 2020, 7:16 a.m.), https://twitter.com/realDonaldTrump/status/1275024974579982336.

[26] Donald J. Trump (@realDonaldTrump), Twitter (June 22, 2020, 9:45 a.m.), https://twitter.com/realDonaldTrump/status/1275062328971497472.

[27] Donald J. Trump (@realDonaldTrump), Twitter (June 28, 2020, 10:30 p.m.), https://twitter.com/realDonaldTrump/status/1277429217190428673.

h.  On July 21, 2020, the President tweeted, "Mail-In Voting, unless changed by the courts, will lead to the most CORRUPT ELECTION in our Nation's History! #RIGGEDELECTION."[28]

i.  On July 30, 2020, the President tweeted, "Mail-In Voting is already proving to be a catastrophic disaster. Even testing areas are way off. The Dems talk of foreign influence in voting, but they know that Mail-In Voting is an easy way for foreign countries to enter the race. Even beyond that, there's no accurate count!"[29]

j.  On August 4, 2020, the President tweeted, "Whether you call it Vote by Mail or Absentee Voting, in Florida the election system is Safe and Secure, Tried and True. Florida's Voting system has been cleaned up (we defeated Democrats attempts at change), so in Florida I encourage all to request a Ballot & Vote by Mail! #MAGA."[30]

k.  On August 5, 2020, the President tweeted, "Nevada has ZERO infrastructure for Mail-In Voting. It will be a corrupt disaster if not ended by the Courts. It will take months, or years, to figure out. Florida has built a great

---

[28] Donald J. Trump (@realDonaldTrump), Twitter (July 21, 2020, 7:41 a.m.), https://twitter.com/realDonaldTrump/status/1285540318503407622.

[29] Donald J. Trump (@realDonaldTrump), Twitter (July 30, 2020, 8:10 a.m.), https://twitter.com/realDonaldTrump/status/1288809157722877952.

[30] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 4, 2020, 12:55 p.m.), https://twitter.com/realDonaldTrump/status/1290692768675901440.

infrastructure, over years, with two great Republican Governors. Florida, send in your Ballots!"[31]

l.   On August 15, 2020, the President tweeted, "The honorable thing to do is drop the Mail-In Scam before it is too late! Absentee Ballots, like they have in Florida, are good!"[32]

m.   On August 17, 2020, the President tweeted, "Some states use 'drop boxes' for the collection of Universal Mail-In Ballots. So who is going to 'collect' the Ballots, and what might be done to them prior to tabulation? A Rigged Election? So bad for our Country. Only Absentee Ballots acceptable!"[33]

n.   On August 20, 2020, the President tweeted, "The Democrats are demanding Mail-In Ballots because the enthusiasm meter for Slow Joe Biden is the lowest in recorded history, and they are concerned that very few people will turn out to vote. Instead, they will search & find people, then "harvest" & return Ballots. Not fair!"[34]

o.   On August 20, 2020, the President tweeted, "They are sending out 51,000,000 Ballots to people who haven't even requested a Ballot. Many of those people

---

[31] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2020, 7:08 a.m.), https://twitter.com/realDonaldTrump/status/1290967953542909952.

[32] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 15, 2020, 4:24 p.m.), https://twitter.com/realDonaldTrump/status/1294731591030378497.

[33] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 17, 2020, 11:40 a.m.), https://twitter.com/realDonaldTrump/status/1295385113862090753.

[34] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 20, 2020, 7:57 p.m.), https://twitter.com/realDonaldTrump/status/1296597150181330944.

don't even exist. They are trying to STEAL this election. This should not be allowed!"[35]

159.     During this period, the Trump Campaign or the RNC filed a number of lawsuits against states that allow for voting by mail, including Pennsylvania and California. On June 19, 2020, President Trump said about his election prospects that, "My biggest risk is that we don't win lawsuits" and "We have many lawsuits going all over. And if we don't win those lawsuits, I think—I think it puts the election at risk."[36]

160.     On August 13, 2020, during a television interview, President Trump explained that he opposed additional funding for the Postal Service because he wanted to prevent expanded mail-in voting: "Now they need that money in order to have the post office work so it can take all of these millions and millions of ballots. Now, in the meantime, they aren't getting there. By the way, those are just two items. But if they don't get those two items, that means you can't have universal mail-in voting because they're not equipped to have it."[37]

### *Changes to Postal Operations*

161.     In early July 2020, at the direction of Postmaster General DeJoy, the Postal Service instituted several operational changes affecting how mail is transported.

162.     These operational changes altered "the nature of postal services" and "affect[ed] service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b).

---

[35] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 20, 2020, 8:15 p.m.), https://twitter.com/realDonaldTrump/status/1296601698891374593.

[36] Christina A. Cassidy & Nicholas Riccardi, *Trump: Mail-in voting presents 'biggest risk' to reelection*, AP News (June 19, 2020), https://apnews.com/419b8fc1a387e4f85a914296 51c59b76.

[37] Barbara Sprunt & Alana Wise, *Trump Opposes Postal Service Funding But Says He'd Sign Bill Including It*, NPR (Aug. 13, 2020), https://www.npr.org/2020/08/13/902109991/trump-admits-to-opposing-funding-for-postal-service-to-block-more-voting-by-mail.

163.    At the direction of DeJoy, the Postal Service instituted these operational changes immediately and on a nationwide basis without first obtaining an advisory opinion from the Postal Regulatory Commission.

164.    Two documents prepared by Postal Service employees reflect these operational changes. The first, a document titled "Mandatory Stand-Up Talk: All Employees" was dated July 10, 2020 (the "July 10 Stand-Up Talk," Ex. A). The second, a PowerPoint presentation entitled "PMGs [Postmaster General's] expectations and plans" (the "July PPT," Ex. B) was prepared at around the same time.

165.     "Stand-Up Talks" are a widely used means of providing postal employees with information about changes or updates in Postal Service policies and procedures. Postmasters and supervisors are expected to communicate the contents of a "Stand-Up Talk" to the relevant employees at the beginning of their shift. The relevant employees are then expected to abide by those policies and procedures.

166.    The July 10 Stand-Up Talk states that it must be provided to "all employees" and that "[e]very single employee will receive this information, no matter what job they perform[.]" Out of a need to make "immediate, lasting, and impactful changes," the July 10 Stand-Up Talk ordered an "operational pivot" targeted at the transportation of mail. It provides specific examples of "transportation changes being implemented immediately (today)." These changes included:

> a.  "All trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted."
>
> b.  "Extra trips are no longer authorized or accepted."
>
> c.  "Carriers must begin on time, leave for the street on time, and return on time."

      d.   "Carriers must make the final dispatch of value; no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch."

167.    The functional result of these operational changes is that mail can be delayed at multiple places in the mailstream. If processed mail is not ready when the truck is scheduled to leave the processing plant, then that mail is left behind for the day. If the truck is delayed on its way to the delivery unit, then the carrier must leave on her route at her start time without that day's mail. If the carrier is unable to deliver all of that day's mail before her return time, then she must return to the delivery unit with that mail undelivered and any new mail uncollected. If the mail carrier did not depart with all of that day's mail—for example, because it was too much to carry or because additional mail arrived after she left—then that carrier cannot make extra trips and that mail remains in the delivery unit overnight. And if the carrier returns to the delivery unit after the truck has returned to the plant, then any new mail collected that day remains at the delivery unit overnight and will not be sent to the plant until the following day.

168.    The July 10 Stand-Up Talk acknowledges that as a result of the changes, postal employees will see mail "left behind" and "on the workroom floor or docks" of processing plants. The Stand-Up Talk acknowledges that these consequences are "not typical."

169.    The July 10 Stand-Up Talk estimated that the changes implemented would result in around $200 million in reduced expenses. For Fiscal Year 2019, the Postal Service reported operating revenue of $71.1 billion and operating expenses of $79.9 billion.

170.    In two July 22, 2020, letters to members of Congress (Ex. C), General Counsel Thomas Marshall confirmed that the Postal Service is "taking immediate steps to increase operational efficiency," including by "running operations on-time and on-schedule."

171.     In an August 6, 2020, letter to members of Congress (Ex. D), Postal Service Chief Operating Officer David Williams confirmed that the Postal Service has taken "immediate steps" focused on "improving our transportation efficiency," including "working to eliminate extra and late trips." He also stated that the Postal Service was working to reduce "unnecessary" and "unauthorized" overtime and that "operational managers must ensure that overtime is earned as the result of unexpected volume or other factors pursuant to our normal overtime analysis before it is approved."

172.     Similarly, DeJoy's opening remarks for a Board of Governors meeting on August 7, 2020 (Ex. E), confirm that the Postal Service had taken "immediate steps" focused on "running our operations on time and on schedule, and by not incurring unnecessary overtime or other costs."

173.     In an August 11, 2020, letter to Congresswoman Carolyn Maloney (Ex. F), Marshall confirmed that the Postal Service had taken "immediate steps" focused on "improving our transportation efficiency," including "working to eliminate extra and late trips." He also stated that the Postal Service was working to reduce "unnecessary" and "unauthorized" overtime and that "operational managers must ensure that overtime is earned as the result of unexpected volume or other factors pursuant to our normal overtime analysis before it is approved."

174.     In an internal memo from August 13, 2020 (Ex. G), DeJoy stated that the Postal Service "must make a number of significant changes," including "re-establish[ing] fundamental operating principles and then adher[ing] to them and run[ning] on time." He confirmed that he "began those efforts right away." As a result, he noted that the Postal Service now had an "on-time dispatch schedule" of "97.3 percent, up from 89.8 percent" and had "reduced extra trips by 71 percent."

175.    On August 18, 2020, DeJoy issued a public statement (Ex. H). To "avoid even the appearance of any impact on election mail," he suspended several "initiatives" until "after the [November 2020] election is concluded." DeJoy did not state that these initiatives would be revoked, nor did he state how the Postal Service would operationalize the rollback of these unspecified suspended initiatives.

176.    DeJoy characterized the suspended initiatives as "longstanding operational initiatives" that "predate[d] [his] arrival at the Postal Service." He did not otherwise specify which initiatives would be suspended.

177.    DeJoy also stated that:

    a.   "Retail hours at Post Offices will not change."

    b.   "Mail processing equipment and blue collection boxes will remain where they are."

    c.   "No mail processing facilities will be closed."

    d.   "[O]vertime has, and will continue to be, approved as needed."

178.    In the statement, DeJoy did not address the operational changes instituted at his direction in early July 2020, including the elimination of late and extra trips or the requirement that carriers adhere to rigid schedules.

179.    On August 20, 2020, the Washington Post reported that DeJoy intends to make "far more sweeping changes to the U.S. Postal Service than previously disclosed," including requiring States to pay First-Class postage for ballots in the future.[38]

---

[38] Jacob Bogage, et al., *Postmaster general eyes aggressive changes at Postal Service after election*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/business/2020/08/20/us-postal-service-louis-dejoy/.

## VII. Impact of Service Changes on Mail Delivery

180.    In his August 13, 2020, memo, DeJoy acknowledged that the recent changes had had an effect on service, stating that "this transformative initiative has had unintended consequences that impacted our overall service levels."

181.    Since July 2020, there has been widespread reporting by the news media on changes in Postal Service operations and significant delays in mail delivery across the nation.

182.    Because late trips and extra trips are now prohibited, including in Plaintiff States, mail has been left behind at processing plants and delivery units. Because letter carriers throughout the country, including in Plaintiff States, have been ordered to depart for their routes at set times, even if the processed mail has not yet arrived, and then to return at set times, even if all mail has not yet been delivered, carriers have been forced to leave mail undelivered. And because workers are not allowed to spend sufficient time processing and delivering the mail, the mail piled up, leading to greater delays.[39]

183.    In some areas, substitute workers are not being assigned when another worker is out, for reasons such as contracting COVID-19. While failing to assign substitute workers, USPS is simultaneously experiencing increased package volume.[40]

---

[39] *E.g.*, Michael Sainato, *Postmaster general's changes causing mail delays, USPS workers say*, The Guardian (Aug. 16, 2020), https://www.theguardian.com/business/2020/aug/16/usps-mail-delays-postmaster-general-changes-workers; James Doubek, *Postal Workers Decry Changes And Cost-Cutting Measures*, KUOW (Aug. 11, 2020), https://kuow.org/stories/postal-workers-decry-changes-and-cost-cutting-measures.

[40] *E.g.*, Ellie Rushing, *Mail delays are frustrating Philly residents, and a short-staffed Postal Service is struggling to keep up*, Phila. Inquirer (Aug. 2, 2020), https://www.inquirer.com/news/philadelphia/usps-tracking-in-transit-late-mail-delivery-philadelphia-packages-postal-service-20200802.html; Peter Hall, *Does the mail seem slow? You're not imagining it*, The Morning Call (Aug. 1, 2020), https://www.mcall.com/news/pennsylvania/mc-nws-pa-usps-mail-delivery-operations-slow-20200801-nmabfad46bc43a5mebq23xogbi-story.html.

184.    The combination of too few workers, elimination of late and extra trips, rigid adherence to start and end times, and increased package volume is causing undelivered mail and packages to pile up.[41] In places, this has left rotting food and dead animals inside mail processing plants.[42]

185.    Elected officials, including officials in Plaintiff States, have received thousands of calls about delayed mail.[43]

186.    The operational changes implemented by the Postal Service come as millions of individuals nationwide are complying with stay-at-home and safer-at-home orders in response to the COVID-19 pandemic.

187.    The Pennsylvania Department of Health, for example, recommends that individuals have "access to several weeks of medications and supplies in case you need to stay

---

[41] *E.g.*, Sainato, *supra* note 39.

[42] *E.g.*, Laura J. Nelson & Maya Lau, *'Like Armageddon': Rotting food, dead animals and chaos at postal facilities amid cutbacks*, L.A. Times (Aug. 20, 2020), https://www.latimes.com/california/story/2020-08-20/usps-cutbacks-post-office-chaos; Scott Thistle, *Chicks shipped by mail are arriving dead, costing Maine farmers thousands of dollars*, Sun Journal (Aug. 19, 2020), https://www.sunjournal.com/2020/08/19/dead-chick-deliveries-costing-maine-farmers-thousands-of-dollars/.

[43] *E.g.*, Ellie Rushing & Jonathan Lai, *Philly mail delays are raising alarms about the 2020 election: 'This is a huge problem'*, Phila. Inquirer, (Aug. 6, 2020), https://www.inquirer.com/politics/election/mail-voting-phiadelphia-post-office-delays-20200806.html; Daniel Moore, *Should the USPS run like a business? Yearslong dispute roils mail delivery ahead of 2020 elections*, Pittsburgh Post-Gazette (Aug. 16, 2020), https://www.post-gazette.com/news/insight/2020/08/16/United-States-Postal-Service-mail-delivery-2020-elections-Trump-Doyle-Kelly-Toomey/stories/202008160025.

home for prolonged periods of time."[44] As a result, many people now rely on the mail for basic supplies.[45]

188.    Consequently, delays in the mail mean that individuals are not receiving essential items, such as medicine, paychecks, and unemployment benefits.[46] In Pennsylvania, for example, some residents are have gone three weeks without packages and letters that would otherwise deliver medication, paychecks, and bills.[47] Customers across southern Maine have experienced delays on as many as 65,000 pieces of mail. Delaware state agencies have reported significant delays in the delivery of important mail, such as checks from the State Pension Office and EBT cards being delivered to recipients. In North Carolina, there have been sustained reports of late delivery—by at least two weeks—of mail and packages, including mail and packages that small businesses depend on and medicines for those in rural communities.[48] In California, one 77-year old resident with asthma complained of not receiving her inhaler for three weeks in the mail, despite it usually only taking three to five days.[49] Another California resident reported that it recently took nine days for a letter with First-Class postage to be delivered from San Diego to

---

[44] Pennsylvania Dep't of Health, *COVID-19 Information for At Risk Individuals* (last updated May 12, 2020), https://www.health.pa.gov/topics/disease/coronavirus/Pages/Guidance/At-Risk-Individuals.aspx.

[45] *E.g.*, Julie Zauzmer, *Amid national Postal Service crisis, D.C. area residents struggle without consistent mail*, Wash. Post (Aug. 15, 2020), https://www.washingtonpost.com/dc-md-va/2020/08/15/amid-national-postal-service-crisis-dc-area-residents-struggle-without-consistent-mail/.

[46] *E.g.*, Zauzmer, *supra* note 45.

[47] *See supra* note 43.

[48] Michelle Wolf, *Mail delays hurting local small business owners*, MyFox8 (Aug. 9, 2020), https://myfox8.com/news/mail-delays-hurting-local-small-business-owners/.

[49] Kate Irby, *US Postal Service suspending cuts — but will it help Californians?* Sacramento Bee (Aug. 18, 2020), https://www.sacbee.com/news/local/article245050900.html.

San Jose.[50] One California resident living in a rural area reported that she did not receive any mail for a month, and ended up receiving two sets of bills in one day.[51] California residents are incurring late-penalties because they have not received bills, and therefore cannot pay bills on time.[52]

189.    Many Native American tribes in California depend solely on USPS to send and receive mail. Tribes are required to submit in writing to request to be notified of proposed projects within an area that is traditionally and culturally affiliated. Tribes must respond in writing within 30 days of receipt of the formal notification and request consultation on the proposed project. Without this request, there is no requirement that an organization implementing a proposed project engage in tribal consultation for the protection of Native American burials and cultural resources. USPS delays will increase missed deadlines and responses to lead agencies for the protection on Native American burials and cultural resources.

190.    USPS delays deprive people of important prescription medication. Veterans and VA staff told members of the Senate Committee on Veterans' Affairs that medications "are often taking weeks to be delivered and causing veterans to miss doses of vital medications."[53] One postal worker reported that a pharmaceutical company had complained that there were delays in

---

[50] Emily Deruy, *Q&A: What does the Postal Service kerfuffle mean for California voters?*, The Mercury News (Aug. 18, 2020), https://www.mercurynews.com/2020/08/18/qa-what-does-the-postal-service-kerfuffle-mean-for-california-voters/.

[51] Kate Cimini, *Late deliveries, missing mail: Hundreds of Salinas residents want answers from USPS*, Salinas Californian (July 22, 2020), https://www.thecalifornian.com/story/news/2020/07/22/rural-california-residents-take-issue-u-s-postal-service/5456022002/.

[52] Cimini, *supra* note 51.

[53] Letter from Sen. Jon Tester, Sen. Gary Peters, and 29 other Senators to Postmaster General Louis DeJoy (Aug.13, 2020), https://www.veterans.senate.gov/download/usps-delays.

picking up its outgoing shipments.[54] One California resident reported that his eye medications took about 20 days to arrive from the time they were ordered from the local VA.[55]

191.    Businesses, too, are not receiving essential payments, some going as long as two weeks without mail.[56] Small businesses in particular rely heavily on the Postal Service to ship products and pay vendors, and delays can have an outsized impact on business reputation and customer retention.[57] In 2019, 70 percent of businesses with fewer than 10 employees had used USPS within the previous six months and the majority use USPS more than any other vendor.[58] In California, one business reported that customers have not received a packages shipped via USPS for one to two weeks, when those packages were supposed to arrive within two days.[59] Other businesses report that their payment checks from vendors are not arriving, forcing business owners to incur extra costs to cancel checks and wire funds instead.[60] And yet other businesses have had to reimburse customers for products that have not arrived on time via USPS, sometimes

---

[54] Brian Naylor, *Pending Postal Service Changes Could Delay Mail And Deliveries, Advocates Warn*, NPR (July 29, 2020), https://www.npr.org/2020/07/29/894799516/pending-postal-service-changes-could-delay-mail-and-deliveries-advocates-warn.

[55] Rosalind Adam, et al., *USPS Delays Are Causing People To Get Their Prescriptions Late*, BuzzFeed News (Aug. 17, 2020) https://www.buzzfeednews.com/article/rosalindadams/post-office-delay-prescription-medicine.

[56] Zauzmer, *supra* note 45.

[57] Samantha Masunaga, *How Postal Service cutbacks have left small businesses hurting*, L.A. Times (Aug. 19, 2020), https://www.latimes.com/business/story/2020-08-19/usps-changes-hurt-small-businesses.

[58] USPS OIG, *From Home Office to Post Office: Improving Microbusiness Engagement with the U.S. Postal Service* (Sept. 4, 2019), https://www.uspsoig.gov/sites/default/files/document-library-files/2019/RISC-WP-19-008.pdf.

[59] *Residents Throughout SoCal Report Increase In Package Delays From USPS*, CBS Los Angeles (Aug. 15, 2020), https://losangeles.cbslocal.com/2020/08/15/residents-throughout-socal-report-increase-in-package-delays-from-usps/.

[60] Masunaga, *supra* note 57.

having to ship replacement products through another delivery service, which cuts into business profits.[61]

192.    State contracting and purchasing has also been impacted. The Pennsylvania Department of General Services has received numerous complaints from vendors concerning checks that appear to have been lost in the mail. The Department has also noticed that incoming mail from USPS has slowed significantly; on some occasions no mail is delivered and on other days what amounts to multiple days of mail is dropped off.

193.    Mail delays have also slowed the delivery of legal documents and impeded legal proceedings. The Pennsylvania Department of Labor reports that at least 20 hearings before the Unemployment Compensation Review Board have been continued because the parties have not received the hearing notices (mailed 14 days in advance) or the documents for the telephone hearings (mailed 5 days in advance). There have also been delays in receipt of Department determinations and referee decisions, resulting in late appeals. The Pennsylvania Office of General Counsel's Criminal Unit, which handles extradition and interstate rendition matters, has experienced delays of a week to ten days in receiving extradition requests sent by USPS mail from Pennsylvania counties.

194.    California's state agencies have been impacted by USPS delays, including various delayed licenses, payments, job applications, exams, lease payments, unemployment claims, equipment, hearing notices and other notices, subpoenas, personal protective equipment, and contracts, among other critical items.

---

[61] Masunaga, *supra* note 57.

## VIII. Impact on the 2020 General Election

195.    The effects of the Postal Service's operational changes also come on the eve of an election in which "an unprecedented number of people plan to vote by mail."[62]

196.    In late July 2020, General Counsel Marshall sent letters to 46 states and the District of Columbia warning that the Postal Service cannot guarantee all ballots sent by mail for the November election will arrive in time to be counted.

197.    Every Plaintiff State received a tailored version of this letter (the "Marshall Letters," Ex. I).

198.    The letters explained that, under the Postal Service's reading of several of Plaintiff States' election laws, "certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards." Marshall cautioned Plaintiff States that any "mismatch creates a risk"—and for California, a "significant risk"—"that ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them."

199.    Marshall explained that "most domestic First-Class Mail is delivered 2-5 days after it is received by the Postal Service, and most domestic Marketing Mail is delivered 3-10 days after it is received."

200.    Marshall recommended "that election officials use First-Class Mail to transmit blank ballots and allow 1 week for delivery to voters." If election officials use Marketing Mail, it "will result in slower delivery times and will increase the risk that voters will not receive their ballots in time to return them by mail."

---

[62] Zauzmer, *supra* note 45.

201.    The Marshall Letters did not reference or reaffirm any of the Postal Service's longstanding practices and policies of treating Election Mail with the highest priority and providing Election Mail with First-Class Mail delivery standards.

202.    The Marshall Letters assumed that the Postal Service was operating pursuant to its normal delivery standards. The letters did not reference the operational changes instituted in early July 2020 that have significantly undermined the Postal Service's ability to meet its normal delivery standards.

203.    For the November 2020 general election, Pennsylvania, Delaware, and Maine require ballots to be received on or before Election Day to be counted. North Carolina requires ballots to be received on or before Election Day, or postmarked on or before Election Day and received by November 6. Massachusetts, the District of Columbia, and California require ballots to be postmarked on or before Election Day and received by November 6, November 13, and November 20, respectively.

204.    In response to the Marshall Letter, Pennsylvania requested the Pennsylvania Supreme Court to order that mail ballots be counted as long as they are received by the Friday after Election Day and postmarked on or before Election Day.[63]

205.    In response to USPS delays and President Trump's remarks, voters have reported that they "have great fear they [their] vote won't count" because they are "not sure if [they] can trust the mail right now."[64] Voters who have experienced mail delays, "will definitely vote" but

---

[63] Jonathan Lai & Ellie Rushing, *USPS says Pennsylvania mail ballots may not be delivered on time, and state warns of 'overwhelming' risk to voters*, Phila. Inquirer (updated Aug. 16, 2020), https://www.inquirer.com/politics/election/pennsylvania-mail-voting-deadlines-post-office-lawsuit-20200813.html.

[64] Irby, *supra* note 49.

will not "use the mail for it because of the delays."[65] These voters are making plans to "go in person to make sure [they're] counted,"[66] which poses the risk of exposure to COVID-19. California's Secretary of State has received a significant increase in calls and inquiries from voters concerned about the November 2020 general election and the implications of potential USPS delays.

206.    The service delays caused by Postal Service's implementation of sweeping new policies in the midst of a pandemic may disenfranchise voters because their ballots will not be sent or received in time and may deter people from voting because they do not trust that their ballot will be delivered.

207.    During the global pandemic, voting by mail is the safest method for all voters.[67] To reduce the risk of contracting COVID-19, individuals are advised to limit interactions with other people as much as possible, including by reducing otherwise routine events, such as visiting the pharmacy.[68]

208.    The need to limit even routine interactions makes the option to vote by mail an essential option for all voters, but particularly important for those who are most likely to become severely ill.[69]

---

[65] Rushing & Lai, *supra* note 43.

[66] Irby, *supra* note 49.

[67] Rushing & Lai, *supra* note 43; Sam Levine, *Postal service changes pose threat to voting, says former USPS deputy*, The Guardian (Aug. 13, 2020), https://www.theguardian.com/us-news/2020/aug/13/united-states-postal-service-trump-republicans.

[68] CDC, Coronavirus Disease 2019, *Your Health, Older Adults* (updated Aug. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[69] CDC, Coronavirus Disease 2019 (COVID-19), *Your Health, People Who Are at Increased Risk for Severe Illness* (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html.

209.     The option to vote by mail is critically important for people over 65. Eighty

percent of deaths from COVID-19 have been adults 65 and older and the rate of hospitalizations

per 100,000 population due to COVID-19 drastically increases with age: from 27.2 for those 18-

29, to 136.1 for those 50-64, 198.7 for those 65-74, 329.3 for those 75-84, and 513.2 for those 85

and older.[70] In California alone, almost 75 percent of the over 11,000 deaths from COVID-19

have been adults age 65 and older.[71]

210.     People of any age are also at an increased risk of severe illness from COVID-19 if

they have any of a host of underlying health conditions,[72] although many of those conditions are

more prevalent among older adults.[73]

211.     Voters over 65 and those with disabilities are already the most likely to vote by

mail nationwide.[74] A national survey of the 2016 election found that "'33 percent of voters 70

---

[70] Nat'l Ctr. for Health Statistics Mortality Reporting System, *Coronavirus Disease 2019 (COVID-19)-Associated Hospitalization Surveillance Network (COVID-NET)* (data through week ending June 6, 2020) https://www.cdc.gov/coronavirus/2019-ncov/images/need-extra-precautions/high-risk-age.jpg; CDC, Coronavirus Disease 2019, *Your Health, Older Adults* (updated Aug. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[71] Cal. Dep't of Public Health, *Cases and Deaths Associated with COVID-19 by Age Group in California* (Aug. 18, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-19-Cases-by-Age-Group.aspx.

[72] CDC, Coronavirus Disease 2019, *Your Health, People with Certain Medical Conditions* (updated Aug. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

[73] Pa. Dep't of Health, *COVID-19 Information for At Risk Individuals* (updated May 12, 2020), https://www.health.pa.gov/topics/disease/coronavirus/Pages/Guidance/At-Risk-Individuals.aspx.

[74] Kevin Morris, *Who Votes by Mail?*, Brennan Center for Justice (Apr. 15, 2020), https://www.brennancenter.org/our-work/analysis-opinion/who-votes-mail; Charles Stewart III, *Some Demographics on Voting by Mail*, Election Updates (Mar. 20, 2020), https://election

---

years and older voted absentee, compared to 20 percent of voters in their thirties' and that '30 percent of voters with a disability that kept the voter "from participating fully in work, school, housework, or other activities" voted absentee, compared to 22 percent of voters without a disability.'"[75]

212.    In response to COVID-19, the Centers for Disease Control and Prevention (CDC) guidance recommends election officials consider "offering alternatives to in-person voting if allowed in the jurisdiction," and relocate polling places away from "nursing homes, long-term care facilities, and senior living residences, to help protect older adults and those with medical conditions." For voters, the CDC recommends considering "voting alternatives available in your jurisdiction that minimize contact," including "us[ing] early voting, if available," and "vot[ing] at off-peak times."[76]

213.    Pennsylvania Governor Tom Wolf and Secretary of the Commonwealth Kathy Boockvar both encouraged voters in the June primary election to "vote safely" by mail,[77] as have leaders of other Plaintiff States.[78] Both Republican and Democratic party officials in

---

updates.caltech.edu/2020/03/20/some-demographics-on-voting-by-mail/ (citing data from the Cooperative Congressional Election Study, Harvard University, https://cces.gov.harvard.edu/).

[75] U.S. Election Assistance Comm'n, Election Administration and Voting Survey, *Deep Dive, Early, Absentee, and Mail Voting* (Oct. 17, 2017), https://www.eac.gov/sites/default/files/document_library/files/eavsdeepdive_earlyvoting_101717.pdf (quoting Charles Stewart III, *2016 Survey of the Performance of American Elections*, MIT 13, https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/Y38VIQ#).

[76] CDC, Coronavirus Disease 2019, *Community, Work & School, Considerations for Election Polling Locations* (updated June 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

[77] Press Release, *Gov. Wolf Encourages Voters to Apply for a Mail-in Ballot* (Apr. 22, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-encourages-voters-to-apply-for-a-mail-in-ballot/.

[78] Governor John Carney (@JohnCarneyDE), Twitter (Aug. 18, 2020, 11:13 a.m.), https://twitter.com/JohnCarneyDE/status/1295740564969869320. California Governor Gavin

Pennsylvania "have encouraged people to vote by mail amid concerns from county officials who fear the virus will make it difficult to find polling places and get poll workers to staff them."[79]

## IX. Harm to the States as a Result of Defendants' Actions

214.    Defendants' actions have caused and will continue to cause injury to the States' sovereign, quasi-sovereign, and proprietary interests.

215.    Defendants are undermining the States' efforts to fairly administer their own elections pursuant to the authority vested in them by the Constitution. As a result, Defendants have caused and will continue to cause harm to the States' sovereign interests, which include prescribing the method of selecting their representatives in the federal system to ensure equal sovereignty. In addition to the federal elections, the States will conduct their own statewide and local elections on Election Day. The conduct of state elections, in conformance with the Constitution and federal law, is a central component of State sovereignty.

216.    In addition, Defendants' actions will also force the States to devote significant additional resources to administering their elections, harming the States' proprietary interests.

217.    Many States will be required to devote additional resources to encouraging voters to return their ballots earlier than otherwise necessary, and will be required to implement

---

Newsom passed an executive order, later ratified by the California Legislature, to automatically send mail-in ballots to registered active voters for the November 2020 general election because "[n]o Californian should be forced to risk their health in order to exercise their right to vote." Press Release, *Governor Newsom Issues Executive Order to Protect Public Health by Mailing Every Registered Voter a Ballot Ahead of the November General Election* (May 8, 2020), https://www.gov.ca.gov/2020/05/08/governor-newsom-issues-executive-order-to-protect-public-health-by-mailing-every-registered-voter-a-ballot-ahead-of-the-november-general-election/.

[79] 6ABC, *Pennsylvania boosting efforts to promote voting by mail amid COVID-19 pandemic* (Apr. 22, 2020), https://6abc.com/coronavirus-pennsylvania-reopen-pennsylvnania-one-retailer-customer-stay-at-home/6122146/.

alternate means for voters to submit mail-in ballots, as a result of the delay in mail service caused by Defendants' actions.

218.    The delays in mail service caused by Defendants' actions have harmed and will continue to harm the States in other ways. For instance, the States all depend on the operation of the Postal Service to perform essential government functions, including collecting revenue and providing services to their citizens. Delays in mail delivery caused by Defendants' actions thus cause direct harm to the States.

219.    Administrative and state judicial systems in each of the States depend on operation of the mail to provide notice to parties and others about proceedings. Delays in mail delivery caused by Defendants' actions have undermined the efficient operation of legal proceedings in the States.

220.    State criminal law proceedings also rely on the Postal Service for delivery of important legal documents. Delays in the delivery of mail risk undermining the enforcement of criminal law.

221.    The States are also consumers of goods and services and frequently procure and pay for items using the Postal Service. Delays in delivery of goods and payment harm business relationships and deprive the States of the use of items purchased.

## CAUSES OF ACTION

## COUNT I

## Violation of Postal Reorganization Act – 39 U.S.C. § 3661

222.    Plaintiffs incorporate by reference the foregoing paragraphs as if they were set forth fully herein.

223.    Whenever the Postal Service "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially

nationwide basis" the Postal Service must first "submit a proposal, within a reasonable time prior

to the effective date of such proposal, to the Postal Regulatory Commission requesting an

advisory opinion on the change." 39 U.S.C. § 3661(b). Before the Commission issues an

advisory opinion, it must hold a hearing on the record. *Id.* § 3661(c). The public is entitled to

submit comments in proceedings before the Commission. 39 C.F.R. § 3010.140.

224.     As reflected in the July 10 Stand-Up Talk, the July PPT, letters to Congress,

public statements, and internal memorandum, Defendants changed the nature of postal services

in July 2020. Defendants adopted new operational policies that, among other things, prohibit late

or extra trips by postal workers that are often necessary to keep the mail moving forward in the

mailstream, require carriers to adhere rigidly to start and stop times regardless of whether all

mail for their route has arrived or been delivered, and limit the use of overtime. As the July 10

Stand-Up Talk concedes, a consequence of the recent changes is that some mail will be "left

behind." Before these changes, such results were "not typical." And as Defendant DeJoy

concedes, these changes "had unintended consequences that impacted our overall service levels."

225.     Defendants' recent changes to postal services have nationwide effect. The

changes reflected in the July 10 Stand-Up Take were to be communicated to "[e]very single

[Postal Service] employee . . . no matter what job they perform." In subsequent letters to

Congress and internal memorandum, the Postal Service has confirmed that the changes

documented in the July 10 Stand-Up Talk are part of a nationwide change to the operation of

postal services.

226.     Despite the recent nationwide changes to the nature of postal services, the Postal

Service did not first submit a proposal to the Commission or seek an advisory opinion before

implementing the changes, depriving the public of an opportunity to comment on the changes before they took effect.

227.    Because Defendants did not submit a proposal of the recently enacted changes to, or seek an advisory opinion from, the Commission before the changes took effect, Defendants acted beyond their statutory authority and the changes are *ultra vires*.

## COUNT II

### Violation of Postal Reorganization Act – 39 U.S.C. §§ 101, 403

228.    Plaintiffs incorporate by reference the foregoing paragraphs as if they were set forth fully herein.

229.    The PRA mandates that it "shall be the responsibility of the Postal Service to maintain an efficient system of collection, sorting, and delivery of the mail nationwide." 39 U.S.C. § 403(b)(1).

230.    Under the PRA, the "Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C. § 403(a).

231.    When "determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

232.    As reflected in the July 10 Stand-Up Talk, the July PPT, letters to Congress, public statements, and internal memorandum, Defendants adopted new operational policies in July 2020 that, among other things, prohibit late or extra trips by postal workers that are often necessary to keep the mail moving forward in the mailstream, require carriers to adhere rigidly to start and stop times regardless of whether all mail for their route has arrived or been delivered, and limit the use of overtime. As the July 10 Stand-Up Talk concedes, a consequence of the

recent changes is that some mail will be "left behind." Before these changes, such results were "not typical."

233.    As reflected in the Marshall Letters, Defendants intend to abandon their longstanding practice of giving Election Mail the highest priority regardless of the class of mail.

234.    The policies adopted by Defendants in July 2020 undermine the Postal Service's "efficient system of collection, sorting, and delivery of the mail nationwide" and fail to "provide adequate and efficient postal services."

235.    The policies adopted by Defendants in July 2020 also fail to "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery" of Election Mail, which is "important letter mail."

236.    As a result, Defendants acted beyond their statutory authority and the policy changes are *ultra vires*.

## COUNT III

### Violations of the Elections Clause – U.S. Constitution, Article I, Section IV, Clause 1 & the Electors Clause – U.S. Constitution, Article II, Section I, Clause II

237.    Plaintiffs incorporate by reference the foregoing paragraphs as if they were set forth fully herein.

238.    The Constitution's Elections Clause vests authority in the States to regulate the "The Times, Places and Manner of holding Elections for Senators and Representatives" that will represent that State. U.S. Const. art. I, § 4, cl. 1. Only Congress may displace how a State has chosen to regulate the time, place, and manner of a federal election. *Id.*

239.    Plaintiffs have exercised their authority under the Elections Clause to allow voters to vote by mail.

240.    Congress has not passed any laws that conflict with Plaintiffs' exercise of authority under the Elections Clause.

241.    The Constitution's Electors Clause vests authority in the States to appoint "a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const., art. II, § 1, cl. 2.

242.    Plaintiffs have exercised their authority under the Electors Clause to appoint their presidential electors based on the results of popular elections and have directed that voters may cast ballots for presidential electors by mail.

243.    Plaintiffs have exercised their authority under the Elections Clause and the Electors Clause in reliance on the Postal Service's history of timely delivering Election Mail and treating Election Mail with the highest priority.

244.    Defendants have abruptly and unlawfully impaired the operation of the postal services and have acted to cast doubt on the Postal Service's ability to facilitate mail-in voting.

245.    As a result, Defendants have interfered with how Plaintiffs have exercised their authority under the Elections Clause and thus violated Plaintiffs' constitutional authority to set the "Times, Places and Manner of holding Elections for Senators and Representatives."

246.    Defendants have further interfered with how Plaintiffs have exercised their authority under the Electors Clause and thus violated Plaintiffs' constitutional authority to appoint presidential electors.

## COUNT IV

### Violation of the 26th Amendment to the U.S. Constitution

247.     Plaintiffs incorporate by reference the foregoing paragraphs as if they were set forth fully herein.

248.     The 26th Amendment to the U.S. Constitution guarantees that "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."

249.     Plaintiffs have a sovereign interest in their elected officials best representing the people of the respective States in the federal system, which Plaintiffs accomplish by exercising their constitutional authority over the time, place, and manner of elections to maximize the number of voters, including establishing voting by mail.

250.     Defendants' changes to postal services will significantly and disproportionately harm older voters, who are more likely to vote by mail and more at risk of serious harm from COVID-19.

251.     Defendants made changes to the nature of postal services in a manner that departed from normal procedure because Defendants did not first submit a proposal of the newly implemented changes to the Commission.

252.     Defendants' recently implemented changes are intended to interfere with the Plaintiffs' ability to count votes cast by mail and to make voters in Plaintiff States, especially senior citizens, less willing to vote by mail.

253.     Because Defendants have acted in a way that disenfranchises voters on the basis of age, Defendants have violated the 26th Amendment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in their favor and grant the following relief:

a. Declare that the operational and policy changes adopted by Defendants in July 2020—which include prohibiting late or extra trips by postal workers that are often necessary to keep the mail moving forward in the mailstream, requiring carriers to adhere rigidly to start and stop times regardless of whether all mail for their route has arrived or been delivered, limiting the use of overtime, and failing to treat Election Mail with the highest priority—are unlawful;

b. Vacate the operational and policy changes adopted by Defendants in July 2020;

c. Preliminarily and permanently enjoin Defendants from:

    i. Continuing to implement and enforce the operational and policy changes adopted by Defendants in July 2020; failing to rescind these operational and policy changes to the extent they have been implemented; and failing to restore service to the levels provided before the unlawful changes;

    ii. Instituting any changes with a nationwide or substantially nationwide effect on delivery services without first seeking an advisory opinion from the PRC pursuant to 39 U.S.C. § 3661 and seeking public input as required by the statute and by regulation;

    iii. Failing to adhere to the Postal Service's longstanding practice of treating Election Mail with the highest priority and as First-Class Mail regardless of the class of mail;

    iv. Failing to postmark every piece of Election Mail the day it is received by USPS; and

     v.   Prohibiting overtime, late trips, and extra trips during the week before, day of, and 17 days after the November 2020 general election.

d.  Appoint an independent monitor to oversee Defendants' compliance with the terms of the Court's order;

e.  Award Plaintiffs reasonable costs, including attorneys' fees; and

f.  Grant such other and further relief as the Court deems just and proper.

August 21, 2020                          Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania
MICHAEL J. FISCHER (Pa. Bar. No. 322311)
Chief Deputy Attorney General

 s/ *Aimee D. Thomson*
AIMEE D. THOMSON (Pa. Bar. No. 326328)
RYAN B. SMITH (Pa. Bar. No. 324643)
JACOB B. BOYER (Pa. Bar. No. 324396)
Deputy Attorneys General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 374-2787
athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

XAVIER BECERRA
Attorney General
State of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SUSAN SLAGER
Supervising Deputy Attorney General
ANTHONY O'BRIEN**
JASLEEN SINGH**
LISA C. EHRLICH**
Deputy Attorneys General
Office of the Attorney General for the
State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3489
Lisa.Ehrlich@doj.ca.gov
*Attorneys for Plaintiff State of California*

KATHLEEN JENNINGS
Attorney General
State of Delaware
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
JILLIAN A. LAZAR
VANESSA L. GEORGE***
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Vanessa.Kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
*Attorney General*
*District of Columbia*
KATHLEEN KONOPKA*
Deputy Attorney General, Public Advocacy
Division
BRENDAN B. DOWNES*
Assistant Attorney General, Public Advocacy
Division
Office of the Attorney General for the District
of Columbia
400 6th St. NW
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
*Attorneys for Plaintiff District of Columbia*

AARON M. FREY
Attorney General
State of Maine
SUSAN P. HERMAN*
Chief Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
T (207) 626-8814
susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

MAURA HEALEY
Attorney General
Commonwealth of Massachusetts
DAVID C. KRAVITZ*
Deputy State Solicitor
Office of Attorney General Maura Healey
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2427
david.kravitz@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

JOSHUA H. STEIN
Attorney General
State of North Carolina
SRIPRIYA NARASIMHAN*
Deputy General Counsel
SARAH G. BOYCE*
Deputy Solicitor General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
snarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*Appearing pro hac vice (applications forthcoming)*

**Appearing pro hac vice (applications pending)*

*** Application for admission forthcoming*