UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>                      Plaintiffs,<br><br>                v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>                      Defendants. | No. 2:20-cv-4096 |

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

    In the upcoming election, more voters than ever are expected to vote by mail. Plaintiffs have all established no-excuse mail-in voting and have encouraged their citizens to vote by mail as a safe and secure alternative to voting in person. Because of the COVID-19 pandemic, voting by mail will be, for many, the safest way to vote. Voting by mail is about to begin in the Plaintiff States, with two Plaintiff States starting to mail ballots the first week of September.

    Despite the critical role the U.S. Postal Service (USPS or Postal Service) is set to play in America's democratic process, Defendants made changes to postal services in July 2020 that affect how mail in general, and Election Mail in particular, is transported, processed, and delivered. Those changes already have delayed delivery across the country, which in turn has

raised concerns that the Postal Service will not be able to efficiently and reliably deliver ballots during the November 2020 general election.

In response to public concern, Defendants have issued letters and statements and Defendant DeJoy has testified before Congress twice. Defendants' public-facing communications, coupled with DeJoy's testimony, confirm that in July 2020 the Postal Service made "transformative" changes to postal service transportation, processing, and delivery practices that negatively affected mail service across the country. But inconsistencies in these statements and DeJoy's testimony have led to continued uncertainty about what level of service the Postal Service plans to provide absentee and mail-in ballot applications and blank and completed ballots during the November 2020 general election.

Plaintiffs will soon file an expedited motion for preliminary injunction to enjoin Defendants' improper changes to Postal Service operations, to remedy ongoing harm, to require Defendants to adhere to their longstanding practice of prioritizing ballots, and to ensure that the harm caused by Defendants' recent changes is addressed far enough in advance of the upcoming election that it does not to undermine voters' willingness, and ability, to vote by mail.

In advance of that motion, Plaintiffs now seek expedited discovery in this case. Expedited discovery is warranted here because the November 2020 general election is rapidly approaching and Plaintiffs seek only narrowly tailored categories of information to support their motion for preliminary injunction (see Plaintiffs' proposed discovery requests, Ex. 1). Defendants will already be providing information in response to expedited discovery granted in a similar suit. Order Granting Plaintiffs' Motion For Expedited Discovery (ECF No. 38), *Washington, et al. v. Trump, et al.*, No. 20-3127 (E.D. Wa. Aug. 27, 2020) (granting motion for expedited discovery).

## BACKGROUND

The Postal Service is a fundamental public service dedicated to the "prompt, reliable, and efficient" delivery of mail. 39 U.S.C. § 101(a). The processing and delivery of mail in the Postal Service network is a highly integrated and complex cycle through which an average of 470 million mailpieces move every day. Compl. ¶ 121 (ECF No. 1). The majority of incoming mail is processed—i.e., separated, sorted, and arranged for transportation and delivery—overnight by postal workers and mail handlers at mail processing facilities. *Id.* ¶ 123. Processed mail is dispatched in trucks from the processing facilities in the very early morning (often 5 or 6 a.m.), where it travels either to non-local destinations for further processing or to delivery units (e.g., a post office or carrier station) for delivery to local destinations. *Id.* Processed mail ready for delivery normally arrives at the delivery unit in the morning (often 8 or 9 a.m.). *Id.* ¶ 124. Carriers deliver the processed mail and collect new mail on foot or by vehicle in a prescribed area during general business hours (i.e., between approximately 9 a.m. and 6 p.m.). *Id.* In the evening, mail collected by carriers on their routes and mail collected by clerks at post offices is sent from the delivery unit by truck to the processing plant. *Id.* When the collected mail arrives at the processing plant, the cycle begins again. *Id.*

Due to its public service commitment, the Postal Service has long operated under a practice of "every piece, every day": every piece of mail is moved out of the processing facility for further transport, or out of the delivery unit for delivery, every day. *Id.* ¶ 125. As a result, overtime is often necessary, particularly when processing facilities or mail routes are understaffed. *Id.* Likewise, it is commonplace for a truck to be held until the final tray of processed mail is loaded on board, or for a letter carrier to wait until that day's mail has arrived before departing on her route and to stay on her route until every piece of mail is delivered. *Id.*

Doing otherwise would introduce choke points in the mail cycle, causing mail to pile up on docks and in post offices.

In reliance on the "fundamental service" provided by the Postal Service, 39 U.S.C. § 101(a), all states have established some form of voting by mail, Compl. ¶¶ 128-130 (ECF No. 1). The delivery of Election Mail, which includes absentee and mail-in ballot applications and blank and completed ballots, makes the Postal Service "an important part of the U.S. election process." *Id.* ¶¶ 131-152. The Postal Service has long followed a practice of providing the "highest level of service" in processing and delivering Election Mail, regardless of the class of mail used or the amount of postage. *Id.*

In July 2020, following the appointment of Defendant DeJoy, Defendants changed or suggested changes to these longstanding policies. The resulting delays have already caused harm to Plaintiffs and their citizens, while the risk of continuing delays, coupled with mixed messages from the Postal Service over its treatment of Election Mail, threatens to undermine Plaintiffs' ability to conduct a free and fair election this fall.

First, Defendants abruptly instituted a "transformative initiative" that changed how the Postal Service transported and delivered mail. Compl. App'x Ex. G (ECF No. 1-1); *see* Compl. ¶¶ 164-168 (ECF No. 1). Under this initiative, overtime was strongly discouraged, if not eliminated entirely. *E.g.*, Compl. App'x Ex. B (ECF No. 1-1) ("Overtime will be eliminated."); Compl. App'x Ex. C (ECF No. 1-1) ("The document entitled 'PMG's Expectations and Plan' [Compl. App'x Ex. B (ECF No. 1-1)] was prepared by a mid-level manager in one district[.]"). Trucks were ordered to leave processing facilities and delivery units at set times irrespective of whether all of that day's mail was on board. *E.g.*, Compl. App'x Ex. A (ECF No. 1-1). Letter carriers were ordered to depart for their delivery routes at set times and return at set times

4

irrespective of whether that day's mail had arrived or had been delivered. *Id.* Postal Service employees were ordered to no longer make any extra trips that might otherwise ensure that the mail continued to move forward in the mail cycle. *Id.* The result of these changes created choke points in the mailstream, causing mail to be delayed. Compl. ¶¶ 164-168 (ECF No. 1).

The existence of these changes is reflected in internal Postal Service documents, public statements from Defendant DeJoy, letters from the Postal Service to members of Congress, and in Defendant DeJoy's testimony before Congress. *See* Compl. ¶¶ 164-166, 170-174 (ECF No. 1); Compl. App'x Exs. A-H (ECF No. 1-1); *Examining the Finances and Operations of the United States Postal Service During COVID-19 and Upcoming Elections Before the S. Comm. on Homeland Security & Governmental Affairs*, 116th Cong., at 25:52, 29:17, 1:22:42 (Aug. 21, 2020) [the "Senate testimony"];[1] *Protecting the Timely Delivery of Mail, Medicine, and Mail-in Ballots: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. at 39:03 (Aug. 25, 2020) [the "House testimony"].[2] Indeed, Defendant DeJoy stated that he had "directed" that the Postal Service "develop and execute on a plan to improve our adherence to the transportation schedule of [their] over 40,000 trips a day." House Testimony at 39:03.

As a result of these changes, mail delivery has been delayed across the country. *E.g.*, Compl. ¶¶ 180-194 (ECF No. 1); USPS, *Service Performance Measurement – PMG Briefing* (Aug. 12, 2020) (Ex. 2) (showing sharp decreases in mail service beginning on or about July 11, 2020); USPS, *Eastern Area AIM Meeting – Service Update* 2, 4, 6 (Aug. 4, 2020)[3] (Ex. 3) (showing sharp decreases in mail service beginning during Week 41 of the USPS fiscal year,

---

[1] Unofficial transcript available at: https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[2] Unofficial transcript available at: https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

[3] https://postalpro.usps.com/node/8407.

which corresponds to approximately July 14, 2020); USPS, *Pacific Area AIM Meeting Presentation* 26, 28, 29 (Aug. 13, 2020)[4] (Ex. 4) (showing sharp decreases in mail service beginning on or about July 11, 2020). Although Defendants have suspended other initiatives until after the election, *see* Compl. ¶¶ 175-178 (ECF No. 1), they appear to remain committed to these operational changes, Senate Testimony at 32:52.

Second, Defendants have, at best, provided contradictory statements about whether the Postal Service will continue to adhere to its longstanding practice of providing the "highest level of service" to Election Mail, regardless of the class of mail used or the postage applied. At worst, the Postal Service intends to depart from its longstanding practice and treat Election Mail like all other mail.

Some of Defendants' public statements would seem to confirm that the Postal Service intends to adhere to its longstanding past practice. For example, in his sworn testimony before the Senate Committee on Homeland Security and Government Affairs, Defendant DeJoy said the Postal Service "will deploy processes and procedures that advance any election mail, in some cases ahead of first class mail" and affirmed there would be "no changes in any policies with regard to election mail for the comfort of 2020 election [*sic*]." Senate testimony at 37:33, 15:44.

But other public communications from Defendants not only say the opposite, but also present differing delivery standards for regular First-Class Mail. For example, letters sent to every State and the District of Columbia advise election officials to "use First-Class Mail to transmit blank ballots"—most of which "is delivered [in] 2-5 days"—because "[u]sing Marketing Mail will result in slower delivery times and will increase the risk that voters will not receive their ballots in time to return them by mail." Compl. App'x I (ECF No. 1-1); *see* Compl.

---

[4] https://postalpro.usps.com/node/8472.

¶¶ 196-202 (ECF No. 1); *see also* Compl. App'x Ex. F (ECF No. 1-1). The Postal Service's current website on Election Mail—launched on August 20, 2020—states that "[e]lection officials should use First-Class Mail *or a higher level of service* for Election Mail" because "[u]sing USPS Marketing Mail® service will result in slower delivery times and may increase the risk that voters will not receive their ballots in time to return them by mail." USPS, *Election Mail*[5] (emphasis added). The website also warns voters that they "must make sure appropriate postage is affixed to your return ballot envelope," which it says is both required by "federal law" and necessary to "ensure timely processing and delivery by the Postal Service." The Postal Service's Pacific Area presentation from August 12 states that "Election Mail sent as Marketing Mail is not upgraded to First Class service." Ex. 3 at 50. A letter to Mail Service Providers states that "[p]lacing the Official Election Mail Logo on a mailpiece sent using Marketing Mail will not upgrade service to First-Class Mail"; instead "mail is delivered in accordance with the class of service for which postage has been paid." Letter from Steven W. Monteith Acting Chief Customer and Marketing Officer and Executive Vice President (Aug. 26, 2020) (Ex. 5). The letter also states, for the first time, that "First-Class Mail is delivered in *3 to 5 days*." *Id.* (emphasis added).[6]

---

[5] https://about.usps.com/what/government-services/election-mail/ (last visited Aug. 26, 2020).

[6] Elsewhere, Defendants' official statements describe First-Class Mail as being delivered in "1-3 business days." USPS, *First-Class Mail*, https://www.usps.com/ship/first-class-mail.htm (last visited Aug. 27, 2020); *see also* USPS, *Delayed mail and packages?*, https://faq.usps.com/s/article/Delayed-Mail-and-Packages (last visited Aug. 27, 2020) (describing the "delivery standard" for First-Class Mail as "1-3 business days (not guaranteed)" and instructing customers to contact customer on the fifth or subsequent day after mailing); USPS, *What are the Types of First-Class Mail®?*, https://faq.usps.com/s/article/What-are-the-Types-of-First-Class-Mail (last visited Aug. 27, 2020) ("Estimated delivery time is one (1) to three (3) days and begins on the date postmarked. *In some instances* (short distance between ZIP Codes™), *it is possible for delivery to occur in one day*." (emphasis added)).

7

Absent preliminary relief, these changes will continue to hinder mail delivery nationwide and risk undermining the general elections that will be held in each of the Plaintiff States on November 3, 2020. In Pennsylvania, ballots will be mailed to voters as early as September 14; absentee and mail-in ballot applications must be submitted by 5 p.m. on October 27 unless a statutory excuse applies; and completed ballots must be received by county boards of election by 8 p.m. on November 3. Compl. ¶¶ 35-39 (ECF No. 1). In California, the State must begin mailing ballots to active registered voters no later than October 5; completed ballots must be postmarked on or before November 3 and received by November 20. *Id.* ¶¶ 47-51. In Delaware, ballots will be mailed to voters as early as September 4; ballots must be received by the Department of Elections before polls close. *Id.* ¶¶ 62-63. In the District of Columbia, ballots will be mailed to all active, registered voters the first week in October; completed ballots must be postmarked on or before November 3 and received by November 13. *Id.* ¶¶ 68, 71; D.C. Bd. of Elections, *Vote Absentee*.[7] In Maine, absentee ballots will be shipped to municipalities no later than October 2, 2020, and municipalities may start sending the absentee ballots out to voters who have requested absentee ballots as soon as the ballots are received. By statute, a no excuse absentee application must be submitted by 5 p.m. on October 29 unless a statutory excuse applies; ballots must be received by 8 p.m. on November 3. Compl. ¶¶ 76-78 (ECF No. 1). In Massachusetts, ballots will be sent beginning no later than October 9[8]; mail-in ballot applications must be received no later than October 28; and mailed ballots must be postmarked on or before November 3 and received on or before November 6. Compl. ¶¶ 88-92 (ECF No. 1). In North Carolina, ballots will be mailed starting on September 4; absentee and mail-in ballot applications

---

[7] https://www.dcboe.org/Voters/Absentee-Voting/Request-an-Absentee-Ballot (last visited Aug. 27, 2020).

[8] Plaintiffs' Complaint incorrectly stated that ballots will be sent as of October 5, 2020. *See* Compl. ¶ 90 (ECF No. 1).

must be submitted by 5 p.m. on October 27; and ballots must be received by 5 p.m. on November 3 or postmarked on or before November 3 and received by November 6. Compl. ¶¶ 97-99 (ECF No. 1).

## **LEGAL STANDARD**

District courts "have broad discretion to manage the discovery process, and can expedite or otherwise alter the timing and sequence of discovery." *Vision Films, Inc. v. John Does 1-24*, No. 12-1746, 2013 WL 1163988, at *2 (D. Del. Mar. 20, 2013) (citing Fed. R. Civ. P. 26(d)(1)). Courts are also "specifically authorized, if circumstances warrant, to shorten the time for responses to interrogatories and requests for production of documents, and to permit early depositions." *Id.* (quoting *Kone Corp. v. Thyssenkrupp USA, Inc.*, No. 11-465, 2011 WL 4478477, at *3 (D. Del. Sept. 26, 2011)). While the Third Circuit Court of Appeals "has not announced a standard" for determining when expedited discovery is warranted, the "prevailing approach in this Circuit is to apply the 'good cause' or reasonableness standard to resolve motions for expedited discovery." *Schuylkill Valley Sports, Inc. v. Corporate Images Co.*, No. 20-2332, 2020 WL 3167636, at *6 (E.D. Pa. June 15, 2020) (quoting *Kone*, 2011 WL 4478477 at *4); *see also, e.g.*, *Bath Auth., LLC v. Anzzi LLC*, No. 18-834, 2018 WL 5112889, at *8 (E.D. Pa. Oct. 19, 2018) ("The prevailing approach in this Circuit is to apply the 'good cause' or reasonableness standard to resolve motions for expedited discovery."); *Wiluna Holdings, LLC v. Does 1-50*, No. 13-1143, 2013 WL 1336792, at *2 (E.D. Pa. Apr. 3, 2013) (same).

Under the "good cause" or reasonableness standard, the Court considers: "(1) the timing and context of the discovery requests, including whether a preliminary injunction hearing has been scheduled; (2) the scope and purpose of the requests; and (3) the nature of the burden to the respondent." *Schuylkill Valley Sports*, 2020 WL 3167636, at *6 (quoting *Kone Corp.*, 2011 WL

9

4478477 at *4). "Good cause has been shown where a party seeks a preliminary injunction, where physical evidence may be consumed or destroyed, or where the case involves infringement or unfair competition claims." *Bath Auth., LLC v. Anzzi LLC*, No. 18-834, 2018 WL 5112889, at *9 (E.D. Pa. Oct. 19, 2018) (citing *Fonovisa, Inc. v. Does 1-9*, No. 07-1515, 2008 WL 919701, at *10 n.22 (W.D. Pa. Apr. 3, 2008)). "Good cause" is determined by "weighing the plaintiff's need for expedited discovery against 'the breadth of the discovery requests and the prejudice to the responding party.'" *Id.* (quoting *Kone Corp.*, 2011 WL 4478477, at *4).

## ARGUMENT

Expedited discovery is necessary to prevent irreparable harm resulting from Defendants' unlawful changes to the nature of postal services that are currently causing harm and that threaten the upcoming elections in each Plaintiff State. The urgency is a product only of the Defendants' decision to abruptly implement new policies during an unprecedented global pandemic and on the eve of a general election in which an unprecedented number of Americans will be voting by mail. All aspects of the good cause standard counsel in favor of granting expedited discovery. Indeed, a district court in Washington, applying the same standard, yesterday granted expedited discovery in a similar suit. Order Granting Plaintiffs' Motion For Expedited Discovery (ECF No. 38), *Washington, et al. v. Trump, et al.*, No. 20-3127 (E.D. Wa. Aug. 27, 2020) (finding that state plaintiffs had demonstrated good cause to warrant expedited discovery because the November 2020 election is imminent, the plaintiffs will soon file a motion for preliminary injunction or a request for a writ of mandamus that will need to be heard on an expedited basis, the public interest at stake is "extraordinary," and the Defendants' resources are "vast").

The same considerations apply here. First, "the urgent need for action is clear." *Vision Films, Inc.*, 2013 WL 1163988, at *1-2, 4. The operational changes instituted by Defendants have already caused a documented decline in mail service across the country. In addition, Plaintiffs must administer elections that will conclude in just 66 days. Voting in these elections will begin in the next several weeks as Plaintiffs begin mailing ballots out to voters. Just recently, a district court presiding over a challenge to voting procedures granted a motion to expedite discovery because of the need for "resolution of Plaintiffs' claims in advance of the November general election." Scheduling Order (ECF No. 124) at 2, *Donald J. Trump for President v. Boockvar*, No. 20-966 (W.D. Pa. July 17, 2020).

To prevent Defendants' changes from continuing to harm Plaintiffs and from harming the administration of their elections, Plaintiffs will soon seek a preliminary injunction. Expedited discovery is necessary to determine exactly what operational changes Defendants implemented in July 2020, what they communicated to USPS employees about these changes, and what steps they took prior to implementing these changes. Expedited discovery is also necessary to understand what policies and practices Defendants have adopted regarding the transportation, processing, and delivery of Election Mail and whether they intend to depart from longstanding Postal Service practice, given their conflicting statements.

Second, the discovery requests subject to this motion are limited to two factual issues: (1) the "transformative initiative" Defendants instituted in July 2020 and its "unintended consequences," Compl. App'x Ex. G (ECF No. 1-1); and (2) how the Postal Service has treated and will treat Election Mail. Indeed, rather than embark on broader discovery that may be appropriate in the normal course—or later in this case—Plaintiffs have limited the requests for expedited discovery to only the facts needed to remedy the irreparable harm already occurring

from mail delays and to prevent irreparable harm that will result from postal changes that will slow the delivery of Election Mail or will discourage voting. *See Commissariat A L'Energie Atomique v. Dell Computer Corp.*, No. 03-484, 2004 WL 406351, at *1 (D. Del. Mar. 3, 2004) (granting motion for expedited discovery where it appeared "to be appropriately tailored to the issues raised by the P.I. Motion and [Defendant's] response," including written discovery and requests to depose two individuals, one of whom was outside of the United States). Particularly where facts relevant to preliminary relief are in dispute, discovery on those issues is appropriate. *See Samuel, Son & Co., Inc. v. Beach*, No. 13-128, 2013 WL 4855325, at *4 (W.D. Pa. Sept. 11, 2013) (granting motion for expedited discovery because the discovery sought would help "crystallize the issues for the preliminary injunction hearing" and "ensure a clear and focused factual record," and limiting discovery to those "disputed factual issues" (citation omitted)); *Exclusive Supplements, Inc. v. Abdelgawad*, No. 12-1652, 2013 WL 160275, *1 (W.D. Pa. Jan. 15, 2013) (granting motion for expedited discovery given the "wildly divergent factual assertions made by the parties" but limiting discovery to the issues relevant to the preliminary injunction).

Third, the burden on the Defendants will be minimal, given the nature of the materials sought and given that Defendants must produce similar materials and information in a similar case. Plaintiffs seek information and documents that have been publicly referenced by the Postmaster General, are kept routinely in the course of USPS business, or are communications directly relevant to Plaintiffs' claims. Additionally, much of what Plaintiffs seek has already been publicly discussed by Defendants, albeit inconsistently. Plaintiffs are willing to continue to confer with Defendants regarding their discovery requests in order to arrive at a reasonable schedule and to avoid unnecessarily duplicative production in similar lawsuits.

The "timing and context" of Plaintiffs' request favors relief—the timing is mere days before Plaintiffs begin to conduct their elections; the context is an outpouring of public concern regarding both ongoing mail delays that began with Defendant DeJoy's tenure and the impact of these delays on voting by mail. Because Plaintiffs' request is time-sensitive, is made in anticipation of a forthcoming motion for preliminary injunction, is tailored to their claims for preliminary relief, and would burden Defendants only minimally, Plaintiffs respectfully request this Court grant the motion for expedited discovery.

## CONCLUSION

Plaintiffs' motion to expedite discovery should be granted and Defendants should be ordered to respond to Plaintiffs' interrogatories and requests for the production of documents (Ex. 1) within ten days from the date of the Court's order.

August 28, 2020

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania
MICHAEL J. FISCHER (Pa. Bar. No. 322311)
Chief Deputy Attorney General

s/ *Aimee D. Thomson*
AIMEE D. THOMSON (Pa. Bar. No. 326328)
RYAN B. SMITH (Pa. Bar. No. 324643)
JACOB B. BOYER (Pa. Bar. No. 324396)
Deputy Attorneys General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 374-2787
athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

XAVIER BECERRA
Attorney General
State of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SUSAN SLAGER
Supervising Deputy Attorney General
MARISSA MALOUFF
ANTHONY O'BRIEN**
JASLEEN SINGH**
LISA C. EHRLICH**
Deputy Attorneys General
Office of the Attorney General for the State of California
455 Golden Gate Avenue, Suite 11000 San Francisco, CA 94102
(415) 510-3489
Lisa.Ehrlich@doj.ca.gov
*Attorneys for Plaintiff State of California*

KATHLEEN JENNINGS
Attorney General
State of Delaware
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
JILLIAN A. LAZAR
VANESSA L. KASSAB***
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Vanessa.Kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
*Attorney General*
*District of Columbia*
KATHLEEN KONOPKA*
Deputy Attorney General, Public Advocacy Division
BRENDAN B. DOWNES*
Assistant Attorney General, Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 6th St. NW
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
*Attorneys for Plaintiff District of Columbia*

AARON M. FREY
Attorney General
State of Maine
SUSAN P. HERMAN**
Chief Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
T (207) 626-8814
susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

| | |
|---|---|
| MAURA HEALEY<br>Attorney General<br>Commonwealth of Massachusetts<br>DAVID C. KRAVITZ*<br>Deputy State Solicitor<br>Office of Attorney General Maura Healey<br>One Ashburton Place, 20th Floor<br>Boston, MA 02108<br>(617) 963-2427<br>david.kravitz@mass.gov<br>*Attorneys for Plaintiff Commonwealth of Massachusetts* | JOSHUA H. STEIN<br>Attorney General<br>State of North Carolina<br>SRIPRIYA NARASIMHAN*<br>Deputy General Counsel<br>SARAH G. BOYCE*<br>Deputy Solicitor General<br>North Carolina Department of Justice<br>114 W. Edenton Street<br>Raleigh, NC 27603<br>(919) 716-6400<br>snarasimhan@ncdoj.gov<br>*Attorneys for Plaintiff State of North Carolina* |

*\*Appearing pro hac vice (applications forthcoming or pending)*

*\*\*Appearing pro hac vice*

*\*\*\* Application for admission forthcoming*