**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>Plaintiffs,<br><br>v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>Defendants. | No. 2:20-cv-4096<br><br>**EVIDENTIARY HEARING REQUESTED** |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 1

I.   Mail-In Voting Is Safe, Secure, and Common in Plaintiff States and Across the United States ................................................................................................. 3

    A.   Pennsylvania ..................................................................................... 4

    B.   California ........................................................................................... 6

    C.   Delaware ............................................................................................ 7

    D.   District of Columbia ......................................................................... 8

    E.   Maine ................................................................................................. 9

    F.   Massachusetts .................................................................................. 10

    G.   North Carolina ................................................................................. 11

II.  The United States Postal Service ................................................................. 12

    A.   Organization of Postal Services ...................................................... 14

    B.   Postal Service Operations ............................................................... 15

    C.   Historic Priority Given to Election Mail ........................................ 16

III. Recent Changes to Postal Service Operations and to Treatment of Election Mail ........... 21

    A.   Attacks on Mail-In Voting .............................................................. 21

    B.   The July 2020 Operational Changes ............................................... 23

    C.   Changes in the Treatment of Election Mail .................................... 26

ARGUMENT ..................................................................................................... 28

I.   Defendants Exceeded Their Authority Under the Postal Reorganization Act ................. 29

    A.   Defendants Significantly Changed Postal Service Operations Without Seeking an Opinion from the Postal Regulatory Commission ............................. 30

    B.   Defendants Intend to Implement Nationwide Changes to the Treatment of Election Mail Without Seeking an Opinion from the Postal Regulatory Commission ................... 33

II.  Defendants Have Violated the Elections Clauses ........................................ 35

III. Without Preliminary Relief, Plaintiff States Will Suffer, and Will Continue To Suffer, Irreparable Harm ...................................................................... 41

    A.   Current Mail Delays ........................................................................ 42

    B.   Election-Mail Related Harms .......................................................... 46

C.      Deprivation of the Right to Comment on Postal Regulatory Commission
        Proceedings ........................................................................................................... 49

IV.    The Balance of the Equities and the Public Interest Favor Injunctive Relief ................... 50

CONCLUSION ................................................................................................................... 52

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) ...................................................... 28

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003)............................ 29

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994).......... 51

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).................................. 29

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ................................................... 29

*Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975) ................................................ 29, 30

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ................................................. 50

*Elansari v. United States*, 615 Fed. App'x 760 (3d Cir. 2015)...................................................... 50

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017).................................................. 50, 51

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)..................................................... 51

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............... 51, 52

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................................... 49

*N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852 (D.C. Cir. 2012).............................................. 29

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................... 50

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ....................................................................................... 52

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) .......................................................... 28

*Roudebush v. Hartke*, 405 U.S. 15 (1972) ................................................................................... 37

*Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260 (D.C. Cir. 2016)................................ 29

*Smiley v. Holm*, 285 U.S. 355 (1932) ..................................................................................... 35, 37

*Storer v. Brown*, 415 U.S. 724 (1974) ......................................................................................... 35

*U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114 (1981) ....................... 13

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736 (2004) ................................ 12, 14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ............................. 40

*Zirin v. McGinnes*, 282 F.2d 113 (3d Cir. 1960) ......................................................................... 29

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ............................................................ 39

*Zschernig v. Miller*, 389 U.S. 429 (1968) .................................................................................... 38

**Constitutional Provisions**

U.S. Const. art. I, § 4 ......................................................................................................... 34, 36

U.S. Const. art. II, § 1 .............................................................................................................. 34

U.S. Const., art. I, § 8, cl. 7 ...................................................................................................... 12

Del. Const. Article V, § 4A ......................................................................................................... 7

Mass. Const. amend. art. CV ................................................................................................... 10

**Statutes**

Postal Accountability and Enhancement Act, Pub. L. No. 109-435, 120 Stat. 3198 (2006) ........ 18

Postal Reorganization Act, Pub. L. No. 91-375, 84 Stat. 719 (1970) ........................................ 18

Private Express Statutes, 18 U.S.C. §§ 1693-99, 39 U.S.C. §§ 601-06 ..................................... 60

39 U.S.C. § 101 ........................................................................................................................ 60

39 U.S.C. § 101(a) .............................................................................................................. 16, 60

39 U.S.C. § 102(5) .............................................................................................................. 38, 40

39 U.S.C. § 201 ................................................................................................................... 18, 46

39 U.S.C. § 3661 ...................................................................................................................... 37

39 U.S.C. § 3661(b) ........................................................................................................... passim

39 U.S.C. § 3661(c) ....................................................................................................... 19, 37, 59

39 U.S.C. § 501 ........................................................................................................................ 18

39 U.S.C. § 502 ........................................................................................................................ 18

25 Pa. Stat. § 3146.1 ................................................................................................................. 5

25 Pa. Stat. § 3146.2(e.1) .......................................................................................................... 5

25 Pa. Stat. § 3146.2a(a) ....................................................................................................... 5, 45

25 Pa. Stat. § 3146.5(b)(1) ................................................................................................. 5, 6, 45

25 Pa. Stat. § 3146.6 ........................................................................................................... 6, 45

iv

25 Pa. Stat. § 3150.11 ........................................................................................................... 5

25 Pa. Stat. § 3150.12(g) ...................................................................................................... 5

25 Pa. Stat. § 3150.12a(a) ................................................................................................ 5, 44

25 Pa. Stat. § 3150.15 ..................................................................................................... 5, 6, 44

25 Pa. Stat. § 3150.16 ..................................................................................................... 6, 45

25 Pa. Stat. § 3511 ............................................................................................................... 6

2020 Cal. Stat. ch. 4 (AB 860) ........................................................................................... 7

Cal. Elec. Code § 3000.5 ..................................................................................................... 8

Cal. Elec. Code § 3017, subd. (a) ....................................................................................... 8

Cal. Elec. Code § 3017, subd. (b) ....................................................................................... 8

Cal. Elec. Code § 3020 ........................................................................................................ 8

D.C. Code § 1-1001.05(a)(10A) ......................................................................................... 11

D.C. Code § 1-1001.05(a)(9A) ........................................................................................... 11

D.C. Code § 1-1001.05(a)(9A-i) ......................................................................................... 11

Del. Code Ann. tit. 15, § 5502 ............................................................................................ 9

Del. Code Ann. tit. 15, § 5503(k) ....................................................................................... 9

Del. Code Ann. tit. 15, § 5601 ............................................................................................ 10

Del. Code Ann. tit. 15, § 5603(a) ....................................................................................... 10

Del. Code Ann. tit. 15, § 5604(b) ................................................................................. 10, 44

Del. Code Ann. tit. 15, § 5607(a)(4) .................................................................................. 10

Del. Code Ann. tit. 15, § 5608 ..................................................................................... 10, 45

Mass. Gen. Laws ch. 51, § 26 ............................................................................................. 14

Mass. Gen. Laws ch. 51, § 3 ............................................................................................... 14

Mass. Gen. Laws ch. 54, § 25B .......................................................................................... 13

Mass. Gen. Laws ch. 54, §§ 89-100 ................................................................................... 13

Mass. Stat. 2020, ch. 115, § 1 ................................................................................ 13

Mass. Stat. 2020, ch. 115, § 18 .............................................................................. 13

Mass. Stat. 2020, ch. 115, § 6 ................................................................................ 13

Mass. Stat. 2020, ch. 115, § 6(f)(2) ........................................................................ 13

Mass. Stat. 2020, ch. 115, § 6(h)(1) ....................................................................... 14

Mass. Stat. 2020, ch. 115, § 6(h)(3) ................................................................. 14, 45

Mass. Stat. 2020, ch. 115, § 8(b) ........................................................................... 14

Me. Rev. Stat. Ann. Tit. 21-A § 626(2) .............................................................. 12, 45

Me. Rev. Stat. Ann. Tit. 21-A § 751 ....................................................................... 11

Me. Rev. Stat. Ann. Tit. 21-A § 753-B(2)(D) ....................................................... 12, 44

Me. Rev. Stat. Ann. Tit. 21-A § 754-A .................................................................... 12

Me. Rev. Stat. Ann. Tit. 21-A § 755 ................................................................... 12, 45

N.C. Gen. Stat. § 163-230.1(a) .......................................................................... 15, 45

N.C. Gen. Stat. § 163-230.2 ................................................................................... 14

N.C. Gen. Stat. § 163-231(b) ............................................................................. 15, 45

**Regulations**
39 C.F.R. § 3010.140 ......................................................................................... 14, 48

39 C.F.R. § 3010.142 ......................................................................................... 14, 48

39 C.F.R. pt. 310 ................................................................................................... 48

39 C.F.R. pt. 320 ................................................................................................... 48

**Other Authorities**
Barbara Sprunt & Alana Wise, *Trump Opposes Postal Service Funding But Says He'd
    Sign Bill Including It*, NPR (Aug. 13, 2020) ................................................. 22, 40

Brian Schwartz, *USPS board Chairman Robert Duncan serving as a director for Mitch
    McConnell-aligned super PAC*, CNBC (Sept. 1, 2020) ....................................... 21

CDC, Coronavirus Disease 2019, *Your Health, Older Adults* (updated Aug. 16, 2020)............. 46

CDC, Coronavirus Disease 2019, *Your Health, People with Certain Medical Conditions* (updated Aug. 14, 2020) ................................................................................................ 46

Christina A. Cassidy & Nicholas Riccardi, *Trump: Mail-in voting presents 'biggest risk' to reelection*, AP News (June 19, 2020) ..................................................................... 22

Donald J. Trump (@realDonaldTrump), Twitter (Aug. 20, 2020, 7:57 p.m.)............................ 40

Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:00 p.m.) ............................ 40

*Examining the Finances and Operations of the United States Postal Service During COVID-19 and Upcoming Elections Before the S. Comm. on Homeland Security & Governmental Affairs*, 116th Cong. (Aug. 21, 2020) (testimony of Postmaster General DeJoy) ................................................................................................................ passim

Jeremy Herb and Marshall Coen, *Former Postal Service board member says Mnuchin sought to make Postal Service a "political tool,"* CNN (Aug. 20, 2020) ............................ 21

Kate Rabinowitz & Brittany Renee Mayes, *At least 77% of American voters can cast ballots by mail in the fall*, Wash. Post. (updated Aug. 20, 2020) ............................................ 3

Lauren Egan & Pete Williams, *Trump encourages North Carolina residents to vote twice to test mail-in system*, NBC News (Sept. 2, 2020)................................................................. 21

Letter from David E. Williams, Chief Operating Officer, USPS, to Members of Congress (Aug. 6, 2020) ................................................................................................................ 31

Letter from Steven W. Monteith Acting Chief Customer and Marketing Officer and Executive Vice President, USPS, to Mail Service Providers.................................................. 27

Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Election Mail (Aug. 11, 2020) ........................................................................................... 26, 34

Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Operations (Aug. 11, 2020) ............................................................................................... 31

Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Operations (July 22, 2020)................................................................................................ 22, 32

Letter from Thomas J. Marshall, General Counsel, USPS, to State Election Officials (End July 2020)........................................................................................................................ 26, 27

*Mail-in ballots can still be delivered without a stamp, the Guardian's Sam Levine reports*, The Guardian (Apr. 20, 2020) .................................................................................. 17

*Mandatory Stand-Up Talk: All Employees* (July 10, 2020) ........................................ 23, 24, 30, 31

Mary Pflum, *Despite DeJoy's vows to halt changes, serious problems persist, postal workers say*, NBC News (Aug. 28, 2020) ............................................................. 41

Nathaniel Rakich & Julia Wolfe, *How to Vote in the 2020 Election*, FiveThirtyEight (updated Sept. 1, 2020) ......................................................................................... 3, 4

Pa. Dep't of State, *Pennsylvania 2020 Primary Election Act 35 of 2020 Report* (Aug. 1, 2020) ......................................................................................................................... 5

*Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020) ...................................... 22, 25, 31

Pew Research Center, *Public Holds Broadly Favorable Views of Many Federal Agencies, Including CDC and HHS* (Apr. 9, 2020) .............................................................. 13

Pew Research Center, *Share of voters casting ballots by mail has steadily risen since 1996* (June 23, 2020) .................................................................................................... 3

*Postmaster General Louis DeJoy Statement* (Aug. 18, 2020) ....................................... 39

PowerPoint Presentation, *PMGs Expectations and Plans* (July 2020) ................................... 22, 23

Praecipe To Withdraw Certain of Respondents' Preliminary Objections Based on United States Postal Service's Announcement of Statewide Mail Delays Affecting General Election, *Crossey, et al. v. Boockvar, et al.*, No. 108 MM 2020 (Pa. Aug. 13, 2020) .............. 5

*Protecting the Timely Delivery of Mail, Medicine, and Mail-in Ballots: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. (Aug. 25, 2020) ........................... passim

Reed Abelson, *U.S. Mail Delay Slow Delivery of Medicines*, N.Y. Times (Aug. 20, 2020)........ 41

Sam Berger & Stephanie Wylie, *Trump's War on the Postal Service Hurts All Americans*, Ctr. For Am. Progress (Aug. 19, 2020) .......................................................................... 13, 14

Sam Levine, *Trump says Republicans would 'never' be elected again if it was easier to vote*, The Guardian (Mar. 30, 2020) ..................................................................................... 40

Secretary Boockvar's Application for the Court to Exercise Extraordinary Jurisdiction Over the Commonwealth Court Case Docketed at 407 MD 2020, *Pa. Democratic Party, et al. v. Boockvar, et al.*, No. 133 MM 2020 (Pa. Aug. 16, 2020) ................................ 5

Sixth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (Mar. 24, 2020) ...................................................................... 7

SPS, *Delayed mail and packages?*................................................................................................. 27

USPS Office of Inspector General, Audit Report, *Assessment of the U.S. Postal Service's Service Performance and Costs* (Sept. 17, 2019) ............................................................. 15, 16

USPS Office of Inspector General, Audit Report, *Processing Readiness for Election and Political Mail for the 2018 Midterm Elections* (June 5, 2018) ......................................... 17, 18

USPS Office of Inspector General, Audit Report, *Processing Readiness of Election and Political Mail During the 2020 General Elections* (Aug. 31, 2020) .............................. passim

USPS Office of Inspector General, Audit Report, *Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections* (Nov. 4, 2019)............. 17, 18

USPS Office of Inspector General, *From Home Office to Post Office: Improving Microbusiness Engagement with the U.S. Postal Service* (Sept. 4, 2019)............................. 13

USPS Postal Bulletin 22239 (Aug. 14, 2008) ........................................................ 17, 18

USPS Postal Bulletin 22342 (July 26, 2012) ............................................. 17, 18, 20, 39

USPS Postal Bulletin 22449 (Sept. 1, 2016).................................................... 20, 39

USPS, *Congressional Briefing: Transportation & Service Performance Updates* (Aug. 31, 2020) ....................................................................................................... 25

USPS, *Eastern Area AIM Meeting – Service Update* (Aug. 4, 2020) ................................... 25, 31

USPS, *Election Mail* ............................................................................................. 26

USPS, *First-Class Mail* ......................................................................................... 27

USPS, *One Day* ...................................................................................................... 15

USPS, *Pacific Area AIM Meeting Presentation* (Aug. 13, 2020)................................... 25, 26, 31

USPS, *Postal Leadership: Robert M. Duncan* (last updated Dec. 2019) .............................. 20, 40

USPS, *Publication 631: Official Election Mail – Graphic Guidelines and Logos* (Jan. 2020) ...................................................................................................................... 19

USPS, *Publication 632: State and Local Election Mail – User's Guide* (Jan. 2020).................. 20

USPS, *Service Performance Measurement – PMG Briefing* (Aug. 12, 2020) ...................... 25, 30

USPS, *Universal Service and the Postal Monopoly: A Brief History* (Oct. 2008)....................... 49

USPS, *What are the Types of First-Class Mail®?* ...................................................... 27

USPS, *Your 2020 Official Election Mail™ Kit 600* (Jan. 2020) ............................................ 19, 20

# INTRODUCTION

Plaintiffs Pennsylvania, California, Delaware, the District of Columbia, Massachusetts, Maine, and North Carolina (Plaintiff States or the States) respectfully move for a preliminary injunction to block recent changes implemented by the Postal Service and to require the Postal Service to adhere to its longstanding practices with respect to the treatment of Election Mail. Defendants' recent changes to the delivery of mail have led to significant delays, causing substantial harm to the States and their residents. Furthermore, those changes, coupled with a separate change in the manner in which the Postal Service treats Election Mail, threaten to disrupt the 2020 election in the States and elsewhere.

At the direction of Postmaster General Louis DeJoy, the United States Postal Service (USPS or Postal Service) implemented a number of significant operational changes in July 2020. They included prohibitions on "late" and "extra" trips by mail trucks and restrictions on when letter carriers must start and end their shifts—practices the Postal Service has long relied on to ensure that each piece of mail continues to move toward its destination each day. With the July 2020 changes, Defendants flipped the Postal Service's longstanding public service commitment on its head: instead of prioritizing the continued movement of the mail, they prioritized compliance with scheduling dictates, regardless of the impact on service. And Defendants implemented these significant changes without first taking the steps necessary to ensure that they would not lead to significant nationwide disruptions in service and in the middle of a once-in-a-century global pandemic that has left many Americans more dependent on the mail than ever.

The effects of these changes have been widespread and well-documented. The delivery of mail has been delayed across the country. Prescription medicines have taken weeks to be delivered; hearing notices have failed to arrive on time; essential benefits have been delayed; and countless other mailpieces—from birthday cards to e-commerce purchases to payments for small

businesses—have been held up. Yet despite these delays, and the resulting public outcry, Defendants have refused to undo the changes. To the contrary, they have taken only minor steps to create the impression that they are responding to public concern while leaving in place the most serious changes that have contributed most significantly to the delays. As a result, despite minor improvements, mail service continues to be worse than it was before July 2020.

Defendants' actions are not merely reckless and misguided; they are unlawful. First, it is undisputed the Defendants implemented the July 2020 changes without seeking an opinion from the Postal Regulatory Commission, as required by federal law. The requirement that such changes be submitted to the Commission exists precisely to prevent what happened here: costly mistakes, such as the delays Americans have experienced over the past weeks, which could have been avoided by seeking an opinion from experts and the public before implementing significant changes to mail service. Defendants did not follow this required procedure and the result was predictable. Rather than acknowledge their mistake, Defendants have left the misguided policies in place and insisted that they were not required to seek an opinion from the Postal Regulatory Commission, often contradicting their own public statements in the process. They were—and their failure to do so was illegal.

Second, Defendants' actions have unlawfully interfered with the States' constitutional authority to manage their own elections. Defendants have implemented these changes on the eve of a nationwide election in which more Americans than ever before will have the opportunity to cast their votes by mail. In each of the Plaintiff States, voters can choose to vote by mail without any specific justification. The States have implemented their procedures with respect to voting by mail based on the Postal Service's longstanding practices regarding the treatment of ballots and other Election Mail. Yet the Postal Service has recently indicated that it does not intend to

comply with its historical practices, threatening the delivery of Election Mail across the country. Given the number of voters who are expected to vote by mail in November 2020, even minor delays in the delivery of Election Mail could lead to the disenfranchisement of hundreds of thousands of voters in the States. And the delays caused by Defendants' recent changes are not minor: as the declarations attached to this motion demonstrate, they are widespread and significant. By implementing changes threatening such widespread harm so close to an election in which more Americans will vote by mail than ever before, Defendants have unlawfully interfered with the constitutional authority of the States.

Defendants' changes are unlawful and, if left in place, will continue to cause irreparable harm to the States and their residents—including irreparable harm to the fair administration of the November 2020 general election. The States' motion should be granted, and Defendants' unlawful actions should be enjoined.

## BACKGROUND

### I.    Mail-In Voting Is Safe, Secure, and Common in Plaintiff States and Across the United States

Over the past several decades, voting by mail has steadily expanded nationwide. In 1996, 7.8 percent of Americans mailed in their votes; in 2016, 20.9 percent did. Pew Research Center, *Share of voters casting ballots by mail has steadily risen since 1996* (June 23, 2020).[1] Thirty-four states and the District of Columbia, including all Plaintiff States, allow no-excuse mail-in voting. Nathaniel Rakich & Julia Wolfe, *How to Vote in the 2020 Election*, FiveThirtyEight (updated Sept. 1, 2020).[2] Mail-in voting has expanded independent of the COVID-19 pandemic, but the current circumstances make voting by mail an even more important option for many

---

[1] https://www.pewresearch.org/fact-tank/2020/06/24/as-states-move-to-expand-the-practice-relatively-few-americans-have-voted-by-mail/ft_2020-06-24_votebymail_01/.

[2] https://projects.fivethirtyeight.com/how-to-vote-2020/.

voters and have caused some states to modify how they administer elections. For instance, California and the District of Columbia have responded to the pandemic by passing laws requiring ballots be mailed to all active registered voters. *Id.*; Kate Rabinowitz & Brittany Renee Mayes, *At least 77% of American voters can cast ballots by mail in the fall*, Wash. Post. (updated Aug. 20, 2020).[3] Ten other states allow voters to cite the COVID-19 pandemic as a reason to vote by mail. Rakich & Wolfe, *supra*. And in six, voters may request a mail-in ballot if they provide a reason under state law. *Id.* Procedures for the November 2020 election in each of the plaintiff States are set forth below:

### A. Pennsylvania

In October 2019, Pennsylvania enacted Act 77, which entitles every registered voter to vote by an official mail-in ballot in the 2020 general election. 25 Pa. Stat. § 3150.11. Act 77 builds upon Pennsylvania's decades-long history of allowing, among others, individuals serving in the military and anyone who would be away from his or her polling place on Election Day for business or occupational reasons to submit an absentee ballot. 25 Pa. Stat. § 3146.1.

Voters may apply for a mail-in or absentee ballot until a week before an election; for the November 2020 general election, the deadline is 5 p.m. on October 27, 2020. 25 Pa. Stat. §§ 3150.12a(a), 3146.2a(a). Any voter who applies to vote by mail may also request to be placed on a permanent mail-in or absentee ballot list. 25 Pa. Stat. §§ 3150.12(g), 3146.2(e.1). More than 1.4 million Pennsylvania voters signed up for the permanent mail-in ballot list for elections in calendar year 2020. Marks Decl. ¶ 15 (Ex. 35).

Once the ballot for an election is certified, but no more than 50 days before that election, county boards of elections must begin mailing mail-in and absentee ballots to approved voters.

---

[3] https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/.

25 Pa. Stat. §§ 3150.12a(a), 3150.15, 3146.2a(a), 3146.5(b)(1). After delivery of mail-in and absentee ballots has begun, county boards of elections must mail or deliver mail-in and absentee ballots to voters within 48 hours of receiving and approving an application for a mail-in ballot. 25 Pa. Stat. §§ 3150.15; 3146.5(b)(1). Because applications can be submitted until a week before the election, the latest a Pennsylvania county board can mail a ballot for the November 2020 general election is Thursday, October 29.

Mail-in and absentee ballots are counted if they are received by the relevant county board of elections by 8 p.m. of Election Day.[4] 25 Pa. Stat. §§ 3150.16, 3511, 3146.6. In response to the COVID-19 pandemic and the significant increase in mail-in voting applications, Pennsylvania will provide funding to allow counties to send a postage-paid ballot-return envelope with each ballot for the November 2020 general election.

On June 2, 2020, Pennsylvania conducted its first election under Act 77. "Nearly 1.5 million voters cast their vote by mail-in or absentee ballot, 17 times the number that voted absentee in the 2016 primary, when approximately 84,000 absentee ballots were cast." Pa. Dep't of State, *Pennsylvania 2020 Primary Election Act 35 of 2020 Report* 4 (Aug. 1, 2020) ("2020 Report").[5]

As of August 31, 2020, more than 8.72 million Pennsylvanians have registered to vote. Marks Decl. ¶ 17. Of these, more than 1.89 million voters have requested a mail-in or absentee

---

[4] In response to the letter sent from USPS General Counsel Thomas J. Marshall on July 29, 2020 (*see* Ex. 5), and to avoid infringement on Pennsylvanians' right to vote, Pennsylvania has requested that the Pennsylvania Supreme Court extend this deadline. *See* Praecipe To Withdraw Certain of Respondents' Preliminary Objections Based on United States Postal Service's Announcement of Statewide Mail Delays Affecting General Election, *Crossey, et al. v. Boockvar, et al.*, No. 108 MM 2020 (Pa. Aug. 13, 2020); Secretary Boockvar's Application for the Court to Exercise Extraordinary Jurisdiction Over the Commonwealth Court Case Docketed at 407 MD 2020, *Pa. Democratic Party, et al. v. Boockvar, et al.*, No. 133 MM 2020 (Pa. Aug. 16, 2020). These requests remain pending.

[5] https://www.dos.pa.gov/VotingElections/Documents/2020-08-01-Act35Report.pdf .

ballot for the November 2020 general election and more than 1.55 million voters have been approved. *Id.* By comparison, only 356,300 absentee ballot requests were approved for the 2008 general election; 311,477 for the 2012 general election; and 322,467 for the 2016 general election. Of those who have applied for an absentee or mail-in ballot for the November 2020 general election, more than 632,000 requests have come from voters 65 and older. *Id.*

### B.     California

California has a decades-long history of safely and securely administering mail-in elections. California began tracking the use of absentee mail-in voting in 1962, and it has allowed absentee mail-in voting for any registered voter, for any reason, since 1979. In June 2020, in response to COVID-19, California enacted Assembly Bill 860, which requires that all active registered voters in California receive a vote-by-mail ballot in the mail prior to the November 2020 general election. 2020 Cal. Stat. ch. 4 (AB 860). As of August 2020, 20.9 million active California voters will automatically be receiving a mail-in ballot for the November 2020 general election.

For the November 2020 general election, California election officials must begin mailing ballots to every active registered voter in each county no later than October 5; California must send a ballot to any person who registers to vote after October 5 within five days. Cal. Elec. Code § 3000.5.

California voters may return completed ballots either by mail (with postage prepaid by the State); by returning the ballot in person to a polling place, a vote center, an early voting location, or an office of county elections official; by dropping the ballot into one of the county's ballot drop boxes; or by authorizing someone to return the ballot on the voter's behalf. Cal. Elec. Code § 3017, subds. (a), (b). For the 2020 election, the State will accept completed ballots that are received by no later than the time the polls close on Election Day, or those that are

postmarked by Election Day and are received within 17 days of Election Day. Cal. Elec. Code § 3020.

In the 2020 primary election, over 9.6 million ballots were cast by mail, considerably more than the 7.1 million ballots cast by mail for the 2018 primary election. Padilla Decl. ¶ 15 (Ex. 40). And the percentage of total ballots cast by mail increased as well, from 67.7 percent of the total ballots cast in the 2018 primary election to 72.08 percent of the total ballots cast in the 2020 primary election. *Id.*

California's expansive vote-by-mail system already has allowed the state to run elections during the COVID-19 pandemic without the danger of voters congregating at overcrowded polling stations. In two special elections held in May 2020, all active status, registered voters in those districts were automatically sent mail-in ballots. *Id.* ¶ 16.

### C.     Delaware

Delaware has allowed absentee voting for decades if, among other listed reasons, the voter is sick, physically disabled, absent from the State due to public or military service, or is living abroad or on vacation. Del. Const. Article V, § 4A. Del. Code Ann. tit. 15, § 5502. Delaware subsequently permitted some of these classes of individuals to obtain permanent absentee status and receive an absentee ballot for every election. Del. Code Ann. tit. 15, § 5503(k).

Due to the COVID-19 pandemic, absentee voting eligibility for Delaware's 2020 presidential primary was expanded through an executive order issued by Delaware Governor John C. Carney, Jr., which allowed any otherwise duly-registered voter to vote by absentee ballot using the "sick or physically disabled" qualification under Delaware law if the individual was exercising self-quarantine or social distancing to avoid potential exposure to (and community spread of) COVID-19. *See* Sixth Modification of the Declaration of a State of Emergency for the

7

State of Delaware Due to a Public Health Threat (Mar. 24, 2020).[6] More than 56,000 individuals

utilized this expanded absentee voting eligibility to cast an absentee ballot for the 2020

presidential primary, compared to 5,046 individuals who voted by absentee ballot for the 2016

presidential primary. Albence Decl. ¶ 5.

On July 1, 2020, Delaware enacted legislation to allow any registered voter to vote by

mail-in ballot for the non-presidential primary election scheduled for September 15, 2020, the

general election on November 3, 2020, and any special election to be called in 2020. Del. Code

Ann. tit. 15, § 5601.

For the November 2020 general election, the State Election Commissioner is required to

send an application to receive a mail-in ballot to every qualified registered voter by September 4.

Del. Code Ann. tit. 15, § 5603(a). For each registered voter who requests a mail-in ballot, the

Delaware Department of Elections must send a mail-in ballot and a First-Class postage-paid

envelope between October 4 and October 30. Del. Code Ann. tit. 15, § 5604(b).

Delaware voters may return completed ballots to the Department of Elections in one of

three ways: depositing the ballot envelope in a United States postal mailbox; delivering the ballot

envelope to the Department of Elections; or placing the ballot envelope in a secure drop-box

located in a publicly accessible portion of a Department of Elections office either before or on

the day of election. Del. Code Ann. tit. 15, § 5607(a)(4). In each case, the Department of

Elections must receive a mail-in ballot before the polls close on Election Day for it to be

counted. Del. Code Ann. tit. 15, § 5608.

As of August 21, 2020, a total of 727,968 Delaware voters have registered to vote.

Albence Decl. ¶ 10. Of these, 102,474 voters have requested an absentee or mail-in ballot for the

---

[6] http://governor.delaware.gov/health-soe/sixth-state-of-emergency/.

November 2020 general election and 24,552 Delaware voters are on the permanent absentee ballot list. *Id.* ¶¶ 10-11.

### D.    District of Columbia

In the District of Columbia, voters may cast an absentee ballot via mail without an excuse, or cast a ballot in person during early voting or on Election Day.

Due to the COVID-19 pandemic, the District of Columbia Board of Elections mailed an absentee ballot application and a postage-paid return envelope to all active registered voters for the June 2, 2020, primary election. D.C. Code § 1-1001.05(a)(9A). Tens of thousands of voters submitted that application and participated in the election via mail-in ballot. Over 81,000 voters cast their ballot by mail in that election. Miller Decl. ¶ 20 (Ex. 37).

For the November 2020 general election, to protect the public and election workers, all active registered voters will receive an absentee ballot and a postage-paid return envelope at their registered address or mailing address without having to request either. D.C. Code § 1-1001.05(a)(9A-i). As of July 31, 2020, there were 503,093 registered voters in the District of Columbia.

For the November 2020 election, ballots cast by mail must be postmarked or otherwise demonstrated to have been sent on or before Election Day and must arrive no later than the tenth day after Election Day. D.C. Code § 1-1001.05(a)(10A).

### E.    Maine

Since 1999, Maine voters have been able to vote absentee without an excuse. Me. Rev. Stat. Ann. Tit. 21-A § 751. For the November 2020 general election, a voter must request an absentee ballot by no later than 5 p.m. on October 29, 2020. Me. Rev. Stat. Ann. Tit. 21-A § 753-B(2)(D). Voters may choose between three methods of absentee voting: voters may mail their completed ballot to the municipal office for the municipality where they are registered to vote;

9

voters may carry their completed ballot to that same municipal office, or have a family member or authorized third person do so; and voters may complete their ballot prior to Election Day in the presence of the clerk in their municipality. Me. Rev. Stat. Ann. Tit. 21-A § 754-A. With an exception for communities with fewer than 100 residents, absentee ballots must be received in the municipal office before 8 p.m. on November 3. Me. Rev. Stat. Ann. Tit. 21-A §§ 626(2), 755.

The need for an effective vote-by-mail option is critical in Maine because the electorate includes relatively high levels of individuals unable to vote in person and individuals at risk of severe illness from COVID-19, particularly disabled and elderly voters. "Maine's most recent primary, held on July 14, 2020, shows the importance of allowing voters to vote by mail." Dunlap Decl. ¶ 23 (Ex. 23). "Historically, the rate at which Maine voters voted by mail has been lower than 10 percent in general elections and less than 3 percent in primaries." *Id.* "Based upon final figures for the July 2020 primary, there were 111,139 ballots cast by mail, which equates to about 35 percent of ballots cast." *Id.* "This represents at least a 10 fold increase over primaries in the last four election cycles." *Id.*

As of August 2020, there are 1,063,383 residents registered to vote. Since Maine's online ballot request service was launched on August 17, 2020, a total of 71,000 voters have applied for an absentee or mail-in ballot through the online ballot request service, more than the total for the 2016 general election. Dunlap Decl. ¶ 11.

### F.  Massachusetts

Massachusetts has a long history of safely and securely accepting absentee ballots by mail. *See* Mass. Gen. Laws ch. 54, §§ 89-100. In 2014, Massachusetts law was changed to allow "early voting" for biennial state elections only, beginning with the 2016 election. The law provided for early voting in person or by mail, but only during the early voting period, which was limited to 10 days before the election. Mass. Gen. Laws ch. 54, § 25B. The most important

difference between absentee and early voting is that the state constitution requires that absentee voters have an excuse (for example, a voter can vote absentee if he is away from his city or town on Election Day), *see* Mass. Const. amend. art. CV, but no excuse is needed in order to vote early.

In 2020, in response to the ongoing COVID-19 pandemic, Massachusetts expanded its early voting program to make every registered voter eligible to vote early by mail this year. Mass. Stat. 2020, ch. 115, §§ 6, 18. In order to vote by mail, a registered voter must send a signed application for a mail-in ballot to a local election office by October 28. Mass. Stat. 2020, ch. 115, §§ 1, 6(f)(2). A voter can register online, by mail, or in person at any city or town hall in Massachusetts. Mass. Gen. Laws ch. 51, §§ 3, 26. Local election officials will begin mailing ballots to voters no later than October 9. Mass. Stat. 2020, ch. 115, § 8(b).

A voter can return the ballot to local election officials either by mail, in person, or, where available, to a secure drop box. Mass. Stat. 2020, ch. 115, § 6(h)(1). For the November 2020 general election, mailed ballots must be postmarked by November 3 and received at the local election office by November 6; if hand-delivered, the ballots must be returned by 8 p.m. on November 3. Mass. Stat. 2020, ch. 115, § 6(h)(3). As of August 2020, Massachusetts had 4,642,444 registered voters, of whom 1,081,089 requested mail-in ballots for the September 1 primary election.

### G.    North Carolina

North Carolina has been safely and securely administering elections, including by giving voters the option to vote by mail for any reason, since 1999. To vote by mail, the voter must first request an absentee ballot by filling out a form provided by the North Carolina State Board of Elections. N.C. Gen. Stat. § 163-230.2. This form is available for download at the State Board's website and is also available for pickup at all county board of elections offices, at the DMV,

libraries, and at National Voter Registration Act agencies. *Id.* The form can also be mailed to the interested voter upon request. *Id.* Starting September 1, voters can request an absentee ballot online on a portal on the State Board's website. Bell Decl. ¶ 7 (Ex. 21). Absentee ballots may be requested until 5 p.m. on October 27, 2020. N.C. Gen. Stat. § 163-230.1(a).

County boards of elections will begin mailing absentee ballots to voters who have requested them beginning on September 4, 2020. Bell Decl. ¶ 8. Voters may return completed ballots by mail. N.C. Gen. Stat. § 163-231(b). Alternatively, they may return completed ballots in-person to a county board of elections office or to early-voting sites during the early-voting period. *Id.* Absentee ballots must be returned to the county board of elections no later than 5 p.m. on Election Day. *Id.* Absentee ballots received after 5 p.m. on Election Day will be counted only if they are postmarked on or before Election Day and are received by mail no later than 5 p.m. three days after Election Day. *Id.*

Traditionally, roughly 4-5 percent of the votes cast are by absentee voters. Bell Dec. ¶ 15. This year, the State Board and the county boards of elections are preparing for 30-40 percent of votes to be cast by absentee voters. *Id.* In 2016, 4,769,640 voters cast ballots. *Id.* Therefore, assuming similar voting patterns, it can be expected that approximately 1.4-1.9 million voters will cast their ballots by mail this year. *Id.* As of August 31, 2020, North Carolina has received 535,148 requests for absentee ballots. *Id.*

## II.     The United States Postal Service

The Constitution empowers Congress to "establish Post Offices and post Roads." U.S. Const., art. I, § 8, cl. 7. In the years since America's founding, "the Postal Service has become the nation's oldest and largest public business," *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004), playing "a vital yet largely unappreciated role in the development of" the United States, *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 121

(1981). During the early years of this country's development, "the Post Office was to many citizens situated across the country the most visible symbol of national unity." *Id.* at 122.

By law, the Postal Service is to be "operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). Its services are "to bind the Nation together through the personal, educational, literary, and business correspondence of the people," which it does through "prompt, reliable, and efficient services to patrons in all areas." *Id.* In this role, the Postal Service has been overwhelmingly successful: 91 percent of Americans view USPS favorably. Pew Research Center, *Public Holds Broadly Favorable Views of Many Federal Agencies, Including CDC and HHS* (Apr. 9, 2020).[7]

The Postal Service touches the lives of virtually every American. Eighteen percent of Americans, and 40 percent of senior citizens, pay their bills via the mail. Sam Berger & Stephanie Wylie, *Trump's War on the Postal Service Hurts All Americans*, Ctr. For Am. Progress (Aug. 19, 2020).[8] Nearly 20 percent of Americans who receive tax refunds do so through the mail. The Department of Veterans Affairs (VA) fills about 80 percent of veterans' prescriptions by mail, sending 120 million prescriptions a year. *Id.* Every day, more than 330,000 veterans receive a package of prescriptions in the mail. *Id.* More than half of the people who receive medication by mail are over the age of 65. *Id.* Small businesses rely heavily on the Postal Service: 40 percent send packages via USPS every month, *id.*, and 70 percent of businesses with fewer than 10 employees had used USPS within the previous six months, USPS Office of Inspector General (OIG), *From Home Office to Post Office: Improving Microbusiness*

---

[7] https://www.pewresearch.org/politics/2020/04/09/public-holds-broadly-favorable-views-of-many-federal-agencies-including-cdc-and-hhs/.

[8] https://www.americanprogress.org/issues/democracy/news/2020/08/19/489664/trumps-war-postal-service-hurts-americans/.

*Engagement with the U.S. Postal Service* (Sept. 4, 2019).[9] In rural areas, where more than a third

of post offices are located, the Postal Service provides a vital link to more than 14 million people

without broadband access. Berger & Wylie, *supra*. In 2018, the Postal Service helped 42 million

Americans securely vote in the midterm elections. *Id.*

A.     **Organization of Postal Services**

Postal services in the United States took their current form in 1970, when Congress

passed the Postal Reorganization Act (PRA). *See* Pub. L. No. 91-375, 84 Stat. 719. The PRA

effected several changes designed "to increase the efficiency of the Postal Service and reduce

political influences on its operations." *Flamingo Indus.*, 540 U.S. at 740. Among the changes,

Congress made the Postal Service "an independent establishment of the executive branch of the

Government of the United States." 39 U.S.C. § 201.

Congress likewise created the Postal Rate Commission—now called the Postal

Regulatory Commission—as an "independent establishment of the executive branch of the

Government of the United States." 39 U.S.C. § 501. The Commission has five presidentially

appointed members, all to "be chosen solely on the basis of their technical qualifications,

professional standing, and demonstrated expertise in economics, accounting, law, or public

administration." *Id.* § 502.

The Commission has numerous responsibilities set forth in the PRA and the Postal

Accountability and Enhancement Act. *See* Pub. L. No. 109-435, 120 Stat. 3198 (2006). Among

them, anytime "the Postal Service determines that there should be a change in the nature of

postal services which will generally affect service on a nationwide or substantially nationwide

basis" the Postal Service must first "submit a proposal, within a reasonable time prior to the

---

[9] https://www.uspsoig.gov/sites/default/files/document-library-files/2019/RISC-WP-19-008.pdf.

effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). Before the Commission issues an advisory opinion, it must hold a hearing on the record. *Id.* § 3661(c). The public is entitled to submit comments or intervene in proceedings before the Commission. 39 C.F.R. §§ 3010.140, 3010.142.

### B.        Postal Service Operations

Processing, transporting, and delivering mail in the United States happens through a complex network that cycles an average of 470 million mailpieces every day. USPS, *One Day.*[10] In this network, the steps are all interdependent; "failure in any phase has the potential to create significant delays in subsequent phases." *See generally* USPS OIG, Audit Report, *Assessment of the U.S. Postal Service's Service Performance and Costs* 6-9 (Sept. 17, 2019)[11] ("OIG Report Service Standards") (summarizing mail cycle). Most mail is processed—i.e., separated, sorted, and arranged for transportation and delivery—overnight by postal workers and mail handlers at processing facilities. Processed mail is dispatched in trucks from the processing facilities in the very early morning (often 5 or 6 a.m.), where it travels either to other facilities for further processing or to delivery units (e.g., a post office or carrier station) for delivery to local destinations. Processed mail ready for delivery normally arrives at the delivery unit in the morning (often 8 or 9 a.m.). Carriers deliver the processed mail and collect new mail on foot or by vehicle in a prescribed area during general business hours (i.e., between approximately 9 a.m. and 6 p.m.). In the evening, mail collected by carriers on their routes and mail collected by clerks at post offices is sent from the delivery unit by truck to the processing plant. When the collected mail arrives at the processing plant, the cycle begins again.

---

[10] https://facts.usps.com/one-day/ (last visited Aug. 31, 2020).

[11] https://www.uspsoig.gov/sites/default/files/document-library-files/2019/NO-AR-19-008.pdf.

Due to its public service commitment, the Postal Service has long operated under a practice of "every piece, every day": every piece of mail is moved out of the processing facility for further transport, or out of the delivery unit for delivery, every day. *See also* OIG Report Service Standards at 1-2. As a result, overtime is often necessary, particularly when processing facilities or mail routes are understaffed. *E.g.*, Gibson Decl. ¶ 16 (Ex. 26)*;* OIG Report Service Standards at 3. Likewise, it is commonplace for a dispatch truck to be held until the final tray of processed mail is loaded on board, or for a letter carrier to wait until that day's mail has arrived before departing on her route and to stay on her route until every piece of mail is delivered. *E.g.*, OIG Report Service Standards at 3.

COVID-19 has caused staffing shortages at USPS and exacerbated the use of overtime, especially among letter carriers. *See* Gibson Decl. ¶ 16. If a letter carrier is sick, under quarantine, dealing with the absence of child care, or otherwise unable to complete her route, then another carrier must work on an off-shift to ensure that the mail is delivered.

## C.   Historic Priority Given to Election Mail

The "Postal Service plays a vital role in the American democratic process." USPS OIG, Audit Report, *Processing Readiness of Election and Political Mail During the 2020 General Elections* 6 (Aug. 31, 2020) ("OIG Audit 2020") (Ex. 19). Aware of its responsibility, the Postal Service has historically "prioritize[d] the processing of Election Mail," which is "any mailpiece that an authorized election official creates for voters participating in the election process and includes ballots and voter registration materials." *Id.* at 13, 1.[12] The "[t]imely delivery of

---

[12] For the same reason, USPS prioritizes "Political Mail," which "is any mailpiece created by a registered political candidate, a campaign committee, or a committee of a political party for political campaign purposes." *Id.*

Election and Political Mail is necessary to ensure the integrity of the U.S. election process." *Id.* at 7.

In light of the unique importance of Election Mail, the Postal Service has historically "altered its normal processes to accommodate for the timely processing of Election and Political Mail and help meet the needs of elections." *Id.* at 12; *see also, e.g.*, USPS Postal Bulletin 22239, at 20 (Aug. 14, 2008) ("PB Aug. 2008")[13] (The Postal Service "stands ready to do everything it can to make sure voters experience a smooth, well-organized process—one that provides them with the highest levels of trust and confidence when they cast their ballots by mail").

For example, "the Postal Service often prioritizes Election and Political Mail mailed as Marketing Mail and treats it as First-Class Mail." OIG Audit 2020 (Ex. 19) at 12; *see also* USPS OIG, Audit Report, *Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections* 1 (Nov. 4, 2019) ("OIG Audit 2019") (Ex. 18) (finding that 95.6 percent of Election Mail in the 2018 midterm election met the 1-3 day service standard for first-class mail); USPS OIG, Audit Report, *Processing Readiness for Election and Political Mail for the 2018 Midterm Elections* 4 (June 5, 2018) ("OIG Audit 2018") (Ex. 17) ("USPS expedites eligible election and political mail."). USPS has also expedited ballots that may not otherwise reach the voter in time. OIG Audit 2020 (Ex. 19) at 12. In addition, USPS "does not delay delivery of ballots addressed to an election office due to insufficient postage." *Id.*; *see also Mail-in ballots can still be delivered without a stamp, the Guardian's Sam Levine reports*, The

---

[13] https://about.usps.com/postal-bulletin/2008/pb22239.pdf.

17

Guardian (Apr. 20, 2020)[14]; USPS Postal Bulletin 22342, at 15 (July 26, 2012) ("PB July 2012")[15]; PB Aug. 2008 at 26.

Ahead of Election Day, the Postal Service will "add[] direct transportation trips to election offices to ensure all outgoing ballots are picked up and processed." OIG Audit 2020 (Ex. 19) at 12. And on Election Day, "the Postal Service often diverts staff to manually identify and separate absentee ballots to speed up their delivery to election officials and help ensure votes are counted." *Id.*

A number of facilities take further steps as best practices, such as: obtaining estimates of Election Mail volume and mailing dates in advance "to help plan for potential staffing requirements," *id.* at 17; obtaining sample ballots to test them in the mail processing machines and identify any design issues, *id.* at 18; using "work floor monitors to display important Election and Political Mail information, such as upcoming election dates and deadlines," *id.*; having personnel separate and identify Election Mail from other mail in the facility, OIG Audit 2019 (Ex. 18) at 1; and facilitating timely and frequent communications with all levels of plant staff about policies and procedures for Election Mail, *id.*

The Postal Service has long communicated the need to prioritize Election Mail to its employees. *E.g.*, PB Aug. 2008 at 20 (it is "critical" that "Postal Service employees be ready to provide reliable service and delivery for this very important and time-sensitive mail," which "must be handled promptly and receive equal care and attention"); PB July 2012 at 3 (all employees must "watch for this important time-sensitive mail and do their part to ensure each mailing receives the highest level of service"). As a result, employees have understood that they

---

[14] https://www.theguardian.com/world/live/2020/apr/22/coronavirus-us-live-first-deaths-weeks-earlier-trump-cuomo-latest-news-updates?page=with:block-5ea0b2e58f084784dca58330#block-5ea0b2e58f084784dca58330.

[15] https://about.usps.com/postal-bulletin/2012/pb22342/pdf/pb22342.pdf.

must be extra vigilant when processing and delivering Election Mail. *E.g.*, Gibson Decl. ¶¶ 17-18. As with all practices, however, consistent and effective training is necessary to ensure full compliance. *E.g.*, OIG Audit 2018 at 5 (recommending "management conduct standardized election and political mail training for all mail processing employees at least annually").

To further the expedited processing of Election Mail, the Postal Service has adopted Election Mail readiness procedures at its mail processing facilities and delivery units (e.g., Post Offices). OIG Audit 2020 at 14. These include "daily self-audits, clearance checklists, and Election and Political Mail logs." *Id.* In addition, the Political and Election Mail Coordinator is required conduct a daily "all-clear" certification that all facilities under their jurisdiction "are clear of all committed Election and Political Mail during the specified election timeframe (two weeks before and two weeks after the election)." *Id.* But even prior to Defendants' mixed messages, "unclear guidance" has resulted in USPS employees not always complying with these official readiness procedures as required. *Id.* at 14-16.

In addition, even though postmarks are not required on all mailpieces, the Postal Service in 2018 "directed personnel to postmark all ballots to assist state election boards" in the many states that require a postmark on ballots. *Id.* at 17, 23 (citing David E. Williams, Postmarks on Ballots [Memorandum], United States Postal Service (April 23, 2018)). In the November 2020 general election, postmarks will be important for California, District of Columbia, Massachusetts, and North Carolina. But as with other internal policies, this directive requires clear training and implementation protocols to ensure widespread compliance. *Id.* at 17.

To increase the visibility of Election Mail during processing, the Postal Service developed the green Tag 191 in 2007 to mark incoming trays of blank ballots from election

officials. USPS, *Your 2020 Official Election Mail™ Kit 600*, at 13 (Jan. 2020).[16] The Postal

Service also developed the Official Election Mail logo, a unique registered trademark that

"identif[ies] Official Election Mail for Postal Service workers and distinguish[es] it from the

thousands of other mailpieces that are processed daily." USPS, *Publication 631: Official

Election Mail – Graphic Guidelines and Logos*, at 4 (Jan. 2020).[17]

To aid state and local election officials, Political and Election Mail coordinators conduct

outreach, develop channels of communication, and help train officials on best practices. OIG

Audit 2020 (Ex. 19) at 12. The Postal Service also regularly releases an Election Mail user's

guide and toolkit. USPS, *Publication 632: State and Local Election Mail – User's Guide* (Jan.

2020)[18]; *Your 2020 Official Election Mail™ Kit 600*,.

Finally, due to the importance of Election Mail, the Postal Service has historically shown

caution when implementing projects during an election cycle that could negatively impact timely

delivery. In 2012, for example, USPS suspended its network consolidations from September

through December "[d]ue to the volume of high-priority mail predicted for the election as well as

the holiday mailing seasons." PB July 2012 at 14. In 2016, after changes in delivery standards

raised concerns that Election Mail could require additional time, the Postal Service announced

that "plans [were] in place from coast to coast to ensure the timely receipt, processing, and

delivery of election and political mail." USPS Postal Bulletin 22449, at 4 (Sept. 1, 2016) ("PB

Sept. 2016").[19]

---

[16] https://about.usps.com/kits/kit600.pdf#page=13.

[17] https://about.usps.com/publications/pub631.pdf.

[18] https://about.usps.com/publications/pub632.pdf.

[19] https://about.usps.com/postal-bulletin/2016/pb22449/pb22449.pdf

**III.     Recent Changes to Postal Service Operations and to Treatment of Election Mail**

In November 2017, President Trump appointed Robert M. Duncan to the Postal Service

Board of Governors; he was confirmed by the Senate the following year and currently serves as

the Board's Chairman. Duncan had previously served as Chairman of the Republican National

Committee (RNC) from 2007 to 2009. His official USPS biography states, "As RNC Chairman,

he raised an unprecedented $428 million and grew the donor base to 1.8 million – more donors

than at any time in RNC history." USPS, *Postal Leadership: Robert M. Duncan* (last updated

Dec. 2019).[20]

In May 2020, the Board of Governors selected Louis DeJoy to serve as Postmaster

General and Chief Executive Officer.[21] Postmaster General DeJoy had no prior experience

working at the Postal Service. He began serving as Postmaster General on June 15, 2020.

**A.     Attacks on Mail-In Voting**

Shortly before DeJoy's appointment, President Trump began a campaign of false claims

about mail-in voting, erroneously stating that it is vulnerable to widespread fraud. *See* Compl.

¶¶ 158.a-158.o (ECF No. 1). That campaign continues to escalate. This week, President Trump

encouraged voters to abuse North Carolina's vote-by-mail option by casting both a mail-in ballot

and an in-person ballot. Lauren Egan & Pete Williams, *Trump encourages North Carolina*

---

[20] https://about.usps.com/who/leadership/board-governors/robert-duncan.htm.

Duncan continues to serve as a director of certain Republican-affiliated "super PACs." Brian Schwartz, *USPS board Chairman Robert Duncan serving as a director for Mitch McConnell-aligned super PAC*, CNBC (Sept. 1, 2020), https://www. cnbc.com/2020/09/01/usps-chair-robert-duncan-is-director-for-mcconnell-linked-super-pac.html.

[21] A former member of the Postal Regulatory Commission has testified before Congress that Treasury Secretary Mnuchin improperly influenced the selection process and sidestepped the contracting firm undertaking the search for a new Postmaster General to push Mr. DeJoy. Jeremy Herb and Marshall Coen, *Former Postal Service board member says Mnuchin sought to make Postal Service a "political tool,"* CNN (Aug. 20, 2020), https://www.cnn.com/2020/08/20/ politics/louis-dejoy-postmaster-scrutiny-democrats/index.html.

*residents to vote twice to test mail-in system*, NBC News (Sept. 2, 2020).[22] In reality, States' mail-in voting systems are safe from such abuse. States, including Plaintiffs States, employ extensive procedures that safeguard mail-in voting, including systems for tracking ballots and verifying a voter's identity. *See, e.g.*, Bell Decl. ¶ 10; Dunlap Decl. ¶ 21; Padilla Decl. ¶ 13; Marks Decl. ¶ 20.

During this period, the Trump Campaign or the RNC filed a number of lawsuits against states that allow for voting by mail, including Pennsylvania and California. On June 19, 2020, President Trump said about his election prospects that, "My biggest risk is that we don't win lawsuits" and "We have many lawsuits going all over. And if we don't win those lawsuits, I think—I think it puts the election at risk." Christina A. Cassidy & Nicholas Riccardi, *Trump: Mail-in voting presents 'biggest risk' to reelection*, AP News (June 19, 2020).[23] A month later, President Trump explained that he opposed additional funding for the Postal Service because he wanted to prevent expanded mail-in voting: "Now they need that money in order to have the post office work so it can take all of these millions and millions of ballots. Now, in the meantime, they aren't getting there. By the way, those are just two items. But if they don't get those two items, that means you can't have universal mail-in voting because they're not equipped to have it." Barbara Sprunt & Alana Wise, *Trump Opposes Postal Service Funding But Says He'd Sign Bill Including It*, NPR (Aug. 13, 2020).[24]

---

[22] https://www.nbcnews.com/politics/2020-election/trump-encourages-north-carolina-residents-vote-twice-test-mail-system-n1239140.

[23] https://apnews.com/419b8fc1a387e4f85a91429651c59b76.

[24] https://www.npr.org/2020/08/13/902109991/trump-admits-to-opposing-funding-for-postal-service-to-block-more-voting-by-mail.

B.        **The July 2020 Operational Changes**

In early July 2020, at the direction of Postmaster General DeJoy, the Postal Service abruptly instituted a "transformative initiative" that changed how mail was processed, transported, and delivered. *Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020) (Ex. 13); *see, e.g.*, Gibson Decl. ¶¶ 14-15. Under this initiative, overtime was strongly discouraged, if not eliminated entirely. *See* Gibson Decl. ¶ 14; PowerPoint Presentation, *PMGs Expectations and Plans* (July 2020) (Ex. 2) ("Overtime will be eliminated."); Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Operations (July 22, 2020) (Ex. 3) ("The document entitled 'PMG's Expectations and Plan' was prepared by a mid-level manager in one district[.]"). Trucks were ordered to leave processing facilities and delivery units at set times irrespective of whether all of that day's mail was on board. *E.g.*, Gibson Decl. ¶¶ 14-15; *Mandatory Stand-Up Talk: All Employees* (July 10, 2020) (Ex. 1) ("Mandatory Stand-Up Talk"). Letter carriers were ordered to depart for their delivery routes at set times, irrespective of whether all of that day's mail had arrived, and to return at set times, irrespective of whether that day's mail had been delivered. *See* Mandatory Stand-Up Talk (Ex. 1). Postal Service employees were ordered to no longer make any extra trips that might otherwise ensure that the mail continued to move forward in the mail cycle. *Id.* The result of these changes created choke points in the mailstream, causing mail to be delayed. *See* Gibson Decl. ¶ 15.

Two documents prepared by Postal Service employees reflect these operational changes. The first is a July 10, 2020, document titled "Mandatory Stand-Up Talk: All Employees." Ex. 1. Stand-up talks are a widely used means of providing postal employees with information about changes or updates in Postal Service policies and procedures. Zimmerman Decl. ¶¶ 5-6 (Ex. 46). Postmasters and supervisors typically communicate the contents of a "Stand-Up Talk" to the

23

relevant employees at the beginning of their shift or share the contents in writing. *Id.* The

employees are then expected to abide by those policies and procedures. *Id.* "Mandatory" stand-

up talks usually reflect directives from Postal Service Headquarters and are delivered

nationwide. Zimmerman Decl. ¶¶ 7-8. The second, a PowerPoint presentation entitled "PMGs

[Postmaster General's] expectations and plans" was prepared at around the same time. *See*

PowerPoint Presentation, *PMGs Expectations and Plans* (Ex. 2).

   The existence of these changes has been confirmed in numerous USPS public statements,

letters, and Defendant DeJoy's testimony before Congress. *See, e.g.*, Exs. 3, 4, 7, 8, 10, 13;

*Examining the Finances and Operations of the United States Postal Service During COVID-19*

*and Upcoming Elections Before the S. Comm. on Homeland Security & Governmental Affairs*,

116th Cong., at 25:52, 29:17, 1:22:42 (Aug. 21, 2020) (testimony of Postmaster General DeJoy)

(the "Senate Testimony");[25] *Protecting the Timely Delivery of Mail, Medicine, and Mail-in*

*Ballots: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. at 39:03 (Aug. 25,

2020) (testimony of Postmaster General DeJoy) (the "House Testimony").[26] Indeed, Postmaster

General DeJoy stated that he had "directed" that the Postal Service "develop and execute on a

plan to improve our adherence to the transportation schedule of [their] over 40,000 trips a day."

House Testimony at 39:03.

   The result of these operational changes is that mail is delayed at multiple places in the

mailstream. If processed mail is not ready when the truck is scheduled to leave the processing

plant, then that mail is left behind for the day. If the truck is delayed on its way to the delivery

unit, then the carrier must leave on her route at her start time without that day's mail. If the

_____

   [25] Unofficial transcript available at: https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

   [26] Unofficial transcript available at: https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

carrier is unable to deliver all of that day's mail before her return time, then she must return to the delivery unit with that mail undelivered and any new mail uncollected. If the mail carrier did not depart with all of that day's mail—for example, because it was too much to carry or because additional mail arrived after she left—then that carrier cannot make extra trips and that mail remains in the delivery unit overnight. And if the carrier returns to the delivery unit after the truck has returned to the plant, then any new mail collected that day remains at the delivery unit overnight and will not be sent to the plant until the following day. Indeed, the Mandatory Stand-Up Talk acknowledged that as a result of the changes, postal employees will see mail "left behind" and "on the workroom floor or docks" of processing plants, which is "not typical." *See* Mandatory Stand-Up Talk (Ex. 1).

In an August 13, 2020, memo, DeJoy acknowledged that the recent changes have had an effect on service: the "transformative initiative has had unintended consequences that impacted our overall service levels." *Path Forward: PMG Addresses Restructuring* (Ex. 13). Indeed, mail service has been down across the country since early July 2020. *E.g.*, USPS, *Congressional Briefing: Transportation & Service Performance Updates* (Aug. 31, 2020) (Ex. 16) (showing sharp decreases in mail service across all types of mail as of early July 2020); USPS, *Service Performance Measurement – PMG Briefing* (Aug. 12, 2020) (Ex. 11) (showing sharp decreases in mail service beginning on or about July 11, 2020); USPS, *Eastern Area AIM Meeting – Service Update* 2, 4, 6 (Aug. 4, 2020) (Ex. 6) (showing sharp decreases in mail service beginning during Week 41 of the USPS fiscal year, which corresponds to approximately July 14, 2020); USPS, *Pacific Area AIM Meeting Presentation* 26, 28, 29 (Aug. 13, 2020) (Ex. 12) (showing sharp decreases in mail service beginning on or about July 11, 2020).

### C.      Changes in the Treatment of Election Mail

Since Postmaster General DeJoy's appointment, Defendants have offered contradictory statements about whether the Postal Service will continue to adhere to its longstanding practice of providing the "highest level of service" to Election Mail, regardless of the class of mail used or the postage applied. But some of those statements indicate that the Postal Service intends to depart from its longstanding practice and treat Election Mail like all other mail.

A few of Defendants' public statements would seem to indicate that the Postal Service intends to adhere to its longstanding past practice. For example, in his sworn testimony before the Senate Committee on Homeland Security and Government Affairs, Postmaster General DeJoy said the Postal Service "will deploy processes and procedures that advance any Election Mail, in some cases ahead of first class mail" and affirmed there would be "no changes in any policies with regard to Election Mail for the comfort of 2020 election [*sic*]." Senate Testimony at 37:33, 15:44.

But other public communications from Defendants say the opposite. For example, letters sent to every State and the District of Columbia advise election officials to "use First-Class Mail to transmit blank ballots" because "[u]sing Marketing Mail will result in slower delivery times and will increase the risk that voters will not receive their ballots in time to return them by mail." Letter from Thomas J. Marshall, General Counsel, USPS, to State Election Officials (End July 2020) (Ex. 5); *see also* Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Election Mail, at 3 (Aug. 11, 2020) (Ex. 9). The Postal Service's current website on Election Mail—launched on August 20, 2020—states that "[e]lection officials should use First-Class Mail *or a higher level of service* for Election Mail" because "[u]sing USPS Marketing Mail® service will result in slower delivery times and may increase the risk that voters will not receive their

ballots in time to return them by mail." USPS, *Election Mail*[27] (emphasis added). The website also warns voters that they "must make sure appropriate postage is affixed to your return ballot envelope," which it says is both required by "federal law" and necessary to "ensure timely processing and delivery by the Postal Service." *Id.* The Postal Service's Pacific Area presentation from August 12 states that "Election Mail sent as Marketing Mail is not upgraded to First Class service." USPS, *Pacific Area AIM Meeting Presentation* 8 (Aug. 13, 2020) (Ex. 12). A letter to Mail Service Providers states that "[p]lacing the Official Election Mail Logo on a mailpiece sent using Marketing Mail will not upgrade service to First-Class Mail"; instead "mail is delivered in accordance with the class of service for which postage has been paid." Letter from Steven W. Monteith Acting Chief Customer and Marketing Officer and Executive Vice President, USPS, to Mail Service Providers (Aug. 26, 2020) (Ex. 15).

Defendants have also offered mixed messages about how quickly Election Mail will arrive, even if it is sent first class. In the letters sent to every State and the District of Columbia, the Postal Service explained that most first-class mail "is delivered [in] *2-5 days*." Letter from Thomas J. Marshall, General Counsel, USPS, to State Election Officials (End July 2020) (Ex. 5) (emphasis added). But a month later, the letter to Mail Service Providers states that "First-Class Mail is delivered in *3 to 5 days*." Letter from Steven W. Monteith Acting Chief Customer and Marketing Officer and Executive Vice President, USPS, to Mail Service Providers (Aug. 26, 2020) (Ex. 15) (emphasis added). Defendants' official website describes first-class mail as being delivered in "1-3 business days." USPS, *First-Class Mail*;[28] *see also* USPS, *Delayed mail and*

---

[27] https://about.usps.com/what/government-services/election-mail/ (last visited Aug. 26, 2020).

[28] https://www.usps.com/ship/first-class-mail.htm (last visited Aug. 27, 2020).

*packages?*[29] (describing the "delivery standard" for First-Class Mail as "1-3 business days (not

guaranteed)" and instructing customers to contact customer service on the fifth or subsequent

day after mailing); USPS, *What are the Types of First-Class Mail®?*[30] ("Estimated delivery time

is one (1) to three (3) days and begins on the date postmarked. *In some instances* (short distance

between ZIP Codes™), *it is possible for delivery to occur in one day*." (emphasis added)).

Meanwhile, the USPS OIG recently described first-class mail service as taking 2-3 days within

the continental United States. OIG Audit 2020 (Ex. 19) at 9 n.13.

### ARGUMENT

In the Third Circuit, a party seeking a preliminary injunction must satisfy two "gateway"

factors: "that it can win on the merits" and "that it is more likely than not to suffer irreparable

harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d

Cir. 2017). Satisfying the first requirement "requires a showing significantly better than

negligible but not necessarily more likely than not" that the movant can prevail. *Id.* To satisfy the

irreparable harm requirement, a plaintiff must demonstrate "a significant risk that he or she will

experience harm that cannot adequately be compensated after the fact by monetary damages."

*Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000). The States have satisfied

these two requirements: Defendants' actions exceed the Postal Service's authority and are

interfering with the constitutional authority of the States to administer their own elections. If

allowed to continue, Defendants' actions will irreparably harm Plaintiff States in numerous

ways, including by threatening the States' ability to ensure that the 2020 election is free and fair.

---

[29] https://faq.usps.com/s/article/Delayed-Mail-and-Packages (last visited Aug. 27, 2020).

[30] https://faq.usps.com/s/article/What-are-the-Types-of-First-Class-Mail (last visited Aug. 27, 2020).

Once a movant has satisfied these "gateway" factors, relief depends on balancing these two threshold considerations along with the possibility of harm to other interested persons and any public interest. *Reilly*, 858 F.3d at 176, 179. Here, all these factors favor ordering Plaintiff States' requested relief.

## I.    Defendants Exceeded Their Authority Under the Postal Reorganization Act

Federal courts may grant injunctive relief against federal officials who violate federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). In this Circuit, "[t]he law is settled that if a federal officer does or attempts to do acts which are in excess of his authority or under authority not validly conferred, equity has jurisdiction to restrain him." *Zirin v. McGinnes*, 282 F.2d 113, 115 (3d Cir. 1960). Acts of the Postal Service are often reviewed by courts on this basis. *See, e.g.*, *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003).

Relevant here, the Postal Reorganization Act hems in the Postal Service's authority to act unilaterally. Whenever the Postal Service "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it "*shall* submit a proposal, within a reasonable time *prior to* the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b) (emphases added). And before issuing its advisory opinion, the Commission must hold a hearing on the record, in accordance with 5 U.S.C. § 556 and 5 U.S.C. § 557, at which the interests of the Postal Service, the public, and the Commission are represented. 39 U.S.C. § 3661(c). After the hearing, the Commission issues its written advisory opinion. *Id.*

Section 3661 creates three conditions that, when met, trigger the Postal Service's obligation to submit a proposal to, and seek an advisory opinion from, the Commission. First, there must be "a change," which means some adjustment that meaningfully impacts service. *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262 (5th Cir. 1975). Second, that change must be to "the nature of postal services." "Postal services" are "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5). Third, the change must "affect service on a nationwide or substantially nationwide basis." That is, the change must affect a "broad geographical area." *Buchanan*, 508 F.2d at 262. When all three conditions are met, the Postal Service must consult with the Commission *before* the changes takes effect.

In the last two months, the Postal Service has prohibited Postal Service workers from doing what is needed to keep the mail cycle moving forward, which is causing mail delays nationwide, and has indicated it will, or might, end the priority treatment historically afforded to Election Mail. Making those changes without first submitting a proposal to, and seeking an advisory opinion from, the Commission exceeds the Postal Service's authority, as limited under section 3661.

### A. Defendants Significantly Changed Postal Service Operations Without Seeking an Opinion from the Postal Regulatory Commission

To begin, the restrictions instituted in July are new policies intended to meaningfully impact service. The Postal Service's Mandatory Stand-Up Talk, one means of communicating the new initiative, describes the changes as part of an "operational pivot" to achieve "immediate, lasting, and impactful changes" to the Postal Service's operations. *See* Mandatory Stand-Up Talk (Ex. 1). The "shifts" described in that memo aim to "change [the Postal Service's] culture and move away from past practices." *Id.* Testifying before a House Committee, Postmaster General

30

DeJoy confirmed both that in July he had instituted changes to mail transportation and delivery and that the purpose of those changes is to meaningfully impact the Postal Service's operations. House Testimony at 39:03, 3:49:09, 4:41:26, 4:46:57.

Postal Service data confirms that the July initiative immediately produced a decline in the Service's ability to complete on-time delivery of first-class mail, marketing mail, and periodicals. Since the start of the COVID-19 pandemic, the Postal Service had been able to process 90 to 95 percent of first-class mail on time. *See* USPS, *Service Performance Measurement: PMG Briefing* (Aug. 12, 2020) (Ex. 11). Immediately after the July changes, those rates dropped to between 80 and 85 percent. *Id.* The July changes produced similar declines for marketing mail and periodicals. *Id.* Other Postal Service reports convey even dimmer results. In the Postal Service's Eastern Area, the July changes dropped on time delivery of first-class letters and flats to below 80 percent, from a sustained on-time delivery rate near 93 percent. USPS, *Eastern Area AIM Meeting – Service Update* 2, 4, 6 (Aug. 4, 2020) (Ex. 6) (showing sharp decreases in mail service beginning during Week 41 of the USPS fiscal year, which corresponds to approximately July 14, 2020).The Pacific Area experienced similar declines after the July changes. USPS, *Pacific Area AIM Meeting Presentation* 26, 28, 29 (Aug. 13, 2020) (Ex. 12) (showing sharp decreases in mail service beginning on or about July 11, 2020).

Sure enough, the July initiative has meaningfully impacted service: In two letters to members of Congress, the Postal Service acknowledged that the new changes have disrupted service. Letter from David E. Williams, Chief Operating Officer, USPS, to Members of Congress (Aug. 6, 2020) (Ex. 7); Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Operations (Aug. 11, 2020) (Ex. 10). Postmaster General DeJoy, too, confirmed in both an

August 13, 2020, internal memo and then in his testimony to Congress, that the July changes have impacted service. In the internal memo, DeJoy explained that the Postal Service's "transformative initiative has had unintended consequences that impacted our overall service levels." *See Path Forward: PMG Addresses Restructuring* (Ex. 13). Before Congress, he acknowledged the July changes delayed service and conceded that those delays were worse than expected. *See* Senate Testimony at 25:52; House Testimony at 4:44:50.

Changing when trucks leave the plants or delivery units, and when letter carriers must start and stop their daily routes, is a change to the delivery and transportation of mail. As described in the Mandatory Stand-Up Talk, the new policies are "targeted on transportation." *See* Mandatory Stand-Up Talk (Ex. 1). That same memo identified eliminating late trips and extra trips, as well as the mandate that "carriers must begin on time, leave for the street on time, and return on time," as "transportation changes being implemented immediately." *Id.* And delivering and transporting mail are quintessential "postal services," *see* 39 U.S.C. § 102(5), thus satisfying section 3661's second condition.

It is no justification that the changes may require only that the Postal Service "adhere to [its] transportation schedules." *See* House Testimony at 4:22:00. Before Postmaster General DeJoy assumed his position, the Postal Service's longstanding commitment to moving the mail forward every day meant that a truck was ready to leave when all the day's processed mail was on board, not at a set time on the clock. Likewise, letter carriers would stay a little longer on route to ensure every piece of that day's mail was delivered. Postmaster General DeJoy's transformative initiative upends the Postal Service's longstanding practice in favor of adherence to fixed departure and return times that deemphasize advancing the mail.

Finally, these changes are in effect nationwide. Before a House Committee, Postmaster General DeJoy testified that the changes were in place in "every state a truck moves in." House Testimony at 4:41:45. Postmaster General DeJoy also confirmed that data reflecting declines in on-time delivery was based on nationwide numbers. House Testimony at 4:41:47.

Although the July changes check all three of section 3661's boxes, the Postal Service never submitted a proposal to the Commission. Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Operations (July 22, 2020) (Ex. 3) (asserting Postal Service's authority to make July changes without following section 3661's procedures).Those changes, then, are beyond the Postal Service's authority.

### B. Defendants Intend to Implement Nationwide Changes to the Treatment of Election Mail Without Seeking an Opinion from the Postal Regulatory Commission

Defendants also have signaled plans to modify how the Postal Service will handle Election Mail. The Postal Service's longstanding practice is to prioritize Election Mail, regardless of the class of mail the sender pays. *See supra* at Background, Section II.C. Since assuming his current role, Postmaster General DeJoy has at times claimed that the Postal Service will adhere to this past practice. For example, he told a Senate Committee that the Postal Service "will deploy processes and procedures that advance any Election Mail, in some cases ahead of first class mail." Senate Testimony at 37:33. He also claimed "that there has been no changes in any policies with regard to Election Mail for the comfort [sic] of 2020 election." Senate Testimony at 15:44. But other Postal Service statements are directly to the contrary, advising States to use first-class mail because marketing mail would be slower, and informing them that mail is delivered according to its paid-for class. *See supra* at Background, Section III.C.

This change to Election Mail would meaningfully impact service in at least two ways. First, by subjecting Election Mail to the standards applicable to ordinary mail, the Postal Service slows the processing of Election Mail. Consequently, rather than being prioritized, Election Mail will be swept up in the delays caused by the Postal Service's July changes. Those delays will be especially pronounced for any Election Mail otherwise sent in one of the Postal Service's slower classes. Second, because the Postal Service will not process Election Mail without adequate postage, some Election Mail will not be delivered altogether. Because an adjustment to the treatment of Election Mail would have these impactful consequences, executing a change that results in Election Mail being handled as any other mail satisfies the first of section 3661's conditions.

As with the July changes, altering service standards for Election Mail is a change to the nature of postal services. Here, the change affects both the pace of processing mail and, in some cases, whether the Postal Service will complete service at all. Each affects how mail is transported and whether mail is delivered. Delivery and transportation of mail are, again, quintessential postal services, satisfying section 3661's second condition.

Finally, the changes to Election Mail are nationwide. Election officials in all 50 states and the District of Columbia have been told that Election Mail will be treated as if it were any ordinary mail. *See* Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Election Mail (Aug. 11, 2020) (Ex. 9). That, of course, is corroborated by much more of the Postal Service's recent messaging. *See supra* at Background, Section III.C.

The contemplated changes to the processing of Election Mail, therefore, are subject to section 3661's procedural requirements. But the Postal Service has not submitted any proposal to

the Commission about processing Election Mail—nor is there any indication that Defendants

plans to do so before Plaintiff States begin sending Election Mail in the next few days —and the

Commission has not held a public hearing or issued an opinion about any such changes. Until all

of these steps are complete, the Postal Service has no authority to change how Election Mail is

processed, transported, and delivered.

## II.     Defendants Have Violated the Elections Clauses

By constitutional design, States have initial authority to determine "The Times, Places

and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4. So,

too, may States "appoint, in such Manner as the Legislature thereof may direct, a Number of

Electors, equal to the whole Number of Senators and Representatives to which the State may be

entitled in the Congress." U.S. Const. art. II, § 1. These are broad powers, and States have

properly employed them to establish "comprehensive, and in many respects complex, election

codes regulating in most substantial ways, with respect to both federal and state elections, the

time, place, and manner of holding primary and general elections, the registration and

qualifications of voters, and the selection and qualification of candidates." *Storer v. Brown*, 415

U.S. 724, 730 (1974). Those comprehensive codes are necessary for elections "to be fair and

honest" and for "some sort of order, rather than chaos, [] to accompany the democratic

processes." *Id.* The power given to States is "in short, to enact the numerous requirements as to

procedure and safeguards which experience shows are necessary in order to enforce the

fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

The States have exercised their constitutional authority to permit mail-in voting in

various forms. *See supra* Background, Section I.A-G. In some cases, the States' vote-by-mail

procedures exist independent of the current pandemic. In other cases, those procedures have been

modified because of the current pandemic. In all cases, the States' decision to allow voting by

35

mail is made more important by the challenges that voting in person now presents, particularly to certain at-risk groups.

The States' respective decisions to permit voting by mail rely upon the Postal Service's historic competencies. Delaware, Maine, and Pennsylvania, for example, allow election officials to mail absentee ballots to voters until three to four business days before an election. Del. Code Ann. tit. 15, § 5604(b); Me. Rev. Stat. Ann. Tit. 21-A § 753-B(2)(D); 25 Pa. Stat. §§ 3150.12a(a), 3150.15, 3146.5(b)(1), 3146.2a(a). Those ballots must be returned by Election Day to be counted. Del. Code Ann. tit. 15, § 5608; Me. Rev. Stat. Ann. Tit. 21-A §§ 626(2), 755; 25 Pa. Stat. §§ 3150.16(a), 3146.6.[31] In Massachusetts, voters must request a ballot at least four days business before an election, and votes will be counted so long as they are postmarked by Election Day and received no more than three days later. Mass. Stat. 2020, ch. 115, § 6(h)(3). Similarly, in North Carolina, voters may request an absentee ballot until a week before an election, and their vote will be counted so long as it is postmarked by Election Day and received within three days. N.C. Gen. Stat. §§ 163-230.1(a), 163-231(b). These timelines reasonably balance an interest in maximizing time to vote against the Postal Service's past performance and *ordinary* service standards.

Delaware's voting laws in particular rely on the Postal Service's ability "to deliver election mail in a timely fashion, including permitting the Department of Election to get ballots into the hands of voters within the four-day period prior to an election." *See* Albence Decl. ¶ 14 (Ex. 20). That reliance makes sense because the Postal Service has assured Delaware's Election Commissioner that the Postal Service "would deliver election mail without delay." *Id.* ¶ 13. Election officials in other Plaintiff States share a similar understanding of the Postal Service's

---

[31] *See supra* note 4.

ability to quickly deliver Election Mail. Bell Decl. ¶ 13; Bluestein Decl. ¶ 11 (Ex. 22); Dunlap Decl. ¶¶ 12, 16; Freitag Decl. ¶ 7 (Ex. 25); Marks Decl. ¶ 23; Padilla Decl. ¶¶ 20-21.

While the Constitution assigns initial regulatory authority over elections to the States, "Congress may at any time by Law make or alter such Regulations." U.S. CONST. art. I, § 4. But, as the Supreme Court has confirmed, the Elections Clause gives the federal government only a legislative power. *Smiley*, 285 U.S. at 367; *see also Roudebush v. Hartke*, 405 U.S. 15, 24 (1972) ("Unless Congress acts, Art. I, s 4, empowers the States to regulate the conduct of senatorial elections."). Federal authority to displace state regulations, then, lies exclusively with Congress. Defendants, however, are within the federal government's executive branch. 39 U.S.C. § 201. They therefore may not displace how States have chosen to regulate the time, place, and manner of elections. But that is precisely what they have done here.

The States have exercised their authority under the Elections Clauses to allow voting by mail. Defendants' recent operational changes, made as the 2020 election draws near, interfere with that exercise of authority. The July changes have caused widespread delays in the delivery of mail. Those changes, as well as a failure to prioritize Election Mail, will lead to delays in the delivery of ballots. Slowing delivery by even a day, relative to service standards, jeopardizes the manner in which the States have chosen to let voters vote. Election officials are now hearing from voters wishing to cancel their mail-in ballot application, or who are concerned about whether they may still vote by mail. Bell Decl. ¶ 19; Bluestein Decl. ¶ 14; Dunlap Decl. ¶¶ 17-18; Freitag Decl. ¶ 10; Marks Decl. ¶ 27; Padilla Decl. ¶¶ 27, 29. States' voting laws rely on the Postal Service's past ability to deliver Election Mail without pervasive problems. Those laws, however, do not account for the Postal Service's instituting new policies right before an election that have the predicted—and actual—consequence of causing delays in mail delivery. And

implementing these changes the summer before an election does not leave States enough time to revamp their entire mail-in voting procedures.

These effects underpin the unconstitutionality of the Postal Service's recent changes. The Supreme Court has previously struck laws that have the consequence of intruding upon the exercise of power constitutionally committed to a different governmental entity. For example, the Supreme Court struck a state law that acted as an "intrusion by the State into the field of foreign affairs" because the Constitution makes governance of foreign affairs the exclusive province of the federal government. *Zschernig v. Miller*, 389 U.S. 429, 432 (1968). In *Zschering*, the Supreme Court did so because the state law—an Oregon law that restricted nonresidents' right to inheritance based on the United States' reciprocal agreements with the country in which the heir lived—had "more than some incidental or indirect effect in foreign countries." *Id.* at 434 (internal quotation marks omitted). Oregon's law, the Supreme Court resolved, "affects international relations in a persistent and subtle way." *Id.* at 440. The Supreme Court ruled that Oregon's law was unenforceable even though States "have traditionally regulated the descent and distribution of estates." *Id.* at 441. It ruled that way because, for foreign affairs, the Constitution requires "that federal power . . . be left entirely free from local interference." *Id.* at 442-43 (Stewart, J., concurring).

Likewise, Defendants' recent actions intrude upon an exercise of power constitutionally committed to different governmental bodies. For elections, the Constitution requires regulation be left to the States, subject only to Congress's interference. The executive branch of the federal government has no independent role regulating elections, and so may not interfere. But that is what has happened. And that interference is even more problematic because it is the result of acts

that, apart from their intrusion upon state power, exceed Defendants' authority under the Constitution.

What is more, Defendants' actions suggest a purpose of interfering with Plaintiff States' constitutional prerogatives. Purposes matter when judging whether one organ of government has usurped power belonging to another. Instructively, the Supreme Court recently considered a statute in which Congress allowed those born in Jerusalem to list Israel as their place of birth, and considered the legislative purpose of the statute. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 7 (2015). First, the Court ruled that the power to recognize a foreign state and its boundaries belongs exclusively to the President. *Id.* at 10-28. Second, the Court ruled Congress's act infringed on that power. *Id.* at 28-32. The latter ruling was informed "by the undoubted fact that the purpose of the statute was to infringe on the recognition power—a power the Court now holds is the sole prerogative of the President" *Id.* at 31.

Here, the aim of the July changes ostensibly was to improve the Postal Service's financial position. Yet the Postal Service is financially viable through August 2021. *See* House Testimony at 1:07:57. Nevertheless, the July changes were hurried into place right before an election in which more voters than ever are expected to vote by mail. In doing so, the Postal Service deviated from its ordinary practice which is to *avoid* making changes right before elections. PB July 2012 at 14 (suspending consolidations from September through December "[d]ue to the volume of high-priority mail predicted for the election as well as the holiday mailing seasons"); PB Sept. 2016 at 4 (responding to concern that recent changes to delivery standards would slow Election Mail by announcing that "plans [were] in place from coast to coast to ensure the timely receipt, processing, and delivery of election and political mail"). And the rush to change

transportation and delivery operations here happened despite the Postal Service's own forecasts that the changes would cause mail to be left behind.

Worse, to give the July changes immediate effect, Defendants had to ignore section 3661's procedural requirements, which, if followed, would have delayed Defendants' ability to make the July changes and might have caused Defendants to reconsider implementing them at all. And even now that the full harm the July changes have caused and will cause to the upcoming election has come to light, Postmaster General DeJoy has remained steadfast that those changes will not be suspended, even though he has suspended less detrimental changes until after the election. Senate Testimony at 32:38; *Postmaster General Louis DeJoy Statement* (Aug. 18, 2020) (Ex. 14).

Departing from normal procedures—as Defendants have done both by skipping the review required under section 3661 and launching a major overhaul of Postal Service operations on the eve of an election—is suggestive that "improper purposes are playing a role." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (identifying "[d]epartures from the normal procedural sequence" as possible evidence of malign intent). Furthermore, these changes have occurred against the backdrop of the President repeatedly making false claims about voting by mail, including that mail-in ballots are subject to widespread fraud and that administering elections by mail harms Republicans. *See, e.g.*, Barbara Sprunt & Alana Wise, *Trump Opposes Postal Service Funding But Says He'd Sign Bill Including It*, NPR (Aug. 13, 2020); Sam Levine, *Trump says Republicans would 'never' be elected again if it was easier to vote*, The Guardian (Mar. 30, 2020)[32]; Donald J. Trump (@realDonaldTrump),

---

[32] https://www.theguardian.com/us-news/2020/mar/30/trump-republican-party-voting-reform-coronavirus.

Twitter (May 28, 2020, 9:00 p.m.)[33]; Donald J. Trump (@realDonaldTrump), Twitter (Aug. 20, 2020, 7:57 p.m.).[34] Of course, before assuming their respective positions, Postmaster General DeJoy and Chairman Duncan each was a prominent member of, and fundraiser for, the Republican Party. In fact, Chairman Duncan's official government biography still touts his partisan affiliation, noting that "he served as Chairman of the Republican National Committee from 2007 to 2009" and in that role "he raised an unprecedented $428 million and grew the donor base to 1.8 million – more donors than at any time in RNC history." USPS, *Postal Leadership: Robert M. Duncan* (last updated Dec. 2019).[35]All together, these circumstances signal a purpose of the Postal Service's changes is to disrupt Plaintiff States' administration of the upcoming elections for political reasons.

In this case, the power to regulate how elections are administered belongs to the States in the first instance, subject only to conflicting acts of Congress. Acts of the executive branch that substantially interfere with the exercise of that power violate the allocation of responsibility under the Elections Clauses. That is especially so when the challenged actions, independent of any constitutional concerns, fall outside the executive branch's authority and are suggestive of an improper purpose.

## III.   Without Preliminary Relief, Plaintiff States Will Suffer, and Will Continue To Suffer, Irreparable Harm

The July 2020 changes have caused mail delays nationwide, and "[d]espite [Postmaster General] DeJoy's vows to halt changes, serious problems persist." Mary Pflum, *Despite DeJoy's vows to halt changes, serious problems persist, postal workers say*, NBC News (Aug. 28,

---

[33] https://twitter.com/realDonaldTrump/status/1266172570983940101.

[34] https://twitter.com/realDonaldTrump/status/1296597150181330944.

[35] https://about.usps.com/who/leadership/board-governors/robert-duncan.htm.

2020).[36] For instance, numerous individuals have reported delayed medications, an unsurprising consequence given that "nearly one in five Americans" report receiving medications through the mail. Reed Abelson, *U.S. Mail Delay Slow Delivery of Medicines*, N.Y. Times (Aug. 20, 2020).[37] Checks, bills, business-related items and other time-sensitive materials have been delayed as well. Some customers are receiving mail only once per week, rather than the usual six days. *Id.*

These harms will continue as long as the mail is delayed. And the States themselves are not spared. Defendants' recent changes to the operation of Postal Services impede the work of agencies across all the Plaintiff States. These changes are interfering with the administration of the 2020 election. And by making these changes without first undertaking the procedures required by section 3661, Defendants deprived the States of the opportunity to comment on changes affecting essential operations.

### A.      Current Mail Delays

Many state agencies use the Postal Service to operate, including by mailing payments, benefits, legal notices, and other essential documents; with so many employees working from home, they also use the mail to distribute supplies and other items. Consequently, agencies in Plaintiff States have been, and will continue to be, harmed because of the mail delays.

Delays in the mail have hamstrung the States' administration of critical benefits during the COVID-19 crisis. For example, Pennsylvania's Department of Labor & Industry administers programs such as unemployment and workers' compensation. O'Brien Decl. ¶¶ 9, 14 (Ex. 39). That department uses the Postal Service to send critical documents related to these programs, but recent delays have led to significant difficulty in scheduling and holding hearings, responding to

---

[36] https://www.nbcnews.com/politics/2020-election/despite-dejoy-s-vows-halt-changes-serious-problems-persist-postal-n1238666 (last visited Sept. 1, 2020).

[37] https://www.nytimes.com/2020/08/20/health/Covid-us-mail-prescription-drugs.html (last visited Sept. 1, 2020).

litigation, adjudicating claims, and paying critical benefits, all of which undermines the Department of Labor & Industry's ability to operate its essential programs. O'Brien Decl. ¶¶ 27-45.

Likewise, Delaware's Department of Health and Social Services administers payments for child support, general cash assistance programs, food assistance programs, and other benefit programs, all of which meet critical needs right now. Kejner Decl. ¶ 2 (Ex. 31). It sends correspondence for these programs by mail. Kejner Decl. ¶¶ 6-8. Since July 2020, interruptions to mail service have delayed receipt of state-issued checks and other correspondence essential to the administration of these benefit programs. Kejner Decl. ¶¶ 14-17. In one case, a check mailed July 24, 2020, has not yet arrived; in two other cases, hearing notices were not received until after the scheduled hearing. Kejner Decl. ¶ 14. As a result, the Department of Health and Social Services has had difficulty providing adequate services to all of its clients and has been challenged to comply with state and federal timeliness requirements. Kejner Decl. ¶¶ 15-18.

In North Carolina, interruptions in mail service affect the ability of the Office of Recovery and Resiliency to timely deliver assistance to hurricane survivors. Whichard Decl. ¶ 5 (Ex. 45). Timely mail service is also critical for the North Carolina Department of Commerce's payment of unemployment insurance benefit, 5 percent of which are made by mail. Whichard Dec. ¶ 9. Delays in mail service also affect the North Carolina Department of Health and Human Services's ability to send eWIC cards, replacement eWIC cards, WIC Farmer's Market Nutrition Program coupons (which expire after 30 days), and EBT cards and applications. Whichard Decl. ¶ 10. Delays in these mailings will impact the ability of participants, particularly the most financially insecure, to buy food and will decrease the time they have to redeem food-related benefits. Whichard Decl. ¶ 10.

Similarly, Los Angeles County's Department of Health Services, which offers lost cost or free health care to low-income county residents, uses on an automated prescription refill service through which medicine is mailed to patients through the Postal Service. Pallares Decl. ¶¶ 3-4 (Ex. 41). Because of the COVID-19 pandemic, over 70 percent of the department's patient receive their medicine through the mail. Pallares Decl. ¶ 7. Since July, many DHS patients have reported waiting up to three weeks for a refill to arrive. Palleres Decl. ¶ 8. The Department of Health Services has had to take protective measure—such as early refills—to make sure patients are not left with medicine, but that has led to a number of double orders and increased operational costs. Palleres Decl. ¶ 11.

State agencies' internal operations have been harmed too. In California, the Department of Conservation's overnight shipments to employees of necessary equipment have taken 11 days to arrive, during which time the employees could not perform their job duties. Haas Decl. ¶ 8 (Ex. 27). Hearing notices, documentary evidence, and settlement agreements sent by or to the Department of Conservation or by California's Labor and Workforce Development Agency, have in some cases arrived too late to be useful, or have never arrived at all. Haas Decl. ¶¶ 9-10; Knox Decl. ¶ 10 (Ex. 33). For the Labor and Workforce Development Agency, delays have meant the department has had to reschedule hearing dates, or re-open closed matters, for people claiming an entitlement to unemployment insurance. Knox Decl. ¶ 11. And in recent weeks, the California Department of Consumer Affairs, the licensing body for more than 3.5 million professionals in 250 different categories, has had some of its exam scheduling letters, licenses, documents from applicants, fees, and other important items delayed by weeks or lost altogether. Kirchmeyer Decl. ¶ 4, 9-15 (Ex. 32). California's who need agency approval for licensing have not always received it in a timely fashion, which can impose financial hardship. Kirchmeyer

Decl. ¶¶ 16-17. Those delays all hamper the agency's collection of licensing fees, which is its sole source of funds. Kirchmeyer Decl. ¶ 19. Moreover, frustrated consumers have filed more complaints with the agency, which the agency has spent additional time handling. Kirchmeyer Decl. ¶ 18.

Individual mail customers in the States, too, have experienced and continue to experience personal harm from delayed medical supplies, medications, checks, bills, and benefits. Those harms, as is now known, are common and can be devastating.

A former Pennsylvania teacher and recent heart transplant patient had to wait ten days to receive an order form for a blood draw, despite the form coming from the same city she lived in. Jara Decl. ¶¶ 13-17 (Ex. 29). Separately, a small business owner in Pennsylvania recently sent a furloughed employee her last paycheck by first-class mail, along with a personal note expressing gratitude for her work. Erlbaum Decl. ¶ 9 (Ex. 24). More than three weeks later, the checks and note had still not been delivered. Erlbaum Decl. ¶¶ 12-13. One California small business owner who sells goods through an online marketplace has had, since July 2020, nine shipments delayed by an average of six days, leading to several negative reviews. Utal Decl. ¶¶ 13-21, 24 (Ex. 43). From January 2019 to June 2020, the same retailer had just one of 124 domestic packages sent through the Postal Service delayed. Utal Decl. ¶ 12. Because that retailer has responded by starting to use Priority Mail, she has sold fewer goods and estimates that she has lost more than $1,500 in refunds and business due to the delays. Utal Decl. ¶ 25-32. Finally, a Delaware child missed at least one dose of his prescribed medicine in August because a package that typically had been delivered within three days of shipment took a week to deliver. Naccarato-O'Toole Decl. ¶¶ 6-7, 11 (Ex. 38).

### B.      Election-Mail Related Harms

Defendants' improper changes to the transportation, processing, and delivery of mail threaten irreparable harm to the ability of the States to conduct free and fair elections in November 2020. *E.g.*, Marks Decl. ¶¶ 26-27 ; Bluestein ¶¶ 15-16; Albence Decl. ¶ 23; Bell Decl. ¶¶ 17, 20; Dunlap Decl ¶ 25; Miller ¶¶ 22-23; Padilla Decl. ¶ 29; Tassinari Decl. ¶ 16 (Ex. 42). The States have established no-excuse mail-in voting for the general election with deadlines and procedures adopted to maximize voter participation and in reliance on the Postal Service's historical treatment of Election Mail. *See* Marks Decl. ¶¶ 7-15 ; Bluestein Decl. ¶ 11; Albence Decl. ¶¶ 12-14; Bell Decl. ¶ 14; Dunlap Decl. ¶¶ 12-13, 16; Padilla Decl. ¶¶ 20-21; Tassinari Decl. ¶¶ 12-13. Changes in this treatment threaten the States' administration of their elections: for example, if the Postal Service does not postmark every ballot (or rigorously ensure that all USPS employees know to postmark every ballot), then voters in California, Massachusetts, North Carolina risk being disenfranchised. Bell Decl. ¶ 14; Padilla Decl. ¶ 18; Tassinari Decl. ¶ 10.

Moreover, due to COVID-19, the States are actively encouraging voters to use mail-in ballots as an easier, safer, and more easily accessible alternative to voting in person. *E.g.*, Marks Decl. ¶ 22; Albence Decl. ¶ Bell Decl. ¶¶ 11, 14; Padilla Decl. ¶ 19. California and the District of Columbia have both responded to COVID-19 by enacting laws requiring ballots to be mailed to all active registered voters. Miller Decl. ¶ 7; Padilla Decl. ¶¶ 6, 16-18. And all the States are anticipating unprecedented numbers of ballots cast by mail due to the COVID-19 pandemic. *E.g.*, Marks Decl. ¶ 17; Albence Decl. ¶ 16; Bell Decl. ¶ 15; Dunlap Decl. ¶¶ 22, 24; Miller Decl. ¶ 10. In Philadelphia alone, 42 times as many people voted by mail in the 2020 primary as in the 2016 primary. Bluestein Decl. ¶ 6.

Voting by mail is particularly important for elderly voters and voters with underlying medical conditions, who are at high risk of severe illness from COVID-19. *See, e.g.*, CDC, Coronavirus Disease 2019, *Your Health, Older Adults* (updated Aug. 16, 2020)[38]; CDC, Coronavirus Disease 2019, *Your Health, People with Certain Medical Conditions* (updated Aug. 14, 2020).[39] This is of particular importance in Maine, where a significant number of voters are elderly or have disabilities. Dunlap Decl. ¶ 9. In Philadelphia, nearly one-third of mail-in voters for the 2020 primary were over the age of 65, and nearly one-third of all ballots requested for November 2020 are from seniors. Bluestein Decl. ¶ 9.

Continued mail delays—especially during the final two weeks prior to November 3—risk leaving thousands of voters disenfranchised through no fault of their own. For example, during Pennsylvania's June 2020 primary election, more than half a million ballots were returned during the final week. Marks Decl. ¶ 27. If a voter receives her ballot later than anticipated, she will have to make a difficult decision about whether to entrust her ballot to USPS or seek out an alternative method—such as delivering the ballot in person, voiding her mail-in ballot to vote in person, or voting in person provisionally if the mail-in ballot never arrives—with concomitant risks to her health and safety. *E.g.*, Bluestein ¶ 18; Freitag Decl. ¶ 12; Marks Decl. ¶ 26. In addition, voters who successfully requested a mail-in ballot but do not receive it may submit duplicate applications, detracting from time spent mailing ballots. Bluestein ¶ 17.

Delayed mail also risks stressing state and local infrastructure and plans for processing returned Election Mail. For example, Delaware law allows election officials to begin processing envelopes 30 days before the election, but it allows only two days to certify the election results

---

[38] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[39] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

afterwards. Albence Decl. ¶¶ 16-18. In anticipation of increased mail-in ballots, the State

purchased extra scanners and implemented a plan relying on the routine arrival of ballots. *Id.* If

delays cause a huge volume of ballots to arrive close to Election Day, ballots risk being left

uncounted. *Id.*

To prevent mail delays from disenfranchising voters, some States are taking steps to

allow their residents to safely vote by mail without relying on the Postal Service. For example,

the Secretary of State's Office in Maine is working with municipal offices to install secure drop

boxes. Dunlap Decl. ¶ 19. The District of Columbia will install 55 Secure Mail Ballot Drop

Boxes, at a cost of over $76,000. Miller Decl. ¶¶ 13-14. The District of Columbia will also allow

voters to drop their ballots off early at Vote Centers. Miller Decl. ¶ 15.

In response to the delays, voters have contacted election officials in the States to express

concern about the reliability of the Postal Service to delivery ballots. *E.g.*, Bell Decl. ¶ 19;

Dunlap Decl. ¶ 18; Freitag Decl. ¶ 10. In Pennsylvania, the Department of State experienced a

roughly 50 percent increase in the number of calls from voters, most of whom were anxious

about the delays. Marks Decl. ¶ 25. In California, the Secretary of State has received over 1,000

calls questioning the ability of USPS to reliably deliver ballots. Padilla Decl. ¶ 27. To ease public

concern, Maine is working to establish an online ballot tracking system so voters can see if their

ballot has been received and accepted. Dunlap Decl. ¶ 20. The States are also developing media

campaigns to encourage voters to vote early and to counter public anxiety. Bluestein Decl. ¶13;

Albence Decl. ¶ 22; Dunlap Decl. ¶ 22; Freitag Decl. ¶ 9. Miller Decl. ¶ 16; Padilla Decl. ¶ 28.

If Defendants fail to revoke the operational changes that cause delays and fail to clearly

communicate a single message about the treatment of Election Mail, voters may grow

increasingly distrustful of the Postal Service and look for alternative ways to return their

ballots—despite the risks to their health. *E.g.* Jones Decl. ¶¶ 27-30 (Ex. 30) (expressing fear and confusion over how to vote safety); Mayer Decl. ¶¶ 27-36 (Ex. 36) (elderly voter now planning to deliver her ballot in person); Weber ¶¶ 28-33 (Ex. 44) (planning to deliver her ballot in person and encourage others to do the same). In Pennsylvania, there has been a marked increase since late July in the number of voters asking to cancel their permanent mail-in or absentee ballot status such that they would not receive a mail-in ballot for the November 2020 general election. Marks Decl. ¶ 25; Bluestein ¶ 14. Still other voters may decline to participate in the election at all. Miller Decl. ¶ 22.

### C. Deprivation of the Right to Comment on Postal Regulatory Commission Proceedings

Defendants instituted or are in the process of instituting "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," 39 U.S.C. § 3661(b), without first seeking an advisory opinion from the Postal Regulatory Commission. Because Defendants did not go before the Postal Regulatory Commission, there was no hearing on the record to assess the proposed changes, *id.* § 3661(c), nor an opportunity to submit comments, 39 CFR § 3010.140, or to intervene, *id.* § 3010.142.

As a result, the States have been deprived of a "procedural right" adopted to protect the "concrete interests" of the public whenever the Postal Service makes changes that can affect the service of mail. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.7 (1992). Congress granted the Postal Service a monopoly on letter-mail and mailboxes, Private Express Statutes, 18 U.S.C. §§ 1693-99, 39 U.S.C. §§ 601-06, 39 C.F.R. pts. 310, 320, precisely to ensure universal service to all Americans, 39 U.S.C. § 101. And numerous basic government services in the States depend on the efficient and reliable delivery of mail. *E.g.*, O'Brien Decl. ¶¶ 7-18; Kirchmeyer Decl. ¶¶ 4-6; Knox Decl. ¶¶ 6-9; Kejner Decl. ¶¶ 6-13. In fact, the existence of a nationwide

Postal Service predates the founding of America itself. *See generally*, USPS, *Universal Service and the Postal Monopoly: A Brief History* (Oct. 2008).[40] Indeed, the very viability of absentee ballots and mail-in voting in American elections depends wholly on the Postal Service's obligation to "provide prompt, reliable, and efficient services to patrons in all areas and [] render postal services to all communities." 39 U.S.C. § 101(a).

Had Defendants followed the proper procedures, the States would have filed comments and intervened to oppose any changes that deprioritize the delivery of Election Mail. Likewise, the States would have filed comments or intervened to ensure that any changes to Postal Service transportation practices would not undermine service—much less cause an abrupt and dramatic decline in service with no warning. The States would have cautioned that four months before a general election, in which an unprecedented number of Americans will vote by mail due to an unprecedented global health crisis, is not the time to disrupt the status quo.

The States do not oppose efforts to make the Postal Service more efficient. But commitment to arbitrary departure and return times, without more, does nothing to further the efficient delivery of mail, and should not supersede the Service's commitment to every piece, every day. By depriving the States of this opportunity to participate in proceedings about changes to the nationwide service of mail, the States have suffered and will continue to suffer irreparable harm.

## IV.    The Balance of the Equities and the Public Interest Favor Injunctive Relief

Finally, the balance of the equities and the public interest strongly favor issuing a preliminary injunction. "When the government is a party, [the balance of the equities and the public interest] factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.

---

[40] https://about.usps.com/universal-postal-service/universal-service-and-postal-monopoly-history.pdf.

2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing the factors in the context of a request for stay pending judicial review)); *see also Elansari v. United States*, 615 Fed. App'x 760, 761 (3d Cir. 2015) (mem.) (per curiam) (holding the same in the context of a preliminary injunction).

The Third Circuit has stated that "[i]f a plaintiff proves 'both' a likelihood of success on the merits and irreparable injury, it 'almost always will be the case' that the public interest favors preliminary relief." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). In such cases, analyzing whether an injunction favors the public interest is "often fairly routine." *Id.* (citing *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004)).

The federal government has "no interest in continuing practices" that violate the law. *See Issa*, 847 F.3d at 143 (holding that a school district had "no interest in continuing practices" that violated statute at issue); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[t]here is generally no public interest in the perpetuation of unlawful agency action"). On the other hand, the States have demonstrated the public interest in reliable, timely delivery of the mail for critical medicines and documents and the essential governmental functions of the States. *See supra* Part III; *see also* Compl., ¶¶ 180-94, 214-21 (ECF No. 1). Requiring the Postal Service to cease its illegal and unconstitutional actions will merely restore the status quo, including decades of formal and informal policy and practice in place prior to Defendants' unlawful changes in July 2020.

More importantly, the November 2020 general election, held in the midst of a once-in-a-century pandemic, will feature significantly more voting by mail than previous elections in the States. Delays in the mail, coupled with Defendants' de-prioritization of Election Mail, means

"there is a substantial risk that citizens will be disenfranchised" absent an injunction. *League of Women Voters*, 838 F.3d at 12. Thus, the public interest favors an injunction to protect the "fundamental political right to vote" that is "preservative of all rights," and "of the most fundamental significance under our constitutional structure." *Id.* (citations omitted). Even actions that "create a disincentive for citizens who would otherwise attempt to register to vote" weigh in favor of an injunction. *Id.* at 13. Here, ballots of qualified voters are threatened to be nullified by Defendants' actions if they are returned too late to be counted. The States have chosen to expand mail-in voting during the COVID-19 pandemic, agreeing that "[t]he public interest [] favors permitting as many qualified voters to vote as possible." *Id.* at 12. The States and the public also have an "indisputabl[e]" interest "in preserving the integrity of [the] election process." *Id.* at 13 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). The public interest in the issuance of an injunction is clear.

Defendants' actions have delayed and will continue to delay the mail. The have undermined the confidence the States' residents have in the reliability and security of voting by mail. And they threaten to disenfranchise voters in the States if they are not enjoined. For those reasons, the balance of the equities and the public interest strongly favor restoring the status quo until this matter may be resolved finally by the Court.

## CONCLUSION

For the foregoing reasons, Plaintiffs request the Court grant their motion for preliminary injunction.

September 2, 2020

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania
MICHAEL J. FISCHER (Pa. Bar. No.
322311)
Chief Deputy Attorney General

 s/ *Aimee D. Thomson*

AIMEE D. THOMSON (Pa. Bar. No.
326328)
RYAN B. SMITH (Pa. Bar. No. 324643)
JACOB B. BOYER (Pa. Bar. No. 324396)
Deputy Attorneys General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 374-2787
athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

XAVIER BECERRA
Attorney General
State of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SUSAN SLAGER
Supervising Deputy Attorney General
MARISSA MALOUFF
ANTHONY O'BRIEN**
JASLEEN SINGH**
LISA C. EHRLICH**
Deputy Attorneys General
Office of the Attorney General for the State of
California
455 Golden Gate Avenue, Suite 11000 San
Francisco, CA 94102
(415) 510-3489
Lisa.Ehrlich@doj.ca.gov
*Attorneys for Plaintiff State of California*

KATHLEEN JENNINGS
Attorney General
State of Delaware
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
JILLIAN A. LAZAR
VANESSA L. KASSAB***
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Vanessa.Kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
*Attorney General*
*District of Columbia*
KATHLEEN KONOPKA*
Deputy Attorney General, Public Advocacy
Division
BRENDAN B. DOWNES*
Assistant Attorney General, Public Advocacy
Division
Office of the Attorney General for the District
of Columbia
400 6th St. NW
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
*Attorneys for Plaintiff District of Columbia*

AARON M. FREY
Attorney General
State of Maine
SUSAN P. HERMAN**
Chief Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
T (207) 626-8814
susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

MAURA HEALEY
Attorney General
Commonwealth of Massachusetts
DAVID C. KRAVITZ*
Deputy State Solicitor
Office of Attorney General Maura Healey
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2427
david.kravitz@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

JOSHUA H. STEIN
Attorney General
State of North Carolina
SRIPRIYA NARASIMHAN*
Deputy General Counsel
SARAH G. BOYCE*
Deputy Solicitor General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
snarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*Appearing pro hac vice (applications
forthcoming or pending)*

**Appearing pro hac vice*

*** Application for admission forthcoming*