# EXHIBIT 13

# LINK

## Daily News: August 14, 2020

Link Extra
# Path forward

**PMG addresses restructuring**

Aug. 13 at 4:18 p.m.

*Postmaster General Louis DeJoy distributed the following memo to USPS employees on Aug. 13:*



Today, I am in my ninth week as Postmaster General. I am grateful to everyone who has welcomed me, and I am thoroughly impressed by the dedication and commitment you have shown since I started June 15.

Last week was extremely busy for all of us with the announcement that we are *restructuring into three operating units*. I purposely timed the announcement with my first open meeting of the Board of Governors to set the stage with public statements emphasizing that we are developing a strategic plan to achieve operational excellence and financial stability. Our plan will be based on facts and data, and together, we can systematically roll out this plan and position ourselves for future success.

Let me be clear about the reasons behind our restructuring and the need for our plan. Our financial condition is dire. Ongoing declines in mail volume, a broken business model that Congress and the Postal Regulatory Commission have failed to act upon, and the crippling economic impact of the coronavirus pandemic have all combined to bring us to where we stand today. Our critics are quick to point to our finances, yet they offer no solution. On the other hand, our restructuring and the plan we are developing provide a path to our transformation into a financially stable organization. I repeat again how excited I am to take on these challenges, with your support, to improve the Postal Service and better serve our nation. Together, our leadership team and I are taking aggressive and professional actions to ensure a successful future for the Postal Service.

*Postmaster General Louis DeJoy*

In order to transform and remain a self-sustaining, mission-focused organization that continues to serve the American people, we must make a number of significant changes that will not be easy, but are necessary. We must re-establish fundamental operating principles and then adhere to them and run on time. It is the only path to consistent, affordable service and it is foundational to our future aspirations and objectives. As you know, we began those efforts right away, as it was imperative for us to strengthen these disciplines immediately by running our trips with mail and packages according to established schedules.

I congratulate you on substantial improvements in our on-time dispatch schedule, which reached 97.3 percent, up from 89.8 percent. We also have reduced extra trips by 71 percent — a tremendous achievement. This means more mail is being moved to its intended destination on time and on schedule than in quite some time.

Exhibit 13

And we accomplished this in a cost-effective manner. This marks the beginning of our journey toward world-class performance necessary for us to compete and be sustainable.

Unfortunately, this transformative initiative has had unintended consequences that impacted our overall service levels. However, recent changes are not the only contributing factors. Over the years we have grown undisciplined in our mail and package processing schedules, causing an increase in delayed mail between processing facilities and delivery units. We are working feverishly to stabilize this, so that all mail and packages moved for the American people and businesses can benefit from this new cost and schedule discipline. This will increase our performance for the election and upcoming peak season and maintain the high level of public trust we have earned for dedication and commitment to our customers throughout our history.

I also firmly believe that the realignment we announced last week will ultimately help us to stabilize and improve service and provide positive forward momentum as we work to transform our business. We needed to provide greater focus on the core aspects of our business, and the new structure allows that, with clearer lines of authority and accountability. While it will take some time to get the new organizational structure fully in place and achieving our expected levels of high performance, we are confident that it is the right alignment and that it was a change that needed to be made. As I said in my *first video message* to you, "I am decisive, and … when I see problems, I work to solve them." I ask you to bear with me while we work through these changes to transform for the better and continue to provide the excellent service for which we are known.

During my *remarks at the Board of Governors meeting*, I stated that I accepted the job of Postmaster General fully committed to the role of the Postal Service as an integral part of the United States government, providing all Americans with universal and open access to our unrivaled processing and delivery network, as reflected in the mission statement that the board *adopted* April 1. I repeat that statement here, because I meant it.

I fully embrace six-day delivery of mail and packages as one of this organization's greatest strengths. I plan to invest in tools and equipment for our workforce to continue to provide the nation's most trusted public service. I accept the responsibility that the governors gave me to maintain and enhance our reputation and role as a trusted face of the federal government in every community, and I intend to work with postal executives, management associations, managers, union leadership, and our craft employees to do everything I can to put us back on a financially stable path.

Together, I am confident we will chart a path forward that allows us to fulfill our critical public service mission in a financially sustainable manner. I look forward to the challenge, and I know we are up to it.

---

## 'Retirement 101'

**Webinar to be held Aug. 18**

Aug. 13 at 11:24 a.m.

Postal Service employees can participate in an upcoming webinar on preparing for retirement.

The session, "Retirement 101," will be held Tuesday, Aug. 18, at noon EDT.

Aetna will conduct the webinar, which will help participants understand how benefits might work nationwide and overseas. Participants can also learn about tools and resources that are available before and after retirement.

Additionally, the webinar will feature a discussion of Tricare dental insurance and include time for questions.

Participants must register before the event on the *webinar website*. After signing up, directions will be emailed to

Exhibit 13

# EXHIBIT 14





FOR IMMEDIATE RELEASE
Aug. 18, 2020

Contact: David Partenheimer
*david.a.partenheimer@usps.gov*
*usps.com/news*

# Postmaster General Louis DeJoy Statement

WASHINGTON, DC — Postmaster General Louis DeJoy issued the following statement today:

"The United States Postal Service will play a critical role this year in delivering election mail for millions of voters across the country. There has been a lot of discussion recently about whether the Postal Service is ready, willing and able to meet this challenge.

I want to make a few things clear:

The Postal Service is ready today to handle whatever volume of election mail it receives this fall. Even with the challenges of keeping our employees and customers safe and healthy as they operate amid a pandemic, we will deliver the nation's election mail on time and within our well-established service standards. The American public should know that this is our number one priority between now and election day. The 630,000 dedicated women and men of the Postal Service are committed, ready and proud to meet this sacred duty.

I am announcing today the expansion of our current leadership taskforce on election mail to enhance our ongoing work and partnership with state and local election officials in jurisdictions throughout the country. Leaders of our postal unions and management associations have committed to joining this taskforce to ensure strong coordination throughout our organization. Because of the unprecedented demands of the 2020 election, this taskforce will help ensure that election officials and voters are well informed and fully supported by the Postal Service.

I came to the Postal Service to make changes to secure the success of this organization and its long-term sustainability. I believe significant reforms are essential to that objective, and work toward those reforms will commence after the election. In the meantime, there are some longstanding operational initiatives — efforts that predate my arrival at the Postal Service — that have been raised as areas of concern as the nation prepares to hold an election in the midst of a devastating pandemic. To avoid even the appearance of any impact on election mail, I am suspending these initiatives until after the election is concluded.

I want to assure all Americans of the following:

- Retail hours at Post Offices will not change.

- Mail processing equipment and blue collection boxes will remain where they are.

- No mail processing facilities will be closed.

- And we reassert that overtime has, and will continue to be, approved as needed.

In addition, effective Oct. 1, we will engage standby resources in all areas of our operations,

Exhibit 14

including transportation, to satisfy any unforeseen demand.

I am grateful for the commitment and dedication of all the men and women of the Postal Service, and the trust they earn from the American public every day, especially as we continue to contend with the impacts of COVID-19. As we move forward, they will have the full support of our organization throughout the election."

# # #

**Please Note:** For U.S. Postal Service media resources, including broadcast-quality video and audio and photo stills, visit the *USPS Newsroom*. Follow us on *Twitter, Instagram, Pinterest,* and *LinkedIn*. Subscribe to the *USPS YouTube channel*, like us on *Facebook* and enjoy our *Postal Posts blog*. For more information about the Postal Service, visit *usps.com* and *facts.usps.com*

Exhibit 14

# EXHIBIT 15

STEVEN W. MONTEITH
A/CHIEF CUSTOMER AND MARKETING OFFICER
EXECUTIVE VICE PRESIDENT


UNITED STATES
POSTAL SERVICE

August 18, 2020

RE: Election Mail

Due to the impacts of the COVID-19 pandemic, the Postal Service anticipates that many voters will choose to use the mail to participate in the upcoming elections, including the 2020 General Election in November. The Postal Service employs a robust and proven process to ensure proper handling of all Election Mail, including ballots. Mailer Service Providers (MSPs) and printers have a critical role to play in the success of that process.

The Postal Service makes the following recommendations to MSPs and printers to facilitate the timely delivery of Election Mail:

1. MSPs, printers, and the Postal Service must work together to educate election officials and voters about the USPS delivery standards. While we are committed to delivering ballots in a timely manner, the Postal Service cannot guarantee a specific delivery date or alter delivery standards to comport with individual state election laws. As general guidance, domestic First-Class Mail is delivered in 3 to 5 days, and domestic Marketing Mail (used by many states to send absentee ballots to voters) is delivered in 3 to 10 days. The Postal Service strongly recommends the MSPs and printers provide our delivery standards to their Election Mail customers when discussing mailing timelines.

2. One of the key challenges during this election will be the transit time for each ballot. The Postal Service strongly recommends that domestic voters request their ballots at the earliest point allowable but at least 15 days before Election Day. The Postal Service further recommends voters mail their ballots at least one week before the due date to account for the Postal Service's delivery standards and to allow for contingencies such as weather issues or unforeseen events. It should be further noted that the above timeline is suited for domestic, non-military voters. To ensure that ballots reach military and overseas voters timely, elections officials should mail ballots at least 45 days before elections for Federal office. The Postal Service asks MSPs and printers to discuss these recommendations with their election customers.

3. The Postal Service recognizes that many state and local jurisdictions allow voters to request ballots less than 15 days before they must be returned. MSPs, printers, election officials, and voters must understand that such deadlines may not provide enough time for the Postal Service to deliver an absentee ballot from the election office to the voter and return the marked ballot from the voter to the election office. Failing to follow the Postal Service's recommendations will increase the risk that voter ballots will not be completed, delivered, and returned in time to be counted.

Exhibit 15

- 2 -

4. We would also like to clarify the purpose of the Official Election Mail logo. Placing the Official Election Mail Logo on a mailpiece sent using Marketing Mail will not upgrade service to First-Class Mail. The mail is delivered in accordance with the class of service for which postage has been paid. However, the Official Election Mail Logo is a critical component of mailpiece visibility.

5. The Postal Service recommends that MSPs and printers work with their elections customers to use the Postal Service's available visibility tools on all qualifying Election Mail. This includes:

   • Placing the Official Election Mail Logo on every qualifying Election Mail envelope.
   • Utilizing uniquely serialized Intelligent Mail barcodes on every outbound and return ballot envelope.
   • Checking the Election Mail checkbox on all postage statements and eDocs.
   • Attaching Tag 191, Domestic and International Ballots, to ballot mail containers to make the mailing more visible when it is entering a plant.
   • Creating Informed Delivery campaigns to notify the voter that marked ballots should be put in the mail by one week before Election Day.
   • Providing 48 hours of advanced notice to the appropriate Postal Service location before you enter large or at-risk election mailings.
   • We also recommend that all Election Mail meet automation compatibility requirements.

6. Mailpiece design plays a key role in the timely delivery of blank ballots to voters and completed ballots back to election officials. Time-sensitive Election Mail, including ballots, must be prepared in a manner which complies with USPS regulations. The Postal Service has assigned a mailpiece design analyst to assist each local election jurisdiction with quality mailpiece design.

7. It is crucial that every outbound and return envelope or mailpiece is approved by a mailpiece design analyst before each election. Please note that while some pieces may technically meet the Postal Service's mailing requirements, not all designs are recommended. Many templates of quality pieces are available through the Mail & Shipping Solutions Center.

8. An Election Mail project calls for the creation of multiple accounts with the Postal Service. It may take time for those accounts to be created before printing and mail pieces for each account may need to be reviewed. For more information, please contact the Mail and Shipping Solutions Center at 877-672-0007 or mssc@usps.gov.

9. Plan ahead. We recommend that MSPs advise their elections customers to use automation compatible, letter-sized envelopes.

The U.S. Mail remains a secure, efficient, and effective means for citizens and campaigns to participate in the electoral process. The Postal Service is proud of our role as an important component of the nation's democratic process, and we would like to thank you for cooperating with us during this election cycle.

Sincerely,

Steven W. Monteith

Steven W. Monteith

Exhibit 15

# EXHIBIT 16



# CONGRESSIONAL BRIEFING:

Transportation & Service
Performance Updates

August 31, 2020

Exhibit 16



# Transportation Performance

Data Through 8/29/20

Exhibit 16



# Transportation Analysis Overview

**Service Impacts:** USPS transportation and logistics professionals manage an average flow of over 390 million mail pieces daily throughout the Postal Service network, which includes 285 processing facilities and about 35,000 retail locations.

Postal Service facilities are linked by a complex transportation network that depends on the nation's highway, air, rail, and maritime infrastructures. The success of each system affects the success of others. If surface transportation departs late or unscheduled trips are added, the connection between processing facilities, post offices, airlines, and others become misaligned, impacting downstream operations and hindering efforts to meet service performance.

**Financial Impacts:** In FY 2019, the Postal Service spent over $550 million extra in transportation to mitigate delays that occurred in the network:

- $266 million in extra trips;
- $130 million in overtime;
- $14 million in late trips; and
- $140 million in air freight mitigation

**Effectively aligning operational plans and a timely, consistent transportation network will improve service and reduce cost.**

Exhibit 16                         For more information, please reference the Office of Inspector General Audit Report Number 20-144-R20                         3



# Transportation Summary



Exhibit 16

Trips on time references left axis. Late and extra trips references right axis

Source: SV - Surface Visibility

4



**Late Trips Analysis**



Exhibit 16

Source: SV - Surface Visibility    5



## Extra Trips Analysis



Exhibit 16



# Service Performance

Data Through 8/26/20

Exhibit 16



Exhibit 16

First-Class Mail    USPS Marketing Mail    Periodicals

All scores for current week-to-date (week of 8/22) are through 8/26. USPS Marketing Mail score for current week-to-date does not include Saturation Mail as that data is available after the end of the week i.e. on 9/1

8



Presort First-Class Mail
Score Breakdown – Processing vs Last Mile

- Baseline Period: 3/14 - 7/3
- Current week-to-date: 8/22 - 8/26

Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and may NOT match the official scores in slide 1 which are weighted.

9



**UNITED STATES POSTAL SERVICE**

**USPS Marketing Mail
Score Breakdown – Processing vs Last Mile**

- Baseline Period: 3/14 - 7/3
- Current week-to-date: 8/22 - 8/26

**OVERALL**
**8.26% HIGHER THAN 8/1 – 8/7**

**OVERALL**
**0.49% LOWER THAN BASELINE**

**PROCESSING**
**0.10% LOWER THAN BASELINE**

**LAST MILE**
**0.40% LOWER THAN BASELINE**

Overall Score — Processing Score — 1 Extra Day — Last Mile Impact

Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan at the destination plant measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. it includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and may NOT match the official scores in slide 1 which are weighted.

11



# EXHIBIT 17

**<u>Exhibit 17</u>**: USPS Office of Inspector General, Audit Report, Processing Readiness for Election and Political Mail for the 2018 Midterm Elections (June 5, 2018) is filed as a separate attachment due to USPS OIG security features in the document.

# EXHIBIT 18

**<u>Exhibit 18</u>**: USPS Office of Inspector General, Audit Report, Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections (Nov. 4, 2019) is filed as a separate attachment due to USPS OIG security features in the document.

# EXHIBIT 19

**Exhibit 19**: USPS Office of Inspector General, Audit Report, Processing Readiness of Election and Political Mail During the 2020 General Elections (Aug. 31, 2020) is filed as a separate attachment due to USPS OIG security features in the document.

# EXHIBIT 20

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

                Plaintiffs,

                v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

                Defendants.

**No. 2:20-cv-4096-GAM**

## DECLARATION OF ANTHONY J. ALBENCE

I, Anthony J. Albence, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true
and correct:

1.      I am the State Election Commissioner at the Department of Elections located in

Delaware. I have been employed as the State Election Commissioner since June 19, 2019. I have

a Bachelors degree in American Political Theory from the Catholic University of America and a

Masters in Urban Affairs and Public Policy from the University of Delaware. Prior to being

confirmed as the State Election Commissioner, I spent twelve years as the Director of the New

Castle County office of the Department of Elections in Delaware.

2.      As the State Election Commissioner, I was appointed by the Governor and

confirmed by the State Senate for a four-year term. In this role, I serve as an ex officio member

Exhibit 20

of the State Board of Elections, attend all State Board of Elections meetings, and supervise the Department of Elections. I also develop regulations, policies, procedures and guidelines as provided in Title 15 of the Delaware Code, which governs our state elections; investigate violations of the state's campaign finance law; and collect and report election results.

3.      I submit this Declaration in support of the State of Delaware's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      I have compiled the information in the statements set forth below through my personal knowledge and access to Department of Elections records. If called as a witness, I could and would testify competently to the matters set forth below.

I.      **Delaware's Absentee and Mail-in Voting Laws, Policies, Procedures**

5.      Absentee voting eligibility for Delaware's 2020 presidential primary was expanded due to the COVID-19 pandemic through an executive order issued by Delaware Governor John C. Carney, Jr., which allowed any otherwise duly-registered voter to vote by absentee ballot using the "sick or physically disabled" qualification under Delaware law if the individual was abiding by Centers for Disease Control & Prevention and Delaware Division of Public Health guidelines by exercising self-quarantine or social distancing to avoid potential exposure to (and community spread of) COVID-19. *See* Sixth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (Mar. 24, 2020).[1] More than 56,000 individuals utilized this expanded absentee voting eligibility to cast an

---

[1] Office of the Governor, *Sixth Modification: Declaration of a State of Emergency* (March 24, 2020), http://governor.delaware.gov/health-soe/sixth-state-of-emergency/.

Decl. of Anthony J. Albence                                          Case No. 20-cv-4096-GAM
Exhibit 20

absentee ballot for the 2020 presidential primary, compared to 5,046 individuals who voted by absentee ballot for the 2016 presidential primary.

6.      On July 1, 2020, Delaware enacted legislation to allow any registered voter to vote by mail-in ballot for the non-presidential state primary election scheduled for September 15, 2020, the general election on November 3, 2020, and any special election to be called in 2020 due to a vacancy in a statewide office, the Delaware General Assembly, or an office of United States Representative, Senator, or Presidential Elector. Del. Code Ann. tit. 15, § 5601.

7.      Under the new mail-in voting law, the State Election Commissioner is required to send an application to receive a mail-in ballot to every qualified, registered voter no less than 60 days before an applicable election. Del. Code Ann. tit. 15, § 5603(a). For each registered voter who requests a mail-in ballot, the Delaware Department of Elections must send that voter a mail-in ballot, instructions for completing the ballot, and a postage-paid envelope marked "BALLOT ENVELOPE" to return it. Del. Code Ann. tit. 15, § 5604(b). These materials must be sent to the requesting registered voter not more than 30 days nor less than 4 days prior to the applicable election, and within 3 days of the materials becoming available to the Department of Elections. *Id.* As a matter of practice, the Department of Elections sends outbound election materials by First-Class Mail, except for the mail-in voting application, which is sent Business Reply Mail. The postage-paid ballot envelopes sent to voters metered with First-Class postage and marked as such.

8.      Delaware voters may return completed ballots to the Department of Elections in one of three ways: depositing the ballot envelope in a United States postal mailbox; delivering the ballot envelope to the Department of Elections; or placing the ballot envelope in a secure drop-box located in a publicly accessible portion of a Department of Elections office either

Decl. of Anthony J. Albence                                    Case No. 20-cv-4096-GAM
Exhibit 20

before or on the applicable day of election. Del. Code Ann. tit. 15, § 5607(a)(4). In each case, the Department of Elections must receive a mail-in ballot before the polls close on the day of election in order for it to be counted. Del. Code Ann. tit. 15, § 5608.

9.  Approximately 19.4 percent of Delaware residents, and 24.2 percent of all registered Delaware voters, are 65 years of age or older.

10.  As of August 21, 2020, 727,968 Delaware voters have registered to vote. As of August 28, 2020, 102,474 of these voters have requested an absentee or mail-in ballot for the November 3, 2020 general election, with applications still forthcoming. As of the date of this filing, 100,492 Delaware voters have requested an absentee or mail-in ballot for the September 15, 2020 state primary election.

11.  As of August 21, 2020, 24,552 Delaware voters are on the permanent absentee ballot list.

**II.   Impact of USPS Delays**

12.  Over the course of my career with the Department of Elections, I have had ongoing and regular interactions with the USPS regional election mail specialist assigned to Delaware, as well as other USPS regional and headquarter officials. During these interactions, I have received assurance that USPS would deliver election mail without delay.

13.  In the past, the Department of Elections has utilized standard tools available through or in conjunction with USPS. For example, we have utilized electionmail.org, which is a problem reporting and tracking system that flags election mail-related issues in the USPS system. This tool is sponsored by a nonprofit organization, the Democracy Fund, and is fully integrated with the USPS tracking system to facilitate the prompt resolution of problems with election mail. We also use USPS tools as part of our address verification process and have never experienced

Decl. of Anthony J. Albence                                                  Case No. 20-cv-4096-GAM
Exhibit 20

any significant difficulties. Accordingly, the Department of Elections anticipated that it could continue to rely on USPS when it contemplated voting during the COVID-19 pandemic.

14.     There is an inherent reliance on USPS in Delaware's new mail-in voting law, as its operation anticipates that USPS would continue to deliver election mail in a timely fashion, including permitting the Department of Elections to get ballots into the hands of voters within the four-day period prior to an election, as contemplated by Title 15, §5604.

15.     In July 2020, I received a letter from an attorney for the USPS, noting a tension between provisions in the Delaware election law (including the four-day provision in Title 15, §5604) and current USPS delivery standards. This letter stated that USPS cannot adjust its deliveries "to accommodate the requirements of state election law" and indicated that for ballots to count, absentee and mail-in voters must mail their ballots by October 27, 2020, which is more than a week before the election. This means that when Delaware voters request ballots four days prior to the election, as they are permitted to do under state statute, the USPS is indicating that those ballots are unlikely to be timely delivered. This could result in a legal challenge regarding whether the Department of Elections is adhering to the applicable law, most likely in a circumstance where a Delaware resident requests an absentee or mail-in ballot to be sent to an address outside of the immediate area, where USPS delivery may be delayed.

16.     Title 15 § 5611 of Delaware's new mail-in voting law permits us to begin processing envelopes containing ballots when they arrive, up to 30 days in advance of the polls closing. While we are unable to tabulate the ballots until the polls close on election night, we are permitted by law to open the envelopes and scan the ballots. We purchased additional scanners and implemented this timeframe in anticipation of increased absentee and mail-in ballot due to COVID-19. Should absentee and mail-in ballots arrive routinely and without delay over the

Decl. of Anthony J. Albence                                    Case No. 20-cv-4096-GAM
Exhibit 20

course of the 30 days, this would permit us to process the increased volume of such ballots in intervals.

17.     Now, with anticipated USPS delays, we expect to receive a huge volume of ballots at the end, making processing more difficult.

18.     In addition, Delaware law requires all ballots must be received by the Department of Elections by the time the polls close on election night, and then we have only two days to certify the election results. Because of the tight timeframe required by Delaware law, any widespread delay in mail delivery means that a significant number of ballots will not be counted. For example, in the 2020 presidential primary election, 1,661 ballots were received late and were not counted. We anticipate that this number will increase dramatically in the upcoming election if there are widespread USPS delays.

19.     Because of the anticipated USPS delays, the Department of Elections is trying to send constituents the message that they should request absentee and mail-in ballots at least one week in advance of the election.

**III.    Impact of President Trump's Public Attacks on Mail-In Voting**

20.     In light of President Trump's claims about the integrity of mail-in voting, the Department of Elections has received a lot of questions about the process.

21.     I respond by telling constituents that we have a number of safeguards in place in the Delaware elections system that protect the integrity of the process. These safeguards have been there all along, having been enhanced pre-COVID when there was an uptick in absentee voting. These enhanced safeguards include additional badge-access check points and video surveillance both inside and outside the buildings where votes are tabulated.

Decl. of Anthony J. Albence                                    Case No. 20-cv-4096-GAM
Exhibit 20

22.     The Department of Elections will seek to combat President Trump's message with its own messages reassuring the public about the integrity of the process. We have been working on this messaging with Delaware Governor John Carney's office, including by placing announcements on the Department of Elections website, and will continue our efforts to reach out to the public with our message. We will also continue to encourage people to vote early.

**IV.     Potential Consequences on the November 2020 Election**

23.     If the USPS delays continue into November, it could result in significant absentee and mail-in ballots in Delaware going uncounted. As such, it could impact the accuracy of the outcome of the election.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this ⟋⟍⟍ day of August, 2020

Anthony J. Albence
State Election Commissioner

Decl. of Anthony J. Albence                                  Case No. 20-cv-4096-GAM
Exhibit 20

Exhibit 20

# EXHIBIT 21

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

Plaintiffs,

v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

Defendants.

No. 2:20-cv-4096-GAM

## DECLARATION OF KAREN BRINSON BELL

I, KAREN BRINSON BELL, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I serve as the Executive Director of the North Carolina State Board of Elections.  I became Executive Director of the State Board effective June 1, 2019.  Prior to my employment as the Executive Director, I spent a significant portion of my professional life working on a wide scope of issues related to election administration, including in the State of North Carolina.  I served as an Election Administration Consultant for the Ranked Choice Voting Resource Center from October 2016 until May 2019.  I worked part time for the Center from April 2016 to October 2016.  Prior to that, I was employed as a Business Development Director/Project Management Director at EasyVote Solutions from April 2015 until September 2016, and as a Director of Elections for the Transylvania County Board of Elections from March 2011 until

Exhibit 21

March 2015.  I also worked for the State Board as a District Elections Technician from February

2006 until March 2011.

2.      My statutory duties as Executive Director include staffing, administration, and

execution of the State Board's decisions and orders.  I am also the Chief State Elections Official

for the State of North Carolina under the National voter Registration Act of 1993 and N.C. Gen.

Stat. § 163-27.  As Executive Director, I am responsible for the administration of elections in the

State of North Carolina.  The State Board has supervisory responsibilities for the 100 county

boards of elections, and as Executive Director, I provide guidance to the directors of the county

boards.

3.      I submit this Declaration in support of the State of North Carolina's litigation

against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M.

Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the

United States Postal Service.

4.      I have compiled the information in the statements set forth below through my

personal knowledge and through consultation with senior staff at the State Board, who have

assisted me in gathering this information from our institution.  If called as a witness, I could and

would testify competently to the matters set forth below.

**I.      North Carolina's Absentee and Mail-in Voting Laws, Policies, Procedures**

5.      North Carolina has been safely and securely administering elections, including by

giving voters the option to vote by mail for any reason, since 1999.

6.      To vote by mail, voters must first be registered to vote.  N.C. Gen. Stat. § 163-

82.1.  To vote in the 2020 general elections in North Carolina, voters who wish to register online

or in-person must do so by October 9, 2020.  N.C. Gen. Stat. § 163-82.6(d).  Voters who wish to

register by mail must ensure that their registration application is postmarked by October 9, 2020. *Id.* If the postmark is missing or unclear the application must be received in the mail not later than 20 days before the election. *Id.*

7.     To vote by mail, the voter must first request an absentee ballot by filling out a form provided by the State Board.  N.C. Gen. Stat. § 163-230.2.  This form is available for download at the State Board's website and is also available for pickup at all county board of elections offices, at the DMV, libraries, and at National Voter Registration Act (NVRA) agencies.  *Id.*  The form can also be mailed to the interested voter upon request.  *Id.*  Starting September 1, 2020, voters can request an absentee ballot online on a portal on the State Board's website.  The county board of elections office must receive an absentee request by 5 p.m. on October 27, 2020.  N.C. Gen. Stat. § 163-230.1(a).

8.     County boards of elections will begin mailing absentee ballots to voters who have requested them beginning on September 4, 2020.

9.     Voters may return completed ballots by mail.  N.C. Gen. Stat. § 163-231(b). Alternatively, they may return completed ballots in-person to a county board of elections office or to an early-voting site in their county during the early-voting period.  *Id.*  Absentee ballots must be returned to the county board of elections no later than 5 p.m. on Election Day.  *Id.* Absentee ballots received after 5 p.m. on Election Day will be counted only if they are postmarked on or before Election Day *and* are received by mail no later than 5 p.m. three days after Election Day (in 2020, November 6).  *Id.*

10.     North Carolina's laws governing absentee voting ensure that mail-in voting is safe and secure.  Only the voter or a near relative or verifiable legal guardian may complete an absentee ballot request form.  N.C. Gen. Stat. § 163-230.2.  The State Board's request form also

requires the voter to verify her identity by providing her date of birth, last four digits of her Social Security number or driver's license number, and signature. *Id.* When a voter is ready to vote her absentee ballot, she must mark her ballot in the presence of one witness to certify that the voter is the registered voter voting and submitting the marked ballot. N.C. Gen. Stat. § 163-231 (as modified). The voter must also certify on the return envelope containing the marked ballot that she is qualified to vote in the election, under penalty of a felony conviction for false or fraudulent attestation. When returning the marked ballot to the county board of elections, only a voter or her near relative or verifiable guardian may take possession of a ballot for delivery. N.C. Gen. Stat. § 163-226.3. Finally, it is a felony to fraudulently sign the name of a voter in connection with an absentee ballot (N.C. Gen. Stat. § 163-237(d)), and a misdemeanor to either make any written false statement to obtain or vote a ballot (N.C. Gen. Stat. § 163-237(a)) or to "aid and abet fraud" in connection to an absentee ballot (N.C. Gen. Stat. § 163-237(d)).

11. The COVID-19 pandemic has caused the executive and legislative branches of the State to institute a number of changes. Among them is Session Law 2020-17 (H.B. 1169), which reduced the number of witnesses required to witness an absentee ballot from two to one for the 2020 general elections. S.L. 2020-117. In addition, S.L. 2020-17 also permitted members of multipartisan assistance teams to assist not only voters in a covered facility, such as a hospital, clinic, nursing home, or adult care home, but also to assist any voter who requests assistance with the absentee ballot process. *Id.* Finally, S.L. 2020-17 appropriated approximately $13 million in State and CARES Act funds to the State Board and county boards of elections to administer the 2020 general elections, with $424,000 allocated to establish of an online portal for absentee ballot requests. *Id.*

12.     On August 21, 2020, I issued Numbered Memo 2020-19, in which I gave county boards of elections guidance on various aspects of the absentee-ballot process.  Specifically, the Numbered Memo clarified that, absent clear evidence to the contrary, the county board shall presume that the voter's signature on her absentee ballot envelope is that of the voter,  as opposed to some other person's signature, even if the signature is illegible.  It dictates that the voter's signature shall not be compared to the voter's signature in her registration record.  In addition, the Numbered Memo set out the parameters of a cure process for absentee ballots in which voters fail to sign the envelope correctly.  The cure process is dependent on the mail—if the voter is notified of the need to cure her absentee ballot by mail, the notification includes a cure affidavit, and the voter must complete the cure affidavit and ensure it is returned to the county board of elections by the date of canvass.  Much of this process is dependent on the U.S. Postal Service.  Similarly, the Numbered Memo provides a cure process for failure to complete the witness certification correctly.  This process is also dependent on the mail—the voter is notified of the need to fill out a new ballot by mail and the voter must complete a new ballot and ensure it is returned to the county board of elections in time for it to be counted in accordance with state law.  Much of this process, too, is dependent on the U.S. Postal Service.

13.     The State Board of Elections enjoys a close partnership with the U.S. Postal Service.  This partnership has led to an understanding that U.S. Postal Service policy encouraged prioritizing Election Mail, regardless of postage placed on the Mail, such that all Election Mail will be treated like first-class mail.  This partnership and understanding have important implications, particularly because North Carolina experiences severe storms and hurricanes on a nearly annual basis, often on or around Election Day, which may lead to disruptions in elections administration and mail service.

14.     The State's absentee ballot laws rely heavily on the function and performance of the U.S. Postal Service—particularly this year, in the midst of the COVID-19 pandemic. Because North Carolina law limits the people who can handle a ballot to the voter and the voter's near relative or legal guardian, the voter has a limited number of options to ensure that her marked ballot reaches her county board of elections in time to be counted.  The U.S. Postal Service is critical to any voter who, for health or other reasons, cannot drop off her ballot and who does not live with or near a relative who may be able to drop off her ballot.  In addition, North Carolina law requires that an absentee ballot that arrives at a county board of elections after 5 p.m. on Election Day be postmarked on or before Election Day *and* be received before 5 p.m. three days after Election Day.  This requires two things of the U.S. Postal Service: that it faithfully postmark all Election Mail and that it deliver it with sufficient expediency that a ballot cast on Election Day (*i.e.*, postmarked by Election Day) reaches the county board of elections in sufficient time for State law to count it as timely.  Although the U.S. Postal Service has a policy of postmarking all Election Mail, I am aware that not all Election Mail received by county boards of elections through the mail are postmarked.  Failure to postmark an absentee ballot being returned will cause the ballot to be rejected, if it is received after Election Day.  Finally, as noted above, much of the cure process and communication between the county board of elections and the voter is dependent on timely service by the U.S. Postal Service.

15.     Traditionally, roughly 4-5% of the votes cast are by absentee voters.  This year, the State Board and the county boards of elections are preparing for 30-40% of votes to be cast by absentee voters.  In 2016, 4,769,640 voters cast ballots.  Therefore, assuming similar voting patterns, we may expect that approximately 1.4-1.9  million voters will cast their ballots by mail

this year.  As of August 31, 2020, 535,148 voters have requested absentee ballots—
approximately 15.8 times the number of requests at this time in 2016.

16.    Approximately 16.7% of North Carolina residents are senior citizens, age 65 or
older.

**II.    Impact of U.S. Postal Service Delays**

17.    Delays by the U.S. Postal Service will affect nearly every absentee ballot that is
sent out by the county boards of elections to voters and every absentee ballot that is returned by
mail by voters.  Because state law places limitations on the people, other than the U.S. Postal
Service, who may handle an absentee ballot, any delay by the U.S. Postal Service is likely to
affect a voter who is unable to drop off her ballot in-person, particularly if she and her near
relative are both at high-risk of contracting COVID-19.  Moreover, because the State's cure
process requires communication with the voter and cure by the voter—processes that generally
rely on prompt delivery by the U.S. Postal Service—delays by the U.S. Postal Service may lead
to delayed communication with voters and delays in voters' ability to cure their ballots in time
for valid ballots to be counted under state law.

18.    As a result, the State Board  recommends voters plan ahead and ensure plenty of
time to return their ballot, and cure their ballots if necessary.  In its absentee ballot materials, the
State Board recommends that voters mail their ballots at least a week before the election.
Because the deadline to *request* an absentee ballot is a week before the election, however, not all
voters will be able to do so.  In addition, the State Board is now assessing the U.S. Postal
Service's comments that state laws are incompatible with the mail delivery standards.

19.     The State Board has also been made aware of concerns from voters about the reliability of timely delivery of absentee ballots, in light of reports of recent changes to the U.S. Postal Service's handling of Election Mail.

### III.     Potential Consequences on the November 2020 Election

20.     County boards of elections are scheduled to begin mailing absentee ballots beginning on September 4.  If delays to delivery continue into late October, and early November, a substantial number of voters might be disenfranchised as they wait for ballot request forms to reach county boards, for absentee ballots to be delivered to them, for absentee ballots to be mailed back to the county boards, and for any cure procedures that voters would need to follow to ensure that their ballot is properly cast and counted.  This concern becomes even more acute as the State Board and county boards prepare for the expected ten-fold surge in absentee voting.

21.     This is the first election for which the State Board expects this volume of voting to be completed by mail and the State Board is committed to ensuring that every eligible voter who wants to vote can do so, no matter the method they choose.  The State Board is implementing a tracking system using Intelligent Mail Barcodes to allow voters and county boards of elections to obtain updates as to the status of their ballot in the mail stream.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 1st day of September, 2020

_____
KAREN BRINSON BELL
Executive Director
North Carolina State Board of Elections

# EXHIBIT 22

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>Plaintiffs,<br><br>v.<br><br>LOUIS DᴇJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>Defendants. | No. 2:20-cv-4096-GAM |

**<u>DECLARATION OF SETH BLUESTEIN</u>**

I, Seth Bluestein, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.       I am the Chief Deputy Commissioner for Philadelphia City Commissioner Al Schmidt. I have been employed as a Deputy Commissioner since 2012, and have been Chief Deputy since July 2017. My educational background includes a Masters Degree in Public Administration from the Fels Institute of Government at the University of Pennsylvania and a Bachelors Degree in Political Science and History from the University of Pennsylvania. Since January 2018, I have also served as Chief Integrity Officer for the Office of the City Commissioners in Philadelphia.

2.       The Philadelphia City Commissioners are three elected officials in charge of elections and voter registration for the City of Philadelphia.  Each Commissioner is elected to

Exhibit 22

serve a four-year term. The Commissioners set and enforce department policies to administer

voter registration and conduct elections in accordance with federal and state voter registration

and election laws.  Pursuant to the Pennsylvania Election Code, the Commissioners constitute

the Board of Elections for Philadelphia County.  The day-to-day operations of the Board,

including much of the work described below that is performed in preparation for elections, is

conducted by its employees, overseen by the Executive Director, Joseph Lynch, and the offices

of the City Commissioners.  References below to "the Board" include the work of the Board staff

and offices of the City Commissioners in preparation for the election and are not limited to

matters on which the three-member Board of Elections has reached a formal determination.

   3.  I submit this Declaration in support of the Commonwealth of Pennsylvania's

litigation against Louis DeJoy, in his official capacity as United States Postmaster General;

Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of

Governors; and the United States Postal Service.

   4.  I have compiled the information in the statements set forth below through my

personal knowledge, through Board personnel who have assisted me in gathering this

information from our institution, and on the basis of documents that I have been provided and

reviewed. If called as a witness, I could and would testify competently to the matters set forth

below.

**I.  Philadelphia's History of Absentee and Mail-in Voting**

   5.  Prior to the 2020 Primary Election, Pennsylvania only allowed absentee voting for

voters who could not vote in-person on election day.  Beginning with the 2020 Primary Election,

no-excuse mail-in balloting was allowed.

6.      The following table lists the number of Philadelphia residents who voted by mail-in and/or absentee ballot in 2012 and 2016 primary and general elections and the 2020 primary election:

| Year | Primary Election | General Election |
|------|------------------|------------------|
| 2012 | 1,894 | 14,956 |
| 2016 | 4,240 | 14,915 |
| 2020 | 175,176 | |

7.      As of August 28, 2020, the Board will send 200,743 Philadelphia residents a mail-in or absentee ballot for the 2020 general election.

8.      In the 2020 Primary Election, 54,081 senior citizens (age 65 and older) voted by mail-in or absentee ballot.  Those ballots comprised 31% of the total mail-in/absentee ballots in that election.

9.      As of August 28, 2020, at least 60,219 senior citizens had applied for absentee or mail-in ballots for the 2020 General Election.   These applications comprise 30% of the total applications approved as of that date.

10.      The Board itself does not track COVID infections in the County but is required to follow Pennsylvania and Philadelphia laws, regulations, and executive orders that can limit the sites, such as nursing homes, that were often used as polling places in the past but which may no longer be permitted due to concerns about high-risk populations.

11.      In prior elections, the Board understood that USPS would prioritize the processing and delivery of election mail and that it would deliver such mail even if it lacked proper postage.

**II.      The Impact of USPS Delays on Election Planning Philadelphia**

12.      The Board is planning to take a number of additional steps to communicate with the public and ensure ballots arrive in time to be counted for the 2020 General Election. The

Board is undertaking a public relations campaign expected to cost several hundred thousand

dollars. The campaign will emphasize that voters who are not voting in-person should apply to

vote and return their ballots as early as possible.

13.     Due in part to USPS delays, the Board is also planning to expand the number of

locations available to Philadelphia residents to drop off ballots and to provide regional offices

where voters can apply in-person for, and return, absentee and mail-in ballots. These efforts will

also be promoted as part of the public relations campaign. While the Board spent several

thousand dollars on equipment for in-person ballot collection for the primary, the Board expects

to spend several million dollars to expand in-person early-voting and ballot collection for the

2020 General Election. Additionally, the Board plans to pre-sort ballot mailings according to

destination to help speed delivery by USPS.

14.     Since the 2020 Primary Election and the widespread reports of USPS delays, the

Board has begun to receive ballot cancellation requests from voters who previously opted to

receive a mail-in ballot for the 2020 General Election.

**III.     The Potential Impact of USPS Delays on the Election in Philadelphia**

15.     If USPS delays in delivering election materials to voters continue into October

and November it may result in some voters who wish to cast their vote not being able to do so or

their ballots not arriving in time to be counted through no fault of their own, and will certainly

hamper the Board's work for the 2020 General Election.

16.     If USPS chooses to no longer treat Election Mail with the highest priority as it has

done in the past, it may take longer for paper absentee or mail-in ballot applications to reach the

Board and be processed.  As a result, it may take longer for those voters to receive their ballot.

Further, it is possible some voters who timely applied for ballots under state law may not receive

their ballots by election day. Others may receive their ballots but without sufficient time to return them before polls close on election day. Ballots that are timely mailed prior to election day might arrive still too late to be counted.

17.     Mail delays can have a cascading effect on ballot mailings. When voters who have successfully applied for an absentee or mail-in ballot do not receive it in the time leading up to election day, the Board receives duplicate applications from voters concerned their ballot has not been sent.  These applications require additional Board resources to process and detract from work processing new applications, further delaying other voters' ballots from being mailed.

18.     If USPS delays cause ballots not to be received by the Board before election day, those voters may appear at their polling place to vote in-person by provisional ballot.  This could lead to increased wait times at the polling places.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __1st__ day of __September__, 2020

*Seth Bluestein*
.                                          _____
Seth Bluestein
Chief Deputy Commissioner

# EXHIBIT 23

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA, <br><br> Plaintiffs, <br><br> v. <br><br> LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE, <br><br> Defendants. | **No. 2:20-cv-4096-GAM** |

<u>**DECLARATION OF MATTHEW DUNLAP,  SECRETARY OF STATE OF MAINE**</u>

I, Matthew Dunlap, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.  My name is Matthew Dunlap.  I am over the age of 21 years, have personal knowledge of the facts stated herein, and am competent to testify to the same.

2.  I currently serve as Maine's Secretary of State and have held that office continuously since January 7, 2013.  Among other duties, the Secretary of State's Office is responsible for administering state and federal elections, in accordance with Title 21-A of the Maine Revised Statutes and applicable federal election statutes.  The Elections Division within the Bureau of Corporations, Elections and Commissions is primarily responsible for carrying out those duties, under the direct supervision of Julie L. Flynn, Deputy Secretary of State for the Bureau of

Corporations, Elections, and Commissions, and Melissa Packard, Director of Elections.

3.   I submit this Declaration in support of the State of Maine's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.   I have compiled the information in the statements set forth below through my personal knowledge, through personnel in the Elections Division who have assisted me in gathering this information from our office, and on the basis of documents that have been provided to and reviewed by me.  If called as a witness, I could and would testify competently to the matters set forth below.

## I.   Maine's Absentee and Mail-in Voting Laws, Policies, Procedures

5.   Before 1999, Maine voters could vote absentee when the voter was unable to cast a ballot due to absence from the municipality during the time the polls are open on election day; physical incapacity; confinement in a penal institution; or unreasonable distance from the polls, if the voter is a resident of a township, coastal island ward or district.  Me. Rev. Stat. Ann. Tit. 21-A § 751 (1999).  Since 1999, Maine voters have been able to vote absentee with no excuse.  Me. Rev. Stat. Ann. Tit. 21-A § 751 (2020).

6.   To vote absentee, a voter must request a ballot.  A request for a no excuse absentee ballot must be made no later than 5:00 p.m. on the Thursday before Election Day, which is October 29, 2020, for the upcoming election.  Voters can still obtain an

2

absentee ballot after that deadline if they can invoke one of the reasons listed in Me. Rev. Stat. Ann. Tit. 21-A § 753-B(2)(D) (2020).

7.    Voters may choose between three methods of delivering their absentee ballot: voters may mail their completed ballot to the municipal office for the municipality where they are registered to vote; voters may carry their completed ballot to that same municipal office, or have a family member or authorized third person do so; and voters may complete their ballot prior to Election Day in the presence of the clerk in their municipality.

8.    Absentee ballots must be received in the municipal office before 8:00 P.M. on Election Day to be counted.  Me. Rev. Stat. Ann. Tit. 21-A §§ 626(2), 755 (2020).

9.    The need for an effective vote-by-mail option is critical in Maine because the electorate includes relatively high numbers of individuals unable to vote in person and individuals at risk of severe illness from COVID-19, particularly disabled and elderly voters.

10.   To request an absentee ballot, a voter may contact their municipal clerk by telephone or request one through an online absentee ballot request service – in either case, the absentee ballot will be mailed to them.  Voters may also request an absentee ballot in person at their municipal clerk's office and vote it in the presence of the clerk.  Most voters receive their ballots by mail.  Municipalities will not have ballots available to mail to voters until 30 days before the general election – i.e., on October 2, 2020.

11.   Since the online absentee ballot request service was activated on August 17, 2020, over 71,000 requests for absentee ballots have been received.  The Secretary of

3

State's Office does not have a way of tracking the number of requests made directly to municipal offices, but those would be in addition to this number.

12. Prior to June 2020, the Secretary of State's office understood that the United States Postal Service ("USPS") would deliver absentee ballots within 2-3 days. This understanding was based upon communications from the USPS as well as years of past practice.

13. On or about July 29, 2020, the USPS issued a warning letter to Maine. To my knowledge, Maine has never received a letter like this from the USPS.

14. This letter warned Maine that Maine's deadlines for requiring and casting ballots by mail "are incongruous" with the Postal Service's delivery standards. The Postal Service further warned that voters should submit their requests for absentee ballot so that the request for the absentee ballot was received by election officials at least 15 days prior to Election Day at a minimum, and that voters should mail their completed ballots no later than Tuesday, October 27, 2020, at least one week prior to Election Day.

15. Unless the Postal Service's recommendations were followed, the letter states that "there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with [Maine's] election rules and returned promptly, and yet not be returned in time to be counted."

16. The warning contained in the July 29, 2020 letter was unprecedented and is a marked change from prior communications received by Maine from the United States Postal Service. Based upon prior communications with the USPS and past experience, the Secretary of State's office has understood (up until the July 29,

2020 letter), that absentee ballots would be delivered by the USPS within 2-3 days of mailing.

## II.  Impact of USPS Delays

17.  In response to the USPS warning letters, and other reports of delays, my office is encouraging voters to return absentee ballots as soon as possible after they are received.

18.  The Secretary of State's office has received a lot of questions from voters who say that they do not trust the USPS to deliver their mail in absentee ballots on time.

19.  The Secretary of State's office has worked with municipal officials to secure funding to partially offset the cost of the installation of secure drop boxes where voters will be able to drop off absentee ballots instead of putting them in the mail.

20.  In addition, my office is working to activate an on-line website where voters will be able to track their absentee ballot to see if the ballot has been received and accepted. It is anticipated that this service will be activated by October 2, 2020.

## III.  Security of Mail-In Voting in Maine

21.  Absentee voting in Maine is a secure and closely tracked method of voting. Beginning when a voter requests an absentee ballot, each absentee ballot is entered into a tracking system, where it is recorded into a state-wide database. The ballot is also logged into the database when it is received back by the municipality, at which time the absentee ballot is either accepted or rejected.

22.  Given the historic turnout expected for mail in absentee voting, the Secretary of State's office is encouraging voters to return their votes early.

## IV.    Potential Consequences on the November 2020 Election

23.    Maine's most recent primary, held on July 14, 2020, shows the importance of allowing voters to vote by mail.  The percentage of ballots voted by mail increased significantly over prior years.  Historically, the rate at which Maine voters voted by mail has been lower than 10 percent in general elections and less than 3 percent in primaries.  Based upon final figures for the July 2020 primary, there were 111,139 ballots cast by mail, which equates to about 35 percent of the 316,210 ballots cast.  This represents at least a 10-fold increase over primaries in the last four election cycles.

24.    If the same percentage of voters vote by mail in the general election as voted in the July 2020 primary, that could mean 270,000 ballots would be submitted by mail (35% of the total ballots cast in the last presidential election) during the 30-day period leading up to the November election.

25.    Delays in mail delivery during this period of time could cause significant numbers of voters' ballots to be uncounted, and for those voters to be disenfranchised.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 31st day of August 2020.

/s/ Matthew Dunlap_____
Matthew Dunlap
Secretary of State
State of Maine

6

# EXHIBIT 24

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

                Plaintiffs,

           v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

                Defendants.

No. 2:20-cv-4096-GAM

## DECLARATION OF JEFFREY ERLBAUM

I, Jeffrey Erlbaum, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

      1.      I am the owner of JLE Travel LLC d/b/a ETA Travel and I reside at 2113 Magnolia Lane, Lafayette Hill, PA 19444.

      2.      I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

      3.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

Exhibit 24

4.  JLE Travel LLC d/b/a ETA Travel, a travel agency, is a limited liability company with two employees which have been in business for more than 20 years.

5.  As of March 17, 2020, after I implemented remote work for ETA Travel, I have been sending out paychecks to my employees via USPS mail.

6.  All paychecks were mailed out via First-Class Mail from my home address, 2113 Magnolia Lane, Lafayette Hill, PA 19444, by placing them in my outgoing mailbox.

7.  Starting from March 17, 2020, on every other Tuesday, I sent out bi-weekly paychecks to the employees and they received the paycheck in the mail within three or four days of the date of sending.

8.  As of August 9, 2020, I had to furlough two of my employees due to the economic hardship the business was facing during the Covid-19 pandemic.

9.  On August 4, 2020, I sent out the furloughed employees' last paychecks along with hand-written notes expressing gratitude for their services to each of their addresses via USPS First-Class mail.

10.  On August 6, 2020, I received verification from one of the furloughed employees that she received the paycheck in the mail.

11.  On August 7, 2020, I sent a text message to the other furloughed employee, Eileen Siegel, to find out if she had received her last paycheck. Eileen had not received the paycheck so we decided to wait until August 10, 2020.

12.  On August 10, 2020, Eileen still had not received the paycheck through USPS mail, so the same day, I drove to PNC Bank in Conshohocken, PA and made a direct deposit to Eileen's bank account.

Decl. of Jeffrey Erlbaum                                    Case No. 20-cv-4096-GAM
Exhibit 24

13.     To the best of my knowledge, Eileen Siegel, an employee who has worked for me for over 20 years, has not yet received the paycheck and my handwritten note, which was sent on August 4, 2020 through USPS mail.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 28th day of August, 2020

_____

Jeffrey Erlbaum
Owner of JLE Travel LLC d/b/a ETA Travel

# EXHIBIT 25

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA, <br><br> Plaintiffs, <br><br> v. <br><br> LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE, <br><br> Defendants. | No. 2:20-cv-4096-GAM |

## <u>DECLARATION OF THOMAS A. FREITAG</u>

I, Thomas A. Freitag, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Director of the Board of Elections located in Bucks County in Pennsylvania. I have worked for the Board of Elections since March of 2014. I took over as Election Coordinator in August of 2015 until I was put as Acting Director in July of 2019. I have been employed as Director since December of 2019. My educational background includes a bachelor's degree in Political Science.

2.      My professional duties include overseeing the Board of Elections, Voters' Registration and Voting Machines Departments in Bucks County, Pennsylvania. Prior to this as Election Coordinator I oversaw the entire absentee process from applications on through preparation, mailing and return of absentee ballots.

Exhibit 25

3.      I submit this Declaration in support of the State of Pennsylvania's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      I have compiled the information in the statements set forth below through my personal knowledge through my time working in the Board of Elections office. If called as a witness, I could and would testify competently to the matters set forth below.

I.      **Bucks County's History of Absentee and Mail-in Voting**

5.      102,295 voters applied for a mail-in and/or absentee ballots in the 2020 primary in Bucks County.  78,855 voters returned mail-in and/or absentee ballot in the 2020 primary. In 2016's primary, 5,657 voters applied for absentee ballots and 4,397 returned them. In 2012's primary, 1,568 voters applied for absentee ballots and 1,280 voters returned them.

6.      Currently there are 92,174 approved applications in Bucks County for the November 3, 2020 General Election with thousands more applications pending review by our staff.

7.      It is our understanding that First Class Mail previously had a delivery time of 1-3 days. The U.S. Postal Service has now stated that mail delivery times are 2-5 days. They have also recommended that ballot requests be submitted 15 days in advance of the election. Additionally they recommend to allow 1 week mail time for delivery of ballots to voters. USPS will deliver ballots even without postage and charge the Board of Elections; USPS will deliver ballot with First-Class Mail delivery standards even if the County is using Marketing Mail postage; USPS prioritizes Election Mail in processing and delivery.

Decl. of Thomas A. Freitag                                    Case No. 20-cv-4096-GAM
Exhibit 25

8.      The Board of Elections plans to again allow the use of drop boxes at three staggered locations throughout the County in order to assist voters who do not feel confident that their ballots will be delivered by the 8:00 pm November 3, 2020 deadline.

## II.      Impact of USPS Delays

9.      The Board of Elections, through use of social media, plans to encourage voters interested in voting by mail to apply for ballots as soon as possible and mail them back as soon as possible thereafter. We also plan to implement ballot boxes at our Government Service Centers in Levittown and Quakertown as well as the Administration Building in Doylestown. The dates and times that these ballot boxes will be available shall be determined by vote of the Board of Elections.

10.     We have received countless phone calls from voters voicing concern over news articles because of recent changes at USPS. They have expressed concerns that their ballots would not be received in time to be counted.

## III.     Potential Consequences on the November 2020 Election

11.     During the 2020 General Primary approximately 50% of Bucks County voters chose to cast their ballots by mail. In the last Presidential Election in November of 2016, registered voters in Bucks County cast 349,791 ballots.  If that same number of voters voted in November 2020, and 50% of those voters decided to vote by mail that would result in 174,895 absentee or mail-in ballots being received by Bucks County Board of Elections.  Voters can continue to apply for absentee or mail-in ballots up until the Tuesday before Election Day, in which case the application ballot would need to be reviewed and if approved, the ballot would be mailed within 48 hours.  If postal delays continue into October and November, that could lead to thousands of voters being disenfranchised.

12.     Postal delays could also cause thousands of voters to choose to cancel their absentee or mail-in permanent status or go to the polls "just in case" as we saw many people do during the Primary. This could have a twofold effect. It could lead to confusion at the polls as those who applied for ballots would need to bring their ballot to the polls in order to spoil it or else do a provisional ballot. This could lead to long lines and voters being confused on whether or not their ballot has been counted as large amounts of provisional ballots take time to research. We learned this from the Primary Election. This could lead to public distrust of the election process. Additionally, cancellations of absentee or mail-in permanent status ballot applications will slow our ability to process new applications because we are cancelling former applications.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this First day of September, 2020

_____
Thomas A. Freitag
Director, Board of Elections

EXHIBIT 26

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

                  Plaintiffs,

                v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

                  Defendants.

**No. 2:20-cv-4096-GAM**

## DECLARATION OF JOHN GIBSON

I, John Gibson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and

correct:

      1.      I am the President of Local 308 of the National Postal Mail Handler's Union

("NPMHU"). I live at 7129 Bryan St. Philadelphia, PA 19119.

      2.      I submit this Declaration in support of litigation against Louis DeJoy, in his

official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity

as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

      3.      I have personal knowledge of the facts set forth in this declaration. If called as a

witness, I could and would testify competently to the matters set forth below.

Exhibit 26

**I.      Work with the United States Postal Service & NPMHU**

4.      I began working for the United States Postal Service in 1985 as a mail handler at the New York Bulk Mail Center, now known as a Network Distribution Center ("NDC").

5.      In 1986, I transferred to the Philadelphia NDC and worked there until my retirement in 2017.

6.      NDCs are highly mechanized processing plants that distribute packages and bulk marketing mail, among other types.

7.      As a mail handler, I worked transporting mail, distributing equipment, loading and unloading trailers of mail, and occasionally sorting and separating mail.

8.      I began working with the NPMHU in 1991 as shop steward.

9.      I retired from USPS in 2017 but retained my full-time position at NPMHU.

10.      I have been President of Local 308 since 2011.

11.      Local 308 has jurisdiction over the Central Pennsylvania USPS District, the South Jersey USPS District, and the Philadelphia Metropolitan USPS District, including the following facilities: Lancaster Processing & Distribution Center ("P&DC"); LeGree S. Daniels P&DC; Lehigh Valley P&DC; Philadelphia NDC; Philadelphia P&DC; Scranton P&DC; South Jersey P&DC; Trenton P&DC; and Delaware P&DC.

12.      As President of Local 308, my duties include administering the collective bargaining agreement ("CBA"), ensuring branch presidents and other Union officials fulfill their duties, including filing grievances when appropriate, communicating with Union members, and protecting the rights of postal employees while engaging in national NPMHU policy and political actions.

Decl. of John Gibson                                                          Case No. 20-cv-4096-GAM
    Exhibit 26

13.     On a daily basis, I receive calls from represented workers to discuss issues in facilities across the Local's jurisdiction and speak with branch presidents and union representatives several times each week. I also ensure the implementation of policies, that CBA violations are addressed, and negotiate facility-level matters. I conduct site visits, traveling to each plant every several months at least but my visits have become more frequent during the COVID-19 pandemic.

**II.     USPS Operational Changes in July 2020**

14.     In July 2020, I learned of specific policy changes within Local 308's jurisdiction. First, mail handlers and other postal employees were instructed that all trips, including trucks and carriers, were to leave as scheduled. Second, overtime was significantly restricted at certain facilities.

15.     Since July, I have learned that delays in processing causing mail to miss its scheduled departure from a processing facility, known as processing failures, have increased in Local 308's jurisdiction and that delayed mail has remained at the facility for 2-5 days or longer. Once mail is marked as a processing failure, typical practice is to focus on moving current mail through the mailstream and catch up when possible. Requiring trucks to depart on time despite processing failures is atypical; flexible departure times allow delayed mail to exit the facility close to on-schedule. Rigidly requiring trucks to leave at their scheduled time means that trucks leave without all of their mail, which exacerbates delays because a piece of mail that may have been an hour late becomes a day late or more.

16.     In addition, overtime is a regular part of USPS business as a negotiated term of the CBA. During the COVID-19 pandemic, more overtime has been required than usual. I have received reports that USPS has unilaterally restricted overtime at certain facilities in Local 308's

Page 3 of 4

jurisdiction in violation of the CBA. One branch manager reported that it was his understanding that the overtime restrictions came from the Postmaster General. Overtime has recently increased since its dramatic reduction in late July-early August, but the underuse of overtime to ensure adequate staffing is still a problem, as package volume remains extremely high even as absentee rates decline.

**III.     Election Mail has always been given the highest priority.**

17.     In my experience as a mail handler, Election Mail is always treated with a heightened sense of urgency, including being moved through the plant in one day.

18.     Historically, the heightened urgency is uniquely attached to both red tagged political mail as well as green tagged Election Mail, and it is treated as though it is a priority or express piece of mail.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 1st day of September, 2020

_____
JOHN GIBSON

# EXHIBIT 27

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>    Plaintiffs,<br><br>    v.<br><br>LOUIS DEJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>    Defendants. | No. 2:20-cv-4096-GAM |

<u>**DECLARATION OF CLAYTON HAAS**</u>

I, Clayton Haas, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Deputy Director for Administration and Acting Chief Deputy of the California Department of Conservation (DOC or Department). I was appointed as Deputy Director for Administration in 2013 and have served as Acting Chief Deputy since February 2020. Prior to these appointments, I was appointed Assistant Chief of Manufactured Housing for the Department of Housing and Community Development, Division of Codes and Standards, from January 2008 through March of 2013. Before that appointment, I worked in DOC's Legislative Office from February 2003 through January 2008, including a year as acting legislative director. I have also worked in the Division of Recycling, auditing recycling programs

Exhibit 27

to prevent predatory pricing from January 2000 through February 2003. I have a bachelor's

degree in government from California State University – Sacramento.

2.      I submit this Declaration in support of the State of California's litigation against

Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in

his official capacity as Chairman of the Postal Service Board of Governors; and the United States

Postal Service (USPS).

3.       I have compiled the information in the statements set forth below through my

personal knowledge, and through DOC personnel who have assisted me in gathering and

analyzing this information on the basis of documents that have been provided to me. If called as

a witness, I could and would testify competently to the matters set forth below.

**I.      The DOC Relies on USPS to Conduct its Operations**

4.      The DOC administers a variety of programs related to the use and conservation of

energy, land, and mineral resources, as well as earthquake safety. Five divisions comprise the

DOC: (1) the Division of Land Resource Conservation, which promotes orderly population

growth in coordination with the State's agricultural endeavors; (2) the Division of Mine

Reclamation, which oversees mining operators' compliance with mining entitlements and

reporting requirements and the reclamation of mined lands; (3) the California Geological Survey,

which, among other things, monitors and gathers data on earthquakes, maps earthquake faults

and prepares maps that contain seismic related potential hazards to provide to local governments

critical geologic information that affects land use, zoning and development so that buildings and

structures are better able to withstand earthquakes; (4) Geologic Energy Management, which

oversees the oil, natural gas, and geothermal industries; and (5) the State Mining and Geology

Board, which serves as an independent regulatory, policy, and appeals body representing the

state's interest in geology, geologic and seismologic hazards, conservation of mineral resources, and reclamation following surface mining activities. These services are vital to California's public safety, environment, and economy.

5.      As the Deputy Director for Administration and Acting Chief Deputy, I oversee all divisions and programs within the Department of Conservation.

6.      The DOC relies on the USPS to carry out basic operations. For example, the DOC receives checks for assessments on oil and gas production, fees from mining operators, and other fees in the mail, which is a key source of funding for the agency. Currently, as DOC staff members are teleworking, the agency uses USPS to mail telework equipment and supplies. Additionally, only a limited number of staff members collect and process mail for their respective divisions on a weekly basis, which includes time-stamping mail received each day.

## II.      USPS Delays Are Affecting the DOC

7.      The DOC has recently experienced several frustrations stemming from USPS delays.

### a.  Geologic Energy Management Staff Teleworking Equipment

8.      Because of USPS delays, two new Geologic Energy Management staff members' telework equipment arrived over eleven days after being sent on July 31, 2020, via USPS for overnight delivery. During this time, those staff members could not work. At a time when most of the DOC's employees are teleworking, USPS delays in delivering supplies and equipment undermine staff productivity, and results in a loss to state resources spent on hired staff who are unable to perform their work duties.

Decl. of Clayton Haas                                        Case No. 20-cv-4096-GAM
Exhibit 27

### b. Human Resources Division's Personnel Matters

9.       USPS delays have negatively impacted the DOC's human resources (HR)

division. HR staff oversee all disciplinary actions against DOC employees and employee

grievances related to union contracts (also referred to as memorandums of understanding). This

often involves appeals and administrative litigation before the California State Personnel Board,

which handles appeals of disciplinary actions, and the California Department of Human

Resources, which handles appeals involving employee grievances under memorandums of

understanding. On July 9, 2020, the California Department of Human Resources scheduled a

hearing for August 3, 2020 and issued a hearing notice to the parties via USPS, but the DOC

never received it. The only reason the DOC learned of the hearing was because the opposing

party contacted the DOC personnel attorney on July 22, 2020 to inquire about the agency's

representation at the scheduled hearing. The opposing party was not required to do this, and but

for their email, we would have missed the hearing and possibly forfeited the DOC's right to

defend its personnel decisions. The hearing noticed served on the DOC on July 9, 2020 via USPS

never arrived.

10.       On a second occasion, the DOC settled an employment dispute and filed the

settlement with the State Personnel Board for approval. On July 16, 2020, after hearing nothing

for 30 days, the DOC personnel attorney instructed a paralegal to contact the State Personnel

Board to check on the status on the agreement. The DOC learned that the approved agreement

had been mailed to all parties on July 9, 2020. The approved settlement agreement served on the

DOC on July 9, 2020 via USPS never arrived.

11.       Because mail delivery has become unreliable, the personnel attorney now must

call the California Department of Human Resources and the State Personnel Board to check if

appeals have been filed or if hearings have been set. To date, the personnel attorney has called

the Personnel Board once to check the status of one appeal, and he anticipates contacting the

Personnel Board again later this month. The attorney's paralegal has also checked the status of

the settlement agreement described above. It is a waste of time and resources for legal staff to

proactively call the Personnel Board and/or the California Department of Human Resources to

inquire about appeals which may have been filed or hearing notifications which may have issued.

However, without reliable mail delivery, it is necessary to ensure the DOC is able to defend its

personnel decisions.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 31st day of August, 2020

/s Clayton Haas
Clayton Haas
Deputy Director for Administration and Acting
Chief Deputy of the California Department of
Conservation

Decl. of Clayton Haas                                            Case No. 20-cv-4096-GAM
Exhibit 27

EXHIBIT 28

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>Plaintiffs,<br><br>v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>Defendants. | No. 2:20-cv-4096-GAM |

## DECLARATION OF BEVERLY HUDSON

I, Beverly Hudson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.    I am the Deputy Secretary for Administration at the Department of General Services (DGS) located in Commonwealth of Pennsylvania. I have been employed as Deputy Secretary for Administration since March of 2015. My educational background includes degrees from both Susquehanna University and Johns Hopkins University.

2.    I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service (USPS).

Exhibit 28

3.      I have compiled the information in the statements set forth below through DGS personnel who have assisted me in gathering this information from our institution.  If called as a witness, I could and would testify competently to the matters set forth below.

## I.      DGS' Interaction with USPS

4.      As Deputy Secretary for Administration, I oversee human resources, budget and insurance management, information technology, enterprise real estate services, and print and media services, including the processing of in-bound and outgoing mail on behalf of the Commonwealth.

5.      DGS is responsible for the distribution of in-bound mail received from the USPS to Commonwealth agencies within the enterprise.  In its role as a distributor of in-bound mail, DGS handles accountable, first class and other rated mail.  Furthermore, DGS is a full-service mailer that is officially recognized by the USPS and is responsible for processing and presorting outgoing mail on behalf of the Commonwealth agencies within the enterprise.

6.      Commonwealth agencies within the enterprise pay for additional services guaranteed through the use of Caller Service Boxes and accountable mail services.

7.      A Caller Service Box is essentially a P.O. Box that receives a large volume of mail for which the USPS delivers directly to the Central Mail Processing Center (CPMC) for scanning each day.

8.      Accountable mail includes Priority Mail Express service and Special Service mail such as Certified Mail, Collect on Delivery, Insured Mail for more than $200, Registered Mail, Return Receipt, and Signature Confirmation.

9.      Those services and a schedule are reflected below:

**7:00 AM –** DGS picks up specifically sorted accountable and non-accountable mail at the CPMC, Technology Park, DGS Annex Complex, Harrisburg, PA 17110.

**7:15 AM -** DGS picks up accountable, first class and other rated mail at the Federal Square USPS Office, 228 Walnut St, Harrisburg, PA 17108.

**7:30 AM -** DGS picks up accountable, first class and other rated mail at the Crooked Hill USPS Office, 1425 Crooked Hill Rd, Harrisburg, PA 17107.

**7:45 AM –** DGS returns to the CPMC and picks up the remaining accountable, first class and other rated mail.

**8:00 AM –** DGS delivers the accountable, first class and other rated mail from the CPMC to the mailrooms of the Commonwealth agencies within the enterprise.

**9:00 AM -** DGS picks up accountable, first class and other rated mail from the mailroom of the Department of State and the Department of Health and Human Services for delivery to the mailrooms of the Commonwealth agencies within the enterprise.

**10:45 AM** CMPC picks up accountable, first class and other rated mail at the 7th street USPS Office, 2347 N 7th St, Harrisburg, PA 17110.

**11:00 AM -** CMPC delivers all mail received from UPS, FEDEX, Overnight and the 7th Street USPS Office to the mailrooms of the Commonwealth agencies within the enterprise.

## II.   Recent Delays in USPS Mail Delivery/Other USPS Services

The following list of delays include July 1, 2020 through the present:

| DATE | AGENCY | ISSUES |
|---|---|---|
| Thursday, July 9, 2020 | OB Comptrollers | No mail received for Caller Service Boxes 69180, 69183 and 8006 |

| | | No mail received for Caller Service Boxes 69180, 69183 and 8006, but did receive mail that was scanned on the July 9, 2020 |
|---|---|---|
| Friday, July 10, 2020 | OB Comptrollers | |
| Monday, July 13, 2020 | PLCB | Priority mail lost and never recovered |
| Monday, July 20, 2020 | OB Comptrollers | No mail received for Caller Service Boxes 69180-69183 and 8006 |
| Tuesday, July 21, 2020 | OB Comptrollers | No mail received for Caller Service Boxes 69180, 69183 and 8006 but did receive 2 or 3 pieces from July 20, 2020 |
| Tuesday, August 11, 2020 | OB Comptrollers | No mail received for Caller Service Boxes 69180, 69183 and 8006 |
| Monday, August 17, 2020 | OB Comptrollers | No mail received for Caller Service Boxes 69180,69183 and 8006 but did receive 2 or 3 pieces from August 11, 2020 |
| Tuesday, August 18, 2020 | OB Comptrollers | No Caller Service Box mail received for Tuesday, but did receive the previous days mail August 17, 2020 |
| Wednesday, August 19, 2020 | OB Comptrollers | No mail received for Caller Service Boxes 69180, 69183 and 8006 |
| Thursday, August 20, 2020 | OB Comptrollers | Received Caller Service Box mail from August 19, 2020 |
| Monday, August 24, 2020 | OB Comptrollers | No mail received for Caller Service Boxes 69180, 69183 and 8006 |
| Monday, August 25,2020 | OB Comptrollers | Received Caller Service Box mail from August 24, 2020 |

In addition, the DGS Bureau of Procurement has received a number of complaints from suppliers that participate in the COSTARS program concerning payments that have been mailed and are never received.  The DGS Bureau of Procurement has received numerous checks that have been mailed by suppliers more than two weeks after the date they were mailed.

## II.     Consequences of the Delays

These delays cause an interruption in the processing of incoming revenue, travel reimbursements, and other priority items.  Agencies pay additional fees for the use of Caller Service Boxes that the USPS has guaranteed a certain level of service, which it has been unable achieve over the last few months.  In response to the delays, the DGS Bureau of Publications has

twice requested meetings with USPS to address these issues.  As of this date, a meeting has not

been scheduled and the problems continue.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this 1st day of September, 2020

_____
Beverly Hudson, Deputy Secretary of Administration
Commonwealth of Pennsylvania
Department of General Services

# EXHIBIT 29

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

Plaintiffs,

v.

No. 2:20-cv-4096-GAM

LOUIS DEJOY, *in his official capacity as United States*
*Postmaster General*; ROBERT M. DUNCAN, *in his*
*official capacity as Chairman of the Postal Service*
*Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

Defendants.

## DECLARATION OF LINDA JARA

I, Linda Jara, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am a citizen of the Commonwealth of Pennsylvania and currently reside at 9001
Ridge Avenue, Unit 28, Philadelphia, Pennsylvania 19128.

2.      I was a teacher for approximately 23 years before I was forced to retire early due
medical issues in December of 2017.

3.      I submit this Declaration in support of the Commonwealth of Pennsylvania's
litigation against Louis DeJoy, in his official capacity as United States Postmaster General;
Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of
Governors; and the United States Postal Service.

4.      I have personal knowledge of the facts set forth in this declaration.  If called as a
witness, I could and would testify competently to the matters set forth below.

Exhibit 29

5.      In 2014, I suffered a heart failure unexpectedly.

6.      In September of 2016, I received a heart transplant.

7.      After I had heart transplant surgery, I began taking an anti-rejection mediation called tacrolimus, the active ingredient in the prescription drug Prograf, to make sure that my body did not reject my transplanted heart.

8.      On or around October of 2016, I switched from taking the generic version of tacrolimus manufactured by Mylan to the generic version of tacrolimus manufactured by Dr. Reddy's Laboratory, and became very sick.

9.      I was hospitalized for five (5) days due to how my body responded to the change in anti-rejection medications.

10.     After that experience, I went back to taking the Mylan manufactured version of tacrolimus.

11.  .   However, on or around the end of June of this year, I learned that I would likely not be able to refill my prescription for the Mylan manufactured version of tacrolimus until the end of August, at the earliest, due to a shortage.

12.     In consultation with my care team at Jefferson, it was decided that I would switch from generic tacrolimus to Prograf, if approved by insurance, and that I would get two to three rounds of blood work to monitor my body's response to Prograf.

13.     On or around July 15, 2020, my care team at Jefferson mailed out my lab work slips from their Center City location to my residence at 9001 Ridge Avenue, Unit 28, Philadelphia, Pennsylvania 19128.

14.     I began taking Prograf on July 20, 2020.

15.    In anticipation of receiving my lab work slips, I scheduled appointments for blood work for July 24th, July 29th, and August 5th.

16.    I checked the mail every day for several days waiting for these lab work slips as I was anxious about having to change anti-rejection medications.

17.    The lab slips that I needed for my Prograf related lab work did not arrive in my mailbox until July 25th, approximately ten (10) days after they were mailed out, despite the fact they were mailed from one part of Philadelphia to another part of the same city.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 28 day of Aug, 2020

_____
Linda Jara

Decl. of Linda Jara                         Case No. 20-cv-4096-GAM
Exhibit 29

# EXHIBIT 30

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

Plaintiffs,

v.

**No. 2:20-cv-4096-GAM**

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

Defendants.

## DECLARATION OF JENNIFER JONES

I, Jennifer Jones, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and
correct:

1.    My name is Jennifer Jones.

2.    I am a resident and a registered voter in the Town of Falmouth, Maine.

3.    I am 59 years old.  I live with my husband who is 61 years old.  My husband and I

also live with two of our adult children who have autism and require full-time support. We have

a third adult child who has autism who recently moved to a group home that provides daily

support to him.  While the group home takes care of many of his needs, he also requires daily

support from my husband and me.

4.    I am currently employed as a social worker, and I hold an LCSW (Licensed

Clinical Social Worker) license.

Exhibit 30

5.      I submit this Declaration in support of the State of Maine's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

6.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

## I.      Interaction with United States Postal Service

7.      I have been a customer of the United States Postal Service ("USPS") for all my life.  Throughout this time, I have always been satisfied with the service that the USPS has provided to me.  Whether it has been during my time as a resident of the Portland, Maine suburbs or during my years living in the rural Maine towns of China and Vassalboro, I have consistently found the staff of the USPS to be polite, kind, professional, friendly, and helpful.  Likewise, I have always thought of the USPS as an effective part of our government that connects all Americans.

8.      In addition to being a casual customer of the USPS, starting approximately 20 years ago, I began switching much of my major shopping to that of mail-order businesses online. In all my years as a USPS customer, I cannot recall a specific instance when an important piece of my mail has been lost or destroyed, whether I was acting as the sender or recipient.  I have even noticed that during inclement weather my local USPS mail carrier takes extra precautions to keep my packages from getting damaged.

9.      Aside from my employment as a social worker, I also own and operate a small backyard farm, consisting mostly of female chickens (hens).  I operate this farm in order for my

family and friends to obtain chicken eggs in a clean, ethical way and to allow the hens to be raised in a cage-free and healthy environment.

10.     I also raise and re-sell a modest number of chickens to others who need them, which I believe provides a valuable service to my fellow community members. My backyard farm allows me to sell individual chickens to members of my community who only desire to purchase a small number and are not in a position to order from hatcheries in bulk.

11.     I first started procuring chicks for my backyard farm approximately 15 years ago. I order chicks for my farm from hatcheries in Iowa, Missouri, and other states in the Midwest United States. I purchase from these hatcheries because they are able to supply a large array of breeds including rare heritage breeds that allow me to have unique, rainbow-colored eggs.

12.     Additionally, larger hatcheries outside of Maine have the ability to segregate their baby chicks by sex. This is important for several reasons. First, it is difficult to keep multiple male chickens ("roosters") on a farm, as they tend to fight. Second, many zoning laws forbid people from housing roosters, which makes them more difficult to resell. Third, most people I work with want to purchase hens so that they can have fresh eggs.

13.     I am not aware of any farm in Maine that can fulfill my orders. I am also aware that Mainers have used the USPS to order chicks without major problems for decades.

14.     Typically, when I place an order for baby chickens, they arrive through the USPS within 72 hours. This is important, as chicks can live up to 72 hours without food or water by surviving on the nutrients that exist in the yolk of newly hatched eggs. Over the years I have ordered thousands of chicks through the mail. In all my years ordering baby chickens through the USPS, I can recall just one chick arriving that was dead.

15.     Usually when an order of chickens arrives, it is a happy day.  In my mind, I equate it to opening a present on Christmas morning.  With a typical shipment of chicks, it is easy to hear the birds loudly peeping inside the box, and often the postal staff will ask me to open the parcel inside the post office so that they too can enjoy seeing the baby birds inside. Shipment day is truly one of the most enjoyable aspects of operating my backyard farm.

## II.     Recent Problems with USPS Mail Services

16.     Around mid-to-late June of 2020, I started noticing changes in my mail delivery. The first thing that I noticed is that my paycheck started arriving a day late.  Up until the summer of 2020, my paycheck always arrived in my Friday mail delivery.  But now I rarely receive Friday mail at all.

17.     Then, around late June to early July, I experienced something terrible.  I had recently placed a standard order for 25 chicks to a hatchery in the Midwest.  I had already ordered twice from hatcheries this spring with no problems. The shipment arrived within the 72-hour window, but when someone from the post office called to let me know that my order had arrived, I felt the person's voice sounded quite distressed.

18.      I arrived at the post office with my daughter, and it took the postal workers about 20 minutes to get us our package.  Normally staff retrieves my box of chicks as soon as I step up to the counter.  When the postal worker finally got us our box, he pushed it under the plexiglass, and I immediately was hit with a foul stench of decay.  When we opened the box, what we saw was devastating.  There was a small number of birds faintly peeping, surrounded by many dead chicks that had clearly suffered from abusive mishandling during shipment.

19.     My daughter and I immediately separated out the live chickens from those that had died.  Of the 25 chickens in the box, 13 had arrived dead.  On our way home, we stopped at a

local farm supply store to purchase extra supplies in an attempt to save the suffering chickens that had not perished.  This cost about $150.

20.     After we arrived home, my husband buried the 13 dead chicks.  We also had to euthanize an additional suffering chick that clearly would not survive.  It cost approximately $100 to carry out the procedure ethically.  An additional three chickens in our order died within a few days.  All in all, only eight of the 25 chickens from our order survived the week.

21.     When I spoke with an employee of the hatchery to report our problem, I was surprised to learn it had received complaints from many customers.  I was eventually able to get a refund for the cost of the 17 chicks that did not survive.  However, I was not refunded for the cost of euthanizing one of the chicks, or any of the additional supplies that I had to purchase.

22.     Soon after this experience, I learned through conversations with other farm owners that a number of Mainers experienced similar losses when ordering chickens through the mail.  I eventually realized I was just one of many people who experienced this loss when my local newspaper, the Portland Press Herald, did a feature on the phenomenon.

### III.     Consequences and Concerns About Changes in Service

23.     I am troubled by the consequences of the deterioration of service from the USPS.

24.     Getting my paycheck a day late is more than a 24-hour inconvenience.  When my paycheck arrives on a Friday, I can take it to the bank, deposit the check that day, and it clears by the Monday of the following week.  However, when my paycheck arrives on Saturday, I am not able to deposit it until my bank opens on Monday.  This delays the check from clearing until mid-week.  Although I have not experienced an absence of funds due to this delay, I have found the delays to my budgeting and management of my money to be frustrating, especially when I consider that this is my money that I should have access to.

25.     The fallout from receiving dead, decaying, and mishandled baby chicks is even more severe.  The entire reason I started my backyard farm was to prevent any additional mishandling, suffering, or death of chickens—which is exactly what occurred with my summer 2020 order described above.  It was a genuinely traumatic experience for both my daughter and me to open that box of dead chickens.  I hate to think about going through it again.

26.     Raising chickens with my daughter is an activity that we bond over and have enjoyed for years, but I do not wish to subject her to something like this again.  I am concerned that we will not be able to continue with our backyard chicken farming unless the USPS restores its service to what it was like for the many years before this summer.

27.     Finally, I am concerned about how changes in postal service will affect my family's ability to participate in the 2020 general election.  My entire family has rarely left our house since mid-March.  When we do, we take extra precautions.

28.     I am terrified to vote in person—not just because my husband and I are members of an at-risk age group for contracting COVID-19, but also for the health and future of our children.  My husband and I are in the process of obtaining guardianship for our adult children, as they cannot manage independently.  If my husband and I were to succumb to COVID-19, our children would be orphaned.

29.     Before we experienced these changes in postal services, we had all planned to vote by mail using Maine's absentee ballot option.  Now, I am considering using our town's secure drop-box, but I am unsure what I will do.  I am still wondering whether I should risk my family's health and vote in person.

30.     I do not feel like I should have to weigh my right to cast a valid ballot against my right to keep myself and my family safe and healthy.  Under normal circumstances, I would

simply cast a ballot by mail, as I have often done in past elections.  If it were guaranteed that the

USPS was operating under its normal conditions as it always had before, I would cast my

absentee ballot with confidence and without worry about whether it would be counted.  I feel like

no American should have to face the current dilemma that my family and I are facing.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this 28th day of August, 2020

                        /s/ Jennifer Jones_____
                        Jennifer Jones
                        Falmouth, Maine

# EXHIBIT 31

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>       Plaintiffs,<br><br>       v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>       Defendants. | **No. 2:20-cv-4096-GAM**<br><br>**Declaration of Gabriela Kejner** |

## DECLARATION OF GABRIELA KEJNER

I, Gabriela Kejner, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.  I am the Chief of Staff for the Office of the Secretary at the Delaware Department of Health and Social Services (DHSS), located in Delaware. I have been employed as Chief of Staff since May 2018. My educational background includes B.A. from the University of Delaware and J.D. from St. John's University Law School. I am licensed to practice law in New York, New Jersey, and D.C. Prior to coming to DHSS, I was employed by the New York City Administration for Children's Services as the Deputy Director of Policy and Agency Attorney. As the Chief of Staff, I represent the Office of the Secretary at meetings for various councils, work with DHSS divisions on various issues and projects, and coordinate FOIA responses for the Department.

Exhibit 31

2.      DHSS administers programs that help people in their most vulnerable times of

need, and provides various forms of essential assistance and benefits to Delawareans. DHSS's

mission is to improve the quality of life for Delaware's citizens by promoting health and well-

being, fostering self-sufficiency, and protecting vulnerable populations. Amongst other

programs, DHSS administers payments of child support, general cash assistance, Temporary

Assistance for Needy Families (TANF) cash assistance, Supplemental Nutrition Assistance

Program (SNAP) food supplemental benefits, and Pandemic Electronic Benefit Transfer (P-

EBT) food assistance. DHSS also administers medical assistance programs, including

Delaware's Medicaid insurance program.  In addition, DHSS provides its Medicaid and social

services benefits participants with the opportunity for a fair hearing when decisions are made

about those benefits.

3.      The need for these services has grown during the COVID-19 pandemic. The

SNAP program increased by approximately 13,000 clients and Medicaid recipients increased by

approximately 9,000 clients. Additionally, the Division of Public Health (DPH), a division of

DHSS, is tasked with assisting with the COVID-19 pandemic community response for the state

of Delaware, which includes mitigation efforts, contact tracing, community testing programs,

updating guidelines, and spearheading campaigns for prevention and treatment.

4.      I submit this Declaration in support of the State of Delaware's litigation against

Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in

his official capacity as Chairman of the Postal Service Board of Governors; and the United States

Postal Service.

Decl. of Gabriela Kejner                                              Case No. 20-cv-4096-GAM

Exhibit 31

5.      I have compiled the information in the statements set forth below through DHSS personnel who have assisted me in gathering this information from our institution. If called as a witness, I could and would testify competently to the matters set forth below.

**I.      DHSS's Interaction with USPS**

6.      The Division of Social Services (DSS), contained within DHSS, operates a wide range of programs, including Delaware's SNAP, TANF, and Medicaid eligibility. DSS depends on USPS to handle correspondence to and from customers, other agencies, vendors and community partners daily. The following essential items are sent out via USPS:

- Monthly Benefits, including SNAP Electronic Benefit Transfer (EBT) cards, TANF checks, general assistance checks, Child Support Supplementals and Disregards checks, childcare authorizations, and Medicaid cards;

- Eligibility documents, including applications, renewals/recertifications, information/verifications requests;

- Fair Hearings correspondence regarding decisions, approvals, denials, and changes for increases and decreases in benefits;

- Notices regarding employment and training orientations and participation status; and

- Other miscellaneous items such as requests for production, contracts, invoices, and vendor payments.

7.      The Division of Child Support Services (DCSS) mails numerous items to our clients via the USPS that are related to accounting and payments, including:

- Child support payments via checks;

Decl. of Gabriela Kejner                                        Case No. 20-cv-4096-GAM

Exhibit 31

- Missing check affidavits, which are completed by clients who report they have not received a specific check payment that DCSS has mailed to them;

- Direct Deposit/ ReliaCard applications, for which DCSS clients are required to sign up;

- Payment error letters and dishonored check notices when there is a problem with a check/payment mailed to DCSS by a non-custodial parent or their employer. A follow-up letter is sent every 10 days (3 total times) if there is no response.

8.     DCSS also relies on USPS from a case processing perspective, sending and receiving hundreds of letters and forms to customers each day. Most of the letters are to provide case status and updates, as well as to seek additional case information on the parties involved in the child support case. DCSS is also required to send Orders of Income Withholdings to employers to begin to deduct child support payments from the non-custodial parents' wages and to send those payments to DCSS.

9.     The Office of Infectious Disease Epidemiology (OIDE), which is within DPH, uses USPS every day to send out different types of disease notification letters; these letters address additional instructions or actions to be taken by the person to whom the letters are sent. For example, enteric disease notification letters serve as an attempt to reach out to a person for an epidemiological investigation. With regard to post-exposure prophylaxis (PEP), recommendation letters following a rabies exposure are sent out. These are time-sensitive letters that notify clients of potentially fatal diseases and instructions on how to proceed with treatment and any necessary isolation activities. During normal business operations, letters are sent by USPS about 20 times a week for these two types of letters alone.

Decl. of Gabriela Kejner                                    Case No. 20-cv-4096-GAM

Exhibit 31

10.     Clinic Operations for Community Health Services, also within DPH, frequently sends out test/lab results, notifications about the wellness clinic schedule, and updates related to communicable diseases, including epidemics such as Pertussis and pandemics such as COVID-19. These updates are sent to hard-to-reach populations such the Amish population, who are difficult to reach by phone. Additionally, sometimes lab results are mailed to family planning and sexual reproductive health clients when they are unreachable by telephone. This is often the case with the population Community Health Services serves because those clients often have telephone service that is disconnected or suspended.

11.     For the Women, Infants and Children (WIC) Special Supplemental Nutrition program, also within DPH, USPS delivers educational material, program guides, and eWIC cards to new clients, and also to existing clients who may have misplaced these items. WIC also utilizes USPS to send out the Farmer's Market coupons so that families can purchase fresh fruits and vegetables.

12.     The Division of Developmental Disabilities Services (DDDS), which is a part of DHSS, provides a wide range of services to persons with disabilities. DDDS sends and receives numerous documents through USPS including:

- Eligibility Applications and associated correspondence;
- Client benefit checks for personal spending, discretionary spending, and room and board payments;
- Client benefit annual notices advising of new room and board rates;
- Copies of Person-Centered Plans;
- Monthly, quarterly, and annual progress updates;

Decl. of Gabriela Kejner                                Case No. 20-cv-4096-GAM

Exhibit 31

- Critical notices such as COVID-19 notices, investigations of abuse/neglect, investigations of rights violations, and approval for Residential Habilitation services;

- Respite invoices and respite payments; and

- Fair hearing requests and responses.

13.    The Fair Hearing Unit within DHSS provides an opportunity for a fair hearing to any person who is dissatisfied with a decision to deny, suspend, delay, reduce, or terminate benefits. DHSS is required to notify all parties to the hearing, including witnesses, by certified mail of the date, time, and place of the hearing

## II.    Recent Delays in USPS Mail Delivery

14.    Delays in the mail mean that Delawareans are not receiving essential items provided by DHSS in a timely fashion. I have received multiple reports of the following incidences of delayed mail delivery by DHSS personnel which have occurred since approximately July 2020:

- DSS has reported that since early July 2020, there have been service interruptions in mail being delivered from the Milford, Delaware post office. There have been multiple days when no mail has been delivered, followed by days of what amounts to multiple days of mail being delivered at once. This delayed mail includes state-issued checks to Delaware citizens for cash assistance and food subsidies.

- DSS also received a report from a client that as of August 17, 2020, they still had not received a Pandemic Electronic Benefit Transfer (P-EBT) card that DSS mailed on July 24, 2020. Delaware's P-EBT Program provides food assistance to

families with children who lost access to free or reduced-price school meals when Delaware schools closed as a result of the COVID-19 pandemic. Delays in receiving a P-EBT card means that child may be going without proper food and nutrition.

- DCSS has also reported that they are seeing considerably less mail in the New Castle County Post Office and delays in mail coming to DCSS. As an example, a check from the State Pension Office that was postmarked July 30, 2020 was not received by DCSS until August 18, 2020. Therefore, that child support payment could not be sent in a timely manner.

- The Fair Hearing Unit has encountered problems with the mailing of hearing notices. In the past month, there have been two clients who reported to DHSS that they received this mailed notice after the hearing. Therefore, the clients missed their hearing, the fair hearing process has been unnecessarily delayed.

## III.   Consequences of USPS Mail Delays

15.     Mail delays could harm DHSS by preventing proper administration of programs and interrupting services to clients, including essential programs that helps provide our clients with food, shelter, and health insurance.

16.     For DSS, clients depend on critical benefits and services to survive, especially during the current pandemic. Delays with checks, EBT and medical cards may cause food insecurity, financial challenges, lapses in medical coverage and may impact childcare eligibility and authorization. The inability to access these benefits can impact Delaware's economy as a whole.

Decl. of Gabriela Kejner

Case No. 20-cv-4096-GAM

Exhibit 31

17.      In addition, delays in mail delivery may cause a negative impact in the following

areas:

- It may force clients to reach out to community resources that are already
  struggling to keep up with the current demand.
- Client complaints may increase, which can lead to increased phone calls and
  constituent inquiries.
- Foot traffic may increase local DHSS offices, which would impact DHSS's
  efforts to maintain proper social distancing and safety standards.
- Payment accuracy may be impacted, and over and under issuances of benefits
  may occur due to delays in clients receiving and returning mail.
- Administrative costs may increase due to additional work needed to reopen or
  close cases, resulting from the delay of receiving required information from
  clients.
- Client tensions may heighten due to delayed or inability to access much needed
  benefits. This may cause safety issues for DSS staff and mail carriers, and lead to
  clients making desperate decisions.

18.      Further, a delay in mail processing will impact DSS's ability to meet timeliness

standards. DSS has guidelines for timely case processing for all programs, and mail delays may

cause timeliness errors and issues. Most DSS programs require a 30-day processing period to

meet federal and state regulations. When the information required for processing isn't sent or

received within the required timelines, DSS is out of compliance. This will cause processing

errors for the agency, as well as a loss of benefits for clients, which would ultimately lead to

required corrective action by the state.

Decl. of Gabriela Kejner                                          Case No. 20-cv-4096-GAM

Exhibit 31

19.     DSS also has guidelines for processing Fair Hearings for all programs, and mail delays may cause timeliness errors and issues. Clients will be negatively impacted if important correspondence is delayed in reference to their request for a fair hearing, the scheduling of their hearing, or the final decision from their hearing.

20.     Mail delays may also create lags in payments and correspondence to DSS vendor partners. This can create gaps in service delivery and cause financial challenges for vendors that DSS contracts with to provide services.

21.     Within DCSS, delays in mail can delay case processing activities, such as automated enforcement activities and filings with the Family Court for contempt or modifications of existing child support orders. Delays in the employer receiving Orders of Income Withholdings can cause delays in the initiating and receiving of child support payments.

22.     In order to notify clients that they have tested positive for infectious disease, OIDE/DPH would have to identify another means of notification besides mail, which could be more labor intensive, as it would require some type of direct contact. These letters are extremely time-sensitive, and delays in USPS services may have negative consequences on a person exposed to a potentially fatal disease such as rabies.

23.     For DPH Community Health Services, families would not have access to lab results, instructions necessary to curb the spread of disease, access to materials informing them about available vaccinations to prevent childhood diseases, and benefits cards to help feed their children.

Decl. of Gabriela Kejner                                                    Case No. 20-cv-4096-GAM

Exhibit 31

24.     For DDDS, delays in client benefit checks will result in service recipients being unable to access his/her monies in a timely manner. In could also delay receipt of eligibility applications, which would prevent clients from obtaining needed services from DDDS.

25.     In sum, DHSS serves a broad range of vulnerable populations within Delaware, including unemployed persons, persons with disabilities, and low-income families. These Delawareans rely on timely mail delivery for assistance with food and shelter, as well as administration of medical insurance programs. Delays in mail delivery have already caused harm to our clients, and has the potential to cause a devastating disruption to our services.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 31ˢᵀ day of August , 2020

Gabriela Kejner
Chief of Staff, Office of the Secretary
Delaware Department of Health and Social Services

Decl. of Gabriela Kejner                                          Case No. 20-cv-4096-GAM

Exhibit 31

# EXHIBIT 32

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

    Plaintiffs,

        v.                                            No. 2:20-cv-4096-GAM

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

    Defendants.

## DECLARATION OF KIMBERLY KIRCHMEYER

I, Kimberly Kirchmeyer, pursuant to 28 U.S.C. § 1746, hereby declare that the following

is true and correct:

1.      I am the Director of the California Department of Consumer Affairs (DCA). I was

appointed as the Director in October 2019. Prior to my appointment, I served as the Executive

Director of the Medical Board of California from 2013 to 2019, as Deputy Director from 2011 to

2013 and 2005 to 2009, Staff Services Manager from 2001 to 2005, and Associate Governmental

Program Analyst from 1999 to 2001. I also served as the Deputy Director of Board and Bureau

Relations at the DCA from 2009 to 2011.

2.      I submit this Declaration in support of the State of California's litigation against

Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in

Exhibit 32

his official capacity as Chairman of the Postal Service Board of Governors; and the United States

Postal Service (USPS).

     3.     I have compiled the information in the statements set forth below as reported to

me by the Executive Officers and staff of the DCA and its licensing entities in the ordinary

course of their duties.  If called as a witness, I could and would testify competently to the matters

described in this declaration in accordance with the information provided in this paragraph.

## I.      The DCA Relies on USPS to Carry Out Its Mission

     4.     The DCA includes 37 regulatory entities, including bureaus, boards, committees,

and one commission, as set forth in California Business and Professions Code section 101

(collectively, the boards and bureaus). Through the boards and bureaus, the DCA licenses over

3.5 million professionals in more than 250 different categories, including doctors, dentists, and

cosmetologists. The DCA and the boards and bureaus enable consumers to check the license

status of these professionals online or by phone, and they investigate consumer complaints on

issues under their respective jurisdictions. If violations are found, license holders can face

discipline that includes probation, suspension, or revocation of a license, fines and citations,

letters of reprimand, or cease and desist orders.

     5.     As the Director, I promote the interests of California consumers. I receive and

investigate complaints from consumers. *See* Cal. Bus. & Prof. Code, §§ 325 & 326. I recommend

and propose the enactment of legislation as necessary to protect and promote the interests of

consumers, represent consumers' interests before legislative and executive bodies, assist

government agencies with the protection of consumers, investigate consumer protection issues,

and promote ethical standards of conduct for businesses and consumers, among other duties.  *See*

Cal. Bus. & Prof. Code, § 310.

Decl. of Kimberly Kirchmeyer                           Case No. 20-cv-4096-GAM
Exhibit 32

6.      The DCA and the boards and bureaus rely heavily on the USPS for basic operations. For example, through USPS, the boards and bureaus receive license applications and supporting documents, receive renewal applications, collect fees associated with license applications and renewals, and send applicants information regarding examinations and other application requirements. The boards and bureaus also use USPS to receive complaints and transmit investigatory documents.

**II.      USPS Delays Are Affecting the DCA**

7.      I am aware that the DCA and the boards and bureaus are experiencing delays in mail delivery, which are affecting their standard operations.

8.      The DCA's Business Services Office has experienced delays in receiving documents sent via USPS. On August 19, 2020, the DCA received an express priority mail package that was metered by USPS on July 29, 2020, and also received express mail dated August 10, 2020 and August 11, 2020. Express mail usually takes one or two days. Mail shipped via standard USPS mail from Los Angeles to Sacramento is taking five days to receive, when normally it would take two to three days.

9.      Since July 2020, the Physician Assistant Board has heard from several applicants indicating that they have mailed documents that the Board has not received. Some of these documents have not arrived until three weeks later.

10.      The Board of Barbering and Cosmetology mails examination scheduling letters on a weekly basis for candidates whose exams are scheduled 30 days from the date of the letter. The Board administers examinations daily, Monday through Friday. During the months of July and August, the Board received phone calls from several candidates who stated they received

their examination letter too close to the actual date of their exam and did not have enough time to prepare. The Board had to reschedule these applicants' examinations.

11.     Since July 2020, the Bureau of Real Estate Appraisers has had to re-send a copy of a license due to a complaint that the license was not received within two weeks.

12.     Commencing on or about August 3, 2020, the Speech-Language Pathology and Audiology and Hearing Aid Dispensers Board heard from approximately 20 to 30 applicants who stated they mailed documents that the Board had not yet received. Then those documents did not arrive for another three to five days. Within the past month, approximately eight to ten licensees claimed to have submitted renewal forms that were delayed in reaching the Board by three to five days. The Board has also heard complaints from four or five people that display licenses have been delayed by five to seven days beyond when they anticipated to receive them.

13.     Commencing in July 2020, the Bureau of Cannabis Control reported a delay in receiving fees from applicants and licensees.

14.     The Medical Board of California has dealt with mail delays. For example, Board staff sent an encrypted disk containing investigation information to a Federal Bureau of Investigations special agent on July 29, 2020, by First Class Mail, but the investigator contacted the Board on August 12, inquiring whether it had been sent. The investigator did not receive the disk until August 18. According to the USPS website, First Class Mail usually is delivered within one to three days from the date of the postmark. U.S. Postal Service, *What are the Types of First-Class Mail®?* (Jan. 26, 2020), https://faq.usps.com/s/article/What-are-the-Types-of-First-Class-Mail ("Estimated delivery time is one (1) to three (3) days and begins on the date postmarked.")

15.     The California Board of Accountancy recently experienced a delay in the receipt of a certified document from the Sacramento Superior Court that was requested for an enforcement investigative matter. The court mailed the document on or about August 10, 2020, but the Board—also located in Sacramento—did not receive it until August 17, 2020.

**III.     USPS Delays Undermine the DCA's and the Boards' and Bureaus' Ability to Process Licensing Applications and Protect Consumers**

16.     Californians rely on the DCA and the boards and bureaus for consumer protection and professional licensing. In turn, the DCA and the boards and bureaus rely on USPS to send and receive essential documents to process license applications and conduct investigations. If the mail is delayed, the processing of licenses and renewals and investigations will also be delayed.

17.     USPS mail delays could impose financial burdens on applicants and current licensees: new applicants will be unable to practice their trades as their license applications are pending, and current licensees may risk becoming delinquent if their renewal applications are not received in time. Mail delays may temporarily prohibit otherwise-eligible applicants from practicing their professions.

18.     As reported above, the boards and bureaus have expended additional staff resources to grapple with USPS delays. For example, staff members have already had to respond to additional inquiries and complaints from applicants regarding documents that have been delayed in the mail. Boards and bureaus now have to consider USPS delays in sending documents to applicants, such as examination notices, to ensure that applicants receive them in time. As noted above, the Board of Barbering and Cosmetology saw several applicants reschedule their exams because their notices were delayed, which imposed additional administrative burdens on the Board in rescheduling examinations for affected applicants. Mail delays also affect how the boards and bureaus determine whether an individual or business

submitted a renewal application and appeal request on-time, and could force the boards and bureaus to reassess how they determine whether deadlines were met.

19.     USPS delays hinder the collection of fees associated with licensing. Unlike most state departments, which are funded primarily by the State's taxpayer-supported General Fund, the boards and bureaus are funded solely by the licensing fees and other costs paid by licensees that are paid into the entity's special fund. Therefore, delays of the receipt of licensing fees may impact a board's or bureau's fund balance.

20.     Finally, the DCA has the responsibility to protect consumers. That function will become more difficult due to USPS delays. Delays may make it more difficult for the boards and bureaus to efficiently investigate consumer complaints. Delays may also reduce the pool of licensed professionals in a given field or create consumer confusion regarding their license status.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Decl. of Kimberly Kirchmeyer                                    Case No. 20-cv-4096-GAM
Exhibit 32

Executed on this 28th day of August 2020

Kimberly Kirchmeyer
Director of the Department of Consumer Affairs

Decl. of Kimberly Kirchmeyer
Exhibit 32

Case No. 20-cv-4096-GAM

# EXHIBIT 33

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

Plaintiffs,

v.

LOUIS DEJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

Defendants.

No. 2:20-cv-4096-GAM

## DECLARATION OF STEWART KNOX

I, Stewart Knox, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Undersecretary of the California Labor and Workforce Development Agency (LWDA). I have held the position of Undersecretary since July of 2019. From 2014 to 2019, I served as Executive Director of the California Employment Training Panel. Prior to that, I served in various roles including Director of Health and Human services for Nevada County, Director of Economic and Workforce Development for San Mateo County, Director of the Northern Rural Training and Employment Consortium, Executive Director of the North Central Counties Consortium, and Director of Workforce for the City of Glendale and for Yuba Community College. My educational background includes a Bachelor of Arts degree from California State University – Chico.

Exhibit 33

2.      I submit this Declaration in support of the State of California's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

3.      I have compiled the information in the statements set forth below through my personal knowledge, a review of records and information kept in the regular course of LWDA business and made available to me in the course of my duties at LWDA, and information provided to me by LWDA employees and the agencies that LWDA oversees. If called as a witness, I could and would testify competently to the matters set forth below.

I.      **LWDA's Interaction with USPS**

4.      The LWDA is an executive branch agency that oversees seven major entities that serve California businesses and workers.

5.      As the Undersecretary of the LWDA, I oversee LWDA's operations, working closely with LWDA's entities to fulfill their missions. In that role, I regularly receive information about those entities' operations.

6.      Several of the entities that LWDA oversees rely heavily on the USPS to carry out their operations.

7.      The California Unemployment Insurance Appeals Board (CUIAB) is an independent administrative court system for workers and employers seeking to challenge decisions made by the Employment Development Department. The CUIAB relies on USPS to send hearing notices and receive appeal-related information from claimants.

8.      The California Department of Industrial Relations' Office of Self-Insurance Plans (OSIP) is responsible for the oversight and regulation of workers' compensation self-insurance

within California. OSIP relies on USPS to send and receive confidential financial materials from employers, including security deposits supported by financial instruments, such as surety bonds, letters of credit, securities, or cash deposited in trust. These security deposits are required under the California Labor Code to ensure that employers that do not carry workers' compensation insurance (*i.e.* self-insured employers) are able to pay compensation when their employees are injured or killed at work.

9.      The Employment Training Panel (ETP) provides funding to employers to assist in upgrading the skills of their workers through training that leads to good paying, long-term jobs. The ETP also relies on USPS services for its operations. ETP sends and receives grantee payments and receives signed contracts from grantees through the USPS. ETP's contracts often require "wet signatures," and some grantees have resisted utilizing electronic signature systems. Thus, mail delay could slow down ETP's processes, thereby making it more difficult for California workers to receive employment training.

**II.      Recent Delays in USPS Mail Delivery and Impact on LWDA Entities**

10.      Recently, the CUIAB has heard of workers and employers receiving hearing notices just one day prior to a scheduled hearing. CUIAB has also heard from parties asserting that they failed to appear at hearing because they did not receive the mailed notice until the day of hearing or after. For example, on August 20, 2020, CUIAB's Sacramento Office of Appeals had 42 cases scheduled for hearing. Notices of hearings scheduled for August 20 were mailed by First-Class Mail on August 6, 2020. CUIAB's regulations at 22 C.C.R. section 5056(a) require that notices be served by mail at least 10 days prior to the hearing, and CUIAB's general practice is to mail the notices 10-14 days prior to the hearing date, via First-Class Mail, which is usually sufficient to ensure parties receive the notice before the hearing.  Of the 42 scheduled hearings,

32 decisions were issued based on the non-appearance of a party. As of August 25, parties in 11

of these matters have contacted CUIAB to advise that their non-appearance was due to receiving

the notice of hearing on the day of, or following the hearing. Based on this information, it

appears that at least 11 of the 32 decisions that were rendered on the basis of non-appearance

resulted from USPS mail delays.

11.     Parties who are issued adverse decisions due to their failure to appear at a hearing

may attempt to have their matters re-opened for further hearing. Re-opening a matter and

conducting further hearings delays the final administrative adjudication of the appeal. Where a

claimant has appealed an adverse determination of the Employment Development Department

concerning eligibility for unemployment insurance and/or pandemic unemployment insurance

assistance, a delay in their appeals hearing may mean a delay in receiving benefits for a claimant

who ultimately receives a favorable decision from the CUIAB. Thus, mail delays can result in

benefits delays for eligible applicants.

12.     Additionally, the CUIAB relies on USPS to receive documentary evidence from

parties, which may be essential to the resolution of their appeals. Delays in the receipt of material

documentary evidence may similarly delay the Board's final administrative adjudication of

appeals. Again, in circumstances in which a claimant has appealed an adverse determination of

the Employment Development Department concerning eligibility for benefits, a delay in the

Board's potentially favorable adjudication at an appeals hearing may delay claimants' ability to

receive monetary benefits to which they are entitled.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 28th day of August, 2020

Stewart Knox
Undersecretary

# EXHIBIT 34

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA, <br><br> Plaintiffs, <br><br> v. <br><br> LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE, <br><br> Defendants. | No. 2:20-cv-4096-GAM |

## DECLARATION OF CARISSA M. MAGER

I, Carissa M. Mager, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am an Administrative Officer at the Office of General Counsel in the Criminal Unit ("OGC Criminal Unit") located in Pennsylvania. I have been employed as an Administrative Officer since August 20, 2018. My educational background includes a Bachelor of Science in Administration of Justice from the Pennsylvania State University.

2.      I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

Exhibit 34

3.      I have compiled the information in the statements set forth below through my personal observations. If called as a witness, I could and would testify competently to the matters set forth below.

**I.      Office of General Counsel Criminal Unit's Interaction with USPS**

4.      In my role, I am responsible for receiving and processing formal extradition requests from Pennsylvania counties to other states, as well as from other states to Pennsylvania counties. Once a Governor's Requisition from another state or a Petition for Requisition from a Pennsylvania county has been received, I am responsible for performing research on the request, as well as a review for legal sufficiency.

5.      Thereafter, I draft either a Governor's Requisition or a Governor's Warrant depending on the circumstance. Once the documents are approved by my superiors, I issue the formal demand to the appropriate authorities.

6.      In most states there is a 90-day deadline for a Governor's Warrant to be issued in the asylum state. If a Governor's Warrant is not issued and the fugitive does not have pending local charges, the fugitive is released from custody if they were not previously released on bail, bond, or their own recognizance.

7.      Several counties and states utilize the USPS for submitting extradition demands.

**II.      Recent Delays in USPS Mail Delivery/Other USPS Services**

8.      I have noticed a slight delay in receiving USPS mail from counties and states. Mail sent from Pennsylvania counties typically arrived to our office three to four days after being sent from the originating agency. Now it sometimes takes several days longer.

Decl. of Carissa M. Mager                                        Case No. 20-cv-4096-GAM
Exhibit 34

### III.     Consequences of the Delays

9.      It could potentially be a public safety risk for the OGC Criminal Unit to not

receive USPS mail on time. If a Governor's Warrant is not issued by the 90-day deadline, a

fugitive can be released from jail regardless of the crimes with which they have been charged.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this ___1___ day of September 2020

_____
Carissa M. Mager
Administrative Officer

Decl. of Carissa M. Mager                                              Case No. 20-cv-4096-GAM
Exhibit 34

EXHIBIT 35

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

               Plaintiffs,

          v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

             Defendants.

**No. 2:20-cv-4096-GAM**

## <u>DECLARATION OF JONATHAN MARKS</u>

I, Jonathan Marks, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and

correct:

      1.      I am the Deputy Secretary for Elections and Commissions for the Pennsylvania

Department of State located in the Commonwealth of Pennsylvania. I have been employed as

Deputy Secretary since February of 2019.

      2.      In this role, I assist the Secretary of the Commonwealth in her efforts to promote

the integrity and security of the electoral process. I work with election directors and personnel in

the Commonwealth's 67 counties to ensure that our elections are free, fair, secure, and accessible

to all eligible voters. In addition to my responsibilities related to election administration, I also

oversee the Department of State's duties related to the notaries, campaign finance, voter

registration, lobbying disclosure, commissions, and legislation.

Exhibit 35

3.      From October of 2011 until the date I was appointed Deputy Secretary, I served as the Commissioner of the Bureau of Commissions, Elections and Legislation ("BCEL") for the Department, and in that capacity, I supervised the Department's duties relating to election administration. Before being appointed Commissioner, I started in BCEL as a legal assistant in September of 2002, was promoted to Chief of the Division of Elections (August 2004), and later promoted again to Chief of the Division of the Statewide Registry of Electors ("SURE") (May 2008). Overall, I have seventeen (17) years' experience in election administration in Pennsylvania.

4.      I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

5.      I have compiled the information in the statements set forth below through my personal knowledge and through Pennsylvania Department of State personnel who have assisted me in gathering this information from our institution, on the basis of documents that have been provided to and reviewed by me. If called as a witness, I could and would testify competently to the matters set forth below.

**I.      Pennsylvania's Absentee and Mail-in Voting Laws, Policies, Procedures**

        **A. Pennsylvania's vote by mail system**

6.      For several decades, Pennsylvania has allowed for absentee voting by, among others, individuals serving in the military and anyone who would be away from his or her polling place on Election Day for business or occupational reasons. 25 Pa. Stat. § 3146.1.

7.      In October 2019, Pennsylvania enacted Act 77, the most significant change to the

Commonwealth's elections code in more than 80 years. *See* Act of October 31, 2019, P.L. 552

No. 77 (Act 77). Among other reforms, Act 77 gave Pennsylvanians more time to register to

vote; instituted no-excuse mail-in voting for all Pennsylvania voters; extended mail-in and

absentee ballot submission deadlines; allowed Pennsylvanians to request placement on a

permanent mail-in or absentee ballot list for all elections held in a calendar year; and provided

funding for local election boards to implement more secure voting procedures, including

machines with a voter-verifiable paper ballot.

8.      Act 77 took effect for the 2020 primary election and will govern the November

2020 general election in Pennsylvania. As a result, any registered Pennsylvania voter is entitled

to vote by an official mail-in ballot in the 2020 election. 25 Pa. Stat. § 3150.11.

9.      The deadline to register to vote in Pennsylvania is 15 days before the election. 25

Pa. Stat. § 3071. For the November 2020 general election, this deadline is October 19, 2020.

10.     Voters apply for a mail-in or absentee ballot by mailing or hand-delivering a

paper form to the county board of elections. 25 Pa. Stat. § 3150.12(f); 25 Pa. Stat. § 3146.2.

Voters with qualifying state identification can also submit an application for a mail-in or

absentee ballot entirely online. 25 Pa. Stat. § 3150.12(f); 25 Pa. Stat. § 3146.2(k); Pa. Dep't of

State, *Ballot Request Application*.[1]

11.     Applications for mail-in and civilian absentee ballots must be submitted one week

before the election and received by county board of elections "not later than five o'clock P.M. of

the first Tuesday prior to the day of" any election. 25 Pa. Stat. § 3150.12a(a); 25 Pa. Stat.

---

[1] https://www.pavoterservices.pa.gov/OnlineAbsenteeApplication/#/OnlineAbsentee
Begin.

Decl. of Jonathan Marks                                    Case No. 20-cv-4096-GAM
Exhibit 35

§ 3146.2a(a). For the November 2020 general election, the deadline to apply for a mail-in or absentee ballot is 5 p.m. on Tuesday, October 27.

12.     Voters who were unable to apply for a civilian absentee ballot by the deadline, due to a physical disability or illness or due to business or occupational reasons, may apply for an emergency absentee ballot until polls have closed. 25 Pa. Stat. § 3146.2a.

13.     Beginning 50 days before the election, the county board of elections must begin mailing mail-in and absentee ballots as soon as the ballot is certified and the ballots are available. 25 Pa. Stat. §§ 3150.12a(a), 3150.15; 25 Pa. Stat. §§ 3146.2a(a), 3146.5(b)(1). Once delivery of mail-in and absentee ballots has begun, the county board of elections must mail or deliver mail-in and absentee ballots to voters within 48 hours of receiving and approving an application for a mail-in ballot. 25 Pa. Stat. § 3150.15; 25 Pa. Stat. § 3146.5(b)(1). Because applications can be submitted until a week before the election, mail-in and absentee ballots may be sent by Pennsylvania county boards on Thursday, October 29.

14.     Act 77 provides that, except for military and overseas civilian absentee ballots, mail-in and absentee ballots will be counted only if they are received by the county board of elections by 8 p.m. on the day of the election. 25 Pa. Stat. §§ 3150.16; 3511; 25 Pa. Stat. § 3146.6. Voters must mail the completed ballot or deliver it in person to the county board of elections. 25 Pa. Stat. § 3150.16; 25 Pa. Stat. § 3146.6.

15.     Pennsylvania voters at any time can request to be placed on a permanent mail-in or absentee ballot list. 25 Pa. Stat. § 3150.12(g); 25 Pa. Stat. § 3146.2(e.1). Voters on this list will receive a mail-in or absentee ballot application every year. If the voter completes the application and requests to receive a mail-in or absentee ballot for all other elections during that calendar year, then the voter will automatically receive a mail-in or absentee ballot for the

remainder of the calendar year. More than 1.4 million Pennsylvania voters signed up for the permanent mail-in ballot list for elections in calendar year 2020.

16.     On June 2, 2020, Pennsylvania conducted its first election under Act 77. "Nearly 1.5 million voters cast their vote by mail-in or absentee ballot, 17 times the number that voted absentee in the 2016 primary, when approximately 84,000 absentee ballots were cast." Pa. Dep't of State, *Pennsylvania 2020 Primary Election Act 35 of 2020 Report* 4 (Aug. 1, 2020) ("2020 Report").[2] The 2020 Report explained that four "unprecedented conditions" occurred for the 2020 primary: (1) all 67 counties implemented new voting systems with a voter-verifiable paper ballot; (2) the expansion of mail-in voting to all eligible voters; (3) the COVID-19 global pandemic; and (4) civil unrest in response to the death of George Floyd, leading to curfews, travel restrictions, and office closures. *Id.* at 4. Nearly 1.5 million Pennsylvanians voted by mail and more than 1.3 million voted in person, resulting in "overall turnout . . . far higher than in 2012," the last election in which a presidential primary was not contested in either party. *Id.* The ability to cast a mail-in ballot was particularly important in larger counties where hundreds of poll sites were consolidated for reasons related to COVID-19 and civil unrest. *See id.* at 31-32 (Allegheny consolidated 830 polling places into 211; Delaware consolidated 151; Montgomery consolidated 212; and Philadelphia consolidated 850 into 190).[3]

17.     As of August 31, 2020, more than 8.72 million Pennsylvanians have registered to vote. Of these, more than 1.89 million voters have requested a mail-in or absentee ballot for the

---

[2] https://www.dos.pa.gov/VotingElections/Documents/2020-08-01-Act35Report.pdf

[3] *See also, e.g.*, Julian Routh, *County announces consolidated voting places for June 2 Pa. primary*, Pittsburgh Post-Gazette (May 15, 2020), https://www.post-gazette.com/news/vote2020/2020/05/15/allehgeny-County-announces-consolidated-voting-places-for-June-2-Pa-primary/stories/202005150141.

November 2020 general election and more than 1.55 million voters have been approved. By

comparison, only 356,300 absentee ballot requests were approved for the 2008 general election;

311,477 for the 2012 general election; and 322,467 for the 2016 general election.

18.     Of those who have applied for an absentee or mail-in ballot for the November

2020 general election, more than 632,000 requests have come from voters 65 and older.

19.     Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, the

Department received 14 million dollars to help Pennsylvania prepare for the increased use of

mail ballots. Of the 14 million dollars the Department received, nearly 6 million will be

distributed to county boards of elections to enable them to respond to the increase of mail ballots.

In addition, the Department will distribute 7 million dollars to county boards of elections as part

of its allocation of funds received pursuant to the Help America Vote Act (HAVA). Both of

these sets of funds will allow counties to purchase additional equipment and pay for additional

staff to process mail ballots.

### B.  Voting by mail in Pennsylvania is safe and secure.

20.      Voting by mail is easier, safer and more accessible during the COVID-19

pandemic. Any voter can vote from the safety and comfort of her own home, and only eligible

voters may apply for a mail-in ballot. Once a voter applies for a mail-in ballot online, in person,

or via a paper application submitted through the mail, the county verifies the voter's

qualifications to vote and identification. Each mail-in ballot packet that is sent to a voter contains

a unique identification number that ties that voter to the voter's mail-in ballot packet. Every

mail-in ballot returned by a voter must be enclosed in a return envelope that is signed by the

voter. The Department is working with the counties to make changes to the poll books generated

in SURE to ensure that poll workers are alerted when a voter has already cast her ballot. The

Decl. of Jonathan Marks                                     Case No. 20-cv-4096-GAM
Exhibit 35

Department also worked with counties to update the ballots, envelopes and instructions to voters reminding them that they cannot vote once they've returned their absentee or mail-in ballots.

21.     There is little evidence to support the claim that mail-in balloting causes fraud. States that have been conducting vote by mail for many years have found only rare instances of voter fraud. In fact, even states like Colorado, Hawaii, Oregon, Utah, and Washington, which conduct their elections completely by mail, have found very few instances of voter fraud in mail-in balloting. The process and procedures for mail-in balloting in Pennsylvania are identical to those for absentee balloting, which has been used successfully in Pennsylvania for decades. The only substantial difference between the two types of mail ballots is who qualifies for one versus the other.

### C.  Pennsylvania vote by mail and COVID-19

22.     In response to the COVID-19 pandemic and the significant increase in mail-in voting applications, Pennsylvania will provide funding to allow counties to send a postage-paid ballot-return envelope with each ballot for the November 2020 general election. The Pennsylvania Department of State is working with individual counties to identify the easiest manner of implementing pre-paid postage for November's returned ballots—whether it be reimbursed metered postage, funding Business Reply Mail postage costs, or reimbursement for stamps.

### D.  Pennsylvania & USPS

23.     I understand that, with regard to delivery times, election mail is and was generally treated as first-class mail. Prior to this year, my understanding was that first-class mail, and therefore election mail, was typically delivered within 1 to 3 days of mailing.

24.     Earlier this year, in its Coronavirus Updates for Residential Customers FAQ,[4] the USPS announced that "due to COVID-19 and employee availability, there may be temporary delays to some mail delivery." What is more, according to a letter the Secretary of the Commonwealth received from USPS in August of this year, and in conjunction with updates to its election mail webpages, USPS is now advising that "domestic, non-military voters mail their completed ballots before Election Day and at least one week prior to your state's deadline."

## II.     Impact of USPS Delays

25.     In the week following press reports on the aforementioned USPS letter, the Department experienced a roughly 50% increase in the number of calls received from voters. Many, if not most, of these voters expressed concern over postal delays. Also, beginning in late July, we observed a marked increase in the number of voters requesting to cancel their permanent status and asking not to receive a mail-in ballot for the general election.

## III.    Consequences on the November 2020 Election

26.     Any delays in the delivery of election mail that occur during the two weeks prior to the November 3 General Election could have a profound impact on voters who are applying for or returning their ballots during that period. If a voter receives her ballot a few days before Election Day due to a delay in mail delivery, she will have to make the difficult choice between entrusting her voted ballot to the USPS knowing that it may not arrive at her county election office in time, returning her ballot in person to the location(s) specified by her county, or showing up at her polling place on Election Day and voiding her ballot so that she can vote in person.

---

[4] https://faq.usps.com/s/article/USPS-Coronavirus-Updates-for-Residential-Customers?_gl=1*rad2d1*_gcl_dc*R0NMLjE1OTc0MzY0NTAuZWY2NjdlZGNmOWQyMTFmZDQ4YzcyMWVhMGJjOTMymY (updated Aug. 7, 2020).

Decl. of Jonathan Marks                                          Case No. 20-cv-4096-GAM
Exhibit 35

27.     According to its own assertions regarding Pennsylvania's deadline to apply for an absentee or mail-in ballot and the deadline for a voter to return her ballot, the USPS cannot provide any assurance that a voter who applies for an absentee or mail-in ballot a full week before Election Day can expect that her ballot will be delivered to her timely through the mail. Based on the data available in SURE showing that the number of voters who returned their ballots during the final week prior to the June 2 Primary exceed 500,000, any delays in delivery of election mail occurring during the final week prior to the November election could result in hundreds of thousands of ballots being returned too late to be counted.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 2nd day of September, 2020

_____

Jonathan Marks

EXHIBIT 36

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>          Plaintiffs,<br><br>        v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>          Defendants. | No. 2:20-cv-4096-GAM |

## DECLARATION OF NAOMI MAYER

I, Naomi Mayer, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      My name is Naomi Mayer. I am seventy years old. I am a resident and registered voter in the City of Portland, Maine.

2.      I am retired, after having spent thirty years as an editor.

3.      I submit this Declaration in support of the State of Maine's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

Exhibit 36

I.      **Interaction with the United States Postal Service**

5.      I have been a lifelong customer of the United States Postal Service ("USPS").  I have always been satisfied with the service USPS has provided me.  It has been my experience that when I place a letter in a mail slot, it gets delivered in a short amount of time.  This has been true both while living in Portland, as well as when I lived in rural parts of Maine.

6.      For about five years I lived in the rural town of Greenwood, Maine.  Greenwood was so small it did not have its own post office, but I still got great service from the USPS.  The post office in the neighboring town of West Paris faithfully delivered our mail and packages to our mailbox at the end of the dirt road leading to our farm.

7.      One time my father-in-law mailed us a package, and because of his illegible handwriting it ended up in Paris, France, instead of West Paris, Maine.  Even with the package traveling to France and back, it only took the USPS about three weeks to deliver the package to us in Greenwood.

8.      Now, I live in a densely populated residential area in Portland, Maine. Nevertheless, I still know the woman who delivers my mail.

9.      I would estimate that I use the USPS more than the average person.  I do not use it as much as a business, but I frequently like to mail things to family and friends.  My adult children joke sometimes about how much mail I send.

10.      For around forty years I used the USPS to receive and pay bills.  Starting around ten years ago, I began to pay my bills online.  I did that because it was convenient, not because of any lack of trust with the USPS.  In those forty years, I do not ever remember a time that I did not receive a bill when I expected it or that someone did not receive my payment on time.

11.     I regularly use the USPS to send birthday cards and presents to friends and loved ones.   My three daughters and two grandchildren live in California, and I often send them Christmas presents through the USPS.   Sometimes I mail their presents ahead of a flight to spend the holidays with them on the west coast.   Even during the busy holiday season, the USPS has gotten my family their Christmas presents on time.

12.     During the COVID-19 pandemic, I have used the USPS even more to connect with friends and family.   My husband and I have been very cautious during the pandemic because of our age and some pre-existing medical conditions that place us at higher risk of contracting and experiencing complications with COVID-19.

13.     Because we have not been able to see our friends and family in person, I like reaching out to loved ones through the mail.   I find that sending a card or note represents a little extra effort above and beyond simply interacting over a computer screen.

14.     I feel very lucky that my husband and I have been able to stay home as much as we have.   I worry about others in our community who need to go out to work and those who have to buy the things they need in stores.

15.     We can afford to get our groceries and other necessary items delivered.   We have not gone inside any stores to buy anything since March 2020.   The only place I have gone inside for a service since March 2020 is my local post office—because I view it as essential and I trusted that the post office was taking the necessary safety precautions.

**II.     Recent Delays in USPS Mail Delivery**

16.     I first noticed a change with my USPS service in July 2020.

17.     On July 28, 2020, I mailed a package to friends in Boston, Massachusetts, with a gift for their newborn baby.   I took care to send it after their vacation to make sure someone would

Decl. of Naomi Mayer                                                     Case No. 20-cv-4096-GAM
Exhibit 36

be home to receive it.  I paid for priority mail, which in my experience always takes two to three days.

18.     Our friends did not receive the package until August 5, 2020.  This frustrated me. I paid for priority mail so that the gift would arrive quickly.  Boston is only a two-hour drive away, so I did not see a reason why it should take eight days to get there by priority mail.  I have never had a package take that long to travel such a small distance.

19.     Then, on August 10, 2020, a friend mailed me a personal check.  She lives in Waldoboro, Maine, which is less than a two-hour drive from where I live.

20.     To this date, I still have not received the check.

**III.    Consequences of the Delays in USPS Service**

21.     Luckily, the delayed package I mailed to friends in Boston was not urgent, but I am still very troubled by the delay.  I send a lot of packages by priority mail, and I cannot remember a time it has ever taken a package as long as eight days to travel such a short distance, even around the holidays.

22.     As for the check that has not arrived, I have been in communication with my friend who sent it.  I am still hoping it will arrive soon, but my friend thinks it is totally lost.

23.     My friend is willing to issue another check if the first one does not arrive soon, but I do not want her to have to pay any potential surcharges to "stop payment" on the missing check.

24.     I can financially afford to wait for this $12 check to arrive, but I know a lot of people who depend upon the postal service are not so lucky.  It really worries me how a delay like this might affect other people who are less fortunate than I.

25.     I also worry now about how delays will affect people who rely on the USPS for delivering medicine, food, and other necessary items.  I am troubled by the widespread reports in Maine concerning dead baby chicks arriving via USPS mail.

26.     My experiences and these reports have eroded my trust in the USPS.  I have relied on the USPS my whole life.  It usually works so well that I barely think about the status of my mail and when—or if—it will arrive.

27.     These stories and my firsthand experience with delays in service this summer have led me to decide that I cannot rely on the USPS to vote by mail in the November general election.

28.     Voting is very important to me.  I often like to vote in person, and I usually spend a lot of time helping people register to vote and standing on the sidewalk during election season, encouraging others to vote.

29.     However, on a number of occasions I have been unable to vote in person on Election Day.  I first voted by absentee ballot about forty years ago when I was out of the country.  In the four decades since, I have voted by mail using an absentee ballot on several occasions.

30.     My husband and I have been following the Maine CDC's guidance very closely, and Dr. Shah, the director of the Maine CDC, advised that people in Maine vote by mail to reduce health risks at the polls.

31.     This summer, my husband and I voted in the Maine state primary election using absentee ballots that we sent through the USPS.  At that time, we mailed our state primary ballots through the USPS without any fear that they may not arrive on time or get counted.

32.     I requested my absentee ballot for the November general election as soon as it was available.

33.     My husband and I had planned to mail-in our absentee ballots based on the guidance of the Maine CDC, but we have changed our plans because of these USPS delays.

34.     I know my husband and I are at a higher risk for COVID-19 because of our age and pre-existing health conditions, but voting is too important to me to consider that my vote may not be counted due to problems with the USPS.

35.     I hope that before Election Day my city will be able to get secure boxes to drop off ballots, but I have heard that there is a shortage in boxes and that it might not be possible.  Even if Portland does not have drop boxes, I plan to physically deliver my ballot to City Hall and put it in the hands of a City employee, myself.

36.     It is very frustrating as a seventy-year-old to have to change my voting plans and do something that I know is a risk to my health.  I am aware that Maine has the oldest population in the nation, and I am worried that problems with the USPS are going to affect elderly people's ability to vote in November.  But since I am able-bodied, I feel like I must do this, despite the risk to my health.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 29th day of August, 2020

/s/ Naomi Mayer
Naomi Mayer
Portland, Maine

# EXHIBIT 37

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,

                Plaintiffs,

              v.

LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,

                Defendants.

No. 2:20-cv-4096-GAM

---

**DECLARATION OF ALICE P. MILLER**

I, Alice P. Miller, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Executive Director at the District of Columbia Board of Elections (DCBOE). I have been employed as Executive Director since July 2016. I previously served in this role from 1996 through 2008. In between my two terms as Executive Director of the DCBOE, I served as the Chief Operating Officer of the federal Election Assistance Commission (EAC) from 2008 through 2012, and as acting Executive Director of the EAC from 2012 through 2015.

2.      In my position, I serve as DCBOE's chief administrative official, and am responsible for the overall management and execution of its election administration, ballot access, and voter registration programs.

Exhibit 37

3.      I submit this Declaration in support of the District of Columbia's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      I have compiled the information in the statements set forth below through my personal knowledge, through DCBOE personnel who have assisted me in gathering this information from our institution, and on the basis of documents I have reviewed. If called as a witness, I could and would testify competently to the matters set forth below.

5.      Prior to the novel coronavirus pandemic, DCBOE policy was to mail ballots for District of Columbia elections to the approximately 16,000 registered domestic and military and overseas voters who are on DCBOE's permanent absentee voter list, and to other voters who timely request mail ballots, for all District elections in which such voters were eligible to vote.

6.      Domestic voters were required to submit requests for absentee ballots by the 7th day before each election, and military and overseas voters had to submit requests by the 3rd day before each election. Voted mail ballots had to be received by 8:00 pm on the date of the election.

7.      In light of the public health emergency, and pursuant to the General Election Preparations Emergency Amendment Act of 2020 (D.C. Act 23-382), DCBOE will be mailing ballots to every registered District of Columbia voter for the November 3, 2020 General Election ("the Election") without the need for a request. Ballots are expected to be delivered to voters the 1st week in October.

8.      With the passage of the Primary Date Alteration Act of 2019 (D. C. Law 23-0036), voted mail ballots could be counted if received by the 7th day after an election. However,

in light of the public health emergency, concerns over USPS delays, and pursuant to the

Coronavirus Support Congressional Review Emergency Amendment Act of 2020 (D.C. Act 23-

0328), the ballot receipt deadline was extended to the 10th day after the Election.

9.      The chart below indicates the number of mail ballots cast in general elections held

in the District from 2012 through 2016:

| Election | Mail Ballots Transmitted by Board (Civilian/UOCAVA) | Mail Ballots Returned/ Counted |
|---|---|---|
| 11/6/12 | 17,362 (14,378/2,984) | 13,121/11,588 |
| 11/4/14 | 8,535 (7,705/830) | 6,367/5,989 |
| 11/8/16 | 25,520 (21,362/4,158) | 20,991/20,781 |
| 11/6/18 | 13,673 (12,400/1,273) | 10,011/9661 |

10.     DCBOE anticipates that the number of mail ballots returned and counted will

exponentially exceed the numbers for previous general elections.

11.     I have been made aware of USPS delays through media reports, participation in

meetings with national, state, county, and municipal election officials where USPS delays have

been discussed, correspondence from USPS, anecdotal reports from District voters, and

conversations with DCBOE staff.

12.     In light of the information I have received concerning USPS delays, DCBOE will

implement a rule change that would require voters to submit an absentee ballot request, if

necessary for any reason, by no later than the 15th day before the Election. Voters who do not

submit a request by that date should plan to vote in person from October 27, 2020 through

November 3, 2020.

13.     Moreover, the Board will also install 55 secure Mail Ballot Drop Boxes

throughout the District. Voters may deposit their voted mail ballots into the Mail Ballot Drop

Decl. of Alice P. Miller                                    Case No. 20-cv-4096-GAM
Exhibit 37

Boxes beginning on or around October 5, and up to 8:00 pm on November 3. The total cost for the Mail Ballot Drop Boxes was $76,060.00.

14.     The Mail Ballot Drop Box program was implemented so that District voters do not have to rely on USPS for the return of their voted mail ballots.

15.     Voters may also drop off their voted mail ballots at any one of the Vote Centers in operation from October 27 through November 3 without having to wait in the in-person voting lines.

16.     Beginning after Labor Day, the Board will launch a multimedia messaging campaign encouraging voters not to wait until the last minute to vote, but rather to vote early using all of the methods available for doing so, including returning their voted mail ballots early by mail, in the Mail Ballot Drop Boxes, or at Vote Centers, and by voting early at Vote Centers if necessary.

17.     DCBOE's plan to mail ballots to all registered voters for the Election has been met with near universal approval. In fact, DCBOE received an overwhelming number of requests for the Board to mail ballots to all registered voters for the June 2, 2020 Primary Election.

18.     The District has offered no-excuse mail voting since the 2010 election cycle. Prior to that time, District voters had to provide a specific reason to vote other than in person on the date of the election, for *e.g.*, being away from the District, illness, work, etc.

19.     For at least a decade, District voters have had experience with no-excuse mail balloting with no barriers, and have not expressed a significant level of concern regarding the security and reliability of the program, which includes safeguards such as signature verification and procedures designed to prevent double-voting.

20.     For the June 2, 2020 Primary Election, over 81,000 voters requested and cast mail ballots.

21.     For the general election, DCBOE is making every effort to finalize its ballot as soon as possible so that ballots may be printed and mailed to voters so that they arrive the 1st week in October.

22.     If USPS delays persist, and voters do not receive their ballots in the timeframe intended, the District's Vote Centers will likely be overwhelmed, causing long lines and potentially unsafe conditions for voters and election workers. In turn, voters may decide not to participate in the Election.

23.     DCBOE is hopeful that the modifications to District laws regarding mail balloting and to DCBOE mail ballot program operations will mitigate any harm to the District's voting program that may be caused by USPS delays, but the optimal state of affairs would be the restoration of previous delivery standards, policies, and practices related to election mail by no later than early October.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 31st day of August, 2020

_____
Alice P. Miller
Executive Director
District of Columbia Board of Elections

# EXHIBIT 38

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>                    Defendants. | No. 2:20-cv-4096-GAM |

## DECLARATION OF CHRISTINE ANN NACCARATO-O'TOOLE

I, Christine Ann Naccarato-O'Toole, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am over the age of 18 and reside in Wilmington, Delaware.

2.      I submit this Declaration in support of the State of Delaware's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

3.      I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

Exhibit 38

## I.    Interaction with USPS

4.    My dependent child takes prescription medication for an ongoing, diagnosed medical condition, for which missing doses of the medication could be detrimental to my child's health.

5.    For several years, my child's prescription has been filled through a mail order pharmacy service provider.  Since 2017, we have been using CVS Caremark as our mail order pharmacy service provider.  To my knowledge, the prescription is filled from a location in Wilkes-Barre, Pennsylvania which is approximately 130 miles from Wilmington and less than 2.5 hours away by automobile.  We refill my child's medication every three months upon approval from my child's doctor.

6.    Until recently, the Postal Service has been extremely consistent in delivering the medication on time.  We routinely received the medication 1-2 days after we received notice from CVS Caremark that the medication had shipped.  Due to the routinely quick delivery time, my child's doctor regularly authorized refills 3-4 days before the medication was scheduled to run out, and there had never been a problem receiving the medication on time.

## II.    Recent Delays in USPS Mail Delivery

7.    My child's doctor authorized the most recent refill of my child's prescription with CVS Caremark on August 17, 2020.  CVS Caremark shipped the package out the same day.  Without this refill, the supply of my child's medication was going to run out on Thursday, August 20.

8.    Tracking information provided by the Postal Service showed that the package arrived at the Philadelphia Network Distribution Center on Tuesday, August 18.

Decl. of Christine Ann Naccarato-O'Toole                    Case No. 20-cv-4096-GAM

Exhibit 38

9.      Three days later, on Friday, August 21, the day after my child's medication had run out, the tracking information showed that the package had not yet left the Philadelphia Network Distribution Center.

10.     Four days later, on Saturday, August 22, two days after my child's medication had run out, the tracking information showed that the package had finally left the Philadelphia Network Distribution Center.

11.     The package was delivered to our home in Wilmington, Delaware on Monday, August 24.

### III.     Consequences of the Delay

12.     As a result of this delay in the delivery of my child's refilled prescription, my child ran out of medication.

13.     On the morning of Friday, August 21, when my child's refill was still sitting in Philadelphia, I called my child's doctor to tell her that my child had missed a dose of medication because the package had not arrived by Thursday, August 20.  The doctor expressed surprise that the package had not arrived on time and was concerned about my child missing any more dosages, which the doctor told me could be detrimental to my child's health.

14.     My child's doctor promptly submitted an emergency refill order for the medication to our local pharmacy, and I asked my husband to pick up the medication on his way home from work.

15.     My husband arrived at the local pharmacy about an hour before it was scheduled to close, where he discovered that the pharmacy had not filled the prescription because CVS Caremark had rejected the emergency order because the emergency order "duplicated" the mail order refill that was still sitting in the Philadelphia Network Distribution Center.

Decl. of Christine Ann Naccarato-O'Toole                     Case No. 20-cv-4096-GAM
Exhibit 38

16.     Around 7:00 p.m., I called my child's doctor's office to notify them of the problem.  An on-call physician contacted me at 7:25 p.m., and I explained my child's situation.  He immediately contacted the local pharmacy, and called me again at 7:33 p.m. to tell me that we could pick up a prescription at the local pharmacy.

17.     As a result of these efforts, we were successful in getting the emergency order filled before the local pharmacy closed at 8:00 p.m., more than 24 hours after my child's prescription had run out.  My husband and I suffered a great deal of uncertainty and stress during that time as we worried about our child's health and well-being.

*          *          *

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _30_ day of August, 2020

Christine Ann Naccarato-O'Toole

Decl. of Christine Ann Naccarato-O'Toole                    Case No. 20-cv-4096-GAM

Exhibit 38

EXHIBIT 39

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

          Plaintiffs,

          v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

          Defendants.

No. 2:20-cv-4096-GAM

## DECLARATION OF ROBERT V. O'BRIEN

I, Robert V. O'Brien, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Executive Deputy Secretary of the Pennsylvania Department of Labor and Industry ("PaDLI") located in the Commonwealth of Pennsylvania.

2.      PaDLI's statutory responsibilities include the Commonwealth's unemployment compensation program, workers' compensation system, workforce development including programs for Pennsylvanians with disabilities, labor law and worker safety programs, and disability determination.

3.      I have been employed as the Executive Deputy Secretary since April 2015. I have also served as the Acting Deputy Secretary for Administration for PaDLI since July 2016. Since April 2015, I have also held the positions of Acting Secretary, Acting Deputy Secretary of

Exhibit 39

Unemployment Compensation, Acting Deputy Secretary for Safety and Labor Management Relations, and Acting Director for Human Resources at various times.

4.    I began my employment with PaDLI in 2003 as the Director of the Bureau of Labor Law Compliance and became the Deputy Secretary for Safety and Labor Management in 2005.  In 2008, I became the Executive Deputy Secretary and continued in that position until I resigned in July 2011.  Between July 2011 and April 2015, I owned a consulting business.  Prior to 2003, I was a sheet metal mechanic and served at various times in the positions of elected trustee, recording secretary, and legislative director for Sheet Metal Workers Local Union 19. My educational background includes earning an associate degree in Liberal Arts from Peirce College in Philadelphia and completing the Labor Relations program through the Comey Institute of Industrial Relations at St. Joseph's University.

5.    I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

6.    I have compiled the information in the statements set forth below through my personal knowledge and through PaDLI personnel who have assisted me in gathering this information from our institution, from PaDLI employees and from data, documents, and anecdotal information provided to me.  If called as a witness, I could and would testify competently to the matters set forth below.

I.    **PaDLI's Interaction with USPS.**

7.    As PaDLI's Executive Deputy Secretary, I oversee and coordinate the efforts of PaDLI's program areas which are directly supervised by PaDLI deputies secretaries and

Decl. of Robert V. O'Brien                                     Case No. 20-cv-4096-GAM
Exhibit 39

executive directors.   PaDLI's mail function is supervised by the Bureau of Administrative Services which is a direct report to me.  As outlined below, many of PaDLI's program areas are heavily dependent upon the United States Postal Service ("USPS").

8.     PaDLI relies on the USPS to provide support to its customers, i.e., the statutory beneficiaries of the Commonwealth-wide programs that PaDLI administers.

9.     **Unemployment Compensation (UC).**  PaDLI's UC program relies on the USPS to mail notices of determination, personal identification numbers to allow claimants to access their UC accounts, and debit cards through which UC and Pandemic Unemployment Assistance ("PUA") payments are made.   Timeliness is of utmost importance because the UC system is designed to work swiftly to get parties their adjudications that inform whether UC benefits will be granted or denied, and to get needed money into the hands of eligible individuals who have lost their employment through no fault of their own.

10.     To be eligible for unemployment compensation (UC) benefits, a claimant must make "a valid application for benefits with respect to the benefit year for which compensation is claimed" and make a "claim for compensation in the proper manner and on the form prescribed by the [D]epartment."  43 P.S. § 801(c).

11.     Upon filing an application for UC benefits, PaDLI mails the claimant a Claim Confirmation Letter via USPS to confirm that the application has been processed and to provide the claimant with a personal identification number ("PIN").  The PIN is unique to each claimant and allows the claimant to access PaDLI's Internet claims filing system and to use PA Teleclaims ("PAT"), PaDLI's system for filing claims by telephone.

12.     The Claim Confirmation Letter also instructs the claimant when to file claims for benefits for weeks that the claimant is totally or partially unemployed.  A claimant must file

biweekly claims in accordance with a schedule established by PaDLI for that claimant, and a failure to do so may result in a denial of benefits for those weeks.

13. **Unemployment Compensation Board of Review (UCBR).**  The UCBR also relies on the USPS to send critical communications and documents to parties appealing PaDLI determination of eligibility or ineligibility for UC and PUA payments, including notices of hearing, hearing documents, and referee and Board decisions.  USPS is the primary means by which claimants, employers and their attorney communicate with and provide documents to the UCBR, including to the UC referees who serve as the first level of appeal from PaDLI UC and PUA determinations.  Timeliness is critical because of the need to resolve benefits eligibility issues quickly and in compliance with federal standards.  In addition, the UCBR has statutory filing deadlines that constitute a jurisdictional bar to untimely appeals.

14. **Bureau of Workers' Compensation ("BWC").**  The BWC is charged with the administration and enforcement of the Pennsylvania Workers' Compensation Act ("WC Act"), as well as the maintenance of several statutorily-created funds from which workers' compensation benefits are paid to certain injured workers.  Where workers' compensation benefits are payable under the WC Act from one of BWC's funds, BWC uses the USPS for delivery of those payments, which are made on a bi-weekly and monthly basis to injured workers.  BWC also relies upon the USPS for service of various communications, approvals, and determinations to the numerous stakeholders in the workers' compensation community. BWC additionally uses the USPS for sending correspondence to employers in furtherance of its efforts to ensure compliance with the WC Act's mandatory insurance requirements.  BWC also regularly receives subpoena requests for records that arrive via USPS delivery, and require response via USPS mailing.

Decl. of Robert V. O'Brien                                                    Case No. 20-cv-4096-GAM
Exhibit 39

15.    **State Workers' Insurance Fund ("SWIF").**  The Workers' Compensation Act mandates that every employer provide workers' compensation benefits for its employees. Because workers' compensation insurance is not available to all employers at commercially reasonable rates, the SWIF is the Commonwealth's workers' compensation insurer of last resort. In accordance with its statutory obligations, SWIF continuously issues weekly/biweekly wage loss payments to employees who sustained injuries on the job and are unable to work, and must issue those payments in the form of paper checks when that mode of distribution has been selected by the employee.  Those checks are mailed to the injured employees via the USPS. SWIF also processes bills for medical treatment for the injured employees and makes payment for those bills via the USPS as well.  During the month of July 2020, SWIF mailed 10,178 checks to employees and medical providers via the USPS.  SWIF also relies on the USPS to provide a multitude of administrative forms to injured employees and their representatives to verify continued benefit entitlement and it relies on the USPS for the return of the documents which can be time sensitive, making time of the essence.  SWIF also schedules and sends notices of physical, mental and vocational examinations to employees using the USPS.  Furthermore, SWIF regularly receives applications and deposits for SWIF policies via USPS and the policies of insurance it issues are sent to the insured businesses by USPS.  SWIF invoices, renewal documentation, certificates of insurance verifying coverage, policy cancellation notices as well as policy renewal documentation are mailed to policyholders through the USPS. Notices, communications, pleadings and decisions related to claims filed by injured employees with the U.S. Department of Labor are received via USPS only, and initial bankruptcy court communications are regularly received via USPS delivery.  SWIF is the recipient of subpoenas

Decl. of Robert V. O'Brien                                             Case No. 20-cv-4096-GAM
Exhibit 39

and document requests delivered via USPS which require the timely production of policy documents or employee records.

16.    **Bureau of Disability Determination ("BDD").**   PaDLI oversees the Bureau of Disability Determination which is responsible for assisting the Social Security Administration in determining whether disabled Pennsylvanians are eligible for disability benefits.   BDD relies on the USPS to communicate with applicants for disability benefits.   BDD also relies upon the USPS to obtain medical evidence through medical evidence requests.   The medical evidence received from these requests is used in approximately 55% of all BDD determinations of disability.

17.    **Labor Law and Worker Safety programs.**   PaDLI administers and enforces the Asbestos Occupations and Accreditation and Certification Act, the Bedding and Upholstery Law, the Child Labor Act, the Combustible and Flammable Liquids Act, the Employer to Pay Employment Medical Examination Fee Act, the Equal Pay Law, the Industrial Homework Law, the Minimum Wage Act of 1968, the Pennsylvania Construction Code Act, the Stuffed Toy Manufacturing Act and the Wage Payment and Collection Law.   PaDLI enforces these statutes by filing civil or criminal actions in Pennsylvania's County Courts and Magisterial District Courts.

18.    **PaDLI Litigation Matters.**   Nearly all of the laws and regulations PaDLI administers provide for administrative appeals of PaDLI's determinations as to benefits, support, licensing, permitting and certification for a right of administrative appeal from such determinations.   The hearing officers and boards that hear such appeals rely upon the USPS to transmit and receive critical documents including proposed findings and recommendations, rulings on motions and evidentiary matters, and decisions to the parties.   These administrative

Decl. of Robert V. O'Brien                                            Case No. 20-cv-4096-GAM
Exhibit 39

processes are generally subject to timelines which are often jurisdictional in nature. Accordingly, the delay in receipt of certain documents sent via the USPS can deprive a party of rights of challenge and further appeal, or put parties through the additional burden of proving that the USPS—and not the party—was the cause of the delay resulting in an untimely filing.

II.   **Recent Delays in USPS Mail Delivery Have Impaired PaDLI's Ability to Timely Adjudicate and Pay Benefits, Schedule and Hold Hearings, and Respond to Matters in Litigation.**

19.   <u>**Unemployment Compensation.**</u>  To be eligible for unemployment compensation (UC) benefits, a claimant must make "a valid application for benefits with respect to the benefit year for which compensation is claimed" and make a "claim for compensation in the proper manner and on the form prescribed by the [D]epartment." 43 P.S. § 801(c).

20.   Upon filing an application for unemployment compensation (UC) benefits, PaDLI mails the claimant a Claim Confirmation Letter via USPS to confirm that the application has been processed and to provide the claimant with a personal identification number (PIN).

21.   The PIN is unique to each claimant and allows the claimant to access PaDLI's Internet claims filing system and to use PA Teleclaims ("PAT"), PaDLI's system for filing claims by telephone.

22.   The Claim Confirmation Letter also instructs the claimant when to file claims for benefits for weeks that the claimant is totally or partially unemployed.

23.   A claimant must file biweekly claims in accordance with a schedule established by PaDLI for that claimant, and a failure to do so may result in a denial of benefits for those weeks. 34 Pa. Code § 65.43. Despite PaDLI's prompt issuance and mailing of Claim Confirmation Letters upon the filing of applications for benefits, claimants have reported that

they are receiving Claim Confirmation Letters several weeks after their issuance, rather than the several days that had been the norm for mailing through the USPS.

24.     Typically, Claim Confirmation Letters arrive, at the latest, ten (10) business days after mailing, but over the past two months, PaDLI has received an increasing number of complaints from claimants that they received their PINs several weeks after mailing.

25.     The belated receipt of PINs has resulted in numerous claimants being unable to file their claims for compensation in accordance with their schedule for bi-weekly filing, thereby jeopardizing their eligibility for compensation for those weeks for which they cannot timely file.

26.     **Unemployment Compensation Board of Review.**  Due process requires notice and an opportunity to be heard.  Appeal periods are short (15 days) and jurisdictional.  Notices of hearing are mailed 14 days prior to the hearing date, and hearing documents are mailed five (5) days prior to the hearing date.  In the past, these time periods have allowed the parties sufficient time to evaluate the PaDLI determination and file an appeal and provided proper notice and information prior to the hearings.

27.     Recent delays in mailing, as reported by UC referees on the front lines, have caused late appeals, remailings, and hearings to be rescheduled.  Examples are noted in the chart below:

| DOCUMENT TYPE | DATE MAILED | DATE RECEIVED | CONSEQUENCE |
| --- | --- | --- | --- |
| NOTICE OF DETERMINATION | 7/1/2020 | 7/17/2020 | LATE APPEAL |
| NOTICE OF HEARING AND HEARING DOCS | 7/6/2020 | 7/13/2020 | 7/17/2020 HEARING RESCHEDULED |
| NOTICE OF DETERMINATION | 7/10/2020 | 7/29/2020 | LATE APPEAL |
| NOTICE OF HEARING AND HEARING DOCS | 7/10/2020 | NOT RECEIVED BY 7/27/2020 | 7/27/2020 HEARING RESCHEDULED |

Decl. of Robert V. O'Brien                                    Case No. 20-cv-4096-GAM
Exhibit 39

| NOTICE OF DETERMINATION | 7/13/2020 | 7/29/2020 | LATE APPEAL |
|---|---|---|---|
| NOTICE OF DETERMINATION | 7/13/2020 | 7/28/2020 OR 7/29/2020 | LATE APPEAL |
| HEARING DOCUMENTS | 7/15/2020 | NOT RECEIVED BY 8/3/2020 | 8/3/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 7/16/2020 | NOT RECEIVED BY 7/30/2020 | 7/30/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 7/16/2020 | 7/31/2020 | 7/31/2020 HEARING RESCHEDULED |
| HEARING DOCUMENTS | 7/17/2020 | NOT RECEIVED BY 7/22/2020 | 7/22/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING | 7/20/2020 | NOT RECEIVED BY 8/3/2020 | 8/3/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 7/27/2020 | NOT RECEIVED BY 8/10/2020 | 8/10/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 7/31/2020 | 8/13/2020 | 8/14/2020 HEARING RESCHEDULED |
| HEARING DOCS | 7/31/2020 | NOT RECEIVED BY 8/14/2020 | 8/14/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING | 8/3/2020 | 8/15/2020 | 8/17/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 8/3/2020 | 8/15/2020 | 8/17/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 8/3/2020 | NOT RECEIVED BY 8/17/2020 | 8/17/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 8/4/2020 | 8/13/2020 | RESCHEDULE HEARING |
| NOTICE OF HEARING AND HEARING DOCS | 8/5/2020 | NOT RECEIVED BY 8/19/2020 | 8/19/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING | 8/5/2020 | 8/20/2020 | 8/20/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING AND HEARING DOCS | 8/6/2020 | NOT RECEIVED BY 8/20/2020 | 8/20/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING | 8/7/2020 | NOT RECEIVED BY 8/20/2020 | RESCHEDULE HEARING |

Decl. of Robert V. O'Brien
Exhibit 39

Case No. 20-cv-4096-GAM

| REFEREE DECISION | 8/10/2020 | NOT RECEIVED BY 8/17/2020 | REMAILED DECISION; POSSIBLE LATE APPEAL |
|---|---|---|---|
| NOTICE OF HEARING | 8/12/2020 | 8/24/2020 | 8/26/2020 HEARING RESCHEDULED |
| NOTICE OF HEARING | 8/12/2020 | 8/22/2020 (sat) OR 8/24/2020 | 8/26/2020 HEARING RESCHEDULED |
| HEARING DOCS | 8/14/2020 | NOT RECEIVED BY 8/24/2020 | 8/24/2020 HEARING RESCHEDULED |
| REFEREE DECISION | 8/18/2020 | NOT RECEIVED BY 8/24/2020 | REMAILED DECISION; POSSIBLE LATE APPEAL |
| REFEREE DECISION | 8/18/2020 | NOT RECEIVED BY 8/25/2020 | REMAILED DECISION; POSSIBLE LATE APPEAL |
| REFEREE DECISION | 8/19/2020 | NOT RECEIVED BY 8/24/2020 | REMAILED DECISION; POSSIBLE LATE APPEAL |

28.     Late appeals due to delays in USPS deliveries are creating an unnecessary burden on parties to affirmatively establish that the untimely filing was the result of USPS mailing delays and not a matter of personal negligence.

29.     In light of the rapidly increasing volume of UC and PUA appeals resulting from unemployment resulting from the COVID-19 pandemic, the constant need to reschedule hearings before UC referees on UC and PUA appeals resulting from recent delays in the US mail is creating a growing logjam of hearings and slowing PaDLI's overall processing of these appeals.

30.     **Litigation delays**.  Delays in USPS service and deliveries are affecting PaDLI's matters in litigation.   On August 5, 2020, counsel for PaDLI's Office of Vocational Rehabilitation ("OVR") received a hearing officer's determination in a case involving an appeal of an OVR customer.  The decision was dated July 9, 2020 and the stamp from the Willow Grove Post Office indicates that the postage was paid and the determination mailed on July 9, 2020. The Rehabilitation Act of 1973 requires that a request for review of the decision of the

hearing officer must be made within 20 days of the decision, measured from the date of mailing the decision. In this case, the time in which to request review of the decision expired on July 29, 2020. Due to the delay in receiving the decision, the Office of Vocational Rehabilitation would have been unable to appeal an adverse decision.

### III. The Consequences of the USPS's Delays Are Inflicting Increasing Harm Upon PaDLI's Administration of Key Commonwealth Programs and the Citizens PaDLI Serves.

31. USPS delays in US mail services and deliveries are undermining the key Commonwealth programs that PaDLI administers and increasingly inflicting harm upon Pennsylvania citizens awaiting benefits to which they are entitled and in dire need.

32. **Unemployment Compensation.** As noted above, delays in USPS services have slowed the delivery and receipt of documents critical to PaDLI's ability to administer the UC, PUA and other CARES Act unemployment assistance programs in our citizens' time of greatest need.

33. Delays in USPS services have dramatically slowed the delivery of notices of determination, PIN numbers to allow claimants to access and update their UC accounts, and debit cards through which PaDLI issues UC and PUA payments to individuals who have lost work. The delay or interruption of these payments—which have been a lifeline for many workers during the COVID-19 pandemic—has caused or is likely to cause immediate harm to the recipients of these benefits including the financial inability to provide for basics including food, rent and medical expenses.

34. These delays have adversely impacted PaDLI's ability to execute its UC responsibilities and to get needed money into the hands of eligible individuals who have lost their employment through no fault of their own. The time spent answering inquiries about delays

takes away from the time that would otherwise be spent processing and adjudicating claims. Delays attributable to the USPS have also resulted in a reputational harm to PaDLI which has been the subject of intense criticism for failing to timely provide benefits to those in need.

35.     **Unemployment Compensation Board of Review.**   Recent delays in mailing have caused late appeals, remailings, and hearings to be rescheduled.  These in turn have caused delays in adjudications and delays in getting benefits to eligible individuals.

36.     **Bureau of Workers' Compensation.**   Delays in the delivery of court-ordered bi-weekly and monthly workers' compensation benefit payments from BWC to injured workers will inevitably have a financial impact on the injured worker recipients who rely on payments for lost wages, and may subject BWC to unnecessary litigation and cost.

37.     Failure to timely deliver all BWC communications, approvals, and determinations to the workers' compensation community may affect the rights of those individual stakeholders and will interfere with the proper operation and functioning of Pennsylvania's workers' compensation system.

38.     Untimely delivery of BWC mailings to employers regarding their compliance with the mandatory insurance requirements may inhibit BWC's ability to properly enforce the provisions of the WC Act.

39.     Delays in USPS mail may result in BWC not timely receiving subpoenas for records, or in BWC not meeting time-sensitive deadlines for response, resulting in unnecessary litigation and cost.

40.     **State Workers' Insurance Fund.**   SWIF anticipates that as a consequence of delays in the delivery of its wage loss replacement checks to employees and payments to medical providers it will be inundated with phone calls and emails inquiring as to the status of checks and

questioning the delay.  SWIF will be forced to devote resources to addressing those inquiries.
Increased litigation is anticipated as well, wherein SWIF will be required to demonstrate that it
appropriately issued payment and the reason for the delay lies with the USPS in order to avoid
the imposition of an assessment of penalties and interest.

     41.    Delays in receipt of employee verification forms may result in benefits for an
employee being improperly modified or may result in delay in modifying benefits that should be
modified.  An injured employee's failure to attend medical or vocational examinations due to
lack of notice because of USPS delays in delivering the communications will unnecessarily add
to SWIF's claims handling expenses.

     42.    Failure to promptly receive policy applications and deposits and renewal payment
is expected to cause delay in the issuance of SWIF policies, which will consequently affect
businesses who are obligated to insure their workers' compensation exposure but cannot do so
while the policy issuance is delayed.  Some employers may opt to continue to work in the interim
without insurance, illegally, subjecting themselves to civil and criminal fines and penalties.
Delays associated with receipt of certificates of insurance confirming coverage are expected to
impede business development, and an employer's failure to receive a notice of cancellation
because of postal delivery delay may also result in an employer unknowingly failing to insure its
employees.

     43.    Failure to timely receive and respond to claims filed under the Longshore and
Harbor Workers' Compensation Act and the Mine Safety and Health Act with the U.S.
Department of Labor because of delays in SWIF receiving notices and communications because
of USPS delays will prejudice SWIF's ability to evaluate, and appropriately manage the claims,
and may prejudice SWIF's ability to deny claims.  Failure to timely receive and respond to

Decl. of Robert V. O'Brien                             Case No. 20-cv-4096-GAM
Exhibit 39

bankruptcy notices may affect SWIF'S ability to timely file claims and recover funds it is owed through bankruptcy proceedings.  Failure to timely respond to subpoenas may subject SWIF to exposure to assessments of sanctions and require SWIF to demonstrate that responsibility for the delay lies with the USPS not SWIF.

44.    **Disability Determinations.**  The United States Social Security Administration (SSA) has set a goal for BDD to issue 158,492 determinations for the 2019-20 federal fiscal year. A failure to receive timely medical information could result in a failure of BDD in meeting its goal.  SSA has the authority to reduce funding for any state agency that fails to meet its goal for issuing determinations.

45.    **PaDLI's Litigation and Enforcement.**  Many of Pennsylvania's County and Magisterial District Courts use the USPS to provide notifications of hearings and decisions.  A slowdown in mail delivery which resulted in late delivery of hearing notices and decisions could cause PaDLI to miss hearings and appeal deadlines.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _3/ˢᵗ_ day of August, 2020

Robert V. O'Brien
Executive Deputy Secretary
Commonwealth of Pennsylvania
Department of Labor and Industry

Decl. of Robert V. O'Brien                                          Case No. 20-cv-4096-GAM
Exhibit 39

# EXHIBIT 40

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

                    Plaintiffs,

                v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

                    Defendants.

**No. 2:20-cv-4096-GAM**

---

## <u>DECLARATION OF ALEX PADILLA</u>

I, Alex Padilla, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Secretary of State of California at the California Secretary of State's Office located in Sacramento, California. I have served in this capacity since January 2015 after my election at the November 2014 statewide election. I was reelected to my second term of office at the November 2018 election.

2.      My responsibilities as California's chief election official, as set forth in California Elections Code section 12172.5, include administering the provisions of the elections code. I am further charged with ensuring "that elections are efficiently conducted and that state election laws are enforced." During my administration, I have overseen a number of reforms designed to increase and enhance access to the electoral process, including access to more voter registration

Exhibit 40

opportunities, including through the Department of Motor Vehicles and adoption of the Voters

Choice Act that provides more options for voters to cast their ballot.

3.       I submit this Declaration in support of the State of California's litigation against

Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in

his official capacity as Chairman of the Postal Service Board of Governors; and the United States

Postal Service (USPS).

4.       I have compiled the information in the statements set forth below through my

personal knowledge and through the California Secretary of State's Office personnel who have

assisted me in gathering this information from our institution, on the basis of documents that

have been provided to and reviewed by me. If called as a witness, I could and would testify

competently to the matters set forth below.

## I.       California's Mail-in Voting Laws, Policies, Procedures

### A.  California's Vote-by-Mail System

5.       California has a decades-long history of safely and securely administering mail-in

elections. California began tracking the use of absentee mail-in voting in 1962, and it has been

allowed for any registered voter, for any reason, since 1979.

6.       In California, for the first time, all registered active voters will automatically be

sent a mail-in ballot for the November 2020 election. Approximately 20.9 million active

California voters will automatically be receiving a mail-in ballot.

7.       For the November 3, 2020 election, the California elections officials shall, no

later than September 19, 2020 (45 days before Election Day), mail ballots and required election

materials to absent military or overseas voters. Cal. Elec. Code § 3114(a). The election officials

must also begin mailing ballots and required election materials to every registered voter in each

county by October 5, 2020 (29 days before Election Day). Cal. Elec. Code § 3000.5(a). The

county elections official shall have five days to mail a ballot to each person who is registered to

vote on October 5, 2020, and five days to mail a ballot to each person who is subsequently

registered to vote, up until the voter registration deadline of October 19 (15 days before Election

Day) and often times beyond this date. *Id*., Cal. Elec. Code. §§ 2102(a)(1), 3102(e). This must

include a ballot, and all supplies necessary for the use and return of the ballot, including an

identification envelope with prepaid postage for the return of the vote-by-mail ballot. Cal. Elec.

Code § 3010.

8.     California voters may return completed ballots by mail (with postage prepaid by

the State); by returning the ballot in person to a polling place, vote center or early voting

location, or office of county elections official; by dropping the ballot into one of the county's

ballot drop boxes; or authorizing someone to return the ballot on the voter's behalf. Cal. Elec.

Code § 2017(a), (b). The State accepts completed ballots by mail that are postmarked no later

than on Election Day or by other means no later than the time the polls close on Election Day.

Cal. Elec. Code § 3020.

9.     County election officials may begin to process vote-by-mail ballot return

envelopes beginning 29 days before the election. Processing vote-by-mail ballot return envelopes

may include verifying the voter's signature on the vote-by-mail ballot return envelope pursuant

to Section 3019 and updating voter history records. Cal. Elec. Code § 15101(a).

10.    For the statewide general election to be held on November 3, 2020, any

jurisdiction having the necessary computer capability may start to process vote-by-mail ballots

on October 5, 2020 (29 days before Election Day). Processing vote-by-mail ballots includes

opening vote-by-mail ballot return envelopes, removing ballots, duplicating any damaged

ballots, and preparing the ballots to be machine read, or machine reading them, including

processing write-in votes so that they can be tallied by the machine. However, under no

circumstances may a vote count be accessed or released until 8 p.m. on the day of the election.

Cal. Elec. Code § 15101(b)(2).

11.     All other jurisdictions shall start to process vote-by-mail ballots at 5:00 p.m. on

the day before the election. Cal. Elec. Code § 15101(b)(2). Results of any vote-by-mail ballot

tabulation or count shall not be released before the close of the polls on the day of the election.

Cal. Elec. Code § 15101(c).

12.     For elections other than the November 2020 election, voters can request to be

placed in permanent vote-by-mail status. Cal. Elec. Code. § 3000, et seq. Voters can download a

one-time application from the Secretary of State's website or request an application from their

county elections official. Voters who complete the application to become a permanent vote-by-

mail voter will automatically receive a mail-in ballot for all subsequent elections. A voter's

permanent vote-by-mail status will end if the voter cancels their status or if the voter does not

vote in four consecutive statewide general elections. Approximately 14.4 million California

voters are currently on the permanent mail-in ballot list.

**B.      Efforts to Ensure the Security of California's Vote-by-Mail System**

13.     California's vote-by-mail system has proven to be secure; and historically, there is

no evidence of significant levels of voter fraud related to vote-by-mail ballots in California.

California offers voters the ability to track their ballots online, both as the ballots are mailed to

them by county election officials and as the ballots are returned and received by county election

officials. Additionally, county election officials must examine the postmark on the return

envelope and signature on the declaration before processing the ballot. Signatures are also

reviewed to ensure that a voter's signature on the ballot declaration matches the signature of that voter in the registration files. Cal. Elec. Code §§ 3020, 3019. As returned vote-by-mail ballots are processed, and prior to preparing any ballot for tabulation, county election officials verify that the voter has not already returned another vote-by-mail ballot, has not voted in person, or has not cast a provisional ballot. Cal. Elec. Code §§ 15111, 15278.

14.     The processing of vote-by-mail returned envelopes, as well as the processing and counting of vote-by-mail ballots is transparent and open to the public. Members of the public—including members of the county grand jury, at least one member of the Republican and Democratic county central committees, and representatives of any other party with a candidate on the ballot—may observe and challenge all stages of the process between the processing of vote-by-mail ballot return envelopes through the counting and disposition of the ballots. Cal. Elec. Code § 15104(a),(b).

15.     California's vote-by-mail system is widely and increasingly used by California voters. In the 2020 primary election, over 9.6 million vote-by-mail ballots were cast, considerably above the 7.1 million ballots cast for the most recent similar election, the 2018 primary election. And the percentage of total ballots cast by voting by mail increased as well, from 67.7% of the total ballots cast in the 2018 primary election to 72.08% of the total ballots cast in the 2020 primary election.

**C.     California's Election System and COVID-19**

16.     California's expansive vote-by-mail system has allowed the state to more safely run elections during the COVID-19 pandemic by minimizing the dangers associated with voters congregating at overcrowded polling stations, which could lead to potential COVID-19 outbreaks, as seen in other states. California held two special elections on May 12, 2020 – one in

California's 25th Congressional District (CD 25), encompassing parts of Los Angeles County and Ventura County; and another in California State Senate District 28 (SD 28), encompassing part of Riverside County. Both elections took place during the pandemic, and all active status registered voters in those districts were automatically sent mail-in ballots. Notably, voter participation remained about the same, or increased in Riverside and Ventura counties compared to the March 3, 2020 primary, in which mail-in ballots were not automatically sent to all active voters. In CD 25, there was 41.06% voter participation in the May special election, an increase from 38.95% voter participation in the March primary. In SD 28, there was 38.95% voter participation in the May special election, compared to 44.84% in the March primary.

17.     In June 2020, in response to COVID-19, the California Legislature enacted, and Governor Gavin Newsom signed, Assembly Bill 860, which requires that all active registered voters in California receive a vote-by-mail ballot in the mail prior to the November 3, 2020 election. 2020 Cal. Stat. ch. 4 (AB 860).

18.     Starting with the November 3, 2020 election, county election officials must accept as timely cast any ballot received by the voter's elections official via the USPS or a bona fide private mail delivery company by the 17th day after Election Day—November 20, 2020—as long as the ballot is either (1) postmarked on or before election day, is time stamped or date stamped by a bona fide private mail delivery company on or before election day or it is otherwise indicated by the USPS or a bona fide private mail delivery company that the ballot was mailed on or before election day; or (2) if the ballot has no postmark, a postmark with no date, or an illegible postmark, and no other information is available from the USPS or the bona fide private mail delivery company to indicate the date on which the ballot was mailed, the vote-by-mail ballot identification envelope is date stamped by the elections official upon receipt of the vote-

Decl. of Alex Padilla                                                    Case No. 20-cv-4096-GAM
Exhibit 40

by-mail ballot from the USPS or a bona fide private mail delivery company, and is signed and dated prior to or on election day. Cal. Elec. Code § 3020(d).

19.     Additionally, on June 29, 2020, Governor Newsom signed into law Assembly Bill 89 and Assembly Bill 100 to appropriate state and county funding for the November 2020 election that includes $35 million for outreach and voter education. My office will expand its education and outreach efforts—the Vote Safe campaign—to prepare voters for voting by mail or in person during COVID-19. The Vote Safe campaign will provide information to voters on what steps to take to ensure they are registered to vote, to ensure their voter registration record is updated, to sign up for ballot tracking, and to educate the public on the safety, security, and ease of voting in the November General Election amid the COVID-19 pandemic.

**D.     California's Vote-By-Mail System and USPS**

20.     For prior elections, California has paid the USPS marketing mail rate for distributed ballots and Business Reply Mail rate (First-Class equivalent) for returned ballots. Regardless of the rate paid, USPS has generally tried to process ballots as First-Class Mail, which has a service standard that ranges from one to three days. My office understands that USPS will follow the same arrangement for processing ballots for the November 2020 election.

21.     Over the years, my office and other county elections officials have developed strong and constructive working relationships with our regional post office representatives. Together, we have established coordinated procedures with Postal Service leaders to ensure every vote-by-mail ballot is mailed and returned in a timely manner. My office currently meets weekly with Postal Service representatives to identify, discuss, and resolve issues. These dedicated Postal Service professionals understand the importance and urgency of election mail.

Attached as Exhibit A is an information sheet issued by my office in response to frequently-asked questions regarding the USPS's handling of election mail.

**II.      Impact of USPS Delays**

22.      On August 10, 2020, I wrote Postmaster General DeJoy expressing my opposition to the sweeping policy changes he had announced in early July 2020—including limitations on overtime, prohibition of late trips by postal workers, and the requirement that carriers adhere to strict start and stop times—especially this close to an election. As of this declaration, in less than three weeks, ballots will begin to be mailed out to military and overseas voters, the very people defending our democracy. A copy of my August 10 letter to Postmaster General DeJoy is attached as Exhibit B.

23.      On August 21, 2020, I toured the USPS main processing facility in Los Angeles, which I understand is the largest USPS processing facility in the nation. My purpose in visiting the facility was to learn more about recent operational changes at USPS and to understand their impact on USPS processes and delivery.

24.      I came away with several observations. While important physical distancing and other health and safety measures have been implemented by the USPS, COVID-19 has had a significant impact on the workforce, forcing many employees to miss work. I was told that this USPS facility is trying to quickly hire and train hundreds of new employees in an effort to meet mail processing needs. I was also told by USPS personnel that there has been a significant decrease in letter volume and a significant increase in parcel volume since the beginning of the pandemic.

25.      Election season generates significantly increased mail volume. In my view, while some of the USPS's adjustments made to accommodate the increase in parcel processing and

delivery might make sense short term, the volume of letter mail will significantly increase in late September and October with the delivery of ballots (both to voters and from voters back to their county elections office), State and County Voter Information Guides, and political mail from candidates and campaigns.

26.     Given USPS's recent policy changes, along with the anticipated increase in mail volume—through the delivery of ballots and election materials and increases in parcel processing—my office must maintain regular communication with USPS from September through November to ensure that reported delays and backlogs are eliminated and do not threaten to disrupt election processes, including the delivery and return of vote-by-mail ballots.

27.     The USPS's recent policy changes, combined with President Trump's false claims that voting by mail causes massive voter fraud, has resulted in a drastic spike in inquiries from voters concerned about the integrity of the vote-by-mail process. Since the news reports of USPS mail delays resulting from Postmaster DeJoy's recent policy changes, more than 1,000 people have contacted our office expressing concern about the security of the mail-in voting process and the ability of the USPS to deliver vote by mail ballots to them and get them back to elections offices in time to be counted.

28.     As a result, California will have to divert more resources—both human and financial—in an attempt to counteract the damage that has already been done. We are currently in the planning stages for this public messaging campaign.

**III.     Potential Consequences on the November 2020 Election**

29.     Widespread delays in postal service delivery could be catastrophic to the integrity of the November 3 election. At its most basic level, delayed delivery of ballots to households and/or subsequent delayed return delivery of those ballots to county elections officials could

disenfranchise significant numbers of voters. While California has taken several steps legislatively to mitigate those concerns, USPS policy and staffing changes that have already resulted in mail delivery delays could deny Californians—American citizens—their opportunity to cast a ballot and/or have their ballot counted in the November 3, 2020 Presidential General Election.

30.     The more than 1,000 inquiries received by our office since the USPS policy changes reveal widespread confusion among California voters. Despite Postmaster General DeJoy's representation that he will suspend implementation of some of his recent policy changes, he has refused, in this testimony before Congress, to commit to taking appropriate steps to ensure he brings back the USPS to its status quo prior to his policy shift announcements. Further, there is no guarantee that he will reverse course at a future date before Election Day or during the vote canvass period.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 2nd day of September, 2020

                              /s/ Alex Padilla
                              Alex Padilla
                              California Secretary of State

Decl. of Alex Padilla                                        Case No. 20-cv-4096-GAM
Exhibit 40

# EXHIBIT
# A

Exhibit 40



**CALIFORNIA SECRETARY OF STATE**

# USPS Frequently Asked Questions (FAQs)

## How is the Secretary of State's office responding to concerns regarding the United States Postal Service (USPS)?

✓ California has extended the time that vote-by-mail ballots can arrive to county elections offices for this election. Vote-by-mail ballots postmarked on or before 8:00 p.m. on Election Day can arrive up to **17 days** after Election Day and be counted.

✓ The Secretary of State's "Where's My Ballot?" tracking tool is now available in every county. Voters can sign up to receive automatic notifications by text message, email, or voice call on the status of their vote-by-mail ballot at **WheresMyBallot.sos.ca.gov.**

✓ All completed vote-by-mail ballots sent back to county elections offices are First Class Mail, postage paid, and have an estimated delivery window of 2-5 days. County elections officials use the postal service's Official Election Mail Logo that allows postal workers and carriers to recognize it as essential election mail.

✓ County elections officials work closely with the USPS to review and approve the design of vote-by-mail envelopes and other election mail pieces to ensure machine compatibility and the seamless delivery and return of ballots.

✓ Our USPS partners communicate with each mail plant throughout the state about the vote-by-mail period and provide examples of what local vote-by-mail ballot envelopes look like to ensure that they are given priority and processed timely.

✓ USPS also conduct daily sweeps of processing areas and require staff to certify no unprocessed ballot mail remains.

Exhibit 40

## Is California working directly with the United States Postal Service to prepare for the Election?

California elections officials have weekly meetings with USPS representatives to ensure the timely delivery and return of vote-by-mail ballots. If issues with mail service are identified, we contact USPS immediately. We have spent years establishing relationships and regular communication with local and state postal representatives to prepare for elections.

## Will my vote-by-mail ballot get to me in time?

Vote-by-mail ballots will be mailed to all registered voters beginning 29 days before the election. Voters can return their voted vote-by-mail ballots by mail, at their county elections official's office, or at any ballot drop-box location, any polling place, or any vote center throughout the state.

## How long after Election Day will ballots still count if postmarked by Election Day?

California has extended the time that vote-by-mail ballots can arrive to county elections offices for this election. Vote-by-mail ballots postmarked on or before Election Day can arrive up to 17 days after Election Day and be counted.

## Do vote-by-mail ballots need stamps?

No, all vote-by-mail ballots in California come with First Class, prepaid postage return envelopes.

## What can I do to make sure my ballot arrives back to the county elections office in time?

The Secretary of State recommends returning your vote-by-mail ballot as soon as possible, and signing up for ballot tracking at **WheresMyBallot.sos.ca.gov.**

There are multiple options for returning your voted vote-by-mail ballot to your county elections official.

**By mail:** Vote-by-mail ballots must be postmarked on or before 8:00 p.m. on November 3 and received no later than November 20. If there is no postmark, ballots are considered cast on time by county election officials if the date the voter signed the envelope is on or before Election Day, so be sure to sign and date your vote-by-mail envelope.

**In person:** Vote-by-mail ballots can be dropped off at your county elections office, or at any ballot drop-box location, any polling place, or any vote center throughout the state before the polls close at 8:00 p.m. on November 3.

To ensure timely processing once received by your county elections official, please don't forget to seal, sign, and date your vote-by-mail ballot envelope.

## Which counties will have drop boxes available to drop off vote-by-mail ballots?

Many California counties will have drop boxes and drop off locations available. Californians can check for drop boxes and locations at **Vote.ca.gov** once vote-by-mail ballots are out. Ballots can also be dropped off at every polling place and vote center throughout the state.

Exhibit 40

### How do I know my ballot will get there in time if I use a ballot drop box?

Ballot drop boxes are secure, locked boxes that are clearly marked as an "Official Ballot Drop Box." They are monitored and emptied regularly by authorized county employees. Ballots are placed in a sealable or lockable container for secure transport back to the county elections office. You can track your dropped off ballot by signing up for **WheresMyBallot.sos.ca.gov.**

### I don't want to return my ballot by mail. What options do I have?

California voters can return their completed ballot at their county elections official's office, or at any ballot drop-box location, any polling place, or any vote center throughout the state. Find a location near you at **Vote.ca.gov.**

### Because of issues with USPS, what in-person voting options are available?

Every county in California will offer in-person voting options on Election Day from 7:00 a.m. to 8:00 p.m. and all counties will offer early voting. The times and days of early voting will vary by county. Find a location near you at **Vote.ca.gov.**

### How do I know my vote will be counted?

Voters should sign-up for our "Where's My Ballot?" tool to receive messages by email, text message, or voice call when their ballot has been mailed, received, counted, and if there are any issues with their ballot. Sign up at **WheresMyBallot.sos.ca.gov.**

Additionally, the status of your ballot will be uploaded to **VoterStatus.sos.ca.gov** within 60 days of the election.

### Is it true that vote-by-mail ballots will not count in California?

County elections officials carefully check and process every vote-by-mail ballot they receive. Please be sure to seal, sign, and date your vote-by-mail ballot envelope.  See above about ballot tracking. Voters who sign up will be notified when their ballots are counted or if there is a problem with processing their ballots. In our March 2020 Presidential Primary 98.5% of vote-by-mail ballots counted. Ballots were rejected because they were late, they were missing a signature, or the signature did not match the one on the voter's registration.

### Does the President have a say in what ballots are counted and accepted in California?

No. States and county elections officials are in charge of elections. County elections officials are responsible for printing, mailing and counting votes. The vote count process is open to the public.



For concerns about changes in voting and USPS mail service contact our office at VoteSure@sos.ca.gov



Exhibit 40

# EXHIBIT B

Exhibit 40



**ALEX PADILLA**
CALIFORNIA SECRETARY OF STATE

August 10, 2020

The Honorable Louis DeJoy
Postmaster General
475 L'Enfant Plaza SW
Washington, D.C. 20260

Dear Postmaster General,

As California's Chief Elections Officer, I am gravely concerned about the many recent reports of changes at the U.S. Postal Service and their impact on the voting rights of Californians. In less than forty days, California will begin mailing vote-by-mail ballots to military and overseas voters. I oppose your proposed changes to postal service and pricing as they create unnecessary risk so close to the election and undermine the ability of state and local election officials to administer free and fair elections.

I strongly urge you to work with state and local election officials to share and immediately adopt best practices that will help ensure the timely delivery and return of vote-by-mail ballots. Your regional and local leaders and election officials would benefit greatly from a coordinated effort, especially as many of states are working to protect public health by expanding vote-by-mail.

For nearly 20 years, California has offered no-excuse vote-by-mail. In that time, vote-by-mail utilization has grown from 25% of all ballots cast to nearly 75% in our March 2020 primary election. The health, safety, and voting rights of more than 25 million citizens in California depends on the effective and efficient processing and delivery of mail. Voters of all political parties and demographics rely on vote-by-mail to exercise their franchise. Voters expect and deserve to receive their vote-by-mail ballots without delay regardless of whether they live in rural, urban, suburban, or tribal areas.

Over the years, California elections officials have developed strong relationships and established coordinated procedures with Pacific Area Postal Service leaders to ensure every vote-by-mail ballot is mailed and returned in a timely manner. My office currently meets weekly with Postal Service representatives to identify, discuss and resolve issues. These dedicated Postal Service professionals understand the importance and urgency of election mail.

We rely on the U.S. Postal Mailpiece Design Analysts to review and approve the design of vote-by-mail envelopes and other election materials in order to ensure machine comparability and seamless delivery. Our county elections officials use the postal service's Official Election Mail Logo, allowing postal workers and carriers to easily recognize vote-by-mail ballots as essential election mail. We work with the postal service to inform each mail plant of the vote-by-mail

Exhibit 40

1500 11TH STREET, SACRAMENTO, CA 95814 • (916) 653-7244
300 SOUTH SPRING STREET, ROOM 16507, LOS ANGELES, CA 90013 • (213) 897-6225
WWW.SOS.CA.GOV

August 10, 2020
Page 2

period and examples of what local vote-by-mail ballot envelopes look like to ensure they are given priority and processed in a timely manner. We train our staff and county election officials to report problems through Electionmail.org to ensure the U.S. Postal Service has real-time, awareness of any problems. During the vote-by-mail period, postal workers conduct daily sweeps of processing areas and require staff to certify that no unprocessed ballot mail remains. And this fall, for the first time, every county in California will offer a ballot tracking service for voters, an effort that requires continued coordination with our postal representatives and election officials to implement the use of Intelligent Mail Barcodes. A focus on engaging states that are expanding access to vote-by-mail and assisting them to adopt these best practices will benefit citizens more than any immediate changes to delivery times and pricing.

Postal workers are courageously serving on the front lines during the current health pandemic to deliver medication, paychecks, unemployment benefits, and soon, vote-by-mail ballots. Throughout our nation's history, from our War for Independence, to the Civil War, during the Great Depression, and in the days after 9/11, postal workers proudly and courageously served the nation. As we face one of the most tumultuous elections in American history, citizens, now more than ever, need a strong, steady, and reliable Postal Service to protect our democracy.

Sincerely,

Alex Padilla
California Secretary of State

cc: Honorable Speaker Nancy Pelosi
    Honorable Minority Leader Kevin McCarthy
    Honorable Majority Leader Mitch McConnell
    Honorable Minority Leader Charles Schumer

Exhibit 40

# EXHIBIT 41

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,
STATE OF CALIFORNIA, STATE OF
DELAWARE, DISTRICT OF COLUMBIA,
STATE OF MAINE, COMMONWEALTH OF
MASSACHUSETTS, and STATE OF
NORTH CAROLINA,,

               Plaintiff,

      v.

LOUIS DeJOY, *in his official capacity as
United States Postmaster General*; ROBERT
M. DUNCAN, *in his official capacity as
Chairman of the Postal Service Board of
Governors*; and the UNITED STATES
POSTAL SERVICE,

               Defendants.

No. 2:20-cv-4096

## DECLARATION OF JEAN PALLARES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Jean Pallares, declare and state as follows:

1.     I am the Pharmacy Director for the Los Angeles County Department of Health

Services (DHS). DHS protects and promotes the health of patients and communities throughout

Los Angeles County. I have served as the Pharmacy Director for DHS for two years. Prior to

serving as the Pharmacy Director, I was the Director of Pharmacy Services at Huntington

Hospital located in the City of Pasadena, California for 19 years. I make this declaration in

support of Plaintiffs' preliminary injunction motion based on my personal knowledge, a review

of records and information kept in the regular course of DHS's business and made available to

Exhibit 41

me in the course of my duties, and information provided to me by DHS employees working under my direction and supervision.

## BACKGROUND ON DHS

2.     DHS is the second largest municipal health system in the nation. DHS operates as an integrated health system, with 26 health centers, 16 outpatient clinics, and 4 acute care hospitals. In addition to DHS's network of directly operated clinical sites, DHS also offers low-cost or free health coverage to eligible residents with limited income. DHS serves Medi-Cal beneficiaries by impaneling beneficiaries to a specific provider or group of providers for primary care. DHS also operates My Health LA, a no-cost health care program for residents of Los Angeles County who do not have and cannot access health insurance. Health care services for individuals and families enrolled in My Health LA are provided by a network of over 200 non-profit community-based clinics with whom DHS partners.

3.     Across DHS's network of directly operated clinical sites and partnerships with community-based clinics, DHS cares for approximately 750,000 patients each year. The majority of these patients are low-income patients, including the medically indigent.

## DHS'S PRESCRIPTION MAILING PROGRAM

4.     Since August 2012, DHS has used a Central Fill Pharmacy and Automation System (CFPAS) to provide automated, individualized prescription dispensing, through a central pharmacy facility, to DHS's hospitals and outpatient clinics. Patients may refill their prescriptions at a DHS facility or choose to receive their prescription refills through the mail. For those patients who elect to receive prescriptions through the mail, CFPAS fills the prescription and sends the prescription directly to the patient's home via the United States Postal Service (USPS).

Exhibit 41                                                    - 2 -

5.    Since its inception, the prescription mailing program has been a vital resource for Los Angeles County residents. The direct mailing program allows patients to save time, and in many instances to avoid traveling long distances, in order to refill necessary medications, often for chronic conditions that require continuous and ongoing care. The prescription mailing program also decreases congestion, and therefore wait times, at local DHS pharmacies. Critically, the prescription mailing program improves access to much-needed medications for patients who are unable to travel because of an infirmity or transportation-related issues.

6.    At the outset of the COVID-19 global pandemic, DHS undertook significant efforts to continue to provide high-quality patient care while protecting the health and safety of patients, staff, and the entire Los Angeles County community. As part of these efforts, DHS worked closely with its network of directly operated and community partner clinics to remind clinics, physicians, and pharmacists about the availability of the prescription mailing program and to encourage patients to sign up for the program.

7.    These efforts resulted in a significant increase in the number of patients using the prescription mailing program. Prior to these efforts, approximately 15–16% of patients served by DHS received prescriptions through the mail. In March 2020, participation in the prescription mailing program increased to approximately 36–37% of all DHS patients. Since April 2020 and continuing to the present, over 70–72% of DHS patients receive their prescriptions through the mail. This increase in the number of patients receiving prescriptions by mail helps promote DHS's policy of minimizing the number of in-person visits to facilities to help prevent the spread of COVID-19 and keep patients, staff, and communities safe.

### IMPACT OF USPS'S CHANGES ON DHS AND DHS PATIENTS

8.    Since USPS has enacted operational and policy changes designed to reduce the agency's costs, DHS patients who receive prescriptions through the mailing program have

Exhibit 41                                    - 3 -

experienced substantial delays. Prior to USPS's changes, DHS patients typically received mailed prescriptions within 3–5 days. DHS patients now report delays of up to 3 weeks.

9.     These delays have significantly impacted the health and safety of DHS patients. Because of the delays, DHS patients are at risk of running out of or not having access to prescriptions, including necessary medications for the treatment of chronic conditions. Missed doses could potentially cause adverse health issues.

10.     Many DHS patients do not have easy access to a pharmacy or drug store, making them further reliant on USPS and the proper function of the mail system to obtain their prescriptions on time. This is especially true with limited transportation options available during COVID-19.

11.     The delays in USPS's operations have also adversely affected DHS. To attempt to mitigate the effect of the mail delays, DHS instructed CFPAS to refill and send prescriptions 2–3 weeks early. But even after CFPAS implemented this change, some DHS patients continued to report late mailings and interruptions to their access to prescription medications. To help ensure patients receive prescription medications without interruption, pharmacies at DHS's outpatient clinics have begun refilling and sending prescriptions to patients using alternative, higher-cost methods of delivery, such as FedEx. This has resulted in the unnecessary double-filling of prescriptions by both CFPAS and DHS outpatient clinic pharmacies, as well as increased operational costs to DHS as a result of DHS pharmacies filling and sending prescriptions that CFPAS otherwise would manage.

///

///

Exhibit 41                                            - 4 -

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and of my own personal knowledge.

Executed this 1st day of September 2020 in Los Angeles, California.

Jean Pallares

Exhibit 41                                   - 5 -

Exhibit 41

# EXHIBIT 42

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

Plaintiffs,

v.

**No. 2:20-cv-4096-GAM**

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

Defendants.

## DECLARATION OF MICHELLE TASSINARI

I, Michelle Tassinari, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the director and legal counsel to the Elections Division of the Massachusetts Secretary of State's office. I have been legal counsel since April 2000 and director since 2005. As such, I have personal knowledge of the matters set forth herein.

2. The Elections Division is responsible for administration of state and presidential primaries and elections in the Commonwealth of Massachusetts, including, among other things, responsibility for the printing of nomination papers, the receipt of certified nomination papers, and the printing of candidate lists and ballots, including official, early and absentee.

3. I submit this Declaration in support of the Commonwealth of Massachusetts's litigation against Louis DeJoy, in his official capacity as United States Postmaster General;

Exhibit 42

Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      If called as a witness, I could and would testify competently to the matters set forth below.

### Massachusetts's Absentee and Mail-in Voting Laws, Policies, and Procedures

5.      Massachusetts has a long history of safely and securely accepting absentee ballots by mail. *See* Mass. Gen. Laws ch. 54, §§ 89-100. In 2014, Massachusetts law was changed to allow "early voting" but for biennial state elections only, beginning with the 2016 election. The law provided for early voting in person or by mail, but only during the early voting period, which was limited to 10 days before the election. *See* Mass. Gen. Laws ch. 54, § 25B. The two systems (absentee voting and early voting) overlap in several ways, but the most important difference is that the state constitution requires that absentee voters must have an excuse (for example, a voter can vote absentee if he is away from his city or town on Election Day), *see* Mass. Const. amend. art. CV, while no excuse is needed in order to vote early.

6.      In 2020 and in response to the ongoing public health emergency caused by the coronavirus pandemic, Massachusetts expanded its early voting program to permit voters to vote by mail without an excuse for an extended period of time over the previous law. *See generally* Mass. Stat. 2020, ch. 115. Every registered voter is thus eligible to vote early by mail in Massachusetts this year. A registered voter need only complete a timely application for a mail-in ballot to vote by mail this year in the State Primary or the State Election. *Id.* § 6.

7.      The deadline to register to vote in the State's primary election, held on September 1, 2020 this year, was August 22. Mass. Stat. 2020, ch. 115, § 18. The deadline to register to vote in the State's general election (to be held on November 3, 2020) is October 24. *Id.* A voter

Declaration of Michelle Tassinari                                   Case No. 20-cv-4096-GAM
Exhibit 42

can register online, by mail, or in person at any city or town hall in Massachusetts. *See* Mass.

Gen. Laws ch. 51, §§ 3, 26; https://www.sec.state.ma.us/ele/eleifv/howreg.htm.

8.     In order to vote early by mail in this year's State Primary or State Election, a

registered voter must send a signed application for a mail-in ballot to a local election office. The

voter will then be mailed a ballot to vote and return. *See* Mass. Stat. 2020, ch. 115, § 6.

9.     The deadlines for timely requests for mail-in ballots to be received by local

election officials are August 26 for the September 1 primary election, and October 28 for the

November 3 general election. Mass. Stat. 2020, ch. 115, §§ 6(e)(2) & 6(f)(2). Once a request is

received, local election officials mail ballots to voters as soon as they are available; this year,

state law requires that ballots be made available to local election officials for the State Election

no later than October 9, 2020. *Id.* § 8(b).

10.     Each voter that makes a timely request for a mail-in ballot will receive a ballot,

instructions, a security envelope in which to conceal the ballot after voting which contains an

affidavit that the voter must sign, and a larger pre-addressed, postage-prepaid envelope in which

to return the security envelope. Mass. Stat. 2020, ch. 115, § 6(g)(1). Once a voter receives a

mail-in ballot, it can be completed and returned to local election officials either by hand delivery,

mail or, where available, to a secure drop box. *Id.* § 6(h)(1)-(2). To be counted, the completed

ballot must be received by a particular time by local election officials. For the primary election

on September 1, the ballot must to be received by the local election office by 8 p.m. EDT on

September 1. *Id.* § 6(h)(3). For the general election on November 3, a ballot, if mailed, needs to

be postmarked by November 3 and it must reach the local election office by November 6. *Id.*

(Hand-delivered ballots must be returned by 8 p.m. EST on November 3 for the general election.

*Id.*)

Declaration of Michelle Tassinari                                    Case No. 20-cv-4096-GAM
Exhibit 42

**Importance of Adherence to the USPS's First-Class Mail Delivery Standards**

11.     At the direction of my office, and consistent with United States Postal Service guidance, all ballot applications and all ballots sent to Massachusetts voters are sent via first-class mail; included with these ballots are first class return mail envelopes that are pre-addressed and postage prepaid back to the appropriate local election official.

12.     Publicly-available guidance from the USPS routinely states that the delivery standard for first-class mail is 1-3 business days, although this timeframe is "not guaranteed." *See, e.g.*, https://www.usps.com/ship/first-class-mail.htm; https://faq.usps.com/s/article/Delayed-Mail-and-Packages; https://faq.usps.com/articles/FAQ/Delayed-Mail-and-Packages.

13.     In light of Massachusetts's statutory scheme, there are circumstances in which, if mail delivery did not meet USPS's delivery standards, the risk of a voter's ballot not being counted would be exacerbated.  For example, a ballot for the general election must be postmarked by November 3, and received by November 6, which is 3 business days later.  *See supra* ¶ 10.  Thus, failure by USPS to adhere to its delivery standard of 1-3 business days for first-class mail could create a risk that the ballot of a voter who mailed her ballot in compliance with state law would not be counted because it arrived too late.

14.     By letter dated July 30, 2020, the General Counsel of the USPS, Thomas Marshall, advised the Commonwealth's chief elections officer, Secretary of the Commonwealth William Galvin, of "a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under [Massachusetts's] laws as we understand them." Exhibit XX at 1.  The letter further warned of a "significant risk that, at least in certain

circumstances, ballots may be requested in a manner that is consistent with [Massachusetts's]

election rules and returned promptly, and yet not be returned in time to be counted." *Id.* at 2.

15.     Mr. Marshall's letter states that "most domestic First-Class Mail is delivered 2-5

days after it is received by the Postal Service." *Id.* at 1.  It is unclear whether this letter

represents a departure from USPS's usual first-class delivery standard of 1-3 business days, or

whether the reference to "2-5 days" is intended to include non-business days.  In any event, the

publicly-available USPS guidance on first-class mail noted *supra* ¶ 12 continues to refer to 1-3

business days as of this writing.

16.     Any delays in mail processing or delivery leading to a departure from USPS

delivery standards for first-class mail would increase the likelihood of Massachusetts voters'

ballots being diligently returned but not being counted.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this ⟨28th⟩ day of August, 2020

*[signature]*

Michelle Tassinari

Declaration of Michelle Tassinari                                    Case No. 20-cv-4096-GAM
Exhibit 42

Exhibit 42

EXHIBIT 43

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>          Plaintiffs,<br><br>     v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>          Defendants. | No. 2:20-cv-4096-GAM |

**DECLARATION OF MELINDA UTAL**

I, Melinda Utal, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am 65 years old. I reside at 1285 W. 19th Street, San Pedro, California, where I have lived since March 2019.

2.      I submit this Declaration in support of the State of California's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service (USPS).

3.      I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

/ / /

Exhibit 43

## I.   BACKGROUND

4.      Since 2010, I have worked as a seller for Etsy, an online retailer allowing

individuals to buy and sell merchandise online. I use Etsy to sell antique and vintage items,

including dresses, fine china, jewelry, and collectibles.

5.      From 1990 until 2010, I worked as a fund raising executive for Southern

California museums and colleges.  Beginning in January 2002, I operated a part-time private

practice as a hypnotherapist, planning to eventually leave fundraising and develop the

hypnotherapy practice full time.

6.      After opening my Etsy shop in 2010, I paused operations for several years

beginning in 2015 to devote more time to my growing hypnotherapy practice. I then reopened

the Etsy shop in January 2019. Because the shop was profitable during its reopening, I closed my

hypnotherapy practice to new clients in December 2019, believing that I could rely in the income

received through my Etsy shop.

7.      I currently rely on my income from my Etsy shop to supplement my husband's

income to pay our bills and rent. I am waiting until I am 70 years old to take Social Security

payment and to access my retirement income.

## II.   INTERACTION WITH THE USPS

8.      During California's shelter-in-place orders resulting from the COVID-19

pandemic, I have promoted my Etsy shop as an alternative way for people to buy birthday and

holidays gifts for others. Customers can shop online in my store, and I gift wrap and mail the

package to the recipient in time for their birthdays or other special occasions. Customers also buy

antique and vintage items from my shop.

9.      For my business, I rely exclusively on the USPS for processing, tracking, and delivering my packages to customers in the United States and abroad. Customers almost always choose to pay for the least expensive shipping. Until recently, I sent out all my packages via First-Class, Parcel Ground, or Media Mail rates unless the customer requested and paid extra for Priority Mail (one to three business days delivery window).

10.     I always could rely on the USPS for timely delivery, as well as careful processing and tracking of packages through the delivery system. Shipping through the USPS is far less expensive than using comparable shipping options provided by UPS or FedEx. And until recently, the USPS's tracking services were reliable in locating packages and estimating their delivery date. If I were to significantly raise shipping prices on my items and ship them through UPS or FedEx, many customers would not buy anything from me at all.

11.     Since initially opening in 2010, I have made 855 sales, all of which were shipped through the USPS. To my recollection, I never had delivery problems or delays or customer complaints about delivery until recently.

12.     Before July 2020, my shipments within the United States generally arrived well within the USPS time schedule for each mail type. Between January 2019 and June 2020, I sent out 124 packages to customers living in the United States. Only one of those domestic packages did not arrive on time.

III.    RECENT DELAYS IN USPS PACKAGE DELIVERY

13.     Starting July 6, 2020, I noticed that many of the packages I sent out to customers in the United States were not being received on-time, or that customers were not receiving the packages at all. Nine different domestic shipments were delayed by an average of over six days beyond the three-business-day maximum delivery windows for packages sent via Priority or First

Class Mail. In addition, I have not been able to track several international packages through the USPS tracking system.

14.     A package I shipped on July 6 with Priority Mail (between one to three business days maximum delivery) took four days to go from Los Angeles to Morgan City, Louisiana.

15.     Another package I shipped on July 13 with Priority Mail took seven days to go 27 miles from San Pedro to Los Angeles. A copy of the online tracking form for this shipment is attached as Exhibit A.

16.     Another Priority Mail package I sent on July 15 took seven days to go from San Pedro to Grass Valley, California.

17.     Another package I sent on July 17 by First-Class Mail (between one to three day delivery) from San Pedro took 10 days to arrive at Arvada, Colorado.

18.     A package I sent on July 20 with Priority Mail took 21 days to go from San Pedro to St. Charles, Illinois. A copy of the online tracking form for this shipment is attached as Exhibit B.

19.     A package I sent on July 28 by First-Class Mail took nine days to ship from San Pedro to Sherman Oaks, California—a distance of less than 40 miles within Los Angeles County. A copy of the online tracking form for this shipment is attached as Exhibit C.

20.     A package I shipped on August 11 by First-Class Mail took 10 days to get from San Pedro to Lenexa, Kansas.

21.     A package I shipped on August 15 by First-Class Mail took seven days to ship from San Pedro to Eugene, Oregon.

22.     Additionally, on at least three different occasions, I have been unable to track Priority Mail packages sent out since July 2020. In such cases, neither I nor the customer can

find out what happened to the mailed package. On the USPS tracking website, packages that have never been delivered display as either "Pre-Transit" for several days or "Out for Delivery."

IV.   CONSEQUENCES OF THE DELAYS

    A.   **Negative Customer Reviews**

    23.   A critically important business goal for Etsy sellers is to have five-star reviews from their customers. These reviews give new customers confidence in making a purchase from my store.

    24.   Since my business relies heavily on the customer reviews and ratings provided through Etsy, any negative reviews have a particularly damaging effect on my business. Since July 2020, several customers have expressed their frustration and anger about the delayed or missing packages and the inability to track them online.

    25.   On August 4, 2020, to avoid getting bad reviews because of the disruption in mail delivery, I put a notice on my shop's landing page that I could no longer ship internationally, that I would only ship via Priority Mail within the United States (which costs the customer substantially more), and that even with these additional measures, I could not promise they would get their packages on time. My sales have dropped off considerably since posting the notice on my shop's landing page. I have only had 20 sales in July and 13 in August.  By comparison, I had 65 sales in May and June 2020, combined.

    B.   **Refunding Lost Shipments**

    26.   Since July 2020, five of my shipments never arrived to their customers. In those cases, I have fully refunded one customer and will be preparing refunds for four more customers in the coming days. Such repayment includes a refunding of their purchase, sales tax and shipping price for the item. And because the package is never returned to me, I cannot relist the

item for sale on my Etsy shop for a future customer. These lost items result in losses for my business. I would estimate that I have already lost at least $1,500 in refunds and lost business over the past two months because of my inability to assure customers that they can count on USPS delivery of their purchases.

27.     Because of the recent delays and lost shipments with USPS, I have had to pay for more expensive shipping options, choosing Priority Mail over First-Class, Media Mail or Parcel Ground, and extra insurance, in the hopes that packages marked Priority will get there within three to five days. These expenses make the purchase price of some of my items unattractive to customers, so I cover those additional costs myself. If this continues for the foreseeable future, it does not seem viable for me to try to keep my Etsy shop open.

28.     Attempts at getting a refund for the lost item from the USPS involve several hours of additional time completing online refund applications. This additional time and expense to recover funds from lost items, and to ensure the secure shipment of other items, in turn, forces me to invest several additional hours of unpaid work to ensure that I can keep my Etsy shop open—even for a greatly-reduced profit.

29.     The USPS website will not allow me to file a lost package claim on a lost Priority Mail delivery on behalf of my customer or myself until it is 15 days late. Therefore, I am unable to get a quick determination on the whereabouts of any delayed or missing package for over two weeks.

### C.    Changes to the Shipping Process

30.     As a result of these delays, I have been unable to tell customers when they should expect to receive their purchased items. Customers then have less incentive to order items from my Etsy store.

31.     Moreover, when customers purchase items in my Etsy shop, I now have to communicate with them during several points of the shipping process, to ensure that they are aware of the current whereabouts of the shipped package. If someone buys an item in my shop, I have to message them to tell them that the package will probably take much longer to arrive than normal, and I later update them when the tracking steps progress. These additional communications take more time; and further limit my availability for other tasks necessary for managing my store.

32.     Before July 2020, I dropped off my packages for shipping at the local packaging shop or left them at my local Post Office counter. However, due to the increased delays and failed deliveries, I now wait in line for between 20 to 30 minutes several times a week at the local Post Office to have the package manually scanned at the counter, to ensure that they are properly tracked for shipment. This additional time prevents me from attending to other necessary duties in managing my Etsy store, such as listing new items to sell, thus limiting my ability to make sales on other items.

Decl. of Melinda Utal                                    Case No. 20-cv-4096-GAM
Exhibit 43

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 29th day of aug, 2020

_____
Melinda Utal

# EXHIBIT A

Exhibit 43

ALERT: USPS IS MONITORING CONDITIONS AS HURRICANE LAURA APPROACHES THE GULF COAST. STAY U...

# USPS Tracking®

FAQs ›

Track Another Package  +

**Tracking Number:** 9405509205568716660444

Remove ✕

Your item was delivered in or at the mailbox at 2:50 pm on July 20, 2020 in LOS ANGELES, CA 90034.

**USPS Premium Tracking™ Available** ⌄

 **Delivered**

July 20, 2020 at 2:50 pm
Delivered, In/At Mailbox
LOS ANGELES, CA 90034

**Get Updates** ⌄

Feedback

| Text & Email Updates | ⌄ |
|---|---|

| Tracking History | ⌃ |
|---|---|

**July 20, 2020, 2:50 pm**
Delivered, In/At Mailbox
LOS ANGELES, CA 90034
Your item was delivered in or at the mailbox at 2:50 pm on July 20, 2020 in LOS ANGELES, CA 90034.

**July 20, 2020, 8:59 am**
Out for Delivery
LOS ANGELES, CA 90034

**July 20, 2020, 8:48 am**
Arrived at Post Office
LOS ANGELES, CA 90034

**July 20, 2020, 7:36 am**
Arrived at USPS Facility
LOS ANGELES, CA 90034

Exhibit 43

**July 20, 2020, 7:05 am**
Departed USPS Regional Facility
LOS ANGELES CA DISTRIBUTION CENTER

---

**July 19, 2020**
In Transit to Next Facility

---

**July 18, 2020, 8:39 pm**
Arrived at USPS Regional Facility
LOS ANGELES CA DISTRIBUTION CENTER

---

**July 15, 2020, 10:39 pm**
Arrived at USPS Regional Facility
LOS ANGELES CA NETWORK DISTRIBUTION CENTER

---

**July 15, 2020, 11:29 am**
Arrived at USPS Facility
LOS ANGELES, CA 90049

---

**July 15, 2020, 6:38 am**
Arrived at USPS Facility
LOS ANGELES, CA 90034

---

**July 15, 2020, 6:37 am**
Departed USPS Regional Facility
LOS ANGELES CA DISTRIBUTION CENTER

---

**July 14, 2020, 6:33 pm**
Arrived at USPS Regional Facility
LOS ANGELES CA DISTRIBUTION CENTER

---

**July 14, 2020, 5:18 pm**
Accepted at USPS Origin Facility
SAN PEDRO, CA 90731

---

**July 13, 2020, 12:13 pm**
Shipping Label Created, USPS Awaiting Item
SAN PEDRO, CA 90731

---

Feedback

**Premium Tracking** 

Exhibit 43

**Product Information** ⌄

___

See Less ⌃

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**

Feedback

# EXHIBIT

# B

Exhibit 43

ALERT: USPS IS MONITORING CONDITIONS AS HURRICANE LAURA APPROACHES THE GULF COAST. STAY U…

# USPS Tracking®

FAQs ›

Track Another Package  +

**Tracking Number:** 9405509205568725818386

Remove ✕

Your item was delivered in or at the mailbox at 11:04 am on August 10, 2020 in SAINT CHARLES, IL 60174.

**USPS Premium Tracking™ Available** ⌄

 **Delivered**

August 10, 2020 at 11:04 am
Delivered, In/At Mailbox
SAINT CHARLES, IL 60174

**Get Updates** ⌄

Feedback

---

**Text & Email Updates** ⌄

---

**Tracking History** ⌃

**August 10, 2020, 11:04 am**
Delivered, In/At Mailbox
SAINT CHARLES, IL 60174
Your item was delivered in or at the mailbox at 11:04 am on August 10, 2020 in SAINT CHARLES, IL 60174.

---

**August 10, 2020, 7:10 am**
Out for Delivery
SAINT CHARLES, IL 60174

---

**August 10, 2020, 6:46 am**
Arrived at Post Office
SAINT CHARLES, IL 60175

---

**August 10, 2020, 3:12 am**
Arrived at USPS Facility
SAINT CHARLES, IL 60175

Exhibit 43

**August 10, 2020, 2:38 am**
Departed USPS Regional Facility
CAROL STREAM IL DISTRIBUTION CENTER

---

**August 9, 2020, 6:26 pm**
Arrived at USPS Regional Destination Facility
CAROL STREAM IL DISTRIBUTION CENTER

---

**July 24, 2020**
In Transit to Next Facility

---

**July 20, 2020, 5:56 pm**
Arrived at USPS Regional Origin Facility
LOS ANGELES CA DISTRIBUTION CENTER

---

**July 20, 2020, 12:15 pm**
USPS in possession of item
SAN PEDRO, CA 90733

---

**July 20, 2020, 9:27 am**
Shipping Label Created, USPS Awaiting Item
SAN PEDRO, CA 90731

Feedback

---

**Premium Tracking**　　　⌄

**Product Information**　　　⌄

See Less ⌃

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**

Exhibit 43

# EXHIBIT

# C

Exhibit 43

ALERT: USPS IS MONITORING CONDITIONS AS HURRICANE LAURA APPROACHES THE GULF COAST. STAY U...

# USPS Tracking®

FAQs ›

Track Another Package  +

**Tracking Number:** 9400109205568734882603

Remove ✕

Your item was delivered in or at the mailbox at 11:54 am on August 5, 2020 in SHERMAN OAKS, CA 91423.

**USPS Premium Tracking™ Available** ⌄

## ✔ Delivered

August 5, 2020 at 11:54 am
Delivered, In/At Mailbox
SHERMAN OAKS, CA 91423

**Get Updates** ⌄

Feedback

---

**Text & Email Updates**                                                              ⌄

---

**Tracking History**                                                                   ⌃

**August 5, 2020, 11:54 am**
Delivered, In/At Mailbox
SHERMAN OAKS, CA 91423
Your item was delivered in or at the mailbox at 11:54 am on August 5, 2020 in SHERMAN OAKS, CA 91423.

---

**August 5, 2020, 7:10 am**
Out for Delivery
SHERMAN OAKS, CA 91423

---

**August 4, 2020, 9:43 pm**
Arrived at Post Office
SHERMAN OAKS, CA 91403

---

**August 3, 2020**
In Transit to Next Facility

Exhibit 43

**July 30, 2020, 2:53 pm**
Departed USPS Regional Facility
SANTA CLARITA CA DISTRIBUTION CENTER

---

**July 30, 2020, 12:17 pm**
Arrived at USPS Regional Facility
SANTA CLARITA CA DISTRIBUTION CENTER

---

**July 30, 2020, 10:26 am**
Departed USPS Facility
CARSON, CA 90746

---

**July 28, 2020, 10:08 pm**
Arrived at USPS Regional Facility
LOS ANGELES CA NETWORK DISTRIBUTION CENTER

---

**July 28, 2020, 9:15 am**
USPS in possession of item
SAN PEDRO, CA 90734

---

**July 27, 2020, 6:07 pm**
Shipping Label Created, USPS Awaiting Item
SAN PEDRO, CA 90731

---

**Premium Tracking** ⌄

**Product Information** ⌄

See Less ⌃

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**

Feedback

Exhibit 43

# EXHIBIT 44

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA, | |
| Plaintiffs, | |
| v. | No. 2:20-cv-4096-GAM |
| LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE, | |
| Defendants. | |

## <u>DECLARATION OF JILL WEBER</u>

I, Jill Weber, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     My name is Jill Weber.  I am 63 years old.  I am a resident and registered voter in the Town of Bar Harbor, Maine.

2.     I am employed as a consulting botanist, and I also do biological research and analysis for a private firm.  Additionally, I teach part time at a local college.  In addition to my employment, I am a civic leader and organizer in the Town of Bar Harbor.

3.     I submit this Declaration in support of the State of Maine's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

Exhibit 44

4.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

**I.      Interaction with the United States Postal Service**

5.      I have been a customer of the United States Postal Service ("USPS") for all my life. Throughout this time, I have always been satisfied with the service that the USPS has provided to me.

6.      I grew up in a small town in western New Jersey and received mail at a "Rural Route" address.  Now, I live in the Town of Bar Harbor, a tourist community on Maine's Mount Desert Island.  In Bar Harbor I receive mail that is delivered to my house by a mail carrier.

7.      Over the years, I have used the USPS for various services that are important to me, and the USPS has been responsible for transporting nearly every significant document that I have had to send or receive throughout my life.

8.      For example, I have used the USPS to mail and receive birthday cards from friends and family.  I also used the USPS to mail all of my college applications and, in turn, to receive acceptance letters.  More recently I have used the USPS to mail my tax returns, as well as to receive annual refund checks.  I regularly use the USPS to pay a majority of my monthly and annual bills.

9.      This summer, I opted to vote in Maine's 2020 state primary election using an absentee ballot that I sent by mail through the USPS.

10.      Throughout my time as a USPS customer, I cannot recall a single instance of when the USPS has lost or unreasonably delayed an important document that I have sent through the mail.

11.      Prior to this past summer, I regularly received daily mail delivery, typically in the noon-1:00 p.m. hour.

12.     In addition to mail delivery, I view the USPS as providing an important public service in the Town of Bar Harbor and in Hancock County.  Our community has many elderly residents, and some of them have very little interaction with the broader public.  Daily mail delivery provides an informal "wellness check" for many community members.

## II.      Recent Changes in USPS Mail Services

13.     I first noticed a change in my mail delivery around July of 2020.

14.     Before summer of 2020, I do not recall a day going by without receiving a piece of mail.  Then, one July day my mail carrier picked up my outgoing mail but did not drop off any mail at all.

15.     After that day in July, I started noticing other changes to how mail was being delivered in our community.

16.     The timing of when I receive my mail during the day has become unpredictable. Often my mail is delivered much later than it was in the past, but sometimes it is delivered earlier.

17.     I have noticed that the staffing of who is delivering mail and who is regularly working inside the post office seems to have changed.  Specifically, I have noticed that mail carriers who have served my neighborhood for years have been replaced by other individuals.

18.     The most troubling change regarding my mail service occurred over the course of June and July of 2020.

19.     I mailed a payment check to my Illinois-based cable company on June 26 for a bill that was due on July 3.  On July 20, I called my cable company to complete a service change, but I was told that I could not make any changes because my account was delinquent.  This surprised me and caused my heart to sink.  Paying my bills on time and maintaining good credit are important to me.

20.     My cable company suggested that I stop payment on my original check that I mailed in late June.  However, I chose not to do that because I did not want to pay a large service fee that I would have been charged by my bank.  Instead, I chose to wait to see if the check turned up.

21.     My check eventually arrived, and it was finally cashed by my cable company on July 23, 2020, nearly a full month after I mailed it.

22.     For years I have allowed a full week for bill payments to reach my cable company and other service providers, and I cannot recall a single payment arriving late.  Most payments have been cashed in advance of the date that the bill is due.

### III.     Consequences of Changes in USPS Service

23.     When my cable bill was past-due, I was able to engage in a lengthy conversation with a customer-service associate at my cable company to explain what had happened.  Because I was able to effectively advocate for myself and point to my long history of paying my bills on time, I managed to avoid any surcharges or negative marks on my credit.  However, the time and stress it took to resolve this issue was frustrating.

24.     Moreover, I wonder how the interaction might have been different if I was not in a privileged position as an educated, financially secure customer with a lengthy history of good credit.  I also wonder how the interaction might have gone if I was older and hard-of-hearing, or if I did have the ability to advocate for myself over the phone in what is perceived as "professional" or "polished" English.  Finally, I recognize that I was in a fortunate circumstance where I was able to take the time out of my day to have such a lengthy telephone conversation, and I understand that others are not always so lucky.

25.     Because of the changes in mail service, I no longer feel comfortable paying my bills on the same schedule—one week in advance—that I had been using for years.  Instead, I feel that

I will need to make sure to be vigilant and pay any bill as soon as I receive it.  Even still, I fear that continued delays in mail may not provide enough time for my service providers to send me a monthly bill and for me to return my check on time.  I fear that future late payments—through no fault of my own—will result in getting docked with surcharges or negative marks on my credit.

26.     The experience with my cable bill and other changes that I have observed causes me to doubt the dependability of the USPS.

27.     I worry for my community members who depend on the USPS for an informal wellness check.  If USPS staffing is subject to unpredictable changes and if daily mail is no longer dependable, I fear there may be real consequences for members of my community who interact with few or no other individuals.

28.     I understand that my age places me at a greater risk of contracting more serious complications or symptoms from COVID-19 than if I were in a younger age group.  Because of the COVID-19 pandemic, I had originally planned to vote by mail in the fall 2020 general election to better protect myself and as a way of reducing foot-traffic in our public spaces for those who need to vote in person.

29.     Voting by mail seemed like a desirable option to me, because Bar Harbor, Maine is a tourist community, and we consistently have many visitors from other parts of Maine and other parts of the country.  Because of the current pandemic, I find it especially important to avoid person-to-person contact when so many members of our community are interacting with visitors from around the nation.

30.     I had also previously encouraged fellow members of my community to vote by mail in Maine's July 2020 primary and had planned to do the same this fall.

31.     But now I am not sure I am comfortable advocating that people send their ballots through the USPS.  I particularly worry about people in my community who have no choice but to depend on the USPS to deliver their ballots—such as those who are living in a retirement community outside of town.  I am advocating that they fill out and mail their absentee ballot as early as they possibly can.

32.     Because I am in good health and have the mobility to be able to drop off my ballot in person to my town clerk, that is my new plan.  I am planning to advocate that others in my community who are capable and comfortable dropping off their ballot to do the same.

33.     If I knew that the postal service was delivering mail with the same policies, procedures, and frequency that was in place before the summer of 2020, I would be comfortable in advocating for everyone to use the USPS to vote by mail with an absentee ballot this fall.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 28th day of August, 2020

/s/ Jill Weber
Jill Weber
Bar Harbor, Maine

# EXHIBIT 45

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

Plaintiffs,

v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

Defendants.

No. 2:20-cv-4096-GAM

## DECLARATION OF D. JORDAN WHICHARD IV

I, D. JORDAN WHICHARD IV, pursuant to 28 U.S.C. § 1746, hereby declare that the following
is true and correct:

1.      I am the Director of Intergovernmental Affairs in the Office of the Governor for

the State of North Carolina. I have been employed as Director of Intergovernmental Affairs in

the Office of the Governor for the State of North Carolina since February, 2017. My educational

background includes a Bachelor of Arts from the University of North Carolina at Chapel Hill.

Prior to joining the Office of the Governor for the State of North Carolina, I held various

positions in the public and private sectors, including serving as Associate Director of Scheduling

and Advance at the White House.

2.      In my role as Director of Intergovernmental Affairs in the Office of the Governor

of North Carolina, I am responsible for overseeing the office's relationship with local

Exhibit 45

governments throughout the state, including county and municipal governments, as well as the federal government.  I manage a team of three regional directors placed strategically throughout the state who interact directly with mayors, county commissioners, and other local elected and professional officials and stakeholders. I also oversee the North Carolina Washington Office in Washington, D.C., and in that capacity am responsible for the Office of the Governor's interactions with the White House, the federal executive branch agencies, and the United States Congress.  I am a member of the Governor's senior staff and advise the Governor on matters relating to these areas.

3.      I submit this Declaration in support of the State of North Carolina's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      I have compiled the information in the statements set forth below through my personal knowledge, through conversations with personnel from the Office of the Governor and other State agencies who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and reviewed by me.  If called as a witness, I could and would testify competently to the matters set forth below.

I.      **State Agencies' Interaction with the U.S. Postal Service and Consequences of Delays in U.S. Postal Service Mail Delivery and Other Services**

5.      The Division of Emergency Management is an executive agency within the State of North Carolina whose leadership is appointed by the Governor.  The Division's Recovery section relies on the U.S. Postal Service to communicate with applicants in its recovery programs.  The Office of Recovery and Resiliency serves as the State's grantee for nearly $1 billion in U.S. Housing and Urban Development disaster recovery funding, which is being used

to rebuild North Carolina communities hit by multiple hurricanes over the past few years. The U.S. Postal Services is an integral part of delivering this assistance, particularly to low-to-moderate income families who do not have internet access. For example, the Office of Recovery and Resiliency relies on the U.S. Postal Service to send and receive original documents that are required for compliance with state and federal laws. In addition, hurricane survivors who receive assistance through the Office of Recovery and Resiliency use the U.S. Postal service to submit their escrow funds for the Homeowner Recovery Program. Delays in the ability to send and receive original documents and submit escrow funds have slowed down the delivery of much-needed assistance, particularly to those who are most financially insecure.

6.     Subrecipients of grants from the Governor's Crime Commission who receive paper checks for grant-related reimbursements rely on the U.S. Postal Service for communicating with the Commission and receiving their grant money. Those in rural areas are particularly reliant on the U.S. Postal Service. Delays with Mail Service will affect the receipt of these reimbursements.

7.     The Department of Revenue is an executive agency within the State of North Carolina whose leadership is appointed by the Governor. Revenue is responsible for delivering tax refund checks to North Carolinians. The tax deadline for those who filed for an extension is October 15. Delays in the U.S. Postal Service may delay the delivery of tax refund checks for North Carolinians who sought extensions. In addition, the State receives a large proportion of its tax payments and revenues, including monthly sales-tax payments, by U.S. Mail. Delay in delivery of these payments will skew the State's access to revenue.

8.     The Division of Motor Vehicles is a division of the Department of Transportation, whose leadership is appointed by the Governor. DMV relies on the U.S. Postal Service to

Decl. of D. JORDAN WHICHARD IV                                    Case No. 20-cv-4096-GAM
Exhibit 45

deliver titles, vehicle registrations and notices, notification of driver's license suspensions, and vehicle registration renewal notices. DMV has received hundreds of complaints that items that should take about ten calendar days to be delivered are taking up to three weeks. For example, DMV has received complaints that customers are receiving notifications of driver's license suspensions well after the deadline to request a hearing. In addition, DMV is concerned about timely receipt of vehicle registration renewal notices and license renewal notices so that customers are able to timely renew their registrations and licenses.

9.     The Department of Commerce is an executive agency within the State of North Carolina whose leadership is appointed by the Governor. The Commerce Department is responsible for making unemployment insurance benefit payments. Approximately 5% of unemployment insurance benefit payments are made by mail, including first payment until bank accounts can be verified for direct deposit. Delays in delivery of unemployment insurance benefits is particularly problematic at this time, when there are so many new claimants due to the COVID-19 pandemic.

10.     The Department of Health and Human Services is an executive agency within the State of North Carolina whose leadership is appointed by the Governor. DHHS-operated healthcare facilities are required by law to assist in facilitating voting for patients and residents who wish to do so. Delays in mail service will affect the ability of patients and residents to vote in a timely fashion. In addition, DHHS operates the WIC program and relies on the U.S. Postal Service to send eWIC cards and replacement cards. Delay in delivery of these WIC cards will impact the ability of participants to buy food and decrease the time they have to redeem their food-related benefits. This is particularly problematic for those seeking to redeem their WIC Farmer's Market Nutrition Program coupons, as they expire after 30 days. Delays in mail

Decl. of D. JORDAN WHICHARD IV                                    Case No. 20-cv-4096-GAM
Exhibit 45

service will shorten the time that participants have to use these benefits, potentially eliminating the opportunity to use them entirely.  In addition to the WIC program, DHHS also administers programs for Food and Nutrition Services, which relies on the U.S. Postal Service to mail applications and EBT cards.  Delay to these services will delay the ability of families to purchase food through the program.  DHHS also operates the State's Medicaid program.  DHHS relies on the U.S. Postal Service to send information related to coverage and notices for denial of coverage.  Delays in these mailings will affect the right of recipients to timely appeal any denials.  In addition, DHHS relies on the U.S. Postal Service to send Medicaid ID cards.  Delay in mail service may affect the ability of recipients to receive their Medicaid ID cards and access healthcare.  DHHS also operates the Division of Social Services, which oversees the obligations of parents to their children.  Many non-custodial parents who are ordered to pay child support rely on the U.S. Postal Service to deliver payments from them or their employers each month to meet their court-ordered obligations.  Delays in mail service will not only result in a delay for families receiving child support payments, but it may also result in court action for failure to timely pay child support.

11.     The Department of Natural and Cultural Resources is an executive agency within the State of North Carolina whose leadership is appointed by the Governor.  DNCR houses the North Carolina Library for the Blind and Physically Handicapped.  The Library uses the U.S. Postal Service exclusively to deliver talking books, Braille, and large-print materials to North Carolinians who cannot read standard print materials due to a visual or physical disability.  Delays in U.S. Postal Service delivery of these materials have disrupted this lifeline to learning and reading for the disability community.  In addition, DNCR regularly receives and pays

invoices to vendors through the U.S. Mail.  The delays in receipt of invoices and delivery of

payment have resulted in delays in services to the disability community.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this 1st day of September, 2020

_____
D. JORDAN WHICHARD IV
Director of Intergovernmental Affairs
Office of the Governor of North Carolina

Decl. of D. JORDAN WHICHARD IV                                  Case No. 20-cv-4096-GAM
Exhibit 45

# EXHIBIT 46

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA, <br><br> Plaintiffs, <br><br> v. <br><br> LOUIS DEJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE, <br><br> Defendants. | **No. 2:20-cv-4096-GAM** |

## DECLARATION OF VANCE ZIMMERMAN

I, Vance Zimmerman, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.  I am the Director of Industrial Relations for the American Postal Workers Union (APWU), AFL-CIO. In this capacity, I oversee labor management, national negotiations, safety and health, and the administration of the collective bargaining agreement. This is an elected position, which I have held since November 2016.

2.  Prior to serving as the Director of Industrial Relations, I was a National Business Agent for APWU from May 2001 to November 2016. I also worked for the Postal Service as in various clerk and maintenance positions from September 1986 until my retirement in 2013.

3.  I submit this Declaration in support of the State of Pennsylvania's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M.

Exhibit 46

Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

5.      The USPS regularly conducts "stand-up talks" to train employees on policies or safety issues. The Postal Service expects employee to comply with the rules communicated in stand-up talks.

6.      Usually, stand-up talks are orally delivered to a gathering of all employees in a facility at the beginning of a shift. Sometimes, however, employees receive a written notice of the stand-up talk by email or in their employee mailbox.

7.      Some stand-up talks that are distributed by National Headquarters to make employees aware of specific policies. These are labeled "Mandatory" and delivered to all employees nationwide. There are also local stand-up talks to address specific issues in a particular area. These are prepared by district management and only given in that district's facilities.

8.      In my experience, stand-up talks that are entitled "Mandatory Stand-up Talk" are from National Headquarters.

9.      I received from local union officers a copy of a "Mandatory Stand-Up Talk: All Employees" dated July 10, 2020. A true and correct copy of the document provided to me is attached as Exhibit A.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Decl. of V. Zimmerman                                                    Case No. 20-cv-4096-GAM
Exhibit 46

Executed on this __1st__ day of __Sept__ , 2020

_____
Vance Zimmerman
Director of Industrial Relations, APWU

# EXHIBIT

# A

Exhibit 46

# Mandatory Stand-Up Talk: All Employees
## July 10, 2020

## Pivoting For Our Future

- The Postal Service has a long history of service to the nation, and we take pride in our ability to deliver mail and packages efficiently, timely, and safely.

- Right now, we are at a critical juncture in our organization and must make immediate, lasting, and impactful changes in our operations and in our culture.

- This operational pivot is long overdue and today, we are talking about the first step in a journey we must take together, for the health and stability of the Postal Service.

- Every single employee will receive this information, no matter what job they perform, so remember that YOU are an integral part of the success we will have – again, by working together.

- The initial step in our pivot is targeted on transportation and the soaring costs we incur, due to late trips and extra trips, which costs the organization somewhere around $200 million in added expenses.

- The shifts are simple, but they will be challenging, as we seek to change our culture and move away from past practices previously used.

- Specific examples of transportation changes being implemented immediately (today):

  - ✓ All operations must meet our 24-hour clock commitment
  - ✓ All trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted
  - ✓ Extra trips are no longer authorized or accepted
  - ✓ There must be proper annotation in the scanner, if a Contractor Failure occurs
  - ✓ All PVS/HCR drivers must be notified that trips depart on time.
  - ✓ Function 4 must start on time and end on time and we must make scheduled DUT
  - ✓ Carriers must begin on time, leave for the street on time, and return on time
  - ✓ Carriers must make the final dispatch of value; no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch
  - ✓ The right mail must go on the right truck – every time
  - ✓ ALL EMPLOYEES have an essential role with trips departing on time.

- One aspect of these changes that may be difficult for employees is that – temporarily – we may see mail left behind or mail on the workroom floor or docks (in P&DCs), which is not typical.

- We will address root causes of these delays and adjust the very next day.

- Any mail left behind must be properly reported, and employees should ensure this action is taken with integrity and accuracy.

Exhibit 46

- As we adjust to the ongoing pivot, which will have a number of phases, we know that operations will begin to run more efficiently and that delayed mail volumes will soon shrink significantly.

- More information will be shared as we fully and swiftly implement these strategies.

- You play a direct role in the success of the Postal Service, and your cooperation and teamwork are appreciated.

- This is a critical time for us, when decisive, quick, and meaningful action is needed.

- This operational pivot will ensure we can secure our future as a world-class service provider, improving our performance to fulfill our core mission of service to our customers.

- Thank you for your support and your teamwork.

Exhibit 46