**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

**Commonwealth of Pennsylvania, State of California, State of Delaware, District of Columbia, State of Maine, Commonwealth of Massachussetts, and State of North Carolina**,

Plaintiffs,

v.

**Louis DeJoy, in his official capacity as United States Postmaster General, Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors, and the United States Postal Service**,

Defendants.

Case No. 20-cv-4096

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background .................................................................................................................. 3

I.      The United States Postal Service ..................................................................... 3

II.     USPS's Handling of Election Mail ................................................................... 4

        A.      State, Local, and Individual Responsibilities for Election Mail ............ 6

        B.      USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail ....... 8

                1.      USPS Outreach and Recommendations to Election Officials ................... 8

                2.      USPS's Longstanding Special Measures for Election Mail .................... 11

                3.      USPS's Increased Efforts in Support of the Election .............................. 13

III.    USPS's Years-Long Mandate to Improve Efficiency and Control Expenses.................. 14

        A.      Periodic, Data-Based Reduction in Redundant Processing Equipment and
                Collection Boxes ................................................................................ 15

        B.      USPS's Continued Focus on Adherence to Existing Transportation
                Schedules ........................................................................................... 17

        C.      USPS Personnel Practices Related to Overtime Usage and Staffing
                Shortages Caused by the Covid-19 Pandemic ...................................... 19

                1.      Overtime ................................................................................ 19

                2.      The Impact of the COVID-19 Pandemic .................................... 20

        D.      Other Efforts Aimed at Improving Efficiency ...................................... 21

IV.     Procedural History ......................................................................................... 21

Standard of Review..................................................................................................... 22

Argument .................................................................................................................... 23

I.      Plaintiffs are unlikely to prevail on the merits of their claims......................... 23

        A.      Plaintiffs' alleged injuries rely on a speculative chain of possibilities, and
                are thus insufficient to establish standing. .......................................... 23

        B.      Plaintiffs are unlikely to succeed on their section 3661 claim.............. 25

i

1.      District Courts lack subject-matter jurisdiction over complaints regarding 39 U.S.C. § 3661, which are channeled to the Postal Regulatory Commission and then the D.C. Circuit. ................................ 25

2.      The ultra vires doctrine does not provide an avenue for judicial review here. ............................................................................................... 29

C.      Plaintiffs are unlikely to establish that the alleged USPS policy changes violates the rights of State legislatures under the Elections Clause. ..................... 35

II.     Plaintiffs fail to establish irreparable harm. ...................................................... 42

III.    The balance of equities counsel against Plaintiffs' requested relief. ............................... 43

IV.     Plaintiffs' proposed injunction does not comport with Rule 65 ....................................... 45

Conclusion ....................................................................................................... 47

# TABLE OF AUTHORITIES

## CASES

*Acierno v. New Castle County,*
    40 F.3d 645 (3d Cir.1994) ........................................................................ 42

*Aid Ass'n for Lutherans v. USPS,*
    321 F.3d 1166 (D.C. Cir. 2003) ............................................................... 30

*Am. Fed'n of Gov't Employees, AFL-CIO v. Trump,*
    929 F.3d 748 (D.D.C. 2019) .................................................................... 29

*Bank of Louisiana v. FDIC,*
    919 F.3d 916 (5th Cir. 2019) ................................................................... 28

*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.,*
    502 U.S. 32 (1991) .................................................................................. 30

*Bovard v. U.S. Post Office,*
    47 F.3d 1178 (10th Cir. 1995) ................................................................ 26

*Buchanan v. U.S. Postal Serv.,*
    508 F.2d 259 (5th Cir. 1975) ............................................................ 31, 35

*Cheney v. U.S. Dist. Court for D.C.,*
    542 U.S. 367 (2004) ................................................................................ 38

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .......................................................................... 23, 24

*Cook v. Gralike,*
    531 U.S. 510 (2001) ................................................................................ 36

*Ctr. for Biological Diversity v. EPA,*
    861 F.3d 174 (D.C. Cir. 2017) ............................................................... 28

*Foster v. Pitney Bowes Corp.,*
    549 F. App'x 982 (Fed. Cir. 2013) ......................................................... 26

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) .......................................................................... 28, 29

*Gelman v. FEC,*
    631 F.2d 939 (D.C. Cir. 1980) ............................................................... 33

*I.M. Wilson, Inc. v. Otvetstvennostyou,*
No. 18-5194, 20129 U.S. Dist. LEXIS 182350 (E.D. Pa. Oct. 18, 2019)    43

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
  548 F.3d 110 (D.C. Cir. 2008) ......................................................... 28

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015) ............................................................. 29

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ......................................................................... 30

*LeMay v. U.S. Postal Serv.*,
  450 F.3d 797 (8th Cir. 2006) ...................................................... 25, 26

*McDermott v. Potter*,
  No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom.*
  *McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011) ...................... 27

*Media Access Project v. FCC*,
  884 F.2d 1063 (D.C. Cir. 1989) ....................................................... 28

*Mittleman v. Postal Regulatory Comm'n*,
  757 F.3d 300 (D.C. Cir. 2014) ..................................................... 29, 30

*Murphy v. United States Postal Serv.*,
  No. C 14-02156 SI, 2014 WL 4437731 (N.D. Cal. Sept. 9, 2014) ........... 27

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Service Impasses Panel*,
  437 F.3d 1256 (D.C. Cir. 2006) ....................................................... 30

*Nat'l Ass'n of Postal Supervisors v. USPS*,
  No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020) ........... 30

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................... 22

*Norton v. S. Utah Wilderness,All.*,
  542 U.S. 55 (2004) ........................................................................... 44

*Nyunt v. Broadcasting Bd. of Govs.*,
  589 F.3d 445 (D.C. Cir. 2009) ......................................................... 30

*Pep-Wku, LLC v. USPS*,
  No. 20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020) ....... 27

*Pierre & Carlo, Inc. v. Premier Salons, Inc.*,
  713 F. Supp. 2d 471 (E.D. Pa. 2010) ................................................ 42

*Powell v. United States Postal Serv.*,
  No. CV 15-12913-FDS, 2016 WL 409672 (D. Mass. Feb. 2, 2016) ......... 27

*Public Util. Comm'r of Or. v. Bonneville Power Admin*,
   767 F.2d 622 (9th Cir. 1985) ........................................................................... 28

*Rodriguez v. Hemit*,
   No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018) ...................................... 27

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
   134 F. Supp. 3d 365 (D.D.C. 2015), *aff'd in part on other grounds, vacated in part on
   other grounds, rev'd in part sub nom.*, 844 F.3d 260 (D.C. Cir. 2016) ................................. 27

*Smiley v. Holm*,
   285 U.S. 355 (1932) ........................................................................... 36, 37, 39

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ........................................................................... 23

*Striley v. United States Postal Serv.*,
   No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) ................................. 27

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) ........................................................................... 43

*Telecomms Res. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ........................................................................... 28

*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*,
   735 F.3d 131 (3d Cir. 2013) ........................................................................... 23

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) ........................................................................... 36, 38

*United Farm Workers of Am., AFL-CIO v. Chao*,
   227 F. Supp. 2d 102 (D.D.C. 2002) ........................................................................... 33

*Wilson v. USPS*,
   441 F. Supp. 803 (C.D. Cal. 1977) ........................................................................... 32

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................... 22

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*,
379 U.S. 411 (1995)   28

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ........................................................................... 41, 42

*Zschernig v. Miller*,
   389 U.S. 429 (1968) ........................................................................... 39, 40

## STATUTES

39 U.S.C. § 401 ...................................................................................................... 29

39 U.S.C. § 409 ...................................................................................................... 25

39 U.S.C. § 410 ...................................................................................................... 30

39 U.S.C. § 3661 ........................................................................................ 2, 25, 26, 29

39 U.S.C. § 3662 ............................................................................................. 25, 26, 27

39 U.S.C. § 3663 ...................................................................................................... 27

39 U.S.C. § 3664 ...................................................................................................... 27

## OTHER AUTHORITIES

Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services,
   Docket No. 2006-1 (Dec. 12, 2006) ........................................................... 34

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches,
   Docket No. N2009-1 (Mar. 10, 2010),
   https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf .................................... 34

Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1
   (Mar. 24, 2011),
   https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf .................................... 34

Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket
   No. N2012-1 (Sept. 28, 2012),
   https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf .......... 34

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches,
   Docket No. N2009-1 (Mar. 10, 2010),
   https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf .................................... 34

Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012),
   https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf .................................... 34

Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1
   (Dec. 23, 2011),
   https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf ........................................ 34

Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling,
   Docket No. N2014-1 (Mar 26, 2014),
   https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20
   Opinion.pdf ............................................................................................. 34

Congressional Briefing (Aug. 31, 220),
  https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf.......... 19

*Number of Voters and Voter Registration as a Share of the Voter Population*,
  https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-
  thousands-as-a-share-of-the-voter-
  population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,
  %22sort%22:%22asc%22%7D.................................................................................................... 4

Service Performance Rebounds at Postal Service (Aug. 31, 2020),
  https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-
  rebounds-at-postal-service.htm................................................................................................. 19

**INTRODUCTION**

This case is not about whether the United States Postal Service ("USPS") will be able to meet the burdens imposed by individuals who intend to vote by mail in the November 2020 election (the "Election"). Just as it has in past elections, USPS has taken, and will continue to take, a number of efforts to ensure that ballots move quickly and efficiently through the mail. Such efforts include encouraging state officials to appropriately identify and mark ballots to facilitate proper treatment of Election Mail; asking voters to mail their ballots as soon as they are able; and then tracking (where possible), monitoring, and moving the ballots as expeditiously as possible. Nothing has changed in USPS's approach to Election Mail from past years, except that USPS has put in place *even more* processes to monitor and move these ballots in response to the major increase in Election Mail volume caused by the COVID pandemic. Indeed, to avoid any doubt about USPS's ability to meet its responsibilities, it has suspended a number of routine, long-standing operational activities—implemented *before* Postmaster General DeJoy's tenure—until after the November Election.

In light of these publicly expressed commitments, this case is now about Plaintiffs' attempts to have this court oversee the day-to-day operations of USPS, based on statutory claims that the D.C. Circuit has analogized to a "Hail Mary," to right wrongs that do not exist. Plaintiffs' legally deficient claims, arising from unsupported fears about the potential actions of USPS, do not warrant the extraordinary relief it seeks.

First, Plaintiffs cannot show a likelihood of success because they lack Article III standing. All of their alleged injuries hinge on their theory that certain USPS policies will create future delays. However, the vast majority of policies identified by Plaintiffs either do not exist, or have been in place for years, and thus cannot be responsible for any recent delays. In any event, even if

Plaintiffs establish that there may be delays, any injury flowing to Plaintiffs would be based on a speculative chain of possibilities. It is unclear whether these delays would occur in the Plaintiff States in particular, and would be of a sufficient length and affect a sufficient number of persons. Plaintiffs thus cannot establish standing.

And even if Plaintiffs had standing, the Court still lacks jurisdiction over their statutory claims. Plaintiffs claim that USPS failed to comply with 39 U.S.C. § 3661's requirement that certain major changes first receive an advisory opinion by the Postal Regulatory Commission. But Congress has explicitly channeled those claims away from the district court, and towards the Postal Regulatory Commission, an independent executive branch establishment responsible for regulating the Postal Service, with review in the D.C. Circuit. Decades of precedent thus confirm that district courts have no jurisdiction over these claims.

Plaintiffs turn to the last resort of *ultra vires* jurisdiction to overcome this clear statutory bar, but such jurisdiction is unavailable here for two reasons. First, *ultra vires* review is unavailable where there is a path for judicial review, and because here there clearly is, Plaintiffs cannot invoke this doctrine. Second, relief under the *ultra vires* doctrine requires a clear error, implicating the agency's jurisdiction to take such action.  But the statute Plaintiffs rely upon applies only to certain major changes, and here Plaintiffs' challenge largely centers around alleged policy changes that never occurred. The only national policy Plaintiff challenges is guidance on when extra truck trips are appropriate, which likewise does not constitute a "major change" requiring an advisory opinion by the Postal Regulatory Commission.

Nor can Plaintiffs prevail on their claim that any alleged USPS policy changes interfered with Plaintiffs' authority under the Elections Clause to enact laws concerning the "times, places, and manner" of their elections. USPS has not prevented Plaintiffs from determining how their

citizens may legally vote; indeed, those allowed to vote by mail under Plaintiffs' laws still possess that right today. Plaintiffs' claim thus relies on the remarkable and unprecedented theory that the Elections Clause protects plaintiffs from any federal policy that may indirectly affect the electoral process. Unsurprisingly, Plaintiffs cite to no case where a court has adopted this theory—which could potentially jeopardize a number of federal policies—and Defendants are aware of none.

Furthermore, Plaintiff cannot establish the other prerequisites for a preliminary injunction, including that any irreparable injury must be "certain and great." Plaintiff's injuries consist of speculative and unjustified concerns over future mail deliveries. And the balance of the equities and the public interest support allowing the Postal Service to manage its operations as efficiently and effectively as possible, so it can meet the many burdens placed upon it in advance of the upcoming election. Plaintiffs' request for a broad, ambiguous injunction requiring USPS to employ a number of policy changes does not comport with Rule 65, nor do the equities support placing the Postal Service under judicial receivership with that election only weeks away.

## BACKGROUND

### I.    The United States Postal Service.

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States. USPS has the authority to, among other things, designate mail routes and construct or designate post offices with the authority to carry, deliver, and regulate mail for the entire country. It is one of the nation's largest and most complex business operations. The USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a *single* day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

The Board of Governors of USPS, which is comparable to the board of directors for a publicly held corporation, directs the exercise of powers of the Postal Service, including, among other things, long-range planning, oversight of service standards, management of expenditures, and review of policy and practices. The PRC, an independent agency, has regulatory oversight over USPS.

Louis DeJoy is the 75th Postmaster General and Chief Executive Officer of USPS. The Board appointed Postmaster General DeJoy on May 6, 2020. He assumed office on June 16, 2020.

## II.    USPS's Handling of Election Mail.

"Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3. This includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications).[1] *Id.* USPS regards Election Mail as having special importance.

The USPS has determined that it is fully capable—both financially and operationally—of handling a surge of Election Mail in connection with the November Election. By its analysis, even if every registered voter in the United States[2] used a mail-in ballot to cast a vote in the Election, the associated mail volume would represent only a small fraction of the total mailpieces that the USPS processes each week, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail

---

[1] Election Mail is distinct from "Political Mail" sent by political candidates, political action committees, and similar organizations in order to engage in advocacy. Glass Dec. ¶ 3.

[2] Publicly available data generally indicate that there are approximately 150 million registered voters in the United States. *See, e.g.*, *Number of Voters and Voter Registration as a Share of the Voter Population*, https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Sept. 10, 2020).

volume that the USPS handles every winter holiday season. *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23. Indeed, USPS projects (even accounting for an increased use of mail-in ballots to compensate for COVID-19-related mitigation efforts) that only two to five percent of the total mail volume in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. As detailed below and in USPS's declarations and public statements, USPS has been planning for the Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered. Glass Dec. ¶¶ 42-44.[3]

Beyond these financial and operational resources, USPS will continue to employ longstanding practices to facilitate the timely delivery of Election Mail and provide proper handling of Election Mail and work with external stakeholders to educate them on how to effectively use the mail as part of the electoral process (should they so choose). These include extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots; publishing and distributing the official Election Mail kit (which provides a comprehensive guide to services, resources, and recommendations for Election Mail) to approximately 11,400 state and local election officials; offering special Election Mail markings to improve the visibility and ensure proper handling of Election Mail; and, as the attached declarations further detail, taking extraordinary steps to ensure the timely delivery of Election Mail for the upcoming election. *See* Glass Dec. ¶¶ 3-41. Further, due to the unprecedented

---

[3] *See also* Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Meeting (Aug. 7, 2020) (Ex. 3) at 4 ("[T]he Postal Service has ample capacity to deliver all election mail securely and on-time in accordance with our delivery standards, and we will do so."); Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections (Ex. 5) at 54 ("[W]e have plenty of cash to operate for the election.").

demands of the election, the Board of Governors has established a bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the Election. *Id.* at ¶ 10. USPS has demonstrated, both in its public representations and in practice, its commitment to continuing its longstanding practice to facilitate and expeditiously deliver Election Mail this year.

### A.      State, Local, and Individual Responsibilities for Election Mail.

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters bear significant responsibility in the successful utilization of postal services for the Election. USPS lacks authority over the critical decisions committed by law to states and local election officials regarding their Election Mail policies and procedures. *Id.* ¶ 4. Generally, each state determines whether, and to what extent, mail-in voting of any kind is allowed. If mail-in voting is allowed, either the legislature or state and local election officials, if so authorized, and must choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. *Id.* ¶ 4; *see also* Ex. 4 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)). Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a Priority Mail class with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 4 at 1; Glass Dec. ¶ 4. USPS has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. *See, e.g.*, Ex. 5 (Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections (Aug. 21, 2020)) at 18 ("[W]e are not going to change any rates."); Ex. 3 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and

Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 4 ("We have delivery standards that have been in place for many years. These standards have not changed").

State legislatures, or election officials, if delegated such authority, also have the responsibility for making key decisions that directly impact mail-in voting. Within the constraints of state and federal law, state and local election officials determine, among other things: (1) the design of Election Mail (its dimensions and the graphic and textual elements that will be displayed); (2) whether they will sufficiently mark Election Mail to enable USPS to identify and expeditiously process Election Mail for handling and delivery; (3) deadlines for voters to request and return mail-in ballots (4) when Election Mail will be sent to voters; (5) whether Election Mail will be trackable (for example, using USPS's Intelligent Mail barcode system); and (6) whether to pre-pay postage for returned ballots (versus requiring voters to affix their own postage). Glass Dec. ¶ 4. Individual voters are responsible for, among other things, providing current addresses to election officials; understanding mail-in voting procedures in their state and locality; and timely requesting ballots from, and returning those ballots to, election officials.

USPS's most significant operational concerns with respect to the Election are those elements controlled by the states themselves, either through legislation or state and local election officials and voters, not USPS. *Id.* ¶ 45. Indeed, when reviewing an audit of the special and primary elections in May and June 2020, the USPS Office of Inspector General ("OIG") concluded that USPS had improved several of its practices and procedures since prior OIG audits and had appropriately adjusted its processes to accommodate for the timely processing of Election Mail to meet the needs of the elections. Ex. 4 at 3, 12. OIG identified, however, several "potential concerns" that may affect the USPS servicing capacity for the Election (*i.e.* ballots mailed without tracking technology, ballot mailpiece design, Election Mail sent to voters too close to the election,

varying state postmark requirements for ballots, and out-of-date voter addresses)—none of which are controlled by USPS.

### B.   USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail.

In preparation for the Election, USPS has undertaken extensive, expanded efforts to help election officials and voters in the planning and preparation of Election Mail, strongly encourage election officials, voters, and Postal Service employees to implement best practices, reinforce existing policies and procedures for handling Election Mail with Postal Service employees, and prepare to process and deliver a high volume of Election Mail.

#### 1.   USPS Outreach and Recommendations to Election Officials.

USPS has demonstrated its commitment to provide election officials with the tools necessary to use the U.S. Mail as a secure, efficient, and effective way to facilitate the election process. In support of the Election, USPS has already had approximately 42,000 contacts to confer and advise state and local election officials regarding Election Mail best practices and recommendations, and this outreach is ongoing. Glass Dec. ¶¶ 5-9. Additionally, since February 2020, the outreach strategy has included distributing approximately 11,500 copies of "Kit 600," an official Election Mail guide; offering mailpiece design services; designating Election Mail Coordinators to serve each locality; and publishing extensive election-related information and guidance online. *Id.* ¶ 6; *see also* Ex. 6 (USPS 2020 Election Mail – Kit 600). This outreach strategy in the run-up to the 2020 Election is consistent with USPS's outreach efforts in past election years. The principal distinction between this year's effort and those of previous election years is that the volume and frequency of USPS's communications have *increased* to address challenges stemming from the COVID-19 pandemic. Glass Dec. ¶ 32.

In May and July 2020, following dissemination of Kit 600, the USPS General Counsel's office sent letters to election officials to follow up and emphasize key aspects of the USPS's

processes and recommendations so that they may be taken into account when educating the public on voting by mail. Glass Dec. ¶ 7 & Glass Dec. Ex. 1. USPS tailored the July 2020 letters to each state, identifying key provisions of each state's election laws and procedures and relevant considerations for the timely, effective use of U.S. Mail to facilitate the voting process. *See generally* Ex. 15 (July 29, 2020 USPS Letter). For example, in its letter to Arkansas election officials, USPS cited provisions of state election law that "are incongruous with [USPS] delivery standards" and "create[] a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted." *Id.* at 1. USPS implored Arkansas election officials, as it did all other state and local election officials, to "keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election" by mail. *Id.* at 2.

None of the letters sent to state and local election officials by the Postal Service stated that the Postal Service intended to slow or delay delivery of Election Mail, or that USPS was otherwise altering its service standards for Election Mail. Rather, these letters aimed to ensure that election officials are fully informed, well in advance of the Election, of USPS's delivery standards, the extensive resources that USPS offers to assist election officials, and the potential risks that local ballot request deadlines may pose to voters' full participation by mail in the Election. *See* Ex. 1; *see generally* Ex. 15. Moreover, these letters were consistent with USPS's outreach to election officials during past election cycles. *See, e.g.*, Glass Dec. ¶ 8 & Glass Dec. Ex. Ex. 2 (Sept. 23, 2016 letter to state election officials advising them, for example, to consult with USPS Election Mail Coordinators, urge voters to return ballots one week early in order to ensure timely delivery, use the official USPS Election Mail markings, and send Election Mail by First-Class Mail).

In all of its communications regarding 2020 Election Mail, USPS has strongly, and repeatedly, recommended that election officials adopt USPS best practices, including the following[4]:

- Consult with USPS Election Mail Coordinators to better understand the Postal Service's services, resources, recommendations and to help resolve issues should they arise, as well as mailpiece design analysts on how to ensure quality mailpiece design for Election Mail envelopes, including ballot envelopes. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 2; Ex. 6 at 5; *see also* Glass Dec. ¶ 6.

- Identify Election Mail using USPS's official Election Mail logo, Green Tag 191 (which can be applied only to containers of mail enclosing ballots being sent out to voters), or by other means. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 4, 5, 13, 23; Ex. 8 (USPS Election Mail – Graphic Guidelines and Logos (Pub. 631)); *see also* Glass Dec. ¶¶ 11-14.



Official USPS Election Mail Logo



Green Tag 191

- Use tracking technology, for example USPS's Intelligent Mail Barcode, for Election Mail. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 7.

- Use First-Class Mail to transmit Election Mail (including blank ballots) to voters, and allow sufficient time for delivery to and from voters. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1; Ex. 7 at 10 (USPS Publication 632, explaining the USPS's different delivery standards and

---

[4] *See* Glass Dec. ¶ 32; *see also* Ex. 4 at 2 ("[t]he Postal Service has frequently communicated to state election officials the importance of" following best practices).

"recommend[ing] the use of First-Class Mail service to obtain timely delivery"); *see also* Glass Dec. ¶ 18.

- Keep USPS delivery standards in mind when informing voters how to vote by mail. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1.

Lastly, the USPS has consistently urged voters to return their completed ballots early. *See, e.g.*, Ex. 1 at 2; Glass Dec. ¶ 42 ("[T]o mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively encouraging voters and election officials to act early"); Ex. 9 at 1 (Statement of Postmaster General Louis DeJoy Before the House Committee on Oversight and Reform (Aug. 24, 2020) "encourag[ing] all Americans who choose to vote by mail to request their ballots early and to vote early, as a common sense best practice.").

### 2. *USPS's Longstanding Special Measures for Election Mail.*

For many years, USPS has taken special measures for handling Election Mail. In anticipation of the Election's increased reliance upon USPS, USPS has ramped up its efforts to ensure Election Mail is timely delivered.

First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. This effort is significantly aided when election officials use the official USPS Election Mail logo for all Election Mail mailpieces, affix Green Tag 191 to mail bins containing ballots being sent to voters, and check the "Election Mail" box on the postage statement form that is filled out when bulk Election Mail is entered into the USPS system. *See* Glass. Dec. ¶¶ 11-14. When a mail bin identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary. *Id.* ¶ 19. USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper

location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.*

USPS also has several longstanding practices to expeditiously process and deliver Election Mail, particularly ballots (whether election officials have chosen to send ballots to voters using Marketing Mail or First-Class Mail). *Id.* ¶ 20. USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. *Id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *Id.* And, when identifiable, USPS prioritizes placing ballots on outgoing truck, whether sent using First-Class Mail or Marketing Mails. *Id.* ¶ 22.

Furthermore, USPS has a longstanding practice of postmarking (also referred to as "cancelling") all completed ballots returned by mail that are readily identifiable as ballots. *Id.* ¶ 34. A postmark is a USPS imprint applied to a mailpiece, usually by an Advanced Facer Cancellation System (AFCS) machine at a processing plant, indicating the location and date that the USPS accepted custody of the mailpiece, and the location the cancellation mark was applied, in order to cancel affixed postage so that it may not be reused. *Id.* ¶ 33, 35. Many mailpieces do not need to be cancelled, because they bear indicia of postage that is not at risk of being reused (*e.g.*, metered or permitted mail, or mail bearing a pre-cancelled stamp). *Id.* USPS, however, still takes measures to strive to postmark all returned ballots given the emphasis placed on postmarks by some state laws in validating the timely return of ballots. *Id.* USPS even goes so far as to cancel return ballot envelops by hand, if necessary, to facilitate postmarking. *Id.* ¶ 34.

Based upon USPS's analysis of contemporaneous data regarding current AFCS machine capacity throughout the country, USPS has ample capacity to postmark all mailpieces readily

identifiable ballots. *Id.* USPS also plans to take extra steps for this election to identify and hand-cancel ballots that are rejected by an AFCS machine. *Id.* ¶¶ 39, 41. Further, and for the first time, USPS will use Ballot Monitors during the week preceding and through Election Day to ensure that all USPS personnel follow proper protocol for identifying and postmarking ballots. *Id.* ¶ 39.

USPS will continue these longstanding practices in support of mail-in voting for the Election. Glass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. Glass Dec. ¶¶ 1, 27.

### 3.    *USPS's Increased Efforts in Support of the Election.*

In anticipation of the additional mail volume associated with the Election, USPS remains committed to and has increased its efforts to process and deliver Election Mail. For example, Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 10 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1-2. These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows). Glass Dec. ¶ 29. USPS has also expanded its Election Mail Task Force this year to include leaders of the postal unions and management associations, to ensure strong coordination throughout USPS and with state and local election officials, and to make sure any concerns can be raised and timely resolved at the highest levels of the organization. *Id.* ¶ 10. As discussed above, USPS has also increased the volume and frequency of its communications with election officials and will, for the first time, utilize Ballot Monitors. *Id.* ¶¶ 32, 39.

### III.      USPS's Years-Long Mandate to Improve Efficiency and Control Expenses.

USPS's systematic efforts to facilitate the use of U.S Mail for elections, particularly the 2020 Election, have not been diminished by USPS's mandate to improve performance, adhere to service standards, and help address the Postal Service's precarious financial condition—a mandate that long predates Postmaster General DeJoy's tenure. Per USPS's Fiscal Year 2019 Annual Report to Congress, the USPS's financial condition results, in part, from the steady declines in First-Class and Marketing Mail volumes. *See* Ex. 1 at 28-29; *see also, e.g.*, Ex. 11 (First-Class Mail Volume Since 1926 Report, showing that the volume of First-Class Mail in 2019 was at its lowest point since 1977); Ex. 12 (Statement of Postmaster General and Chief Executive Officer Megan J. Brennan Before the House Committee on Oversight and Reform (Apr. 30, 2019)) at 1 (2019 statement of the former Postmaster noting the steep decline in First-Class Mail, the USPS's "most profitable product"). Pursuant to this mandate, the Postal Service routinely analyzes operations and performance metrics to determine whether and where improvements can be made to further efficient service. To that end, USPS regularly reviews, among other things, collection box and equipment utilization, overtime usage, retail and facility operations, and transportation and delivery initiatives. As a part of that process, the USPS makes determinations as to collection box and equipment removal, implementation of programs to improve efficiency, changing retail hours, consolidation or closing of facilities, and amendments to policies and practices.

In light of the increased scrutiny of these activities recently, and in an effort to bolster public confidence in the Postal Service's ability to handle Election Mail, Postmaster General DeJoy has publicly committed to suspending the aforementioned activities, including equipment and collection box removal, changes to retail hours, plans to consolidate or close any facilities, and implementation of a limited pilot program for mail carriers. *See, e.g.*, Ex. 10. He also clarified that overtime was never banned and that it would continue to be permitted. *Id.* The only exception

14

to Postmaster General's DeJoy's directive to maintain the status quo through Election Day pertains to the ongoing effort to improve compliance with existing schedules throughout USPS's transportation and processing networks—which, as discussed below, has not had any lasting negative impact on USPS's service performance.

### A.   Periodic, Data-Based Reduction in Redundant Processing Equipment and Collection Boxes

For years, and largely the result of changing operational needs due to the decline in letter and flat mail[5] volume, USPS has periodically gathered and analyzed data relating to the utilization of blue collection boxes and mail processing machines. Based upon these analyses, USPS makes determinations regarding the reduction or reallocation of redundant collection boxes and processing equipment based upon its analyses.

USPS has over 140,000 collection boxes. *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. USPS regularly reviews the need for and location of collection boxes in accordance with procedures set out in the Postal Operations Manual ("POM"). *Id.* ¶ 5. Generally, a collection box is targeted for removal if it averages fewer than 25 mailpieces daily during a two week observation period. With some exceptions, USPS posts a 30-day public notice on collection boxes identified for relocation or removal before final action. *Id.* ¶¶ 5, 8. For the last seven years, USPS has removed an average of 3,100 collection boxes each year, many of which were relocated to more heavily trafficked areas. *Id.* ¶¶ 8, 10. Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal. *Id.* ¶ 6. USPS has removed approximately 1,500 boxes in 2020 pursuant to this routine process, consistent with removal rates of previous years. Postmaster General DeJoy was not involved in any decisions relating to the removal of these

---

[5] "Flat mail" refers to periodicals and larger envelopes (for example, newsletters and advertising material). *See, e.g.*, DeChambeau Dec. ¶ 5.

boxes. *Id.* ¶¶ 10, 19. Rather, the removal and relocation of collection boxes (other than damaged boxes or unsecured boxes) has been suspended at least through the Election at Postmaster General DeJoy's direction. *Id.* ¶¶ 18-19.

Similarly, USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement. *See* DeChambeau Dec. ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Declaration of Robert Cintron ("Cintron Dec.") ¶ 5. Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for several years, to align with volume reductions in those types of mail. DeChambeau Dec. ¶ 13. The number of machines reduced varies from year to year, based on utilization data. *Id.* For example, in Fiscal Year 2016, the USPS reduced 1,120 letter and flat sorting machines, while the following year it reduced only 197 machines. *Id.* In 2017, the USPS began a more structured, phased equipment reduction initiative. *Id.* ¶ 14. The first phase focused on reducing unnecessary Delivery Barcode Sorters (DCBS) and Automated Flat Sorting Machines (AFSM), which process letter and flat mail, respectively. *Id.* Later phases included reducing unnecessary AFCS equipment. *Id.* ¶¶ 6, 16. In 2020, the USPS reduced approximately 700 letter and flat sorting machines. *Id.* ¶¶ 19-21. These reductions were planned and scheduled before Postmaster General DeJoy took office, and he had no role in their implementation, *id.* ¶ 22, Couch Dec. ¶¶ 5, 9, Declaration of Michael L. Barber ("Barber Dec.") ¶ 5. Regarding the timing of the removals, as in prior years, the removals were scheduled for summer, when mail volumes are historically lower. DeChambeau Dec. ¶ 19; Couch Dec. ¶ 4.

Mail processing machines that are taken out of service are generally removed from a facility floor and disassembled for their usable parts. Couch Dec. ¶¶ 10-11. Other machines may be offered for sale to the general public through the USPS's Corporate Asset Accountability

Office. *Id.* ¶¶ 10, 12. Indeed, factoring in the mail processing machines that were removed or disconnected this year, USPS's mail processing utilization at the national level ranges from 35 percent (when mail is low) to 65 percent (when mail is high); which means that machines have ample extra capacity. Barber Dec. ¶ 6.

USPS is confident that its processing facilities have ample capacity to process all anticipated Election Mail based on its ongoing monitoring of processing capacity data, taking into account machines that have been removed from service. DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6. USPS tracks mail processing data for machines nationwide in order to evaluate whether machine utilization comports with the volume and types of mail handled in each facility, removing and/or replacing machines accordingly. DeChambeau Dec. ¶ 8; Couch Dec. ¶ 4; Barber Dec. ¶ 4. USPS may also remove machines because they are obsolete, to free up floor space for other use (*e.g.*, sorting operations or package handling equipment), or as a result of facility consolidations, though no mail processing facility closings or consolidations are scheduled for Fiscal Year 2020 or the first quarter of Fiscal Year 2021. DeChambeau Dec. ¶¶ 7-12, 18; Couch Dec. ¶ 3; *see* Barber Dec. ¶ 11; *see also* Ex. 10 at 1 ("No mail processing facilities will be closed.").

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 10 at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15.

### B.   USPS's Continued Focus on Adherence to Existing Transportation Schedules

Approximately two years ago, Robert Cintron, Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules. Cintron Dec. ¶¶ 1, 11-13, 21. When Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed the initiative with the Postmaster General and other Postal executives. *Id.* ¶¶ 22-23. Concurrent with these discussions, the OIG published a report addressing "late deliveries

17

. . . late dispatch, extra trips, and all the time and costs" that those issues caused. Ex. 5 at 10. In

that report, OIG found that "generally, the Postal Service's processing network is not operating at

optimal efficiency." Ex. 13 (USPS OIG Audit Report No. 19XG013NO00O-R20, "US. Postal

Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. In

particular, "mail processing operations were not completed on time and mail missed its last

scheduled transportation trip. In response, management used overtime . . . and either delayed the

scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems,

"[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities

late." *Id.*

Soon after joining the Postal Service, Postmaster General DeJoy reemphasized the need to

adhere to USPS's operational plans, including transportation schedules. Cintron Dec. ¶ 23. Mr.

Cintron and his team then developed written guidelines (generally consistent with past practices)

regarding the circumstances where the scheduling of extra transportation trips is appropriate.

Cintron Dec. ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives,

advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. *Id.* ¶

25.[6]

During the following week, compliance with transportation schedules improved, but USPS

experienced a temporary decline in its service performance. *Id.* ¶ 26. However, after USPS

---

[6] USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All
Employees," which discusses some issues relating to late and extra trips. *See* Cintron Dec. ¶ 24
n.1. USPS, upon investigation, learned that this memo was locally prepared; it was not created,
reviewed, or approved by USPS Headquarters. *Id.* The memo does not represent official USPS
policy, either in July or now; in fact, it mischaracterizes USPS policy and the USPS's initiative to
encourage compliance with transportation schedules. *Id.* It has never been USPS policy or
guidance to "ban" extra trips, nor was it ever USPS's goal or desire to leave mail behind in
processing facilities. *Id.* ¶¶ 24 n.1 & 28; Curtis Dec. ¶ 24 n.1.

addressed the decline, it observed steady improvements in service performance. *Id.* ¶ 27; *See* Declaration of Angela Curtis ("Curtis Dec.") ¶ 30. On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules. In other words, we are improving service performance while more consistently running our trucks on time." *See* Service Performance Rebounds at Postal Service (Aug. 31, 2020) at 1, https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm; *id.* Congressional Briefing (Aug. 31, 220) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels), https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf ("Congressional Briefing"); Cintron Dec. ¶ 27. Furthermore, in the last two months, there has been a sharp decrease in late and extra trips. *See* Congressional Briefing at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27. USPS's performance continues to improve. *See* USPS Service Performance Continues Upward Trend (Sept. 10, 2020), https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-continues-upward-trend.htm.

### C.   *USPS Personnel Practices Related to Overtime Usage and Staffing Shortages Caused by the Covid-19 Pandemic*

#### 1.   *Overtime*

Defendants have not attempted to curtail USPS's ability to handle Election Mail by banning or unreasonably restricting employee overtime. The Postal Service's customary overtime practices, pursuant to which overtime is generally evaluated and approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took

office, and the rate at which USPS has incurred overtime has remained constant. *See* Curtis Dec. ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4. To the extent USPS has made past efforts to monitor or address certain issues regarding overtime usage, such efforts are unrelated to the Election. Instead, these efforts consist of ongoing, routine measures to improve efficiency and reduce unnecessary costs. *See* Curtis Dec. ¶¶ 12-13; Colin Dec. ¶¶ 3-6.

In maintaining the status quo leading up to the Election, Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use. *See, e.g.*, Ex. 14 14 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)) 14 ("I did not direct the elimination or any cutback in overtime."); Ex. 10 at 1 ("[W]e reassert that overtime has, and will continue to be, approved as needed").

### 2.   The Impact of the COVID-19 Pandemic

Since March 2020, USPS has faced significant staffing issues caused by the COVID-19 pandemic. *See* Declaration of John Prokity ("Prokity Dec.") ¶ 4; Curtis Dec. ¶ 18. Prior to the pandemic, USPS experienced, on average, a weekly equivalent of 55,000 employees using full-day leave. Prokity Dec. ¶ 5. In early March, this figure began to increase until it peaked in mid-April at 81,000, or the equivalent of nearly 26,000 additional employees using full-day leave in a week. *Id.* Thereafter, the situation improved somewhat until July, when personnel availability again began to decrease (hitting its lowest levels in the week of July 11, 2020). *Id.*

To mitigate these staffing shortages, which negatively impacted USPS's ability to timely deliver mail, *see id.* ¶¶ 20-21, Prokity Dec. ¶¶ 6, 10, USPS has taken extraordinary steps to hire additional employees.[7] *See* Prokity Dec. ¶ 6. For instance, USPS has implemented a number of

---

[7] On August 7, 2020, in connection with a high-level organizational restructuring, USPS implemented a hiring freeze for managerial positions. Prokity Dec. ¶ 6 n.1. This action has had no

changes to its normal hiring processes to be able to hire employees more quickly, and has negotiated agreements with the postal workers' unions to allow the hiring of non-career employees above the historical contractual limits. *See id.* ¶¶ 7-8. As a result of these and other efforts, USPS has hired an average of 2,000 to 3,000 employees per week, with a total of 88,627 new employees hired between March 1 and August 27, 2020. *Id.* ¶ 9.

### D.  Other Efforts Aimed at Improving Efficiency

There are two other practices that have prompted election-related criticism of USPS: setting park points (*i.e.*, locations where a driver parks and exits a postal vehicle to deliver mail on foot) and "Expedited to Street/Afternoon Sortation" ("ESAS"), a limited pilot program aimed at reducing morning activities to allow carriers to begin their routes earlier. There is no nationwide USPS policy setting a fixed cap on the number of park points that may be used on a route, nor has Postmaster General DeJoy made any changes to USPS practices regarding park points. Colin Dec. ¶¶ 12-14. Furthermore, the ESAS was planned before Postmaster General DeJoy took office, and it was suspended at the Postmaster General's direction. Colin Dec. ¶ 11.

### IV.  Procedural History

Plaintiff filed this Complaint on August 20, 2020, Compl, ECF No.1, and its motion for Preliminary Injunction, ECF No. 8, on September 1, 2020. It complains about two sets of alleged changes, which are purportedly identified in two informal documents. The first purported set of changes are summarized in a document entitled "New PMG's expectations and plan," which purportedly identifies "significant nationwide changes Postmaster DeJoy was implementing," including "that overtime would be eliminated, that letter carriers would have to make changes limiting the timeline and affecting the scope of their delivery routes, and that certain customer

---

effect on the hiring of non-management employees, including mail carriers, mail handlers, and clerks. *Id.*; *see also* Curtis Dec. ¶ 25.

service windows would be closed during lunchtime . . . .[while] direct[ing] employees to leave mail behind at distribution centers if it delayed letter carriers from their routes." PI Mem. at 11 (hereinafter "PMG Plan"). The second set of changes is detailed in a document entitled "Pivoting for our Future," which describes certain "transportation changes being implemented (today)." *Id.* at 12 (hereinafter "Pivot"). As will be discussed later, neither of these documents describes actual changes on behalf of the organization; rather, each was prepared by a mid-level manager, and distributed locally. The documents do not accurately represent USPS policy. *See* Curtis Decl. ¶ 24 n.1. Plaintiff seeks to enjoin the "PMG Plan" and "Pivot." *See* Proposed Order, ECF No. 8-4.

Eleven lawsuits, including this one, have been filed recently across the country concerning purported changes made by USPS. Generally, the plaintiffs in these cases allege that the purported changes were intended to obstruct voting by mail for the Election, asserting overlapping constitutional and statutory claims. Despite the fact that the USPS suspended almost all of the activities at issue until after Election, these plaintiffs continue to pursue litigation.[8]

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Id.* at 20. When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, "when mandatory injunctive relief is sought," seeking to

---

[8] Because the issues here are largely the same, and in the interest of efficiency, Defendants also rely here on the declarations filed in support of Defendants' preliminary injunction briefing in *Jones, et al. v. United States Postal Service, et al.*, No. 1:20-cv-06516 (S.D.N.Y.).

compel affirmative conduct rather than simply preserve the status quo, "the burden on the moving party is particularly heavy" and the "right to relief must be indisputably clear." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

ARGUMENT

**I.      Plaintiffs are unlikely to prevail on the merits of their claims.**

>       **A.   *Plaintiffs' alleged injuries rely on a speculative chain of possibilities, and are thus insufficient to establish standing.***

To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). When a plaintiff seeks prospective relief, the "threatened injury must be certainly impending to constitute injury in fact;" "[a]llegations of possible future injury are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). A "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy" this requirement. *Id.* at 410. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547.

Here, Plaintiffs rely on alleged injuries stemming from their assertion that USPS's purported policy changes will result in material delays of sufficient degree to harm Plaintiffs in particular (*e.g.*, by delaying the delivery of payments and goods to Plaintiffs). But this theory suffers from at least two problems. To start, as noted *supra*, the vast majority of the purported changes pre-date PMG DeJoy's tenure, or simply never existed, which creates an independent redressability problem: Plaintiffs cannot benefit if the Court orders Defendants to suspend policies that do not exist, or are unrelated to recent delays. And although the agency *did* renew its focus on mitigating unnecessary extra or late trips, and there "was a temporary decline in meeting service

23

standards" in mid-July, USPS "began efforts to correct the decline through focusing on meeting mail processing and delivery schedules, conducting a root cause analysis of why some mail was not timely being load on trucks, and identifying corrective measures to improve these issues, Cintron Decl. ¶¶ 25-26. As a result, "service performance is rapidly returning to early July levels." *Id.* ¶ 27. Moreover, any alleged injury based on a delay in the delivery of election mail is entirely speculative, particularly considering the enormous efforts that USPS has put into place in order to ensure that ballots are timely delivered. *See*, *e.g.*, DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6.

In any event, even assuming USPS instituted the policies alleged by Plaintiffs, any alleged injury to Plaintiffs still relies on a "highly attenuated chain of possibilities." First, the purported USPS policy changes must cause *material* delays in the future. Plaintiffs refer to prior delays as proof, but there is no indication that those delays were primarily caused by the USPS policy changes, rather than COVID-related circumstances (*e.g.*, staffing shortages). Second, these material delays must affect Plaintiffs in particular. Plaintiffs do not claim that the alleged policy changes will cause delays across-the-board. And even if Plaintiffs have witnessed delays in the past, that alone is insufficient to establish that they will continue to suffer delays in the future. *See City of L.A. v. Lyons*, 461 U.S. 95, 107-08 (1983). Third, these delays must be of sufficient length and magnitude to actually cause the harms about which Plaintiffs complain. For example, Plaintiffs allege that delays may interfere with the efficient operation of their legal systems, since legal documents are often sent by mail. *See* Compl. ¶ 219. But Plaintiffs must show that the delays will be of sufficient length, and affect the delivery of legal documents to or from a sufficient number of persons, to create any meaningful interference with the legal system. This "speculative chain of possibilities does not establish that injury based on" the purported USPS policy changes "is certainly pending." *Clapper*, 568 U.S. at 414.

**B.  Plaintiffs are unlikely to succeed on their section 3661 claim.**

Plaintiffs' central claim in this lawsuit is that the Postal Service has failed to comply with the requirement to seek an advisory opinion from the PRC pursuant to 39 U.S.C. § 3661(b) before enacting certain purported operational "changes," *i.e.*, changes to policies concerning mail truck schedules and election mail. Section 3661(b) requires that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must first submit a proposal to the PRC requesting an advisory opinion. 39 U.S.C. § 3661(b). The PRC shall issue its written opinion only after an opportunity for a hearing on the record. 39 U.S.C. § 3661(c).

As a threshold matter, clear statutory text and decades of precedent make clear that it is the *PRC* that has exclusive jurisdiction over complaints relating to service issues, including the failure of the Postal Service to first seek an advisory opinion from that body for a nationwide change in service, with the right to appeal to the D.C. Circuit if the complainant is dissatisfied. District courts play no role in adjudicating such disputes. But even if Plaintiffs could somehow overcome this hurdle, the Postal Service was not required to seek an advisory opinion relating to any of the purported actions challenged in this suit.

> 1.    *District Courts lack subject-matter jurisdiction over complaints regarding 39 U.S.C. § 3661, which are channeled to the Postal Regulatory Commission and then the D.C. Circuit.*

Congress has expressly precluded district court jurisdiction over Plaintiff's section 3661 claim. Title 39 of the U.S. Code provides that the district courts have jurisdiction over cases against the Postal Service, "*except* as otherwise provided in this title." 39 U.S.C. § 409(a) (emphasis added); *see also LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (district court jurisdiction over Postal Service can be preempted by other provisions, including section 3662). This case involves one of those exceptions: 39 U.S.C. § 3662, which vests exclusive jurisdiction

over complaints regarding the Postal Service's compliance with certain statutory requirements – including section 3661 – in the PRC.

In section 3662, Congress specified that any person "who believes the Postal Service is not operating in conformance with the requirements of various provisions, including "*this chapter* [i.e., Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission." 39 U.S.C. § 3662(a) (emphasis added). "If the Postal Regulatory Commission finds the complaint to be justified, it shall order that the Postal Service take such action as the Commission considers appropriate in order to achieve compliance with the applicable requirements and to remedy the effects of any noncompliance." *Id.* § 3662(c). If that person is dissatisfied with the PRC's ruling, she may petition for review in the D.C. Circuit. *Id.* § 3663. If she is satisfied with the PRC's order, the district courts have jurisdiction to enforce any PRC orders against the Postal Service. *Id.* § 3664.

Courts have repeatedly held that 39 U.S.C. §§ 3662 and 3663 constitute the exclusive jurisdictional remedy for complaints about postal services that fall within the statutory provisions specifically identified in section 3662—and as discussed above, that includes a claim that the Postal Service is not complying with section 3661. Numerous courts of appeals have so held. *See, e.g.*, *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has "exclusive jurisdiction . . . over claims enumerated in § 3662"); *LeMay*, 450 F.3d at 799-800 ("In this case, Congress removed the district courts' jurisdiction over claims regarding postal rates and services. It did so by enacting 39 U.S.C. § 3662."); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir. 1995) (earlier version of 39 U.S.C. § 3662 "makes clear that a postal customer's remedy for

unsatisfactory service [which was identified in section 3662] lies with the Postal Rate Commission. . . . Accordingly, the district court was without jurisdiction to review this claim.").

And these courts of appeals have been joined by the "countless decisions" of lower courts. *Pep-Wku, LLC v. USPS*, No. 20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020); *see, e.g.*, *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom. McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011) ("Read together, [39 U.S.C. §§ 3662, 3663, and 3664] demonstrate that this Court lacks jurisdiction to consider service-related complaints in the first instance" and holding that "the PRC has exclusive jurisdiction" over such claims); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018) (same); *Striley v. United States Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017) ("Under 39 U.S.C. Section 3662, the Postal Regulatory Commission has exclusive jurisdiction over such complaints"); *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 134 F. Supp. 3d 365, 382 (D.D.C. 2015), *aff'd in part on other grounds, vacated in part on other grounds, rev'd in part sub nom. Sears, Roebuck & Co. v. United States Postal Serv.*, 844 F.3d 260 (D.C. Cir. 2016) ("Particularly exempted [from district court jurisdiction] are claims concerning postal rates and service standards; such claims must first be presented to the Postal Regulatory Commission"); *Murphy v. United States Postal Serv.*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014) ("The PRC has exclusive jurisdiction over service-related complaints with the Postal Service covered by section 3662."); *Powell v. United States Postal Serv.*, No. CV 15-12913-FDS, 2016 WL 409672, at *1 –2 (D. Mass. Feb. 2, 2016) (district courts lack jurisdiction regarding claims brought pursuant to 39 U.S.C. § 3661(a)).

This overwhelming line of precedent has developed for good reason. "Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems' those procedures 'are to be exclusive.'" *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 589 (2010) (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S.411, 420 (1995)). "It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomms Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 186 (D.C. Cir. 2017) ("[W]here 'a special statutory review procedure [exists], it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies.'") (quoting *Media Access Project v. FCC*, 884 F.2d 1063, 1077 (D.C. Cir. 1989)); *Public Util. Comm'r of Or. v. Bonneville Power Admin*, 767 F.2d 622, 627 (9th Cir. 1985) ("[J]urisdiction over a specific class of claims which Congress has committed to the court of appeals generally is exclusive, even in the absence of an express statutory command of exclusiveness."). This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first to an agency, and then to the federal courts of appeals. *See, In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) ("The multiple layers of review evince Congress's intent to direct challenges . . . to the avenues Congress created."); *see also Bank of Louisiana v. FDIC*, 919 F.3d 916, 922 (5th Cir. 2019) ("[S]ometimes Congress leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts"). Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 (including complaints that the Postal Service has not complied with section 3661)

go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C. Circuit. *See* 39 U.S.C. §§ 3661, 3662. Under such circumstances, this court lacks subject matter jurisdiction over this claim[9]

2.     *The ultra vires doctrine does not provide an avenue for judicial review here.*

Plaintiffs fail to acknowledge section 3662's channeling of review to the PRC and then to the D.C. Circuit. Instead, Plaintiffs seek review under this Court's very limited *ultra vires* review doctrine. But Plaintiffs cannot satisfy *ultra vires* review, for two reasons: first, *ultra vires* review is *only* available where there is no other potential remedy, and here the statute provides for the filing of a complaint to the PRC and then the D.C. Circuit. And second, *ultra vires* review is only available if the agency has failed to comply with such a clear and unequivocal statutory command that the agency has acted without any authority. There is no such error here; indeed, the vast majority of the "changes" of which Plaintiffs complains are not changes at all, but routine, long-standing operational practices.

"[T]he Postal Service is exempt from review under the [APA]." *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (internal quotation marks and citations omitted); 39 U.S.C. § 401(a). For claims—unlike here—where there is no other remedy, some

---

[9] The Supreme Court has recognized that district court jurisdiction may not be implicitly precluded if three factors are met: (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) if the suit is "wholly collateral to a statute's review provisions," and (3) "if the claims are 'outside the agency's expertise." *Jarkesy v. SEC*, 803 F.3d 9, 17 (D.C. Cir. 2015) (quoting *Free Enterprise*, 561 U.S. at 489-90. None of these factors is met here.

There is meaningful judicial review of a final PRC order in the D.C. Circuit. Nor does it matter that the PRC cannot provide "immediate relief," as the fact that there may *eventually* be relief is sufficient as a matter of law. *See Am. Fed'n of Gov't Employees*, 929 F.3d at 755-56 ("Here, [the Supreme Court] instructs that the [plaintiffs] are not necessarily entitled to raise a pre-implementation challenge in the district court, and that Congress may require them to litigate their claims solely through the statutory scheme, so long as they can *eventually* obtain review and relief.") (emphasis added) Moreover, the suit is not collateral to the statute's review provisions, but falls within their explicit text, and involves a function committed to the agency's expertise.

courts have, however, found "non-statutory review' available for certain Postal Service decisions,

notwithstanding the preclusion of APA review under 39 U.S.C. § 39 U.S.C. § 410(a)." *Mittleman*,

757 F.3d. at 307; *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)

(Postal Service can be reviewed under *ultra vires* doctrine pursuant to "the leading case, *Leedom*

*v. Kyne*, 358 U.S. 184 (1958)"). Such review, however, "is quite narrow," *id.*, and "is essentially

a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt v. Broadcasting*

*Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). In order to justify relief under the *ultra vires*

doctrine "a plaintiff must show, *first* that the agency has acted 'in excess of its delegated powers

and contrary to a specific prohibition,' and, *second*, that barring review by the district court 'would

wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights.''

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Service Impasses Panel*, 437 F.3d 1256, 1258

(D.C. Cir. 2006) (quoting, first, *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), and, second, *Bd. of*

*Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). With respect to the

first prong, "[a]n agency acts *ultra vires* when it violates a 'clear and mandatory' statutory

provision. A statutory provision is 'clear and mandatory' when it has only one unambiguous

interpretation." *Nat'l Ass'n of Postal Supervisors v. USPS*, No. 18-cv-2236-RCL, 2020 WL

4039177, at 3 (D.D.C. July 17, 2020).

　　　　Plaintiffs' claim fails each requirement. Most obviously, Plaintiffs fail at the second

condition: they have a "meaningful and adequate means of vindicating [their] statutory rights."

*MCorp*, 502 U.S. at 43. Plaintiffs can file a complaint to the Postal Regulatory Commission, with

judicial review if they remain unsatisfied in the D.C. Circuit. Their failure to even attempt to do

so is fatal to their claim. *See id.* (appeal to agency, followed by review in the courts of appeals,

constitutes a meaningful and adequate means of vindicating statutory rights).

Although this Court need not reach it in light of the express channeling of judicial review to the D.C. Circuit, Plaintiffs' claim also fails under the first prong of the *ultra vires* analysis, because they cannot show that the Postal Service has violated section 3661(b). That provision requires the Postal Service to request an advisory opinion whenever it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis. 39 U.S.C. § 3661(b). The leading case interpreting this statute is *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975). There, the Fifth Circuit recognized that "Congress intended 3661 to apply to only a specified class of decisions," and that "Postal management was left with broad decision-making power, subject to 3661's requirements for specified decisions." *Id.* at 262; *see also id.* ("The language of 3661 indicates the limited scope of application."); *see also id.* at 263-64 (recognizing "a policy of broad management power and an unexpansive interpretation of 3661"). Accordingly, three factors that must be satisfied before section 3661(b) comes into play.

"First, there must be a 'change.' This implies that a quantitative determination is necessary." *Id.* at 262. In other words, "[t]here must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661." *Id.* "Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered." *Id.* at 262-63. "Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved." *Id.* at 263. In drawing these lines, courts have made a "distinction between Postal Service managerial decisions and Postal Service decisions which affect the public and give rise to an opportunity to be heard," with decisions like

transferring mail processing facilities and maintaining mail trucks falling into the former category. *See, e.g.*, *Wilson v. USPS*, 441 F. Supp. 803, 806 (C.D. Cal. 1977).

Plaintiffs identify two such purported "changes": (1) certain operational changes to mail transportation, PI Mem. at 30-33; and (2) a future "plan" to no longer "prioritize Election Mail" and to "not process Election Mail without adequate postage." *Id.* at 33-34. Neither meets these demanding standards. First, contrary to Plaintiffs' contention, *id.* at 1, USPS has not prohibited extra or late trips. *See* Cintron Dec. ¶¶ 23-24. The only notable change USPS has made has been to develop written guidance clarifying the circumstances under which extra truck trips were acceptable, in order to mitigate the number of unplanned and unnecessary trips, *see* Cintron Dec. ¶¶ 23-24, and that is not a "change" as that term is used in section 3661. It is not a new policy but rather a renewed focus on ensuring the Postal Service complies with its *existing policies*, and that it operates as efficiently as possible. This is precisely the type of management direction to which section 3661 does not apply. In their brief, Plaintiffs focus on the fact that there was a delay in the mail, *see* PI Mot at 31-33, a delay which has now largely been corrected. But that, by itself, cannot be enough to trigger section 3661 because *any* managerial change can be said to have the effect of changing the Postal Service's operations (i.e., changing how the mail is delivered). If that is true, then nearly any managerial initiative, be that one which would make the Service either more efficient or less efficient, would first need to go through an on-the-record, trial-type proceeding. It cannot be true, for example, that the Postal Service would be required to seek an advisory opinion from a separate agency if it wanted to upgrade its IT or truck routing systems, even if those upgrades might have a temporary effect on its services. Indeed, Plaintiffs never claim that the Postal Service's operational plan needed to undergo PRC review; if so, a decision to enforce *compliance* with that plan could not trigger review.

32

Second, Plaintiffs allege that USPS has stated that it will no longer "prioritize Election Mail," and that "the Postal Service will not process Election Mail without adequate postage." PI Mot. at 33-4. But neither of these changes has even happened. USPS has numerous practices to prioritize Election Mail generally, and ballots in particular, regardless of the class in service. *See* Glass Dec. ¶ 21-23. As a result of these practices "the delivery timeframes for Election Mail entered as Marketing Mail [a cheaper, slower class of service] often are comparable to those of Election Mail entered as First-Class Mail." *Id.* ¶ 21. More to the point, this is not a *change*: it has been USPS practice for a number of years. *Id.* ¶ 18-23. And those practices are in place for the Election in November as well. *Id.* ¶ 29. And with respect to the claim that USPS will not process Election Mail without postage, this is wrong. USPS processes *all* returned ballots, regardless of postage, *see* POM § 171.3; Publication 632, *State and Local Election Mail User's Guide* (Jan. 2020), https://about.usps.com/publications/pub632.pdf, at 7, and USPS has always required state and local election officials to pay for the mail services they use, just like any other mail user. *See, e.g.*, Glass Dec. Ex. 2 (2016 letter from USPS to states recommending that election officials "should use First-Class Mail postage . . . when paying for delivery of outbound absentee or vote by mail ballots."). And given that USPS's efforts to expeditiously deliver Election Mail in the upcoming election actually exceeds what the agency has done in the past, there is simply no basis to suggest that the agency could have violated section 3661.

Moreover, both the Postal Service and the Commission's past practices confirm that any change that USPS has implemented does not fall within section 3661's ambit. "[P]ast practice . . . should be given the deference ordinarily accorded any interpretation of a statute by the agency charged with its enforcement." *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102,107 n.11 (D.D.C. 2002) (quoting *Gelman v. FEC*, 631 F.2d 939, 943 (D.C. Cir. 1980)). The

Commission has noted that a "change in the nature of postal services broadly can be defined as changes to a customer's ability to access essential postal services that require a visit to a postal retail facility."[10] Its past practice illustrates that changes that trigger 3661's review are general changes to postal facility hours or service standards for mail delivery. The Postal Service requires an advisory opinion before, for example, formally changing the service standards (i.e., optimal transit times) for certain pieces of mail (i.e., eliminating overnight delivery for single-piece First-Class Mail or adding an extra day to Standard Mail),[11] changing the hours of operations at

---

[10] Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), at 1, https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.

[11] Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), at 1, 10, https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20Opinion.pdf ("This proposal entails a change to the delivery expectation or delivery service standard for . . . [certain] Standard Mail. . . . Under the Postal Service's proposal, the service standard would change [from 3 days] to 4 days"); Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), at 1 https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf ("The [Postal Service's proposed] changes to service standards would ultimately eliminate all overnight delivery service for single-piece First-Class Mail, and delay much of current First-Class Mail 2-day delivery to 3-day delivery. Presorted First-Class Mail and Periodicals would have to meet new mailing requirements, including new accelerated entry times, to maintain eligibility for overnight service. Standard Mail and Package Services would be affected to a lesser extent."); Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, , at 7 Docket No. 2006-1 (Dec. 12, 2006) (proposing "changes in the application of current service standards to numerous 3-digit ZIP Code service area origin-destination pairs for different classes of mail.").

thousands of post offices or retail operations,[12] or eliminating an entire day of mail delivery.[13] All of these proposals constitute substantial, formal changes in how mail is classified or which customer-facing operations are open. None of them concern basic, managerial operational changes of the type at issue here.

If there were any doubt as to whether these "changes" are covered by section 3661, that doubt would be an insufficient basis for Plaintiffs' *ultra vires* claim. Plaintiffs' claim emerges at the intersection of two lines of doctrine: the requirement that section 3661 be narrowly interpreted, in order to preserve USPS's "broad management power," *see Buchanan*, 508 F.2d at 263-64, and the *ultra vires* doctrine, which requires that any error be clear and unambiguous. The basic, operational activities that Plaintiffs seek to challenge here cannot meet this set of unequivocal requirements. Indeed, were it otherwise, the *ultra vires* doctrine would swallow Congress's express preclusion of judicial review of these types of claims in district court. Almost any sort of operational or management initiatives that could have an impact on Postal Service operations would fall within the ambit of section 3661 – and require extensive hearings---exactly the sort of ossification Congress intended to avoid. *See id.*

---

[12] Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), at 1, 3, https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf (proposing to reduce the hours of operations "at more than 13,0000 post offices nationwide); Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf (proposing to identify "more than 3,650 post offices, retail annexes, stations and branches for possible closing").; Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf (proposing a broad station and branch discontinuation plan).

[13] Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), at 1, available at https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf (The Postal Service requests a Commission advisory opinion on a plan to end Saturday delivery, Saturday outgoing mail processing, and other related service changes.").

**C.   Plaintiffs are unlikely to establish that the alleged USPS policy changes violates the rights of State legislatures under the Elections Clause.**

Plaintiffs next claim that the Elections Clause grants them a constitutional right to a certain level of mail service from USPS to support their own laws regarding elections. In support, Plaintiffs argue that they relied upon USPS policies and performance when crafting their relevant election laws, and thus the alleged USPS alleged policy changes at issue violate the right of their legislatures to enact laws concerning the "times, places, and manner" of elections. This theory— that the Elections Clause creates ancillary rights against actions by the federal government that may have indirect effects on State elections—is unprecedented and without merit.

The Elections Clause states that "[t]he times, places and manner of holding elections for" congresspersons "shall be prescribed in each state by the legislature thereof," but Congress may generally "make or alter such regulations" by law. *Smiley v. Holm*, 285 U.S. 355, 363 (1932). The Elections Clause thus allows State legislatures "to prescribe the procedural mechanisms for holding congressional elections." *Cook v. Gralike*, 531 U.S. 510, 523 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995) ("The Framers intended the Elections Clause to grant States authority to create procedural regulations."). The "function contemplated by [the Elections Clause] is that of making laws." *Smiley*, 285 U.S. at 366.

Here, USPS has not violated the right of Plaintiffs' legislatures under the Elections Clause. First and foremost, there is no support whatsoever for Plaintiffs' novel theory that the Elections Clause not only confers upon State legislatures the authority to pass laws governing how their citizens may vote, but also restricts federal activity which may have an incidental impact on the effects of these State regulations. The Elections Clause, by its terms, empowers Plaintiffs' legislatures to enact laws governing "the times, places, and manner" in which their citizens may vote, and USPS has done nothing to limit that authority. Plaintiffs have all enacted laws allowing

36

some or all of their citizens to cast their ballots by mail, and those laws remain operative today. Even if Plaintiffs purportedly based these laws on an expectation of a certain level of performance by USPS in delivering the mail, that subjective expectation does not mean the Elections Clause now grants Plaintiffs a concomitant Constitutional right to have this Court oversee USPS operations to ensure that their expectations are met.

Unsurprisingly, Plaintiffs do not cite to a single Elections Clause case that has recognized the validity of such a theory, and Defendants are aware of none. The overwhelming majority of Elections Clause cases concern whether State legislatures have enacted elections laws permissible under the Elections Clause, not whether other actors have interfered with powers granted to the States therein.[14] And to the limited extent there is case law concerning whether third parties (other than the federal government) have violated the right of State legislatures under this provision, that case law undermines Plaintiffs' theory. In *Smiley v. Holm*, for example, the Supreme Court found that the Elections Clause does not protect State legislatures from the inherent limitations of legislative activity, including circumstances external to a legislature which may affect the consequences of (or even undo) relevant election laws. 285 U.S. 355 (1932). There, the Minnesota legislature enacted an election law, which the governor vetoed. The State nevertheless sought to implement the law, arguing that the governor could not constitutionally veto a law passed pursuant to the Elections Clause, because that provision confers the relevant authority upon the "legislature"

---

[14] *See*, *e.g.*, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 831-35(1995) (an Arkansas law that functionally created congressional term limits could not be justified under the Elections Clause); *Roudebush v. Hartke*, 405 U.S. 15, 26 (1972) (Indiana Senate election vote recount was consistent with the Elections Clause); *Cook v. Gralike*, 531 U.S. 510, 525 (2001) (Missouri law which required that ballots must identify a candidate's position on term limits could be justified under the Elections Clause); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 459 (2008) (Washington State blanket primary was permissible exercise of Elections Clause power).

alone. *Id.* at 362-63. The Supreme Court rejected this argument, noting that the "subject-matter" of the Elections Clause "involves lawmaking in its essential features," and that "limitation[s]" to lawmaking—including the prospect of a veto—are not "incongruous with the grant of legislative authority to regulate congressional elections." *Id.* at 366, 368. If the Elections Clause does not shield a State legislature from an event which entirely negates an election law, it certainly does not give States a constitutional right against any external event which may incidentally impact an election.

Furthermore, Plaintiffs' theory, if accepted, would effectively allow States to wield the Elections Clause as a means to control the actions of federal agencies. Here, Plaintiffs claim the right to force USPS to operate in a manner Plaintiffs prefer—prioritizing certain considerations over others, regardless of the effect on the overall Postal Service—all because Plaintiffs chose to use USPS for mail-in voting. If Plaintiffs' theory were accepted, then in future elections, States could challenge *any* USPS delays—even those caused by events beyond USPS's control—and secure a federal judgment directing the content of USPS's business operations or forcing USPS to incur additional costs. And these claims would not be limited to USPS. For example, a State could challenge the decisions of federal agencies not to allow their employees the day off to vote on election days, or the decision of a federal health and safety agency to condemn a building (or otherwise ensure safe conditions) in a facility that has been selected as a polling place. States, and by necessary implication the judiciary, would become overseers of federal agencies to the extent their actions could impact state election laws—a result that would present significant separation of powers concerns, risking a "confrontation between the two branches" that "should be avoided whenever possible." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389–90 (2004).

38

This result is, of course, not the one that the Framers intended in crafting the narrow scope of the Elections Clause. Indeed, far from establishing the primacy of State interests, the Elections Clause, if anything, reflects a principle of "federal supremacy over the procedural aspects of determining the times, places, and manner of elections." *U.S. Term Limits, Inc.* 514 U.S. at 810 (describing Congress's authority to preempt State election laws). The Court should therefore conclude that the Elections Clause means what it says: States can issue procedural laws concerning the times, places, and manner of their elections, but the federal government need not contort its programs and policies to best accommodate any given State's election law.

Plaintiffs' arguments in support of creating this new cause of action lack merit. To start, Plaintiffs assert that the Elections Clause expressly grants Congress the authority to generally pass laws which "make or alter" State "regulations" enacted under the Elections Clause, and thus, by inference, this authority is withheld from the Executive Branch. But USPS has not engaged in any conduct reserved for Congress under this provision. Congress can expressly "supplement" or "substitute" relevant State laws; it can dictate when, where, and how States' citizens are allowed to vote in Congressional elections. *Smiley*, 285 U.S. at 366-67. Congress thus "has a general supervisory power over the whole subject." *Id.* at 367. USPS has not acted under, let alone usurp, this legislative authority. It has not even attempted to prescribe how a State's citizens are allowed to vote, nor has it overridden a State law on the subject.[15]

Plaintiffs then argue that under *Zschernig v. Miller*, 389 U.S. 429 (1968), any "interference" with a right vested with another governing body is unconstitutional. In *Zschernig*,

---

[15] As a separate matter, Plaintiffs fail to explain why USPS could not "supplement" or "substitute" relevant State laws when acting pursuant to an express statutory grant of power from Congress. However, because USPS is neither "supplementing" nor "substituting" Plaintiffs' election laws, the Court need not resolve this question.

the Supreme Court struck down an Oregon inheritance statute under which, before an heir located abroad could receive her or his inheritance, Oregon Courts would have to first inquire into (and render a judgment on) the adequacy of certain legal protections of the country in which the heir resided—the kind of "involvement in foreign affairs and international relations . . . which the Constitution entrusts solely to the Federal Government." *Id.* at 432, 436. Obviously, *Zschernig* has no relevance here. First, it dealt with the unique area of "foreign policy" and "foreign relations," where "[e]xperience [had] shown that international controversies of the gravest moment, sometimes even leading to war, may arise from" actions taken "by a government." *Id.* at 440–41. Even assuming *Zschernig* held that any "interference" with the federal government's foreign policy authority is unconstitutional, there is no indication that this standard applies to any other Constitutional provision, much less the Elections Clause in particular.

Regardless, *Zschernig* did *not* find the Oregon law at issue unconstitutional simply because it "interfered" with the federal government's foreign policy authority. Rather, the issue was that Oregon was directly engaging in conduct reserved for the federal government. "The Oregon statute" led to "minute inquiries concerning the actual administration of foreign law" and "into the credibility of foreign diplomatic statements." *Id.* at 435. The Oregon law thus called for activities reserved "for the Federal Government, not for local probate courts," and had "a direct impact upon foreign relations." *Id.* at 437–38, 441. Importantly, the Supreme Court clarified that a state law would not be unconstitutional simply because it had "only some incidental or indirect effect" on foreign policy. *Id.* at 433. Here, USPS did not engage in any activities reserved for State legislatures. It did not select or foreclose the means by which the citizens in any particular state may vote. States that allowed mail-in voting before the alleged USPS policy changes may continue to allow mail-in voting *after* those alleged changes.

Plaintiffs finally argue that USPS violated the Elections Clause because the "purpose" of the alleged USPS policy changes is to interfere with mail-in voting. But there is no evidence, or even well-pled allegation, to support this assertion. Most of the alleged "policy changes" Plaintiffs refer to are actually long-established policies that predate PMG DeJoy's tenure, and in any event, the PMG suspended those changes pending the November 2020 election to assuage public concern. Critically, USPS has made no change to the election mail policies it has followed since before the PMG took office. It has not changed the prices charged for or the services available to those who choose to use the mail to participate in the electoral process. If anything, USPS has now committed *even more* resources towards the processing and delivery of election mail. *See supra* at 10-11.

To establish improper motive, Plaintiffs refer to the timing of the alleged policy changes, the procedure followed for their implementation, and certain extraneous activities of PMG DeJoy and a member of the USPS Board of Governors. But none of these allegations provides any direct support for Plaintiffs' suspicion, and they certainly do not justify any inference of improper motive in light of the measures taken by PMG DeJoy (*e.g.*, suspending certain policies at issue in this litigation). In any event, the alleged policy changes that did occur involved other persons at USPS, and thus the motivation for these policy changes cannot be driven by only the two people emphasized by Plaintiffs. *See, e.g.*, Cintron Decl. (describing transportation imitative which Plaintiffs now challenge as having been started in 2017).

Furthermore, it is unclear how abstract "purpose" has any bearing on the relevant Elections Clause analysis. As explained earlier, USPS has not inhibited States from issuing laws governing how their citizens are allowed to vote in Congressional elections, and so USPS has not violated the right of State legislatures under the Elections Clause. And the States remain free to alter their

policies to account for any fears over the performance of USPS. It is unclear how subjective "motivation" could change this conclusion.

To argue otherwise, Plaintiffs cite to no authority specific to the Elections Clause. Instead, they rely upon *Zivotofsky ex rel. Zivotofsky v. Kerry*, which dealt with whether a statute requiring the State Department to list "Israel" as the birthplace on passports for U.S. citizens born in Jerusalem infringed upon "[t]he President's exclusive recognition power" which "encompasses the authority to acknowledge [a foreign nation's] territorial bounds." 576 U.S. 1, 17 (2015). As is readily apparent, this case is inapplicable. First, the court did not find that an allegation of improper "purpose" could establish a "Presidential recognition power" claim, much less an Elections Clause claim. The Court there held that because the President had claimed that he would not formally recognize Jerusalem as within Israel's sovereignty, Congress could not "require him to contradict [that] statement" by requiring the Executive Branch to proclaim that Jerusalem is part of Israel in U.S. passports. *Id.* at 21; *see also id.* at 29 (the statute at issue "require[d] the President, through the Secretary [of State], to identify citizens born in Jerusalem who so request as being born in Israel. But according to the President, those citizens were not born in Israel," and so the statute "directly contradicts the . . . Executive branch policy of neutrality toward Jerusalem"). Although towards the end of its opinion the Court noted, in passing, that "the purpose of the statute was to infringe on the recognition power," *id.* at 31, this was in no way necessary to its holding. The Court found the statute at issue unconstitutional because "Congress in effect [was] exercis[ing] the recognition power," and "overrid[ing] the President's recognition determination." *Id.* at 29.

If anything, *Zivotofsky* supports USPS's position. There, the Supreme Court held only that Congress could not "directly contradict[]" the President's recognition determinations, but the Court clarified that Congress *could* take other measures which would indirectly impact those

recognition determinations. *Id.* at 30; *see also id.* at 16 ("Although the President alone effects the formal act of recognition," Congress has "substantial authority regarding many of the policy determinations that precede and follow the act of recognition itself. If Congress disagrees with the President's recognition policy, there may be consequences. Formal recognition may seem a hollow act if it is not accompanied by the dispatch of an ambassador, the easing of trade restrictions, and the conclusion of treaties. And those decisions require action by the Senate or the whole Congress."). Here, similarly, USPS is not proclaiming that Plaintiffs' citizens cannot legally vote by mail. Plaintiffs allege only that the purported policy changes, *at most*, may have an indirect impact on citizens who opt to use this voting method. Accordingly, Plaintiffs cannot establish that any alleged USPS policy changes at issue violated the rights of their legislatures under the Elections Clause.

## II.     Plaintiffs fail to establish irreparable harm.

Plaintiffs also have failed to meet their burden to show that they will suffer irreparable harm in the absence of a preliminary injunction. *See Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471, 481 (E.D. Pa. 2010) ("An irreparable harm is a harm which cannot be redressed by a legal or an equitable remedy following a trial.") (quoting *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994). Preliminary injunctive relief "inherently requires a causal connection between the injunction and harm." *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, No. 18-5194, 2019 U.S. Dist. LEXIS 182350, at *9 (E.D. Pa. Oct. 18, 2019).

Plaintiffs claim that they have suffered various harms to the administration of their benefits and other programs as the result of mail delays. But Plaintiffs have not established—as is their burden—a "causal connection" between the mail delays and the challenged policies, or that any future delays, if there are any, would be the result of Postal Service operational changes. As set

forth *supra*, USPS has taken a number of steps that have resulted in service performance improving.

Nor can Plaintiffs' election mail related harms support a finding of irreparable injury. Indeed, in light of the service improvements and ongoing efforts to timely deliver election mail described *supra*, Plaintiffs have failed to show that, if residents mail their ballots a reasonable time before the election (which is approximately two months away), they would not be received in time to be counted. To argue otherwise is pure speculation, which is an insufficient basis for the extraordinary relief Plaintiffs seek.

Finally, for the reasons explained *supra*, there is no procedural injury. PI Mot. at 49-50. As discussed *supra*, Plaintiffs cannot state a claim under section 3661, and thus cannot have suffered any procedural injury as a result of any violation of that statute. And even if there was a technical violation, the mere failure to comply with a procedural rule, absent any independent harm, is insufficient to show Article III injury (and thus is not, by definition, sufficient to show "certain and great" injury). *See Summers*, 555 U.S. at 496.

## III. The balance of equities counsel against Plaintiffs' requested relief.

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor. As explained *supra*, USPS is currently undertaking extensive efforts to facilitate the timely delivery of election mail. There is no dispute that USPS has the capacity, including in terms of financing and machinery, to handle the anticipated surge in election mail. And Plaintiffs and voters have an opportunity to avoid any harm by mailing in their ballots without delay. These considerations demonstrate that the equities weigh against an injunction here.

Moreover, an injunction in this context would be particularly inappropriate. Plaintiffs seek to inject the court in overseeing the entirety of the Postal Service's operations. They demand this Court oversee the Postal Services' postmarking, overtime, transportation, and operational practices—something that is inappropriate even in APA cases, and for good reason. *See, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (noting the importance of "protect[ing] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."). In effect, then, they would designate this Court as the acting Postmaster General. And they would do this even though they have not actually challenged many of these policies (such as USPS's postmarking policy, where, as discussed, the Postal Service goes above and beyond to ensure that ballots are postmarked. *See* Glass Dec. ¶¶ 33-41. The public interest is not served by such actions, particularly when there is no guarantee that the vague and overarching mandatory injunction sought by Plaintiffs would have any noticeable effect, let alone actually redress any of their purported injuries. *See Norton*, 542 U.S. at 66-67.

## IV.   Plaintiffs' proposed injunction does not comport with Rule 65.

The Court should not enter the relief requested by Plaintiffs, even if they somehow overcome each factual and legal hurdle identified above. Plaintiffs' request does not comply with Rule 65's specificity requirement.  Rule 65 requires that "[e]very order granting its injunction . . . must state its terms specifically; and describe in reasonable detail – and not by referring to the complaint or other document – the acts or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "As the Supreme Court has explained, the policy behind this principle is 'to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *Leonard v. Mackerth*, No. 11-

7418, 2014 WL 512456, at *10 (E.D. Pa. Feb. 10, 2014) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). "Broad, non-specific language . . . does not give the restrained party fair notice of what conduct will risk contempt." *NAACP v. City of Philadelphia*, 2014 WL 727410, at *3 (E.D. Pa. Dec. 19, 2014) (quoting *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994)). This also includes framing an injunction that uses "vague terms" such as "required" or "necessary," as such an order is "very likely to be overbroad, difficult for [defendant] to comply with, and difficult for this Court to enforce." *INDECS Corp. v. Claim Doc, LLC*, No. 16-4421 (JBC), 2017 WL 186178, at *4 (D.N.J. Mar. 21, 2017).

Here, Plaintiffs' proposed order seeks to enjoin "the operational changes adopted by Defendants in July 2020," Proposed Order, ECF No. 18-2, without defining what those changes specifically are (and again, the changes of which Plaintiffs complain largely did not occur). Indeed, the order compounds this problem, seeking to "prohibit[] overtime, late trips, or extra trips, in a manner inconsistent with the Postal Service's policies and practice prior to the implementation of the operational policy changes adopted in July 2020." *Id.* But Plaintiffs do not define "inconsistent," nor do they define the Postal Service's policies and practices (something that could be open for debate, given USPS's sheer scope and decentralized nature regarding overtime, *see* Curtis Dec. ¶ 13 ("overtime work is evaluated and approved by field managers, not managers at postal Headquarters")), and, of course, they do not define the specific changes of which they complain. Additionally, they seek to require to enjoin the Postal Service from "[f]ailing to take *reasonable steps* to ensure that every piece of Election Mail receives a postmark the day it is received by the Postal Service," Proposed Order (emphasis added), a command that obviously lacks the requisite specificity. The remainder of their Proposed Order suffers from similar infirmities.

**CONCLUSION**

The Court should deny Plaintiffs' Motion for a Preliminary Injunction.


Dated: September 11, 2020

Respectfully submitted,


JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

WILLIAM M. McSWAIN
U.S. Attorney for the
Eastern District of Pennsylvania

ERIC WOMACK
Assistant Branch Director, Federal Programs Branch


*/s/* Kuntal Cholera
ALEXIS ECHOLS
DENA ROTH
JOSEPH E. BORSON
KUNTAL V. CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
kuntal.cholera@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all users receiving ECF notices for this case.

*/s/* Kuntal Cholera

Kuntal V. Cholera
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

Attorney for Defendants
