**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

                Plaintiffs,

                v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

                Defendants.

**No. 2:20-cv-4096**

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY
INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

ARGUMENT ............................................................................................................. 1

I.    This Court Has Jurisdiction ............................................................................ 1

      A.    Plaintiffs Have Standing ....................................................................... 1

      B.    Section 3662 Does Not Divest this Court of Jurisdiction ...................... 5

II.   All Factors Favor Granting a Preliminary Injunction ..................................... 9

      A.    Plaintiffs Are Likely to Succeed on Merits ........................................... 9

      B.    Without Preliminary Relief, Plaintiff States Will Suffer Irreparable Injury ......... 17

      C.    The Balance of the Equities and the Public Interest Favor an Injunction ............ 19

III.  The Court Can Enter an Injunction that Satisfies Rule 65 .............................. 19

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592 (3d Cir. 2016) ...................................... 9

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003) ........................... 10

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 220 F. Supp. 3d 27 (D.D.C. 2016) ........................................................................................................ 6

*Bostock v. Clayton Cnty,* 140 S. Ct. 1731 (2020) .......................................................................... 8

*Bovard v. U.S. Post Office*, 47 F.3d 1178 (table) (10th Cir. 1995) ................................................. 8

*Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975) ................................................. 8, 11

*City & Cnty of San Francisco v. U.S. Postal Serv.*, No. 09-01964, 2009 WL 3756005 (N.D. Cal. Nov. 5, 2009) ........................................................................................................ 6

*Combined Commc'ns Corp. v. U.S. Postal Serv.*, 891 F.2d 1221 (6th Cir. 1989) ....................... 10

*Foster v. Pitney Bowes Inc*., No. 11-7303, 2012 WL 2997810 (E.D. Pa. July 23, 2012) ............. 8

*Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910 (3d Cir. 1981) ..................................................... 10

*Hope v. Warden, York Cnty Prison*, No. 20-1784, 2020 WL 5001785 (3d Cir. 2020) ............... 19

*INDECS Corp. v. Claim Doc, LLC*, No. 16-4421, 2017 WL 1086178 (D.N.J. Mar. 21, 2017) ...................................................................................................................................... 20

*LeMay v. U.S. Postal Serv.*, 450 F.3d 797 (8th Cir. 2006) ........................................................... 8

*Leonard v. Mackerth*, No. 11-7418, 2014 WL 512456 (E.D. Pa. Feb. 10, 2014) ....................... 20

*NAACP v. City of Philadelphia*, No. 11-6533, 2014 WL 7272410 (E.D. Pa. Dec. 19, 2014) ...................................................................................................................................... 20

*Nat'l Air Traffic Controllers Assoc. AFL-CIO v. Federal Serv. Impasses Panel*, 437 F.3d 1256 (D.C. Cir 2006) ........................................................................................................... 10

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ......................................................... 11

*Republic Indus., Inc. v. Cent. Pennsylvania Teamsters Pension Fund*, 693 F.2d 290 (3d Cir. 1982) ............................................................................................................................. 9

*S. California Edison v. U.S. Postal Serv.*, 134 F. Supp. 3d 311 (D.D.C. 2015) ........................... 8

*Smiley v. Holm*, 285 U.S. 355 (1932) ........................................................................................ 16

*Striley v. U.S. Postal Serv.*, No. 16-07233, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017)............... 8

*Teamsters Local Union No. 455 v. NLRB*, 765 F.3d 1198 (10th Cir. 2014)................................. 10

*Vill. of Niles v. U.S. Postal Serv.*, No. 84-10102, 1985 WL 2900 (N.D. Ill. Sept. 30, 1985)......... 9

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ................................................ 15

*Zschering v. Miller*, 389 U.S. 429 (1968) .................................................................... 15

**Constitutional Provisions**

U.S. CONST., art. I, § 8, cl. 3 ................................................................................ 17

U.S. CONST., art. II, § 2, cl. 2 ............................................................................... 17

**Statutes**

39 U.S.C. § 101(5) ........................................................................................... 11

39 U.S.C. § 3652(a)(2)(B)(i) ................................................................................ 11

39 U.S.C. § 3661(b) ..................................................................................... 10, 11

39 U.S.C. § 3662(a) ....................................................................................... 5, 7

39 U.S.C. § 3662(b)(1) ....................................................................................... 9

39 U.S.C. § 3662(c) .......................................................................................... 7

39 U.S.C. § 401(2) ........................................................................................... 6

**Other Authorities**

39 C.F.R. pts. 121 & 122 .................................................................................... 4

Order Denying Defs.' Motion for Reconsideration, *Colorado v. DeJoy*, No. 20-2768 (D. Colo. Sept. 14, 2020) (ECF No. 21) ........................................................................ 17

*Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020) ........................................... 2, 4

Postal Regulatory Comm'n, *Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services*, Docket No. 2006-1 (Dec. 12, 2006) ...................................... 15, 16

Postal Regulatory Comm'n, *Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches*, Docket No. N2009-1 (Mar. 10, 2010) ................................ 14

Postal Regulatory Comm'n, *Advisory Opinion on Elimination of Saturday Delivery*, Docket No. N2010-1 (Mar. 24, 2011).................................................................... 16

Postal Regulatory Comm'n, *Advisory Opinion on Retail Access Optimization Initiative*, Docket No. N2011-1 (Dec. 23, 2011) .................................................................................. 15

Temporary Restraining Order, *Colorado v. DeJoy*, No. 20-2768 (D. Colo. Sept. 12, 2020) (ECF No. 11) ....................................................................................................... 5, 17, 18

USPS, *Congressional Briefing: Transportation & Service Performance Updates* (Aug. 31, 2020) ...................................................................................................................... 4, 14

**ARGUMENT**

In the middle of a global pandemic, and on the eve of an election in which more Americans will vote by mail than ever before, Defendants imprudently changed critical aspects of their operations, without adequate prior analysis. The result was predictable: mail has been delayed, often for significant periods of time. These delays have already harmed the Plaintiff States and will continue to do so. Plaintiff States' ability to conduct essential functions have been impaired, and the States' elections will be too unless these changes are rescinded or enjoined. Given the stakes in this case, Plaintiffs' request for injunctive relief is quite modest.

Defendants argue that there is no basis for this Court to enjoin them. But to do so, they present facts that are contradicted by their own documents and sworn statements. Indeed, in supplemental declarations filed this evening, Defendants admit that material factual statements previously presented to this Court are false. Suppl. Cintron Decl (ECF No. 46-1); Suppl. Curtis Decl. (ECF No. 46-2). Defendants' legal arguments fare no better. Having acted outside the scope of their authority by failing to go before the Postal Regulatory Commission prior to making these changes, Defendants cannot now hide behind that Commission in contending that their actions are immune from review by this Court. Defendants' policy changes were unlawful, and they have caused and will continue to cause injury to the States and their residents. The States' motion should be granted.

I.     **This Court Has Jurisdiction**

    A.     **Plaintiffs Have Standing**

Defendants' brief, statements, and own documents confirm that Plaintiffs have satisfied each aspect of Article III standing.

Postmaster General DeJoy, by his own admission, has undertaken a "transformative initiative," focused in particular on reducing the number of late and extra trips. *See Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020) (Ex. 13).[1] That initiative began as soon as Postmaster General DeJoy took on his current rule. *Id.* Defendants' brief confirms that Postmaster General DeJoy changed the status quo for how rigidly employees must adhere to transportation schedules. Defs.' Response to Pls.' Motion for a Preliminary Inj. ("Defs.' Opp'n") at 14-15, 23-24, 32 (ECF No. 37). In connection with this effort, in July 2020, Robert Cintron, the Postal Service's Vice President of Logistics, developed new guidelines governing late and extra trips following meetings with Postmaster General DeJoy. Cintron Decl. ¶¶ 23-24 (ECF 37-1); *see also* Defs.' Opp'n at 18.

Two separate internal documents further corroborate the sweeping changes that were implemented as part of this initiative. *Mandatory Stand-Up Talk: All Employees* (July 10, 2020) ("Mandatory Stand-Up Talk) (Ex. 1); PowerPoint presentation, *PMGs Expectations and Plans* (July 2020) (Ex. 2). The Power Point presentation attributes several statements directly to the "PMG"—Postmaster General—himself. *PMGs Expectations and Plans* (July 2020). In their opposition, Defendants discredited these two documents as "prepared by a mid-level manager, and distributed locally," Defs.' Opp'n at 18 n.6, 22, but now admit that at least the Mandatory Stand-Up Talk reflects statements made by "members of Headquarters" during a July 10 teleconference with Area Vice Presidents. Suppl. Cintron Decl. ¶ 3; Suppl. Curtis Decl. ¶ 3.

Defendants' belated correction of the record explains why two Postal Service managers—including one Vice President at the area level, *see* Suppl. Cintron Decl. ¶ 2 (stating

---

[1] Exhibits 1-46 were attached to Plaintiffs' Motion for a Preliminary Injunction. *See* ECF Nos. 18-3, 18-4, and 18-5. Exhibits 47-53 are attached to this reply.

that the Mandatory Stand-Up Talk "was prepared by the then-Area Vice President [] for what was then the Southern Area and his team")—both decided to issue remarkably similar directives that abruptly upended decades of Postal Service practice about late and extra trips, when letter carriers must start and stop performing their routes, and when overtime can be approved, *see* Gibson Decl. ¶¶ 15-16 (Ex. 26); Cassel Decl. ¶¶ 26-36 (Ex. 47); Dickey Decl. ¶¶ 15-18, 26 (Ex. 50); *see also* Goldway Decl. ¶ 29 (Ex. 52) (explaining that "Postal Service operations have traditionally had a certain amount of flexibility to ensure that mail will be delivered in accordance with the service standards"). It also begins to explain how similar directives were given to Postal Service employees across the country. *E.g.*, Gibson Decl. ¶¶ 14-16 (Philadelphia); Dickey Decl. ¶¶ 19-25 (Pittsburgh); *see also, e.g.*, Coradi Decl. ¶ 8, *New York v. Trump*, No. 20-2340 (S.D.N.Y. Sept. 2, 2020) (ECF No. 12-34) (Ex. 49) (declaration from union officer in New York stating that his members have been "prohibited from making late trips and extra trips even if waiting just a few minutes would ensure timely delivery to entire communities" and "instructed to leave behind mail that is ready for delivery"); Cogan Decl. ¶¶ 12-13, *Washington v. Trump*, No. 20-3127 (E.D. Wa. Sept. 9, 2020) (ECF No. 54-2) (Ex. 48) (declaration from postal worker in Oregon stating that "[o]ne of the recent changes to the way mail is processed in Oregon is that trucks travelling between stations and processing centers must now depart their origin facility by a set time each day, without exception").

In short, Defendants argument that Plaintiffs do not have standing because "the vast majority of the purported changes [challenged by Plaintiffs] pre-date PMG DeJoy's tenure, or simply never existed," Defs.' Opp'n as 23, is belied by the record.

As with the existence of changes, Postmaster General DeJoy has acknowledged that the changes "had unintended consequences that impacted [the Postal Service's] overall service

levels"—i.e., the changes led to delays in mail delivery. *See Path Forward: PMG Addresses Restructuring*. Cintron and the Defendants' brief confirm the same. Cintron Decl. ¶ 26; Defs.' Opp'n at 23-24. This is consistent with nationwide experience. Pls.' Mem. in Support of Motion for Preliminary Inj. ("Pls. Mem.") at 41-42 (ECF No. 18-1). Defendants' own data also links their changes to delays in the mail. From the onset of the current pandemic, the Postal Service had been able to meet service standards for First-Class Mail and Marketing Mail, respectively, at rates consistently above, or at, 90%. USPS, *Congressional Briefing: Transportation & Service Performance Updates* (Aug. 31, 2020) (Ex. 16).[2] In the weeks after the July operational changes, the Postal Service met service standards for those two classes of mail only slightly better than 80% of the time. *Id.* Here, too, the evidence defeats Defendants' argument that "there is no indication that [the] delays were primarily caused by the USPS policy changes." Defs.' Opp'n at 23.

Defendants contend that, whatever harm they have already caused is irrelevant because it might not continue into the future. Defs.' Opp'n at 23-24. But while Defendants make much of having suspended a series of recent operational activities that have little to do with this case, Defs.' Opp'n at 14, 16, 17, 21, 22, they admit that they have not suspended the primary operational policy at issue in this case—the one admitted to have caused delays, Defs.' Opp'n at 14-15. And Defendants do not claim the deficiencies in service have been corrected. Rather, the

---

[2] "Service standards" are "the official timeliness goal for delivering mail after receiving it from the customer." Goldway Decl. ¶ 12. The Postal Service issues regulations in consultation with the Postal Regulatory Commission that set service standards for all market-dominant mail, i.e., mail over which the Postal Service exercises a monopoly. *See* 39 C.F.R. pts. 121 & 122. The Postal Service also measures and reports on "service performance," which "measures reliability: how often the Postal Service accomplishes its service standard." Goldway Decl. ¶ 14. A service performance of 95% means that the Postal Service meets its service standard 95% of the time.

best they can argue is that service is improving from its worst levels, Defs.' Opp'n at 19, which, even if accepted as true, does not negate the States' injuries.

The ongoing delays caused by Defendants' recent changes have been harmful to the States and their residents, as documented in detail in the declarations attached to the States' motion. And the harm those delays has caused the States is not speculative. To take just one example, declarants from Pennsylvania and California both explained how delays in the delivery of hearing notices, decisions, or related documents have harmed complainants and otherwise had adverse consequences for the administration of each state's system of unemployment compensation. O'Brien Decl. ¶ 27 (Ex. 39) (listing specific delays in July and August and the consequences of each); Knox Decl. ¶ 10 (Ex. 33) ("Of the 42 scheduled hearings [for August 20, 2020], 32 decisions were issued based on the non-appearance of a party. As of August 25, parties in 11 of these matters have contacted CUIAB to advise that their non-appearance was due to receiving the notice of hearing on the day of, or following the hearing."). While Defendants also argue there is no reason to conclude that these problems will affect the delivery of Election Mail in light of the USPS's "enormous efforts" in this area, Defs.' Opp'n at 24, within the last week, they were found to have sent inaccurate postcards across the country regarding how to use the Postal Service to vote, *see* Temporary Restraining Order, *Colorado v. DeJoy*, No. 20-2768 (D. Colo. Sept. 12, 2020) (ECF No. 11).

The harms Plaintiff States have endured because of Defendants' recent changes are actual, concrete, and they are documented with specificity in the States' declarations.

### B.    Section 3662 Does Not Divest this Court of Jurisdiction

Anyone who "believes the Postal Service is not operating in conformance with the requirements of the provisions of sections 101(d), 401(2), 403(c), 404a, or 601, or [Chapter 36 of

Title 39] . . . may lodge a complaint with the Postal Regulatory Commission in such form and manner as the Commission may prescribe." 39 U.S.C. § 3662(a). Section 3662, which was most recently amended in 2006, is intended to allow the Commission to "'respond[] to complaints of pricing, service, or other actions by [USPS] in violation of law,' such as by 'adjust[ing] the rates of [c]ompetitive products to lawful levels if they are set below attributable costs.'" *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 220 F. Supp. 3d 27, 32 (D.D.C. 2016) (quoting H.R. Rep. 109–66, at 52).

By its text, section 3662 applies only when the Postal Service is alleged to have violated an enumerated statutory provision. But here, Plaintiffs argue that the Postal Service acted, first, beyond its powers, and, second, unconstitutionally, meaning section 3662 does not apply. Consistent with section 3662's limits, courts have ruled that Congress did not intend for the Commission to hear constitutional claims. *See, e.g.*, *Anatol Zukerman*, 220 F. Supp. 3d at 32 (ruling that Congress did not intend for Commission to adjudicate constitutional claims); *City & Cnty. of San Francisco v. U.S. Postal Serv.*, No. 09-01964, 2009 WL 3756005, at *3 (N.D. Cal. Nov. 5, 2009) (same). And just as a constitutional claim is outside section 3662's parameters, so too is a claim of an ultra vires act, which rests on an assertion that an agency acted beyond the authority delegated to it by Congress.

Even if Plaintiff States' claim that the Postal Service acted ultra vires is reconceived as a claim that the Postal Service violated section 3661, section 3662 still would not apply. At their core, the statutory provisions identified in section 3662 govern service standards. *Anatol Zukerman*, 220 F. Supp. 3d at 31 ("Aside from a provision permitting USPS to promulgate regulations, *see* 39 U.S.C. § 401(2), all of these provisions expressly govern "postal rates and service standards."). Consequently, section 3662 has been properly interpreted as providing an

6

administrative forum for *service-related* complaints. That is true of every single case that Defendants cite. *See* Defs.' Opp'n at 26-27. Plaintiffs ask the Court to addresses whether the Postal Service made a policy change outside their statutory authority, not whether a specific service decision was improper.

Two additional aspects of section 3662 corroborate the focus on service-related complaints. First, section 3662 provides the following list of examples of the Commission's remedial authority: "[O]rdering unlawful rates to be adjusted to lawful levels, ordering the cancellation of market tests, ordering the Postal Service to discontinue providing loss-making products, or requiring the Postal Service to make up for revenue shortfalls in competitive products." 39 U.S.C. § 3662(c). Second, the administrative forum that section 3662 creates is available to anyone "who believes the Postal Service is not *operating* in conformance with" the identified statutes. 39 U.S.C. § 3662(a). Use of the gerund communicates that complaints will relate to ongoing problems, not isolated instances like whether a particular act was outside the Postal Service's authority.

Understanding section 3662 to create a venue for service-related complaints also comports with Defendants' explanation of why Congress passed section 3662 in the first place: to tap into the Commission's "deep expertise in postal matters." Defs.' Opp'n at 29. Extending section 3662 to a case like this would not tap into any expertise about postal matters. Instead, Plaintiffs would be asking the Commission for an opinion only about whether, as a statutory matter, the Defendants also needed to seek an opinion from the Commission. Because Plaintiffs' claim is not service-related, but instead is about the limits of the Postal Service's authority, section 3662—by text or by purpose—does not apply.

Even if section 3662 did apply, it creates only a permissible, rather than mandatory, alternative to judicial relief. An aggrieved person "*may* lodge a complaint with the" Commission. 39 U.S.C. § 3662(a) (emphasis added). "May" connotes that the Commission's jurisdiction, where it exists, is not exclusive. *S. California Edison v. U.S. Postal Serv.*, 134 F. Supp. 3d 311, 318 (D.D.C. 2015). True, the Eighth Circuit—in a case about inadequate service—cited legislative history as a reason to interpret "may" to instead mean "shall." *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799–800 (8th Cir. 2006); *see also Bovard v. U.S. Post Office*, 47 F.3d 1178 (table) (10th Cir. 1995). And *LeMay* has influenced other courts to likewise read "may" as used in section 3662 as a command. *See, e.g.*, *Striley v. U.S. Postal Serv.*, No. 16-07233, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017); *Foster v. Pitney Bowes Inc.*, No. 11-7303, 2012 WL 2997810, at *4 (E.D. Pa. July 23, 2012), *aff'd sub nom. Foster v. Pitney Bowes Corp.*, 549 F. App'x 982 (Fed. Cir. 2013).

Yet *LeMay*, which is not binding here, did too much with legislative history, which is meant to "clear up ambiguity, not create it." *Bostock v. Clayton Cnty,* 140 S. Ct. 1731, 1749 (2020). Moreover, the relevant legislative history suggests that section 3662 was meant to "redress a disaffected party's concerns about *postal rates and services*." *LeMay*, 450 F.3d at 800 (emphasis added). So even if legislative history could alter the meaning of "may," it makes sense to do so only in the context of service-related complaints.

The better understanding of section 3662 is that it "complements 3661, and together they form a harmonious scheme." *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263–64 (5th Cir. 1975). Section 3661 furnishes a limit on the Postal Service's authority. If, despite that limit, the Postal Service unilaterally implements nationwide changes, judicial relief is available. For more individualized concerns, section 3662 supplies an alternative administrative forum.

But even if section 3662 applies and even if it is mandatory, an exception to the exhaustion requirement still allows the claim to proceed in this Court. Failure to exhaust administrative remedies is excusable when those remedies would not adequately protect against irreparable injury. *Republic Indus., Inc. v. Cent. Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 293 (3d Cir. 1982). Failure to exhaust under section 3662 has been excused before. *See Vill. of Niles v. U.S. Postal Serv.*, No. 84-10102, 1985 WL 2900, at *6 (N.D. Ill. Sept. 30, 1985). Here, much of the harm visited upon Plaintiff States from the Postal Service's unilateral changes relates to how the States administer elections. Those harms are beginning now: North Carolina already has started mailing ballots, and other Plaintiff States will do so soon. Section 3662, however, gives the Commission 90 days to act on any complaint. 39 U.S.C. § 3662(b)(1). Because some of the injuries are tied to the election, Plaintiffs cannot afford to wait more than a few more weeks for a decision. If the Commission took all 90 days to consider any complaint, the election would be over by the time of resolution. And if the Commission ruled more swiftly, but against the Plaintiff States, it is unlikely the Plaintiff States could seek judicial relief in time to remedy the election-related harms. So Plaintiff States cannot rely on any administrative remedy to prevent irreparable harm.

## II.     All Factors Favor Granting a Preliminary Injunction

### A.     Plaintiffs Are Likely to Succeed on Merits

#### 1.     Recent Changes to Postal Service are Ultra Vires

The Third Circuit, like other circuits, disfavors shielding claims of ultra vires agency action from judicial review. *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 600 (3d Cir. 2016) (ruling that party did not forfeit claim of ultra vires agency action because such claims should not be insulated from judicial review); *Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 916

(3d Cir. 1981) ("Although the courts will respect authorized agency action, an assumption of jurisdiction or action that is ultra vires and beyond the scope of the delegated authority will be set aside.") (internal citation omitted); *see also Teamsters Local Union No. 455 v. NLRB*, 765 F.3d 1198, 1201 (10th Cir. 2014) ("[I]t would be passing strange for an ultra vires agency action to be better insulated from judicial review than one issued under lawful authority."); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172 (D.C. Cir. 2003) ("[J]udicial review is favored when an agency is charged with acting beyond its authority.") (internal citation omitted). Nevertheless, Defendants cite *National Air Traffic Controllers Association AFL-CIO v. Federal Service Impasses Panel*, 437 F.3d 1256 (D.C. Cir 2006), to suggest that the ultra vires acts of the Postal Service are beyond this Court's review. *See* Defs.' Opp'n at 30. But the D.C. Circuit has said time and again that courts may consider claims that the Postal Service has acted ultra vires. *See* Pls.' Mem. at 29. So has the Sixth Circuit. *See Combined Commc'ns Corp. v. U.S. Postal Serv.*, 891 F.2d 1221, 1227-28 (6th Cir. 1989). Moreover, the reason Defendants contend there is no path forward in this Court for a claim that the Postal Service acted in excess of its authority is that Plaintiffs could take that claim to the Commission. Defs.' Opp'n at 30. As already explained, that is wrong. *See supra* Section I.B.

On the merits of Plaintiffs' claim, Defendants first resist that the operational changes made in July 2020 are changes for the purposes of section 3661. Defs.' Opp'n at 32. The factual record establishing that Defendants, in July, changed decades of its transportation and delivery practices by restricting when Postal Service employees may make late or extra trips, when letter carriers must start and stop performing their routes, and when overtime can be approved, is compelling. *See supra* Section I.A. Indeed, the supplemental declaration from Cintron undermines Defendants' claim that there was just one "notable change." *Compare* Defs.' Opp'n

at 32, *with* Supp. Cintron Decl. ¶ 3 (admitting that there was a conference call between Postal Service Headquarters and area Vice Presidents on July 10 that led to the Mandatory Stand-Up Talk). The evidence of a change, even prior to the completion of discovery, far surpasses the "reasonable probability" standard needed at the preliminary injunction stage. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).

Apart from whether the Postal Service made any changes, Defendants argue that if their changes to late and extra trips, overtime, and letter carrier start and stop times must go before the Commission, so too would "any managerial change," such as "upgrading [their] IT or truck routing systems." Defs.' Opp'n at 32. Defendants' argument ignores that their authority is limited only when three independent conditions are all met. The second of those conditions is that the change must be "in the nature of postal services," 39 U.S.C. § 3661(b), which involves a qualitative assessment of the change, *see Buchanan*, 508 F.2d at 262-63. The statute defines "postal services" to be "*the delivery of letters*, printed matter, or mailable packages, including acceptance, collection, sorting, *transportation*, or other functions ancillary thereto." 39 U.S.C. § 101(5) (emphases added). Upgrading an IT or routing system is not a change in the nature of postal services; prioritizing rigid adherence to departure and return deadlines at the expense of the Postal Service's longstanding practice and commitment to transport and deliver every piece of mail, every day, is. The third is that the change must "affect *service* on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b) (emphasis added). "Service" refers to the universal and reliable delivery of market-dominant mail products within a certain number of days. 39 U.S.C. § 3691 (objectives of service standards include assuring customers of "delivery reliability, speed and frequency" and "regular and effective access to postal services in all communities"); *id.* § 3652(a)(2)(B)(i); *see also supra* note 2.

Not all changes will be in the nature of postal services and affect service on at least a substantially nationwide basis. The July operational changes do, which Defendants do not contest. Rather, Defendants admit that the July operational changes caused a "decline in service performance" across the country, Defs. Opp'n at 18, and service performance is still below pre-July levels, *see USPS, Congressional Briefing: Transportation & Service Performance Updates*.

Defendant' assert that the Postal Service must take only "substantial, formal changes," such as "changes to postal facility hours or service standards for mail delivery," to the Commission. Defs.' Opp'n at 34-35. That writes words into the statute that do not exist. *See* Goldway Decl. ¶ 35.

Defendants also misconstrue prior Commission opinions. For example, Defendants take out of context language from a 2010 Advisory Opinion. Defs.' Opp'n at 34. The Commission did state that the "change in the nature of postal services broadly can be defined as changes to a customer's ability to access essential postal services that require a visit to a postal retail facility"—but in the context of describing the initiative proposed by the Postal Service that prompted the advisory opinion (closing physical locations), not changes in general. Postal Regulatory Comm'n, *Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches*, Docket No. N2009-1, at 11 (Mar. 10, 2010).[3] Nor must the change be to service standards themselves to warrant an advisory opinion. For example, a 2011 Advisory Opinion reviewed proposed screening criteria intended to determine which post offices the Postal Service could close *without* impairing public access to postal services. Postal Regulatory Comm'n, *Advisory Opinion on Retail Access Optimization Initiative*, Docket No. N2011-1 (Dec. 23,

---

[3] https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.

2011).[4] And in a 2006 Advisory Opinion addressing proposed network and transportation changes, the Postal Service "explicitly disclaim[ed] any intention to change currently-established service standards as part of its proposal." Postal Regulatory Comm'n, *Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services*, Docket No. 2006-1, at 15 (Dec. 12, 2006) ("2006 Advisory Opinion").[5]

At bottom, the purpose of section 3661(b) is to ensure that the Postal Service complies with section 3661(a), which requires the "develop[ment] and promot[ion] of adequate and efficient postal services." As the Commission itself has stated, its role is to "appraise the Service's stated goals in light of the Postal Reorganization Act's policy declarations, and to assess the apparent soundness of all the methods it intends to use in achieving those goals." 2006 Advisory Opinion at 13; *see also id.* (quoting Postal Regulatory Comm'n, Docket No. 1975-1, at 33-34 (Apr. 22, 1976) (in first advisory opinion, stating that Commission should "focus on two questions: (1) whether the program conforms, in terms of its stated objectives, to the policies of § 3661 and the remainder of title 39; and (2) whether the methodology employed in the program is sufficiently sound to enable the program to meet those objectives.")). Input from a body of experts is especially important when the effects of a Postal Service proposal "on the postal system cannot be known in advance." *Id.* at 13. And advisory opinions from the Commission are able to identify errors, unanticipated effects, and unconsidered factors that help guide the Postal Service in fulfilling its statutory obligations to the public. *E.g.*, Postal Regulatory Comm'n, *Advisory Opinion on Elimination of Saturday Delivery*, Docket No. N2010-1 (Mar. 24, 2011) (finding that Postal Service proposal overstated cost savings by $1.4 billion, would cause net

---

[4] https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf.
[5] https://www.prc.gov/docs/55/55431/N2006-1AdvDec.pdf.

revenue losses of $0.6 billion, would cause 25 percent of all First-Class and Priority mail to be delayed, and failed to consider the impact on rural communities).

With respect to Election Mail, Plaintiffs welcome Defendants' commitment to "expeditiously deliver Election Mail in the upcoming election" and undertake efforts that "exceed[] what the agency has done in the past." Defs.' Opp'n at 33. But other actions by Defendants continue to raise questions about this commitment. In the past few days, Defendants sent to "every American residential mailing and P.O. box" a postcard about mail-in voting that contains factually inaccurate information for voters in some states. Suppl. Padilla Decl. Exs. A & C (Ex. 53). For example, the postcard states: "Request your mail-in ballot (often called 'absentee' ballot) at least 15 days before Election Day," even though every active, registered voter in California and the District of Columbia will be mailed ballots automatically. Suppl. Padilla Decl. ¶¶ 6-7 & Ex. C; Miller Decl. ¶ 7 (Ex. 37). For the remaining Plaintiff States, the postcard is still misleading because voters may request a ballot less than 15 days before Election Day. *See, e.g.,* Suppl. Dunlap Decl. ¶ 5 (Ex. 51). Therefore, the mailer gives "voters false and misleading instructions about how they should vote." Temporary Restraining Order at 4, *Colorado v. DeJoy*, No. 20-2768 (D. Colo. Sept. 12, 2020) (ECF No. 11).

### 2.    Recent Changes to Postal Service are Unconstitutional

In some respects, the constitutional issues in this case are novel. Executive branch agencies do not commonly interfere with the administration of elections by States. Therefore, as Defendants note, courts have not before been asked to consider the circumstances under which federal executive branch interference violates the Constitution's Elections Clause. In other respects, the constitutional issues in this case are far more familiar. Different governmental bodies possess different powers under the Constitution, and courts must police when the acts of

one government body travel too far into space reserved for another. The need to police those boundaries animated the Supreme Court's decision in both *Zschering v. Miller*, 389 U.S. 429 (1968) and *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015). And States may "assert their own constitutional claims related to [State] authority under the Elections Clause to determine the 'Times, Places and Manner of holding Elections.'" Order Denying Defs.' Motion for Reconsideration at 5, *Colorado v. DeJoy*, No. 20-2768 (D. Colo. Sept. 14, 2020) (ECF No. 21).

Without the Court enforcing the constitutional assignment of powers, Plaintiff States' authority to administer their own elections will not be protected. Defendants have taken affirmative acts beyond their authority that significantly interfere with Plaintiff States' administration of elections. Pls.' Mem. at 37-38, 46-49. Even since Plaintiffs filed the motion for a preliminary injunction, Defendants have taken additional actions to interfere with the administration of elections. As discussed above, they have sent to every address a postcard with information that is misleading at best and wrong at worst. *See* Suppl. Padilla Decl. ¶ 7 & Exs. A & C; Miller Decl. ¶ 7. California and the District of Columbia in particular are similar to Colorado, in which a district court just enjoined the further delivery of the postcards because disseminating "patently false information regarding Colorado elections jeopardizes Colorado's constitutional right to establish the 'Times, Places and Manner of holding elections.'" Temporary Restraining Order at 3, *Colorado v. DeJoy*, No. 20-2768 (D. Colo. Sept. 12, 2020) (ECF No. 11). Because Defendants' interference with Plaintiff States' administration of elections is pervasive rather than merely incidental, this case is much like *Zschering*. And evidence suggests that those interfering acts, which are independently unlawful, *see supra* Section II.A.1, were carried out for that purpose, *see* Pls.' Mem. at 21-23, 39-41. This combination of circumstances—and not, as

15

Defendants intimate, the failure to run the Postal Service as Plaintiffs prefer, *see* Defs.' Opp'n at 38—makes Defendants' challenged acts unconstitutional under the Elections Clauses.

That States may protect a constitutional interest against undue interference does not mean States can manipulate federal agencies at their whim or challenge any Postal Service delay. The dearth of examples of States suing the federal government under these constitutional provisions is enough to dispel that concern. Moreover, the negative inference of Defendants' argument— that States are powerless to defend against an invasion of constitutional authority—is untenable. If that were right, the Postal Service could, for example, choose to stop delivering mail received from select zip codes the week before an election for patently pretextual purposes and the States could do nothing about it.

Finally, Defendants argue that two Supreme Court cases that Plaintiffs cite reflect the Supreme Court's tolerance for one arm of government interfering with the exclusive powers of another. First, Defendants contend that *Smiley v. Holm*, 285 U.S. 355 (1932) stands for the proposition that third parties—in that a case governor—may negate a State legislature's exercise of authority under the "time, place, and manner" clause. Defs.' Opp'n at 37-38. But Defendants miss the point of *Smiley*. The question there was the meaning of "Legislature" as used in that clause. *Smiley*, 285 U.S. at 365. The Supreme Court answered that "Legislature" does not mean a State's legislative body, but instead means a State's legislative process. *Id.* at 367. Minnesota, where the case originated, included the governor's right to veto as part of the law-making process. So, rather than an external force that acted upon Minnesota's exercise of constitutional power, the veto was a permissible *part of* the exercise of State power.

Similarly, Defendants note that in *Zivotofsky* the Supreme Court held that a law allowing United States citizens born in Jerusalem to list Israel as their birth place infringed upon the

President's exclusive power to recognize foreign states, but that at the same time the Court wrote that Congress may take measures that indirectly make a President's recognition decision hollow. Defs.' Opp'n at 42-43 (citing *Zivotofsky*, 576 U.S. at 16, 30). While much of the separation of powers principles present in *Zivotofsky*, and in *Zshering* for that matter, translate to this context, Defendants' implication that indirectly interfering with State election administration is permissible does not. For one, the congressional acts which the Supreme Court identified as potentially weakening the President's exclusive authority over recognition—failing to confirm ambassadors, refusing to ratify treaties, or restricting trade—are constitutional powers themselves. U.S. CONST., art. I, § 8, cl. 3 (foreign commerce); U.S. CONST., art. II, § 2, cl. 2 (ambassadors and treaties). So Congress's ability to limit the potency of the recognition power is a feature of the Constitution's assignment of powers. But the Constitution confers no authority on the Postal Service, or any arm of the executive branch, to regulate elections. Worse, the Postal Service's acts here not only lack a direct constitutional foundation, they lack *any* foundation. *See supra* Section II.A.1. Voting is a fundamental right, and the exercise of that right must be guarded from interference, direct or indirect.

The executive branch of the federal government may not significantly disrupt how States have regulated the time, place, and manner of administering elections through acts that, independent of constitutional concerns, have no lawful basis. That is especially so when circumstances suggest those acts were taken for that purpose.

### B.    Without Preliminary Relief, Plaintiff States Will Suffer Irreparable Injury

Defendants do not respond to the catalog of ongoing harms to Plaintiff States' essential operations documented in Plaintiffs' Motion for a Preliminary Injunction and accompanying declarations. *See* Pls.' Mem. at 42-45. They do, however, dispute that their recent changed have

*caused* any of Plaintiffs injuries Defs.' Opp'n at 43-44. This argument is really a restatement of their challenge to Plaintiffs' standing, and by Defendants' own admissions is wrong in any regard. *See supra* Section I.A.

Next, Defendants maintain that Plaintiffs' administration of elections will not be harmed so long as all voters mail their ballots at a reasonable time for the election, and that any assumption that voters will act otherwise is speculative. Defs.' Opp'n at 44. Yet experience during the only comparable election—the 2020 primaries—shows that many voters do wait until closer to the election to cast their ballot. In Pennsylvania's primary, for example, more than 500,000 ballots were returned during the final week. Mark Decl. ¶ 27 (Ex. 35). And by Defendants' theory, Plaintiffs' injuries will accrue only after the election, at which point it will be too late to do anything about them. Plus, Defendants take an overly narrow view of the harm to Plaintiff States' elections. During a pandemic, the ability to vote by mail may be the only safe option for many. *See* Bluestein Decl. ¶ 9 (Ex. 22); Dunlap Decl. ¶ 9 (Ex. 23). But Defendants' changes are already causing voters to doubt that voting by mail is a reliable option. Bell Decl. ¶ 19 (Ex. 21); Dunlap Decl. ¶ 18; Freitag Decl. ¶ 10 (Ex. 25); Jones Decl. ¶¶ 27-30 (Ex. 30); Marks Decl. ¶ 25; Mayer Decl. ¶¶ 27-36 (Ex. 36); Padilla Decl. ¶ 20 (Ex. 40); Weber ¶¶ 28-33 (Ex. 44). The Postal Service's recent election postcard only compounds the problem. Within days of the postcard going out, California's Secretary of State started receiving calls from confused voters. Suppl. Padilla Decl. ¶¶ 4-5. And Plaintiff States have incurred additional expenses to account for the Postal Service's recent unreliability. Albence Decl. ¶¶ 16-18, 22 (Ex. 20); Dunlap Decl. ¶¶ 19, 22; Freitag Decl. ¶ 9; Miller Decl. ¶¶ 13-16; Padilla Decl. ¶ 28.

Finally, Plaintiffs' procedural harm is real. The Commission's advisory process is designed to evaluate nationwide changes such as the ones implemented by Defendants and to

create a forum for input from interested parties, including Plaintiffs. If given the opportunity, Plaintiffs would have expressed these concerns to Defendants through the Commission, allowing Defendants to consider a better to way to target the operational concerns that ostensibly motivated the recent changes.

### C.     The Balance of the Equities and the Public Interest Favor an Injunction

Plaintiffs seek an injunction to restore the status quo before Defendants' unlawful changes caused nationwide delays in mail service. Defendants suggest that the balance of equities weighs against entering an injunction here because they are undertaking some actions to facilitate the timely delivery of election mail. *See* Defs.' Opp'n at 44. But Plaintiffs' requested injunction is not inconsistent with any of those asserted acts, which would not be precluded by any injunction. And this Court would not be "designate[d] . . . as the acting Postmaster General" by issuing an injunction. *Id.* at 45. Courts enter and enforce injunctions regularly. Here, Plaintiffs seek to restore the status quo with respect to extra trips, late trips, overtime, and for when employees may start and stop routes to relieve ongoing harms and to protect upcoming elections, not to interfere with other Postal Service activities.

## III.    The Court Can Enter an Injunction that Satisfies Rule 65

Finally, Defendants take issue with Plaintiffs' proposed injunction for lacking specificity. Defs.' Opp'n at 45. The specificity requirement of Rule 65 "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders"; in other words, "a party must 'receive fair and precisely drawn notice of what the injunction actually prohibits [or requires].'" *Hope v. Warden, York Cnty Prison*, ___ F.3d ____, No. 20-1784, 2020 WL 5001785, at *5 (3d Cir. 2020) (alteration in original) (citations omitted). Plaintiffs' proposed order would enjoin Defendants from specific actions, including enforcing the two changes at issue in this lawsuit:

(1) the July operational changes that deprive postal employees of the flexibility needed to use overtime, late trips, and extra trips to ensure that mail always continues toward its destination and (2) the departures from the longstanding priority treatment of Election Mail, and failing to ensure Election Mail is postmarked, among others. *See* Proposed Order (ECF No. 18-2). Plaintiffs' proposed order, if entered as an injunction, gives Defendants sufficient notice of what would be required to comply.

Cases that Defendants cite as instances of untenably vague requests are not comparable. In *Leonard v. Mackerth*, No. 11-7418, 2014 WL 512456 (E.D. Pa. Feb. 10, 2014), the Court could not enter injunctive relief because the law that Defendants violated was not clear enough about what was required for compliance, and so the Court could not enter a sufficiently specific injunction. *Id.* at *12. In *NAACP v. City of Philadelphia*, No. 11-6533, 2014 WL 7272410 (E.D. Pa. Dec. 19, 2014), the Court opted to enter defendants' proposed injunction rather than plaintiffs' proposed injunction because plaintiffs' version would have prohibited lawful conduct. *Id.* at *3. And in *INDECS Corp. v. Claim Doc, LLC*, No. 16-4421, 2017 WL 1086178 (D.N.J. Mar. 21, 2017), the Court ruled that plaintiffs were not entitled to an injunction, but that even if they were the court could not enter the proposed injunction because plaintiffs had proposed several vague alternatives, making it unclear what exactly the plaintiffs wanted. *Id.* at *4.

## CONCLUSION

For the reasons stated herein, the Court should grant the Plaintiffs' motion for preliminary injunction.

September 15, 2020

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania
MICHAEL J. FISCHER (Pa. Bar. No. 322311)
Chief Deputy Attorney General
AIMEE D. THOMSON (Pa. Bar. No. 326328)
RYAN B. SMITH (Pa. Bar. No. 324643)

s/ *Jacob B. Boyer*
JACOB B. BOYER (Pa. Bar. No. 324396)
Deputy Attorneys General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 768-3968
jboyer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

XAVIER BECERRA
Attorney General
State of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SUSAN SLAGER
Supervising Deputy Attorney General
MARISSA MALOUFF
ANTHONY O'BRIEN
JASLEEN SINGH
LISA C. EHRLICH
Deputy Attorneys General
Office of the Attorney General for the State of California
455 Golden Gate Avenue, Suite 11000 San Francisco, CA 94102
(415) 510-3489
Lisa.Ehrlich@doj.ca.gov
*Attorneys for Plaintiff State of California*

KATHLEEN JENNINGS
Attorney General
State of Delaware
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
JILLIAN A. LAZAR
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Vanessa.Kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
*Attorney General*
*District of Columbia*
KATHLEEN KONOPKA
Deputy Attorney General, Public Advocacy
Division
BRENDAN B. DOWNES
Assistant Attorney General, Public Advocacy
Division
Office of the Attorney General for the District
of Columbia
400 6th St. NW
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
*Attorneys for Plaintiff District of Columbia*

AARON M. FREY
Attorney General
State of Maine
SUSAN P. HERMAN
Chief Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
T (207) 626-8814
susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

MAURA HEALEY
Attorney General
Commonwealth of Massachusetts
DAVID C. KRAVITZ
Deputy State Solicitor
Office of Attorney General Maura Healey
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2427
david.kravitz@mass.gov
*Attorneys for Plaintiff Commonwealth of*
*Massachusetts*

JOSHUA H. STEIN
Attorney General
State of North Carolina
SRIPRIYA NARASIMHAN*
Deputy General Counsel
SARAH G. BOYCE*
Deputy Solicitor General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
snarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*Appearing pro hac vice (applications*
*forthcoming or pending)*

22

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 5.1.2(8)(b), I hereby certify that the foregoing has been filed

electronically and is available for viewing and downloading from the ECF system by all parties.

*s/ Jacob B. Boyer*
JACOB B. BOYER
