**Table of Contents**

| Exhibit | Document | Page |
|---|---|---|
| 47 | Declaration of Chester L. Cassel, USPS Transportation Manager (ret.) | 2 |
| 48 | Declaration of Joseph Cogan, President, Portland Oregon Area Local, APWU | 11 |
| 49 | Declaration of Peter Coradi, National Business Agent "A," New York Region, APWU | 17 |
| 50 | Declaration of Kelly Dickey, President, Local 322, NPMHU | 24 |
| 51 | Supplemental Declaration of Matthew Dunlap, Secretary of State, Maine | 31 |
| 52 | Declaration of Ruth Y. Goldway, Commissioner, Postal Regulatory Commission (1998-2015; Chair, 2009-2014) | 34 |
| 53 | Supplemental Declaration of Alex Padilla, Secretary of State, California | 45 |

# EXHIBIT 47

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

                    Plaintiffs,

            v.                                    No. 2:20-cv-4096-GAM

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

                    Defendants.

### DECLARATION OF CHESTER L. CASSEL

I, Chester L. Cassel, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and

correct:

    1.      I am a retired United States Postal Service (USPS or Postal Service) employee. I

worked for the Postal Service for 51 years in the Houston area district. I currently live in

Houston, Texas.

    2.      I started working for the Postal Service as a clerk in 1966. I became a Mail

Processing Manager in 1974 and held that role until the late 1980s. I then transitioned to in-plant

support, before becoming a Transportation Manager in 1993. I held this position until my

retirement in 2017.

3.      I submit this Declaration in support of litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4.      I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

## I.      Mail Transportation

5.      For 24 years, I worked as the Transportation Manager for the entire Houston area district. In this role, I routed mail to and from city delivery units, to and from mail processing facilities, to and from cities within Texas, and to and from cities outside Texas. I supervised the transportation of all classes of mail via truck and plane.

6.      Houston is one of the largest cities in the nation and the Houston area district is one of the major districts in the Postal Service network.

7.      The Postal Service network is a complex, integrated, and intertwined system with the mail processing plants at its core. Letter carriers and post offices clerks collect the incoming mail at delivery units (e.g., post offices), also called stations; trucks transport the incoming mail from the stations to the plant; the plant processes the mail, sorting it for further transportation or delivery; trucks and planes deliver processed mail to destinations in other cities and states for further processing; trucks ultimately deliver the processed mail to the stations, where clerks and letter carriers do any final sorting in preparation for delivery; and letter carriers deliver the processed mail on fixed routes and collect new incoming mail.

8.      To keep the cycle moving efficiently and effectively, it is important that every step in the process operate in the proper sequence.

9.      The cardinal sin in the Postal Service is leaving mail behind. In my 51 years as a Postal Service employee, the most important goal was to keep the mail moving forward in the mail stream. Throughout my career, my co-workers and I understood that our primary commitment was to deliver the mail on time as promised and in accordance with our service standards.

10.      When I started working at the Postal Service, there were five mail processing plants in the Houston area district. They were eventually consolidated into one big plant, the North Houston Processing and Distribution Center (P&DC). The North Houston P&DC is more than 1 million square feet.

11.      The Postal Service receives, processes, and delivers mail six days a week.

12.      Six days a week, trucks would make six scheduled trips from the P&DC to each station: three AM trips in the early morning with processed mail from the plant for delivery, and three PM trips during the day to collect new incoming mail from the stations and bring it back to the plant for processing.

13.      Every morning, I had to coordinate more than 350 dispatches from the P&DC to stations all across the Houston district, which is approximately 13,000 square miles.

14.      Each trip was targeted—that is, it served a specific function in the mail cycle in close coordination with the other steps in the process.

15.      The first two AM trips sent Priority mail, parcels, any other mail that was ready early, and any mail that needed to be cased (i.e., sorted by hand). This mail was sent on the first two trucks so that the mail processing clerks at the stations could have time to do the sorting before the letter carriers arrived.

16.     The final AM trip would bring all remaining mail ready for delivery that day. This primarily consisted of the First-Class and Marketing Mail that had been sorted by machines at the plant into delivery point sequence, also known as walk sequence. Mail in walk sequence does not need any additional sorting; it is in the order of the letter carrier's fixed route.

17.     First-Class and Marketing Mail in walk sequence makes up the majority of mail being delivered every day. This mail was sent on the last truck because the plant had spent the night processing it and because the letter carrier could pick it up and immediately take it to the street for delivery.

18.     I always worked to make sure that no mail ready for delivery would remain at the plant after the final AM trip.

19.     During the day, the letter carriers would deliver all the mail sent to the station that day. Letter carriers were not allowed to bring undelivered mail back to the station; a letter carrier could be removed or demoted for doing so.

20.     Before the letter carrier went on his/her route, the carrier supervisor would review the load. If there was excess volume that day, the supervisor would approve overtime so that the carrier could deliver every piece of mail that day.

21.     In the afternoon, the first two PM trips would bring back to the plant all empty equipment and any incoming mail collected at the station's mail boxes or over the counter by clerks.

22.     The final PM trip was the closeout trip: it would take to the plant all remaining mail collected by the clerks at the post offices and by letter carriers from their routes and from mail boxes.

23.     If the letter carrier arrived back at the station after the last PM truck had left, then the letter carrier would drive the incoming mail to the plant directly.

24.     No mail—either incoming mail ready for processing at the plant or processed mail ready for delivery by a carrier—was allowed to remain at the station overnight. This was a cardinal sin.

25.     There are always inevitable small delays in the mail cycle: a transportation delay caused by a malfunction or traffic; a staffing shortage that prevents the plant from having enough people to process the mail; a machine malfunction; or an unexpectedly large volume of mail. To keep the mail moving forward despite these inevitable delays, I would have to exercise discretion to make quick judgment calls.

26.     Because the cardinal sin was leaving mail behind, it was often necessary to hold trucks for a few minutes at the plant or at the station to make sure that all the day's mail was loaded on board.

27.     The Houston district is a large area; the closest station to the plant was 30 minutes away. And the North Houston P&DC is a large facility; it can sometimes take 10 or 15 minutes to move the mail from the machines to the loading docks.

28.     To keep the mail moving forward, it was always better to hold a truck for 15 minutes and have the mail be 15 minutes late, than send the truck half-full on a three-hour-long round trip, return the truck to the plant, and send the truck out again with the rest of the mail now almost five hours late.

29.     Because the Postal Service network is an integrated operation, my colleagues and I were always in regular communication with postal workers and mail handlers in the plants and with clerks and letter carriers at the stations. If a postal worker or mail handler said the processed

mail was a few minutes away from the truck, I would hold the truck. If the letter carrier was a few blocks away from the station when the truck was ready to depart back to the plant, I would hold the truck.

30.     The general rule in the Houston area district was: if the delay was less than 15 minutes, hold the truck; if the delay was 15 to 30 minutes, make a decision based on where the truck was going and other factors; and if the delay was more than 30 minutes, send the truck with an incomplete load and send an extra truck if necessary. These were discretionary calls made based on my experience, my understanding of where each truck was going, and what the circumstances were on the ground. For example, if the late mail was First-Class mail in walk sequence, and it was more than 30 minutes late due to a machine malfunction, I would send that mail in an extra trip so that it would be delivered that day as promised.

31.     The primary goal was always to keep the mail moving and leave no mail piece behind.

32.     Throughout my career, Postal Service Headquarters always pushed us to have all trips 100 percent on time. To help mitigate late and extra trips, the Postal Service had a nationwide program, Trips on Time. We were directed to make sure a certain percentage (e.g., 95% or 98%) of our trips left on time.

33.     At the same time, HQ recognized that the primary goal was to keep the mail moving and to meet our service standards. HQ also recognized that 100 percent on time was impossible to accomplish in practice.

34.     In my 24 years as a Transportation Manger, I was never prohibited from holding a truck or sending an extra trip.

35.     In my 24 years as a Transportation Manger, there was never a directive to stick to the transportation schedule no matter what.

36.     In my 51 years as a Postal Service employee, I never received a directive to leave mail behind.

**II.     Mail Processing**

37.     Before working as a Transportation Manger, I worked for nearly 15 years as a Mail Processing Supervisor at the North Houston P&DC.

38.     In this role, I supervised all aspects of mail processing: cancelling the mail, otherwise known as postmarking; sorting; sequencing; placing the mail in tracks; and readying it for dispatch on trucks.

39.     The Postal Service placed great emphasis on any political volume: mail from candidates, mail from election officials, and mail-in ballots. We would give Election Mail the highest priority, processing it as First-Class Mail.

40.     Mail processing machines are designed to give priority to Election Mail, especially ballots coming back from voters. During election season, incoming First-Class mail that was deposited in mail collection boxes, would be put through the cancelling equipment. The computers in the cancelling machine would identify the ballots and move them to special pockets. This would allow the ballots to be extracted early for quick and easy transport directly to local election officials.

//
//
//
//
//
//
//
//

Decl. of Chester Cassel                                    Case No. 20-cv-4096-GAM

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __13th__ day of September 2020

*Chester L. Cassel*

Decl. of Chester Cassel                                                    Case No. 20-cv-4096-GAM

# EXHIBIT 48

1    ROBERT W. FERGUSON
     *Attorney General*

2

3

4

5                    **UNITED STATES DISTRICT COURT**
                    **EASTERN DISTRICT OF WASHINGTON**
6                            **AT YAKIMA**

7
     STATE OF WASHINGTON, et          NO. 1:20-CV-03127
8    al.,
                                      DECLARATION OF
9                    Plaintiff,       JOSEPH COGAN

10       v.

11   DONALD J. TRUMP, et al.,

12                   Defendants.

13

14       I, Joseph Cogan, declare as follows:

15       1.      I am over the age of 18, am competent to testify as to the matters

16   herein, and make this declaration based on my personal knowledge.

17       2.      I have been a United States Postal Service (USPS) employee for

18   over 36 years. In addition to my role as a Postal Clerk for the USPS, I currently

19   serve as President of the Portland Oregon Area Local (Portland Local) of the

20   American Postal Workers Union (APWU), a role I have held since 2016. I

21   make this declaration personally and not on behalf of any organization or entity.

22

DECLARATION OF                    1            ATTORNEY GENERAL OF WASHINGTON
JOSEPH COGAN                                         Complex Litigation Division
10423341v2                                          800 5th Avenue, Suite 2000
                                                    Seattle, WA 98104-3188
                                                    (206) 464-7744

1    3.    The Portland Local represents over 1000 postal service workers in

2    more than 30 communities in Northwest Oregon, including Oregon's three most

3    populous counties.

4    4.    The USPS Distribution Center in Portland Oregon (Portland

5    Distribution Center) is one of the newest and largest mail processing facilities

6    in the United States and handles mail originating in and destined for the entire

7    Willamette Valley and a number of Oregon communities on the east side of the

8    Cascade Mountains. At this time the Portland Distribution Center operates 24

9    hours a day, seven days a week sorting mail and packages.

10    5.    I am familiar with operations in the Portland Distribution Center. I

11    worked as a Postal Clerk in the predecessor facility in Portland, and as part of

12    my duties as Union President I visit the Portland Distribution Center two or

13    three times each week.

14    6.    Portland Local represents USPS workers in multiple job classes

15    including clerks, expediters, and carriers. I regularly communicate with union

16    members employed across different job functions regarding policies, working

17    conditions, and mail volumes in the Portland Distribution Center and other

18    USPS facilities in Northwest Oregon.

19    7.    The USPS has recently made several significant changes to the

20    way it processes and delivers mail in the State of Oregon, including reducing

21

22

DECLARATION OF                    2         ATTORNEY GENERAL OF WASHINGTON
JOSEPH COGAN                                      Complex Litigation Division
                                                  800 5th Avenue, Suite 2000
10423341v2                                         Seattle, WA  98104-3188
                                                       (206) 464-7744

1  the mail sorting capacity in the Portland Distribution Center and imposing and

2  then retracting rules affecting distribution and delivery schedules.

3       8.    The Portland Distribution Center recently removed 5 out of 40

4  high capacity mail sorting machines for handling letter-sized mail (rectangular

5  mailpieces up to 6 1/8 x 11 1/2 inches). The high capacity mail sorting

6  machines handle up to 35,000 pieces of mail per hour and those removed

7  represent approximately 12% of letter-sized mail capacity in the Portland

8  Distribution Center. The Portland Distribution Center also recently removed

9  one of 1 of 4 flat sorting machines for handling magazines and large envelopes.

10  This reduced capacity makes it less likely the facility will be able to process all

11  mail prior to the departure of trucks conveying mail for delivery.

12       9.    Ballots for state, local, and national elections are of the dimensions

13  processed by high capacity mail sorting machines. Oregon conducts elections

14  by mail only. USPS in Oregon experiences noticeable increases in volume

15  associated with elections, including the distribution of ballots and voter

16  pamphlets, and the return of ballots by votes.

17       10.    Since March of 2020 package mail volume passing through the

18  Portland Distribution Center has increased to resemble the high volumes USPS

19  handles during December holidays.

20       11.    Mail routing and handling includes these common steps: a mail

21  carrier on a daily route picks up outgoing mail from various sources, including

22

DECLARATION OF                3           ATTORNEY GENERAL OF WASHINGTON
JOSEPH COGAN                             Complex Litigation Division
10423341v2                                800 5th Avenue, Suite 2000
                                         Seattle, WA 98104-3188
                                         (206) 464-7744

1    from private mailboxes and public blue boxes. When the mail carrier finishes

2    their route, they bring that outgoing mail back to the local postal station, where

3    it is put on a truck that will take it to a regional processing center in the

4    evening. At the processing center, mail is postmarked and sorted by destination.

5    Most mail to a local or in-state destination will be loaded onto a truck the next

6    morning that will take it to a station for delivery.

7         12.     One of the recent changes to the way mail is being processed in

8    Oregon is that trucks traveling between stations and processing centers must

9    now depart their origin facility by a set time each day, without exception. This

10    applies both to trucks leaving stations at the end of the day to take outgoing

11    mail to a processing center, and to trucks leaving processing centers in the

12    morning to take mail to a station for delivery.

13         13.     Previously, if a large volume of mail was nearly complete,

14    meaning being postmarked and sorted for delivery, trucks could wait to make

15    sure they got all the mail that should go to the station that day. Now, however,

16    those trucks must also leave at the set time without any exception. As a result,

17    mail that was nearly done being processed will may miss the truck entirely and

18    could sit at the facility for at least another day until it can be driven to the

19    station for delivery.

20         14.     In the past, significant changes such as removal of equipment

21    impacting mail handling capacity, or changes in policies affecting the timeliness

22

DECLARATION OF                   4             ATTORNEY GENERAL OF WASHINGTON
JOSEPH COGAN                                         Complex Litigation Division
10423341v2                                            800 5th Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                             (206) 464-7744

1   of mail delivery, were announced well ahead of their implementation. Personnel

2   that I represent at the Portland Distribution Center and postal stations in our

3   region have not been able to fully assess likely impacts to the system. These

4   changes have been announced and put into place with very little notice.

5        I declare under penalty of perjury under the laws of the State of Oregon

6   and the United States that the foregoing is true and correct.

7        DATED this __3__ day of September, 2020, at Portland, Oregon.

8

9

10   JOSEPH COGAN

11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF           5        ATTORNEY GENERAL OF WASHINGTON
JOSEPH COGAN                           Complex Litigation Division
10423341v2                             800 5th Avenue, Suite 2000
                                    Seattle, WA  98104-3188
                                     (206) 464-7744

# EXHIBIT 49

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

STATE OF NEW YORK, et al.,

                Plaintiffs,

       v.

DONALD J. TRUMP, et al.,

                Defendants.

Case No. 20 Civ. 2340

DECLARATION OF PETER CORADI

Pursuant to 28 U.S.C. § 1746(2), I, Peter Coradi, hereby declare as follows:

**Personal Background**

1.      I am over the age of eighteen and have personal knowledge of, or state upon information and belief, the facts stated herein.

2.      I am the National Business Agent "A" for the Clerk Division, New York Region of the American Postal Workers Union ("APWU"), a position I have held since November 2001. The Clerk Division is the largest division of the APWU, representing approximately 150,000 postal clerks who work in over 200 different types of roles. Clerks in these roles perform work in mail processing, bulk mail entry, retail windows, call centers, and more.

3.      As National Business Agent "A", I represent Clerk Craft employees[1] throughout the entire State of New York, as well as two large postal facilities in Northern New Jersey. As part of my duties, I represent postal employees in arbitration proceedings, grievance procedures, and labor management meetings; provide advice and guidance to local union chapters; and teach classes on a wide array of postal issues. In a typical year, these duties require me to visit postal

---

[1] Postal employees represented by the APWU's Clerk Division are referred to as "Clerk Craft" employees.

1

facilities across New York and in Northern New Jersey.

4.       I began my postal career in Brooklyn, NY on August 4, 1984 as a letter carrier.  I

soon became a "special delivery" messenger, a type of role that was subsumed into the Clerk

Craft in 1997.  I became a national officer for the APWU in November 1996, when I first

became a National Business Agent.  After retiring from the U.S. Postal Service on October 31,

2009, I continued my work with the APWU.  Today, I have 36 years of experience with the U.S.

Postal Service.

**Executive Summary**

5.       Beginning in July 2020, I became aware of recent changes in the practices and

procedures of the U.S. Postal Service after a document began to circulate among APWU

officials.  These changes included the removal of sorting machines and collection boxes,

elimination of late trips and extra trips, and workflow alterations requiring employees to leave

mail behind in facilities.  As I learned more about these changes over the following weeks, I

came to believe that these changes were decimating the longstanding practices and procedures

that have made it possible for the U.S. Postal Service to timely deliver mail to the country's 160

million addresses six days a week.  These changes are unlike any other that I have ever

experienced or observed over my 36-year career.

**Factual Background**

6.       As part of my APWU role to represent the interests of the Clerk Craft to

management, I regularly communicate with current U.S. Postal Service employees about policy

changes that may affect their work.  For the past month, I have had numerous communications

with current employees via phone, text, and email about the most recent changes.

7.       For example, APWU received notification in June 2020 of the U.S. Postal

Service's intent to remove 671 machines that sort letter and flat mail from postal facilities nationwide.  I received a copy of the notification from APWU headquarters.  In the period that followed, postal employees reported that sorting machines were being taken out of service by being dismantled, removed, scrapped, covered with a tarp, or otherwise roped off.  Collection box removals are also reported to be ongoing.  In fact, these reports have continued despite Postmaster General DeJoy's public statements in mid-August that he intended to "suspend" the removal of machines and collection boxes.  Reduced hours at postal retail units have continued to occur, as well.

8.     As part of my APWU work, I also asked local APWU chapters to provide us with more information relative to the other recent changes.  I have received reports from current U.S. Postal Service employees that they are prohibited from making late trips and extra trips even if waiting just a few minutes would ensure timely delivery to entire communities.  At the same time, postal workers report that they have been instructed to leave behind mail that is ready for delivery.

9.     I have reviewed several reports sent from postal employees throughout my jurisdiction that describe mail and packages sitting in facilities for days and weeks—far past their scheduled delivery dates.  For example, employees report astonishing amounts of delayed mail in facilities that I visited multiple times before the pandemic in Rochester, NY; Rockville Centre, NY; and Oceanside, NY.  I have never heard anything like it in my 36 years serving the U.S. Postal Service and its employees.

**Postal Operations**

10.     These reports have shocked me.  The U.S. Postal Service's policy changes and the delays they engender defy every creed and convention of the U.S. Postal Service to which I have

dedicated my life.

11.     In my experience, the most critical component to achieving the U.S. Postal Service's mission is to ensure that every single piece of First Class mail and Expedited mail[2] in a facility is sent out the same day that it is processed.  In my experience, the U.S. Postal Service prided themselves on delivering mail on time.  In fact, over the years, I have seen postal workers get fired for delaying the processing or delivery of just one or two pieces of mail.  The thought that postal employees would be leaving *thousands* of pieces of mail behind for any longer period of time was inconceivable.

12.     Delayed mail would surely occur, but in isolated incidents typically triggered by acts of God—such as blizzards or hurricanes—or emergencies like the terrorist attacks of September 11, 2001.  For the most part, only events that physically prevented employees from being able to operate trucks or open offices safely would lead to any broad effect on mail getting out for delivery.  Neither anthrax sent via mail in 2001 nor the COVID-19 pandemic in 2020 stopped U.S. Postal Service workers from doing their duty every single day.

13.     To do their duty, being flexible and responsive each day is important.  Postal employees must make daily adjustments in mail processing and delivery to account for fluctuations in mail volume, machine malfunctions, truck breakdowns, inclement weather, and— as especially relevant during the COVID-19 pandemic—health and safety concerns.  Accordingly, it has long been typical for postal drivers to depart for post offices or delivery points a short period *after* the prescribed time if needed to ensure that all the mail for that truck would be loaded before departure.

---

[2] First Class mail and Expedited mail offer delivery speeds of one to three days. In my experience, postal employees treated this mail with the utmost importance.

14.     For as long as I have been with the U.S. Postal Service and the APWU, it has also been standard practice to send trucks out on unscheduled trips when needed to ensure on-time delivery.  For postal workers, these are not "extra" trips or "late" trips—they are needed adjustments to adequately administer a system responsible for delivering over 470 million pieces of mail per day.  They are features of the postal system, not bugs.

15.     That postal employees would be prohibited from taking these "late" trips or "extra" trips is all the more astounding in light of the continuing reports of machine decommissioning.  As sorting machines are the key to the effective processing of all mail, decommissioning machines is usually rare.  Even when mail volume is down, machines are not usually removed in case other machines malfunction or—as happens during every election and holiday season—mail volume increases again.  And managers at processing facilities typically have the opportunity to negotiate if, when, and how a sorting machine is removed or decommissioned.  Often, facility managers simply turn off sorting machines on a trial basis to test whether the machine will still be necessary for operations.

16.     Together, recent policy changes regarding late trips, extra trips, and sorting machines have compounding effects on the timely delivery of all mail—not just letter mail.  With fewer sorting machines for letter mail and flat mail, postal employees must adapt the remaining machines to accommodate more volume or sort letter and flat mail manually.  These efforts take resources away from sorting other mail, such as packages.  If postal drivers are no longer allowed to make adjustments for processing delays and must leave at their prescribed time, then mail that would otherwise have been sorted gets left behind at the processing facility.  If postal employees are also prevented from making extra trips throughout the day, then postal employees cannot even begin to reduce the backlog.

17.     If postal employees are not able to make the necessary daily adjustments via late trips, extra trips, and the full fleet of sorting machines for the 2020 election season, I am deeply concerned about whether the U.S. Postal Service will be able to deliver election mail as quickly as it has in the past.  Since I began as a letter carrier in 1984, it has been standard practice to treat election mail as First Class mail with delivery times of one to three days—or better—regardless of whether it was marked as Marketing Mail, which has a delivery time of three to 10 days.  In my experience, green tags may also be utilized to identify trays and sacks of ballot mail, which helps to improve visibility of ballots as they travel through the mail stream.

18.     Given the recent U.S. Postal Service policy changes which have reduced sorting capacity and limitations on late trips and extra trips, I fear that the dedicated employees of the U.S. Postal Service will be prevented from making the necessary adjustments to accommodate potential influxes of election mail.  Election mail includes ballots, voter registration cards, absentee voting applications, and polling place notifications.  If delivery is being significantly delayed in August, which, in my experience, is when mail volume is typically lower, the risk of even more dramatic delays beginning in the fall is high.

19.     Through my many years of experience, I have never witnessed or heard about anything like the absolute chaos presently occurring within the U.S. Postal Service.  If the disastrous initiatives were immediately rescinded, there is no doubt in my mind that the chaos would abate and that U.S. Postal Service employees would be able to deliver mail in a timely, efficient, and professional manner—just as they have always done.

Executed on this 2nd day of September, 2020.

/s/ *Peter Coradi*
Peter Coradi

6

# EXHIBIT 50

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF MAINE,
COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NORTH CAROLINA,

               Plaintiffs,

               v.

LOUIS DeJOY, *in his official capacity as United States
Postmaster General*; ROBERT M. DUNCAN, *in his
official capacity as Chairman of the Postal Service
Board of Governors*; and the UNITED STATES
POSTAL SERVICE,

               Defendants.

No. 2:20-cv-4096-GAM

## <u>DECLARATION OF KELLY DICKEY</u>

I, Kelly Dickey, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and

correct:

      1.     I am the President of Local 322 ("Local 322") of the National Postal Mail

Handlers Union (NPMHU). My office is located at 841 California Avenue, Pittsburgh, PA

15212.  I also live in Pittsburgh, PA.

      2.     The NPMHU represents approximately 44,000 mail handlers, who load, unload,

prepare, sort, and containerize mail for delivery by the Postal Service.

      3.     I submit this Declaration in support of litigation filed by the Commonwealth of

Pennsylvania and several other States against the U.S. Postal Service and several of its officials.

      4.     I have personal knowledge of the facts set forth in this declaration. If called as a

witness, I could and would testify competently to the matters set forth below.

**I.      Work with the United States Postal Service & NPMHU Local 322**

5.      I began working for the United States Postal Service in 1998 as a mail handler at the Pittsburgh Processing and Distribution Center (P&DC).

6.      A P&DC is a type of mail processing facility or plant. Mail that has been collected from mail boxes and post offices is sent to mail processing facilities so that the mail can be postmarked, separated, sorted, and sequenced for further travel or for delivery.

7.      As a mail handler, I load and unload trucks, separate mail by zip code, transport mail from one part of the plant to another, and prepare mail to be put into machinery.

8.      When employed by the Postal Service, I have always been a mail handler.

9.      I began working with the NPMHU and its Local 322 in 1998; I've been President of Local 322 since 2015.

10.     In 2018, I notified the Postal Service that I would begin working full time with Local 322.

11.     Local 322 has jurisdiction over the entire area of Western Pennsylvania, including the Pittsburgh P&DC, the Pittsburgh Network Distribution Center (NDC), the Pennwood P&DC, the Greensburg Post Office, the Uniontown Post Office, and the Washington Post Office. Local 322 also covers parts of Central Pennsylvania, including the Altoona P&DC, the Johnstown P&DC, the Butler Post Office, the New Castle Post Office, the State College Post Office, as well as the Post Office in Wheeling, West Virginia.

12.     As a union officer, my job is to uphold the collective bargaining agreement. I visit the mail processing facilities on most days to speak with union members, observe working conditions, and facilitate communication between union members and USPS management. I have meetings with various postal management personnel. I perform a walkthrough of each

facility frequently and on all three shifts to obtain information from members and to observe postal operations.

13.     One of my jobs is to help solve problems that union members are facing with working conditions or demands from management. As a result, union members know to reach out to me to share their concerns and observations.

## II.     USPS Operational Changes in July 2020

14.     The Postal Service has always been committed, first and foremost, to keeping the mail moving. This commitment was engrained in the culture of the plant. As a USPS employee, I knew that I worked for the customer.

15.     The use of overtime is common in USPS because many plants have become chronically understaffed. Overtime is necessary to ensure that the Postal Service accomplishes its mission of moving every piece of mail out of the plant every day.

16.     Overtime is so common that every plant has an Overtime Desired List. Union members that want to work overtime during a certain time period sign up on the list; if the need for overtime arises, union members are selected from the list on a daily, rotating basis based on seniority. All plants also have daily overtime lists to enable union members to volunteer for overtime that day.

17.     COVID-19 has exacerbated the need for overtime. Due to the pandemic, USPS employees may be unable to work because of illness, quarantine, or child care issues.

18.     To keep the mail moving out of the plant everyday, trucks would sometimes be held back until they were at 100% or until the mail that was committed to be delivered that day was on the truck. A lot of the time, this delay wasn't long. For example, a truck scheduled to leave at 6 a.m. may be held until 6:10 a.m. so the last trays of mail could be loaded. These delays

Decl. of Kelly Dickey                                          Case No. 20-cv-4096-GAM

were necessary to ensure that all the mail ready to be delivered that day would delivered and to keep processed mail from staying in the plant unnecessarily.

19.     Since July 2020, there have been two major changes to operations at the plants in central and western Pennsylvania. I learned about these changes through my conversations with union members, observing it directly, and from reports to me from shop stewards.

20.     Based on my conversations with union members in Local 322, these changes were implemented at every facility under our jurisdiction.

21.     First, management told all employees to cease all overtime.

22.     The termination of overtime lasted for about a week. During this time, the mail stopped going out of the plant on schedule. The trucks were dispatched according to their schedule even though they hadn't been loaded with all of the mail that was committed to be delivered that day. This mail went to the dock after the truck departed and sat there until the next truck arrived. Although another truck may be scheduled later that same day, this mail would not be delivered in time because the carriers would be out delivering when the truck dropped the mail off later that day and it would sit at that post office until the next day.

23.     After about a week, management began using overtime again, but only sparingly. Management has also starting relying more on temporary employees to fill the gaps.

24.     Second, management ordered that all trucks must leave the plants at the exact scheduled time, regardless of whether the mail is ready to go or not.

25.     As a result, processed mail that is ready for delivery has been left on the docks for a day. In addition, even if another truck is scheduled to depart later in the day, the mail will not be delivered in time because the carriers would be out delivering when the truck dropped the mail off later that day and it would sit at that post office until the next day.

Decl. of Kelly Dickey                                              Case No. 20-cv-4096-GAM

26.     In my near 22 years at as a mail handler, I have never witnessed management tell USPS employees at a plant that every truck must leave on time no matter what.

**III.     Election Mail has always been given the highest priority.**

27.     During my near 22 years as a mail handler, I processed the mail through five presidential elections and five midterm elections.

28.     Throughout my career, I always witnessed Postal Service treat Election Mail with the highest priority.

29.     During every election cycle, the managers and supervisors would put everyone working at the Pittsburgh P&DC on notice: if you see any Election Mail, upgrade it to First Class and treat it as First Class. We were told to keep our eyes peeled for Election Mail coming through and work extra diligently to process Election Mail quickly.

30.     Upgrading mail to First Class means that even though the postage on the election mail may be standard rate (which has no delivery time commitment) or marketing rate (which has a 3 day commitment), we treat it as first class meaning it is to be processed that same day and delivered the next day.

31.     During election cycles, supervisors at the end of each shift would do sweep of each section to make sure that no Election Mail was overlooked or misplaced.

32.     We were told to treat Election Mail as First-Class Mail even if it was sent with Standard Mail or Marketing Mail postage.

33.     If a piece of Election Mail came through without any postage, we were told to process and deliver it with a "postage due" stamp on it.

34.     We are instructed to "upgrade" Election and Political Mail to First Class. We have never been told to upgrade any other type of mail.

35.     My co-workers and I are flabbergasted by PMG DeJoy's recent orders. It goes against everything we were ever told and against the oath we all took when we began our careers.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 4th day of September, 2020

Kelly Dickey

# EXHIBIT 51

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>                    Defendants. | No. 2:20-cv-4096-GAM |

<u>**SUPPLEMENTAL DECLARATION OF MATTHEW DUNLAP,  SECRETARY OF STATE OF MAINE**</u>

I, Matthew Dunlap, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      My name is Matthew Dunlap.  I am over the age of 21 years, have personal knowledge of the facts stated herein, and am competent to testify to the same.

2.      I currently serve as Maine's Secretary of State and have held that office continuously since January 7, 2013.  Among other duties, the Secretary of State's Office is responsible for administering state and federal elections, in accordance with Title 21-A of the Maine Revised Statutes and applicable federal election statutes.  The Elections Division within the Bureau of Corporations, Elections and Commissions is primarily responsible for carrying out those duties, under the direct supervision of Julie L. Flynn, Deputy Secretary of State for the Bureau of

Corporations, Elections, and Commissions, and Melissa Packard, Director of Elections.

3. I submit this Declaration in support of the State of Maine's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

4. I have compiled the information in the statements set forth below through my personal knowledge, through personnel in the Elections Division who have assisted me in gathering this information from our office, and on the basis of documents that have been provided to and reviewed by me.  If called as a witness, I could and would testify competently to the matters set forth below.

5. I have seen a copy of the notices that the United State Postal Service has sent. They incorrectly describe how to vote by mail in Maine because voters do not have to request mail-in ballots more than 15 days before Election Day.  The inaccurate notice is likely to cause voter confusion.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of September 2020.

/s/ Matthew Dunlap
Matthew Dunlap
Secretary of State
State of Maine

# EXHIBIT 52

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA, <br><br> Plaintiffs, <br><br> v. <br><br> LOUIS DeJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE, <br><br> Defendants. | No. 2:20-cv-4096-GAM |

## DECLARATION OF RUTH Y. GOLDWAY

I, Ruth Y. Goldway, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I served on the U.S. Postal Regulatory Commission (the "Commission"), the agency that regulates the United States Postal Service (USPS or Postal Service), from 1998 to 2015.

2.      I was first appointed to the Commission by President Bill Clinton in April 1998, and was reappointed by President George W. Bush in 2002 and 2008. In 2009, I was selected by President Barack Obama as chairwoman, a position I held until 2014. I left the Commission in November 2015.

3.      I earned a B.A. from the University of Michigan in 1965 and received an M.A. in English Literature from Wayne State University in 1969.

4.      I came to the Commission with a background in consumer protection and public service. Prior to my work on the Commission, I served as the Director of Public Affairs at California State University, Los Angeles; Mayor and Council Member of the city of Santa Monica; Assistant to the Director of California's Department of Consumer Affairs; and Manager of Public Affairs for the Getty Trust, the largest arts and education foundation in the U.S.

5.      While serving on the Commission, I helped found and co-chaired Women in Logistics and Delivery Services, an organization dedicated to promoting opportunities for women in the postal, logistics and delivery services.

6.      After leaving the Commission, I worked from 2016 to 2018 as an independent consultant to several research firms offering expertise on the Postal Service's operations to investors wanting to invest in publicly traded companies involved in the postal sector.

7.      I am now fully retired.

8.      I submit this Declaration in support of litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service.

9.      I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

I.      **The Role and Work of the Postal Regulatory Commission**

10.     The Commission is an independent agency with oversight and regulatory authority over the Postal Service. The Commission was created by Congress in 1970 as part of

the Postal Reorganization Act. Prior to 2006, the majority of the Commission's work focused on setting rate increases in response to requests from the Postal Service.

11.     After the Postal Accountability and Enhancement Act of 2006, the Commission gained expanded responsibilities. Among other things, the Commission is charged with: reviewing petitions by the public; adjudicating certain complaints against the USPS; reviewing requests by the Postal Service to close post offices, adjust rates, enter into negotiated service agreements, and make changes between market dominant and competitive products and services; assessing the financial and operational performance of the Postal Service; and ensuring that the Postal Service meets its commitments to universal service and to its service standards.

12.     A "service standard" is the official timeliness goal for delivering mail after receiving it from the customer. It is the Postal Service's public commitment to the sender and the recipient about how many days it will take a piece of mail to reach its destination. Service standards must "preserve regular and effective access to postal services in all communities, including those in rural areas or where post offices are not self-sustaining" and must "reasonably assure Postal Service customers [of] delivery reliability, speed and frequency consistent with reasonable rates and best business practices." 39 U.S.C. § 3691(b)(1)(B), (C).

13.     By law, the Postal Service must issue regulations that set the service standards for all market-dominant mail products—i.e., the mail products over which the Postal Service exercises a monopoly. *See* 39 C.F.R. pts. 121 & 122. The Postal Service establishes its service standards in consultation with the Commission. *See* 39 U.S.C. § 3691.

14.     The Postal Service must also report on the service performance of each market-dominant mail product. The service performance measures reliability: how often the Postal Service accomplishes its service standard. Service performance goals vary depending on the

class of mail, but generally the target is around 95%, which means the Postal Service delivers

that class of mail on time (*i.e.,* within the number of days set in the service standard) 95% of the

time.

15.     As part of the Commission's oversight role, the Postal Service must provide the

Commission with an annual report that measures, among other things, "the level of service

(described in terms of speed of delivery and reliability) provided." 39 U.S.C. § 3652(a)(2)(B)(i).

The Commission then issues an Annual Compliance Determination Report. 39 U.S.C. § 3653.

Among other things, the report assesses whether any of the Postal Service's service standards

were not met for the prior fiscal year.

16.     The Commission's oversight role further includes reviewing changes in postal

services that may impact service standards on a nationwide or substantially nationwide basis.

17.     The law requires the Postal Service to submit a proposal to the Commission

whenever it wants to make "a change in the nature of postal services which will generally affect

service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b).

18.     Upon receiving such a proposal, the Commission reviews the proposal, accepts

testimony and relevant factual documents, allows for discovery, submits written information

requests to the Postal Service, allows for public comment and participation, accepts written

briefs, and provides the opportunity for a hearing.

19.     The Commission ultimately issues an advisory opinion based on the evidence.

The opinion analyses the proposal, determines whether it will impact service on a nationwide or

substantially nationwide basis, assesses whether the proposal will accomplish the stated goals of

the Postal Service, and makes recommendations about whether and how the Postal Service

should proceed with the proposed change.

20.     Through its oversight and regulatory role, the Commission helps ensure that the Postal Service maintains its commitment to reliable universal service and adheres to its service standards.

21.     For example, in 2010, the Postal Service requested that the Commission review a proposal to end the Saturday delivery of mail. Postal Regulatory Comm'n, *Advisory Opinion on Elimination of Saturday Delivery*, Docket No. N2010-1 (Mar. 24, 2011).[1] The Postal Service based its proposal "on its estimate of significant cost savings, reduced overall demand for postal services, and market research that projects relatively minor volume loses in reaction to these changes." *Id.* at 1. Upon review, the Commission determined that the cost savings were overstated by more than $1 billion, would cause up to $0.6 billion in net revenue losses, and would cause almost 25 percent of all First-Class and Priority mail to be delayed for two days. *Id.* The Commission also determined that the Postal Service had failed to assess the impact its proposal would have on people living and working in rural or remote locations. *Id.* The Postal Service ultimately declined to move forward with its proposal.

22.     In 2012, the Postal Service asked the Commission to review its Mail Processing Network Rationalization (MPNR) initiative, in which the Postal Service planned to consolidate mail processing and transportation networks to better match estimated mail volume. Postal Regulatory Comm'n, *Advisory Opinion on Mail Processing Network Rationalization Service Changes*, Docket No. N2012-1 (Sept. 28, 2012).[2] As proposed, the initiative would "eliminate all overnight delivery service for single-piece First-Class Mail, and delay much of current First-Class Mail 2-day delivery to 3-day delivery." *Id.* at 1. The Commission approved of the network

---

[1] https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf.

[2] https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf.

rationalization effort in general, but presented the Postal Service with alternatives, not originally considered by the Service, that would accomplish this goal while preserving the current level of service for much of First-Class Mail. *Id.* at 45. The Commission also cautioned that benefits of moving forward as proposed would not outweigh the risks of exacerbating declining volume or harm to the Postal Service brand. *Id.* at 45. In response, the Postal Service considered the recommendations of the Commission and amended its plans so that it continued to deliver some portion of the mail on an overnight schedule until 2014, when additional changes to the network that further increased the number of days to delivery were submitted to the Commission for consideration. *See* Postal Regulatory Comm'n, *Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling*, Docket No. N2014-1 (Mar 26, 2014).[3]

23.     The Commission also provides the Postal Service with valuable analysis and guidance on how to best accomplish its goals of increased efficiency and cost-savings without impeding mail service and public access.

24.     For example, in 2011, the Postal Service asked the Commission to review its Retail Access Optimization Initiative (RAOI), which reviewed post offices and other retail outlets to determine whether they could be closed without impairing public access and postal services. Postal Regulatory Comm'n, *Advisory Opinion on Retail Access Optimization Initiative*, Docket No. N2011-1 Dec. 23, 2011).[4] Among the goals of the RAOI was to "better align postal retail facilities with demand for such facilities," to capture cost-savings from the resulting closures, and to "improve efficiency and enhance customer convenience in the provision of retail

---

[3] https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20Opinion.pdf.

[4] https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf.

Decl. of Ruth Y. Goldway                                    Case No. 20-cv-4096-GAM

services through use of alternate access." *Id.* at 40. Under the initiative, the Postal Service had

identified more than 3,650 post offices, retail annexes, stations, and branches for possible

closing. Upon review, the Commission concluded that the program was "not designed to

optimize the retail network," would negatively impact service, and would strain the Postal

Service's network and customer access. *Id.* at 1, 110-15. The Commission instead proposed

alternatives to ways the Postal Service could consider meeting its goals of aligning service with

demand. *Id.* at 64-81.

25.     In 2012, the Postal Service returned to the Commission with a revised proposal to

align postal services with demand and achieve cost savings with only limited reductions in

access and service. Postal Regulatory Comm'n, *Advisory Opinion on Post Office Structure Plan*,

Docket No. N2012-2 (Aug. 23, 2012).[5] The Postal Service proposed to "match post office retail

hours with workload" by reducing the hours of operation at more than 13,000 post offices

nationwide. *Id.* at 1. The Postal Service also proposed a "markedly improved process for

obtaining input from affected communities" before closing a post office. *Id.* at 2. The

Commission noted that the revised plan "incorporate[d] many of the recommendations the

Commission made in its RAOI Advisory Opinion." *Id.* at 5. The Commission concluded that the

new proposal was "a significant improvement over the previous Retail Access Optimization

Initiative" and "commended the Postal Service for maintaining its current retail presence,

especially in remote areas." *Id.* at 1. The advisory opinion also provided recommendations about

access, community input, revue, and staffing. *Id.* at 2.

---

[5] https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf.

Decl. of Ruth Y. Goldway                                      Case No. 20-cv-4096-GAM

26.     The Postal Service's monopoly on mail is balanced with regulatory oversight. As a regulator, one of the core functions of the Commission is to provide transparency and accountability whenever the Postal Service is making any change that could impact the reliable delivery of mail.

27.     It is important that the public knows what to expect when they entrust the Postal Service with their mail. If the Postal Service is making a change that impacts the speed or reliability of the mail, it should do so transparently and publicly.

## II.     The Postal Service's Recent Changes

28.     The longstanding ethic of the Postal Service has been "every piece, every day": mail that comes in on a certain day should go back out on the same day.

29.     Consistent with this ethic, Postal Service operations have traditionally had a certain amount of flexibility to ensure that mail will be delivered in accordance with the service standards. For example, I am aware that if the mail arrives late at a delivery unit, the local postmaster might sometimes personally deliver the mail himself to ensure that it does not remain at the delivery unit overnight. Likewise, I am aware that if the delivery unit is understaffed, the letter carrier might work a 10-hour shift to ensure that all the mail ready to be delivered that day is actually delivered.

30.     I understand that the Postal Service, at the direction of Postmaster General DeJoy, recently made changes to some of its operations with the stated goal of improving adherence to transportation schedules. My understanding is that the Postal Service attempted to accomplish this goal by reducing or eliminating flexibility with regards to overtime, late and extra trips made by Postal Service trucks, and letter carrier start and stop times.

31.     It is my opinion, based on my two decades of experience reviewing Postal Service operations, that eliminating local flexibility and requiring rigid adherence to transportation schedules would negatively impact service performance.

32.     I also understand that the Postal Service has recently removed a significant number of mail processing machines.

33.     I am also aware that the General Counsel for the Postal Service, Thomas J. Marshall, recently sent a letter to election officials that seemed to suggest the Postal Service would no longer provide extra care and attention to election-related mail, on the level of First-Class Mail, as it had in the past.

34.     Based on publicly available information, it is my understanding that following the recent operational changes, the Postal Service experienced a significant decline in service performance across the country.

35.     Changes to transportation and delivery operations that are likely to impact service performance should be presented to the Commission for an advisory opinion. In this case, the Commission could have cautioned the Postal Service that such changes would indeed negatively affect service performance and provided alternatives for how the Postal Service could meet its goal of improving on-time performance.

36.     Even if the Postal Service did not know that its changes were likely to impact service standards, it should still have reported to the Commission once it became clear that the changes were preventing the Postal Service from meeting its existing service standards.

37.     The purpose of the Commission is to provide oversight and transparency. The Postal Service has an obligation to the Commission and to the public to report in advance before making any change that will undermine the Postal Service's ability to meet its legal

commitments, including its service standards. And the Postal Service has a continuing obligation

to the Commission and the public to report on changes that have undermined the Postal Service's

ability to meet its service standards.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this 15th day of September, 2020

   /s/ Ruth Y. Goldway                   
Ruth Y. Goldway

# EXHIBIT 53

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,<br><br>Plaintiffs,<br><br>v.<br><br>LOUIS DEJOY, *in his official capacity as United States Postmaster General*; ROBERT M. DUNCAN, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,<br><br>Defendants. | No. 2:20-cv-4096-GAM |

## SUPPLEMENTAL DECLARATION OF ALEX PADILLA

I, Alex Padilla, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.       I am the Secretary of State for the State of California. I have served as Secretary of State since January 2015 following my election in November 2014. Pursuant to state law, I serve as California's chief elections official and I am responsible for enforcing California's election laws.

2.       I submit this Declaration in support of the State of California's litigation against Louis DeJoy, in his official capacity as United States Postmaster General; Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors; and the United States Postal Service (USPS).

3.      I have compiled the information in the statements set forth below through my personal knowledge, in consultation with California Secretary of State personnel who have assisted me in gathering this information from our institution, and on the basis of reports that have been provided to and reviewed by me. If called as a witness, I could and would testify competently to the matters set forth below.

4.      Beginning on or about September 11, 2020, our office began receiving calls from California voters about postcards that they have received from the USPS directing them how to vote by mail. USPS has subsequently notified our office that the mailer has already been delivered to some households and will reach every American residential mailing and P.O. Box address in the coming week.

5.      Since September 11, 2020, we have received several dozen calls from voters registered in California expressing concern and confusion about why they had received the mailer from the USPS.

6.      I have also personally received the postcard mailer notice from the USPS. The following statements are inaccurate with respect to the vote-by-mail process in California for the November 3, 2020 election:

- "Request your mail-in ballot (often called "absentee" ballot) at least 15 days before Election Day."

- "Once received, follow the instructions. Add postage to the return envelope if needed."

7.      The first statement inaccurately describes how to vote by mail in California because voters in California do not have to request mail-in ballots at any time. In response to the

COVID-19 global pandemic, California passed legislation requiring all active registered voters to be mailed a vote-by-mail ballot for the November 3, 2020 election. No application is necessary.

8.      The second statement is also inaccurate. California does not require the addition of postage/stamps to mail-in ballots. The language of this statement, however, may confuse voters into believing that such postage is required for mail-in ballots in California, or in certain circumstances, such as when the return envelope is especially bulky.

9.      These inaccuracies have created, and will continue to create, voter confusion. The misstatements in the mailer will now require our office to redirect outreach and education efforts to correct the misinformation included in the USPS mailer—resources (both financial and human) that we could have otherwise directed elsewhere.

10.     I am concerned that persons who are as yet unaware that they will be automatically mailed a mail-in ballot will attempt to contact their county election official seeking to obtain and file an application to vote by mail, thereby unnecessarily taxing county resources. It is critical that all election messages sent out, especially those with instructions about the November 3, 2020 election, not contain confusing or potentially conflicting inaccurate information.

11.     Before the USPS' mailer campaign, our office was not contacted about the postcards or provided any notice that such mailers would be sent. Had the USPS reached out to us, we would have sought to have them correct the bullet points referenced above and perhaps add other, more useful information, including, but not limited to, the ballot tracking tool our office has developed and which counties have deployed. This tool provides voters with information about when a county election official has mailed the ballot to the voter's address, and, after the voter has placed the completed ballot back in the mail, when a county elections

office has received the completed ballot. The ballot tracking tool also notifies voters if there are any issues requiring their intervention, such as a missing or mismatched signature. Information on how voters can use the ballot tracking tool would have been a much more effective use of space in the USPS mailer.

12..    Attached as Exhibit A is a true and correct copy of an e-mail sent on September 11, 2020 from Dan Bentley of the USPS to Amy Cohen, Executive Director of the National Association of State Election Directors (NASED).

13.     Attached as Exhibit B is a true and correct copy of the letter sent from Lori Augino, President of the NASED and Director of Elections for the Washington Secretary of State, to Postmaster General Louis DeJoy on September 11, 2020.

14.     Attached as Exhibit C is a true and correct copy of the postcard mailer from USPS referenced in Exhibits A and B.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of September, 2020 at Sacramento, California

_/s/ Alex Padilla_____
Alex Padilla
California Secretary of State

Decl. of Alex Padilla                                    Case No. 20-cv-4096-GAM

# EXHIBIT A

**acohen@nased.org**

| | |
|---|---|
| **From:** | Bentley, Daniel M - Washington, DC <Daniel.M.Bentley@usps.gov> |
| **Sent:** | Friday, September 11, 2020 5:59 PM |
| **To:** | acohen@nased.org |
| **Subject:** | USPS Postcard |

Good afternoon Amy,

Thank you for the call this morning and letting me know about your member concerns. Please review and share the following message with your members.

September 11, 2020

Amy Cohen
Executive Director
National Association of State Election Directors

Dear Amy:

In August, the Postal Service began to roll out a national omni-channel public information campaign in order to educate the American public about the Postal Service's role and to inform voters what to expect if they choose to use the mail to participate in the electoral process.

This educational campaign neither encourages nor discourages mail-in voting; rather, it is designed to reach and inform voters across the country about the importance of planning ahead if they plan to vote using the mail.  The campaign includes print, TV and radio ads, direct mail to residential customers, retail signage in Post Office lobbies, social media, and online resources, including the recently launched Election Mail website on usps.com.

The mail-piece – which has already been delivered to some households and will reach every American residential mailing and P.O. Box address in the coming week – is intended to provide general, common-sense information to voters throughout the nation.  It was developed with generic recommendations recognizing that each state has specific rules, deadlines and requirements.  The language is not meant as a commentary on any state's election laws or rules, but is instead intended to complement those laws and rules with general guidance on using the mail.

The main message of the mail-piece is that voters should plan ahead, educate themselves about voting  options available in their jurisdiction, and, if they choose to vote by mail, to give themselves and election officials enough time to request, receive, complete and return their ballot.

We believe the mail-piece – and other elements of the campaign – supports the Postal Service's ongoing outreach and educational efforts on how to use of the U.S. mail to participate in the electoral process, and is consistent with the organization's longstanding recommendations regarding mailing timeframes.  Earlier this month, our plans regarding campaign elements were discussed with the National Association of State Secretaries of State, and we continue to work with the nation's election officials to support their efforts to use the mail and fully educate the public on the vote-by-mail process.

We are always available to discuss these and related issues, and look forward to discussing further.

Dan Bentley

# EXHIBIT

# B

 NATIONAL ASSOCIATION of
STATE ELECTION DIRECTORS

September 11, 2020

The Honorable Louis DeJoy
Postmaster General
475 L'Enfant Plaza SW
Washington, D.C. 20260

SENT VIA EMAIL AND U.S. MAIL

Dear Postmaster DeJoy:

I am disappointed to learn that the United States Postal Service (USPS) mailed postcards to all residential addresses and post office boxes regarding voting by mail without consulting election officials on the mailing.  While I am certain the postcards were well-intentioned, they were sent to all residential and post office box addresses, a list that includes eligible but unregistered citizens, noncitizens, or other ineligible voters.  In all states but one, citizens must be registered to vote in order to request, receive, or vote a ballot.  The integrity of the vote is a responsibility that state and local election officials take seriously, yet the USPS mailing does not mention the voter registration requirement at all.

We appreciate the effort to encourage voters to plan ahead, but rules and requirements for voting by mail vary by state.  States whose residents have already received the postcard have been inundated by calls from confused voters because the recommendations do not align with their state law.  These calls distract from the critical work that state and local election officials are doing right now, including preparing mail ballots for both domestic and overseas voters, which as you are aware, are required by federal law to be mailed no later than September 19, 2020.

Like the post office, we strongly encourage voters to follow the instructions on any written materials they receive from their election officials.  We also agree that if a voter chooses to vote by mail, they should return their ballot well before Election Day and leverage other return options within seven days of the election.  Voters can recognize mail from election offices because it has the official election mail logo.

NASED members across the country report productive working relationships with their regional and in-state USPS staff, from local postmasters to election mail coordinators.  Those states with historically low percentages of votes cast by mail have worked hard to develop and strengthen those ties.  Relationships, however, go both ways, and USPS's lack of engagement with election officials on this mailing is disconcerting and disappointing going into November's historic election.



# NATIONAL ASSOCIATION of
# STATE ELECTION DIRECTORS

NASED is happy to collaborate with you and your staff on any future efforts around the upcoming election.  Please feel free to contact Amy Cohen, NASED Executive Director, at 240-801-6029 or acohen@nased.org.

Sincerely,

Lori Augino
President, National Association of State Election Directors (NASED)
Director of Elections, Office of the Washington Secretary of State

# EXHIBIT

# C

## Dear Postal Customer,

If you vote by mail, we're committed to providing you a secure, effective way to deliver your ballot. Use this checklist to prepare:

☐ Start today. Give yourself and your election officials ample time to complete the process.

☐ Rules and dates vary by state, so contact your election board to confirm. Find links at **usps.com/votinginfo**.

☐ Request your mail-in ballot (often called "absentee" ballot) at least 15 days before Election Day.

☐ Once received, follow the instructions. Add postage to the return envelope if needed.

☐ We recommend you mail your ballot at least 7 days before Election Day.

We're ready to deliver for you. Make sure you're ready, too.

## Your United States Postal Service

©2020 United States Postal Service®. All Rights Reserved.
The Eagle Logo is among the many trademarks of the U.S. Postal Service®.



475 L'Enfant Plaza SW
Washington, DC 20260

PRESORTED
FIRST-CLASS MAIL
POSTAGE & FEES PAID
USPS
PERMIT NO. G-10



MIX
Paper from
responsible sources
FSC® C101537

Please Recycle



00002

 Visit **usps.com/votinginfo**
or contact your election board.