

**U.S. Department of Justice**
Civil Division, Federal Programs Branch

Kuntal Cholera
Trial Attorney

Tel.: (202) 305-8645
E-mail: kuntal.cholera@usdoj.gov

October 14, 2020

The Honorable Gerald A. McHugh
United States District Court
Eastern District of Pennsylvania
James A. Byrne U.S. Courthouse
601 Market Street, Room 9613
Philadelphia, PA 19106

    Re:    **Plaintiffs' Request for a Court-Appointed Monitor, ECF No. 72** (*Pennsylvania v. DeJoy*, **No. 20-cv-4096**).

Dear Judge McHugh,

    Plaintiffs ask this Court to authorize what two other courts in two related cases would not: a special monitor, of uncertain authority, that will begin overseeing postal operations roughly twenty days before the November election. Plaintiffs do not attempt to justify that extraordinary request with precedent that demonstrates when such a request is appropriate. Nor do they explain why this Court is incapable of enforcing its own orders. Indeed, what is most striking about Plaintiffs' request is that it does not suggest that Defendants have failed to follow this Court's instructions. Instead, Plaintiffs effectively ask this Court to amend its preliminary injunction by imposing the most onerous sanction on the Postal Service by any court to date. This request is unnecessary and impracticable and should be denied to avoid disruption on the eve of the election.

    On October 8, 2020 and October 9, 2020, the D.C. District Court and the Southern District of New York respectively rejected requests for the appointment of a special monitor to oversee the Postal Service's compliance with the courts' preliminary injunctions. *See Richardson v. Trump*, 20-cv-2262, ECF No. 65, at 49-50 (D.D.C. Oct. 8, 2020) (a special monitor is unnecessary since there "is no history of Defendants failing to comply with Court orders, no difficult legal issues involved, and relatively few measures for Defendants to take"); *Jones v. USPS*, 20-cv-6516, ECF No. 82, at 6 (S.D.N.Y. Oct. 9, 2020) ("with the November 3 election mere weeks away," it is unlikely that "imposing an independent monitor would be helpful, let alone practicable"). Plaintiffs here waited even longer to make a similar, formal request. On October 10, 2020—the Saturday of a long weekend—Plaintiffs sent the Postal Service a note proposing a special monitor candidate, and requesting the Postal Service's position. *See* Ex. A. Plaintiffs now formally request that the Court reconsider its PI Order (ECF Nos. 63, 69) and appoint a special master roughly twenty days before the November 2020 election, with an uncertain role and uncertain responsibilities, based solely on general statistics regarding Postal Service delivery times rather than any suggestion of

illegality or noncompliance with this Court's orders. The Court should decline Plaintiffs' untimely, and unsupported, request.

"Courts will sometimes appoint a special master to oversee compliance with remedial decrees, but these cases typically involve institutions . . . where the Court could not otherwise easily ascertain whether the defendant is complying, and the master's job is limited only to observing and reporting." *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 939 F.3d 567, 589 (3d Cir. 2019). "There is no need for such an observational special master" where it is unnecessary to ensure "judicial review" of defendant's compliance with the court's order, and where the court need "not doubt the [defendant's] good faith in its efforts to comply." *Id.* And even if a court were to appoint a special monitor, it may not allow the monitor to exercise "any powers beyond the simply observational, as doing so would raise grave constitutional concerns." *Id.* Appointment of "a master shall be the exception and not the rule." *Richardson v. Trump*, 20-cv-2262, ECF No. 65, at 49-50 (D.D.C. Oct. 8, 2020) (*citing* Fed R. Civ. P. 53(a)).

Here, the appointment of a special monitor is unjustified. ***First***, the appointment of a special monitor is unnecessary for the Court to verify the Postal Service's compliance with the preliminary injunction. This Court's Order already includes measures to ensure compliance, including a provision requiring the Postal Service to identify the steps it is taking to comply with the Court's preliminary injunction, *see* ECF No. 70, and Plaintiffs provide no sound reason why the Court should "doubt the [Postal Service's] good faith in its efforts to comply." *Prometheus*, 939 F.3d at 589; *see also Advantacare Health Partners v. Access IV*, No. C 03-04496 JF, 2004 WL 1837997, at *9 (N.D. Cal. Aug. 17, 2004) ("appointment of a special master is [not] warranted" where "the Court [may] expect[]" the defendant " to address . . . compliance issues professionally and promptly"). Indeed, the Postal Service demonstrated its willingness and ability to comply with court-ordered requirements when it issued the Clarifying Operational Instructions in response to the preliminary injunction in *Washington v. Trump*, 20-cv-3127, ECF No. 81 (E.D. Wash. Sept. 17, 2020), as well as multiple additional steps it has taken to clarify and implement orders of courts nationwide.

In response, Plaintiffs make a number of arguments, none of which are relevant to the extraordinary relief they request. Plaintiffs argue, for example, that service performance levels have recently dipped. But this does not mean that the Postal Service has violated the Court's preliminary injunction. The preliminary injunction, as clarified, prevents the Postal Service from implementing certain policies (*e.g.*, any firm prohibition on late/extra trips) and requires the Postal Service to clarify its policy in certain areas (*e.g.*, that overtime is permitted when necessary to meet service performance standards). *See* ECF Nos. 63, 69. The preliminary injunction, however, does not (and cannot) require that the Postal Service maintain any particular service performance score—a requirement that, even if practicable, would be unmoored to any legal claim. As the Southern District of New York recently noted when confronted with a similar argument:

> With respect to USPS's service performance levels, the Preliminary Injunction does not require that USPS meet or maintain certain performance scores . . . The Court is not persuaded that the Government has failed to abide by [its] obligation to make a good faith effort [to comply with the preliminary injunction], particularly

> in light of the variety of issues -- such as the COVID-19 pandemic, wildfires on the west coast, and inclement weather -- which contribute to the delays and are outside of USPS's control.

Ex. B. Here, likewise, there is no indication that any recent dip in service performance levels can be attributed to the Postal Service's alleged failure to comply with the Court's preliminary injunction. As the Postal Service explained during a prior teleconference, there are alternative explanations for the performance level decline and the Postal Service immediately worked to resolve these issues. Although Plaintiffs do not accept these explanations, they offer no reason why the Court should instead assume that the Postal Service violated its Court-ordered obligations, rather than simply inferring that any number of other factors in the complex, nationwide Postal Service system may have contributed to the decline. Moreover, service performance improved for both First-Class Mail and Marketing Mail during the week of September 26, 2020. *See* ECF No. 72-3.

Plaintiffs relatedly argue that late and extra trip levels are lower than they once were. But again, there is no indication that this is a result of any alleged violation of the Court's preliminary injunction. In the Clarifying Operational Instructions, the Postal Service emphasized that "transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited." ECF No. 66-1. Likewise, in a stand-up talk relating to Election Mail, the Postal Service reiterated that "[l]ate or extra trips have not been banned; they should not be restricted if they are reasonably necessary to complete timely mail delivery." ECF No. 66-2. And as the Postal Service will certify on Friday, both before this Court and the Southern District of New York, the Postal Service plans to issue further guidance further confirming that late and extra trips are authorized when they will enable the Postal Service to meet its service performance standards.

Plaintiffs then argue that the Postal Service has "made further changes," but then refer only to one change: adoption of "Dispatch of Value minus 60" (or, "DOV-60") program whereby sorting facilities seek to ensure that mail is promptly dispatched to carrier facilities for delivery. *See Jones v. USPS*, 20-cv-6516, ECF No. 67-1 ¶ 4(a) (S.D.N.Y. Oct. 1, 2020). The Postal Service notified the Southern District of New York of DOV-60 to demonstrate the "steps" it is taking to "expedite the timely delivery of Election Mail and to improve on-time delivery of First-Class and Marketing Mail, without significant disruption to the nationwide flow of mail according to operating plans in place for over five years." *Id.* ¶ 4. The Postal Service noted that DOV-60 "does not restrict late or extra trips or restrict the window for mail processing for timely delivery of the mail," *id.* ¶ 4(a)—and Plaintiffs here do not suggest otherwise. The DOV-60 program provides no support for Plaintiffs' request for a Court-appointed monitor. To start, there is no allegation that this program violates any provision of the Court's preliminary injunction. Nor do Plaintiffs provide any evidence suggesting that the DOV-60 program is causing any decrease in service performance levels. Plaintiffs assert only that DOV-60 may have resulted in an increase of DOV unsorted mail that carriers must then sort (although Plaintiffs do not claim that carriers are unable to perform this task or that it causes any delays). Further, Plaintiffs rely solely on anecdotal evidence for this assertion, citing to complaints from certain Postal Service employees.

Accordingly, there is no indication that the Postal Service is violating the Court's preliminary injunction, and thus the extraordinary relief of a Court-appointed monitor is unnecessary. Moreover, to the extent any issues arise in the near future, the Postal Service has a process in place for reporting concerns regarding compliance with Election Mail processes. As explained in the supplemental guidance memorandum approved by the Southern District of New York:

> In the event that any . . . current Election Mail policies and practices, including the guidance in this memorandum, are not being observed, or any employee has any concern regarding [the] ability to deliver Election Mail on time, please report any such concerns as soon as possible so they can be corrected promptly. In the first instance, reports should be made to the relevant ballot ambassador. If the relevant ballot ambassador is not available or is not known, reports should be made to a relevant union representative, who can refer reports of any Election Mail concerns to ballot ambassadors on the reporter's behalf. If the individual reporting the concern is unable to reach either a ballot ambassador or union representative, the individual should contact the relevant Election Mail coordinator.

*Jones v. USPS*, 20-cv-6516, ECF No. 85-1, at 4 (S.D.N.Y. Oct. 9, 2020). Adding a new and unprecedented position now, after such guidance to the field, may create confusion.

***Second***, Plaintiffs' request for a Court-appointed monitor also raises a number of practical concerns, especially in light of the limited time remaining before the November 2020 election. Plaintiffs are requesting that the Court effectively require the Postal Service to create a new position of uncertain duties and powers. This raises a number of difficult questions, including:

- Will the monitor be compensated, and if so, out of what funding source?

- Which Postal Service systems will the monitor have access to? Will access be supervised?

- Who will the monitor's point(s) of contact be within the Postal Service for any specific inquiries?  Will the monitor be provided a staff?

- How often will the monitor communicate with those point(s) of contact? Are those points of contact obligated to prioritize work for the monitor over their other work commitments?

- Will the monitor be allowed to conduct her or his own investigations, beyond review of relevant data? Can the monitor interview any employee(s) of her or his choosing?

- By what process will the monitor report information to the Court? Will the Postal Service have an opportunity to confer with the monitor prior to any reporting?

- Will *all* Postal Service employees be permitted to communicate complaints and/or information to the monitor?

Once these questions (and others) are resolved, the Postal Service would then have to overcome the red tape involved in creating any new federal government position, and then integrate this new role into its overall structure. Invariably, questions and/or disputes may arise as the monitor performs her or his unprecedented duties, which may require judicial intervention. Critically, all of these steps would have to be taken, and related issues would have to be resolved, in time for the monitor to play any meaningful before the November 2020 election which, again, is roughly twenty days away. *See Jones v. USPS*, 20-cv-6516, ECF No. 82, at 6 (S.D.N.Y. Oct. 9, 2020) ("with the November 3 election mere weeks away," it is unlikely that "imposing an independent monitor would be helpful, let alone practicable").

These questions, and the difficulties they pose, are only magnified by the identified monitor's experience. The monitor in question spent the vast majority of his time at the Postal Service as an inspector general. *See* ECF No. 72-1, at 2. Inspectors general play a unique role in agency structures, but they are not typically involved in the day-to-day management of the agency. *See*, *e.g.*, *U.S. Dep't of Justice v. Fed. Labor Relations Auth.*, 39 F.3d 361, 369 (D.C. Cir. 1994) ("the Office of Inspector General is not within th[e] category" of "management."); 39 CFR § 230.1(j) ("Except as required by law, the Governors may not transfer to the Inspector General responsibility for performing any of the program activities of the Postal Service."). Instead, they identify instances of waste, fraud or abuse. *See* 5 USCA APP. 3 § 4. Additionally, the Postal Service still has an Inspector General Office, which maintains a website that includes information on Election Mail. *See* https://www.uspsoig.gov/election-and-political-mail. And the Inspector General Office is an independent body. *See Nigg v. U.S. Postal Serv.*, 555 F.3d 781, 787 n.3 (9th Cir. 2009) ("The [relevant] House Conference Report explains that the more general provisions in the statute relating to the postal service created an independent Office of the Inspector General ('IG') for the Postal Service."); 39 CFR § 230.1(b) ("The Inspector General reports directly to" the Board of Governors "and shall not be supervised by, nor report to, the Postmaster General and/or any designee appointed by the Postmaster General."). Plaintiffs have given this Court no reason to think that the Postal Service Inspector General Office is somehow incapable of performing its responsibilities, and that *another* inspector general needs to be added to this structure.

***Third***, and importantly, Plaintiffs were entirely dilatory in their request. Although Plaintiffs noted during an earlier teleconference that they had planned to identify a specific special monitor candidate, Plaintiffs only identified this candidate for the Postal Service on October 10, 2020 (the Saturday of a long weekend), and formally filed a request for a Court-appointed special monitor the evening of October 13, 2020 (fifteen days after the Court issued its preliminary injunction). The request, which is the most onerous request they have made of this Court so far, was not included in any briefing on the preliminary injunction, and was made only after clarification of that injunction was concluded.

Plaintiffs could have, and should have, made this request earlier; indeed, at least one plaintiff in a related case sought a court-appointed special master on August 20, 2020—nearly *two months* ago. *See Richardson v. Trump*, 20-cv-2262, ECF No. 14, at 2 (D.D.C. Aug. 20, 2020) ("Plaintiffs . . . respectfully request that this Court appoint a special master to oversee compliance with the Order."). Plaintiffs' delay is especially unjustified here since their request is based, in

- 6 -

part, on recent service performance levels which the Postal Service produced in *Jones* on October 2, 2020—*eleven* days ago. *See Jones v. USPS*, 20-cv-6516, ECF No. 68-1 (S.D.N.Y. Oct. 2, 2020). The Court should not require the Postal Service to undergo the burdens of incorporating a Court-appointed monitor into postal operations on an accelerated timetable simply because Plaintiffs dragged their feet, with an unknown potential effect on Postal Service operations.

   Accordingly, for the many reasons identified above, the Court should deny Plaintiffs' belated and unsupported request for a Court-appointed monitor.

                Respectfully submitted,

                /s/ Kuntal Cholera
                Kuntal V. Cholera

CC: All Counsel of record via ECF.