# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, and STATE OF NORTH CAROLINA,

                    Plaintiffs,

          v.

LOUIS DeJOY, *in his official capacity as United States Postmaster General*; RON A. BLOOM, *in his official capacity as Chairman of the Postal Service Board of Governors*; and the UNITED STATES POSTAL SERVICE,

                    Defendants.

**No. 2:20-cv-4096**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

ACRONYMS ................................................................................................................... viii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

I.     United States Postal Service ..................................................................................... 3

       A.     Modern Postal Services.................................................................................. 4

       B.     Postal Service Operations ............................................................................. 7

       C.     Service Standards and Service Performance................................................ 10

       D.     Postal Regulatory Commission.................................................................... 11

II.    The 2020 Operational Initiatives to Cut Costs........................................................ 12

       A.     No Late or Extra Trip Initiative .................................................................. 13

       B.     Do-It-Now Strategies to Reduce Work Hours ............................................ 24

       C.     Resulting Mail Delays ................................................................................. 30

III.   Procedural History .................................................................................................. 34

       A.     This Action................................................................................................... 34

       B.     Related Litigation......................................................................................... 37

ARGUMENT ..................................................................................................................... 38

I.     The no late and extra trip initiative exceeded the limits of the Postal Service's
       authority defined by 39 U.S.C. § 3661 (Count I)................................................... 40

       A.     The no late and extra trip initiative was a change................................... 42

       B.     The no late and extra trip initiative changed the nature of postal services. .......... 44

       C.     The no late and extra trip initiative negatively affected service nationwide. ....... 46

II.    The 2020 cost-cutting policy, effectuated by numerous operational strategies,
       violated nondiscretionary obligations established by 39 U.S.C. §§ 101 and 403
       (Count II). ............................................................................................................... 47

       A.     The Postal Service has a statutory duty to expeditiously handle important
              letter mail and provide efficient and adequate postal services. ........................ 48

       B.     By adopting and implementing the 2020 operational strategies to cut costs,
              the Postal Service violated its statutory obligations. .................................. 52

III.   The Court should order injunctive and declaratory relief. .................................... 56

       A.     The Court should enter a permanent injunction.................................... 56

       B.     The Court should order declaratory relief.............................................. 61

CONCLUSION................................................................................................................. 63

# TABLE OF AUTHORITIES

**Cases**

*Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388 (3d Cir. 2016) .............................. 39

*Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975) ................................... 36, 41, 42, 45

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 39

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201 (3d Cir. 2002) ........................................................................ 39

*Dunkin' Donuts Franchising, LLC v. Claudia I, LLC*, No. 12-2010, 2014 WL 5343724 (E.D. Pa. Oct. 20, 2014) ........................................................... 60

*Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910 (3d Cir. 1981) ...................................... 39

*Jones v. United States Postal Serv.*, 488 F. Supp. 3d 103 (S.D.N.Y. 2020) ................................ 38

*Krist v. Pearson Educ., Inc.*, 419 F. Supp. 3d 904 (E.D. Pa. 2019) ................................ 39

*Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) ...................................... 51

*N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852 (D.C. Cir. 2012) ................................ 39

*NAACP v. United States Postal Serv.*, 496 F. Supp. 3d 1 (D.D.C. 2020) .............................. 38, 41

*Nat'l Urb. League*, No. 20-2391, 2020 WL 6363959 (D. Md. Oct. 29, 2020) ............................ 41

*Ne. Pennsylvania Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424 (3d Cir. 2019) .......................................................... 57

*New York v. Trump*, 485 F. Supp. 3d 422 (S.D.N.Y. 2020) ........................................ 62

*New York v. Trump*, 490 F. Supp. 3d 225 (D.D.C. 2020) ................................... 38, 39, 41

*Norman v. Trans Union, LLC*, No.18-5225, 2020 WL 4735538 (E.D. Pa. Aug. 14, 2020) ............................................................. 51

*Pellegrino v. Transp. Sec. Admin.*, 937 F.3d 164 (3d Cir. 2019) .................................. 51

*Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833 (E.D. Pa. 2020) .............................. passim

*Pennsylvania v. DeJoy*, No. 20-4096, 2020 WL 6580462 (E.D. Pa. Oct. 9, 2020) ..................... 37

*Pennsylvania v. DeJoy*, No. 20-4096, 2020 WL 6580463 (E.D. Pa. Oct. 9, 2020) ..................... 37

*Reifer v. Westport Ins. Corp.*, 751 F.3d 129 (3d Cir. 2014) ....................................... 61

*Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260 (D.C. Cir. 2016)................................. 39

*Simler v. Conner*, 372 U.S. 221 (1963)........................................................................ 39

*TD Bank NA v. Hill*, 928 F.3d 259 (3d Cir. 2019) ........................................................ 57

*U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114 (1981) ......................... 3

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736 (2004) ..................................... 3, 4

*Vote Forward v. DeJoy*, 490 F. Supp. 3d 110 (D.D.C. 2020) ....................................... 38

*Washington v. Trump*, 487 F. Supp. 3d 976 (E.D. Wash. 2020) ............................................ 38, 41

*Zirin v. McGinnes*, 282 F.2d 113 (3d Cir. 1960) .......................................................... 39

**Constitutional Provisions**

U.S. Const., art. I, § 8, cl. 7.................................................................................... 3

**Statutes**

28 U.S.C. § 2201(a) ..................................................................................... 61, 62

Private Express Statutes (18 U.S.C. §§ 1691-99 & 39 U.S.C. §§ 601-06)............................ 10, 49

Postal Reorganization Act (PRA), Pub. L. No. 91-375, 84 Stat. 719 ............................ 4

Postal Accountability and Enhancement Act (PAEA), Pub. L. No. 109-435, 120
  Stat. 3198 (2006)................................................................................... 10

39 U.S.C. § 101 ............................................................................. passim

39 U.S.C. § 101(a) .......................................................................... passim

39 U.S.C. § 101(b) ..................................................................................... 60

39 U.S.C. § 101(e) ................................................................ 48, 50, 52, 56

39 U.S.C. § 102(5) ..................................................................... 45, 49, 52

39 U.S.C. § 201 ..................................................................................... 5

39 U.S.C. § 202(c) ..................................................................................... 6

39 U.S.C. § 203 ..................................................................................... 6

39 U.S.C. § 2803 ..................................................................................... 11

39 U.S.C. § 2804 ..................................................................................... 11

39 U.S.C. § 3621 ................................................................................................ 10, 49

39 U.S.C. § 3621(a) ................................................................................................ 10

39 U.S.C. § 3621(a)(1) ............................................................................................ 49

39 U.S.C. § 3621(b) ................................................................................................ 49

39 U.S.C. § 3622 ................................................................................................ 10, 49

39 U.S.C. § 3626 ................................................................................................ 10, 49

39 U.S.C. § 3627 ................................................................................................ 10, 49

39 U.S.C. § 3629 ................................................................................................ 10, 49

39 U.S.C. § 3631(a) ................................................................................................ 10

39 U.S.C. § 3652(a) ................................................................................................ 11

39 U.S.C. § 3652(a)(2)(B)(i) ................................................................................... 11

39 U.S.C. § 3661 ............................................................................... 40, 47, 61, 62

39 U.S.C. § 3661(b) ......................................................................................... passim

39 U.S.C. § 3661(c) ............................................................................................ 12, 41

39 U.S.C. § 3691(a) ................................................................................................ 10

39 U.S.C. § 3691(b)(1)(B) ...................................................................................... 11

39 U.S.C. § 3691(b)(1)(C) ...................................................................................... 11

39 U.S.C. § 3961(b)(1)(D) ...................................................................................... 11

39 U.S.C. § 403 ................................................................................................. passim

39 U.S.C. § 403(a) ..................................................................................... 51, 52, 56

39 U.S.C. § 403(b)(1) ................................................................................ 51, 52, 56

39 U.S.C. § 404(c) ................................................................................................... 50

39 U.S.C. § 501 ...................................................................................................... 11

39 U.S.C. § 502 ...................................................................................................... 12

Postal Reorganization Act Amendments of 1976, Pub. L. No. 94-421, § 2(b), 90
   Stat. 1303-04 (codified at 39 U.S.C. § 2401(e)(1) ............................................ 50

## Regulations

39 C.F.R. pt. 121 ......................................................................................................... 11

    39 C.F.R. § 121.1 ................................................................................................ 11

    39 C.F.R. pt. 121 app'x A ............................................................................ 11, 50

39 C.F.R. pt. 122 ......................................................................................................... 11

39 C.F.R. pt. 310 .................................................................................................. 10, 49

39 C.F.R. § 221.5(a) ..................................................................................................... 6

39 C.F.R. § 3010.140 ................................................................................................. 12

39 C.F.R. § 3010.142 ................................................................................................. 12

## Rules

Fed. R. Civ. P. 56(c) ................................................................................................... 38

Fed. R. Civ. P. 57 ....................................................................................................... 39

## Other Authorities

*Adequate*, MerriamWebster Dictionary (online) ........................................................ 52

*Adequate*, Webster's New World Dictionary (2d coll. ed. 1972) ................................ 51

Dickinson, Administrative Justice and Supremacy of Law (1927) ............................. 39

Drew Desilver, *Turnout soared in 2020 as nearly two-thirds of eligible U.S. voters cast ballots for president*, Pew Research Center (Jan. 28, 2021) ................................ 50

*Efficient*, MerriamWebster Dictionary (online) .......................................................... 52

*Efficient*, Webster's New World Dictionary (2d coll. ed. 1972) ................................ 51

*General Oversight and Postal Service Budget Hearing Before the Subcomm. on Postal Operations and Services of the H. Comm. on Post Office and Civil Service* 95th Cong. (Mar. 15, 1977) ........................................................................ 50

Geoff Bennett (@GeoffRBennett), Twitter (Sept. 6, 2020, 6:15 PM) ........................ 22

H.R. Rep. No. 109-66 (2005) ..................................................................................... 12

H.R. Rep. No. 91-1104 (1970) ................................................................................... 48

Hope Yen, *Lawmakers: Postal changes delay mail-order medicine for vets*,
ABCNews (Aug. 14, 2020) ......................................................................... 4

Pew Research Center, *Public Holds Broadly Favorable Views of Many Federal
Agencies, Including CDC and HHS* (Apr. 9, 2020) .................................... 3

Postal Bulletin 22342 (July 26, 2012) ......................................................... 54

Postal Regulatory Comm'n, *Advisory Opinion Concerning a Proposed Change in
the Nature of Postal Services*, Docket No. N75-1 (Apr. 22, 1976) ............... 42, 45, 46

Postal Regulatory Comm'n, *Mail Classification Schedule* (current redline version
Mar. 31, 2021) ......................................................................................... 49, 50

*Protecting the Timely Delivery of Mail, Medicine, and Mail-in Ballots: Hearing
Before the H. Comm. on Oversight & Reform*, 116th Cong. (Aug. 25, 2020)
(testimony of Postmaster General DeJoy) .................................................. 23

Sam Berger & Stephanie Wylie, *Trump's War on the Postal Service Hurts All
Americans*, Ctr. For Am. Progress (Aug. 19, 2020) .................................... 4

U.S. Census Bureau, *2020 Census Mailings* (Mar. 6, 2020) ...................... 51

USPS Link, *A new era begins* (June 17, 2020) .......................................... 6

USPS Office of Inspector General, Report No. 19POG001SAT000-R20,
*Effectiveness of the Postal Service's Efforts to Reduce Non-Career Employee
Turnover* (Feb. 12, 2020) .......................................................................... 5

USPS Office of Inspector General, Report No. 19SMG011HR000-R20,
*Management Structure at the Postal Service* (Mar. 18, 2020) ..................... 5

USPS Office of Inspector General, Report No. NO-AR-19-008, *Assessment of the
U.S. Postal Service's Service Performance and Costs* (Sept. 17, 2019) ....... 7, 8, 10

USPS Office of Inspector General, Report No. RISC-WP-19-008, *From Home
Office to Post Office: Improving Microbusiness Engagement with the U.S.
Postal Service* (Sept. 4, 2019) ................................................................... 4

USPS, *Board of Governors Announces Selection of Louis DeJoy to Serve as
Nation's 75th Postmaster General* (May 6, 2020) ...................................... 6

USPS, *Organization Information – 2020 Census Mailing Campaign* (Mar. 12,
2020) ........................................................................................................ 51

USPS, *Postal Facts - Size and Scope* ........................................................ 7

USPS, *Postmaster General Louis DeJoy Modifies Organizational Structure to
Support USPS Mission* (Aug. 7, 2020) ...................................................... 6

Zachary Scherer, *Majority of Voters Used Nontraditional Methods to Cast Ballots in 2020*, U.S. Census Bureau (April 29, 2021) ............................................................... 2, 4, 50

**ACRONYMS**

| | |
|---|---|
| AVP | Area Vice President |
| CSDRS | Customer Service Delivery Reporting System |
| COO | Chief Operating Officer |
| DM | District Manager |
| F1 | Function 1 (mail processing) |
| F2A | Function 2A (rural mail delivery) |
| F2B | Function 2B (city mail delivery) |
| F3A | Function 3A (vehicles services) |
| F3B | Function 3B (maintenance) |
| F4 | Function 4 (retail, customer service, and other duties at delivery units) |
| FY | Fiscal Year |
| HCR | Highway Contract Route |
| LDC | Labor Distribution Code |
| MOS | Manager of Operations Support |
| OT | Overtime |
| PAEA | Postal Accountability and Enhancement Act of 2006 |
| PMG | Postmaster General |
| POOM | Post Office Operation Manager |
| POT | Penalty overtime |
| PRA | Postal Reorganization Act of 1970 |
| PVS | Postal Vehicle Services |
| SDO | Scheduled Day Off |
| SPLY | Same Period Last Year |

## INTRODUCTION

In June and July 2020, in the middle of a global pandemic, the United States Postal

Service instituted a significant cost-cutting policy, effectuated by dozens of strategies and

initiatives, without considering the effect these strategies and initiatives would have on the

timely delivery of mail and in disregard of statutory obligations that ensure the Postal Service

functions as a "basic and fundamental service provided to the people by the Government of the

United States, authorized by the Constitution, created by Act of Congress, and supported by the

people." 39 U.S.C. § 101(a). As part of this policy, the Postal Service implemented a new

initiative to eliminate "late" and "extra" trips taken by trucks transporting mail, which required

all Postal Service employees to adhere strictly to schedules regardless of real-world

circumstances. That policy also required employees to follow dozens of haphazardly

communicated strategies designed to cut costs by reducing employee work hours across the

entire Postal Service.

The result was predictable, widespread, and well-documented: mail was delayed, often

for significant periods of time. Prescription medicines were held up, hearing notices were late,

essential benefits were delayed, and countless other mailpieces—including election mail and

census mail—took weeks to arrive.

These delays were not the result of merely reckless and misguided conduct; they were the

result of unlawful conduct. First, the initiative to eliminate late and extra trips exceeded limits

placed on the Postal Service's authority to make any "change[s] in the nature of postal services

which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C.

§ 3661(b). The Postal Service is powerless to make such changes without first obtaining an

advisory opinion from the Postal Regulatory Commission, *id.*, a step it indisputably failed to

take. Nationwide changes to postal services must be submitted to the Commission to prevent

precisely what happened here: costly mistakes, such as the delays Americans experienced in the summer and fall of 2020.

Second, implementation of the 2020 cost-cutting policy violated 39 U.S.C. §§ 101 and 403, which require the Postal Service to "provide adequate and efficient postal services" and give "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." The Postal Service failed to conduct any analysis of how rushing through dozens of comprehensive operational directives, in the middle of a pandemic that had made Americans more reliant on the mail than ever before, would impact postal services and service performance. The Postal Service also failed to ensure that the methods for carrying out the cost-cutting policy were communicated clearly and implemented consistently. What is more, the policy was executed amidst the decennial census and ahead of a presidential election that would see twice as many Americans vote by mail than in 2016, Zachary Scherer, *Majority of Voters Used Nontraditional Methods to Cast Ballots in 2020*, U.S. Census Bureau (April 29, 2021),[1] thus affecting constitutionally important mail. Implementing the cost-cutting policy in this way failed to adequately prioritize the important letter mail that the Postal Service must expeditiously deliver and fell short of the "adequate and efficient postal services" owed to the American people.

The Postal Service's 2020 operational measures are unlawful and, if not permanently enjoined, will cause irreparable harm to the States and their residents. The States' motion should be granted.

---

[1] https://www.census.gov/library/stories/2021/04/what-methods-did-people-use-to-vote-in-2020-election.html.

## STATEMENT OF FACTS

**I.**     **United States Postal Service**

The Constitution empowers Congress to "establish Post Offices and post Roads." U.S. Const., art. I, § 8, cl. 7. Since America's founding, "the Postal Service has become the nation's oldest and largest public business," *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004), playing "a vital yet largely unappreciated role in the development of" the United States, *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 121 (1981). During the early years of this country's development, "the Post Office was to many citizens situated across the country the most visible symbol of national unity." *Id.* at 122.

By law, the Postal Service is to be "operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). Its services are "to bind the Nation together through the personal, educational, literary, and business correspondence of the people," which it does through "prompt, reliable, and efficient services to patrons in all areas." *Id.* In this role, the Postal Service has been overwhelmingly successful: as of last year, 91 percent of Americans viewed USPS favorably. Pew Research Center, *Public Holds Broadly Favorable Views of Many Federal Agencies, Including CDC and HHS* (Apr. 9, 2020).[2]

The Postal Service touches the lives of virtually every American. Eighteen percent of Americans, and 40 percent of senior citizens, pay their bills by mail. Sam Berger & Stephanie Wylie, *Trump's War on the Postal Service Hurts All Americans*, Ctr. For Am. Progress (Aug. 19,

---

[2] https://www.pewresearch.org/politics/2020/04/09/public-holds-broadly-favorable-views-of-many-federal-agencies-including-cdc-and-hhs/.

2020).[3] Nearly 20 percent of tax refunds are sent by mail. The Department of Veterans Affairs fills about 80 percent of veterans' prescriptions by mail, sending 120 million prescriptions a year. Hope Yen, *Lawmakers: Postal changes delay mail-order medicine for vets*, ABCNews (Aug. 14, 2020).[4] Every day, more than 330,000 veterans receive a package of prescriptions in the mail. *Id.* More than half of the people who receive medication by mail are over the age of 65. Berger & Wylie, *supra.* Small businesses rely heavily on the Postal Service: 40 percent send packages via the Postal Service every month, *id.*, and 70 percent of businesses with fewer than 10 employees had used the Postal Service within the previous six months, USPS Office of Inspector General (OIG), Report No. RISC-WP-19-008, *From Home Office to Post Office: Improving Microbusiness Engagement with the U.S. Postal Service*, at 1 (Sept. 4, 2019).[5] In rural areas, where more than a third of post offices are located, the Postal Service provides a vital link to more than 14 million people without broadband access. Berger & Wylie, *supra*. In the 2020 presidential election, 43 percent of voters cast their ballots by mail. Scherer, *Majority of Voters Used Nontraditional Methods to Cast Ballots in 2020*, *supra*.

### A. Modern Postal Services

Postal services took their current form in 1970, when Congress passed the Postal Reorganization Act (PRA). *See* Pub. L. No. 91-375, 84 Stat. 719. The PRA effected several changes designed "to increase the efficiency of the Postal Service and reduce political influences on its operations." *Flamingo Indus.*, 540 U.S. at 740. Among the changes, Congress made the

---

[3] https://www.americanprogress.org/issues/democracy/news/2020/08/19/489664/trumps-war-postal-service-hurts-americans/.

[4] https://abcnews.go.com/Politics/wireStory/lawmakers-postal-delay-mail-order-medicine-vets-72374343.

[5] https://www.uspsoig.gov/sites/default/files/document-library-files/2019/RISC-WP-19-008.pdf.

Postal Service "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201.

The Postal Service operates under a headquarters and field office structure. USPS OIG, Report No. 19SMG011HR000-R20, *Management Structure at the Postal Service*, at 5 (Mar. 18, 2020).[6] Headquarters, led by the Postmaster General and the Executive Leadership Team, determines "the overall strategic direction of the Postal Service, including setting overall policy and overseeing financial and operational functions." *Id.*; *see* USPS Official Organizational Chart (May 26, 2020) (Ex. 50); *see also* Colin Dep. 73:8-24 (Ex. 57); Williams Dep. 49:1-19 (Ex. 60).[7] Field offices oversee and execute the day-to-day operations of more than 31,000 Postal Service facilities and 633,000 employees. USPS OIG, *Management Structure at the Postal Service*, *supra*, at 5; USPS OIG Report No. 19POG001SAT000-R20, *Effectiveness of the Postal Service's Efforts to Reduce Non-Career Employee Turnover*, at 1 (Feb. 12, 2020).[8]

Before August 7, 2020, the Postal Service divided its field offices into seven geographic areas and 67 geographic districts. USPS OIG, *Management Structure at the Postal Service*, *supra*, at 5; Colin Dep. 61:6-12, 64:4-8; McAdams Dep. 45:19-46:21 (Ex. 59). At that time, the Chief Operating Officer and Executive Vice President (COO) oversaw all operational aspects of the Postal Service, including the collection, processing, transportation, and delivery of mail. *See* USPS Official Organizational Chart (Ex. 50). Each of the seven areas was overseen by an Area

---

[6] https://www.uspsoig.gov/sites/default/files/document-library-files/2020/19SMG011HR000-R20.pdf.

[7] This brief follows the practices of colloquially using "Headquarters" to refer to the Postal Service leadership team. Williams Dep. 23:11-14.

[8] https://www.uspsoig.gov/sites/default/files/document-library-files/2020/19POG001SAT000-R20.pdf.

Vice President (AVP), who reported directly to the COO and was responsible for all the area's operational aspects. *Id.*; Williams Dep. 26:3-28:20; Colin Dep. 76:16-19. A District Manager, who reported to an AVP, supervised each district and was responsible for overseeing all operational aspects within their district. Williams Dep. 96:9-22; Colin Dep. 55:11-19; Curtis Dep. 71:2-3 (Ex. 58). Within each district were numerous facilities that reported to the District Manager. Williams Dep. 202:7-203:1; Curtis Dep. 70:16-74:11. These facilities included mail processing facilities, also known as plants, which were overseen by a Plant Manager; and post offices, also known as delivery units, which were overseen by a Postmaster or Post Office Operations Manager. McAdams Dep. 20:14-18; Curtis Dep. 71:4-11.[9]

The Postmaster General is the chief executive officer of the Postal Service and "responsible for [its] the overall operation." 39 U.S.C. § 203; 39 C.F.R. § 221.5(a). On May 6, 2020, the Postal Service's Board of Governors selected Louis DeJoy to serve as the next Postmaster General. USPS, *Board of Governors Announces Selection of Louis DeJoy to Serve as Nation's 75th Postmaster General* (May 6, 2020);[10] *see* 39 U.S.C. § 202(c). Postmaster General DeJoy was sworn in on June 16, 2020. USPS Link, *A new era begins* (June 17, 2020).[11]

---

[9] On August 7, 2020, Postmaster General Louis DeJoy reorganized USPS headquarters. USPS, *Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission* (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/2020/0807-pmg-modifies-organizational-structure.htm. The new structure retained the 67 districts, but divided the seven geographic areas by operational function: retail and delivery (four areas), logistics and mail processing (two areas), and commerce and business solutions. *See* Interim - USPS Leadership Team (Aug. 7, 2020) (Ex. 51).

[10] https://about.usps.com/newsroom/national-releases/2020/0506-bog-announces-selection-of-louis-dejoy-to-serve-as-nations-75th-postmaster-general.htm.

[11] https://link.usps.com/2020/06/17/a-new-era-begins/.

B.      **Postal Service Operations**

Mail in the United States moves through a complex nationwide network that collects, processes, transports, and delivers about 430 million mailpieces every day. USPS, *Postal Facts - Size and Scope*.[12] The Postal Service's core operations —collection, processing, transportation, and delivery of mail[13]—"are interdependent, and must align to achieve prompt and efficient operations." USPS OIG, Report No. 20-292-R21, *Operational Changes to Mail Delivery*, at 8 & Appendix B (Oct. 19, 2020) (Ex. 52) ("OIG Report Oct. 2020"); *see generally* USPS OIG, Report No. NO-AR-19-008, *Assessment of the U.S. Postal Service's Service Performance and Costs*, at 6-9 (Sept. 17, 2019)[14] (summarizing mail cycle). The "failure in any phase has the potential to create significant delays in subsequent phases." USPS OIG, *Assessment of the U.S. Postal Service's Service Performance and Costs*, *supra*, at 9; *see also* Williams Dep. 129:3-7 ("When one element of the chain is late it causes [a] downhill spiral of late transportation, late processing, [and] late and poor service.").

Postal Service operations follow a 24-hour clock. Williams Dep. 189:6-190:10; McAdams Dep. 67:5-68:5. Mail can enter the mail stream from multiple points, including blue collection boxes, directly from a home or business, or at a post office. USPS OIG, *Assessment of the U.S. Postal Service's Service Performance and Costs*, *supra*, at 7. Trucks transport this "originating mail" to processing plants. *Id.* at 8; *see also* Williams Dep. 18:20-19:7; McAdams

---

[12] https://facts.usps.com/size-and-scope// (last visited May 27, 2021).

[13] The Postal Services divides its core operations into numbered functions. Function 1 (F1) is mail processing; Function 2A (F2A) is rural mail delivery; Function 2B (F2B) is city mail delivery; Function 3A (F3A) is vehicle services; Function 3B (F3B) is maintenance; and F4 is retail, customer service, and other duties at delivery units. Curtis Dep. 57:23-24, 58:8-9, 134:19-2, 139:25:2-140:4; Colin Dep. 187:9-10.

[14] https://www.uspsoig.gov/sites/default/files/document-library-files/2019/NO-AR-19-008.pdf.

Dep. 68:13-17. Originating mail collected by letter carriers and post office clerks during the day is generally transported from the delivery unit to a plant in the afternoon, with the last such trip, known as the "dispatch of value," departing before the unit closes in the late afternoon. Williams Dep. 128:10-129:12; McAdams Dep. 73:4-13; Cassel Decl. ¶ 21 (Ex. 61). Letter carriers typically return to their delivery unit before the dispatch of value so that day's originating mail can be placed on the truck and moved forward in the mail stream. Williams Dep. 128:15-24.

At any of 285 plants, originating mail is processed—i.e., separated, sorted, and placed in mail containers for transportation or delivery—by postal workers and mail handlers using more than 8,500 mail sorting machines. OIG Report Oct. 2020 at 8; *see also* Colin Dep. 84:3-15. Once the mail is processed, mail handlers bring it to loading docks for placement on trucks. Colin Dep. 81:4-15. Mail with a non-local destination is transported to another processing facility via the Postal Service's surface, air, rail, and maritime networks. *See* USPS OIG, *Assessment of the U.S. Postal Service's Service Performance and Costs*, *supra*, at 7; OIG Report Oct. 2020 at 8; Randel Decl. ¶¶ 2, 4 (ECF No. 115-1). Mail with a local destination is processed overnight and dispatched in the early morning by truck to delivery units for delivery. Declaration of Joseph Cogan, President, Portland Oregon Area Local, APWU ¶ 11 (filed in *Washington v. Trump,* No. 20-3127 E.D.Wa) (Ex. 62); Randel Decl. ¶ 3 (ECF No. 115-1).

Mail ready for delivery, or "destinating mail," arrives at a delivery unit in the early morning. McAdams Dep. 69:7-70:8. More than 168,000 city letter carriers and 70,000 rural letter carriers deliver destinating mail on fixed routes to nearly 158 million addresses each day during general business hours (i.e., between approximately 9 a.m. and 6 p.m.). OIG Report Oct. 2020 at 8. Letter carriers also collect new originating mail and bring it back to the delivery unit, starting the mail cycle again. McAdams Dep. 68:10-17.

Because the Postal Service is a public agency with a public service mandate, it has long operated under a practice of "every piece, every day," endeavoring to get "every piece delivered every day, every piece on the truck every day." Cintron Dep. (Sept. 22, 2020) 106:8-21 (Ex. 55); *see* Cintron Dep. (Oct. 15, 2020) 117:13-118:23 (Ex. 56); McAdams Dep. 142:13-143:18. For decades, fulfilling this public commitment has been possible because of flexibility in the Postal Service's operating plan, which allowed the Postal Service to account for a broken machine, a traffic accident, unexpected extra mail volume, and other everyday delays and disruptions. Cassel Decl. ¶ 25; Declaration of Peter Coradi, National Business Agent "A," New York Region, APWU ¶¶ 10-14 (filed in *New York v. Trump*, No. 20-2340 D.D.C.) (Ex. 63). For example, it is commonplace for a plant to hold a truck for a short while past scheduled departure (i.e., cause a "late trip") to allow the final container of processed mail to be loaded on board, or for the plant to send an extra truck (i.e., an "extra trip") with mail that missed a scheduled departure. Cassel Decl. ¶ 30; Cintron Dep. (Sept. 22, 2020) 40:7-15; McAdams Dep. 76:17-77:16. Likewise, a letter carrier might wait until all the day's destinating mail arrives before starting her route and would stay on her route until every piece of mail is delivered. Cassel Decl. ¶¶ 18-20. If a letter carrier is delayed on her route, the delivery unit might hold the truck until she returns with that day's originating mail or have the letter carrier drive that originating mail directly to the plant. Cassel Decl. ¶¶ 23, 26, 29; Williams Dep. 129:7-130:2; Colin Dep. 132:14-21; 337:7-16. Union employees on the ground usually decided whether to hold a truck or send an extra truck. Williams Dep. 197:23-200:1. In addition, to keep the mail moving forward, overtime often has been necessary, particularly when processing facilities or mail routes are understaffed. *E.g.*, Gibson Decl. ¶ 16 (Ex. 66); Cassel Decl. ¶ 20; Dickey Decl. ¶¶ 15-16 (Ex. 64).

The use of overtime has been especially necessary during the COVID-19 pandemic, which "negatively affected the Postal Service's operational capacity in numerous ways— reducing employee availability, disrupting transportation, and inducing large shifts in the mail mix towards packages." Postal Regulatory Comm'n, *Annual Compliance Determination Report Fiscal Year 2020*, at 96, 101-18 (Mar. 29, 2021) (Ex. 54) ("Commission Report 2021"); Williams Dep. 327:17-333:17; Colin Dep. 92:18-93:23, 112:2-9; Curtis Dep. 101:13-105:19. Decreased employee availability in particular exacerbated the use of overtime. Gibson Decl. ¶ 16; Dickey Decl. ¶¶ 15-17.

### C.    Service Standards and Service Performance

Since 1792, the Postal Service has had the exclusive right to transport and deliver certain categories of mail, now known as "market-dominant products." *See* Private Express Statutes (18 U.S.C. §§ 1691-99 & 39 U.S.C. §§ 601-06, codified at 39 C.F.R. pt. 310); 39 U.S.C. §§ 3621-29. Market-dominant products include First-Class Mail, periodicals, marketing mail (formerly called "standard mail"), and single-piece parcels. 39 U.S.C. § 3621(a). The Postal Service also transports and delivers "competitive products," such as priority mail, expedited mail, and bulk parcel post, 39 U.S.C. § 3631(a), which compete with the private sector.

The Postal Accountability and Enhancement Act (PAEA), Pub. L. No. 109-435, 120 Stat. 3198 (2006), required the Postal Service to establish "service standards" for market-dominant products "in consultation with" the Postal Regulatory Commission. 39 U.S.C. § 3691(a). Service standards "specify the amount of time within which a customer may ordinarily expect that a particular mailpiece will be delivered" and are established "by the class of mail, where it originates, and where it is going, or destined." Commission Report 2021, at 96 (Ex. 54); USPS OIG, *Assessment of the U.S. Postal Service's Service Performance and Costs*, *supra*, at 5; *see also* Goldway Decl. ¶ 12 (Ex. 67). Among other goals, Congress intended service standards to

"preserve regular and effective access to postal services in all communities" and to "reasonably assure Postal Service customers [of] delivery reliability, speed and frequency consistent with reasonable rates and best business practices." 39 U.S.C. § 3691(b)(1)(B), (C). Service standards also "provide a system of objective external performance measurements for each market-dominant product as a basis for measurement of Postal Service performance." *Id.* § 3961(b)(1)(D).

The Postal Service established service standards by regulation in 2007. *See* 39 C.F.R. pts. 121 & 122. The service standard for First-Class Mail in the contiguous 48 states, for example, is one to three days, depending on where the mail is coming from and going. 39 C.F.R. § 121.1; *see also* 39 C.F.R. pt. 121 app'x A.

Congress also requires the Postal Service to establish, measure, and report performance metrics for each Postal Service activity. 39 U.S.C. §§ 2803-2804, 3652(a). "Service performance" specifically "measures reliability: how often the Postal Service accomplishes its service standard." Goldway Decl. ¶ 14; *see also* 39 U.S.C. § 3652(a)(2)(B)(i). A service performance rate of 95 percent for a certain time period means that during that period, the Postal Service met its service standards 95 percent of the time. For Fiscal Year 2020, which ran from October 1, 2019, to September 30, 2020, *see* Williams Dep. 170:21-171:7, the service performance target for First-Class Mail was between 95.25 percent and 96.5 percent, Commission Report 2021 at 161 (Ex. 54).

### D.     Postal Regulatory Commission

The PRA also created the Postal Regulatory Commission—originally called the Postal Rate Commission before Congress renamed it as part of the PAEA—as an "independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 501. The Commission has five presidentially appointed members, all to "be chosen solely on the basis

11

of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration." *Id.* § 502.

The Commission has numerous responsibilities set forth in the PRA and the PAEA. Among them, anytime "the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" the Postal Service must first "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). The proposal requirement "formally balances" the Postal Service's self-sufficient operations with its statutory charge to provide universal service. *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 843 (E.D. Pa. 2020) (ECF No. 62); *see* H.R. Rep. No. 109-66, at 42 (2005). Before the Commission issues an advisory opinion, it must hold a hearing on the record. 39 U.S.C. § 3661(c). The public is entitled to submit comments or intervene in proceedings before the Commission. 39 C.F.R. §§ 3010.140, 3010.142.

## II.     The 2020 Operational Initiatives to Cut Costs

In June and July 2020, Postal Service Headquarters announced a far-reaching policy to cut costs. Colin Dep. 264:23-265:22, 311:1-7; Curtis Dep. 61:25-63:21; McAdams 94:22-101:20, 137:19-138:9; Williams Dep. 171:8-172:21. Headquarters effectuated its policy by implementing an initiative to eliminate all late and extra trips and by mandating adoption of more than 50 additional "do-it-now" strategies to reduce work hours. *E.g.*, PowerPoint - Do-it-now Strategies-v5.pptx (Ex. 32) (attachment to Ex. 31) ("Do-It-Now Strategies PPT").[15]

---

[15] The States refer to these strategies interchangeably as the "do-it-now strategies" and the "work-hour reduction strategies."

Many of the changes to Postal Service operations came at the instigation of Postmaster General DeJoy. On June 22, 2020, Postmaster General DeJoy ███████████████████ ████████████████████████████████████ Williams Dep. 71:22-73:16, 91:24-93:13; *see* ELT (June 22, 2020) (Ex. 2).[16] ███████████████ ████████████████████████████ Williams Dep. 73:5-13; *see* ELT at 9 ███████ ████████████████████████████████████ ████████████ COO David E. Williams, who attended this meeting as a member of the Executive Leadership Team, promptly conveyed these dislikes to his team and understood that Postmaster General DeJoy expected senior leadership to address them. Williams Dep. 73:14-23, 74:12-75:6, 92:12-93:8. In later meetings or conversations, Postmaster General DeJoy frequently raised the problem of late and extra trips, the need to operate on time, "being a finely tuned operating service machine," and "operating with precision." Williams Dep. 76:6-21.

A.    **No Late or Extra Trip Initiative**

Of all the cost-cutting strategies launched by the Postal Service in June and July 2020, the initiative to eliminate late and extra trips had the greatest impact on Postal Service operations and service performance. From the time of Postmaster General DeJoy's appointment, Mr. Williams understood that Postmaster General DeJoy expected Mr. Williams to make an effort to reduce late and extra trips. Williams Dep. 77:18-21. Indeed, Postmaster General DeJoy specifically asked Mr. Williams to come to one of the early executive leadership team meetings "with charts on how we were doing with respect to reducing extra trips and reducing late trips."

---

[16] Exhibit 2, which appears to be the printed slides of a presentation, was produced to Plaintiffs on May 28, 2021, in response to a request to produce the presentation Postmaster General DeJoy prepared for a meeting with his Executive Leadership Team during the first two weeks after assuming office. *See* Williams Dep. 72:14-73:16, 90:24-91:19.

Williams Dep. 77:2:16; *see also* Email from Brent Raney to Robert Cintron re: Extra Trip Report

for PMG (July 9, 2020) (Ex. 16) (stating that they needed to talk about the "report PMG

requested on Extra Trips"). Postmaster General DeJoy also requested ████████████████████

████████████████████████████████████████████ Email from Robert Cintron to

Otis Smith re: ████████████████████████████████████████████████████████████

(July 20, 2020) (Ex. 17).

    Mr. Williams began implementing the Postmaster General's directive by having

conversations with the AVPs about the "need to change" and the need to eliminate late and extra

trips. Williams Dep. 80:9-84:10. The first step was to get everyone "all in on [the] initiative"; the

second step—presumably, how the Postal Service would address the root causes of late and extra

trips to eliminate the need for their use—was not addressed. Williams Dep. 84:11-85:24. During

these conversations, Mr. Williams emphasized the need for "message saturation"; even "the

custodians" were expected "to understand the change and why we're doing it." Williams Dep.

82:24-83:11. But at no point did Headquarters prepare any written materials, such as a stand-up

talk,[17] to clearly define the message and communicate it to the field offices. Williams Dep. 96:9-

97:10. Instead, communication was left to the AVPs. *Id.*

    On July 10, 2020, Mr. Williams led a meeting to summarize the effort to eliminate late

and extra trips. Williams Dep. 164:1-6, 166:12-23; PowerPoint - AVP Telepresence (July 10,

2020) (Ex. 5) ("July 10 PPT"). Seven AVPs and other members of Headquarters attended the

---

[17] Stand-up talks are a widely used means of providing postal employees with information about
changes or updates in Postal Service policies and procedures. Zimmerman Decl. ¶¶ 5-6 (Ex. 79).
Postmasters and supervisors typically communicate the contents of a "Stand-Up Talk" to the
relevant employees at the beginning of their shift or share the contents in writing. *Id.* The
employees are then expected to abide by those policies and procedures. *Id.* "Mandatory" stand-
up talks usually reflect directives from Postal Service Headquarters and are delivered
nationwide. *Id.* ¶¶ 7-8.

meeting. Defs.' Resps. to Pls.' Second Interrogs., at 10-11 (Ex. 81) ("Second Interrogatories") (listing attendees of July 10 meeting).

During the July 10 meeting, Mr. Williams told the AVPs that the Postal Service "can't afford the heroics that we've been accustomed to in the past." Williams Dep. 180:11-15; *see* July 10 PPT, at 5 ("Affordable, Efficient & Reliable Service vs Costly & Heroic Service"). The "first test" of this new mandate was "no extra transportation" and "no late transportation." July 10 PPT, at 8-9; Williams Dep. 183:9-184:13.

Under this initiative, if some processed mail was not on board when the truck was scheduled to leave the processing plant, then the truck would not be held (even for a few minutes) and no extra truck would be sent; instead, that mail would be left behind until the next scheduled truck. Williams Dep. 193:23-194:8. Likewise, if a letter carrier was delayed on her route, the dispatch of value from the delivery unit would not be held (even for a few minutes) and no extra truck would transport that day's originating mail to the plant for processing; instead, the originating mail would remain at the delivery unit overnight. *See* Williams Dep. 202:7-203:5.

The initiative to eliminate late and extra trips required changing letter carriers' practices as well: carriers had to "leave on schedule" and "come back on time" and could not "go back out and deliver late mail." McAdams Dep. 148:19-149:17; Williams Dep. 185:9-186:15; *see also* Williams Dep. 299:23-300:2 ("Everybody needed to understand the mission to ensure that the trips left on time because everybody plays a part in some way."). The impact on letters carriers was "understood" and did "not need explanation." Williams Dep. 189:15-190:6 (stating it's "highly likely" he told the AVPs that the no late and extra trip initiative would impact letter carrier start and stop times). This meant that if the truck was delayed on its way to the delivery unit in the morning, then the carrier would leave on her route at her start time without all of that

day's destinating mail. *See* Williams Dep. 125:14-18, 185:19-186:15, 242:12-243:11. If the carrier was unable to deliver all of that day's mail before the dispatch of value, then she must return to the delivery unit with that mail undelivered and some originating mail uncollected. *See* Williams Dep. 185:19-186:15; Colin Dep. 337:17-23. And if the mail carrier did not depart with all of that day's mail—for example, because it was too much to carry or because additional mail arrived after she left—then that carrier would not make extra trips and that mail would remain in the delivery unit overnight. *See* Williams Dep.185:19-186:15; Coradi Decl. ¶ 16.

To enforce the no late or extra trip initiative, Mr. Williams announced that "[e]ffective July 13 all extra trips and Postal caused late trips are unauthorized contractual commitments." July 10 PPT, at 10; Williams Dep. 206:23-207:6. An "unauthorized contractual commitment occurs when a Postal Service employee who has not been delegated contracting or local buying authority, or who exceeds such authority, by his or her actions causes another party to deliver or provide goods or services." USPS, Management Instruction MI SP-G4-2006-2, at 1 (Nov. 30, 2006) (Ex. 49). Unauthorized contractual commitments must go through a process called "ratification," which "normally involves the after-the-fact preparation and execution of the appropriate contractual documents." Management Instruction MI SP-G4-2006-2, at 2. If the contractual commitment is not ratified, then "the employee who causes an unauthorized contractual commitment may be required to assume some or all of the liability for the commitment in addition to other administrative sanctions." *Id.* at 2, 5; Williams Dep. 211:8-213:17. Even if the commitment is ratified, the person may still be subject to discipline. Williams Dep. 213:12-17.

Under this new directive, AVPs were to be the "ratifying official" and "must ratify and submit to" Mr. Williams the relevant documents for each extra and Postal Service-caused late

trip. July 10 PPT, at 11. AVPs were also instructed to call Mr. Williams "daily if extra trips or late trips occur the prior day to discuss next steps." July 10 PPT, at 11; Williams Dep. 229:6-10. Mr. Williams also intended to end the practice of union employees in plants and delivery units making the decision to hold a truck or send an extra truck and instead have District Managers and Plant Managers make these decisions. Williams Dep. 197:23-202:6.[18]

Although the Postal Service had long worked to run trips on time, Robert Cintron—then Vice President of Logistics, *see* USPS Official Organizational Chart (Ex. 50), and the individual who had led that effort, Cintron Dep. (Sept. 22, 2020) 40:22-41:6—was unaware of the Postal Service ever placing similar restrictions on the use of extra or late trips. Cintron Dep. (Sept. 22, 2020) 42:11-43:1; *see also* Curtis Dep. 26:15-28:8; McAdams Dep. 155:10-20, 223:5-21.

At the end of the July 10 meeting, Mr. Williams expected the AVPs to communicate to the field offices that they must make a "highly significant effort to reduce to eliminate extra trips, late trips" and "to make the operating plan." Williams Dep. 245:23-247:6. He further expected them to communicate "that there was a new process, that we were no longer going to tolerate the use of expediters, mail handlers or other employees that did not have the authorization to hold a trip or to call an extra trip, that there was going to be a rigor around the justification for that process." *Id.* Mr. Williams did not prepare any written materials, such as a stand-up talk, to ensure that the message was communicated consistently to the field offices. Williams Dep. 247:7-12.

The reaction to the July 10 meeting was abrupt. That day, the AVP for the Southern Area prepared a Mandatory Stand-Up Talk and pushed it out for presentation to all employees.

---

[18] It is unclear how they would have authority to do so when all such trips are unauthorized contractual commitments.

Mandatory Stand-Up Talk: All Employees - Pivoting For Our Future (July 10, 2020) (Ex. 10) (attachment to Ex. 9) (the "Mandatory SUT"); Email from Thelma Griffin to Louisiana ACE Users re: SUT: Pivoting for Our Future (July 14, 2020) (Ex. 9) (requiring Mandatory SUT to be shared with all employees); Email from Louis DeJoy to Heather A. Clarke & Emily M. Saunders re: FW: House COR inquiries--PMG memos and election mail (July 15, 2020) (Ex. 13) (identifying author of the Mandatory SUT). The stand-up talk reflected the message communicated by Mr. Williams earlier that day: "late trips are no longer authorized or accepted," "[e]xtra trips are no longer authorized or accepted," "[c]arriers must begin on time, leave for the street on time, and return on time," "[c]arriers must make the final dispatch of value; no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch," and "ALL EMPLOYEES have an essential role with trips departing on time." Mandatory SUT (Ex 10). Although intended to be shared in the Southern Area, the stand-up talk had a wider reach; on July 13, a union representative in Arizona emailed to say her members had received the document. *See* Robert Cintron to Shaun Mossman re: Pivoting (July 13, 2020) & Attachments (Pivoting For Our Future 7-10-20.docx; Training records.jpeg) (Ex. 11).

Other AVPs likewise communicated Mr. Williams' message to the field offices. A Manager of Post Office Operations in the Northern Ohio District prepared a PowerPoint presentation explaining, among other things, that "[i]f the plants run late they will keep the mail for the next day" and if delivery units receive destinating mail late and "cannot get the mail out without OT it will remain for the next day." PowerPoint - *PMGs expectations and plans*, at 1 (July 2020) (Ex. 12) ("PMGs Expectations PPT"); Email from Louis DeJoy to Heather A. Clarke & Emily M. Saunders re: FW: House COR inquiries--PMG memos and election mail (July 15, 2020) (Ex. 13) (identifying author of the PMGs Expectations PPT). In Pittsburgh, letter carriers

were told that "there is no more waiting on mail and there is no more coming back for parcels.

The excuses of why people can't get done with their routes are gone. We NEED to start

capturing the downtime." Email from Brad M. Horn to Richard B. Crase, et al. re: Fwd:

Reminders (July 10, 2020) (Ex. 28). Trucks at western Pennsylvania plants were ordered to

"leave the plants at the exact scheduled time, regardless of whether the mail is ready to go or

not." Dickey Decl. ¶¶ 24-26. So too were trucks in central and eastern Pennsylvania and southern

New Jersey. Gibson Decl. ¶¶ 14-15. Trucks transporting mail between plants and delivery units

in Portland, Oregon departed at the scheduled time without exception, leaving mail volume

behind. Cogan Decl. ¶¶ 12-14. Postal Service employees in New York and northern New Jersey

were likewise "prohibited from making late trips and extra trips even if waiting just a few

minutes would ensure timely delivery to entire communities," and at the same time "instructed to

leave behind mail that is ready for delivery." Coradi Decl. ¶¶ 8-9.

  The field offices immediately began complying with the no extra or late trip initiative. An

employee in Headquarters' sales department emailed on July 13 to ask whether ██████████████



████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (July 13, 2020) (Ex. 18). That employee had learned about the

new initiative when █████████████████████████████████████████

██████████████ *Id.* Likewise, a district sales manager learned through communication with a

customer in Ohio on July 13 that █████████████████████████████████████

19

██████████████████████████████████████████████

██████████████████████████████ Email from Robert Cintron to David Webster re: FW:

████████████████████████████████████████████████ (July

13, 2020) (Ex. 19).

After Mr. Williams had already directed that all extra and Postal Service-caused late trips

would be unauthorized contractual commitments, Mr. Cintron "worked over the weekend with

the team to come up with criteria around extra trips and late trips that would then be deemed as

authorized." Williams Dep. 222:18-22; *see* Cintron Dep. (Sept. 22, 2020) 53:7-10, 54:5-18

(stating that executives, not his modeling and analytics team, were involved in preparing the

guidelines); *see also* Email from Robert Cintron to Area Vice Presidents re: Extra Guidance

(July 14, 2020) (Ex. 14); Excel - Keys to Success for Elimination of Extras and Lates (Ex. 15)

(attachment to Ex. 14) ("Cintron Guidelines"). Although Mr. Williams authorized Mr. Cintron to

prepare guidelines, Mr. Williams was not involved in preparing the Cintron Guidelines and never

reviewed them. Williams Dep. 223:11-12, 235:12-19, 248:16-249:2. The Cintron Guidelines

explained under what circumstances a late or extra trip would be considered "acceptable" to

Headquarters. *See* Cintron Guidelines. The Guidelines did not revoke the directive that late and

extra trips would be unauthorized contractual commitments; instead, the Guidelines reinforced

that the goal was the "elimination of Extras and Lates." *Id.*; *see also* Williams Dep. 249:12-

252:21. In his email, Mr. Cintron reemphasized that the "focus is to eliminate unplanned extra

transportation," the "operating plan must be met," and "Trips must depart on time." Email from

Robert Cintron to Area Vice Presidents re: Extra Guidance (July 14, 2020).

Customers from all over the country immediately began to complain about mail not being

picked up—so much so that Headquarters started tracking complaints. Email from Robert

Cintron to Chung H. Shen re: FW: Update RE: Pickup concerns by customer (July 14, 2020) (Ex. 20); Excel - Customer Inquiry Feedback-Transportation 071320v2.xlsx (Ex. 21) (attachment to Ex. 20). Complaints continued through at least July 30, the last email produced to Plaintiffs. Email from Christine Bailey to Jakki Krage Strako re: Update RE: Pickup concerns by customer 7-15-20 (July 15, 2020) (Ex. 22) (additional concerns collected on July 15 not included in Ex. 27); Excel - Customer Inquiry Feedback-Transportation 071620 Update.xlsx, June 15 tab (Ex. 23) (attachment to Ex. 22); Email from Timothy Costello to David Williams Jr re: Customer Inquiry Feedback-Transportation and Service 071720 (July 18, 2020) (Ex. 24); Excel - Customer Inquiry Feedback-Service 071720 (Ex. 25) (attachment to Ex. 24); Email from Robert Cintron to Shaun Mossman re Missed Pickup spreadsheet 7-30-20 (July 30, 2020) (Ex. 26); Excel - Customer Inquiry Feedback-Transportation073020_Consolidated.xlsx (tabs July 13-17, 20-24, 27-30) (Ex. 27) (attachment to Ex. 26).

Despite evidence of deteriorating service, on July 30, 2020, Mr. Williams held a meeting with at least some Plant Managers (and possibly District Managers and AVPs)[19] to reinforce the new transportation initiative for managers of plants that "were still showing relatively high percentages of extra trips and late trips." Williams Dep. 265:22-266:9; PowerPoint - AVP & Plant Managers Transportation Telepresence (July 30, 2020) (Ex. 7) ("July 30 PPT"). During the presentation, Mr. Williams repeated that employees needed to ████████████████████████

---

[19] Defendants represented in their sworn response to Plaintiffs' Second Interrogatories that six of the seven AVPs attended the July 30 teleconference, along with other senior leadership from headquarters and all plant managers for all areas. *See* Second Interrogatories at 10-11 (Ex 81). Defendants also produced a July 30 PPT to Plaintiffs with the filename "AVP and Plant Manager Transportation July 30." In his deposition, however, Mr. Williams was confident that only the plant managers working at the plants identified in the July 30 PPT, and possibly district managers, attended. Williams Dep. 293:10-296:15, 298:1-298:14. When Plaintiffs asked about the inconsistency, Defendants declined to update or correct their interrogatories.

and ███████████████████ and that there was to be ██████████████████ and ████

██████████ July 30 PPT, at 8. Mr. Williams reaffirmed that "everybody needed to

understand the mission to ensure that the trips left on time because everybody plays a part in

some way," "whether they were involved in dispatching trips or not." Williams Dep. 299:19-

300:1. He also asked the attendees whether ████████████████████████████

████████████████████████████████████████████████████ July 30

PPT, at 10-11. Mr. Williams did not discuss the Cintron Guidelines at the meeting nor instruct

the attendees to refer to them when applying the no late and extra trip initiative. Williams Dep.

304:22-305:15.

Following the July 30 meeting, Mr. Williams followed up with Mr. Cintron and other

Postal Service employees regarding ██████████████████████████████████████

Emails between David E. Williams, Jr. and USPS employees re: ████████████████████

████ (July 31, 2020) (Ex. 29). One plant manager emailed Mr. Williams to ██████████████

██████████████████████████████████████" Emails between David

E. Williams, Jr. and USPS employees re: ████████████████████████████████

(July 30, 2020) (Ex. 30). As late as September 6, 2020, a sign went up in a Portland, Oregon

plant stating that "No Employee has Authorization to Hold Trucks," "All HCR and PVS trips

will depart on time, no exceptions," and "All Trips Depart on Time." Geoff Bennett

(@GeoffRBennett), Twitter (Sept. 6, 2020, 6:15 PM);[20] *see also* Tr. Prelim. Inj. Teleconference

at 66, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020) (Ex. 82).

Postmaster General DeJoy and Mr. Williams confirmed and reinforced the no late and

extra trip initiative in public statements, letters, and congressional testimony. Mr. Williams, in an

---

[20] https://twitter.com/geoffrbennett/status/1302732181949816832?lang=en.

August 6, 2020, letter to members of Congress, discussed "immediate steps" the Postal Service had taken to "run[] our operations on time and on schedule." Letter from David E. Williams, Chief Operating Officer, USPS, to Members of Congress (Aug. 6, 2020) (Ex. 38). Postmaster General DeJoy, in an August 13, 2020, message to all USPS employees, highlighted his "transformative initiative" of dramatically reducing late and extra trips. Message from the Postmaster General to all USPS Employees, *U.S. Postal Service Plan for Operational Excellence and Financial Stability* (Aug. 13, 2020) (Ex. 40). Postmaster General DeJoy, in an August 14, 2020, letter to members of Congress, discussed how the Postal Service was "working to eliminate late and extra trips." Letter from Louis DeJoy, Postmaster General, USPS, to Nancy Pelosi, Speaker of the House, House of Representatives, and Charles E. Schumer, Minority Leader, Senate (Aug. 14, 2020) (Ex. 41). In congressional testimony, Postmaster General DeJoy stated that he had "directed" that the Postal Service "develop and execute on a plan to improve our adherence to the transportation schedule of [their] over 40,000 trips a day." *Protecting the Timely Delivery of Mail, Medicine, and Mail-in Ballots: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong., at 11 (Aug. 25, 2020) (testimony of Postmaster General DeJoy);[21] *see also* Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the Senate Committee on Homeland Security and Governmental Affairs, at 8-9 (Aug. 21, 2020) (Ex. 42) ("DeJoy Senate Statement") ("I started with one simple step: directing that we be more disciplined by ensuring that our trucks should run on time and on schedule, and that we should eliminate unnecessary extra trips.").

---

[21] https://docs.house.gov/meetings/GO/GO00/20200824/110969/HHRG-116-GO00-Transcript-20200824.pdf.

The effect of the no late or extra trip initiative on Postal Service operations was immediate. Williams Dep. 228:11-229:3. The Postal Service had used an average of ▮ extra trips per day prior to July 13, 2020. PowerPoint - COO Learn and Grow Field Webinar, at 14 (July 31, 2020) (Ex. 8) ("July 31 PPT"); Williams Dep. 218:6-219:17. After July 13, the number of extra trips dropped to ▮ per day. July 31 PPT, at 14; Williams Dep. 219:18-23. The Postal Service had also experienced an average of ▮ late trips per day prior to July 13, 2020. July 31 PPT, at 15; Williams Dep. 229:11-230:8. After July 13, the number of late trips dropped to ▮ per day. July 31 PPT, at 15; Williams Dep. 230:14-22.

## B.    Do-It-Now Strategies to Reduce Work Hours

The no extra or late trip initiative was part of a larger policy to cut costs by eliminating 64 million work hours in Fiscal Year 2021. OIG Report Oct. 2020 at 10-11 (Ex. 52); USPS OIG, Report No. 21-041-R21, *Deployment of Operational Changes*, at 5-7 (Nov. 6, 2020) (Ex. 53) ("OIG Report Nov. 2020"); Colin Dep. 264:23-265:22, 311:1-7; Curtis Dep. 61:18-63:21; McAdams Dep. 95:17-101:20. All told, the Postal Service developed and implemented more than 50 strategies in service of that policy, many of which Headquarters designated as "Do It Now." *See* Do-It-Now Strategies PPT (Ex. 32); OIG Report Oct. 2020 at App'x B (listing all work-hour reduction strategies and the status of implementation as of mid-September 2020). The Postal Service expected the strategies to be implemented well ahead of October 1, 2020 (the start of Fiscal Year 2021) to fully capture the cost savings in the new fiscal year. Williams Dep. 174:23-175:16.

A subset of the do-it-now strategies was first communicated to AVPs during a meeting on June 26, 2020. PowerPoint - AVP Telepresence (June 26, 2020) (Ex. 3) ("June 26 PPT") (slides 8, 11, 13-21); Colin Dep. 184:11-186:1; Second Interrogatories at 10-11 (Ex. 81) (listing attendees of June 26 meeting). The strategies were discussed again during a July 7, 2020,

meeting, attended by the AVPs and Postmaster General DeJoy. PowerPoint - AVP Telepresence (July 7, 2020) (Ex. 4) ("July 7 PPT"); Second Interrogatories at 10-11 (listing attendees of June 26 meeting). Headquarters emailed a list of the do-it-now strategies to the AVPs and Managers of Operations Support[22] on July 14, 2020, and presented them at a July 15, 2020, meeting. Email from Jennifer Vo to MDPS - AREA re: FW: PROJECT PLAN (July 14, 2020) (Ex. 31); Do-It-Now Strategies PPT (Ex. 32) (attachment to Ex. 31); PowerPoint - AVP Telepresence, at 32-37 (July 15, 2020) (Ex. 6) ("July 15 PPT").

For purposes of the work-hour reduction policy, the do-it-now strategies required a number of operational adjustments beyond the no late and extra trip initiative. For example,



Colin Dep. 210:18-212:6, 253:23-255:4, 256:11-257:21; Curtis Dep. 149:19-152:19; June 26 PPT, at 19

Do-It-Now Strategies PPT, at 5

Additionally, letter carriers were expected to depart for their delivery routes once reaching their earned hour figure, a practice that had not always been followed because carriers sometimes needed to wait for late arriving mail. Colin Dep. 214:4-25, 216:3-25; Curtis Dep. 78:10-16; July 7 PPT, at 10 AVPs also were instructed to cut the extra hours of supervisors in processing plants by and to eliminate certain forms of overtime. Colin Dep. 234:23-235:18, 252:6-17; Curtis Dep. 127:6-

---

[22] The Manager of Operations Support (MOS) is responsible for overseeing delivery, mail processing, maintenance, and vehicles in an area, and for implementing initiatives from Headquarters. Colin Dep. 62:11-64:18.

128:17; McAdams Dep. 216:3-217:16; June 26 PPT, at 14 ▮▮▮▮▮▮▮[23] to ▮▮▮▮▮▮
▮▮▮▮▮▮; *id.* at 19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[24]). And sorting machines
were expected to be started at the time identified in the Postal Service's operating schedule,
without discussion of possible exceptions. Colin Dep. 245:11-248:5; June 26 PPT, at 18 ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* July 30 PPT at 8 (Ex. 7) ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮.

    Headquarters set a firm two-month timeline for implementing the do-it-now strategies,
with many strategies to be implemented much sooner. Colin Dep. 317:3-7, 320:19-321:25,
324:16-325:15; Curtis Dep. 136:18-137:4; McAdams Dep. 103:4-21, 119:20-120:13; *e.g.*, June
26 PPT, at 21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮. The PowerPoint summarizing the strategies ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Do-It-
Now Strategies PPT (Ex. 32). In the email sharing all strategies with AVPs, Dr. Joshua Colin—
then Acting Vice President of Processing and Maintenance Operations, *see* USPS Official
Organizational Chart (Ex. 50)—wrote that the deadlines were ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ Email from Jennifer Vo to MDPS - AREA re: FW: PROJECT
PLAN (July 14, 2020) (Ex. 31). Consistent with the rigid timeline, Mr. Williams wanted daily
progress reports on whether the strategies were in fact being followed. Colin Dep. 306:3-15.

---

[23] T-Time is time paid at the normal rate for extra work done by supervisors or other exempt
employees beyond their scheduled hours. Curtis Dep. 112:7-16.

[24] LDC, or "Labor Distribution Code," is the operation or function that a Postal Service
employee is performing during the course of their work. Curtis Dep. 63:4-8; Colin Dep. 194:1-
23. LDC 11 refers to processing letters through an automated sorting machine. Colin Dep.
230:22-231:3. LDC 12 refers to processing flats through an automated sorting machine. Curtis
Dep. 117:9-10; McAdams Dep. 217:17-218:1.

Although the Postal Service had annually looked for ways to improve efficiency and cut costs, "prior year initiatives were not executed with the same velocity and consistency as the July 2020 initiatives." OIG Report Oct. 2020 at 13; *id* at 24. In prior years, Postal Service leadership had not distributed a fixed list of strategies for work hour reductions with a timeline for implementation. Colin Dep. 146:21-147:4, 149:13-150:15, 259:11-260:4, 322:1-15, 328:16-19; McAdams Dep. 201:17-202:18. Kevin McAdams—then Vice President, Delivery & Retail Operations, *see* USPS Official Organizational Chart (Ex. 50)—observed that the do-it-now strategies for FY 2021 were greater in scope than previous years. McAdams Dep. 196:24-198:5.

Headquarters did not conduct any advance analysis or conduct any pilot programs to determine how the do-it-now strategies would impact the Postal Service's mission. OIG Report Oct. 2020 at 2, 8, 13; *see also* Commission Report 2021 at 134 (Ex. 54) (encouraging USPS, in the wake of the 2020 operational initiatives, "to expand its use of pilot programs to better understand the impacts that cost-reduction initiatives may have on service performance results"). Before sending the do-it-now strategies to the AVPs on July 14, 2020, the Postal Service had not analyzed how executing all strategies within 60 days would affect service performance. Colin Dep. 330:21-331:1. Nor had the Postal Service analyzed the possible effect of particular initiatives, such as dramatically reducing late and extra trips. Williams Dep. 237:18-238:22; Cintron Dep. (Sept. 22, 2020) 59:23-60:7; McAdams Dep. 150:19-152:2. Once implemented, the Postal Service did not take any steps to track how the strategies were affecting service performance. Colin Dep. 285:10-20, 306:16-307:2; Williams Dep. 305:16-306:20; Curtis Dep. 107:12-108:6. Indeed, only on July 14 did some members of Headquarters first suggest the need for field offices to track implementation of the strategies themselves. Email from Joshua D. Colin to Kevin L. McAdams re: FW: 3A Do now Strategies-.pptx (July 14, 2020) (Ex. 33).

Despite the number of strategies and initiatives, and the speed at which they were to be implemented, Headquarters did not provide AVPs with any specific instructions about how to execute or communicate the various strategies. Colin Dep. 260:5-10; Williams Dep. 300:12-16; OIG Report Oct. 2020 at 2, 8, 13 (Ex. 52); OIG Report Nov. 2020 at 1 (Ex. 53). For example, Headquarters did not explain what a letter carrier, now required to depart for her delivery route at a certain time, should do if she was not yet done organizing mail for delivery or had not received all of that day's destinating mail, or of any other possible exceptions to the new expectation. Colin Dep. 215:9-12, 217:1-4. Nor was information provided about how certain forms of overtime should be eliminated, despite an instruction to do so. Colin Dep. 219:9-221:22, 275:4-276:15. By the same token, while AVPs were informed that sorting machines needed to run on schedule, they were not told what to do if mail was not ready to be sorted when a machine was scheduled to operate. Colin Dep. 246:20-247:6.

Instead, the do-it-now strategies were communicated down to the field offices primarily orally, "which resulted in confusion and inconsistent application across the country." OIG Report Oct. 2020 at 13; *see* Curtis Dep. 32:20-33:4, 34:15-36:11; McAdams Dep. 231:17-233:14. Simultaneously, Postmaster General DeJoy and Postal Service executives publicly reinforced their efforts to reduce work hours and cut costs, particularly overtime. On July 27, 2020, Postmaster General DeJoy issued a statement on "operational excellence and financial stability," affirming that the Postal Service "need[s] to redouble our efforts to focus on our plans to improve operational efficiency and to further control overtime expenditures." USPS News Break, *Postmaster General statement on operational excellence and financial stability* (July 27, 2020) (Ex. 37); *see also* DeJoy Senate Statement at 11 (Ex. 42). Postmaster General DeJoy further explained on August 7, 2020, that he had "taken immediate steps to better adhere to our

existing operating plans," including by "running our operations on time and on schedule, and by not incurring unnecessary overtime or other costs." Opening Remarks of Postmaster General Louis DeJoy at Board of Governors Meeting (Aug. 7, 2020) (Ex. 39). Mr. Williams, in his August 6, 2020, letter to members of Congress, explained that the Postal Service had "reemphasiz[ed] that operational managers must ensure that overtime is earned as the result of unexpected volume or other factors pursuant to our normal overtime analysis before it is approved." Letter from David E. Williams, Chief Operating Officer, USPS, to Members of Congress (Aug. 6, 2020) (Ex. 38).

It is no surprise, then, that the message received and implemented by many field offices was stark. For example, the Manager of Post Office Operations in the Northern Ohio District prepared a PowerPoint presentation explaining, among other things, that "POT[25] will be eliminated," "Overtime will be eliminated," and "only the POOMs can authorize SDO."[26] PMGs Expectations PPT, at 1-2 (Ex. 12). A delivery unit in the South Jersey district "only used the approved limit of SDO" and did not use available SDO "in accordance to SJ/Area Instructions," even though this caused mail delays. Email from Jennifer Vo to Ltisha Slagle re Delayed CSDRS - Daily Reporting 7/10/2020 (July 11, 2020) (Ex. 34); Email from Lisa Skelton to MDPS -AREA re Delayed CSDRS - Daily Reporting 7.11.2020 (July 13, 2020) (Ex. 35). Facilities in western Pennsylvania outright banned overtime for about a week, then began using it only sparingly. Dickey Decl. ¶¶ 21-23. Mail processing facilities in central and eastern Pennsylvania and

---

[25] Penalty overtime (POT) is paid at a higher rate than overtime and occurs after an employee works a certain amount of regular overtime. *See* Curtis Dep. 117:17-22.

[26] A scheduled day off (SDO), sometimes referred to as a non-scheduled day, is when a USPS employee works a day they are not scheduled to work. Cintron Dep. (Sept. 22, 2020) 87:7-18. The entire day is paid at the penalty rate. *Id.* POOM is the Post Office Operation Manager.

southern New Jersey reported broad overtime restrictions, Gibson Decl. ¶ 14, as did facilities in San Antonio, Texas, Tr. Prelim. Inj. Teleconference at 23, *Jones v. USPS* (Ex. 82).

Current and former Postal Service employees from all over the country also understood Postmaster General DeJoy to have made significant changes to USPS operations. *E.g.*, Email from Louis DeJoy to Rhonda Stavely re: New mandate from PG (July 13, 2020) (Florida) (Ex. 43); Email from Louis DeJoy to Rhonda Stavely re: Help us, Help you (July 16, 2020) (Ex. 44); Email from Louis DeJoy to Rhonda Stavely re: Communication (July 17, 2020) (Ohio) (Ex. 45); Email from Louis DeJoy to Rhonda Stavely re: Congrats and a comment (July 19, 2020) (Ex. 46); Email from Angie Breving to Louis DeJoy re: the difference you have made (July 25, 2020) (Virginia) (Ex. 47); Email from Louis DeJoy to Rhonda Stavely re: RCA from Orland, CA Hello (July 30, 2020) (California) (Ex. 48).

### C.    Resulting Mail Delays

The effect of the no late and extra trip initiative and the work-hour reduction strategies on service performance was swift. In the days following implementation, the amount of delayed mail skyrocketed. OIG Report Oct. 2020 at App'x E (Ex. 52). The Postal Service went from a little more than 2 million pieces of daily delayed mail nationwide as of June 27, 2020, to more than 11 million pieces of daily delayed mail by mid to late July. *Id.*; *see also* Coradi Decl. ¶ 9 (reporting "astonishing amounts of delayed mail").

And as more mail piled up on loading docks and at delivery units, service performance dropped. USPS Service Performance for Market-Dominant Products (Jan. 10, 2020 - May 21, 2021) (Ex. 1) ("USPS Service Performance Data"); *see also* Mandatory SUT (Ex. 10) (acknowledging that as a result of the changes, postal employees will see mail "left behind" and "on the workroom floor or docks" of processing plants, which is "not typical"). Nationwide service performance for First-Class Mail had been hovering at just above 90 percent for most of

2020, notwithstanding the incredible pressures caused by the COVID-19 crisis. *See* USPS Service Performance Data. Indeed, the average nationwide service performance for First-Class Mail between the week ending on March 6, 2020, and the week ending on July 10, 2020, was 91.18 percent. *Id.* But during the week after Mr. Williams' July 10 meeting, nationwide service performance for First-Class Mail dropped five points, to 85.34 percent. *Id.* Service performance continued to decline, reaching a low of 81.58 percent during the week ending on August 14, 2020. *Id.*

Postmaster General DeJoy acknowledged these delays. In his August 13, 2020, message, Postmaster General DeJoy recognized that his "transformative initiative has had unintended consequences that impacted our overall service levels." Message from the Postmaster General to all USPS Employees, *U.S. Postal Service Plan for Operational Excellence and Financial Stability* (Aug. 13, 2020) (Ex. 40). A week later, he explained to the Senate that mail had missed scheduled transportation, which had "temporarily impacted mail and package service performance." DeJoy Senate Statement at 9 (Ex. 42).

The mail delays harmed Plaintiff States and their residents, impacting government payments, legal notices, and other documents and materials necessary for Plaintiffs' agencies to function, as well as bills, checks, prescriptions, and other important individual mail.

For example, Pennsylvania's Department of Labor & Industry administers programs such as unemployment and workers' compensation. O'Brien Decl. ¶¶ 9, 14 (Ex. 75). That department uses the Postal Service to send vital documents related to these programs, but mail delays led to significant difficulty in scheduling and holding hearings, responding to litigation, adjudicating claims, and paying life-sustaining benefits, all of which undermines the Department of Labor & Industry's ability to operate its essential programs. O'Brien Decl. ¶¶ 27-45.

Likewise, Delaware's Department of Health and Social Services administers payments for child support, general cash assistance programs, food assistance programs, and other benefit programs, all of which meet critical needs. Kejner Decl. ¶ 2 (Ex. 71). It sends correspondence for these programs by mail. Kejner Decl. ¶¶ 6-8. From July 2020 until the preliminary injunction was entered, interruptions to mail service delayed receipt of state-issued checks and other correspondence essential to the administration of these benefit programs. Kejner Decl. ¶¶ 14-17. In two instances, hearing notices were not received until after the scheduled hearing. Kejner Decl. ¶ 14. As a result, the Department of Health and Social Services had difficulty providing adequate services to all of its clients and complying with state and federal timeliness requirements. Kejner Decl. ¶¶ 15-18.

In North Carolina, interruptions in mail service affected the ability of the Office of Recovery and Resiliency to timely deliver assistance to hurricane survivors. Whichard Decl. ¶ 5 (Ex. 78). Timely mail service is also critical for the North Carolina Department of Commerce's payment of unemployment insurance benefits, five percent of which are made by mail. Whichard Decl. ¶ 9. Delays in mail service also affected the North Carolina Department of Health and Human Services' ability to send eWIC cards, replacement eWIC cards, WIC Farmer's Market Nutrition Program coupons (which expire after 30 days), and EBT cards and applications. Whichard Decl. ¶ 10. Delays in these mailings impacted the ability of participants, particularly the most financially insecure, to buy food and decreased the time they have to redeem food-related benefits. Whichard Decl. ¶ 10.

Similarly, Los Angeles County's Department of Health Services, which offers low-cost or free health care to low-income county residents, uses an automated prescription refill service through which medicine is mailed to patients through the Postal Service. Pallares Decl. ¶¶ 3-4

(Ex. 76). Because of the COVID-19 pandemic, over 70 percent of the Department's patients receive their medicine through the mail. Pallares Decl. ¶ 7. Before the preliminary injunction issued, many DHS patients reported waiting up to three weeks for a refill to arrive. Pallares Decl. ¶ 8. The Department of Health Services had to take protective measures—such as early refills—to make sure patients were not left with medicine, but that led to a number of double orders and increased operational costs. Pallares Decl. ¶ 11.

State agencies' internal operations were harmed as well. In Pennsylvania, the Department of General Services received a number of complaints from suppliers concerning payments that have been mailed and never received. Hudson Decl. at 4-5 (Ex. 69). In California, the Department of Conservation's overnight shipments to employees of necessary equipment took 11 days to arrive, during which time the employees could not perform their job duties. Haas Decl. ¶ 8 (Ex. 68). Hearing notices, documentary evidence, and settlement agreements sent by or to the Department of Conservation or by California's Labor and Workforce Development Agency arrived too late to be useful or never arrived at all. Haas Decl. ¶¶ 9-10; Knox Decl. ¶ 10 (Ex. 73). For the Labor and Workforce Development Agency, delays meant the department had to reschedule hearing dates, or re-open closed matters, for people claiming an entitlement to unemployment insurance. Knox Decl. ¶ 11. And in July and August, the California Department of Consumer Affairs, the licensing body for more than 3.5 million professionals in 250 different categories, had some of its exam scheduling letters, licenses, documents from applicants, fees, and other important items delayed by weeks or lost altogether. Kirchmeyer Decl. ¶ 4, 9-15 (Ex. 72). Californians who need agency approval for licensing did not always received it in a timely fashion, which can impose financial hardship. Kirchmeyer Decl. ¶¶ 16-17. Those delays all hampered the agency's collection of licensing fees, which is its sole source of funds. Kirchmeyer

Decl. ¶ 19. Moreover, frustrated consumers filed more complaints with the agency, which the agency spent additional time handling. Kirchmeyer Decl. ¶ 18.

Individual mail customers in the States, too, experienced personal harm from delayed medical supplies, medications, checks, bills, and benefits. Those harms, as is now known, were common and can be devastating.

A former Pennsylvania teacher and recent heart transplant patient had to wait ten days to receive an order form for a blood draw, despite the form coming from the same city she lived in. Jara Decl. ¶¶ 13-17 (Ex. 70). Separately, a small business owner in Pennsylvania sent a furloughed employee her last paycheck by First-Class Mail, along with a personal note expressing gratitude for her work. Erlbaum Decl. ¶ 9 (Ex. 65). More than three weeks later, the check and note had still not been delivered. Erlbaum Decl. ¶¶ 12-13. One California small business owner who sells goods through an online marketplace had, from July to September 2020, nine shipments delayed by an average of six days, leading to several negative reviews from customers. Utal Decl. ¶¶ 13-21, 24 (Ex. 77). From January 2019 to June 2020, the same retailer had just one of 124 domestic packages sent through the Postal Service delayed. Utal Decl. ¶ 12. Because that retailer responded by starting to use Priority Mail, she sold fewer goods and estimates that she lost more than $1,500 in refunds and business due to the delays. Utal Decl. ¶¶ 25-32. Finally, a Delaware child missed at least one dose of his prescribed medicine in August because a package that typically had been delivered within three days of shipment took a week to arrive. Naccarato-O'Toole Decl. ¶¶ 6-7, 11 (Ex. 74).

## III.    Procedural History

### A.    This Action

Plaintiffs filed suit against Defendants on August 21, 2020, and brought four causes of action: first, Defendants exceeded their authority by implementing changes to postal service

34

operations without an advisory opinion from the Postal Regulatory Commission as required by 39 U.S.C. § 3661(b) (Count I); second, Defendants implemented operational initiatives without complying with the statutory directives of the PRA, 39 U.S.C. §§ 101, 403 (Count II); third, the operational initiatives and related changes to the treatment of election mail violated the Elections and Electors Clauses of the U.S. Constitution (Count III); and finally, the operational initiatives and related changes to the treatment of Election Mail violated the 26th Amendment to the U.S. Constitution (Count IV).[27]

Plaintiffs moved for a preliminary injunction on Counts I and III on September 2, 2020 (ECF No. 18). The Court granted Plaintiffs' motion to conduct expedited discovery (ECF No. 14) on September 4, 2020 (ECF No. 22), after which Defendants produced documents and Plaintiffs conducted two depositions. The Court held a hearing on the preliminary injunction motion on September 24, 2020, at which Plaintiffs introduced supplemental exhibits primarily obtained through discovery.

On September 28, 2020, the Court granted Plaintiffs' motion for preliminary injunction (ECF Nos. 62, 63). The Court found as a matter of fact that the Postal Service had "implemented new initiatives to slash the number of late and extra truck trips and restrict work hours." *Pennsylvania*, 490 F. Supp. 3d at 845-46 (ECF No. 62). The Postal Service's "sudden and rigid pivot to operating goals in the areas of truck transportation, overtime, and start and stop times for letter carriers constituted a significant change in agency practice" and "resulted in mail being left behind." *Id.* at 846. On the threshold legal questions, the Court first found that it had jurisdiction to review Plaintiffs' claim that Defendants exceeded their authority by implementing operational changes without first obtaining an advisory opinion from the Commission. *Id.* at 857.

---

[27] Counts III and IV, which related to the 2020 election, are moot.

Specifically, the Court held that 39 U.S.C. § 3662 did not preclude district court review of claims related to 39 U.S.C. § 3661(b), nor require Plaintiffs to first bring their challenge before the Commission. *Id.* at 864-65. The Court further concluded that Pennsylvania had standing to challenge Defendants' *ultra vires* conduct. *Id.* at 869-73.

Turning to the merits of Count I, the Court first concluded that it would analyze the claim under a theory of nonstatutory review, *id.* at 876, and that it owed the Postal Service's conclusory interpretation of 39 U.S.C. § 3661 little deference, *id.* at 882. The Court then found that Plaintiffs were likely to succeed on the merits of their claim that the Postal Service had made a "change" "in the nature of postal services" that affected mail service "on a nationwide or substantially nationwide basis." *Id.* at 884-87 (quoting 39 U.S.C. § 3661; *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975)). The Postal Service's "own pronouncements and substantial evidence in the record" demonstrated quantitatively that USPS had changed its operational practices. *Id.* at 884-85. Individual postal consumers experienced a decline in postal services, *id.* at 885-86, and the changes were implemented nationwide, *id.* at 887. Finally, the Court concluded that Plaintiffs had demonstrated prior and ongoing irreparable harm caused by the Postal Service's operational changes, *id.* at 887-88, and that the public interest and balance of the equities favored entry of injunctive relief, *id.* at 888-89. The Court enjoined implementation of the operational changes nationwide, incorporated Judge Marrero's Order in the related case *Jones v. United States Postal Service*, No. 20 Civ. 6516 (S.D.N.Y. Sept. 25, 2020), imposed data reporting requirements, and ordered compliance with Clarifying Operational Instructions issued by the Postal Service on September 21, 2020. *Id.* at 893; Order (ECF No. 63).[28]

---

[28] The Court also held that California had standing to bring Count III, *Pennsylvania*, 490 F. Supp. 3d at 873-74, but concluded that the evidence was inconclusive of changes to the handling of election mail, *id.* at 853, and ultimately declined to reach the question, *id.* at 889-90.

Defendants subsequently moved to clarify or reconsider the Court's order (ECF No. 66). Following negotiation between the parties facilitated by the Court, the Court entered a Clarifying Order on October 9, 2020. *Pennsylvania v. DeJoy*, No. 20-4096, 2020 WL 6580462 (E.D. Pa. Oct. 9, 2020) (memorandum) (ECF No. 69); *Pennsylvania v. DeJoy*, No. 20-4096, 2020 WL 6580463 (E.D. Pa. Oct. 9, 2020) (order) (ECF No. 70). Among other provisions, the Clarifying Order required that "[t]ransportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets" and that USPS "approve overtime, including penalty overtime, for the purpose of meeting service standards and service performance targets." *Pennsylvania*, 2020 WL 6580463 at *1-2. Where conflicting, the Court's Order superseded "any prior guidance, including Guidelines regarding transportation sent by Robert Cintron to Area Vice Presidents and other agency representatives on July 11, 2020 and July 14, 2020." *Id.* at *2.

The Court's orders remain in effect. Service performance remains below where it was at the same time last year. *See* USPS Service Performance Data (Ex. 1).

## B.  Related Litigation

The 2020 operational initiatives and resulting delays, as well as concerns regarding election mail, prompted several other lawsuits against the Postal Service.

**Ongoing**

- *NAACP v. USPS*, No. 20-2295 (D.D.C.) (in discovery on amended complaint filed March 5, 2021)
- *New York. v. Trump*, No. 20-2340 (D.D.C.) (pending decision on motion for summary judgment)

**Resolved**

- *Vote Forward v. DeJoy*, No. No. 20-2405 (D.D.C.) (voluntarily dismissed May 24, 2021)
- *Jones v. USPS*, No. 20-6516 (S.D.N.Y.) (dismissed but for fees May 13, 2021)
- *Washington v. Trump*, No. 20-3127 (E.D. Wash.) (voluntarily dismissed Feb. 17, 2021)

- *Richardson v. Trump*, No. 20-2262 (D.D.C.) (voluntarily dismissed Jan. 21, 2021)
- *National Urban League v. DeJoy*, No. 20-2391 (D. Md.) (voluntarily dismissed Dec. 15, 2020)
- *Bullock v. USPS*, No. 20-79 (D. Mont.) (voluntarily dismissed Dec. 1, 2020)
- *Johnakin v. USPS*, No. 20-4055 (E.D. Pa.) (settled and dismissed Nov. 25, 2020)
- *Colorado v. DeJoy*, No. 20-2768 (D. Colo.) (settled and voluntarily dismissed Sept. 17, 2020)

The plaintiffs in the *Washington, Jones*, *NAACP*, *New York*, and *Vote Forward* cases sought and obtained preliminary injunctions. *See Washington v. Trump*, 487 F. Supp. 3d 976 (E.D. Wash. 2020) (granting injunction on 39 U.S.C. § 3661 claim), order clarified, 2020 WL 6588502 (E.D. Wash. Oct. 2, 2020); *Jones v. United States Postal Serv.*, 488 F. Supp. 3d 103 (S.D.N.Y. 2020) (granting injunction on constitutional claims), order clarified, 2020 WL 6554904 (S.D.N.Y. Sept. 29, 2020); *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110 (D.D.C. 2020) (granting injunction on constitutional claims); *NAACP v. United States Postal Serv.*, 496 F. Supp. 3d 1 (D.D.C. 2020) (granting injunction on 39 U.S.C. § 3661 claim); *New York v. Trump*, 490 F. Supp. 3d 225 (D.D.C. 2020) (granting injunction on 39 U.S.C. § 3661 claim), order clarified, 2020 WL 6572675 (D.D.C. Oct. 22, 2020). The *NAACP* and *New York* injunctions remain in place.

Expedited discovery produced by Defendants in the *Washington* case, as well as depositions conducted by the *New York* plaintiffs, were shared with the Plaintiff States here.

## ARGUMENT

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment must be granted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "That standard does not change when the parties cross-move for summary judgment." *Krist v. Pearson Educ., Inc.*, 419 F. Supp. 3d 904, 907 (E.D. Pa. 2019) (citing *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016)). "The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief." *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 n.12 (3d Cir. 2002) (citing Fed. R. Civ. P. 57; *Simler v. Conner*, 372 U.S. 221, 222 (1963)).

Courts may perform "non-statutory review" to determine if a government action is *ultra vires*, and use equitable power to set aside is aside if so. *Zirin v. McGinnes*, 282 F.2d 113, 115 (3d Cir. 1960); *see also Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 916 (3d Cir. 1981) ("[A]n assumption of jurisdiction or action that is ultra vires and beyond the scope of the delegated authority will be set aside." (quoting Dickinson, Administrative Justice and Supremacy of Law 41 (1927))). Acts of the Postal Service are often reviewed by courts on this basis. *See Pennsylvania*, 490 F. Supp. 3d at 876 (summarizing cases); *see also, e.g.*, *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012); *New York v. Trump*, 490 F. Supp. 3d 225, 240-41 (D.D.C. 2020).

Here, it cannot be reasonably disputed that in June and July 2020, the Postal Service adopted a policy to cut costs and effectuated this policy by implementing dozens of initiatives and strategies. Key among these was an initiative to eliminate all late and extra trips, which the Postal Service enforced by making all such trips unauthorized contractual commitments. The Postal Service further implemented dozens of do-it-now strategies to reduce work hours. As a result of these cost-cutting measures, the evidence demonstrates that delayed mail skyrocketed and service performance dropped.

It is undisputed that the Postal Service did not obtain an advisory opinion from the Commission prior to adopting the no late and extra trip initiative, and the evidence shows that the initiative changed postal services and negatively impacted service performance nationwide. Implementing the initiative, therefore, exceeded the Postal Service's authority, as limited by 39 U.S.C. § 3661.

The evidence also demonstrates that the Postal Service did not conduct any analysis prior to implementing the no late and extra trip initiative and the other do-it-now strategies to reduce work hours, nor did it consider the impact on service performance that would result from implementing so many strategies so quickly during a pandemic, or the consequence of executing its strategies ahead of the 2020 election. The evidence further shows that the Postal Service implemented the strategies haphazardly, causing confusion and inconsistent application in the field. In short, the evidence demonstrates that the Postal Service failed to consider the impact on important letter mail, such as First-Class Mail and election and census mail, and failed to provide adequate and efficient postal services. Implementing the no late and extra trip initiative and other do-it-now strategies, therefore, was in violation of the Postal Service's nondiscretionary obligations under 39 U.S.C. §§ 101 and 403.

**I.      The no late and extra trip initiative exceeded the limits of the Postal Service's authority defined by 39 U.S.C. § 3661 (Count I).**

The PRA limits the Postal Service's authority to act unilaterally. Whenever the Postal Service "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it "shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). Before issuing its advisory opinion, the Commission must hold a hearing on the record, in

accordance with 5 U.S.C. § 556 and 5 U.S.C. § 557, at which the interests of the Postal Service, the public, and the Commission are represented. 39 U.S.C. § 3661(c). After the hearing, the Commission issues its written advisory opinion. *Id.* Any act defined by § 3661(b), but taken without satisfying §§ 3661(b) and 3661(c)'s procedural requirements, is beyond the Postal Service's authority.

As several courts, including this one, concluded last year, the Postal Service likely was without power to unilaterally implement its late and extra trip policy. *See Pennsylvania*, 490 F. Supp. 3d at 884-87; *see also Washington*, 487 F. Supp. 3d at 982-83; *New York*, 490 F. Supp. 3d at 241-43; *NAACP*, 496 F. Supp. 3d at 16-18. Even the one court that denied a motion for a preliminary relief based on the Postal Service unilaterally initiating the late and extra trip policy agreed the Postal Service likely exceeded its power when issuing that directive. *Nat'l Urb. League*, No. 20-2391, 2020 WL 6363959, at *7 (D. Md. Oct. 29, 2020). The evidence in support of these conclusions is even more compelling now.

Section 3661(b) prohibits unilateral action that meets three conditions: (1) a "change," (2) "in the nature of postal services," that (3) affects service "on a nationwide or substantially nationwide basis." *Buchanan*, 508 F.2d at 262 (quoting 39 U.S.C. § 3661(b)).[29]

---

[29] The only Postal Service interpretation of 39 U.S.C. § 3661(b) contemporaneous with the no late and extra trip initiative is a letter from the Postal Service's general counsel summarily stating that the Postal Service took no act in July 2020 subject to § 3661's procedural requirements. *Pennsylvania*, 490 F. Supp. 3d at 877. As this Court thoroughly covered in its opinion granting Plaintiffs' motion for a preliminary injunction, that statement is due, at most, a low level of deference because it was not issued contemporaneously with the statute it purports to interpret, conflicts with positions the Postal Service has taken at other times, is unreasonable, and does not draw from any source of expertise. *Id.* at 879-82. Moreover, the Postal Service's perfunctory statement is at odds with the Postal Regulatory Commissions' past practice, a historic precedent more deserving of deference. *Id.* at 882-84.

### A.      The no late and extra trip initiative was a change.

First, the act must constitute "a change." *Buchanan*, 508 F.2d at 262. Analysis of this condition involves a quantitative determination of whether the Postal Service has made some adjustment that meaningfully impacted service. *Id.* Courts may be guided by the effect of an act as much as they are by the Postal Service's intent. *Pennsylvania*, 490 F. Supp. 3d at 884 (citing Postal Regulatory Comm'n, *Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services*, Docket No. N75-1, at 20 (Apr. 22, 1976)).

Here, by both intent and effect, the Postal Service's late and extra trip policy was a "change." The Postal Service's new approach to late and extra trips was instigated by Postmaster General DeJoy's appointment. Soon after assuming his role in June 2020, Postmaster General DeJoy informed the Postal Service's existing leadership of his distaste for, among other things, the Postal Service's use of extra trips. Statement of Facts Part II, *supra*, at 13. Postmaster General DeJoy expected Mr. Williams, then the COO, and other members of the leadership to promptly address his concerns. Mr. Williams disseminated that message to his team. *Id.*

Mr. Williams, following his conversations with Postmaster General DeJoy, implemented a new initiative to eliminate the use of late and extra trips. Statement of Facts Part II.A, *supra*, at 13-17. After speaking directly with AVPs about the "need to change" how the Postal Service uses late and extra trips, Mr. Williams presented them with a summary of the new initiative on July 10, 2020. Statement of Facts Part II.A, *supra*, at 14-15. He explained that the Postal Service's "first test" was "no extra transportation" and "no late transportation." Statement of Facts Part II.A, *supra*, at 15. To ensure compliance, extra and Postal Service-caused late trips would become "unauthorized contractual commitments" as of July 13, thus subjecting employees who ordered an extra or late trip without express authority to possible liability and discipline. Statement of Facts Part II.A, *supra*, at 16-17. Going forward, AVPs would ratify late and extra

trips and report daily to Mr. Williams about usage. *Id.* No prior effort to run trips on time had adopted affirmative restrictions on the use of extra or late trips, much less ones that came with personal liability. Statement of Facts Part II.A, *supra*, at 17.

Postal Service employees began following the new directive immediately after the July 10 meeting. That day, the AVP of the Southern Area sent a document notifying all employees in the area that late and extra trips were no longer authorized; that document quickly spread across the country. Statement of Facts Part II.A, *supra*, at 17-18. A manager in Ohio drafted a document that similarly explained that late mail would be held and delivered the next day. Statement of Facts Part II.A, *supra*, at 18. Across the country, trucks were ordered to leave at the scheduled time, regardless of whether all the mail was on board. Statement of Facts Part II.A, *supra*, at 18-19. By July 13, the Postal Service sales department was fielding calls from customers complaining about the Postal Service's failure to collect some pieces of mail for delivery. Statement of Facts Part II.A, *supra*, at 19-21. Although Mr. Cintron devised guidelines that identified when certain late and extra trips would be "acceptable," Postal Service Headquarters did not rescind the effort to eliminate late and extra trips nor the directive making all such trips unauthorized contractual commitments. Statement of Facts Part II.A, *supra*, at 20. To the contrary—at the end of July 2020, Mr. Williams held another meeting ███████████████████ ████████████████████████████████████████████████████ ███████████████████████ Statement of Facts Part II.A, *supra*, at 21-22. Postmaster General DeJoy subsequently confirmed that, following his appointment, the Postal Service adopted a new policy to eliminate late and extra trips. Statement of Facts Part II.A, *supra*, at 22-23.

The initiative directly impacted the Postal Service's use of late and extra trips. In the two weeks after July 13, the Postal Service averaged ███ daily extra trips, down from an average of ███ daily extra trips for the two prior weeks. Statement of Facts Part II.A, *supra*, at 24. Likewise, the Postal Service averaged ███ daily late trips in the wake of the change, after having averaged ███ daily late trips in the month and a half before July 13. *Id.* These were, as Mr. Williams recognized, dramatic declines. Williams Dep. 237:18-238:4.

The initiative also directly impacted delayed mail, which jumped fivefold after the late and extra trip directive. Statement of Facts Part II.C, *supra*, at 30. Unsurprisingly, service performance dropped. Statement of Facts Part II.C, *supra*, at 30-31. Before July 2020, the Postal Service met its service standard for First-Class Mail 90 percent of the time in nearly every week of 2020. *Id.* Within a week of implementation, the Postal Service experienced a 5.36 percent drop in service performance for First-Class Mail. Statement of Facts Part II.C, *supra*, at 31. Before that, the largest single week drop in 2020 had been 1.93 percent, notwithstanding the impact of COVID-19. *See* USPS Service Performance Data (Ex. 1). Across the five weeks immediately following the change, the Postal Service met its service standard for First-Class Mail just 83.19 percent of the time. And since the change, there has not been a single week in which the Postal Service met its service standard for First-Class Mail more than 88.7 percent of the time. *See* USPS Service Performance Data.

These data, as well as the Postal Service's repeated acknowledgment that they had implemented a change, show that § 3661(b)'s first condition is met.

**B.     The no late and extra trip initiative changed the nature of postal services.**

Second, 39 U.S.C. § 3661(b) requires that the change be "in the nature of postal services." 39 U.S.C. § 3661(b). "Postal services" are "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions

ancillary thereto." 39 U.S.C. § 102(5). This condition calls for "a qualitative examination of the manner in which postal services available to the user will be altered." *Buchanan*, 508 F.2d at 263. The Commission has examined whether individual consumers have experienced an alteration in the availability of postal services as evidence of whether a change in the nature of postal services has occurred. *Pennsylvania*, 490 F. Supp. 3d at 885 (citing Advisory Opinion Docket No. N75-1, at 21).

In this case, the change was "in the nature of postal services." Late and extra trips are trips by trucks transporting mail that are either delayed relative to the Postal Service's operating schedule or are in addition to what the schedule calls for. Williams Dep. 65:22-66:8; Cintron Dep. (Sept. 22, 2020) 29:3-12, 31:23-32:15; Colin Dep. 332:9-333:19; Curtis Dep. 31:12-18; McAdams Dep. 76:17-20. Late and extra trips may be used when the Postal Service has greater than expected mail volume or because of upstream delays in the mail cycle. Cintron Dep. (Sept. 22, 2020) 30:1-31:5, 32:21-33:5; Curtis Dep. 41:21-43:15; McAdams Dep. 76:21-77:16. A change to the use of late and extra trips, then, is a change to the "transportation" of mail. Eliminating late and extra trips also requires a change to letter carriers' "delivery" and "collection" of mail. Implementing the no late and extra trip initiative meant letter carriers had to "leave on schedule" and "come back on time" and could not "go back out and deliver late mail." McAdams Dep. 148:19-149:17; Williams Dep. 185:9-186:15.

Eliminating late and extra trips can negatively impact service because some mail will be transported a day or more later than it otherwise would if an extra or late trip was run. McAdams Dep. 209:13-211:17. Indeed, since the Postal Service implemented the new policy, customers' experiences have reflected the changed availability of postal services. In the wake of the change, customers regularly complained about mail being delayed or not being picked up. *See* Statement

of Facts Part II.C, *supra*, at 31-34. A heart transplant patient had to wait to wait ten days to

receive an order form for a blood draw, despite the form coming from the same city she lived in.

Jara Decl. ¶¶ 13-17. Private businesses that rely on the Postal Service experienced harmful

delays. Erlbaum Decl. ¶¶ 9-13; Utal Decl. ¶¶ 13-21, 24. Government agencies were affected, too.

Pennsylvania and California agencies could not provide necessary services, including supplying

prescriptions by mail. *See* Pallaras Decl. ¶¶ 8, 11; *see also* Haas Decl. ¶¶ 8-10; Kirchmeyer Decl.

¶¶ 4, 9-15; Knox Decl. ¶¶ 10-11; O'Brien Decl. ¶¶ 27-45. The Delaware agency that administers

payments for child support, general cash assistance programs, food assistance programs, and

other benefit programs experienced delays with the delivery of correspondence essential to the

administration of these benefit programs, as well as with state-issued checks and hearing notices.

Kejner Decl. ¶¶ 14-17. The delays have impeded the agency's ability to provide all required

services, and its obligation to comply with state and federal timeliness requirements. Kejner

Decl. ¶¶ 15-18.

In short, the no late and extra trip initiative had a qualitative effect on the collective,

transportation, and delivery of mail.

**C.     The no late and extra trip initiative negatively affected service nationwide.**

Finally, the change must "affect service on a nationwide or substantially nationwide

basis." 39 U.S.C. § 3661(b). That is, the change must affect a "broad geographical area."

*Buchanan*, 508 F.2d at 263. A change that emanates from Postal Service's Headquarters can be

evidence of the change's nationwide scope. *Pennsylvania*, 490 F. Supp. 3d at 886 (citing

Advisory Opinion Docket No. N75-1, at 26). Likewise, a change more likely affects service

nationwide if it is felt by a significant number of customers spread across the country. *Id.* (citing

Advisory Opinion Docket No. N75-1, at 29).

The Postal Service's no late and extra trip initiative was effective nationwide, a point never in dispute. Defs' Resp. to Pls.' Reqs. for Admis. No. 31 (Ex. 80). The directive to cut late and extra trips came from the very top of Postal Service Headquarters, and, as Mr. Williams explained, went "all the way down to the frontline," such that "even the custodians need[ed] to understand the change." Statement of Facts Part II.A, *supra*, at 13-14. The message was in fact received by Postal Service employees throughout the country. Statement of Facts Part II.A, *supra*, at 17-21. Likewise, the effect on service that immediately followed the late and extra trip directive was felt nationwide. Statement of Facts Part II.C, *supra*, at 30-31.

*      *      *

Although the no late and extra trip initiative checks all three of § 3661's boxes, the Postal Service never submitted a proposal to the Commission. Letter from Thomas J. Marshall, General Counsel, USPS, to Carolyn B. Maloney, Chairwoman, Committee on Oversight and Reform, House of Representatives re: Operations (July 22, 2020) (Ex. 36). Because the Postal Service implemented its no late and extra trip initiative without first obtaining an advisory opinion from the Commission, the initiative was *ultra vires*.

For these reasons, the Court should enter judgment in Plaintiffs' favor on Count I.

## II. The 2020 cost-cutting policy, effectuated by numerous operational strategies, violated nondiscretionary obligations established by 39 U.S.C. §§ 101 and 403 (Count II).

The initiative to eliminate late and extra trips was part of a larger set of operational strategies—the "do-it-now" strategies—to reduce 64 million total work hours during Fiscal Year 2021. The Postal Service implemented these operational initiatives quickly and haphazardly in summer 2020 to effectuate its policy to cut costs. But by rolling out so many strategies so quickly, during the middle of a pandemic, without having devised any plan for communicating or tracking the effect of the strategies, and without having performed any analysis of what

47

consequences such action would have on service quality, the Postal Service violated several

statutory provisions requiring it to prioritize expeditious delivery and to maintain an efficient

postal network. 39 U.S.C. §§ 101, 403. Service still has not recovered from the shock of the

Postal Service's cost-cutting policy.

> **A.** **The Postal Service has a statutory duty to expeditiously handle important letter mail and provide efficient and adequate postal services.**

When Congress enacted the PRA to overhaul the nation's postal services, Congress also

affirmed that the newly constituted Postal Service would remain, at bottom, a public service. The

House Report for the PRA explained that "[t]he Postal Service is required to develop and provide

adequate and efficient postal service at fair and reasonable rates and to serve as nearly as

practicable the entire population of the United States," that "the existing concept of universality

of postal service is explicitly carried forward in the [PRA]," and that "effective postal service is

to be assured to residents of rural, as well as urban, communities." H.R. Rep. No. 91-1104, at

3657 (1970). In its opening section, the PRA announces that the "United States Postal Service

shall be operated as a basic and fundamental service provided to the people by the Government

of the United States, authorized by the Constitution, created by Act of Congress, and supported

by the people." 39 U.S.C. § 101(a).

Several provisions of the PRA specifically address how the Postal Service must fulfill its

public charter.

> **1.** **Postal Service policies must give the highest consideration to First-Class Mail and other important letter mail.**

First, when the Postal Service determines "all policies for postal services," it "shall give

the highest consideration to the requirement for the most expeditious collection, transportation,

and delivery of important letter mail." 39 U.S.C. § 101(e). Consistent with the PRA's definition

of "postal services," "policies for postal services" means policies for "the delivery of letters,

printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5).

While the PRA did not define "important letter mail," that phrase can only logically include first-class letter mail, a class of mail that was categorically delayed by the Postal Service's cost-cutting policy. Historically, "letters" is the category of mailable matter for which Congress has protected the Postal Service from competition. *See generally* Private Express Statutes (18 U.S.C. §§ 1691-99 & 39 U.S.C. §§ 601-06, codified at 39 C.F.R. pt. 310); 39 U.S.C. §§ 3621-29. In other words, "letter mail" refers to the Postal Service's market-dominant products, which includes "first-class mail letters." 39 U.S.C. § 3621(a)(1). Of the market-dominant products, First-Class Mail is how Congress would expect important letters to be sent. First-Class Mail must be used for "[m]atter containing personal information, partially or wholly handwritten or typewritten matter, or bills or statements of account." Postal Regulatory Comm'n, *Mail Classification Schedule* at 5 (current redline version Mar. 31, 2021) (word doc);[30] *see also* 39 U.S.C. § 3621(b) ("Mail matter referred to in subsection (a) shall, for purposes of this subchapter, be considered to have the meaning given to such mail matter under the mail classification schedule."). And First-Class Mail is "sealed against postal inspection and shall not be opened except as authorized by law." Mail Classification Schedule, *supra*, at 5.

Moreover, the PRA, as amended, instructs the Postal Service to maintain a system of mail classification with one class "for the most expeditious handling and transportation afforded mail matter by the Postal Service," and for which letters shall not "be opened except under authority of a search warrant authorized by law, or by an officer or employee of the Postal Service for the sole purpose of determining an address at which the letter can be delivered, or pursuant to the

---

[30] https://www.prc.gov/mail-classification-schedule (last visited May 28, 2021).

authorization of the addressee." 39 U.S.C. § 404(c). First-Class Mail fits this description, *compare id.*, *with* Mail Classification Schedule, *supra*, at 5, and receives the most expeditious service standard among the market-dominant products, *see* 39 C.F.R. pt. 121 app'x A. And the similar language between § 101(e) and § 404(c) suggests that the class of mail described in § 404(c) qualifies as the important letter mail described in § 101(e).

The Postal Service itself considers First-Class Mail to fall within the "important letter mail" described in § 101(e). Since 1976, the Postal Service has been required to report to Congress its compliance with § 101. *See* Postal Reorganization Act Amendments of 1976, Pub. L. No. 94-421, § 2(b), 90 Stat. 1303-04 (codified at 39 U.S.C. § 2401(e)(1)). In its very first report, the Postal Service affirmed compliance with 39 U.S.C. § 101(e) by reporting on its handling of First-Class Mail. *General Oversight and Postal Service Budget Hearing Before the Subcomm. on Postal Operations and Services of the H. Comm. on Post Office and Civil Service* 95th Cong. 67 (Mar. 15, 1977) (Postal Service's comprehensive statement of compliance with statutory policies).

Other mailpieces, required by the Constitution or mailed in furtherance of constitutional rights, would also logically fall within "important letter mail." For example, an increasing number of Americans are using the mail to vote; indeed, due to the pandemic, more than 68 million Americans voted by mail. *See* Scherer, *Majority of Voters Used Nontraditional Methods to Cast Ballots in 2020*, *supra* (43% of ballots cast by mail in 2020); Drew Desilver, *Turnout soared in 2020 as nearly two-thirds of eligible U.S. voters cast ballots for president*, Pew Research Center (Jan. 28, 2021) (158.4 million ballots cast in 2020).[31] Similarly, 2020 decennial

---

[31] https://www.pewresearch.org/fact-tank/2021/01/28/turnout-soared-in-2020-as-nearly-two-thirds-of-eligible-u-s-voters-cast-ballots-for-president/.

census was conducted initially over mail, with 95 percent of households receiving a census mailing and the Postal Service handling nearly 590 million mailpieces. U.S. Census Bureau, *2020 Census Mailings* (Mar. 6, 2020);[32] USPS, *Organization Information – 2020 Census Mailing Campaign* (Mar. 12, 2020).[33]

### 2.    The Postal Service must provide adequate and efficient postal services.

Second, the PRA mandates that the Postal Service "shall . . . provide adequate and efficient postal services at fair and reasonable rates and fees," 39 U.S.C. § 403(a), and "shall . . . maintain an efficient system of collection, sorting, and delivery of the mail nationwide," *id.* § 403(b)(1). The PRA did not specifically define those terms, so they should be interpreted consistent with their ordinary meaning. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012).

A word's ordinary meaning usually "accords with its dictionary definition." *Norman v. Trans Union, LLC*, No.18-5225, 2020 WL 4735538, at *115-16 (E.D. Pa. Aug. 14, 2020) (quoting *Pellegrino v. Transp. Sec. Admin.*, 937 F.3d 164, 170 (3d Cir. 2019) (brackets omitted)). As defined contemporaneously, "efficient" means "producing a desired effect, product, etc. with a minimum of effort, expense, or waste; working well." *Efficient*, Webster's New World Dictionary (2d coll. ed. 1972). Likewise, "adequate" means "enough or good enough for what is required or needed; sufficient; suitable." *Adequate*, Webster's New World Dictionary (2d coll. ed. 1972). This comports with how these terms are understood today: "efficient" means "capable of producing desired results with little or no waste (as of time or materials)," *Efficient*,

---

[32] https://www.census.gov/newsroom/press-kits/2020/2020-census-mailings.html.

[33] https://about.usps.com/postal-bulletin/2020/pb22541/html/info_001.htm.

MerriamWebster Dictionary,[34] and "adequate" means "of a quality that is good or acceptable," *Adequate*, MerriamWebster Dictionary.[35] Putting these definitions together, the Postal Service must provide a baseline of good quality postal services with little waste, where "postal services" means the "delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5). Neither § 403(a) nor § 403(b)(1) permits falling below the baseline or minimizing waste at the expense of good quality postal services.

### B. By adopting and implementing the 2020 operational strategies to cut costs, the Postal Service violated its statutory obligations.

The Postal Service's policy to cut costs in summer 2020 violated its obligation under each of 39 U.S.C. § 101(e), § 403(a), and § 403(b)(1). The Postal Service effectuated its cost-cutting effort by implementing a number of operational strategies in June and July 2020, including the no late and extra trip initiative as well as more than 50 other do-it-now strategies designed to reduce work hours in Fiscal Year 2021 by 64 million hours relative to the prior fiscal year. Statement of Facts Part II.B, *supra*, at 24.

Postal Service leadership began communicating these strategies during meetings with the AVPs on June 26 and July 7, 2020; leadership provided the AVPs with a comprehensive list on July 14, 2020. Statement of Facts Part II.B, *supra*, at 24-25. The strategies came with a strict timetable for implementation, which was not typical practice; Postal Service leadership labeled many strategies as "do-it-now," with the rest to be implemented by mid-September. Statement of Facts Part II.B, *supra*, at 26-27. As a whole, the strategies were tools to reduce work hours—i.e.,

---

[34] https://www.merriam-webster.com/dictionary/efficient (last visited May. 26, 2021).

[35] https://www.merriam-webster.com/dictionary/adequate (last visited May. 26, 2021).

the time that Postal Service employees spent collecting, sorting, transporting, or delivering mail. Statement of Facts Part II.B, *supra*, at 25-26. For example, the strategies called for ███████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████ *Id.*

Despite the volume and speed of Headquarters' mandate, Headquarters did not prepare any written materials, such as a stand-up talk, to clearly and consistently communicate the many strategies to the field offices. Statement of Facts Part II.B, *supra*, at 28-29. Instead, the strategies and impetus behind them were communicated primarily orally. *Id.* Nor did Headquarters provide the AVPs with guidance about how to execute or communicate the various strategies. Statement of Facts Part II.B, *supra*, at 28. That left open questions, such as what a letter carrier ordered to depart for her route by a certain time should do if she was not yet done organizing mail for delivery or had not received all of that day's destinating mail. *Id.* Likewise, the direction to eliminate certain forms of overtime came without guidance about how to operationalize it. *Id.* Similarly, AVPs were told to run sorting machines on time, but not how to comply with that rule if mail was not ready to be sorted when a machine was supposed to start running. *Id.*

Although Headquarters failed to communicate how to give the new strategies effect, it repeatedly stressed the urgency of compliance and in particular, the need to reduce overtime. Statement of Facts Part II.B, *supra*, at 28-29. Postmaster General DeJoy appeared before the Board of Governors to impress upon them that he was taking immediate action to keep operations running on time and to cut overtime and other costs. *Id.* Mr. Williams wrote to members of Congress emphasizing the importance of strictly enforcing oversight of overtime. Statement of Facts Part II.B, *supra*, at 29. Confusion predictably followed. Among other

problems, employees in the field were told that overtime was no longer permitted, or severely restricted. Statement of Facts Part II.B, *supra*, at 29-30.

Worse yet, the Postal Service took these steps—and caused this confusion—amidst a pandemic that already put the speed and quality of postal services in jeopardy. By summer 2020, the Postal Service had been operating in a pandemic for several months. Although the Postal Service had managed to sustain service quality thus far, Postal Service leadership was aware that the pandemic presented novel challenges, such as causing significant employee availability problems. Williams Dep. 327:16-333:17; Colin Dep. 92:18-93:23, 112:2-9; Curtis Dep. 101:13-105:19. Leadership should also have been aware that, because of these underlying challenges, the Postal Service needed to proceed cautiously with, or even delay, any operational initiatives designed to reduce work hours. Rather than act with caution, however, the Postal Service carelessly launched its aggressive cost-cutting policy in June and July 2020.

Even without the pandemic, summer 2020 was an inopportune moment to risk degrading the quality of postal services. At that time, both election mail and census mail were travelling through the postal network, with even more volume on the horizon. Commission Report at 135-139 (Ex. 54). The Postal Service had precedent for using external events such as an election as reason to delay cost-cutting measures. Postal Bulletin 22342 at 14 (July 26, 2012)[36] ("Due to the volume of high-priority mail predicted for the election as well as the holiday mailing seasons, no consolidating activities will be conducted from September through December 2012."). Elections and the census, of course, are both essential to our democracy; mail related to each is the height of importance. Yet, instead of affording the highest consideration to how promptly it would be able to deliver constitutionally important mail, the Postal Service rushed its 2020 operational

---

[36] https://about.usps.com/postal-bulletin/2012/pb22342/pdf/pb22342.pdf.

initiatives without adequate information about their potential consequences, or a plan for communicating expectations, thereby displaying insufficient consideration for the especially important letter mail that the Postal Service was responsible for delivering at the time.

The Postal Service may have assumed from its work-hour-reduction efforts in prior years that it could reduce work hours in 2020 without compromising its obligation to maintain an expeditious and efficient network. But no prior effort to improve efficiency or minimize costs matched the 2020 operational initiatives in terms of size, speed, or external events counseling for particular care. *See* OIG Report Oct. 2020 at 13 (Ex. 52); Commission Report 2021 at 99. Despite these distinctions, the Postal Service did not perform any advance analysis of how rolling out so many strategies and initiatives so quickly, during a pandemic, on the brink of an election, and with the census count underway, would affect service performance before forging ahead. Statement of Facts Part II.B, *supra*, at 27. The Postal Service did not even analyze what effect specific directives, such as its no late and extra trip initiative, would have on meeting service standards. *Id.* Similarly, the Postal Service did not take any steps to track how its many strategies were affecting service performance. *Id.* Both the Inspector General and the Commission made specific note of the failure to conduct advance analysis, and encouraged the Postal Service to analyze what effect any future cost-cutting initiatives would have on meeting service standards. *Id.*

These aggressive, untested efforts sent service performance for all mail, including First-Class Mail, into a tailspin. Service performance dropped precipitously in July 2020. Statement of Facts Part II.C, *supra*, at 30-31. And the impact of the Postal Service's cost-cutting policy appears to still resonate. For First-Class Mail, there is no week since July 2020 in which the Postal Service has met its service standard more than 88.7 percent of the time. *Id.* More often,

the Postal Service has performed far worse. From the start of 2021 until the middle of March,

there was not a single week in which the Postal Service met its service standards for First-Class

Mail more than 85 percent of the time. *Id.*

Far from the "highest consideration," the execution of the work-hour reduction strategies

reflected little consideration for the expeditious delivery of important letter mail, despite an

explicit statutory command to do so. 39 U.S.C. § 101(e). And a moment that counseled for

deliberativeness to maintain adequate and efficient postal services, 39 U.S.C. § 403, the Postal

Service forged ahead with an aggressive and rigid plan to reduce work hours. It did so without

sending a clear message to its employees, without considering how its plan might impact service

performance under ordinary circumstances—to say nothing of COVID-19—and without any

special consideration for the constitutionally important mail it was delivering in summer and fall

2020. Nor did the Postal Service track whether its strategies and initiatives were harming service,

and thus give itself the chance to adjust in light of new information. In short, the evidence

demonstrates that the Postal Service relegated the importance of adequate and expeditious

service to focus primarily on cost concerns. Rather than promote an expeditious, efficient

network, the do-it-now strategies brought service to a stall. In these ways, the Postal Service

acted in violation of its obligations under 39 U.S.C. § 101(e), § 403(a), and § 403(b)(1).

For these reasons, the Court should enter judgment in Plaintiffs' favor on Count II.

## III.    The Court should order injunctive and declaratory relief.

### A.    The Court should enter a permanent injunction.

To provide Plaintiffs adequate relief from Defendants' unlawful conduct, the Court

should enter a permanent injunction. As detailed in Plaintiffs' proposed order, the Court should

permanently enjoin Defendants from enforcing the July 2020 initiative to eliminate late and extra

trips and from implementing and enforcing any effort to prohibit or eliminate late and extra trips

without first obtaining an advisory opinion from the Postal Regulatory Commission. The Court should further permanently enjoin Defendants from implementing and enforcing any strategy or initiative to cut costs without first giving the highest consideration to important letter mail; ensuring that the strategy or initiative will not negatively impact the ability of the Postal Service to provide adequate and efficient postal services and to meet service standards and service performance targets; and clearly and consistently communicating the strategy or initiative to field offices and Postal Service employees. Finally, the Court should order Defendants to utilize late and extra trips as necessary to meet service standards and service performance targets and to minimize mail delays.

For a plaintiff that prevails on the merits, a permanent injunction is appropriate if (1) the plaintiff has suffered irreparable injury and (2) has no adequate remedy at law; (3) the balance of hardships tips in the plaintiff's favor; and (4) granting an injunction would not be against the public interest. *Ne. Pennsylvania Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019). Each element is met here.

Irreparable injury and the availability of remedies at law constitute a single inquiry, "for the 'availability of adequate monetary damages belies a claim of irreparable injury.'" *Id.* (quoting *TD Bank NA v. Hill*, 928 F.3d 259, 282 (3d Cir. 2019)). The delays resulting from the Postal Service's unlawful operational directives have caused and will continue to cause irreparable harm to Plaintiffs and their residents if the injunction is dissolved. The Court entered the preliminary injunction in this case upon finding that the "sudden and rigid pivot to operating goals in the areas of truck transportation, overtime, and start and stop times for letter carriers constituted a significant change in agency practice," and that change resulted in "declines in service[.]" *Pennsylvania*, 490 F. Supp. 3d at 846. The harm caused by delayed bills, business

mail, checks, legal notices, medications, and government mail remain significant, and "will continue as long as the mail is delayed." Pls. Mem. of Law in Supp. of Mot. for Prelim. Inj. at 42 (ECF No. 18-1). If the Court does not issue a permanent injunction, Defendants will be free to immediately re-institute the sweeping operational initiatives and strategies that caused, and will continue to cause, irreparable harm to Plaintiffs.

Several Postal Service initiatives threaten irreparable harm if a permanent injunction does not issue. First, the no late and extra trip initiative "sharply curbed" their use; any efficiencies gained by adhering to the transportation schedule "came at the cost of timely delivery of mail." *Pennsylvania*, 490 F. Supp. 3d at 849-50. Moreover, the no late and extra trip initiative required strict adherence to the operating schedule by all employees, which led to letter carriers leaving without that day's destinating mail, returning to the delivery unit without completing their routes, and leaving mail at delivery units overnight. Second, the haphazard implementation of the do-it-now strategies resulted in "restrictions on overtime in a way that [] affected timely delivery of mail." *Id.* at 852. Although service performance remains below where it was prior to July 2020, *see* USPS Service Performance Data (Ex. 1), the challenged practices have at least "contributed" to Plaintiffs' injuries; as the Court determined last fall, "halting the Defendants' policies would meaningfully contribute to addressing Pennsylvania's injuries," *Pennsylvania*, 490 F. Supp. 3d at 871-72.

Government payments, legal notices, and other documents and materials necessary for Plaintiffs' agencies to function, as well as bills, checks, prescriptions, and other important individual mail, risk being further delayed if a permanent injunction does not issue. *See* Statement of Facts Part II.C, *supra*.

For the States, the delays caused reputational harm as well as interfered "with their basic ability to administer their programs." *Pennsylvania*, 490 F. Supp. 3d at 887-88 (citing examples); *e.g.*, O'Brien Decl. ¶¶ 27-45 (Pennsylvania Department of Labor & Industry, which administers workers' compensation and unemployment); Kejner Decl. ¶¶ 14-18 (Delaware Department of Health and Social Services, which administers payments for child support, general cash assistance programs, food assistance programs, and other benefit programs); Whichard Decl. ¶¶ 5, 9-10 (North Carolina's Office of Recovery and Resiliency, which assists hurricane survivors; North Carolina Department of Commerce, which administers unemployment insurance benefits; North Carolina Department of Health and Human Services, which administers food and other assistance programs); Pallares Decl. ¶¶ 7, 8, 11 (Los Angeles County Department of Health Services, which offers low-cost and free health care to low-income residents). The delays also undermined the effective internal operation of State agencies. *E.g.*, Hudson Decl. at 4-5 (Pennsylvania Department of General Services); Haas Decl. ¶¶ 8-10 (California Department of Conservation); Knox Decl. ¶¶ 10-11 (California Labor and Workforce Development Agency). Kirchmeyer Decl. ¶¶ 4, 9-19 (California Department of Consumer Affairs).

Individual mail customers in the States, too, experienced personal harm from delayed medical supplies, medications, checks, bills, and benefits. *E.g.*, Jara Decl. ¶¶ 13-17 (Philadelphia resident and recent heart transplant patient waited ten days to receive an order form for a blood draw); Erlbaum Decl. ¶¶ 9, 12-13 (last paycheck sent by small business owner in Pennsylvania to furloughed employee had not arrived after three weeks); Utal Decl. ¶¶ 13-21, 25-32 (small business owner in California had nine shipments delayed in three months, compared to one in

prior 18 months); Naccarato-O'Toole Decl. ¶¶ 6-7, 11 (Delaware child missed at least one dose of prescribed medication).

Absent the entry of a permanent injunction, the Postal Service can immediately reinstate its currently enjoined initiatives, leading to fresh mail delays and causing Plaintiffs to suffer additional irreparable harm. No remedy other than an injunction can prevent that harm.

Nor will a permanent injunction impose any significant hardship on the Postal Service. If the Postal Service, despite the deterioration of service quality triggered by the no late and extra trip policy, still wants to undertake an effort to eliminate late and extra trips, an injunction in this case would require only that the Postal Service submit that proposed change to the Postal Regulatory Commission for a public proceeding. If the Postal Service wants to adopt new cost-cutting policies, it must only comply with the statutory commands laid out by Congress. In addition, a "permanent injunction prohibiting [a party] from doing something it cannot do anyway is not an undue burden to" that party. *Dunkin' Donuts Franchising, LLC v. Claudia I, LLC*, No. 12-2010, 2014 WL 5343724, at *10 (E.D. Pa. Oct. 20, 2014). And when a preliminary injunction has been in place for months, the entry of a permanent injunction does not "impose a new hardship" on the subject party. *Id.*

Finally, the Postal Service is a "basic and fundamental service provided to the people by the Government of the United States." 39 U.S.C. § 101(a). The public's paramount interest is in a postal service that operates reliably and expeditiously—which, of course, is also the Postal Service's statutory obligation. *Id.* § 101(a)-(b), (e). For some, reliable and expeditious service is more than a passing interest—it is a matter of necessity. That is true of every individual who receives medicine by mail, conducts business by mail, pays bills by mail, or receives government assistance by mail, to say nothing of the many other essential operations conducted by mail.

60

Since July 2020, that public interest has not been served. An injunction that may move the Postal

Service back toward reliable, expeditious delivery is decidedly in the public interest.

### B.    The Court should order declaratory relief.

The Court should further enter an order declaring the Postal Service's actions violated the

Postal Regulatory Act, 39 U.S.C. §§ 101, 403, and 3661. The Declaratory Judgment Act vests

the Court with the authority to "declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.

§ 2201(a). In this Circuit, a district court considering whether to exercise its discretion under the

Declaratory Judgment Act should consider the following factors, to the extent relevant:

> (1) the likelihood that a federal court declaration will resolve the uncertainty of
> obligation which gave rise to the controversy;
> (2) the convenience of the parties;
> (3) the public interest in settlement of the uncertainty of obligation;
> (4) the availability and relative convenience of other remedies;
> (5) a general policy of restraint when the same issues are pending in a state court;
> (6) avoidance of duplicative litigation;
> (7) prevention of the use of the declaratory action as a method of procedural fencing
> or as a means to provide another forum in a race for res judicata; and
> (8) (in the insurance context), an inherent conflict of interest between an insurer's
> duty to defend in a state court and its attempt to characterize that suit in federal
> court as falling within the scope of a policy exclusion.

*Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014) (footnote omitted).

Declaratory relief is necessary and appropriate here. First, a declaratory judgment in this

action would resolve the disputed legal questions: whether the Postal Service was required to

seek an advisory opinion from the Commission before instituting its summer 2020 operational

initiatives and whether its 2020 cost-cutting policy violated its governing statutes. Second, the

public interest in resolution of the dispute via this proceeding is strong. The public has the

utmost interest in the Postal Service as a "basic and fundamental service" to "bind the Nation

together." 39 U.S.C. § 101(a). As Congress recognized, the public has an interest in the Postal

Service fulfilling its obligation to provide "prompt, reliable, and efficient services to patrons in all areas and . . . communities." *Id.* A declaratory judgment in this matter would serve the public by establishing the Postal Service's statutory obligations when it considers initiatives to improve efficiency or save costs—especially when other circumstances, such as a global pandemic or a forthcoming historic election, could impede or undermine efficiency—and assist in restoring public confidence in its services. *See New York v. Trump*, 485 F. Supp. 3d 422, 481 (S.D.N.Y. 2020) (three-judge court) (issuing declaratory judgment where it would reassure the public the Census was sound and encourage participation), *vacated on other grounds by Trump v. New York*, 141 S. Ct. 530, 536-37 (2020). Third, while a permanent injunction in this case may also resolve the parties' dispute, the Court may enter a declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Fourth, to the best of Plaintiffs' knowledge, there is no parallel state court or federal administrative proceeding to consider; the other suits against the Postal Service, noted above, are in federal court. Fifth, while there are several pending federal suits regarding the same or similar legal issues, the issuance of declaratory relief will not spawn duplicative litigation and may prevent future litigation. Finally, the above-described suits were filed within a few weeks of each other and have been pending for months—there is no indication that the parties here or elsewhere are in a "race for res judicata."

For these reasons, the Court should enter an appropriate judgment declaring that the no late and extra trip initiative exceeded the Postal Service's authority as defined by 39 U.S.C. § 3661, and that the Postal Service's 2020 cost-cutting policy, effectuated by numerous operational strategies to reduce work hours, violated 39 U.S.C. §§ 101 and 403.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment, declare that that

Defendants exceeded their authority and acted in violation of 39 U.S.C. §§ 101, 403, and 3661,

and issue an appropriate permanent injunction.


May 28, 2021                                    Respectfully submitted,

                                                JOSH SHAPIRO
                                                Attorney General
                                                Commonwealth of Pennsylvania
                                                MICHAEL J. FISCHER (Pa. Bar. No.
                                                322311)
                                                Chief Deputy Attorney General

                                                 s/ *Aimee D. Thomson*
                                                AIMEE D. THOMSON (Pa. Bar. No.
                                                326328)
                                                RYAN B. SMITH (Pa. Bar. No. 324643)
                                                JACOB B. BOYER (Pa. Bar. No. 324396)
                                                Deputy Attorneys General
                                                Office of Attorney General
                                                1600 Arch Street, Suite 300
                                                Philadelphia, PA 19103
                                                (267) 374-2787
                                                athomson@attorneygeneral.gov
                                                *Attorneys for Plaintiff Commonwealth of*
                                                *Pennsylvania*

ROB BONTA
Attorney General
State of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SUSAN SLAGER
Supervising Deputy Attorney General
MARISSA MALOUFF
ANTHONY O'BRIEN*
JASLEEN SINGH*
LISA C. EHRLICH*
Deputy Attorneys General
Office of the Attorney General for the State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3489
Lisa.Ehrlich@doj.ca.gov
*Attorneys for Plaintiff State of California*

KATHLEEN JENNINGS
Attorney General
State of Delaware
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
JILLIAN A. LAZAR
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Vanessa.Kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General
District of Columbia
KATHLEEN KONOPKA*
Deputy Attorney General, Public Advocacy Division
BRENDAN B. DOWNES*
Assistant Attorney General, Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 6th St. NW
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
*Attorneys for Plaintiff District of Columbia*

AARON M. FREY
Attorney General
State of Maine
PAUL E. SUITTER*
JASON ANTON
Assistant Attorneys General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Paul.Suitter@maine.gov
*Attorneys for Plaintiff State of Maine*

MAURA HEALEY
Attorney General
Commonwealth of Massachusetts
DAVID C. KRAVITZ*
Deputy State Solicitor
Office of Attorney General Maura Healey
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2427
david.kravitz@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

JOSHUA H. STEIN
Attorney General
State of North Carolina
SRIPRIYA NARASIMHAN
Deputy General Counsel
SARAH G. BOYCE*
Deputy Solicitor General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
snarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*Appearing pro hac vice*