I, Earl D. Randel, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, state as follows:

1. I submitted a declaration in support of Defendants' Notice of Extra Trips Process in the above-captioned matter on April 30, 2021, and a supplemental declaration in support of Defendants' Motion for Clarification or, in the Alternative, to Modify the Preliminary Injunction, on May 12, 2021. I submit this third declaration to respond to certain factual assertions made by plaintiffs in their opposition to defendants' motion for clarification and to provide additional details concerning the two limited circumstances in which the Postal Service seeks clarification as to the scope of the Court's preliminary injunction. This declaration is based on information available to me in the course of my duties at the Postal Service as Director, Logistics Surface Planning at Postal Service Headquarters, including information provided by other Postal Service officials with whom I work.

2. As explained previously, the Surface Planner Group process is directed at centralizing and managing Highway Contract Route (HCR) supplier selection for extra network transportation service and improving data collection regarding such transportation service. In FY 2020, HCR network trips constituted less than 19% of all trips in the Postal Service's entire surface transportation network.

3. During the first week of the formal implementation of the process on May 17, 2021 (during postal week beginning May 15, 2021), the process began monitoring requests for extra trips performed by one type of vehicle—tractor-trailers—as those are the vehicles used almost exclusively in HCR network transportation.

4. The Postal Service has developed criteria for, but has not yet implemented, two limited circumstances where the Surface Planner Group would evaluate the circumstances of an

1

extra network HCR trip request and potentially decline approval. The criteria for potential denial of an extra trip request are permissive, to allow for adjustments to be made when appropriate, as during elections. The Postal Service intends for the criteria to be applied to approve extra trips that are necessary to improve service performance and not to be applied in a manner that would decrease on-time mail deliveries.

5. One of the two limited criteria is where the extra trip would not be service responsive. As explained in my prior declarations, an extra trip would not be service responsive when the trip would not arrive at the destination processing facility within a timeframe that will meet the critical entry time (CET) in time for the mail to be delivered to its ultimate destination consistent with service performance standards. If an extra trip would not be service responsive, the variance from target (i.e., the difference between the service standard and actual delivery date) would be the same regardless of whether an extra trip is run or the mail is loaded onto the next regularly scheduled trip. Thus, for extra trips that are not service responsive, the delivery of the subject mail to its final destination would be the same whether sent on an extra trip or on the next regularly scheduled trip.

6. To be clear, declining to authorize extra trips that would "not be service responsive" (or "not service standard responsive") would not mean that the Postal Service would decline to approve an extra trip to expedite mail merely because the mail to be delivered is already late. In other words, declining to authorize an extra trip that would not be service responsive would not result in mail arriving at its final destination any later than it would if the Postal Service had run an extra trip.

7. Where the extra trip requested would not be authorized because it would not be service responsive, and there is no other reasonable means of transporting the mail at issue onto

another route (e.g., putting the mail on a different, regularly scheduled trip that would arrive at the destination processing facility prior to CET), the Postal Service would put the mail at issue on the next regularly scheduled trip. *See* Supp. Dec. ¶¶ 11, 16, 21. In the unlikely event that there is insufficient capacity on the next regularly scheduled trip, and there is no other reasonable means of delivering the mail only one day later (e.g., a different, regularly scheduled trip), then the Postal Service would run the extra trip, regardless of capacity. In other words, denying a trip as not service responsive would not result in delay of mail, i.e., in a later arrival.

8. The second criterion under which the Postal Service believes that the Surface Planner Group should consider denying approval for an extra trip is where not utilizing an extra trip would delay the delivery of only a small volume of mail. For purposes of applying a uniform standard, the Postal Service intends to authorize the Surface Planner Group to decline approval of an extra trip where the volume of mail for which an extra trip is requested is less than 15% of the truck's full capacity.

9. Field transportation managers, as well as members of the Surface Planner Group, are experienced in assessing capacity as part of daily management of transportation and can easily do so based on container count. Whether the capacity is less than 15% depends on the number and sizes of containers containing mail that are loaded onto the truck. Depending on the size of the containers on the specific trip, a tractor-trailer could carry from 2 to 48 containers.

10. During conferences and conversations with field transportation managers, transportation management has often advised that a best practice would be not to order an extra trip that would travel a long distance when the volume of mail to be transported is so small that a

one-day delay would not have a significant effect on overall service performance. Based on operational experience, the Postal Service's Headquarters Logistics team believes that trips within HCR network transportation do not often have a capacity that is lower than 20%, so Headquarters decided to set the criteria at less than 15% to minimize the number of trips that could be denied on that basis of low capacity.

11. As explained in prior declarations, the new process monitors tractor-trailer capacity in HCR network transportation only. Tractor-trailers are 53-feet long and have a capacity of up to 48 containers. The Postal Service uses several sizes of containers to transport mail: 4-feet wide by 6-feet long; 40 inches by 46 inches, and 30 by 36 inches. Depending on the size of the containers on the specific trip, a tractor-trailer could carry from 2 to 48 containers. The volume of mail that the containers may hold varies from as low as 5 pieces of mail and up to 12,000, depending on type of mail (e.g., letter, flat or package, non-machinable outside parcel, etc.). For example, a mixed container of packages converts on average to about 288 pieces of mail. Postal Service transportation employees submitting extra trip data to the Surface Planner Group currently identify the number of containers to be transported. For purposes of determining whether the volume of mail for which an extra trip is requested is less than 15% of the truck's full capacity, the Surface Planner Group will make the determination as to capacity, based on the numbers and sizes of containers.

12. The Postal Service anticipates that if the new process were authorized to deny extra trips in the limited circumstances identified, only a small percentage of requests would be denied due to truck capacity utilization of less than 15%. During the April 2021 initial implementation of the new process, only one of the over 700 extra trip requests—less than 0.2 percent of requests—did not proceed due to low volume of mail. *See* Dec. ¶¶ 15-

16. During the initial week of formal implementation of the process, May 17-21, 2021, only one of the 365 extra trip requests reported, all of which were run, had a capacity of less than 15%, indicating that less than 0.3 percent of requests would have been impacted if that request had been declined.

13. Where the mail volume is less than 15%, the Surface Planner Group would attempt to identify alternative trips that have capacity to transport the mail to its destination or other means of ensuring the mail arrives at its destination prior to CET. Where no alternatives are available, the mail would be transported via the next regularly scheduled trip. If the next scheduled trip did not have sufficient capacity to include that mail, the Postal Service would approve an extra trip for that day.

14. The Postal Service believes that where the volume of mail for which an extra trip is requested is less than 15%, there would be minimal, if any, effect on its ability to achieve nationwide service performance goals, while the cumulative costs of proceeding with each and every possible extra trip to transport such small volumes of mail would be financially irresponsible. In addition, given the limited number of drivers and tractor-trailers that are available, it would be operationally irresponsible to run each and every extra trip with such a small volume of mail because the driver and truck could be needed for a trip delivering a substantially larger volume of mail.

15. The Postal Service is statutorily required to manage its operations in an efficient and cost-effective manner, as its operations are funded through its revenue, as opposed to appropriations or tax dollars. In fiscal year 2019, extra trips cost the Postal Service over $280 million, and in FY2021, they cost over $415 million. The Postal Service expects

that the Surface Planner Group's application of the new criteria will lead to significant savings.

16. As previously explained, one of the primary goals for the new process is to improve the collection of data concerning extra trips in HCR network transportation, which will better allow the Postal Service to analyze what network adjustments are necessary to improve service performance and mitigate unnecessary expense. Dec. ¶¶ 7-8. Based on current reporting, the Postal Service estimates that the current average utilization of truck capacity for network trips is approximately 45%, but data collection is not currently sufficient to identify average utilization rates with precision. As the Postal Service improves data collection relevant to network transportation as part of this new process, and is better able to assess impact on service performance, the Postal Service intends to adjust application of the 15% criteria as needed to improve overall service

17. Postal Service Headquarters has repeatedly informed field managers that they are to exercise their discretion to approve extra trips as necessary to improve service performance. Prior to 2020 and to the present, thousands of field managers have exercised their discretion every day to determine whether extra trips should be run.

18. To the extent that the Postal Service has run fewer late and extra trips in certain months in 2020 and 2021 than in prior months, that is because fewer extra and late trips have been necessary. There has been no Headquarters-directed effort to deny extra trips. The transportation management team has been actively adjusting truck schedules to improve the timeliness and efficiency of the transportation network, and in late 2020 and early 2021 has added additional trips to the scheduled trip contracts to expand transportation capacity, reducing the need to rely on extra trips. Local managers exercising good

business judgment also have found alternative means of transporting mail in a service responsive manner without running what would have been an unnecessary extra trip.

19. The need for late or extra trips also fluctuates with changes in mail volume, which happen routinely, and which the Postal Service has also experienced during the COVID-19 pandemic.

20. The Postal Service is aware of no correlation between the numbers of extra and late trips and service performance. Ex. A-D. Indeed, during the 2020 peak season, service performance was at its lowest point while both volume and extra trips were at their highest. *Id.* This is true for First-Class Mail and Marketing Mail. *Id.*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Washington, D.C. on the 9th day of June, 2021

_____
EARL D. RANDEL

**Exhibit A**



**Exhibit B**



**Exhibit C**



**Exhibit D**

