**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

**Commonwealth of Pennsylvania, State of California, State of Delaware, District of Columbia, State of Maine, Commonwealth of Massachussetts, and State of North Carolina**,

Plaintiffs,

v.

**Louis DeJoy, in his official capacity as United States Postmaster General, Ron A. Bloom, in his official capacity as Chairman of the Postal Service Board of Governors, and the United States Postal Service**,

Defendants.

Case No. 20-cv-4096

---

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction .............................................................................................................................. 1

Background .............................................................................................................................. 6

I.      The Serious Fiscal Challenges Facing the United States Postal Service. ........................ 6

II.     The Postal Service's Actions in June and July 2020 to Achieve Optimal
        Efficiency. ..................................................................................................................... 8

        A.      Late and Extra Trips. ......................................................................................... 9

        B.      Do-It-Now Strategies to Reduce Unnecessary Work Hours. .............................. 13

III.    Service Performance During the Pandemic. ................................................................. 14

IV.     Procedural History. ...................................................................................................... 16

Legal Standard ....................................................................................................................... 17

Argument ............................................................................................................................... 18

I.      This Court lacks jurisdiction over Plaintiffs' claims due to the lack of any record
        evidence that the alleged Postal Service policies at issue are causing, or will
        cause, any material mail delays affecting Plaintiffs. ................................................... 18

II.     The Postal Service is entitled to summary judgment on Plaintiffs' section 3661(b)
        ultra vires claim. ......................................................................................................... 21

        A.      The Court lacks subject-matter jurisdiction over Plaintiffs' section 3661(b)
                claim. ............................................................................................................... 21

                1.      Under the *Thunder Basin* framework, the applicable review
                        scheme precludes the Court's jurisdiction over Plaintiffs' section
                        3661(b) claim. ....................................................................................... 22

                2.      The Court's conclusion, in its PI Order, that it likely had
                        jurisdiction over Plaintiffs' section 3661(b) claim should not
                        control here. .......................................................................................... 27

        B.      Even if this Court were to reach the merits of Plaintiffs' claim, it should
                conclude that the alleged Trips Initiative is not subject to section 3661(b). ........ 34

III.    Plaintiffs' challenge to the "Do-It-Now" strategies under 39 U.S.C. §§ 101(e) and
        403(a)–(b) fails as a matter of law. ............................................................................ 41

        A.      Congress has precluded judicial review of alleged violations of sections
                101(e) and 403(a)-(b). ..................................................................................... 43

B.    The Postal Service did not clearly and obviously exceed its statutory authority to manage its costs in prescribing the Do-It-Now strategies. ................ 44

      1.    Sections 101(e) and 403 do not impose constraints on the Postal Service's statutory authority that are enforceable through non-statutory review .................................................................................... 45

      2.    Even if Sections 101(e) and 403 impose enforceable constraints, the Postal Service did not clearly and obviously exceed those constraints. ............................................................................... 48

IV.    Even if Plaintiffs prevail on any of their claims, the Court should not enter Plaintiffs' proposed order. ............................................................... 58

Conclusion ........................................................................................................ 66

# TABLE OF AUTHORITIES

## CASES

*Adorers of the Blood of Christ v. Fed. Energy Regul.Comm'n*,
  897 F.3d 187 (3d Cir. 2018),
  *cert. denied*, 139 S. Ct. 1169 (2019) ............................................................ 21, 22, 26

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
  321 F.3d 1166 (D.C. Cir. 2003) ............................................................................. 35

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) .......................................................................................... 19, 20

*Am. Fed'n of Gov't Emps. ("AFGE"), AFL-CIO v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ................................................................................ 22

*American Postal Workers Union, AFL-CIO v. United States Postal Service*,
  Civ. A. No. 06-cv-726, 2007 WL 2007578 (D.D.C. July 6, 2007) ........................... 30

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) ................................................................................................. 27

*Bennett v. U.S. Sec. & Exch. Comm'n*,
  844 F.3d 174 (4th Cir. 2016) ............................................................................. 22-23

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ......................................................................................... 22, 43

*Blunt v. Lower Merion Sch. Dist.*,
  767 F.3d 247 (3d Cir. 2014) ................................................................................... 17

*Buchanan v. United States Postal Service*,
  508 F.2d 259 (5th Cir. 1975) ........................................................................ *passim*

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ......................................................................................... 65-66

*California v. Bureau of Land Mgmt.*,
  2020 WL 1492708 (N.D. Cal. Mar. 27, 2020),
  *appealed*, No. 20-16157 (9th Cir. June 12, 2020) .......................................... 59, 60

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................................................ 2, 18

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................... 18

*Coffelt v. Fawkes*,
765 F.3d 197 (3d Cir. 2014)........................................................................ 58

*Comite de Apoyo a los Trabajadores Agricolas v. Solis*,
933 F. Supp. 2d 700 (E.D. Pa. 2013) ........................................................ 61

*Common Cause v. Nuclear Regulatory Comm'n*,
674 F.3d 921 (D.C. Cir. 1982).................................................................... 63

*Comp. Dep't of Dist. Five, United Mine Workers of Am. v. Marshall*,
667 F.2d 336 (3d Cir. 1981)................................................................ 22, 29

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019).................................................................... 47

*Eagle Tr. Fund v. U.S. Postal Serv.*,
811 F. App'x 669 (D.C. Cir. 2020),
*petition for cert. docketed*, No. 20-1026 (U.S. Jan. 28, 2021)................... 47

*Elgin v. Department of Treasury*,
567 U.S. 1 (2012)............................................................................... 22, 28

*Flowserve Corp. v. Burns Int'l Servs. Corp.*,
423 F. Supp. 2d 433 (D. Del. 2006) ......................................................58-59

*Foster v. Pitney Bowes Corp.*,
549 F. App'x 982 (Fed. Cir. 2013) ................................................ 25, 26, 31, 32

*Foster v. Pitney Bowes Inc.*,
No. Civ. A. No. 11-7303, 2012 WL 2997810 (E.D. Pa. July 23, 2012),
*aff'd sub nom. Foster v. Pitney Bowes Corp.*, 549 F. App'x 982 (Fed. Cir. 2013) ............ 25, 28

*Freeman v. Corzine*,
629 F.3d 146 (3d Cir. 2010)................................................................. 18, 19

*Gill v. Whitford*,
138 S. Ct. 1916 (2018)................................................................................. 65

*Goldman v. Citigroup Glob. Mkts. Inc.*,
834 F.3d 242 (3d Cir. 2016)....................................................................... 30

*Griffith v. Fed. Lab. Rels. Auth.*,
842 F.2d 487 (D.C. Cir. 1988).................................................................... 34

*Grupo Mexicano de Desarrollo, S. A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999)................................................................................... 65

*Hartnett v. Pa. State Educ. Ass'n*,
   963 F.3d 301 (3d Cir. 2020)............................................................ 19, 21

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935)............................................................................ 28

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
   2021 WL 1176645 (N.D. Cal. Mar. 29, 2021)................................20-21

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008)................................................................. 20

*Leedom v. Kyne*,
   358 U.S. 184 (1958)........................................................................... 27

*LeMay v. U.S. Postal Serv.*,
   450 F.3d 797 (8th Cir. 2006) ............................................ 25, 28, 31

*Lewis v. Casey*,
   518 U.S. 343 (1996)..................................................................... 65, 66

*Lewis v. Cont'l Bank Corp.*,
   494 U.S. 472 (1990)........................................................................... 18

*Lorillard v. Pons*,
   434 U.S. 575 (1978)........................................................................... 26

*Mittleman v. Postal Regul. Comm'n*,
   757 F.3d 300 (D.C. Cir. 2014)..................................................... 35, 42

*Motor Vehicle Mrfs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983)............................................................................. 46

*N. Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852 (D.C. Cir. 2012)........................................................... 34

*N. Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020) ...................................... 34, 35, 36, 44

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
   437 F.3d 1256 (D.C. Cir. 2006)......................................................... 44

*Nat'l Ass'n of Postal Supervisors ("NAPS") v. U.S. Postal Serv.*,
   Case No. 1:19-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020),
   *appeal filed*, No. 20-5280 (D.C. Cir. Sept. 15, 2020)................. 35, 47, 55

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
   602 F.2d 420 (D.C. Cir. 1979)........................................................... 44

*New York v. Trump*,
　　490 F. Supp. 3d 225 (D.D.C. 2020) ...................................................................... 58

*Norton v. S. Utah Wilderness All.*,
　　542 U.S. 55 (2004) ................................................................................................. 62

*PHH Corp. v. CFPB*,
　　881 F.3d 75 (D.C. Cir. 2018) ................................................................................. 28

*Pub. Utilities Comm'n of State of Cal. v. FERC*,
　　100 F.3d 1451 (9th Cir. 1996) ................................................................................ 21

*Salvation Army v. Dep't of Cmty. Affairs of N.J.*,
　　919 F.2d 183 (3d Cir. 1990),
　　*appeal filed*, *Yung v. Atty Gen. U.S.*, No. 21-1974 (3d Cir. May 26, 2021) ............................. 58

*Schmidt v. Lessard*,
　　414 U.S. 473 (1974) ............................................................................................... 63

*Scott v. Schedler*,
　　826 F.3d 207 (5th Cir. 2016) ................................................................................. 63

*Sheilds v. Zuccarini*,
　　254 F.3d 476 (3d Cir. 2001) ................................................................................... 58

*Shelby Res., Inc. v. U.S. Postal Serv.*,
　　619 F. Supp. 1546 (S.D.N.Y. 1985) ....................................................................... 25

*Spokeo, Inc. v. Robins*,
　　136 S. Ct. 1540 (2016) ..................................................................................... 18, 19

*Tedesco v. U.S. Postal Serv.*,
　　553 F. Supp. 1387 (W.D. Pa. 1983) ....................................................................... 25

*Thunder Basin Coal Co. v. Reich*,
　　510 U.S. 200 (1994) ................................................................................. 3, 21, 23, 24

*Tilton v. Sec. & Exch. Comm'n*,
　　824 F.3d 276 (2d Cir. 2016) ................................................................................... 23

*Town of Chester v. Laroe Estates, Inc.*,
　　137 S. Ct. 1645 (2017) ........................................................................................... 65

*Trudeau v. Fed. Trade Comm'n*,
　　456 F.3d 178 (D.C. Cir. 2006) ............................................................................... 35

*United Parcel Service, Inc. v. United States Postal Service*,
　　604 F.2d 1370 (3d Cir. 1979) ................................................................................. 30

*United States v. Erika, Inc.*,
    456 U.S. 201 (1982) .......................................................................... 43

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ......................................................................27-28

*Yung v. Garland*,
    Civ. No. 20-032-LIPS, 2021 WL 1027486 (D. Del. Mar. 16, 2021)................................. 58, 60

**STATUTES**

5 U.S.C. § 7701 ................................................................................ 28

39 U.S.C. § 101 ........................................................................... *passim*

39 U.S.C. § 401 .......................................................................... 43, 45

39 U.S.C. § 403 ........................................................................... *passim*

39 U.S.C. § 404 .......................................................................... 45, 46

39 U.S.C. § 404a ......................................................................... 43, 46

39 U.S.C. § 409 .......................................................................... 24, 43

39 U.S.C. § 410 .............................................................................. 55

39 U.S.C. § 601 .............................................................................. 43

39 U.S.C. § 1208 ............................................................................. 43

39 U.S.C. § 2801 ............................................................................. 14

39 U.S.C. § 3661 ........................................................................... *passim*

39 U.S.C. § 3662 ........................................................................... *passim*

39 U.S.C. § 3663 ................................................................... 23, 26, 33, 46

39 U.S.C. § 3664 .......................................................................... 24, 29

**REGULATIONS**

Postal Rate Commission, Order No. 1239,
    64 Fed. Reg. 28015 (May 24, 1999) ........................................................... 23

Postal Rate Commission, Order No. 1307,
    66 Fed. Reg. 16504 (Mar. 26, 2001) .......................................................... 36

## OTHER AUTHORITIES

Advisory Opinion Concerning a Proposal Change in the Nature of Postal Services,
Docket No. N75-1 (Apr. 22, 1976),
https://www.prc.gov/prcarchive/viewpdf.aspx?docid=508276839. .................................. 39, 40

Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services,
Docket No. N2006-1 (Dec. 12, 2006),
https://www.prc.gov/docs/55/55431/N2006-1AdvDec.pdf ................................................ 38, 39

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches,
Docket No. N2009-1 (Mar. 10, 2010),
https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf .............................. 37, 38

Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1
(Mar. 24, 2011),
https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf .............................. 37, 48

Advisory Opinion on Mail Processing Network Rationalization Service Changes,
Docket No. N2012-1 (Sept. 28, 2012),
https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf.......... 37

Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012)
https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf..................................... 38

Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1
(Dec. 23, 2011),
https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf ....................................... 38, 48

Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling,
Docket No. N2014-1 (Mar 26, 2014),
https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20
Opinion.pdf ..................................................................................................................... 37

Congressional Briefing: Transportation & Service Performance Updates (Aug. 31, 220),
https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf.......... 15

Postal Regulatory Comm'n, Report on Universal Postal Serv. & the Postal Monopoly (2008),
https://www.prc.gov/docs/61/61628/USO%20Report.pdf. ................................................ 47, 48

Revenue Forgone, OIG Report, FT-AR-16-006 (2016),
https://www.uspsoig.gov/sites/default/files/document-library-files/2016/FT-
AR-16-006.pdf ..................................................................................................................... 7

S. Rep. No. 108-318 (2004) ............................................................................................... 3

USPS National News, "USPS Service Performance Shows Continued Improvement
Across First-Class Mail and Periodicals,"

https://about.usps.com/newsroom/national-releases/2021/0610-usps-service-performance
-first-class-mail-and-periodicals.htm (June 10, 2020) ............................................................ 16

## INTRODUCTION

As this Court noted, "[t]his is an action brought by six states and the District of Columbia to enjoin certain changes made by the United States Postal Service in the lead up to the November 3, 2020 election." PI Order at 1. Recognizing that the Postal Service's "ability to fulfill its mission during a presidential election taking place in the midst of a public health crisis is vital," PI Order at 3, this Court granted Plaintiffs' motion for a preliminary injunction on September 28, 2020. But that presidential election has come and gone, and the circumstances that prompted this Court's decision have evolved dramatically. At summary judgment, this dispute is no longer about the prompt delivery of election mail, but rather whether Plaintiffs are entitled to a sweeping judicial decree governing the Postal Service's day-to-day operations based on claims arising under the Postal Reorganization Act ("PRA")—a statute aimed at *limiting* judicial interference in postal operations. Whatever the circumstances may have been in the run-up to the 2020 election, the circumstances today do not warrant the extraordinary relief that Plaintiffs now seek. The Court should enter summary judgment for the Postal Service on all of Plaintiffs' claims.

Plaintiffs' summary judgment motion hinges on two alleged Postal Service policies: an alleged prohibition on late and extra trips (the "Trips Initiative"), and the 2020 iteration of general efficiency strategies that the Postal Service devises each year to streamline its operations and manage costs. However, Plaintiffs' characterization of these initiatives is misguided. Although there was initially confusion about the Postal Service's policy on the use of late and extra trips, and although the Postal Service has sought to address the underlying conditions that make these trips necessary, the Postal Service never intended to *ban* the use of late and extra trips. Further, the Postal Service has clarified, repeatedly, that late and extra trips are neither prohibited nor generally discouraged. Plaintiffs also protest that the 2020 efficiency strategies were plentiful and included

ambitious deadlines, but Plaintiffs do not identify a connection between those strategies and a drop in service performance. That is unsurprising, because the 2020 efficiency strategies were merely a continuation of longstanding annual efforts to help the Postal Service improve its operations while remaining within its budget.

But even if Plaintiffs' characterizations of those initiatives were accurate, their claims would nonetheless fail. *First*, Plaintiffs do not have standing to assert their claims. To start, they make little effort to show that the 2020 efficiency strategies have had, or will have, any material impact on them. They submit no evidence tying the specific strategies to any mail delays, but rather rely on general assertions that the efficiency strategies, in totality, will somehow make the Postal Service less efficient.

Further, any claim based on delays caused by the alleged Trips Initiative is now moot. Relying on outdated evidence submitted with their preliminary injunction motion, Plaintiffs point to no updated evidence indicating that the alleged Trips Initiative is *currently* causing, or *will* cause, any material mail delays that will affect Plaintiffs. And under *City of Los Angeles v. Lyons*,[1] Plaintiffs cannot simply rely on the assertion that if this alleged initiative injured Plaintiffs in the past, the Court may assume it will continue to injure them in the future. Such an assumption would be especially inappropriate here since there are multiple reasons why the alleged Trips Initiative may have caused short-term delays in the past, but may not cause delays now or in the future. Back in the summer of 2020, some Postal Service field offices admittedly experienced confusion concerning the Postal Service's late and extra trip policy—an issue which has since been addressed—and COVID-related employee absences were magnifying operational issues within the Postal Service. Recent service reports, however, indicate that Postal Service performance has

---

[1] 461 U.S. 95 (1983).

largely returned to pre-July 2020 levels for First-Class-Mail. Accordingly, Plaintiffs have failed to establish any current or forthcoming injury tied to the alleged policies at issue, and thus they lack standing, or, at a minimum, their claims are moot.

*Second*, Plaintiffs cannot establish a 39 U.S.C. § 3661(b) claim based on the Postal Service's decision not to seek a Postal Regulatory Commission ("PRC") advisory opinion before adopting the alleged Trips Initiative. At the outset, the PRA statutory review scheme precludes the Court's jurisdiction over this claim pursuant to the test set forth in *Thunder Basin Coal Co. v. Reich*.[2] Under this test, a court first determines whether the relevant statutory review scheme provides the exclusive means for litigating the claims within its scope, and the court then determines whether the plaintiff's claim comes within the scope of this review scheme. Importantly, binding precedent makes clear that when Congress establishes a special review scheme, courts must *presume* that the review scheme is exclusive with respect to claims within its scope. Here, multiple factors, including the relevant statutory structure and purpose, confirm that the comprehensive PRA review scheme—under which a party may bring claims before the PRC and ultimately seek review before the D.C. Circuit—is exclusive with respect to claims within its scope. Furthermore, it is indisputable that Plaintiffs may litigate their section 3661(b) claim before, and seek meaningful relief from, the PRC. Thus, both parts of the *Thunder Basin* test are satisfied. Although the Court initially concluded, at the preliminary injunction stage, that it had jurisdiction over the section 3661(b) claim, its central reasoning assumed that the PRC statutory review scheme may be exclusive with respect to some claims within its scope, but not others (such as section 3661(b) claims). But courts must presume that a review scheme is exclusive with respect to *all*

---

[2] 510 U.S. 200 (1994).

claims within its scope, and respectfully, there is no basis for concluding that this presumption has been overcome here.

In any event, the section 3661(b) claim fails on the merits. Congress chose not to provide a statutory cause of action for alleged section 3661(b) violations. Thus, Plaintiffs must assert a nonstatutory ultra vires claim, which requires that a plaintiff establish a *clear* and *obvious* statutory violation; an arguable legal error is insufficient. Here, in light of the ambiguous text of section 3661(b), the ambiguity in the relevant case law, and PRC authority suggesting that section 3661(b) applies only to policy changes that materially limit postal users' access to essential mail services —which would exclude internal, logistical efforts like the alleged Trips Initiative—Plaintiffs fail to establish any violation of section 3661(b), much less one that is clear and obvious. The Postal Service is therefore entitled to judgment as a matter of law on the section 3661(b) claim.

*Third*, Plaintiffs likewise cannot establish a claim based on any alleged violation of 39 U.S.C. §§ 101(e) and 403(a)–(b), provisions which generally call on the Postal Service to maintain an efficient postal system. However, the Court lacks jurisdiction over claims based on these provisions. By exempting the Postal Service from the APA, and providing for administrative review of alleged violations of certain provisions (but *not* sections 101(e) and 403(a)-(b)), Congress implicitly precluded judicial review of any claims based on sections 101(e) and 403(a)-(b). But even if the Court finds that it has jurisdiction over this claim, Plaintiffs must again rely on a nonstatutory ultra vires claim, which fails for multiple reasons.

For one, sections 101(e) and 403(a)-(b) impose no concrete limitations on Postal Service authority that the Postal Service may exceed, and thus they cannot support an ultra vires claim. Regardless, Plaintiffs cannot show that the 2020 efficiency strategies *clearly and obviously* transgressed any clear limitation in sections 101(e) and 403(a)-(b). These efficiency strategies are

merely part of a longstanding, annual process meant to help the Postal Service manage costs. Although Plaintiffs contend that the 2020 iteration of these strategies contained more initiatives, and more deadlines, than in prior years, Plaintiffs do not identify (and *cannot* identify) any judicially manageable standard for deciding how many initiatives, and how many deadlines, are necessary before these strategies run afoul of sections 101(e) and 403(a)-(b). Plaintiffs' legal theory would require a federal court to make a subjective assessment of whether it believes Postal Service strategies—crafted by experienced postal experts—appropriately promote efficiency. Congress could not have intended for these statutory provisions to serve a purpose inconsistent with a policy underlying the PRA: to allow the Postal Service flexibility to make adjustments without intrusive judicial review. The Court should enter summary judgment for the Postal Service on this claim.

Finally, even if the Court were to grant summary judgment for Plaintiffs on any of their claims, the Court should not grant the relief requested in Plaintiffs' Proposed Order. To start, Plaintiffs cannot establish any irreparable harm, and thus they are not entitled to any permanent injunction. As noted above, Plaintiffs submit no evidence that they are currently suffering, or will suffer, any injury due to any delays caused by the alleged policies at issue. In light of recent, positive, service performance reports, Plaintiffs' failure to submit evidence on this issue dooms their claim for relief. But even if this Court were to decide that some injunction is warranted, it still should not grant the specific affirmative injunction that Plaintiffs request. Plaintiffs request a vague, multi-part affirmative injunction imposing several operational requirements on future Postal Service policies—*e.g.*, the Postal Service must "[g]iv[e] the highest consideration to the expeditious collection" of "important letter mail," and "[c]learly and consistently communicat[e] [its] strategy[ies]"—none of which satisfies Rule 65's requirement that an injunction must "state

its terms specifically." Further, this affirmative injunction would unduly interfere with Postal Service operations, and likely require the Court to repeatedly resolve whether routine, day-to-day operational decisions violate any of the broad terms of the affirmative injunction.

Accordingly, and as explained further below, the Court should enter summary judgment for the Postal Service on all of Plaintiffs' claims. However, if the Court enters summary judgment for Plaintiffs on any of their claims, the Court should not issue any injunctive relief, let alone the extraordinary injunction Plaintiffs request.

**BACKGROUND**

I.     **The Serious Fiscal Challenges Facing the United States Postal Service.**

The Postal Service is an independent, self-supporting unit of the executive branch, responsible for providing universal postal services for customers throughout the United States. *See* 39 U.S.C. § 403(a). The Postal Service has the authority to, among other things, "maintain an efficient system of collection, sorting, and delivery of the mail nationwide." *Id.* § 403(b)(1). It is one of the nation's largest and most complex business operations, employing more than 630,000 employees, operating more than 31,000 Post Offices, utilizing more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment, and typically processing and delivering more than 450 million mailpieces to nearly 160 million delivery points in a single day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

Significant business operations, of course, entail significant costs, and "[t]he Postal Service" therefore "needs effective and productive operations to fulfill its mission of providing prompt, reliable, and affordable mail service to the American public." Ex. 2 (USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. The Postal Service, with a few narrow exceptions,

6

generally receives no tax dollars for operating expenses and relies on the sale of postage, products, and services to fund its operations. *See* Revenue Forgone, OIG Report, FT-AR-16-006 (2016), https://www.uspsoig.gov/sites/default/files/document-library-files/2016/FT-AR-16-006.pdf, at 1. Historically, First-Class[3] and Marketing Mail[4] provide the majority of the Postal Service's operating revenue. Ex. 1 (USPS FY 2019 Annual Report to Congress) at 28-29. By Fiscal Year 2019, a steady decline in First-Class and Marketing Mail volumes, in addition to a need for business strategies responsive to current circumstances, presented the Postal Service with grave financial challenges. *Id.*; Ex. 3 (Postmaster General DeJoy's Opening Remarks for the USPS Board of Governors Aug. 7, 2020 Meeting) at 1-2; Ex. 4 (First-Class Mail Volume Since 1926 Report, showing that the volume of First-Class Mail in 2019 was at its lowest point since 1977); Ex. 5 (Statement of Postmaster General and Chief Executive Officer Megan J. Brennan Before the House Committee on Oversight and Reform (Apr. 30, 2019)) at 1 (2019 statement of the former Postmaster noting the steep decline in First-Class Mail, the USPS's "most profitable product").

Although costs have always been a concern to the Postal Service, the financial position is now dire. *See* Ex. 6 (USPS Five-Year Strategic Plan FY2020-FY2024) at 11-12. "Since 2007, [USPS has] suffered 13 years of consecutive net losses totaling $77.8 billion, with an $8.8 billion net loss in 2019 alone." *Id.* at 12. Over the last decade, the Postal Service has therefore attempted to implement "aggressive cost controls that have resulted in significant cost savings," including, among other things, reducing the number of employees, negotiating collective bargaining contracts to control costs, increase workforce flexibility and establish a more affordable, two-tiered wage

---

[3] First Class Mail services "include the delivery of letters, postcards, correspondence, bills or statement of account, and payments." Ex. 1 (USPS FY 2019 Annual Report to Congress) at 7.
[4] Marketing Mail services include "the delivery of advertisements and marketing packages weighing less than 16 ounces, that are not required to be sent using First-Class Mail. *Id.* at 7.

system, reducing lobby hours in underutilized retail offices, and consolidating mail processing. *Id.* at 11-12. These efforts over the years have realized a considerable savings while the Postal Service has maintained its rating as "the most efficient and affordable postal operator in the industrialized world." *Id.*

Despite these efforts, absent necessary changes, the financial forecast will remain bleak. As the Postal Service Office of Inspector General ("OIG") recognized, unnecessary operational costs, in addition to significant revenue declines due to the COVID-19 pandemic and the resulting economic fallout, have placed the Postal Service at a crossroads, requiring it to make difficult choices about costs and operations or face fiscal insolvency by FY 2021. *See* Ex. 7 (USPS OIG Audit Report No. 20-144-R20, "Transportation Network Optimization and Service Performance (June 5, 2020)) at 1. OIG therefore recommended that the Postal Service "focus on its financial health and address causes for costs increasing at a time when mail volumes decreased" by realigning each Postal Service function (mail processing, transportation, and post office operations) to achieve optimal efficiency. *Id.*

## II.     The Postal Service's Actions in June and July 2020 to Achieve Optimal Efficiency.

In June and July 2020, the Postal Service discussed various cost-reduction strategies as part of its ongoing effort to achieve operational efficiency without compromising affordable, and reliable service. Ex. 7 (USPS OIG Audit Report No. 20-144-R20) at 8, 13; Ex. 8 (Williams Dep.) 79:9-13. The Postal Service devised these strategies as part of its annual strategic planning process, by which Postal Service leadership reviews the annual budget, identifies unnecessary cost overruns, and coordinates with the field to implement specific strategies (*e.g.*, limiting unnecessary late and extra transportation, aligning workhours to mail processing volume, and processing mail

efficiently) to meet the Postal Service's Integrated Financial Plan for the year. Ex. 9 (McAdams Dep.) 197:1-198:12; Ex. 10 (Colin Dep.) 142:13-143:19.

Plaintiffs challenge two actions taken by the Postal Service as part of this effort in June and July of 2020. The first concerns the Postal Service's renewed emphasis on reducing unnecessary late and extra transportation trips. *See* Mem. of Law in Supp. of Pls.' Mot. for Summ. J., at 12, ECF No. 122 (public version) ("MSJ"). The second challenge concerns the implementation of "[D]o-[I]t-[N]ow" strategies to achieve operational cost savings. *Id.*

### A.     Late and Extra Trips.

For years, the Postal Service has sought to improve compliance with its long-established transportation schedules to ensure efficient and expeditious service. *See* Ex. 11 (Declaration of Robert Cintron ("Cintron Dec.") ¶¶ 11-13, 21; Ex. 12 (Cintron Dep.) at 22:9-23; Ex. 8 (Williams Dep.) 79:9-20. The failure to adhere to established transportation schedules leads to late trips that miss vital connections necessary to achieve successful service performance, and extra trips that otherwise would not be necessary, and have a significant, negative impact on the Postal Service's budget and service performance. *See* Ex. 8 (Williams Dep.) 79:9-20, 81:10-14; Ex. 2 (USPS OIG Audit Report No. 19XG013NO000-R20) at 1; Ex. 13 (USPS OIG Audit Report No. 21-028-R21, "Late and Extra Trips at the Los Angeles, CA, Processing and Distribution Center" (Jan. 11, 2021)) at 1 ("Late and extra trips to delivery units can cause disruptions and increase the number of carriers returning after 6 p.m. When carriers return after 6:00 p.m., customer service can suffer, and mail collected by carriers may be late to the [Processing and Distribution Center]."). Robert Cintron, then-Vice President of Logistics at USPS Headquarters, began an initiative approximately three years ago to highlight the importance of adhering to existing service standards and the Postal

Service's operating plan, with a focus on adhering to the transportation schedules. Ex. 11 (Cintron Dec. ¶21).

Unfortunately, late and extra trips continued to pose financial and service obstacles to the Postal Service's mission. In June 2020, OIG published a report on whether USPS's processing network was operating at optimal efficiency and meeting service standards. Ex. 2 (USPS OIG Audit Report No. 19XG013NO000-R20) at 1. OIG found that, generally, "the Postal Service's drive to meet service performance targets has increased costs and inefficiency due to issues with integrating mail processing, transportation, and delivery operations." *Id.* In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among other problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.* These issues were exacerbated by the operational impacts of the COVID-19 pandemic, which the report did not account for because the fieldwork for the audit was completed before the pandemic. *Id.* at 1.

It is critical for mail to be processed and available for transportation in a timely manner to mitigate delays and avoid downstream operational costs. *See, e.g.*, Ex. 8 (Williams Dep.) 188:8-189-3. In a separate June 2020 audit report addressing transportation network optimization, OIG quantified the cost of system-wide failures to adhere to existing transportation schedules. Ex. 7 (USPS OIG Audit Report No. 20-144-R20) at 1. The report confirmed that USPS expenditures on late and extra trips were significant. In FY 2019, these line items cost the Postal Service more than $410 million, including $266 million in extra trips, $14 million in late trips, and $130 million in Postal Vehicle Service overtime. *Id.* at 2. OIG determined that misaligned scheduling, insufficient management oversight, imbalanced performance measurements, employee unavailability, and the

inefficient allocation of mail had the greatest impact on the Postal Service's ability to optimize its surface and air networks. *Id.*

Soon after joining the Postal Service in June 2020, Postmaster General DeJoy reemphasized the need to adhere to USPS's existing operational plans, including transportation schedules. *See* Ex. 14 (Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections); Ex. 11 (Cintron Dec. ¶ 23). To that end, on July 10, 2020, David Williams, then-USPS Chief Operating Officer, held a teleconference with area vice presidents to discuss strategies to reduce unnecessary operational costs, including those incurred by late and extra trips, while maintaining affordable, reliable service. Ex. 8 (Williams Dep.) 166:12-23; 183:12-184:4. Immediately thereafter, there was confusion in the field as to whether late and extra trips were prohibited in all circumstances. *See, e.g.,* Ex. 11 (Cintron Dec.) ¶ 24 n.1; Ex. 15 (Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec.") ¶¶ 3-4 (discussing a locally-prepared memorandum, which suggested, incorrectly, that late and extra trips were not permitted). In light of this confusion, USPS Headquarters promptly worked with the field to make clear that late and extra trips were not categorically prohibited. Ex. 15 (Supp. Cintron Dec.) ¶ 4.

Mr. Cintron and his team, in concert with USPS leadership at Headquarters and in the field, developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. Ex. 11 (Cintron Dec.) ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives, advising them of USPS's renewed effort to limit unnecessary extra and under-utilized trips. *Id.* ¶ 25. Importantly, these guidelines did not ban or set a firm limit on late and extra trips. *See* Ex. 12 (Cintron Dep.) 60:7–61:4 (explaining guidelines); *id.* 63:25-65:9 (noting that late and extra trips were expected to

continue to run daily to mitigate inevitable schedule failures); *id.* at 89:13–20 (stating that the guidelines were intended to inform how late and extra trips would be used); Ex. 16 (Second Declaration of Joshua Colin ("Second Colin Dec.")) ¶ 17 & Exs. 1, 2 at 3(clarifying that the Cintron guidelines did not ban late/extra trips, and that USPS employees should follow updated, October 16, 2020 guidance, which provided that "[t]ransportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets"). Indeed, the purpose was to avoid "occurrences where it doesn't make any sense" to have extra or late trips, because such a trip would not actually advance the mail any faster than simply following the schedule. Ex. 12 (Cintron Dep.) at 64:13-19. Late and extra trips may often contribute to mail delays, and thus the guidelines aimed to increase overall service performance scores. *See* Ex. 17 (Third Declaration of Robert Cintron ("Third Cintron Dec.")) ¶¶ 3-4.

The Postal Service also issued additional instructions to clarify its policy concerning late and extra trips after the U.S. District Court for the Eastern District of Washington issued a nationwide injunction in a related case, *Washington v. Trump*, No. 20-cv-3127 (E.D. Wash.). These instructions reiterated that the "Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted." Ex. 18 (Clarifying Operational Instructions (Sept. 21, 2020)) ¶ 5. The Instructions expressly provide that mail should not "be left behind," and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet [USPS] service commitments." *Id*. Thus,

postal workers continue to use late and extra trips every day.[5] *See* Ex. 19 (Fourth Declaration of Robert Cintron ("Fourth Cintron Dec.") ¶ 3.

  **B.**  **Do-It-Now Strategies to Reduce Unnecessary Work Hours.**

  Each year, the Postal Service senior leadership identifies strategies that can be implemented in short order to streamline operations and enhance postal efficiency. *See* Ex. 9 (McAdams Dep.) 78:3-9, 79:23-80:10; Ex. 10 (Colin Dep.) 374:11-20. Consistent with historical practice, for FY 2021, the Postal Service began working on a number of strategies, including one to reduce workhours, to account for a critical financial shortfall forecasted by the Postal Service Chief Financial Officer. Ex. 20 (McAdams Confidential Dep.) 13:1-19. In July 2020, the Postal service outlined 57 initiatives referred to as "Do It Now FY Strategies" intended to save 64 million workhours. Ex. 21 (USPS OIG Audit Report No. 21-014-R21, "Deployment of Operational Changes" (Nov. 6, 2020)) at 7; Ex 22 (Do-It-Now Strategies PPT); Ex. 23 (USPS OIG Audit Report No. 20-292-R21, "Operational Changes to Mail Delivery" (Oct. 19, 2020)) at App'x B (hereinafter, "Oct. 19 OIG Report") (listing each strategy). These strategies applied across the Postal Service's operational functions, including mail processing, vehicle and maintenance, and post office operations (delivery and retail). *Id.* The strategies included initiatives such as eliminating pre-tour overtime in city delivery operations, eliminating certain mail processing operations on Saturday, and alignment of workhours to workload. *Id.*

  The overwhelming majority of the July 2020 Do-It-Now strategies were not new initiatives. Ex. 20 (McAdams Confidential Dep.) 16:5-17:1. The strategies reflect standard managerial

---

[5] Note that Defendants have moved the Court to clarify that its preliminary injunction "does not prohibit the Postal Service from declining to approve extra network trips . . . where an extra trip would not be service responsive, and . . . where not using the extra trip would result in delay of only a small volume of mail, specifically, less than 15 percent of the truck's capacity." ECF No. 116-1.

solutions that should already be in practice across Postal Service operations. Ex. 9 (McAdams Dep.) 180:2-18; Ex. 10 (Colin Dep.) 375:3-20. Consequently, there was no reasonable expectation that these strategies would have a significant, negative impact on service. Ex. 20 (McAdams Confidential Dep.) 65:8-19; Ex. 10 (Colin Dep.) 201:12-202:2. Placing renewed emphasis on these efforts was meant to address failures throughout the network to adhere to these established standards, failures that scale to a significant number of workhours across the entire Postal Service and represent critical operational expenditures. Ex. 9 (McAdams Dep.) 180:16-181:1.

To remain financially and operationally viable, the Postal Service focused on implementing the Do-It-Now strategies so they would be in place at the start of FY 2021. *See* Ex. 8 (Williams Dep.) 174:23-175:16. A project management plan with a two-month timeline for phased implementation was created to help structure the effort. Ex. 9 (McAdams Dep.) 202:16-19. Just as most of the July 2020 strategies were not new, having a timeline for implementation was not new either. *Id.*; Ex. 10 (Colin Dep.) 376:18-377:16.

## III.     Service Performance During the Pandemic.

In FY 2020, the most significant event affecting the Postal Service, and its ability to meet some of its performance goals during that period, was the COVID-19 pandemic. Ex. 24 (PRC, "Analysis of the Postal Service's FY 2020 Annual Performance Report and FY 2021 Performance Plan" (PRC FY 2020 Analysis) (June 2, 2021)) at 8. A performance goal is "a target level of performance expressed as a tangible, measureable objective, against which actual achievement shall be compared, including a goal expressed as a quantitative standard, value, or rate[.]" 39 U.S.C. § 2801(3). The Postal Service has four performance goals: High-Quality Service (on-time delivery), Excellent Customer Experiences (ensuring customer satisfaction), Safe Workplace and Engaged Workforce (promoting employee safety, satisfaction, and engagement), and Financial

Health (achieving financial stability and improving financial position by generating revenue, controlling expenses, and improving efficiency). Ex. 1 (USPS FY2019 Annual Report to Congress) at 31.

The pandemic presented "unprecedented and unpredictable challenges." Ex. 24 (PRC FY 2020 Analysis) at 11. In its FY 2020 Annual Report to Congress and in response to information requests, the Postal Service specified how the COVID-19 pandemic impacted its progress toward each of its four performance goals. *Id.* at 8*.* As a result of the pandemic, the Postal Service faced employee unavailability, changes in the mail mix leading to surges in package volumes and a decline in letter and flat volumes, and disruption to air and surface transportation contractors—all of which impacted the Postal Service's ability to meet its High Quality Service performance goal. *Id.* at 10.

In July 2020, the Postal Service experienced a temporary dip in service performance due to various factors. Ex. 11 (Cintron Dec.) ¶¶ 26-27; Ex. 21 (USPS OIG Audit Report No. 21-014-R21) at 12. The spike in COVID-19 cases in July 2020 was one significant factor negatively impacting service performance during this period, causing severe contraction of the air network and lack of employee and contractor availability. Ex. 8 (Williams Dep.) 327:16-337:19. However, service performance soon rebounded across the board for Market Dominant products. Ex. 21 (USPS OIG Audit Report No. 21-014-R21) at 12; Ex. 25 (Service Performance Rebounds at Postal Service (Aug. 31, 2020)) at 1; *id.* Congressional Briefing: Transportation & Service Performance Updates (Aug. 31, 220) at 8, https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf ("Congressional Briefing") (data showing that USPS service performance has rebounded to early-July 2020 levels); Ex. 11 (Cintron Dec.) ¶ 27.

Despite the unique problems posed by the pandemic, OIG found that the Postal Service performed well during the November 2020 election and the January 2021 Georgia runoff. *See* Ex. 26 (USPS OIG Audit Report No. 20-318-R21, "Service Performance of Election & Political Mail During the November 2020 General Election" (Mar. 5, 2021)) at 3, 21. Indeed, as circumstances surrounding the pandemic have evolved, service performance scores have significantly rebounded. Current scores for First-Class-Mail have largely returned to pre-July 2020 marks. *See* USPS National News, "USPS Service Performance Shows Continued Improvement Across First-Class Mail and Periodicals," https://about.usps.com/newsroom/national-releases/2021/0610-usps-service-performance-first-class-mail-and-periodicals.htm (June 10, 2020) ("Key performance indicators for the week of May 29th include: . . . First-Class Mail: 89.95 percent of First-Class Mail was delivered on time").

## IV.    Procedural History.

On August 21, 2020, Plaintiffs filed their complaint (ECF No. 1) alleging that the Postal Service unlawfully implemented certain policy changes. The Complaint raises four claims: Defendants acted beyond their statutory authority, and in violation of 39 U.S.C. § 3661, when implementing operational changes without seeking an advisory opinion from the PRC (Count I); Defendants failed to comply with the requirements of 39 USC §§ 101 and 403 when implementing operational changes (Count II); the operational changes and related changes to the treatment of Election Mail violated the Elections and Electors Clauses of the U.S. Constitution (Count III); and the operational changes and related changes to the treatment of Election Mail violated the 26th Amendment of the U.S. Constitution (Count IV). Compl. ¶¶ 222-253. Plaintiffs concede that Counts III and IV, which concern the November 2020 general election, are now moot. MSJ. at 35, n.27. Accordingly, only Counts I and II remain.

On September 28, 2020, following expedited discovery, briefing, and oral argument, the Court issued a preliminary injunction based on Count I. *See* PI Order. The Court incorporated the preliminary injunction issued in a related case in the U.S. District Court for the Southern District of New York, *Jones v. United States Postal Service*, No. 20-cv-6516 (S.D.N.Y.), required Defendants to comply with the "Clarifying Operational Instructions" issued by USPS on September 21, 2020, and enjoined Defendants from continued implementation or enforcement of the policy changes at issue. Order, ECF No. 63 (Sep. 28, 2020). The Court later clarified its preliminary injunction, at the Postal Service's request. *See* Order, ECF No. 70 (Oct. 9, 2020).

On May 28, 2021, Plaintiffs moved for summary judgment on their two remaining claims (Counts I and II). Plaintiffs claim that the Postal Service violated section 3661(b) by failing to first secure a PRC advisory opinion before implementing the alleged Trips Initiative, and that the 2020 Do-It-Now initiatives violate sections 101(e) and 403(a)-(b) because, in Plaintiffs' view, these initiatives do not properly advance the efficiency of the postal network.

## LEGAL STANDARD

"[W]here a . . . party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof," then "there is not a genuine dispute with respect to a material fact and thus the" opposing "party is entitled to judgment as a matter of law." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). "[M]ere allegations are insufficient, and [o]nly evidence sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case merits consideration beyond the Rule 56 stage." *Id.*

ARGUMENT

I.     **This Court lacks jurisdiction over Plaintiffs' claims due to the lack of any record evidence that the alleged Postal Service policies at issue are causing, or will cause, any material mail delays affecting Plaintiffs.**

"Under Article III of the Constitution, federal courts may adjudicate only actual, *ongoing* cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (emphasis added).[6] This "requirement subsists through all stages of federal judicial proceedings," and "[t]o sustain [a court's] jurisdiction . . . it is not enough that a dispute was very much alive when suit was filed." *Id.* at 477–78. To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

When a plaintiff seeks prospective relief, the "threatened injury must be *certainly impending* to constitute injury in fact;" "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis added). A "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy" this requirement. *Id.* at 410. Moreover, when, as here, injunctive relief is sought, past injuries are insufficient to "establish a real and immediate threat" of future injury, absent evidence that the past injuries will "*always*" reoccur or that the defendant has a policy that would dictate such reoccurrence. *Lyons*, 461 U.S. at 105-06. "The party invoking federal jurisdiction bears the burden of establishing these elements, and, on summary judgment, the plaintiff cannot rely on mere allegations but must set forth by affidavit or other evidence specific facts demonstrating that these requirements have been met." *Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010). Even if a plaintiff initially had standing on

---

[6] Internal quotation marks and internal citations are omitted throughout this brief, unless otherwise stated.

the day the lawsuit was filed, the case is moot if the "allegedly wrongful behavior [cannot] reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013); *see also Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306-07 (3d Cir. 2020) (acknowledging party claiming mootness has burden of establishing mootness).

Plaintiffs cannot establish standing with respect to their challenge to the "Do-It-Now" initiatives because they have made no attempt to show how any particular "Do-It-Now" initiative has slowed down the mail in a way that has injured them. Indeed, they put forward no evidence showing that these specific actions delayed the mail in a way that caused them a cognizable injury. *See Spokeo*, 136 S. Ct. at 1547. Instead, they assert—without evidence—that the *combination* of "Do It Now" initiatives must have injured them. But there is no indication that the "Do-It-Now" initiatives have stopped since last summer—no injunction in this case, or the related cases, currently prohibits these initiatives—and yet Plaintiffs claim no ongoing injury. Indeed, they have put forward no evidence establishing how the collective impact of these efforts have delayed the mail in a way that caused them cognizable injury, as is their burden at the summary judgment stage. *See Freeman*, 629 F.3d at 153. Thus, whatever the cause of Plaintiffs' injuries (to the extent any remain), they have failed to show that these initiatives were the underlying cause. Regardless, Plaintiffs do not ask the Court to enjoin all of these initiatives, and they have made no particular allegation that these specific initiatives will reoccur, as necessary for standing under *Lyons*. Accordingly, Plaintiffs have failed to establish a cognizable injury sufficient for injunctive relief with respect to these claims.

Plaintiffs similarly cannot establish jurisdiction over their claims relating to the alleged Trips Initiative. Plaintiffs assert that they were injured by delays in the mail that occurred in the summer of 2020 only, as established by declarations that were executed then; they do not submit

updated declarations, or otherwise make any other attempt to demonstrate ongoing or present injury now, in the spring of 2021. But even assuming that the alleged Trips Initiative did cause a delay in the mail in July and part of August 2020, that was caused by unique circumstances from that moment of time, and there is no reason to think that the specific instances underlying those mail delays would "reasonably be expected to recur." *Already, LLC*, 568 U.S. at 92. Rather, the evidence indicates that those delays occurred due to a number of unique factors, including: (1) issues with communication, which caused operational confusion, and (2) "critical employee availability issues . . . as pandemic cases rose following the July 4 holiday weekend." *See* Ex. 21 (USPS OIG Audit Report No. 21-014-R21) at 8. Indeed, as the OIG recognized, "delayed mail volume at [mail processing plants] returned to rates seen earlier in the year" by the end of August 2020, *id.* at 9, and the volume of "[d]elayed mail in post offices, stations, and other facilities," "significantly decreased" by the end of August 2020, to rates comparable to the first half of 2020 (before any of the challenged initiatives occurred), *id.* at 10, 26. This was several weeks before the first preliminary injunction was entered in these related cases. This evidence suggests that any delays during the summer of 2020 were more likely caused by context-specific *implementation* issues (compounded by COVID-related issues, including absences), rather than an inherent issue with the policies themselves.

Plaintiffs have put forward no evidence indicating that these specific circumstances will reoccur in a way that causes the same type of injury. And courts have recognized that when a "perfect storm" that allegedly caused the injurious actions has "ceased," there is no longer a likely, future injury necessary for standing to seek injunctive relief. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008) (rejecting plaintiff claim of injury that was based on a "combination" of independent factors); *In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,

2021 WL 1176645, at *7 (N.D. Cal. Mar. 29, 2021) (same). And, to the extent there was initially standing, under such circumstances the case is moot. *See, e.g.*, *Pub. Utilities Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996) ("When resolution of a controversy depends on facts that are unique or unlikely to be repeated, the action is not capable of repetition and hence is moot."). Nor is this a situation where the defendant has simply "yield[ed] in the face of a court order," and then claims mootness. *Hartnett*, 963 F.3d at 306. Here, the Postal Service acknowledges that implementation issues occurred last summer, began correcting them even before any court orders were issued, and has made clear that it did not (and does not) intend to ban the late and extra trips that are the heart of this lawsuit. *See* Ex. 19 (Fourth Cintron Dec.) ¶ 4. Under these circumstances, there is no longer a basis for Article III jurisdiction over these claims.

## II.    The Postal Service is entitled to summary judgment on Plaintiffs' section 3661(b) ultra vires claim.

Plaintiffs' section 3661 ultra vires claim—that the Postal Service exceeded its authority by adopting the alleged Trips Initiative without first seeking a PRC advisory opinion—fails for two reasons. First, the relevant statutory review scheme precludes the Court's subject-matter jurisdiction over Plaintiffs' section 3661 claim by requiring Plaintiffs to first raise their claim before the PRC and then seek further review, if necessary, before the D.C. Circuit. Second, Plaintiffs cannot establish that the alleged Trips Initiative is *clearly* and *obviously* subject to section 3661(b), as necessary for an ultra vires claim.

### A.  The Court lacks subject-matter jurisdiction over Plaintiffs' section 3661(b) claim.

Congress may "preclude initial judicial review" of an agency action by "allocat[ing] initial review to an administrative body." *Thunder Basin*, 510 U.S. at 207. In determining whether a statutory review scheme implicitly "preclude[s] jurisdiction" over a particular claim, courts use "the two-step framework provided in *Thunder Basin*." *Adorers of the Blood of Christ v. Fed.*

*Energy Regul. Comm'n*, 897 F.3d 187, 195 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 1169 (2019). "At the first step, the court asks whether Congress' intent to preclude district court jurisdiction is fairly discernible in the statutory scheme, based on an examination of the statute's text, structure, and purpose." *Id.* More specifically, the Court asks whether it can "fairly discern that Congress intended the statutory scheme to be exclusive with respect to claims within its scope." *Am. Fed'n of Gov't Emps. ("AFGE"), AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). "The second step, in turn, asks whether plaintiffs' claims are of the type Congress intended to be reviewed within this statutory structure." *Adorers*, 897 F.3d at 195.

### 1.  Under the *Thunder Basin* framework, the applicable review scheme precludes the Court's jurisdiction over Plaintiffs' section 3661(b) claim.

Both steps of the *Thunder Basin* framework confirm that the statutory review scheme in the PRA—found in 39 U.S.C. § 3662—precludes district court jurisdiction over section 3661(b) claims. Starting with the first step, multiple factors make clear "that Congress intended the [section 3662 review] scheme to be exclusive with respect to claims within its scope." *AFGE*, 929 F.3d at 755. First, "the general rule" is that "if there exists a special statutory review procedure, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." *Comp. Dep't of Dist. Five, United Mine Workers of Am. v. Marshall*, 667 F.2d 336, 340 (3d Cir. 1981). Courts have thus repeatedly found that the existence of a special review scheme, in itself, is evidence that Congress intended to preclude district court jurisdiction. *See, e.g.*, *Elgin v. Department of Treasury*, 567 U.S. 1, 11 (2012) ("the [statute's] 'elaborate' framework . . . demonstrates Congress' intent to entirely foreclose judicial review . . .."); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("when a statute provides a detailed mechanism for judicial consideration of particular issues . . . judicial review of those issues . . . may be found to be impliedly precluded."); *Bennett v. U.S. Sec. & Exch. Comm'n*, 844

F.3d 174, 179 (4th Cir. 2016) ("Based on the 'comprehensive review process,' the Court found that congressional intent to preclude district-court jurisdiction over pre-enforcement claims was 'fairly discernible.'"); *Tilton v. Sec. & Exch. Comm'n*, 824 F.3d 276, 279 (2d Cir. 2016) ("By enacting the SEC's comprehensive scheme of administrative and judicial review, Congress implicitly precluded federal district court jurisdiction over the appellants'" claims.).

The PRA established a special, comprehensive statutory review scheme through which parties may assert a host of claims against the Postal Service—including claims relating to section 3661(b). Under this scheme, "[a]ny interested person" may "lodge a complaint with the [PRC]" if it "believes the Postal Service" is not complying with one or more enumerated provisions, including section 3661(b) (hereinafter, "covered claims"). 39 U.S.C. § 3662(a); *see also* PI Order at 30-31 ("The explicit text of section 3662" allows for claims relating to any provision of Chapter 36, and "Chapter 36 includes section 3661."); Postal Rate Commission, Order No. 1239, 64 Fed. Reg. 28015, 28019 (May 24, 1999) ("[T]here is no apparent reason to conclude that considering [a section 3661(b) claim] would exceed the scope of the Commission's authority under section 3662."). Once a complaint is filed, the PRC, in turn, must address it within "90 days," either by "begin[ning] proceedings" or "dismissing the complaint." 39 U.S.C. § 3662(b)(1). If the PRC "finds the complaint to be justified," it has broad authority to issue relief that it "considers appropriate in order to achieve compliance" with the statutory provision at issue "and to remedy the effects of any noncompliance." 39 U.S.C. § 3662(c). A party "adversely affected or aggrieved" by a PRC decision may seek further review in the D.C. Circuit. 39 U.S.C. § 3663. This comprehensive review scheme is comparable to the review scheme at issue in *Thunder Basin*, which was found to preclude district court jurisdiction. *See* 510 U.S. at 207-08 (the statute "establishe[d] a detailed structure for reviewing" certain specified "violations," including before

an administrative "Commission," and parties "may challenge adverse Commission decisions in the appropriate court of appeals."). Thus, the elaborate nature of the section 3662 review scheme, in itself, indicates that Congress intended to preclude district court jurisdiction over claims that may be raised through that review scheme.

Second, the statutory structure confirms that Congress generally intended for section 3662 to be the exclusive remedy for covered claims. The PRA contains a provision specifically providing for district court jurisdiction over certain covered claims, suggesting that Congress did not otherwise intend for district courts to have jurisdiction over covered claims. In particular, a party may bring a claim before the PRC based on the Postal Service's failure to comply with a binding order previously issued by the PRC. *See* 39 U.S.C. § 3662 (allowing for claims based on a violation of any provision within Chapter 36, which includes section 3662, the provision allowing the PRC to issue binding orders upon the Postal Service). The PRA, however, also states that "[t]he several district courts have jurisdiction specifically to enforce, and to enjoin and restrain the Postal Service from violating, any order issued by the Postal Regulatory Commission." 39 U.S.C. § 3664. This provision—section 3664—would be unnecessary if parties were already free to bring covered claims in district court by, say, relying on section 409, which generally states that "the United States district courts shall have original . . . jurisdiction over *all actions* brought by or against the Postal Service." 39 U.S.C. § 409(a) (emphasis added). Thus, Congress's decision to specifically reserve district court jurisdiction over certain covered claims in section 3664 suggests that the review scheme otherwise precludes district court jurisdiction over covered claims. *Cf. Thunder Basin*, 510 U.S. at 209 (finding it instructive that the statute at issue there "expressly authorize[d] district court jurisdiction in only two provisions," but did not include a "corresponding right" for the plaintiff to bring its claim in district court).

Finally, the legislative purpose behind the PRA also confirms that Congress intended for its review scheme to preclude district court jurisdiction. "The PRA's legislative history shows that, in crafting the Act, Congress intended to minimize external intrusions on the Postal Service's managerial independence," and Congress "gave meaning to this intention by placing within the Postal Service the means to redress a disaffected party's concerns about postal rates and services," specifically, "recourse to the PRC." *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 800 (8th Cir. 2006). Thus, "in light of Congress's stated purpose in enacting the PRA, it is 'fairly discernable' that Congress intended to remove consideration of postal service complaints from the courts altogether." *Id.* Another court in this Circuit reached the same conclusion:

> As noted in [a Senate] committee report . . . the goal [of the PRA] was to give postal management the unfettered authority and freedom it has been denied for years to maintain and operate an efficient service. . . . [T]he import of the statutory scheme . . . is clear beyond question. Allowing [judicial] review would be contrary to the legislative intent to give postal management the discretion and autonomy to make decisions without excessive constraints. It is not the place of the courts to tamper with this rational legislative judgment, in light of the clear and convincing evidence of the Congressional intent. . . . We believe that the clear intent of the [PRA] was to permit the Postal Service to operate like a business and to respond with flexibility and imagination to the task of moving the mail. If this goal is to be effectuated, the courts must permit the Postal Service to act like a business, without subjecting routine decisions to the cost and delay of judicial interference.

*Tedesco v. U.S. Postal Serv.*, 553 F. Supp. 1387, 1390-91 (W.D. Pa. 1983). Thus, unsurprisingly, multiple courts—including another Judge in this District—have found that section 3662 operates exclusively, and thus precludes district court jurisdiction. *See Foster v. Pitney Bowes Inc.*, No. Civ. A. No. 11-7303, 2012 WL 2997810, at *5 (E.D. Pa. July 23, 2012) ("it is clear from the statute's history that Congress intended a plaintiff to exhaust the PRC process before challenging an adverse ruling in the United States Court of Appeals for the District of Columbia."), *aff'd sub nom. Foster v. Pitney Bowes Corp.*, 549 F. App'x 982 (Fed. Cir. 2013); *LeMay*, 450 F.3d at 800; *Tedesco*, 553 F. Supp. at 1391; *Shelby Res., Inc. v. U.S. Postal Serv.*, 619 F. Supp. 1546, 1549

(S.D.N.Y. 1985) ("agree[ing] generally with the . . . subject matter jurisdiction [analysis] expressed in *Tedesco*"). Congress presumably knew of several of these cases—*e.g.*, *Tedesco* and *Shelby*—when it amended section 3662 in 2006 and yet, instead of expressly overriding this case law, or otherwise indicating that it wished to preserve district court jurisdiction over covered claims, Congress "*expanded* the reach of § 3662" to cover additional provisions. *Foster*, 549 F. App'x at 986 (emphasis added). Congress thus effectively ratified the interpretation of section 3662 set forth in those cases. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of" a "judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Accordingly, based on the statutory structure and purpose, "Congress' intent to preclude district court jurisdiction is fairly discernible." *Adorers*, 897 F.3d at 195.

Turning to step two of the *Thunder Basin* framework, Plaintiffs' section 3661(b) claim is "of the type Congress intended to be reviewed within this statutory structure." *Id.* "At this stage the court considers three factors: (1) whether the statutory scheme foreclose[s] all meaningful judicial review; (2) the extent to which the plaintiff's claims are wholly collateral to the statute's review provision; and (3) whether "agency expertise could be brought to bear on the . . . questions presented." *Id.* All three factors confirm that section 3661(b) claims are "of the type Congress intended to be reviewed" through the statutory scheme.

First, the statutory scheme does not "foreclose all meaningful judicial review;" to the contrary, it expressly permits review of an adverse PRC decision in a federal appellate court. *See* 39 U.S.C. § 3663. Second, Plaintiffs' section 3661(b) claim is not "wholly collateral" to the statutory scheme. Section 3662 expressly permits claims concerning section 3661, and the PRC's predecessor—the Postal Rate Commission—concluded that parties can bring a section 3661(b) claim through the statutory scheme. *See supra* at 23. The Court has also acknowledged that parties

may bring section 3661(b) claims before the PRC. *See* PI Order at 30-31 ("The explicit text of section 3662" allows for section 3661 claims). Third, and finally, the PRC's expertise may be "brought to bear" on questions relating to section 3661(b). As described below, this provision requires a fact-intensive analysis concerning the nature of the Postal Service policies at issue, in which background knowledge concerning postal operations would undoubtedly be helpful. The PRC, as opposed to a federal court, has the requisite background knowledge, and is thus better situated to conduct the section 3661(b) analysis. *See* PI Order at 66-67 ("The Postal Service clearly does have some expertise in evaluating programs under § 3661. But this expertise is shared with the Postal Commission . . . The Postal Service has previously sought out the expertise of the Commission as to exactly this question—whether a proposed change . . . triggers the procedures of the subsection."). Plaintiffs' section 3661(b) claim is therefore "of the type that Congress intended to be reviewed" in the section 3662 review scheme. Accordingly, under the *Thunder Basin* test, the PRA statutory review scheme precludes this Court's jurisdiction over Plaintiffs' section 3661(b) claim.[7]

### 2. The Court's conclusion, in its PI Order, that it likely had jurisdiction over Plaintiffs' section 3661(b) claim should not control here.

In its PI Order, the Court tentatively concluded that it had jurisdiction over Plaintiffs' section 3661(b) claim. The Court, however, is not bound by that legal conclusion, and should revisit it now that it has the benefit of additional briefing. *See Univ. of Texas v. Camenisch*, 451

---

[7] Plaintiffs may not rely on *Leedom v. Kyne* to establish jurisdiction despite section 3662's preclusive effect. 358 U.S. 184 (1958). The *Leedom* exception applies only if preclusion "would wholly deprive the [plaintiff] of a meaningful and adequate means of vindicating its statutory rights," and if the statute at issue does not "clearly and directly" preclude review. *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991). However, as noted in *supra* at 22-27, section 3662 provides a "meaningful and adequate means" of bringing a section 3661(b) claim, and the statutory structure "clearly and directly" precludes district court jurisdiction over section 3661(b) claims.

U.S. 390, 395 (1981) ("given the haste that is often necessary," a "preliminary injunction is customarily granted on the basis of procedures that are less formal" and so "conclusions of law made by a court granting a preliminary injunction are not binding").

First, the Court generally questioned whether section 3662 precludes district court jurisdiction at all since section 3662 states that parties "may" file a complaint before the PRC. *See* PI Order at 31. But Congress's decision to include the word "may" in section 3662 is not necessarily evidence against the provision's preclusive effect. By using that term, Congress possibly wished to signal only that an aggrieved party "may" bring a complaint before the PRC, or it may elect to take no action at all.[8] Importantly, this language is not uncommon in statutory schemes that are found to preclude district court jurisdiction. The Civil Service Reform Act ("CSRA") review scheme, for example, states that a party "*may* submit an appeal to the [administrative tribunal]," 5 U.S.C. § 7701(a) (emphasis added), yet, in *Elgin v. Dep't of Treasury*, the Supreme Court still found that this review scheme precluded district court jurisdiction over the plaintiffs' constitutional claims, *see* 567 U.S. 1, 7-8 (2012).

Further, another Judge in this District, and other courts, have concluded that, even though section 3662 uses the word "may," multiple other indicators make clear that Congress intended for this provision to preclude district court jurisdiction. *See*, *e.g.*, *Foster*, 2012 WL 2997810, at \*5 (rejecting the argument that section 3662 is not exclusive because "the word 'may' appears" in it); *LeMay*, 450 F.3d at 799-800 (rejecting the argument that "by using the word 'may,' Congress intended application to the PRC to be permissive," since the Court is "not analyzing statutes in

---

[8] Indeed, the Supreme Court has suggested that the word "may" often serves "to limit" the manner and circumstances where an action may occur. *See Humphrey's Executor v. United States*, 295 U.S. 602, 626 (1935) (interpreting provision that officer "may" be removed for cause); *see PHH Corp. v. CFPB*, 881 F.3d 75, 78 (D.C. Cir. 2018) (en banc).

general" but rather "the PRA in specific," and the PRA's "legislative history" confirms that "the remedy provided by section 3662 is exclusive"). As explained above, other elements of the PRA's structure suggest that Congress did *not* intend to allow parties to freely bring covered claims in district court. *See supra* at 22-26.

The Court then reasoned that even if the statutory review scheme generally precludes district court jurisdiction over covered claims, it may not preclude jurisdiction over section 3661(b) claims in particular. But again, "if there exists a special statutory review procedure, it is ordinarily *supposed* that Congress intended that procedure to be the exclusive means of obtaining judicial review *in those cases to which it applies*." *Marshall*, 667 F.2d at 340 (emphasis added). Multiple factors confirm that Congress generally intended to preclude district court jurisdiction over covered claims, and a section 3661(b) claim is a covered claim. *See supra* at 22-27. In addition, if Congress sought to preserve jurisdiction over certain covered claims, it knew how to do so explicitly. Section 3664 explicitly confers jurisdiction upon district courts over claims relating to section 3662. *See supra* at 24. Congress could have included a comparable provision for section 3661(b), but chose not to. Thus, there is no basis for carving out a jurisdictional exception for section 3661(b) claims.

In concluding otherwise, the Court first cited to cases where other courts have entertained section 3661(b) claims. But in none of these cases did a court expressly resolve whether section 3662 may preclude jurisdiction over a section 3661(b) claim. For example, in *Buchanan v. United States Postal Service*, the Fifth Circuit evaluated the merits of a section 3661(b) claim without questioning whether it had jurisdiction to do so. 508 F.2d 259, 263 (5th Cir. 1975). The court only referenced section 3662 when noting that "an unexpansive interpretation of 3661 will not leave remediless the postal user dissatisfied by changes that do not rise to the level of those covered by

3661" because that "postal user may turn to 3662 if the change does in fact affect his postal service." *Id.* at 264. The court, however, did not consider whether section 3662 may also provide a remedy for section 3661(b) claims, thus precluding parties from bringing those claims in district court.

The Court also cited to *American Postal Workers Union, AFL-CIO v. United States Postal Service*, where the D.C. District Court addressed an entirely different jurisdictional argument. Civ. A. No. 06-cv-726, 2007 WL 2007578 (D.D.C. July 6, 2007). There, the Postal Service argued, and the court agreed, that the court "lacks jurisdiction to review [a PRC] Advisory Opinion." *Id.* at *7. The court stated, however, that "[t]his argument [was] inapposite . . . because Plaintiff does not, in fact, seek review of [an] Advisory Opinion," but rather was arguing that the Postal Service unlawfully "proceed[ed] with" a policy change "because USPS failed to submit [the policy change] to the PRC for an advisory opinion within a reasonable time prior to [its] implementation." *Id.* The court never referenced section 3662.

Likewise, the Court cited to *United Parcel Service, Inc. v. United States Postal Service*, which did not address district court jurisdiction and did not concern section 3661(b). 604 F.2d 1370, 1378 (3d Cir. 1979) ("Although . . . a nationwide qualification does exist with respect to changes in the nature of postal Services, 39 U.S.C. s 3661, no such qualification appears in ss 3622-23, the statutes with which we are concerned"). Thus, the cases cited by the Court do not provide guidance on the jurisdictional question here. *See Goldman v. Citigroup Glob. Mkts. Inc.*, 834 F.3d 242, 251 (3d Cir. 2016) ("[a] drive-by jurisdictional ruling, in which jurisdiction has been assumed by the parties, and assumed without discussion by the court" is not instructive).

The Court also stated that the cases cited by the Postal Service—where courts found section 3662 to be exclusive—involved "run-of-the-mill" service complaints, rather than section 3661(b)

procedural claims. *See* PI Order at 32-34. But those cases do not suggest that section 3662's preclusive effect is *limited* to "run of the mill" service complaints. For example, in *LeMay*, the Eighth Circuit noted only that the claims *in that case* involved "classic questions of postal rates and services," and that the plaintiffs could not avoid the preclusive effect of section 3662 by framing their claims as breach-of-contract claims. 450 F.3d at 801. The court, however, said nothing to suggest that section 3662 may not preclude section 3661(b) claims. To the contrary, the court broadly noted that "Congress intended to remove consideration of postal service complaints from the courts altogether," *id.* at 800, and a section 3661(b) claim constitutes a "postal service complaint" (*viz.*, that the Postal Service modified its service policies without following the required procedure). In any event, the cases cited by the Postal Service do *not* include only "run of the mill" service complaints. *Foster*, for example, involved an intellectual property claim—that the Postal Service "obtain[ed] information from" the plaintiff and then "offer[ed] [a] postal service that use[d] such information" with the plaintiff's consent—and the court still found that section 3662 precluded district court jurisdiction over the claim because it was "enumerated in § 3662." 549 F. App'x at 984-86.

The Court also stated that the legislative history does not suggest that Congress specifically intended to preclude district court jurisdiction over section 3661(b) claims. *See* PI Order at 36-38. But the Court can apply the *Thunder Basin* framework, and conclude that it lacks jurisdiction over the section 3661(b) claim, even without referring to legislative history. As noted above, multiple other factors indicate that Congress intended to generally preclude district court jurisdiction over claims that come within the scope of section 3662, and section 3661(b) claims come within the scope of section 3662. *See supra* at 22-27.

Regardless, the legislative history reflects a general policy of minimizing judicial interference in postal operations, *see supra* at 25-26, a concern that applies equally to judicial interference spurred by section 3661(b) claims. Indeed, here, Plaintiffs seek a detailed Court order that would impose operational requirements on the Postal Service's operations in the future—the type of federal court relief Congress likely wanted to limit. *See infra* at 60-64. Moreover, the Court quoted from a Senate Report stating that section 3662 provides the PRC "with enhanced authority to respond to complaints of pricing, service, *or other actions by the Postal Service in violation of law*." PI Order at 37 (quoting S. Rep. No. 108-318, at 48 (2004)) (emphasis added). The italicized language suggests that Congress intended to rely on the PRC to address claims relating not only to pricing and service, but also *other* alleged violations, including section 3661(b) violations. Plaintiffs, by contrast, refer to nothing in the legislative history indicating that Congress intended to specifically preserve district court jurisdiction over section 3661(b) claims.

Finally, the Court sought to distinguish this case from *Thunder Basin* to show why the Court may exercise jurisdiction over Plaintiffs' section 3661(b) claim. But all of the *Thunder Basin* factors counsel against the Court's exercise of jurisdiction here, *see supra* at 22-27, and, respectfully, the distinctions drawn by the Court do not require a contrary conclusion. For example, the Court noted that, unlike the statute at issue in *Thunder Basin*, the PRA includes a general grant of jurisdiction: section 409. But "[t]he fact that § 409 . . . generally grants jurisdiction over actions brought against USPS" is immaterial since "§ 409 specifically states that its grant of jurisdiction to the district courts does not apply to exceptions 'otherwise provided in this title,'" and "[s]ection 3662 . . . provides such an exception." *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013). And again, the statute contains a jurisdictional provision specific to certain covered

claims—section 3664—that would have been unnecessary if Congress intended for section 409's jurisdictional grant to apply to covered claims. *See supra* at 24.

The Court also stated that, in *Thunder Basin*, the statute's "review process did not discuss pre-enforcement challenges" and "told [parties] exactly when they had a right to weigh in on the process, and that was *after* the" agency took action, whereas, here, section 3661(b) grants the "public the right to provide input *before* the Postal Service makes nationwide changes affecting the nature of the postal services." PI Order at 42. But it is unclear why this distinction counsels in favor of district court jurisdiction here. Regardless of the nature of the right involved, Plaintiffs can secure adequate relief before the PRC. Plaintiffs are not seeking pre-enforcement relief; they argue that the Trips Initiative already exists, and thus seek an order setting that initiative aside and requiring the Postal Service to follow the section 3661(b) process if it wishes to reinstate the initiative. Plaintiffs have never disputed that they can seek comparable relief before the PRC. *See* 39 U.S.C. § 3662 (describing broad remedial powers of the PRC). And if the PRC refuses to issue this relief, Plaintiffs can seek further review before the D.C. Circuit. *See* 39 U.S.C. § 3663.

This reasoning also addresses the final distinction the Court draws between this case and *Thunder Basin*: that, here, district court jurisdiction may facilitate the policy underlying section 3661(b). The statutory review process may also provide relief sufficient to vindicate the rights conferred by section 3661(b). And allowing for district court jurisdiction would undermine another policy underlying the PRA as a whole: to *minimize* judicial intervention into postal operations. *See supra* at 25-26. Only review before the PRC is consistent with both policies.

Accordingly, the arguments the Court relied upon in its PI Order do not justify the Court's exercise of jurisdiction over the section 3661(b) claim. Section 3662 generally precludes district

court jurisdiction over covered claims, and there is no sound basis for carving out an exception for section 3661(b) claims.

**B.   Even if this Court were to reach the merits of Plaintiffs' claim, it should conclude that the alleged Trips Initiative is not subject to section 3661(b).**

Plaintiffs cannot prevail on the merits of their section 3661(b) claim, especially in light of the heightened standard for ultra vires claims. "[T]he Postal Service is exempt from . . . the [APA]," *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012), and Plaintiffs cite to no other statute that creates a cause of action for alleged section 3661(b) violations. The Court nonetheless concluded at the preliminary injunction stage that even "if a plaintiff is unable to bring [its] case predicated on either a specific or a general statutory review provision . . . nonstatutory review is available," but "it is quite narrow" and "is available only to determine whether the agency has acted '*ultra vires*.'" PI Order at 58. Even if the Court concludes that it has jurisdiction over a section 3661(b) ultra vires claim, this claim would be "confine[d]" to "agency error" that is "*extreme*." *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (emphasis added). "Garden-variety errors of law or fact are not enough." *Id.* Rather, an agency action must "violate[] a *specific* prohibition in the statute that is *clear and mandatory*," "*obviously* [go] beyond the terms of the statute," or fall "*far* outside the scope of the task that Congress gave it," to be "invalidate[d] . . . as *ultra vires*." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (emphasis added). Strictly enforcing this standard is necessary to give effect to Congress's deliberate choice *not* to provide a statutory cause of action for claims against the Postal Service. Indeed, if Congress intended to subject ultra vires claims against the Postal Service to the same standard as an APA claim, it presumably would have applied the APA to Postal Service policies.

In its PI Order, the Court relied upon relevant D.C. Circuit precedent, but suggested that the restrictive ultra vires standard applies only when "nonstatutory review must proceed under [the

34

Supreme Court's decision in] *Leedom v. Kyne*," and that the Court need not proceed under *Leedom* here because it did "not find that Congress has generally precluded review on this class of claims where jurisdiction already exists within the statute itself." PI Order at 59 n.40. But the D.C. Circuit has stated that the restrictive standard applies to nonstatutory ultra vires claims *in general*. *See Wolf*, 977 F.3d at 1263 (a plaintiff must satisfy a restrictive standard to generally have an agency action "invalidate[d] . . . as ultra vires"); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) ("nonstatutory review is intended to be of extremely limited scope" and "represents a more difficult course . . . than would review under the APA . . . for acts 'in excess of statutory . . . authority'"); *Nat'l Ass'n of Postal Supervisors ("NAPS") v. U.S. Postal Serv.*, Case No. 1:19-cv-2236-RCL, 2020 WL 4039177, at *3 (D.D.C. July 17, 2020) (citing to D.C. Circuit precedent, and noting that "[a]n agency acts *ultra vires* when it violates a 'clear and mandatory' statutory provision" or one that "has only one unambiguous interpretation"), *appeal filed*, No. 20-5280 (D.C. Cir. Sept. 15, 2020). The D.C. Circuit does not distinguish between nonstatutory review predicated on *Leedom* (subject to a restrictive standard) and some other, distinct form of nonstatutory review (supposedly subject to a relaxed standard).

Furthermore, although the D.C. Circuit has cited to *Leedom* in cases involving ultra vires claims against the Postal Service, it has done so to justify nonstatutory ultra vires claims against the Postal Service *in general*; it has not carved out a separate, *Leedom*-based ultra vires claim subject to a distinct standard. *See Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (citing to *Leedom* when noting that "'non-statutory' review" is "available only to determine whether the agency has acted 'ultra vires'" and that "such review . . . is quite narrow"); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003) (citing to circuit precedent relying on *Leedom* to show that, although Congress "exempt[ed] the Postal

Service from the judicial review provisions of the APA," a claim "that the Postal Service 'exceeded its statutory authority' . . . admit[s] of judicial review."). Thus, *all* nonstatutory, ultra vires claims against the Postal Service are subject to the restrictive standard described above. This standard applies even if the Court does "not find that Congress has generally precluded" the Court's jurisdiction over Plaintiffs' section 3661(b) claim. PI Order at 59 n.40. In *Wolf*, for example, the D.C. Circuit applied the restrictive standard—and rejected a plaintiff's ultra vires claim on the merits—even though it rejected the government's argument that the relevant statute "eliminates district courts' jurisdiction" over the plaintiff's non-constitutional claims. 977 F.3d at 1259, 1263.

Thus, Plaintiffs must show that section 3661(b) "clear[ly]" and "obviously" applies to the alleged Trips Initiative. Section 3661(b) states that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal . . . to the [PRC] requesting an advisory opinion . . . ." The statute does not further define these terms, and the relevant case law provides little guidance. For example, the seminal case on this subject—*Buchanan v. United States Postal Service*—notes that there must be "a 'change'" with "some meaningful impact on service" (without clarifying what a "meaningful impact" is). 508 F.2d 259, 262 (5th Cir. 1975). Likewise, it states that the requirement that "the change must be 'in the nature of postal services'" involves "a qualitative examination of the manner in which postal services available to the user will be altered" (without clarifying which types of "postal services" qualify, and the "manner" in which they must be "altered"). *Id.* at 262–63. Thus, the PRC has explained that "[t]here is no bright line for determining when a reduction in collection and mail processing service is a change in the nature of a postal service." Postal Rate Commission, Order No. 1307, 66 Fed. Reg. 16504, 16507 n.12 (Mar. 26, 2001). The Postal Service Office of the Inspector General has explained that the statute

"leaves much to Postal Service determination and intent," and "[i]f the Postal Service does not conceptualize its actions, instructions, and directives as a change in the nature of postal services, those actions likely fall outside the scope of this requirement." Ex. 23 (USPS OIG Audit Report No. 20-292-R21), at 18.

Here, Plaintiffs cannot establish that section 3661(b)'s ambiguous terms "clear[ly]" and "obviously" apply to the alleged Trips Initiative. First, this initiative did not change "the nature of postal services," which *Buchanan* understood to mean "postal services available to the user." 508 F.2d at 263. "Following the guidance offered by *Buchanan*, the [PRC found] that" a "change in the nature of postal services broadly can be defined as changes to a customer's ability to access essential postal services that require a visit to a postal retail facility."[9] Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), at 11, https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf. Thus, the Postal Service has sought section 3661(b) review before instituting formal changes to certain categories of mail (*e.g.*, such as eliminating overnight delivery for single-piece First-Class Mail),[10] eliminating an entire day of mail delivery,[11] or changing the hours of operation at thousands of

---

[9] The Court has already concluded that it would "give broad deference to the past interpretations of section 3661(b) offered by the [PRC]." PI Order at 65; *see also id.* at 68 ("statutory interpretations of the [PRC] are owed the highest degree of deference").

[10] Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), at 1, 10, https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20Opinion.pdf ("This proposal entails a change to the delivery expectation or delivery service standard for . . . [certain] Standard Mail."); Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), at 1 https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf ("The [Postal Service's proposed] changes to service standards would ultimately eliminate all overnight delivery service for single-piece First-Class Mail.").

[11] Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), at 1, https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf ("The Postal Service requests a Commission advisory opinion on a plan to end Saturday delivery, Saturday outgoing mail processing, and other related service changes.").

post offices or retail operations.[12] Unlike those policy changes, however, the alleged Trips Initiative does not formally change the postal products available to users (*e.g.*, eliminating overnight First-Class Mail delivery), or otherwise restrain users' ability to access essential postal services (*e.g.*, limiting local facility hours). At most, it changes *internal* processing practices which may have a downstream effect on postal users. However, "[a]ll changes within the Service will probably affect postal service to some extent," *Buchanan*, 508 F.2d at 262, and thus a downstream effect, in itself, is insufficient to bring a policy within the scope of section 3661(b).

In the PI Order, the Court stated that the PRC "has interpreted section 3661(b) to encompass a larger variety of changes than Defendants imply," and cites to a decision where the PRC found that a "proposal triggered section 3661(b) because" its implementation would "likely [] cause at least a small degradation in the current level of service provided to First-Class Mail on a nationwide basis.'" PI Order at 69 (quoting Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. N2006-1, at 9 (Dec. 12, 2006), https://www.prc.gov/docs/55/55431/N2006-1AdvDec.pdf (hereinafter, "12/12/06 PRC Order")). But the PRC listed two other reasons for why the proposal at issue "triggered section 3661(b)": "First, [no party] argue[d] that th[e] proceeding should not have gone forward for lack of jurisdiction under section 3661," and "[s]econd, the changes to be made in implementing the [proposal] [were] likely to involve qualitative 'changes in the nature of postal services' because

---

[12] Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), at 1, 3, https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf (proposing to reduce the hours of operations "at more than 13,000 post offices nationwide"); Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf (proposing to identify "more than 3,650 post offices, retail annexes, stations and branches for possible closing").; Advisory Opinion Concerning the Process for Evaluating Closing Stations, and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf (proposing a broad station and branch discontinuation plan).

they contemplate[d] moving from mail class-based distinctions in designing postal operations to alternative, largely shape-based processing and distribution concepts." 12/12/06 PRC Order, at 9. The PRC noted that the proposal—a strategy to "realign [postal] mail processing and transportation networks," *id.* at 1—"involv[ed] numerous mail processing and transportation changes," *id.* at 15, and "trigger[ed] the review provisions of section 3661" because it "w[ould] reconfigure [the Postal Service's] logistical network over the course of . . . several calendar years to reduce redundancy and inefficiency through *consolidation of operations and transportation links*." *Id.* at 71 (emphasis added). Thus, that case involved a formal change to the structure of the postal network, and did not find that section 3661(b) applies to *any* policy which may affect service performance.

The Court also quotes from a 1976 Advisory Opinion where the former Postal Rate Commission stated that "[i]t is the experience of the individual postal consumer . . . that must be assayed in determining whether an action or program involves a change in the nature of postal services." Advisory Opinion Concerning a Proposal Change in the Nature of Postal Services, Docket No. N75-1 (Apr. 22, 1976), at 21, https://www.prc.gov/prcarchive/viewpdf.aspx?docid= 508276839. The Court then concluded that because individual postal consumers have "experienced" delays, they have "experienced an alteration in the availability of postal services." PI Order at 74. But the 1976 Advisory Opinion did not conclude that a policy amounts to a change in "the nature of postal services" if postal users "experience" *any* change in mail service, including delays. Rather, consistent with the PRC's March 10, 2010 Advisory Opinion, *see supra* at 37, the 1976 Advisory Opinion found that section 3661(b) applied to the proposal at issue there because it would cause "the representative postal consumer" to experience "a significant change in *the availability of basic postal services*." 1976 Advisory Opinion at 20 (emphasis added). Specifically, the proposal had "the potential to affect . . . the 'nature' of postal services available to the public"

because it could "change the kind of facility to which a postal consumer has convenient access and the level of retail service . . . offered in the facility," causing a "representative postal consumer" to possibly experience reduced "access to one or more postal services because of changes in the kind of facility deployed (*e.g.*, because of changes from manned facilities to contract stations or self-service units)." *Id.* at 23. Again, that case, unlike the case here, involved fundamental changes to the types of services directly available to postal users.

Accordingly, the alleged Trips Initiative does not constitute a change to "the nature of postal services." It does not formally change the postal products available to a user, nor does it otherwise restrain them from accessing essential postal services (*e.g.*, by closing down local facilities). At most, the alleged Trips Initiative may have had certain short-term, downstream effects on service performance, which in itself is insufficient to trigger section 3661(b). If it were otherwise, then there would be no limit to the potential category of claims that must be presented to the PRC, as any action could potentially impact the downstream mail user, including *ad hoc* decisions made by individual managers within postal facilities.

Second, the Postal Service OIG reviewed the alleged Trips Initiative, and concluded that "[b]ased on [its] review of the applicable legal requirements for consulting the PRC at the time the Postal Service was making its determination, the Postal Service was in compliance with policies and legal requirements." Ex. 23 (USPS OIG Audit Report No. 20-292-R21) at 17. It reached that conclusion despite also stating, contrary to the Postal Service's position, that the Postal Service adopted an "initiative . . . to eliminate all late and extra trips outside of regularly scheduled transportation service." *Id.* at 2. The OIG reasoned that section 3661(b) "applies only to *changes* that have a 'meaningful impact on service,'" and that "the failure to meet standards *without intentional degradation* of service does not give rise to a *de facto* change in the nature of postal

services; poor service is, instead, a matter for the PRC's Annual Compliance Determination." *Id.* at 18 (emphasis added). "Thus, in the absence of evidence that [the postal] initiatives"—including the alleged "initiative . . . to eliminate unnecessary late extra trips"—were "intended to disrupt service performance, the Postal Service was not required by then existing precedent to request an advisory opinion." *Id.* at 10, 17-18. The OIG noted that there was no "clear and direct evidence" concerning the Postal Service's intent with respect to the policies at issue, and thus found that the Postal Service committed no violation of section 3661(b). *Id.* at 19. This reasoning applies equally here. Plaintiffs present no evidence indicating that the Postal Service adopted the alleged Trips Initiative in order to "intentional[ly] degrad[e]" service. *Id.*

And again, even if the Court is inclined to disagree with the Postal Service (and the Postal Service OIG) on these points, that alone is insufficient to justify granting Plaintiffs' summary judgment motion, and denying Defendants' cross-motion for summary judgment. The Court must find that the Postal Service's reading of section 3661(b) is *definitively* incorrect; that this provision "clear[ly]" and "obviously" applies to the alleged Trips Initiative. In light of section 3661(b)'s ambiguous terms, the ambiguity in the relevant case law, the relevant PRC opinions, and the Postal Service OIG's opinion, Plaintiffs cannot satisfy the heightened standard for ultra vires claims. The Postal Service is entitled to judgment as a matter of law on the section 3661(b) claim.

## III.   Plaintiffs' challenge to the "Do-It-Now" strategies under 39 U.S.C. §§ 101(e) and 403(a)–(b) fails as a matter of law.

Plaintiffs claim that a set of 57 operational strategies—which Plaintiffs refer to as "Do-It-Now" strategies—exceed the Postal Service's authority under 39 U.S.C. §§ 101(e) and 403(a)–(b). *See* MSJ at 47–56. Section 101(e) provides generally that "[i]n determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." Sections

403(a)–(b) similarly provide that the Postal Service "shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees," 39 U.S.C. § 403(a), and "shall . . . maintain an efficient system of collection, sorting, and delivery of the mail nationwide," *id.* § 403(b)(1).

These claims fail as a matter of law. As an initial matter, Congress has categorically precluded judicial review of claims under sections 101(e) and 403(a)-(b). By exempting the Postal Service from the APA, and creating a special review scheme for alleged violations of some provisions, but *not* sections 101(e) and 403(a)-(b), Congress implicitly precluded judicial review of these provisions. In any event, even if the Court has jurisdiction over this claim, Plaintiffs must rely on "non-statutory review," a "narrow" form of review "available only to determine whether the agency has acted ultra vires—that is, whether it has exceeded its statutory authority." *Mittleman*, 757 F.3d at 307; *see also supra* at 34-35. Plaintiffs' argument that the Postal Service erred in weighing the relevant considerations or failing to consider important issues in developing the operational strategies does not support a cognizable ultra vires claim because the argument does not speak to the agency's *statutory authority* to act. And even if the argument did support a cognizable ultra vires claim, it would fail as a matter of law because Plaintiffs cannot show that the Postal Service exceeded its statutory authority in developing and communicating the Do-It-Now strategies, which are longstanding strategies that the Postal Service has used for years as part of its annual planning to improve service and efficiency.

## A. Congress has precluded judicial review of alleged violations of sections 101(e) and 403(a)-(b).

The Court lacks jurisdiction over a claim if "congressional intent to preclude judicial review is fairly discernible in the statutory scheme." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984). "In the context of [a] statute's precisely drawn provisions" providing "administrative review, together with a further option of judicial review" for certain claims, the "fail[ure] to authorize further review" for other claims "provides persuasive evidence that Congress deliberately intended to foreclose further review of such claims." *United States v. Erika, Inc.*, 456 U.S. 201, 207-08 (1982).

Here, Congress specifically exempted the Postal Service from the APA, and created a complex system of administrative review—section 3662—followed by potential review before the D.C. Circuit, for alleged violations of certain provisions, but not the provisions Plaintiffs invoke here (sections 101(e) and 403(a)-(b)). *See supra* at 23-24, 34; 39 U.S.C. § 3662. For example, Sections 3662 and 3663 of the PRA provide for administrative review, followed possibly by federal circuit court review, of, *inter alia*, complaints that the Postal Service is violating Sections 101(d) (governing postal rates), 401(2) (power to issue regulations), 403(c) (no discrimination in establishing rates), 404a (various specific limitations), and 601 (when letter may be "carried out of the mail"), but they do *not* provide for any review of claims brought under Sections 101(e) or 403(a)–(b). *See also, e.g.*, 39 U.S.C. § 1208(b) (providing for judicial review of "[s]uits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees"); *id.* § 409(c) (providing that the Federal Tort Claims Act applies to tort claims against the Postal Service). Congress's decision not to expressly provide for review of the provisions Plaintiffs invoke "provides persuasive evidence that Congress deliberately intended to foreclose" judicial review of claims under those provisions. *Erika, Inc.*, 456 U.S. at 207-08.

43

Congress's determination not to provide for judicial review of claims brought under Sections 101(e) and 403(a)–(b) is consistent with the broader "legislative determination" that the Postal Service "must have the freedom given by the statute to control costs and manage" itself consistent with its own understanding "of what is the economical and efficient thing to do." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 602 F.2d 420, 432 (D.C. Cir. 1979). Indeed, before the enactment of the Postal Reorganization Act, the Postal Service "always had the obligation to provide an efficiency-conscious nationwide postal delivery system, but it had never had the power to control the costs of that system." *Id.* at 430. With the PRA, Congress "afford[ed] the new postal agency with the control over revenue and costs commensurate with its predecessor's responsibility to provide an efficient postal delivery system." *Id.* Accordingly, Congress precluded judicial review over alleged violations of sections 101(e) and 403(a)-(b).

**B. The Postal Service did not clearly and obviously exceed its statutory authority to manage its costs in prescribing the Do-It-Now strategies.**

To the extent judicial review is available, Plaintiffs must rely upon a nonstatutory ultra vires cause of action, where the scope of the Court's review is "quite narrow." PI Order at 58; *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) (review is "extremely narrow in scope"). An agency action must "violate[] a *specific* prohibition in the statute that is *clear and mandatory*," "*obviously* [go] beyond the terms of the statute," or fall "*far* outside the scope of the task that Congress gave it," to be "invalidate[d] . . . as *ultra vires*." *Wolf*, 977 F.3d at 1263 (emphasis added).[13] This heightened standard is

---

[13] As explained above, this narrow standard applies not only where plaintiff is relying on the *ultra vires* doctrine to invoke the Court's jurisdiction, but also where plaintiff relies on the doctrine to assert a cause of action. *See supra* at 34-35.

especially appropriate here given Congress's deliberate decision to withhold both APA and administrative review for alleged violations of sections 101(e) and 403(a)-(b).

Here, Plaintiffs' claim that the Postal Service implemented an alleged "cost-cutting policy" too "quickly" and "haphazardly," MSJ at 47, fails to state a cognizable non-statutory review claim. The claim fails for two reasons: first, sections 101(e) and 403(a)–(b) do not impose constraints on the Postal Service's statutory authority that are enforceable through non-statutory review, and second, even if these provisions provide enforceable constraints, the Postal Service has not violated—much less *clearly* and *obviously* violated—those provisions.

### 1. Sections 101(e) and 403 do not impose constraints on the Postal Service's statutory authority that are enforceable through non-statutory review.

Congress has vested the Postal Service with exceptionally broad statutory authority over postal operations, including the authority to manage its costs. *See* 39 U.S.C. § 401(3) (the Postal Service "shall have the . . . *general power* []. . . to . . . determine the character of, and necessity for, its expenditures." (emphasis added)). Congress has also authorized the Postal Service to, among other things, "provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1), "determine the need for . . . postal and training facilities and equipment, and to provide such offices, facilities, and equipment as it determines are needed," *id.* § 404(a)(3), "acquire . . . hold, maintain, sell, lease, or otherwise dispose of [personal or real property]," *id.* § 401(a)(5), and "to have all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers," *id.* § 401(a)(10). It is indisputable that, in developing and communicating the Do-It-Now strategies, the Postal Service was acting within this broad grant of statutory authority.

In addition to that broad grant of authority, Congress in Sections 101(e) and 403(a)–(b) also provided a number of *general* policy goals that the Postal Service should attempt to achieve,

including in the statutory provisions at issue here. *See* 39 U.S.C. § 101(e) (stating the Postal Service policy to give the "highest consideration" to ensuring expeditious collection and delivery of important letter mail); *id.* § 403(a) (Postal Service shall "plan, develop, promote, and provide adequate postal services at fair and reasonable rates and fees"); *id.* § 403(b)(1) (Postal Service shall "maintain an efficient system of collection, sorting, and delivery of the mail nationwide"). Those general goals, which may at times be in tension—*e.g.*, ensuring the most "expeditious" delivery of mail may not always be consistent with the most "efficient system" for delivering mail—are not legally enforceable constraints on the Postal Service's statutory authority. There are no judicially manageable standards for deciding when the Postal Service has given the "highest consideration" to ensuring expeditious delivery of important letter mail, or when it has done enough to ensure that its strategies will promote its ability to provide "adequate" and "efficient" postal services. Congress knew how to provide clear statutory limitations, rather than advisory goals, when it wished to. *See, e.g.*, 39 U.S.C. § 404a (providing for "[s]pecific limitations"— enforceable through administrative and judicial review, *see* 39 U.S.C. §§ 3662-3663—on the Postal Service's statutory authority).

Thus, Plaintiffs cannot establish an ultra vires claim based on their argument that the Do-It-Now strategies ran afoul of sections 101(e) or 403. Nor can Plaintiffs salvage this claim by framing it as an arbitrary and capricious challenge, namely, that in exercising its statutory authority, the Postal Service did not conduct an *appropriate analysis* of the various considerations identified in sections 101(e) and 403. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). A "heartland arbitrary-and-capricious challenge under the APA" is not cognizable in non-statutory review because it is "not a claim that the [Postal]

Service exceeded its statutory authority." *Eagle Tr. Fund v. U.S. Postal Serv.*, 811 F. App'x 669, 670 (D.C. Cir. 2020), *petition for cert. docketed*, No. 20-1026 (U.S. Jan. 28, 2021).

The D.C. District Court dealt with a similar issue in *National Association of Postal Supervisors ("NAPS")*, 2020 WL 4039177. There, the plaintiff sought to bring claims against the Postal Service under 39 U.S.C. §§ 101(c), 1003(a), and 1004, contending that the Postal Service's promulgation of a pay package for certain employees violated these provisions. *Id.*, at *6. The court dismissed plaintiff's claims, holding that plaintiff lacked a statutory cause of action and that the relevant provisions of the PRA were not susceptible to ultra vires review, explaining that many of the provisions did not impose any "clear and mandatory" limit on the Postal Service's authority and that the relevant provisions are generally phrased as "directive[s]" to the agency rather than as creating rights in plaintiffs to sue. *Id.*

So too here. Sections 101(e) and 403(a)–(b) do not impose any "clear and mandatory" limits on the Postal Service's authority to manage its costs. Rather, they contain statements of general policies that the Postal Service should consider in exercising its "significant" discretion under the PRA. *NAPS*, 2020 WL 4039177, at *6; see *also DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 510 (D.C. Cir. 2019) (claims not cognizable under ultra vires review where statute required agency to choose "appropriate data"; such an "open-ended" provision was "worlds apart" from a clear statutory command).

The PRC has also emphasized that the "broad formulations" of sections 101 and 403 are "subject to differing interpretations," "flexible," and "indefinite" in scope.[14] Because "what is necessary to bind the Nation together changes over time," the "overlapping requirements" of

---

[14] *See* Postal Regulatory Comm'n, Report on Universal Postal Serv. & the Postal Monopoly ("PRC Report") at 22, 25-27 (2008), https://www.prc.gov/docs/61/61628/USO%20Report.pdf.

sections 101 and 403 give the Postal Service a range of options for how to meet the public's evolving needs. *Id.* at 25-26. And the PRC has reiterated this understanding of sections 101 and 403 in advisory opinions concerning claims similar to those Plaintiffs seek to assert here.[15] For these reasons, Plaintiffs' claims under Sections 101(e) and 403(a)–(b) are not cognizable non-statutory ultra vires claims.

### 2. Even if Sections 101(e) and 403 impose enforceable constraints, the Postal Service did not clearly and obviously exceed those constraints.

The 57 operational strategies that Plaintiffs challenge appeared on a series of PowerPoint presentations that postal executives used during various videoconferences with area vice presidents during the summer of 2020. *See* Pls. Exs. 3, 4, 6. Plaintiffs do not address any of the strategies in detail, but instead contend that all of the strategies were part of an alleged "cost-cutting policy" that "violated . . . 39 §§ U.S.C. §§ 101 and 403." MSJ at 47. Examples of some of the strategies include routine measures such as trying to save money on utilities, "manag[ing] new employees for [their] first 10 weeks," using "flexible work," and "review[ing] spotter schedules." Pls.' Ex. 32 at 2–4. They also included general goals such as meeting "management expectation[s]," enhancing "productivity," and "improv[ing]" certain operations. *Id.* at 1, 4, 6.

---

[15] *See, e.g.*, Postal Regulatory Comm'n, Docket No. N2011-1, Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1, at 7-9 (Dec. 23, 2011), https://www.prc.gov/Docs/78/78971/N2011-1_AdvisoryOP.pdf ("Many of the terms used to delineate the Postal Service's obligations [under Sections 101 and 403] are not defined in title 39. . . . The Postal Service is afforded a significant amount of authority under the statute, and has reasonable discretion to interpret the ambiguous terms delineating its powers and obligations."); Postal Regulatory Comm'n, Docket No. N2010-1, Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1, at 11-13 (Mar. 24, 2011), https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf ("The Postal Service is afforded a significant amount of flexibility in determining how to" fulfill Sections 101 and 403, which "set[ ] out general postal policies[.]")

The Postal Service identified the "Do-It-Now Strategies" as part of its annual effort to meet its annual integrated financial plan. *See* Ex. 34 (Defs.' Interrogatory Resp. No. 3); Ex. 10 (Colin Dep.) 374:11–375:7 ("every year they establish targets, strategies to reduce work hours based on workload"); Ex. 9 (McAdams Dep.) 84:10–17. Each year around July and August, the Postal Service prepares a financial plan that projects revenues and expenses for the following fiscal year. *See* Ex. 34 (Defs.' Interrogatory Resp. No. 3); Ex. 10 (Colin Dep.) 163:11–19. Because the Postal Service's operations are funded through its revenue (as opposed to appropriations or tax dollars), the Postal Service must manage its operations in an efficient and cost-effective manner. Thus, when its financial plan anticipates a shortfall in revenues that will not cover the Postal Service's expenses (as has been the case for many years), the Postal Service estimates the number of work hours that it must reduce to help it make up the shortfall. Ex. 34 (Defs.' Interrogatory Resp. No. 3); Ex. 9 (McAdams Dep.) 84:10–17; Ex. 10 (Colin Dep.) 142:14–143:2 ("Every year headquarters will roll out a budget to say aspirationally, we need you to reduce these work hour[s] so that we can have a positive net income."). Postal Service Headquarters executives then collaborate with managers in the field to identify strategies that will help it meet the annual work-hour reduction target. *See* Ex. 34 (Defs.' Interrogatory Resp. No. 3); Ex. 10 (Colin Dep.) 142:14–143:10; Ex. 9 (McAdams Dep.) 84:10–17.

In the summer of 2020, the Postal Service estimated that it needed to reduce 64 million workhours to account for the projected budget shortfall in fiscal year 2021, which began on October 1, 2020. *See* Ex. 10 (Colin Dep.) 265:1–12; Ex. 8 (Williams Dep.) 171:8–172:21. Postal executives at headquarters worked with managers in the field to develop strategies to meet this work-hour reduction, as they had in prior years. *See* Ex. 20 (McAdams Confidential Dep.) 11:8–12:5; *id.* at 34:17–35:3. Headquarters prepared a chart of strategies "as a shell or a draft or a road

map and [then] sent it out to the area vice presidents for their teams to embrace, absorb, to review." *Id.* at 11:8-12:5. The area vice presidents then "together came to what they agreed upon as an area . . . vice president field plan so that each area would be focusing in on the same initiatives at the same time." *Id.* The resulting plan "was really a field plan . . . [,] and the field area vice presidents agreed and believe[d] they could execute and support it." *Id.*

The Do-It-Now Strategies that resulted from this collaboration consist of longstanding strategies that the Postal Service has used for years as part of its annual process to improve the service performance and efficiency of the Postal Service. *See* Ex. 20 (McAdams Confidential Dep.) 16:8–16 ("[M]ost of these things on this chart are already part of postal operational standards, the contract, our handbooks, and manuals. . . . These are things that any supervisor, manager, postmaster should be doing already."); Ex. 10 (Colin Dep.) 145:7-15 ("It's always the same approach. It's nothing different. There's always the same approach every year. So whether it's 2019 or 2020, it's the same approach to try to go after the earned hours and what can we do or adjust based on reduction in volume that the organization experiences, and you adjust based on that. But it's always the same method."); Ex. 8 (Williams Dep.) 112:18–113:21 ("This was not just now . . . . I had been having five years of conversations on a number of fronts, overtime, productivity, efficiencies, on time transportation. . . . There were multitudes of these types of . . . presentations over the five years that I was the chief operating officer . . . ."); *id.* at 245:11–22 ("[N]one of it's new. Multiple iterations of these strategies have been discussed over the years . . . . These are self-evident. . . . They weren't thought up of the day before the presentation."); Ex. 34 (Defs.' Interrogatory Resp. No. 3) (the strategies that relate to work hours "refer to the same or similar USPS efforts to better manage work hours by minimizing the number of unearned work

hours and unnecessary overtime hours that the Postal Service has pursued through the same or similar strategies yearly before June 1, 2020").

For example, the strategy of "keeping track of supervisor hours" has been "included every year" that certain Postal Service employees could recall. Ex. 9 (McAdams Dep.) 203:14–16. The same is true of "[c]arriers leaving on time," "[o]vertime authorization," "[p]retour overtime authorization," and "stationary time reduction," all of which were strategies that the Postal Service has identified in prior years. *Id.* 203:16–204:7; *see also* Ex. 20 (McAdams Confidential Dep.) 23:12–24 (Q: "[H]ow was this specific proposal carriers leave at earned a change of the Postal Service's prior practice? A: It's not . . . [I]t's not a change."); Ex. 10 (Colin Dep.) 380:4–10 (Q: "[D]o you recall in the past any instances where people . . . in the Postal Service talked about potential ways to reduce T-time[16] usage? A: Every year since I've been in management."); *id.* at 212:8–14 (noting that strategy was "duplicated every year, because that's one of the things that you do"); *id.* at 217:19–23 ("Q: And before this PowerPoint, what was the practice? A: Same thing. Start time no earlier than [distribution-up-time]. It's the same. It wasn't anything different.").

Contrary to Plaintiffs' assertion, the 2020 Do-It-Now strategies were not materially different in scope from strategies from prior years. *See* Ex. 9 (McAdams Dep.) 200: 12–19 ("So what was different about this plan than from prior years apart from the dollar figures involved was you had never done a plan quite like this before; is that fair to say? A: No, it's not fair to say. Most on here would probably have been on previous fiscal year plans."); *id.* at 195:12–16 ("Q: But the overall scope was greater than anything you've done in previous years? A: No, not previous years, throughout the year."); Ex. 8 (Williams Dep.) 116:8–19 (Q: "[W]as this time a different approach

---

[16] T-Time is time paid at the normal rate for extra work done by supervisors or other exempt employees beyond their scheduled hours. Ex. 34 (Defs.' Interrogatory Response No. 3), Ex. 27 (Curtis Dep.) 112:7–16.

then? A: No, I've done this type of approach . . . over the course of my career."); *id.* at 117:22–118:16. In 2019, the Postal Service developed 35 similar strategies. Ex. 21 (USPS OIG Audit Report No. 21-014-R21) at 25 (Management's Comments). In 2018, there were 53 strategies, and in 2017, there were 44. *Id.* The Postal Service distributed these prior-year plans in the same manner as the 2020 plan and, as in 2020, included a timeline for implementation. Ex. 10 (Colin Dep.) 148:12–21 ("Q: So you weren't ever given, the entirety of the time that you were the eastern area vice president, a set of strategies and a date by which you had to implement it? A: Oh yeah. No, no, we were given strategies, I just never waited."); *id.* 259:19–24 (discussing timelines of prior plans); *id.* at 322:1–6 (Q: "[W]hen you were an area vice president, had you ever received a PowerPoint like this with hard deadlines for when to implement certain strategies? A: Yes."). While the timing and nature of some of the strategies change from year to year depending on the circumstances, the vast majority of the 2020 strategies were not new. Ex. 9 (McAdams Dep.) 180:2–181:1 ("[A]bsolutely the majority . . . of these actions are not new initiatives to the Postal Service. . . . [T]he actions themselves are not new strategies."); *id.* at 194:4–12 ("[W]e work on 90 percent of everything on this list throughout the year regularly."); Ex. 20 (McAdams Confidential Dep.) 34:17–35:3 ("Q: Was the effort in the summer of 2020 different from what you would see in prior years? A: No. This process was pretty standard.").

Nor was there any material difference from prior years in how the Postal Service communicated the 2020 strategies. The Postal Service uses the term "Do-It-Now" simply to refer to strategies that "can be done now," as opposed to strategies that "require more development in terms of planning and implementation." Ex. 9 (McAdams Dep.) 77:21–78:2. The term itself is "not a new term," and the Postal Service has used it "for many, many years." *Id.* at 78:6–8. While the Postal Service sets targets for implementing the strategies, these targets have been "aspirational,"

and that did not change in 2020. *See* Ex. 10 (Colin Dep.) 376:23–377:16. And, consistent with prior years, postal headquarters worked with local managers to achieve common goals, while leaving implementation of the strategies primarily to local managers. *See id.* at 215:18–216:2; 221: 6–18 ("[W]hen we put these up, . . . the understanding generally is that . . . these are seasoned managers, seasoned supervisors, so everything we put up here . . . are things that when I was a supervisor in 1988 we dealt with."); *id.* at 209:11–25 ("we had project plans laid out, there [were] roles and responsibilities, and the expectation was that there would be webinars and Zooms to roll out the plan down to the employee level"); Ex. 8 (Williams Dep.) 247:14–29 (area vice presidents have communication teams that "execute initiatives in their areas of responsibility"); Ex. 27 (Curtis Dep.) 89:20–90:9 (strategies are communicated to letter carriers through the Carrier Academy when they are hired, and union instructors and supervisors continue to talk to them about strategies on regular basis).

Plaintiffs are wrong that the Postal Service did not conduct any advance analysis of the strategies. *See* MSJ at 27. Like any large logistics organization, the Postal Service employs experts who are constantly analyzing the organization's operational strategies, including the Do-It-Now strategies that the Postal Service uses every year to improve operational efficiency. *See* Ex. 10 (Colin Dep.) 292:13–22 (discussing six sigma "black belt" who was "responsible for putting a lot of the project plans . . . together"); *id.* at 232:14–25 (discussing "industrial engineers and headquarters and our master black belts giving us . . . models, some data on what's the best in class"); *id.* at 379:1–17 (Q: "And the people who are looking at [the strategies], they would include people who you would consider experts in postal logistics, people such as yourself who have been working there for over three decades? A: Yes."); Ex. 9 (McAdams Dep.) 180:2–181:8 (strategies were "solid operational standardized managerial competencies that we teach and expect to be

done"); Ex. 8 (Williams Dep.) 235:20–236:17 (discussing "years" of analysis around late and extra trips concluding that "service would be improved and cost would be reduced"); *id.* at 237:5–12 ("[P]rior to this initiative there were . . . studies, analysis around the correlation between on-time transportation and service performance. All of those studies show that when your transportation networks run on time, your service is better."). To the extent the Postal Service did not do a formal analysis for the strategies in 2020, that is because many of the strategies are routine, tried-and-true operational initiatives that the Postal Service has been using for years. *See* Ex. 10 (Colin Dep.) 270:8–11 ("[T]hese are all basic . . . This is not like anything different than we did before."); Ex. 8 (Williams Dep.) 240:18–241:5 (strategies for how to reduce extra trips are "really self-evident").

Plaintiffs also cite no evidence suggesting that the Postal Service's communication of the same Do-It-Now strategies that the Postal Service had been using for years caused service performance to decline. *See* MSJ at 30–31. Service performance suffered throughout 2020, beginning with the onset of the COVID-19 pandemic and continuing throughout the year as employee availability fell to record lows. *See* Ex. 28 (Declaration of Stephen M. Dearing) ("Dearing Dec.") ¶ 7. The Postal Service also faced other challenges in 2020, including natural disasters, inclement weather, and holiday backlogs at various times of the year, which also likely contributed to declines in service performance. *Id.* ¶¶ 8–11; *see also* Ex. 8 (Williams Dep.) 327:21–333:17 (discussing challenges posed by contraction of air networks, employee unavailability, and increase in package volumes); *id.* at 336:7–337:19; Ex. 27 (Curtis Dep.) 101:2–105:19 (discussing employee availability challenges); Ex. 29 (Declaration of Angela Curtis) ("Curtis Dec.") ¶¶ 17–21 (same).

Plaintiffs make no serious attempt to demonstrate how any of the 57 Do-It-Now strategies individually or collectively exceed the Postal Service's statutory authority by reference to Sections

101(e) or 403(a)–(b). *See generally* MSJ at 52–56. Of the 57 strategies, Plaintiffs' brief mentions only five. *See* MSJ at 25–26.[17] As to Section 101(e), Plaintiffs assert that the "execution" of the strategies as a whole "violate[s]" Section 101(e) because the execution allegedly "reflected little consideration for the expeditious delivery of important letter mail." MSJ at 48, 56. But, as noted, a claim that the Postal Service gave inadequate "consideration" to an issue is a garden variety arbitrary-and-capricious challenge that Congress expressly determined should not apply to the Postal Service, 39 U.S.C. § 410(a), and is thus not cognizable in non-statutory review. *See supra* at 46-47. If such a claim were cognizable, any party could sue in federal court to enjoin Postal Service operations whenever they believed that the Postal Service's execution of a strategy "reflected little consideration for the expeditious delivery of important letter mail," MSJ at 56—interference that would be unprecedented and inconsistent with the significant discretion that Congress vested in the Postal Service to manage its own operations. *See NAPS*, 2020 WL 4039177, at *3.

In any event, as explained above, the record belies Plaintiffs' contention that the Postal Service gave "little consideration" to the expeditious delivery of important letter mail in developing and prescribing the Do-It-Now strategies. To the contrary, the record demonstrates that the Postal Service develops the strategies annually to optimize its operations so that they run on-time and in an efficient manner. *See, e.g.*, Ex. 10 (Colin Dep.) 378:19–379:17 (discussing how experts in postal logistics reviewed at strategies with service in mind); Ex. 8 (Williams Dep.) 235:20–236:17 (discussing analysis by limiting unnecessary late and extra trips, "service would

---

[17] Plaintiffs' brief mentions the strategies that (i) district and plant managers (as opposed to lower-level supervisors) approve overtime, (ii) letter carriers depart for their delivery routes once reaching their earned-hour figure, (iii) area vice presidents cut extra hours of supervisors, (iv) area vice presidents and eliminate certain forms of overtime, and (v) sorting machines start on time. *See* MSJ at 25–26.

be improved"); *id.* at 243:23–244:7 (importance of machines starting and ending on time for service); Ex. 30 (Cintron Dep. (Sept. 22, 2020) 56:12–57:5; 57:13–23 (providing clarity on the appropriate use of late and extra trips directly improves service); Ex. 12 (Cintron Dep. (Oct. 15, 2020)) 49:13–50:5 (same); Ex. 2 (USPS OIG Audit Report No. 19XG013NO00O-R20) (unnecessary late and extra trips hurt service).

Plaintiffs' argument that the Postal Service violated Sections 403(a)–(b) fares no better. Plaintiffs argue that the Postal Service violated Section 403 because the Postal Service "forged ahead with an aggressive and rigid plan to reduce work hours" during a "moment that counseled for deliberativeness to maintain adequate and efficient postal services." MSJ at 56. Relying on the dictionary definitions of "efficient" and "adequate," *see* MSJ at 51–52, Plaintiffs assert that the Postal Service violated Section 403's requirement that the Postal Service "provide adequate and efficient postal services at fair and reasonable rates and fees," 39 U.S.C. § 403(a), and "maintain an efficient system of collection, sorting, and delivery of the mail nationwide," *id.* § 403(b)(1). But, again, Plaintiffs' argument that the Postal Service was not adequately "deliberative" in developing the Do-It-Now strategies is an arbitrary-and-capricious claim that is not cognizable in non-statutory review. *See supra* at 46-47.

Even if such a claim were cognizable, the evidence described above demonstrates that the entire purpose of the strategies was to improve the Postal Service's ability to provide adequate and efficient postal services. The PowerPoint presentations identifying the strategies themselves identify the number of unnecessary work hours the Postal Service projected the strategies to save. *See, e.g.*, Exs. 35-36. And numerous Postal Service officials testified about how the strategies help to improve the Postal Service's ability to provide adequate and efficient postal services. *See e.g.*, Ex. 8 (Williams Dep.) 114:13–22 ("This is an ongoing operational focus of the postal service that

56

looks at efficiencies, it looks at work hours and the budget and it looks at opportunities for how we can ensure that we are continually improving to make sure that we're providing consistent, reliable, predictable and affordable service."); *id.* at 235:20–236:17 (reducing unnecessary late and extra trips would reduce costs); Ex. 20 (McAdams Confidential Dep.) 34:17–35:3 ("[T]here's an effort to improve efficiency daily in the Postal Service."); Ex. 10 (Colin Dep.) 142:9–144:20 (Q: "[Y]ou were aware that members of headquarters were coming up with strategies about design to capture and maximize efficiency? A: Yes, like they did every year. Every year they did that."); *id.* at 277:17–278:6 (explaining how removing unnecessary machines improves efficiency); Ex. 27 (Curtis Dep. Tr.) 74:16–75:14 (reducing "unearned time" improves efficiency); Ex. 29 (Curtis Dec.) ¶¶ 15–16 (same); Ex. 30 (Cintron Dep.) 56:12–57:5; 57:13–23 (adherence to transportation schedules improves service and efficiency); Ex. 11 (Cintron Dec.) ¶¶ 12–21 (same); Ex. 32 (Declaration of Jason DeChambeau) ("DeChambeau Dec.") ¶¶ 9, 11, 12, 18, 19 (removing underused sorting machines improves efficiency); Ex. 33 (Declaration of Michael L. Barber) ("Barber Dec.") ¶¶ 4–7 (same).

Accordingly, the Postal Service is entitled to judgment as a matter of law on Count II. Congress precluded judicial review over alleged violations of sections 101(e) and 403(a)-(b). Even if the Court finds it has jurisdiction over this claim, the statutory provisions at issue set no limits on the Postal Service's discretion that may be enforced through a nonstatutory ultra vires claim. Regardless, Plaintiffs fail to establish that the Do-It-Now initiatives—again, initiatives comparable to those the Postal Service develops and implements *every year*—"clearly" and "obviously" violate sections 101(e) and 403(a)-(b), as required for a nonstatutory ultra vires claim. The Court should enter summary judgment in favor of Defendants on Count II.

**IV.    Even if Plaintiffs prevail on any of their claims, the Court should not enter Plaintiffs' proposed order.**

Plaintiffs seek an extraordinary affirmative injunction that would effectively turn the Plaintiff States and this Court into the permanent, day-to-day "micromanage[rs] [of] the operations of the USPS," dictating whether *every single transportation trip* is justified. *New York v. Trump*, 490 F. Supp. 3d 225, 243 (D.D.C. 2020). But Plaintiffs are not entitled to any injunctive or declaratory relief, much less the sweeping relief they seek here. Indeed, the requested injunction is unsupported by Plaintiffs' claims of injury, bears little (if any) relationship with their asserted legal claims, would force this Court into an impracticable role monitoring specific operational decisions across an enterprise that spans every corner of this Nation, and would ultimately ossify the Postal Service's managerial efforts in a manner directly contrary to Congress's expressed intent.

To secure injunctive relief, the court must consider whether "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest." *Coffelt v. Fawkes*, 765 F.3d 197, 201 (3d Cir. 2014) (quoting *Sheilds v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).

Plaintiffs are not entitled to any relief, because to secure either declaratory or injunctive relief, a plaintiff must demonstrate a "real and substantial" threat of future harm. *See Yung v. Garland*, Civ. No. 20-032-LIPS, 2021 WL 1027486, at *4 (D. Del. Mar. 16, 2021) (quoting *Salvation Army v. Dep't of Cmty. Affairs of N.J.*, 919 F.2d 183, 192 (3d Cir. 1990)), *appeal filed*, *Yung v. Atty Gen. U.S.*, No. 21-1974 (3d Cir. May 26, 2021). Indeed, "[t]he relevant inquiry is whether, *at the time the injunctive relief is to be* issued, the party seeking the injunction is in danger of suffering irreparable harm." *Flowserve Corp. v. Burns Int'l Servs. Corp.*, 423 F. Supp. 2d 433,

439 (D. Del. 2006) (emphasis added). But Plaintiffs make no attempt whatsoever to justify either ongoing or future harm, much less *irreparable* harm (which is necessarily present or future-looking); rather, their claims of injury are based entirely on injuries purportedly suffered in the summer of 2020. *See* MSJ at 58-60. This is fatal to their request for extraordinary equitable relief.

With respect to the purported Trips Initiative, while Plaintiffs claim that "[a]bsent the entry of a permanent injunction, the Postal Service can immediately reinstate its currently enjoined initiatives, leading to fresh mail delays," MSJ at 60, they offer no evidence that the Postal Service intends to reinstate any enjoined "changes" in postal policy specifically or any initiatives that would likely cause mail delays to recur, let alone that such mail delays would cause them harm (as is their burden on summary judgment). The Postal Service has made clear that it currently has no intention of prohibiting or generally discouraging the use of all late and extra trips. Ex. 19 (Fourth Cintron Dec.) ¶ 4.  Plaintiffs put forward no evidence that the Postal Service ever intended to degrade service; rather, the available evidence (and the conclusion of the independent OIG) was that any service consequences—which have since been addressed—were the result of implementation issues caused by poor communication and exacerbated by a number of unique factors, including employee absences due to the pandemic. There is no indication in the record that the purported Trips Initiative will reoccur, much less reoccur in the same way given the lessons learned from the prior implementation issues, and the significantly different COVID-19 landscape in the summer of 2021 relative to the summer of 2020. *See California v. Bureau of Land Mgmt.*, 2020 WL 1492708, at *5 (N.D. Cal. Mar. 27, 2020) (rejecting claim of impending injury based on "unique circumstances" of agency action), *appealed*, No. 20-16157 (9th Cir. June 12, 2020).

With respect to the "Do-It-Now" initiatives, Plaintiffs' claims of future injury fare even worse. Despite complaining of 57 operational strategies that allegedly exceed the Postal Service's

statutory authority, Plaintiffs mention only five. *See* MSJ at 25-26. And Plaintiffs make no attempt to tie any of these routine operational activities, which happen every year, to any ongoing or future injury. That is plainly insufficient for injunctive relief. *See California*, 2020 WL 1492708, at *5 ("Despite ongoing hydraulic fracturing operations on BLM lands, Citizen Group Plaintiffs do not provide any evidence of current harms, but point only to a hypothetical 'risk' of them."). Having failed to articulate ongoing injury, much less ongoing injury tied to the challenged conduct, Plaintiffs are entitled to neither injunctive nor declaratory relief with regard to their legal challenge to the "Do-It-Now" initiatives. *See e.g.*, *Yung*, 2021 WL 1027486, at *4 ("Issuance of a declaratory judgment requires a threat of future harm."). Indeed, while Plaintiffs claim they are entitled to declaratory relief even in the absence of injunctive relief, *see* MSJ at 61-62, as they themselves admit, such relief would be limited solely to the then-existing 2020 measures, *see id.* at 61, which do not currently injure them and are not likely to reoccur in such a way that a declaratory judgment would be of anything other than historical relevance. The public interest is not served by propounding judgments regarding actions that emerged in—and resulted from—the unique circumstances of the summer of 2020.

But even if Plaintiffs could demonstrate irreparable injury based on the world as it exists now—and they cannot—they cannot show that their proposed affirmative injunction would be in the public interest or that it would not unduly harm defendants. Most of Plaintiffs' proposed order bears little relationship to their asserted legal claims. For example, Plaintiffs seek to affirmatively *require* the Postal Service to "[u]tilize late and extra trips as necessary to meet service standards and service performance targets and to minimize mail delays." Proposed Order, ¶ 6(a); *see also id.* ¶ 6(c) (requiring Postal Service employees to be informed "that the use of late and extra trips is authorized, permissible, and encouraged when necessary to meet service standards and service

60

performance targets or to minimize mail delays"). But this requirement bears no relationship to section 3661, which imposes only a *procedural* requirement that the Postal Service solicit a non-binding advisory opinion from the PRC before taking certain actions. *See* MSJ at 60 ("If the Postal Service . . . still wants to undertake an effort to eliminate late and extra trips, an injunction in this case would require only that the Postal Service submit that proposed change to the Postal Regulatory Commission for a public proceeding."). Indeed, this Court has characterized their claim as an inherently procedural one, *see* PI Order at 46, which, like a procedural APA claim, would not prohibit the agency from taking the actions at issue assuming that they follow the required procedures, *see Comite de Apoyo a los Trabajadores Agricolas v. Solis*, 933 F. Supp. 2d 700, 713 (E.D. Pa. 2013) ("By vacating an invalid rule" on procedural grounds, "a reviewing court leaves the agency" with the option of "reenact[ing] the same rule with an amended procedure . . ..").

Nor do sections 101(e), 403(a), or 403(b) justify this type of affirmative relief. As noted, Section 101(e) requires only that the Postal Service give the "highest consideration" to the expeditious collection and delivery of important letter mail; section 403(a) requires the postal service to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees," while section 403(b) requires the Postal Service to maintain an "efficient system of collection, sorting, and delivery of the mail nationwide." But as discussed above, these abstract goals—which may at times be in tension with one another—impose no judicially enforceable limitation on postal activity. Yet Plaintiffs take it upon *themselves* to balance these general policy goals in a way they see fit—even though they make up only a minute subset of total postal service users—and they do so in a way that provides the Postal Service little discretion and flexibility.

Indeed, Plaintiffs would involve themselves—and this Court—in managing personnel and contracting decisions. They seek an order clarifying that "holding a truck or ordering an extra trip no longer constitutes an unauthorized contractual commitment." Proposed Order, ¶ 6(b). This would be a remarkable order: authorizing "all Postal Service employees who are in *any way involved* . . . in decisions to request or approve the holding of a truck or the scheduling of an extra trip," *id.* (emphasis added), to bind the Postal Service to enforceable contracts, apparently without any restriction, without consideration of any Postal Service or federal requirements governing contracting officers, or without any ability to limit *which* trips are authorized. By such an order, an individual employee could apparently commit the Postal Service to an extra trip to move a single piece of mail, or for that matter, to engage a supplier of their choosing, regardless of personal conflict. Sections 101(e), 403(a), and 403(b) cannot be read to require the Postal Service to grant such broad authorities to its employees.

Moreover, the public interest and the balancing of the harms also do not support Plaintiffs' proposed relief. Federal courts should seek to avoid interfering with the operations of executive agencies. *See*, *e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (noting the importance of "protect[ing] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."). Yet Plaintiffs' requested order relief would necessarily entangle this Court in the Postal Service's day-to-day operations, and would do so, apparently, forever. Plaintiffs, for example, seek to prevent the Postal Service from:

> Implementing and enforcing any work-hour reduction strategy, "do-it-now" strategy, or similar strategy or initiative to cut costs without first: (1) Giving the highest consideration to the expeditious collection, transportation, and delivery of important letter mail, including first-class mail and other important letter mail; (2) Ensuring, prior to implementing any such strategy or initiative and after conducting an analysis or pilot program, that such strategy or initiative will not negatively

impact the ability of the Postal Service to provide adequate and efficient postal services and to meet service standards and service performance targets, taking into consideration current and near-future events that are impacting, or may impact, Postal Service operations; and (3) Clearly and consistently communicating the strategy or initiative to the relevant field offices and/or Postal Service employees.

Proposed Order ¶ 5(c). But this contains a litany of vague and indeterminate terms, including: "similar strategy or initiative to cut costs," "highest consideration," "negatively impact the ability of the Postal Service to provide adequate and efficient . . . service standards and service performance targets," "current and near-future events that are impacting, or may impact, Postal Service operations," and "clearly and consistently communicating." *Id.* These terms fail to comport with Rule 65(d)'s specificity requirement, which "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *see also Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016) ("An injunction should not contain broad generalities."); *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.3d 921, 926-27 (D.C. Cir. 1982) (concluding that the phrase "of a similar nature" "fails to satisfy the exacting requirements of Rule 65(d) of the Federal Rules of Civil Procedure.").

Indeed, even assuming these terms could satisfy Rule 65, they would force this Court to constantly police vast swaths of Postal Service operations. This order would apparently encompass any attempt to "cut costs" or improve the efficiency of postal operations (the purpose of a "Do-It-Now" strategies), including the Postal Service's annual review of efficiencies and work hours. But the Postal Service is a massive logistics and delivery operation; many, perhaps most, of its operations could fall into these categories. Accordingly, the Court would have to constantly determine the factor to which the Postal Service has given "highest consideration" (the statute does not define it) for "important letter mail" (which the statute does not define). The Court would have

63

to define what an adequate "analysis or pilot program" is, and also judge whether the Postal Service has properly balanced the question of whether "such strategy or initiative will not negatively impact the ability of the Postal Service to provide adequate and efficient postal services and to meet service standards and service performance targets, taking into consideration current and near-future events that are impacting, or may impact, Postal Service operations." Plaintiffs do not explain what such an inquiry would even look like. And Plaintiffs' proposed order would require the Court to judge whether communications to the field are done "clearly and consistently." In other words, *any* time the Postal Service proposes a managerial initiative that *could* impact the efficiency of its operations, it would be subject to the contempt power of this Court, without clear notice of when that power would be exercised.

Furthermore, this problem is exacerbated with respect to the paragraph in the proposed order that would require the Postal Service to use (and indeed, *encourage*) late and extra trips "when necessary to meet service standards and service performance targets or to minimize mail delays." Proposed Order ¶¶ 6(a), (c). Plaintiffs provide no definition as to what these terms mean, nor how they would be used in practice. For example, would the Postal Service be required to use an extra trip to move a single piece of mail, if that would allow for a theoretically faster delivery? Would it be required to delay a trip if it would allow some mail to move faster, even if other mail would be delayed? Plaintiffs' injunction would raise a number of questions for which it provides no answers, requiring the Postal Service to constantly seek clarification from the Court, or otherwise simply allow late and extra trips under practically any circumstances. Indeed, such trips cost the Postal Service (and, by extension, those that it serves) hundreds of millions of dollars per year, and, as the OIG has identified, can cause disruptions and ultimately lead to situations where "customer service can suffer." Ex. 13 (USPS OIG Audit Report No. 21-028-R21) at 1. In other

words, far from being a panacea, late and extra trips—while sometimes necessary—can often result in the very problem that Plaintiffs claim that they attempting to resolve: delayed mail.

This remedial scheme would be inappropriate under any circumstances. But it is particularly so here. Congress has made the judgment that the Postal Service should not be subject to the type of judicial supervision applicable to typical agencies. *See supra* at 25-26. Moreover, Congress created an agency—the PRC—that is charged with supervising and monitoring the Postal Service in the first instance, with review to the D.C. Circuit should the public be dissatisfied. *See supra* at 23-24. This proposed order preempts that entire scheme, and vests a single district court with the power to serve as the Postal Service's regulator in the first instance. That is not the scheme Congress has chosen, and it would upset the careful balance that Congress has attempted to strike between the Postal Service's need for flexibility and the need for limited supervision. This Court should reject Plaintiffs' inappropriate invitation to upset that balance.

Finally, Plaintiffs are not entitled to a nationwide injunction. "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff 's] injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018). In short, neither standing nor remedies are "dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Principles of equity reinforce those constitutional limitations imposed by Article III. A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S. A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). In that tradition, injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in that case. *Califano v.*

*Yamasaki*, 442 U.S. 682, 702 (1979). Nationwide injunctions are irreconcilable with those constitutional and equitable limitations. By definition, a nationwide injunction extends relief to parties that were not "plaintiff[s] in th[e] lawsuit, and hence were not the proper object of th[e court's] remediation." *Lewis*, 518 U.S. at 358. Accordingly, to the extent the Court orders any relief, it should be limited to the Plaintiffs only.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment, and grant Defendants' Cross-Motion for Summary Judgment.

Dated: June 18, 2021

> Respectfully submitted,
>
> BRIAN M. BOYNTON
> Acting Assistant Attorney General
>
> ERIC R. WOMACK
> Assistant Branch Director, Federal Programs Branch
>
> */s/* Kuntal Cholera
> KUNTAL V. CHOLERA
> JOSEPH E. BORSON
> ALEXIS J. ECHOLS
> JOHN J. ROBINSON
> Trial Attorneys
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 1100 L Street, NW
> Washington, D.C. 20005
> kuntal.cholera@usdoj.gov
>
> *Attorneys for Defendants*