**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

**Commonwealth of Pennsylvania, State of
California, State of Delaware, District of
Columbia, State of Maine, Commonwealth of
Massachussetts, and State of North Carolina**,

Plaintiffs,

v.

**Louis DeJoy, in his official capacity as
United States Postmaster General, Ron A.
Bloom, in his official capacity as Chairman
of the Postal Service Board of Governors,
and the United States Postal Service**,

Defendants.

Case No. 20-cv-4096

**REPLY IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 7

I.      Plaintiffs have failed to establish a cognizable, ongoing injury tied to either the Trips Initiative or the Do-It-Now Initiatives. .......................................................................... 7

II.     The Postal Service is entitled to judgment as a matter of law on Plaintiffs' section 3661(b) claim. ...................................................................................................... 13

      A.      The PRA's comprehensive review scheme precludes the Court's jurisdiction over Plaintiffs' section 3661(b) claim. ...................................................... 14

            1.     Section 3661(b) is exclusive with respect to claims within its scope. ............ 14

                   i.     The presumption of exclusivity, the statutory structure, and the statutory purpose confirm that section 3662 is generally exclusive with respect to all claims within its scope. ........................ 14

                   ii.    Plaintiffs' arguments for why section 3662 is not exclusive lack merit. ................................................................................... 19

            2.     Plaintiffs' section 3661(b) claim falls within the scope of the section 3662 review scheme. ...................................................................... 26

      B.      Even if the Court finds it has jurisdiction over the section 3661(b) claim, Plaintiffs fail to show that this provision clearly and obviously applies to the alleged Trips Initiative. .......................................................................... 28

III.    Plaintiffs' challenge to the "Do-It-Now" strategies under 39 U.S.C. §§ 101(e) and 403(a)–(b) fails as a matter of law. ................................................................... 36

      A.      Congress has precluded judicial review of alleged violations of sections 101(e) and 403(a)–(b). .......................................................................... 36

      B.      The Postal Service did not clearly and obviously exceed its statutory authority to manage its costs in prescribing the Do-It-Now strategies. .................... 39

            1.     Plaintiffs fail to state a cognizable nonstatutory review claim. ..................... 39

            2.     Even if sections 101(e) and 403(a)–(b) impose enforceable constraints, the Postal Service did not clearly and obviously exceed those constraints. .......................................................................... 42

IV.    Plaintiffs are not entitled to the ambiguous and extraordinarily broad relief sought in their Proposed Order. ...................................................................................... 46

CONCLUSION .......................................................................................................................... 51

# TABLE OF AUTHORITIES

**CASES**

*Adorers of the Blood of Christ v. Fed. Energy Regul. Comm'n*,
  897 F.3d 187 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 1169 (2019). ............................ 14, 23, 26

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ........................................................................................................ 37, 40

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ..................................................................................................... 7, 12, 13

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ...................................................................................................... 14-15, 38

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ............................................................................................................... 8

*Bonnot v. Cong. of Indep. Unions, Loc. No. 14*,
  331 F.2d 355 (8th Cir. 1964) ............................................................................................... 20

*Buchanan v. United States Postal Service*,
  508 F.2d 259 (5th Cir. 1975) ......................................................................................... 18, 32

*Califano v. Yamaski*,
  442 U.S. 682 (1979) ............................................................................................................. 47

*California v. Texas*,
  141 S. Ct. 2104 (2021) ....................................................................................................... 8, 9

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................................................................... 11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................................. 11

*Common Cause v. Nuclear Regulatory Comm'n*,
  674 F.3d 921 (D.C. Cir. 1982) ............................................................................................ 48

*Comp. Dep't of Dist. Five, United Mine Workers of Am. v. Marshall*,
  667 F.2d 336 (3d Cir. 1981) ....................................................................................... 14, 15, 23

*Conoco, Inc. v. Skinner*,
  970 F.2d 1206 (3d Cir. 1992) .............................................................................................. 41

*Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*,
  6 F.3d 990 (3d Cir. 1993) ..................................................................................................... 9

*DaimlerChrysler Corp v. Cuno*,
    547 U.S. 332 (2006) ........................................................................................ 8

*DCH Reg'l Med. Ctr. v. Azar*,
    925 F.3d 503 (D.C. Cir. 2019) ................................................................... 39, 40

*Dir., Off. of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding &
    Dry Dock Co.*,
    514 U.S. 122 (1995) ...................................................................................... 35

*Eagle Tr. Fund v. U.S. Postal Serv.*,
    811 F. App'x 669 (D.C. Cir. 2020), *petition for cert. denied*, No. 20-1026
    (U.S. Jan. 28, 2021) ..................................................................................... 40

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ...................................................................................... 14. 21

*Foster v. Pitney Bowes Corp.*,
    549 F. App'x 982 (Fed. Cir. 2013) ......................................................... 18, 19, 25

*Foster v. Pitney Bowes Inc.*,
    Civ. A. No. 11-7303, 2012 WL 2997810 (E.D. Pa. July 23, 2012), *aff'd sub nom.*
    *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982 (Fed. Cir. 2013) ............................ 17, 23, 24

*Freeman v. Corzine*,
    629 F.3d 146 (3d Cir. 2010) ............................................................................ 7

*Friends of Aquifer, Inc. v. Mineta*,
    150 F. Supp. 2d 1297 (N.D. Fla. 2001), *aff'd*, 31 F. App'x 202 (11th Cir. 2001) .................. 41

*Genovese v. Shell Oil Co.*,
    488 F.2d 84 (5th Cir. 1973) ............................................................................ 20

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .................................................................................. 8

*Hartnett v. Pa. State Educ. Ass'n*,
    963 F.3d 301 (3d Cir. 2020) ........................................................................... 12

*Hughey v. JMS Dev. Corp.*,
    78 F.3d 1523 (11th Cir. 1996) ......................................................................... 49

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) ..................................................................................... 20

*LeMay v. U.S. Postal Serv.*,
    450 F.3d 797 (8th Cir. 2006) ................................................................... 17, 23, 36

*Lewis v. Casey*,
   518 U.S. 343 (1996)...................................................................................... 8

*Lewis v. Cont'l Bank Corp.*,
   494 U.S. 472 (1990)...................................................................................... 7

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010).................................................................................... 18

*Monreal v. Potter*,
   367 F.3d 1224 (10th Cir. 2004) ................................................................. 48

*N. Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852 (D.C. Cir. 2012) ................................................................... 28

*N. Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020) ................................................................. 29

*Nat'l Ass'n of Postal Supervisors ("NAPS") v. U.S. Postal Serv.*,
   No. 19-cv-2236, 2020 WL 4039177 (D.D.C. July 17, 2020), *appeal filed*,
   No. 20-5280 (D.C. Cir. Sept. 15, 2020) ....................................... 39, 40, 41

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
   602 F.2d 420 (D.C. Cir. 1979) ................................................................... 38

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ................................................................... 39

*Park Motor Mart, Inc. v. Ford Motor Co.*,
   616 F.2d 603 (1st Cir. 1980)...................................................................... 20

*Payne v. Travenol Labs Inc.*,
   565 F.2d 895 (5th Cir. 1978) ..................................................................... 49

*Peregrine Myanmar Ltd. v. Segal*,
   89 F.3d 41 (2d Cir. 1996) .......................................................................48-49

*Photopaint Techs., LLC v. Smartlens Corp.*,
   335 F.3d 152 (2d Cir. 2003)....................................................................... 20

*Pub. Utilities Comm'n of State of Cal. v. Fed. Energy Regul. Comm'n*,
   100 F.3d 1451 (9th Cir. 1996) ................................................................... 12

*Ratzlaf v. United States*,
   510 U.S. 135 (1994).................................................................................... 32

*Reese Bros. v. U.S. Postal Serv.*,
   905 F. Supp. 2d 223 (D.D.C. 2012) ........................................................... 37

*Salvation Army v. Dep't of Cmty. Affairs of N.J.*,
  919 F.2d 183 (3d Cir. 1990)................................................................................. 46

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) .......................................................................................... 48

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) ............................................................................. 48

*Shapiro v. United States*,
  335 U.S. 1 (1948) ............................................................................................... 18

*Shelby Res., Inc. v. U.S. Postal Serv.*,
  619 F. Supp. 1546 (S.D.N.Y. 1985)................................................................... 17

*Shook v. Bd. of Cnty. Comm'rs of El Paso*,
  543 F.3d 597 (10th Cir. 2008) ........................................................................... 48

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998).......................................................................................... 8, 47

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ........................................................................... 47

*Tedesco v. U.S. Postal Serv.*,
  553 F. Supp. 1387 (W.D. Pa. 1983).............................................................. 17, 19

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994).............................................................................. 14, 15, 22

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006)........................................................................... 28

*United States v. Erika, Inc.*,
  456 U.S. 201 (1982)........................................................................................... 38

*Yung v. Garland*,
  Civ. No. 20-032-LIPS, 2021 WL 1027486 (D. Del. Mar. 16, 2021), *appeal filed*,
  No. 21-1974 (3d Cir. May 26, 2021) ................................................................. 46

**STATUTES**

5 U.S.C. § 7513 .................................................................................................... 21

5 U.S.C. § 7701 .................................................................................................... 21

30 U.S.C. § 815 .................................................................................................... 22

39 U.S.C. § 101............................................................................................ 5, 7, 40, 42

39 U.S.C. § 102 ........................................................................................................ 27, 32

39 U.S.C. § 401 ........................................................................................................ 37, 40

39 U.S.C. § 403 ...................................................................................................... 5, 7, 42

39 U.S.C. § 404 ........................................................................................................ 37, 40

39 U.S.C. § 410 ............................................................................................................. 37

39 U.S.C. § 503 ............................................................................................................. 37

39 U.S.C. § 1003 ........................................................................................................... 40

39 U.S.C. § 1004 ........................................................................................................... 40

39 U.S.C. § 3661 ..................................................................................................... *passim*

39 U.S.C. § 3662 ..................................................................................................... *passim*

39 U.S.C. § 3663 ........................................................................................................... 21

39 U.S.C. § 3664 ........................................................................................................... 17

**FEDERAL RULES**

Fed. R. Civ. P. 65 ......................................................................................................... 48

**REGULATIONS**

39 C.F.R. §§ 3010.100-3010.336 .................................................................................. 16

Postal Rate Commission, Order No. 1239,
    64 Fed. Reg. 28015 (May 24, 1999) ....................................................................... 26

Postal Rate Commission, Order No. 1307,
    66 Fed. Reg. 16504 (Mar. 26, 2001) ....................................................................... 30

**OTHER AUTHORITIES**

Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services,
    Docket No. N2006-1 (Dec. 12, 2006),
    https://www.prc.gov/docs/55/55431/N2006-1AdvDec.pdf ...................................... 33

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches,
    Docket No. N2009-1 (Mar. 10, 2010),
    https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf ................. 31, 32

PRC Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1
(Dec. 23, 2011),
https://www.prc.gov/Docs/78/78971/N2011-1_AdvisoryOP.pdf ..................................... 33, 34

S. Rep. No. 108-318 (2004) ...................................................................................... 25

USPS OIG, Office of Audit: Introduction,
https://www.uspsoig.gov/audit. ................................................................................ 44

**INTRODUCTION**

In the run-up to the 2020 Election, Plaintiffs brought suit and sought extraordinary relief due to their concerns over the timely delivery of mail-in ballots. That election, however, has come and gone, and by all accounts, the Postal Service successfully managed the significant volume of mail-in ballots. *See* Defs.' MSJ, Ex. 26 (USPS OIG Audit Report) (In the 2020 Election, "[t]he Postal Service . . . significantly improv[ed] timeliness over the 2018 mid-term election even with significantly increased volumes of Election Mail in the mailstream."). The circumstances preceding this Court's preliminary injunction have therefore passed, and this Court has the opportunity to re-evaluate the complex statutory questions at issue with sufficient time and briefing. That review should confirm that Plaintiffs' statutory claims lack merit and do not justify the severe, ongoing restrictions that Plaintiffs seek to impose on the Postal Service. The Court should enter summary judgment for the Postal Service on all of Plaintiffs' claims.

*First*, Plaintiffs lack standing to challenge either the alleged ban on late and extra trips (the "Trips Initiative"), or the 2020 iteration of annual strategic initiatives to increase efficiency (the "Do-It-Now Initiatives"). To start, Plaintiffs have submitted no evidence tying the vast majority of the Do-It-Now Initiatives to any cognizable injury. Indeed, Plaintiffs argue only that they have demonstrated that the alleged Trips Initiative has caused an injury, and thus they claim they may challenge all other Do-It-Now Initiatives as well. But the Supreme Court has historically, and repeatedly, rejected the notion that standing is dispensed in gross. To challenge a government policy, Plaintiffs must establish injuries caused by *that policy*; they cannot prevail only by showing that other, related policies have caused an injury. Plaintiffs thus have not proven their standing to challenge the other Do-It-Now Initiatives.

Furthermore, Plaintiffs have also failed to show that the alleged Trips Initiative is causing any *ongoing* injury. To the extent this alleged initiative ever caused an injury, it was due to multiple unique circumstances—*e.g.*, significant COVID-related employee absences and short-term communication issues—that are no longer present today. And the Postal Service has already made clear that late and extra trips were never prohibited and that it currently has no intention of adopting this type of prohibition. Thus, Plaintiffs cannot show that the alleged Trips Initiative is causing, or will cause, any injury to Plaintiffs.

*Second*, the Postal Service is entitled to summary judgment on the claim that, under section 3661(b), the Postal Service supposedly had to secure an advisory opinion from the Postal Regulatory Commission ("PRC") before adopting the alleged Trips Initiative. As an initial matter, 39 U.S.C. § 3662 precludes the Court's jurisdiction over this claim. Plaintiffs acknowledge that this issue is governed by the *Thunder Basin v. Reich* framework, under which the Court first asks whether a statutory review scheme is exclusive with respect to the claims within its scope, and then asks whether the claim at issue comes within the scope of the review scheme. Critically, Plaintiffs do not dispute that courts must *presume* that a special review scheme is exclusive with respect to *all* claims to which it applies. Nor do they dispute that parties may bring section 3661(b) claims through the section 3662 review scheme and ultimately seek review, if necessary, before the D.C. Circuit.

In their reply brief, Plaintiffs make little effort to affirmatively show that Congress intended to preserve district court jurisdiction over section 3661(b) claims, and thus they fail to overcome the presumption of exclusivity. Plaintiffs primarily note that section 3662 provides that parties "may" bring claims before the PRC. But this is not evidence against section 3662's preclusive effect. Even if the term "may" implies discretion, it could mean only that a party "may" bring its

claim before the PRC, or it "may" choose not to bring the claim at all. It does not mean a party can circumvent section 3662's comprehensive review scheme and pursue a third option not identified in the provision: bringing a claim in district court. Congress frequently uses the term "may" in this fashion (when providing a limited set of options that a party "may" pursue). Unsurprisingly, the Supreme Court has found that statutory review schemes preclude district court jurisdiction even when they include this type of permissive language. Furthermore, multiple other factors, including the relevant statutory structure and purpose, confirm that Congress intended for section 3662 to be exclusive.

Plaintiffs also argue that even if section 3662 is generally exclusive, it is not exclusive with respect to section 3661(b) claims. But a special review scheme is presumably exclusive with respect to *all* claims within its scope, and there is no sound basis for concluding that section 3662 is generally exclusive with respect to some claims within its scope, but not others. In their attempt to show otherwise, Plaintiffs simply refer to legislative history and assert that Congress created section 3662 to address rate and service complaints. But Congress expressly included section 3661 claims in the list of claims that may be brought before the PRC, confirming that Congress intended for these claims to be brought before the PRC as well. Regardless, the relevant statutory purpose and legislative history confirm that Congress sought to generally minimize federal court interference in postal operations, and thus intended for section 3662 to address a variety of legal claims against the Postal Service (including section 3661(b) claims). Thus, section 3662 is exclusive with respect to all claims within its scope—including section 3661(b) claims—and so the Court lacks jurisdiction over Plaintiffs' section 3661(b) claim.

But even if the Court finds that it has jurisdiction over Plaintiffs' section 3661 claim, this claim fails on the merits. As a threshold matter, Congress exempted the Postal Service from the

Administrative Procedure Act ("APA"), and so Plaintiffs must rely on a nonstatutory cause of action that is subject to a heightened standard; Plaintiffs must show that the Postal Service *clearly* and *obviously* violated section 3661(b). If Congress wished to subject Postal Service policies to a lesser standard—one applicable to APA claims—it presumably would have applied the APA to the Postal Service.

Plaintiffs cannot establish a section 3661(b) claim under this standard, especially given the provision's undefined terms. For one, Plaintiffs cannot show that the alleged Trips Initiative clearly and obviously amounts to a change "in the nature of postal services." PRC precedent—which Plaintiffs do not dispute is entitled to great deference—defines this language to cover only policy changes that limit postal users' ability to access essential postal services (*e.g.*, policies that eliminate a class of mail, or close down local post offices on a nationwide basis). This definition excludes purely internal, logistical policies such as the alleged Trips Initiative. In response, Plaintiffs primarily cite to a broad statutory definition of "postal service," and argue that, under this definition, the alleged Trips Initiative falls under section 3661(b). But section 3661(b) applies to changes "*in the nature of* postal services," not just any change "in postal services." The Postal Reorganization Act ("PRA") does not define the italicized language; the PRC, however, does.

Furthermore, the Postal Service OIG reviewed the alleged Trips Initiative, and concluded that it did not amount to a "change" in policy, as that term is used in section 3661(b), because the Postal Service did not intend to degrade service. Although Plaintiffs quibble with the OIG's reading of section 3661(b), the OIG's conclusion undermines any argument that the Postal Service clearly and obviously violated section 3661(b). Accordingly, the Postal Service is entitled to judgment as a matter of law on the section 3661(b) claim.

*Third*, Plaintiffs' second claim, challenging the Do-It-Now initiatives generally, fails for similar reasons. Again, as a threshold matter, the Court lacks jurisdiction over this claim. Congress established a special, comprehensive review scheme—section 3662—through which parties may bring a host of claims against the Postal Service. Congress's decision to deliberately exclude certain claims from this review scheme—including alleged violations of the provisions invoked here, 39 U.S.C. §§ 101(e) and 403(a)–(b)—suggests that Congress did not want parties to bring those claims in *any* forum, not that Congress wanted to permit parties to bring those claims in federal court. Plaintiffs' principal response is that this argument contradicts the *Thunder Basin* argument against the section 3661(b) claim. But there is no contradiction. In establishing a comprehensive review scheme, Congress listed the claims it would permit against the Postal Service. If a party's claim falls on that list, it must proceed through the statutory review scheme. If a party's claim falls outside of that list, then it cannot bring its claim at all. In either case, Congress has precluded district court jurisdiction over the party's claim.

But even if Plaintiffs can overcome this jurisdictional hurdle, their claim still fails on the merits. For one, sections 101 and 403 do not give rise to viable ultra vires claims since they do not provide specific, enforceable constraints to which the Postal Service is bound. Instead, these provisions provide general policy objectives—*e.g.*, that the Postal Service operate "efficiently" and promote "expediency"—and there are no criteria to determine when a policy fails to properly advance those objectives. In response, Plaintiffs attempt to give these provisions more concrete meaning by referring to dictionary definitions that provide no further guidance, and by asserting that these provisions give rise to concrete requirements that cannot be divined from the provisions themselves or from any acceptable definition of the terms therein.

Further, even if the Court concludes that sections 101 and 403 may give rise to an ultra vires claim, Plaintiffs cannot show that the Do-It-Now Initiatives *clearly* and *obviously* violate these ambiguous provisions. These initiatives are a continuation of a longstanding effort to increase the efficiency of postal operations while helping to contain costs in light of budgetary constraints. Plaintiffs primarily challenge the *process* by which these initiatives were adopted, but sections 101 and 403 say nothing of the process required, much less with a level of specificity necessary to give rise to a clear and obvious violation. Plaintiffs effectively ask this Court to render a subjective judgment over whether *it* believes the Do-It-Now Initiatives—routine strategies crafted by postal experts—represent sound policy. Plaintiffs' legal theory would thus prioritize the views of the Court (and Plaintiffs) on what adequately promotes "efficiency" over the sound judgment of the Postal Service, undermining a core feature of the PRA—to *enhance* the Postal Service's managerial discretion.

*Finally*, Plaintiffs are not entitled to their requested relief. Plaintiffs' Proposed Order includes a multi-part injunction with a variety of provisions, some of which are ambiguous, and all of which would require the Court to effectively micromanage the Postal Service's routine operations. Critically, the vast majority of these provisions do more than simply require the Postal Service to retract the allegedly unlawful policies; they place a number of affirmative requirements on the agency without any end-date. In response, Plaintiffs contend that the Court need not impose all of their requested provisions and may impose a fixed end-date. But it is *Plaintiffs'* burden to come forward with an acceptable request for relief. They cannot request a patently unreasonable injunction, and then rely on the Court to repair its deficiencies. The Court should grant the Postal Service's Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

**ARGUMENT**

**I.     Plaintiffs have failed to establish a cognizable, ongoing injury tied to either the Trips Initiative or the Do-It-Now Initiatives.**

Ongoing Article III jurisdiction is an absolute requirement to maintain this lawsuit. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990).[1] With respect to the "Do-It-Now" initiatives, Plaintiffs have failed to show "specific facts demonstrating that these requirements [of Article III standing] have been met, *Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010). With respect to most of these initiatives, Plaintiffs have not even tried to demonstrate a causal link to any injury, and with regard to the alleged Trips Initiative, Plaintiffs have failed to rebut Defendants' evidence that any delays caused by that initiative were the result of a "perfect storm" of consequences based on communication issues and COVID-related employee unavailability in July 2020. Such injuries could not "reasonably be expected to recur," and thus those claims are now moot. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013).

Turning first to the "Do-It-Now" initiatives, Plaintiffs make clear in Count II that they are challenging a purported "cost-cutting policy, effectuated by numerous operational strategies," that purportedly violates 39 U.S.C. §§ 101 and 403. Pls.' Reply at 25. But Plaintiffs do not show that each of these strategies purportedly caused them legal injury; rather, they challenge the *collective* effect of a host of policies.[2] Plaintiffs thus lack standing to challenge *all* of the Do-It-Now

---

[1] Internal citations and quotation marks are omitted throughout this brief, unless otherwise stated.

[2] *See, e.g.*, Pls.' MSJ at 47-48 ("[B]y rolling out so many strategies so quickly, during the middle of a pandemic, without having devised any plan for communicating or tracking the effect of these strategies, and without having performed any analysis of what consequences such action would have on service quality, the Postal Service violated several statutory provisions requiring it to prioritize expeditious delivery and to maintain an efficient postal network."); *id.* at 52 ("The Postal Service's policy to cut costs in summer 2020 violated its obligation[s].");  *id.* at 52-55 (discussing strategies collectively); *id.* at 55 ("Despite these distinctions, the Postal Service did not perform any advance analysis of how rolling out so many strategies and initiatives so quickly, during a

Initiatives. *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2120 (2021) (Plaintiffs must "show a concrete, particularized injury fairly traceable to the defendants' conduct [in regard to the specific action they claim violated the law].").

On Reply, Plaintiffs switch gears, arguing that the Trips Initiative was a part of the "Do-It-Now" strategies, and therefore if *that* initiative injured them, they have standing to challenge the entirety of the "Do-it-Now" program. *See* Pls.' Reply at 5. But the Supreme Court has rejected— as recently as last month—these types of attempts to use injury caused by one aspect of a government program to bootstrap a challenge to the entirety of that program. As this Court is well aware, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Accordingly, the mere fact that a plaintiff "demonstrated harm from one particular inadequacy in government administration" does not authorize the court "to remedy *all* inadequacies in that administration. The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* at 357; *see also Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."); *Gill v. Whitford*, 138 S. Ct. 1916, 1920 (2018) (same). This principle is essential to maintain the separation of powers. *See DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 353 (2006) (characterizing the *Lewis* "particular inadequacy" rule as part of Article III's standing requirements); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

---

pandemic, on the brink of an election, and with the census count underway, would affect service performance before forging ahead.").

If there were any doubt about this question, the Supreme Court removed it just last month. In *California v. Texas*, 141 S. Ct. 2104 (2021), the plaintiff-states challenged a specific statutory provision of the Affordable Care Act. The Court concluded the states lacked standing to challenge that provision, because they were not injured by *that* provision, even though the states were arguably injured by other, related provisions of the law. *Id.* at 2119-20. In other words, the plaintiff-states needed to establish an injury tied to the *specific* provision they were challenging; injury caused by related provisions (or the scheme as a whole) was not enough. So too here. Plaintiffs must establish an injury caused by the entirety of the "Do-It-Now" strategy (or by each of the provisions they now seek to challenge). They cannot simply allege an injury based on a single aspect of the strategy, and use that allegation to challenge all other aspects of the strategy.[3] That conclusion only has more force in the present context, where Plaintiffs also bring a separate challenge to that single aspect—the Trips Initiative. If Plaintiffs' purported injury can be redressed by relief regarding that initiative alone, then it makes little sense for this Court to assume jurisdiction to enjoin other initiatives that have no factual connection whatsoever to the injuries alleged in the Complaint. Plaintiffs thus have standing, if at all, to challenge the Trips Initiative, the only part of the "Do-It-Now" strategy they rely upon for injury in their papers.

And Plaintiffs have *not* shown that the "Do-It-Now" program *collectively* injured them. They state that "these strategies and initiatives caused service performance to decline dramatically

---

[3] This analysis is very similar to the applicability of the severability doctrine for standing purposes in constitutional challenges, where a court considers only the specific parts of a statute that are alleged to have caused legal injury, not the remainder of the statute, unless the court considers the entirety of the statute to be inseverable. *See Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 996-97 (3d Cir. 1993). By analogy, here, Plaintiffs either have to show that the entirety of the "Do-It-Now" program injured them, which they have not done, or they can challenge specific initiatives (out of the 57) that caused them direct injury. But because those fifty-seven initiatives are severable from each other, Plaintiffs cannot use injuries caused by one or two initiatives to challenge the remainder.

in early July 2020." Pls.' Reply at 5 (citing Pls.' MSJ at 30-31). But the material they cite does not support this blanket statement. Instead, it points to a delay in the mail that started "the week after Mr. Williams' July 10 meeting," Pls.' MSJ at 31; *see also* Pls.' Reply at 7 (pointing to connection between the reduction in late and extra trips and service performance scores). They also point to a statement from the Postmaster General stating that delays caused by *transportation* temporarily impacted mail and service performance. *See* Pls.' MSJ at 31 (citing Pls.' Ex. 42 at App'x B). But many of the "Do-It-Now" initiatives did not start until, at the earliest, July 20, 2021, *after* the alleged service impacts occurred. *See* Pls.' Ex. 53 at App'x B. These initiatives therefore could not have caused delays that predated them.

Plaintiffs have simply put forward no evidence that anything other than the Trips Initiative caused any impact on performance that might have injured Plaintiffs. They have not, for example, submitted any declaration showing ongoing injury, or even injury that persisted beyond August 2020, despite the fact that the majority of the "Do-It-Now" initiatives were ongoing. *See* Pls.' Ex. 53 at App'x B. The fact that the allegedly injurious activity continued—and yet Plaintiffs can show no continued injury—strongly indicates that there is no such causal link between the initiatives and any injury. Plaintiffs note, correctly, that the Postal Service has been under an injunction from this Court; but this injunction enjoined only those initiatives related to late and extra trips, extra transportation and delivery trips for Election Mail, certain carrier start time requirements, and certain overtime requirements. *See* Orders, ECF Nos. 63 & 70. This Court did *not* enjoin the "Do-It-Now" initiatives as a whole, or even the vast majority of them, and so there remains a need to prove injury.[4]

---

[4] Plaintiffs state that "[t]o demand updated declarations that demonstrate ongoing harm from initiatives that are currently enjoined would suggest the Postal Service has not followed this Court's orders." Pls.' Reply at 6. To be clear, the Postal Service has complied with this Court's

Even past injury—were there any—would be insufficient for standing with respect to the "Do-It-Now" initiatives. Under the Supreme Court's decision in *City of Los Angeles v. Lyons*, to have standing for injunctive relief, Plaintiffs must establish that the challenged conduct and subsequent injury would "*always*" recur, or that the defendant has a policy that would dictate such recurrence. 461 U.S. 95, 105-06 (1983). Plaintiffs cannot show that these initiatives would recur in such a way that would injure them in the future. It is not enough to say simply that the Postal Service has a policy of cost cutting (a policy Plaintiffs admit the Postal Service has had for decades); they must also show that the policy would manifest itself in the same way as to cause injury in the future. But Plaintiffs themselves assert (without evidence) that their purported harm was the product of a confluence of unique events, including "rolling out so many strategies and initiatives so quickly, during a pandemic, on the brink of an election, and with the census count underway." Pls.' MSJ at 55. Plaintiffs state that "[w]ithout an injunction, the Postal Service will likely re-implement the policy . . . exactly as it did before," Pls.' Reply at 6, but given what Plaintiffs themselves admit was a unique set of circumstances, and given the fact that there is no evidence that past, similar cost-cutting efforts caused any injury at all, there is no reason to think that this confluence of events would occur again; and certainly no reason to think that such reoccurrence would be "*certainly* impending," in the way the Constitution requires. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Plaintiffs have no response to this, other than to say that *Lyons* does not apply because there the plaintiffs were seeking a preliminary injunction, while here they are "asking the Court to make permanent an existing injunction." Pls.' Reply at 6. But this is a distinction without a

---

injunction. But the injunction did not reach the "Do-It-Now" initiatives as a whole or the vast majority of its components, and Plaintiff still must prove injury with regards to those aspects.

difference. *Lyons* speaks of injunctive relief generally; it makes no distinction between preliminary and permanent. Moreover, Plaintiffs are *not* seeking merely to make permanent an existing injunction, rather, they are seeking a much more expansive permanent injunction than they sought earlier.

This Court also lacks jurisdiction over claims relating to the alleged Trips Initiative, as those claims are now moot. Even assuming that the alleged initiative caused Plaintiffs injury in the summer of 2020, there is no evidence of ongoing injury. Rather, the evidence indicates that the delays that allegedly injured Plaintiffs were caused by a confluence of factors, including allegedly inadequate communication and a rise in COVID-related employee unavailability, and that the Postal Service took steps that largely reduced mail delays caused by these efforts *before* any injunctions were implemented. *See* Defs.' MSJ at 20. Under such unique circumstances, there is no reason to think that such injury would "reasonably be expected to recur." *Already, LLC*, 568 U.S. at 92; *see also Pub. Utilities Comm'n of State of Cal. v. Fed. Energy Regul. Comm'n*, 100 F.3d 1451, 1460 (9th Cir. 1996) ("When resolution of a controversy depends on facts that are unique or unlikely to be repeated, the action is not capable of repetition and hence is moot.").

Plaintiffs' objections to mootness are unavailing. First, Plaintiffs argue that the Postal Service "has not voluntarily ceased the challenged behavior." Pls.' Reply at 7; *see also Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020). But this is incorrect. The evidence assembled by the independent Office of the Inspector General makes clear that the Postal Service began to rectify any delays caused by the alleged Trips Initiative in July; and indeed, as early as July 14, the Postal Service made clear that there was no ban on late or extra trips. And contrary to Plaintiffs' suggestion, the Postal Service *has* provided evidence that it does not intend to impose

any such ban.[5] *See* Defs.' MSJ Ex. 19 (Fourth Cintron Decl.) ¶ 4. Plaintiffs say this sworn statement does not "prevent the Postal Service from 'return[ing] to [its] old ways,'" Pls.' Reply at 8 (quoting *Already, LLC*, 568 U.S. at 92), but the test is not whether Defendants are *prevented* from returning to their old ways, but rather whether "the allegedly wrongful behavior [could] reasonably be expected to recur?" *Already, LLC*, 568 U.S. at 92. Here, in light of the Postal Service's remedial efforts that occurred *prior* to any court orders, the unique contexts of the delays, and its stated commitment not to ban or prohibit necessary late or extra trips, there is simply no reasonable expectation that the delays that allegedly injured Plaintiffs would reoccur.

Nevertheless, even if this Court were to conclude that the risk of injury continues with respect to the purported Trips Initiative, and it does not, Plaintiffs still have not put forward evidence of ongoing or future harm sufficient to justify the sweeping injunctive relief that Plaintiffs demand. *See infra* at 46-50.

## II.    The Postal Service is entitled to judgment as a matter of law on Plaintiffs' section 3661(b) claim.

Even assuming Plaintiffs have standing to challenge the alleged Trips Initiative, their section 3661(b) ultra vires claim fails for two independent reasons. First, the section 3662 review scheme precludes the Court's jurisdiction over this claim. Plaintiffs do not dispute that special review schemes are presumably exclusive with respect to all claims within their scope, and they fail to provide sufficient evidence to overcome this presumption here. Second, even if the Court

---

[5] Plaintiffs also state that "[t]he Postal Service's insistence that it did not, and will not, 'ban' late and extra trips is a semantic red herring and fails to acknowledge the unauthorized contractual commitment directive already given." Pls.' Reply at 6 (citation omitted). This is a curious statement, as Plaintiffs themselves characterize this initiative as one that will "eliminate late and extra trips," Pls.' MSJ at 13, something that clearly did not occur, given the fact that late and extra trips have always existed. And while Plaintiffs focus on an "unauthorized contractual commitment directive," the Postal Service made clear as early as July 14, and throughout the months that followed that late and extra trips were permitted when necessary.

had jurisdiction over this claim, the claim nonetheless fails on the merits since Plaintiffs cannot

show that the Postal Service has "clearly" and "obviously" violated section 3661(b).

**A. The PRA's comprehensive review scheme precludes the Court's jurisdiction over Plaintiffs' section 3661(b) claim.**

All parties agree that the *Thunder Basin Coal Co. v. Reich* framework governs whether

section 3662 implicitly precludes the Court's jurisdiction over Plaintiffs' section 3661(b) claim.

510 U.S. 200 (1994). Under this two-step framework, the Court first asks whether section 3662 is

exclusive with respect to claims within its scope, and then asks whether the section 3661(b) claim

comes within the scope of section 3662. *See Adorers of the Blood of Christ v. Fed. Energy Regul.*

*Comm'n*, 897 F.3d 187, 195 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 1169 (2019). Both steps

confirm that section 3662 precludes the Court's jurisdiction over the section 3661(b) claim.

**1. Section 3661(b) is exclusive with respect to claims within its scope.**

**i. *The presumption of exclusivity, the statutory structure, and the statutory***
**   *purpose confirm that section 3662 is generally exclusive with respect to all***
**   *claims within its scope.***

Multiple factors confirm that section 3662 is exclusive with respect to claims within its

scope ("covered claims"). First, Plaintiffs do not dispute "the general rule" that "if there exists a

special statutory review procedure, it is ordinarily supposed that Congress intended that procedure

to be the exclusive means of obtaining judicial review in those cases to which it applies." *Comp.*

*Dep't of Dist. Five, United Mine Workers of Am. v. Marshall*, 667 F.2d 336, 340 (3d Cir. 1981).

The Supreme Court has consistently found that the existence of a special review scheme, in itself,

is evidence that Congress intended to preclude district court jurisdiction. *See*, *e.g.*, *Elgin v. Dep't*

*of Treasury*, 567 U.S. 1, 11 (2012) ("the [statute's] 'elaborate' framework . . . demonstrates

Congress' intent to entirely foreclose judicial review . . . ."); *Block v. Cmty. Nutrition Inst.*, 467

U.S. 340, 349 (1984) ("when a statute provides a detailed mechanism for judicial consideration of particular issues . . . judicial review of those issues . . . may be found to be impliedly precluded.").

Here, Plaintiffs do not dispute that the PRA establishes a special, comprehensive review scheme through which they may (i) raise a section 3661(b) claim before the PRC, (ii) secure adequate relief through the PRC's broad remedial powers, and (iii) appeal an adverse PRC decision to the D.C. Circuit. *See* 39 U.S.C. § 3662; Defs.' MSJ at 23-24; Pls.' Reply at 12 (noting that parties may file claims before the PRC which the PRC "must act on or dismiss within 90 days," the PRC may "fix the [alleged] problem and fine the Postal Service if it deliberately fails to comply," and "[p]arties aggrieved by a [PRC] decision can appeal"). Again, this review scheme is comparable to the review scheme at issue in *Thunder Basin*, which was found to preclude district court jurisdiction. *See* 510 U.S. at 207-08 (the statute "establish[ed] a detailed structure for reviewing" certain specified "violations," including before an administrative "Commission," and parties "may challenge adverse Commission decisions in the appropriate court of appeals.").

In response, Plaintiffs argue that section 3662 lacks the "detail" found in certain other review schemes that have been found to preclude district court jurisdiction. *See* Pls.' Reply at 11-12. But section 3662 still creates "a *special* statutory review procedure" for a set of claims, including section 3661(b) claims, and thus the Court must presume "that Congress intended [for section 3662] to be the exclusive means of obtaining judicial review in those cases to which it applies." *Marshall*, 667 F.2d at 340 (emphasis added). Regardless, as explained above, section 3662 *does* provide a "detailed" review scheme whereby a party may fully litigate its claim before the PRC, potentially secure complete relief, and appeal any adverse ruling to a federal circuit court. Plaintiffs appear to suggest that section 3662 is insufficiently detailed because other statutes, such as the Civil Service Reform Act ("CSRA"), include lengthier provisions concerning the metes and

bounds of their review schemes. *See* Pls.' Reply at 11 n.2 (quoting CSRA review scheme statutory provisions). But Plaintiffs cite to no case indicating that this level of detail—or *any* particular level of detail—is necessary before a Court may find that a special review scheme is exclusive. And even if the PRA itself does not include elaborate provisions on the minutia of its statutory scheme comparable to those in the CSRA, it calls on the PRC to issue regulations providing this type of detail, *see* 39 U.S.C. § 3662(a) (parties may file complaints before the PRC "in such form and manner as the [PRC] may prescribe"), and the PRC has issued these regulations, *see*, *e.g.*, 39 C.F.R. § 3010.100-3010.336. Accordingly, Congress's decision to create a special statutory review scheme through section 3662 is evidence that Congress intended to preclude district court jurisdiction over claims that may be brought pursuant to section 3662.

Second, the statutory structure confirms that section 3662 is exclusive. As explained in the Postal Service's opening brief, the PRA explicitly confers district court jurisdiction over certain covered claims, which would have been unnecessary if district courts otherwise had jurisdiction over those claims. *See* Defs.' MSJ at 24. The exclusivity of section 3662 is best understood by comparing its scope to the grant of district court jurisdiction provided by section 3664. Under section 3662, a party may bring a claim before the PRC based on the Postal Service's failure to comply with a binding order previously issued by the PRC. *See* 39 U.S.C. § 3662 (allowing for claims based on a violation of any provision within Chapter 36, which includes both section 3662(c), allowing the PRC to issue binding orders upon the Postal Service, and section 3662(d), allowing the PRC to issue fines "in cases of deliberate noncompliance"). Section 3664, however, states that "[t]he several district courts have jurisdiction specifically to enforce, and to enjoin and restrain the Postal Service from violating, any order issued by the Postal Regulatory Commission."

39 U.S.C. § 3664. Section 3664 would be unnecessary if section 3662 was not exclusive, and parties were thus already free to bring covered claims in district court.

In response, Plaintiffs argue only that a claim based on the Postal Service's failure to comply with a PRC order is not a "covered claim." *See* Pls.' Reply at 13-14. Plaintiffs appear to argue that the Postal Service's failure to follow PRC orders does not constitute a violation of section 3662(c) since, although that provision allows the PRC to issue binding orders, it does not expressly require the Postal Service to follow those orders. *See id.* This is a distinction without a difference. Section 3662(c) empowers the PRC to issue binding orders, *see* 39 U.S.C. § 3662(c) (PRC may "*order* . . . the Postal Service" to "take . . . action" (emphasis added)), and so it requires the Postal Service to follow those orders. Thus, section 3664 confers district court jurisdiction over certain covered claims—section 3662(c) and (d) claims—suggesting that district courts otherwise lack jurisdiction over covered claims. The statutory structure therefore confirms that section 3662 is exclusive.

Third, and finally, Plaintiffs do not dispute that a central purpose behind the PRA was to minimize judicial intervention into postal operations, thus confirming that Congress intended for section 3662 to operate exclusively. *See* Defs.' MSJ at 25-26. Multiple courts, including another Judge in this Court, have therefore found that section 3662 precludes district court jurisdiction. *See LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 800 (8th Cir. 2006); *Tedesco v. U.S. Postal Serv.*, 553 F. Supp. 1387, 1390-91 (W.D. Pa. 1983); *Shelby Res., Inc. v. U.S. Postal Serv.*, 619 F. Supp. 1546, 1549 (S.D.N.Y. 1985) ("agree[ing] generally with the . . . subject matter jurisdiction [analysis] expressed in *Tedesco*"); *Foster v. Pitney Bowes Inc.*, Civ. A. No. 11-7303, 2012 WL 2997810, at *5 (E.D. Pa. July 23, 2012) ("it is clear from the statute's history that Congress intended a plaintiff to exhaust the PRC process before challenging an adverse ruling in the United

States Court of Appeals for the District of Columbia."), *aff'd sub nom. Foster v. Pitney Bowes Corp.*, 549 F. App'x 982 (Fed. Cir. 2013). Congress was presumably aware of several of these decisions—*e.g.*, *LeMay*, *Tedesco*, and *Shelby*—when it amended section 3662 in 2006 and yet, instead of legislatively overruling these decisions, or otherwise clarifying that it wished to preserve district court jurisdiction over covered claims, Congress *"expanded* the reach of § 3662" to cover *additional* provisions. *Foster*, 549 F. App'x at 986 (emphasis added). Congress thus effectively ratified the construction of section 3661 found in those cases. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."); *Shapiro v. United States*, 335 U.S. 1, 16-20 (1948) ("The traditional rule" is "that re-enactment of a statute creates a presumption of legislative adoption of previous judicial construction," thus, "[i]n adopting the language used in the earlier act, Congress must be considered to have adopted also the construction given by" courts "to such language, and made it a part of the enactment.").

Plaintiffs argue that a Congressional ratification argument works only if there is a "settled" meaning, and that "[i]n 2006, the exclusivity of § 3662 was far from settled." Pls.' Reply at 14. But Plaintiffs do not cite to a *single* pre-2006 case where a court found that section 3662 is not exclusive. Plaintiffs cite only to *Buchanan v. United States Postal Service* where the Fifth Circuit did not address (much less resolve) whether section 3662 is exclusive. 508 F.2d 259 (5th Cir. 1975). Thus, the pre-2006 case law concerning section 3662's exclusivity *was* settled. Plaintiffs also argue that to the extent pre-2006 case law "held § 3662 to preclude judicial review, those decisions had been only in the context of service-related complaints." Pls.' Reply at 14. But Plaintiffs can point to no language from those cases indicating that the preclusive effect of section 3662 is limited to "service related complaints," or some other subset of the claims that may be

brought through section 3662. To the contrary, these cases include language indicating that section 3662 has a broad preclusive effect. *See*, *e.g.*, *Tedesco*, 553 F. Supp. at 1390 ("§ 3662 . . . suggests a strong Congressional desire to keep the federal judiciary out of almost all postal decisions").

Plaintiffs finally argue that a Congressional ratification argument applies "only when Congress re-enacts the same law," whereas, "in 2006," Congress "re-wrote [section 3662] entirely." Pls.' Reply at 14. Again, this is incorrect. Congress did not "entirely" re-write section 3662; it preserved the core language of section 3662 and expanded the list of claims that may be brought before the PRC. As another court explained:

> [T]he initial version of § 3662 . . . established the Postal Rate Commission to hear all claims involving postal rates and services [and] . . . courts have regularly held that early versions of § 3662 conferred exclusive jurisdiction to the Postal Rate Commission to hear these claims . . . In 2006, [Congress] expanded the reach of § 3662 to include claims arising under specific sections . . . There is nothing in the statutory text or legislative history to suggest that [Congress] eliminated the exclusive jurisdiction conferred to the Postal Rate Commission (renamed the Postal Regulatory Commission, or PRC, by [Congress]) over claims enumerated in § 3662. To the contrary, [Congress] added specific, additional types of claims to the jurisdictional provision of § 3662.

*Foster*, 549 F. App'x at 986. Accordingly, the relevant statutory structure and purpose confirms the presumption that section 3662 is exclusive with respect to claims within its scope.

### ii.  *Plaintiffs' arguments for why section 3662 is not exclusive lack merit.*

To show that section 3662 is not exclusive, Plaintiffs make two main arguments: (i) section 3662 states that parties "may" bring claims before the PRC, and (ii) even if section 3662 is generally exclusive, it may not be exclusive with respect to section 3661(b) claims. Neither argument has merit.

First, section 3662 is exclusive even though it uses the term "may." Even if this term conveys discretion, it could mean only that a party "may" choose to bring a claim before the PRC or it "may" elect to take no action at all. It does not mean that Congress intended to provide parties

19

with a third option: circumvent the statutory scheme and go to district court. *Cf. Humphrey's Ex'r v. United States*, 295 U.S. 602, 619 (1935) ("section 1 of the [FTC] Act" states "that 'any commissioner *may* be removed by the President for inefficiency, neglect of duty, or malfeasance,'" and the provision was read to "*limit* the executive power of removal to the causes enumerated." (emphasis added)); *Bonnot v. Cong. of Indep. Unions, Loc. No. 14*, 331 F.2d 355, 356-59 (8th Cir. 1964) (rejecting argument that a contract does not require arbitration simply because it states that a "party *may* request arbitration," because the "obvious purpose of the 'may' language is to give an aggrieved party the choice between arbitration or the abandonment of its claim" (emphasis added)); *Genovese v. Shell Oil Co.*, 488 F.2d 84, 84–85 (5th Cir. 1973) (a statute stated that "a civil action *may*, within thirty days . . . be brought," and the court noted that "[t]he permissive word 'may' refers only to the charging party's decision as to whether a civil action should be brought at all and does not . . . create 'a discretion in the Court to receive the case following the expiration of 30 days'" (emphasis added)); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604-05 (1st Cir. 1980) (the relevant statute states that "[w]ithin ten days after being served with a copy" of a magistrate judge's findings and recommendations, "any party *may* serve and file written objections," but the court concluded that "while 'may' need not mean 'shall' with respect to filing at all, clearly . . . it cannot be thought that there is an option to file later" and so "a party 'may' file objections within ten days or he may not, as he chooses, but he 'shall' do so if he wishes further consideration." (emphasis added)); *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 158 (2d Cir. 2003) ("tax returns *may* be filed anytime up to April 15, but one senses at once that the phrase is permissive only up to a point." (emphasis added)).

Other language in the Act confirms this conclusion. For example, section 3663 states that a party "adversely affected or aggrieved by a final order or decision of the [PRC] *may*, within 30

days after such order or decision becomes final, institute proceedings for review thereof by filing a petition in the United States Court of Appeals for the District of Columbia." 39 U.S.C. § 3663 (emphasis added). In using the word "may," Congress clearly intended to state only that a party "may" file an appeal before the D.C. Circuit within thirty days of an adverse PRC decision, or it "may" file no appeal at all. No party could reasonably argue that because section 3663 uses the term "may," a party may bring an appeal before another circuit court, or may bring an appeal after the thirty-day clock has run. The same logic applies to section 3662: a party "may" bring a covered claim before the PRC, or it may choose to bring no covered claim at all. Section 3662 does not allow a party to bring a covered claim before *another* tribunal simply because it uses the word "may."

Additionally, this type of permissive language is common in statutory schemes that have been found to preclude district court jurisdiction. The Civil Service Reform Act ("CSRA") review scheme states that a party "*may* submit an appeal to the [administrative tribunal]," 5 U.S.C. § 7701(a) (emphasis added), yet, in *Elgin v. Department of Treasury*, the Supreme Court found that this review scheme precluded district court jurisdiction over the plaintiffs' constitutional claims, *see* 567 U.S. at 1, 7-8. Plaintiffs object that the CSRA provision quoted by the Postal Service speaks of administrative *appeals*, rather than the initial filing of an administrative claim. But in speaking of "appeals," the CSRA is simply referring to a party's decision to file an initial challenge to (*i.e.*, "appeal") an adverse employment action; it is not speaking of "appeals" as that term is used in litigation (*e.g.*, appealing a lower court ruling). *See* 5 U.S.C. § 7513(d) ("An employee against whom an action is taken under this section"—*e.g.*, a removal or a long-term suspension—"is entitled to appeal to the Merit Systems Protection Board under section 7701 of this title."). Thus, in the provision allowing for a party to challenge an adverse employment action, the CSRA

review scheme uses permissive language similar to section 3662, and yet the Supreme Court found that the CSRA review scheme is exclusive.

The statute at issue in *Thunder Basin*— the Federal Mine Safety and Health Amendments Act (the "Mine Act")—uses similar, permissive language. If the agency intends to impose a civil penalty on a mine operator, the Mine Act simply calls on the agency to notify the mine operator that it "has 30 days within which to notify the [agency] that [it] wishes to contest the" penalty, 30 U.S.C. § 815(a), and notes that "*[i]f* . . . an operator . . . notifies the [agency] that [it] intends to contest the" penalty, then the administrative tribunal must hold a hearing, *id.* § 815(d) (emphasis added). The Mine Act does not state that a mine operator that wishes to challenge a civil penalty "shall" or "must" proceed through the statutory review scheme, yet the Supreme Court found that the review scheme was exclusive.[6] *Thunder Basin*, 510 U.S. at 207 ("the Mine Act precludes district court jurisdiction").

Plaintiffs point out that the PRA uses the word "shall" elsewhere; *e.g.*, the PRA notes that the "[PRC] shall, within 90 days after receiving a complaint" provide a response. Pls.' Reply at 10. But this is entirely consistent with the Postal Service's reading of section 3662:  although a party "may" bring a PRC claim or "may" bring no claim at all, once a party chooses to bring a claim, the PRC *must* provide a response within 90 days. Accordingly, even if the term "may" is permissive, that does not mean section 3662 allows parties to circumvent the section 3662 review scheme and raise covered claims in district court. Multiple courts have reached the same

---

[6] Plaintiffs note that the Mine Act used the word "shall" in certain places; *e.g.*, it states that if the Labor Secretary wishes to issue a citation, it "*shall* . . . notify the operator" of the mine. Pls.' Reply at 11. But, as with the PRA, this provision speaks of what the *agency* must do, not the private party that seeks to challenge a citation. Plaintiffs do not assert that any provision in the Mine Act states that a party seeking to challenge a citation "shall" proceed through the administrative review scheme, and yet the Supreme Court still found that the Mine Act precludes a private party from challenging a relevant agency action in district court. *See supra* at 22.

conclusion. *See*, *e.g.*, *Foster*, 2012 WL 2997810, at *5 (rejecting the argument that section 3662 is not exclusive because "the word 'may' appears" in it); *LeMay*, 450 F.3d at 799-800 (rejecting the argument that "by using the word 'may,' Congress intended application to the PRC to be permissive," since the Court is "not analyzing statutes in general" but rather "the PRA in specific," and the PRA's "legislative history" confirms that "the remedy provided by section 3662 is exclusive").[7]

Plaintiffs then argue that even if section 3662 is generally exclusive, it may not be exclusive with respect to section 3661(b) claims. But Plaintiffs offer no sound basis for concluding that section 3662 is generally exclusive with respect to certain covered claims, but not others. Plaintiffs do not dispute the presumption that a special review scheme is presumably "the exclusive means of obtaining judicial review *in those cases to which it applies*," *Marshall*, 667 F.2d at 340 (emphasis added), and the section 3662 review scheme applies to section 3661(b) claims, *see infra* at 26-27. And as explained above, multiple factors confirm that section 3662 generally precludes district court jurisdiction over covered claims. *See supra* at 14-19; *see also Foster*, 2012 WL 2997810, at *4 n.5 ("By listing certain provisions . . . in Section 3662, Congress clearly established the kinds of claims that are to be heard by the PRC," and "[n]arrowing the scope of Section 3662 . . . would . . . nullify" Congress's intent). Furthermore, if Congress wished to carve out an exception for certain covered claims, it knew how to do so explicitly. As explained above, in

---

[7] Plaintiffs also briefly argue that, in certain statutes, Congress explicitly precluded jurisdiction— *e.g.*, by stating that certain agency actions "*shall* not be reviewed by any court"—and Congress did not use that language in section 3662. Pls.' Reply at 11. But even without this type of language, for the reasons set forth herein, section 3662 clearly precludes district court jurisdiction. *See supra* at 14-19. Regardless, the whole point of the *Thunder Basin* test is to determine when Congress has "*implicitly*" precluded district court jurisdiction even when it has not done so "expressly." *Adorers*, 897 F.3d at 195 (emphasis added). Thus, in both *Thunder Basin* and *Elgin*, the Supreme Court found that the statutory schemes at issue implicitly precluded district court jurisdiction even though the statutes did not include express language to that effect. *See supra* at 21-22.

section 3664, Congress explicitly provided for district court jurisdiction over 3662(c) claims, and it could have created a comparable provision for section 3661(b) claims, but chose not to.

To support their argument, Plaintiffs assert that "Congress enacted § 3662 to minimize external interference with the Postal Service's management of rates and services," and "[a]llowing the [PRC] to hear individualized complaints about rates and services accomplishes that objective." Pls.' Reply at 12. But this does not *affirmatively* show that Congress wished to preserve district court jurisdiction over section 3661(b) claims, and thus it cannot overcome the presumption that a review scheme is exclusive with respect to all claims within its scope. Regardless, Plaintiffs are wrong that Congress "enacted § 3662" solely to deal with "individualized complaints about rates and services." For one, Congress expressly enumerated the claims that parties could bring before the PRC—a list that includes claims relating to section 3661(b)—and thus "Congress enacted § 3662" to "hear" all of these claims.[8] *See, e.g., Foster*, 2012 WL 2997810, at *4 n.5 ("By listing certain provisions . . . in Section 3662, Congress clearly established the kinds of claims that are to be heard by the PRC.").

Moreover, the relevant statutory purpose confirms that Congress wanted section 3662 to generally be exclusive with respect to *all* claims within its scope, not just standard "rate and service" complaints (however that term is defined). Congress wished to minimize judicial interference with postal operations, a concern that applies equally to judicial interference caused by section 3661(b) claims. *See* Defs.' MSJ at 25-26 (summarizing cases describing relevant

---

[8] It is immaterial that section 3662 is titled "Rate and service complaints." As another Judge of this Court noted: "[W]hen a statute is complex, headings and titles can do no more than indicate the provisions in a most gen[e]ral manner . . . headings and titles are not meant to take the place of the detailed provisions of the text," and "[b]y listing certain provisions . . . in Section 3662, Congress clearly established the kinds of claims that are to be heard by the PRC." *Foster*, 2012 WL 2997810, at *4 n.5.

legislative history). Indeed, here, Plaintiffs seek an order that would dictate the Postal Service's late and extra trip policies moving forward. *See infra* at 46-50. Although Plaintiffs contend that the Postal Service may still adopt certain policy changes after seeking an advisory opinion from the PRC, *see* Pls.' Reply at 15-16, their requested order would still constitute judicial interference into postal operations: it would dictate what the Postal Service can currently do, and the conditions under which it can change course.

Additionally, the relevant legislative history confirms that Congress did not intend for section 3662 to be exclusive only with respect to standard "rate and service" complaints. As the Postal Service noted in its opening brief, and as Plaintiffs do not dispute, a 2004 Senate Report stated that section 3662 provides the PRC "with enhanced authority to respond to complaints of pricing, service, *or other actions by the Postal Service in violation of law.*" PI Order at 37 (quoting S. Rep. No. 108-318, at 48 (2004)) (emphasis added). The italicized language demonstrates that Congress intended to rely on the PRC to address claims relating not only to pricing and service, but also other alleged violations, including section 3661(b) violations. Plaintiffs, by contrast, refer to nothing in the legislative history indicating that Congress intended to specifically preserve district court jurisdiction over section 3661(b) claims. And at least one court has canvassed the relevant legislative history and found that section 3662's preclusive effect is not limited to standard "rate and service" complaints. In *Foster*, a party asserted an intellectual property claim against the Postal Service—which Plaintiffs do not contend is a standard "rate and service" complaint—and the court still found that section 3662 precluded district court jurisdiction over the claim because it involved a statutory provision that, like section 3661(b), is "enumerated in § 3662." 549 F. App'x at 984-86.

In any event, even if the Court believes that section 3662's preclusive effect is somehow limited to "rate and service" complaints, Plaintiffs' section 3661(b) claim *is* one concerning postal "services": Plaintiffs are arguing that the Postal Service adopted changes to its services without first following the required procedure. Accordingly, section 3662 is generally exclusive with respect to all claims within its scope, including section 3661(b) claims, and so the first step of the *Thunder Basin* test is satisfied.

### 2. Plaintiffs' section 3661(b) claim falls within the scope of the section 3662 review scheme.

Under the second *Thunder Basin* step, the Court asks whether section 3661(b) claims are "of the type Congress intended to be reviewed within" the section 3662 review scheme. *Adorers*, 897 F.3d at 195. "At this stage the court considers three factors: (1) whether the statutory scheme foreclose[s] all meaningful judicial review; (2) the extent to which the plaintiff's claims are wholly collateral to the statute's review provision; and (3) whether agency expertise could be brought to bear on the . . . questions presented." *Id.* All three factors confirm that section 3661(b) claims are "of the type Congress intended to be reviewed" through the statutory scheme.

First, Plaintiffs do not dispute that the statutory review scheme provides for "meaningful judicial review." If the Plaintiffs are dissatisfied by a PRC decision, they may pursue an appeal before the D.C. Circuit. *See supra* at 15. Second, section 3661(b) claims are not "wholly collateral" to the section 3662 review scheme. To the contrary, as the Court has found once already, section 3662, by its text, *explicitly* allows for section 3661(b) claims. *See* PI Order at 30-31 ("The explicit text of section 3662" allows for claims relating to any provision of Chapter 36, and "Chapter 36 includes section 3661."). Furthermore, the PRC itself has concluded that parties may bring section 3661(b) claims before the PRC. *See* Postal Rate Commission, Order No. 1239, 64 Fed. Reg. 28015, 28019 (May 24, 1999) ("[T]here is no apparent reason to conclude that considering [a section

3661(b) claim] would exceed the scope of the Commission's authority under section 3662."). In response, Plaintiffs again argue that "[s]ection 3662's core purpose . . . is to allow the [PRC] to review individualized complaints about rates and services." Pls.' Reply at 15. But it is unclear how this means section 3661(b) claims—which indisputably may be brought through the section 3662 review process—are "*wholly* collateral" to the section 3662 review process. Regardless, as explained above, Plaintiffs fail to demonstrate that Congress did not intend for parties to raise section 3661(b) claims through the section 3662 review process. *See supra* at 23-25.

Finally, the PRC's expertise may be "brought to bear on the . . . questions presented" by a section 3661(b) claim. This provision requires a fact-intensive analysis concerning the Postal Service policies at issue to determine whether they amount to a "change" in the "nature of postal services" and thus trigger section 3661(b). *See* Defs.' MSJ at 37-38; *infra* at 30-31. As the Court previously concluded, the PRC has "expertise in evaluating programs under § 3661" and the "Postal Service has previously sought out the expertise of the [PRC] as to exactly this question— whether a proposed change . . . triggers the procedures of" section 3661(b). PI Order at 66-67. In response, Plaintiffs argue that the relevant language in section 3661(b) is "statutorily defined" in 39 U.S.C. § 102(5), and thus PRC expertise is unnecessary. Pls.' Reply at 16. As explained further below, although section 102(5) generally defines "postal service," it does not define what it means for there to be a change "*in the nature of* postal services" sufficient to trigger section 3661(b). *See infra* at 32-33. By contrast, the PRC—whose decisions are entitled to deference—*has* provided guidance on the precise language in section 3661(b). *See infra* at 30-31. Thus, the PRC's expertise would be useful in determining whether a particular postal policy triggers section 3661(b). Plaintiffs' section 3661(b) claim is therefore "of the type that Congress intended to be reviewed"

in the section 3662 review scheme. Under the *Thunder Basin* framework, the PRA statutory review scheme precludes this Court's jurisdiction over Plaintiffs' section 3661(b) claim.[9]

**B. Even if the Court finds it has jurisdiction over the section 3661(b) claim, Plaintiffs fail to show that this provision clearly and obviously applies to the alleged Trips Initiative.**

Plaintiffs cannot show that the Trips Initiative clearly and obviously violates section 3661(b)—an ambiguous provision whose meaning is neither clear nor obvious. Thus, even if the Court finds that it has jurisdiction over Plaintiffs' section 3661(b) ultra vires claim, the Postal Service is nonetheless entitled to summary judgment on the merits of this claim.

As an initial matter, and contrary to Plaintiffs' assertion, *all* nonstatutory ultra vires claims are subject to the heightened "clear and obvious" standard, regardless of the jurisdictional source a party relies upon. A nonstatutory section 3661(b) ultra vires claim is not subject to a lesser standard—*e.g.*, one applicable to APA ultra vires claims—simply because Plaintiffs invoke a ultra vires cause of action without "us[ing] ultra vires action as a s*ource of jurisdiction*," Pls.' Reply at 19. First, applying a heightened standard to all ultra vires claims against the Postal Service is necessary to give effect to Congress's decision not to apply the APA to the Postal Service. *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012) ("[T]he Postal Service is exempt from . . . the [APA]"); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) ("nonstatutory review is intended to be of extremely limited scope" and "represents a more difficult course . . . than would review under the APA . . . for acts 'in excess of statutory . . . authority'"). Plaintiffs appear to acknowledge that, under relevant case law, "nonstatutory review is limited in scope and more difficult than a claim under the APA." Pls.' Reply at 20 n.3. If Congress wished

---

[9] In its opening brief, the Postal Service argued that Plaintiffs cannot satisfy the requirements for the *Leedom v. Kyne* jurisdictional exception because (i) there is an alternative remedy, and (ii) section 3662 undoubtedly precludes district court jurisdiction. *See* Defs.' MSJ at 27 n.7. Plaintiffs make no effort to invoke the *Leedom* exception in their Reply.

to apply a more lenient standard to ultra vires claims against the Postal Service—a standard applicable to APA claims—it presumably would have applied the APA to the Postal Service.

Second, under relevant D.C. Circuit precedent—which Plaintiffs rely upon as well, *see* Pls.' Reply at 19-20—the heightened standard applies to *all* nonstatutory ultra vires causes of action, regardless of the jurisdictional source a plaintiff relies upon. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (generally stating that an agency action must "violate[] a specific prohibition in the statute that is clear and mandatory," "obviously [go] beyond the terms of the statute," or fall "far outside the scope of the task that Congress gave it," to be "invalidate[d] . . . as *ultra vires*."). In response, Plaintiffs first argue that, in *Wolf*, the "court was not engaging in nonstatutory review," but rather "was evaluating a standalone ultra vires merits argument." Pls.' Reply at 20 n.3. But *Wolf* certainly included a nonstatutory claim. As Plaintiffs note, the plaintiff in *Wolf* invoked a "*standalone* ultra vires" claim—one that was not based on any statutory cause of action—and thus the plaintiff relied upon a "nonstatutory" claim. Indeed, the D.C. Circuit indicated that it was applying an "extremely limited" form of ultra vires review precisely because the plaintiff was not proceeding "under the [APA]." *Wolf*, 977 F.3d at 1262. Plaintiffs also argue that "all three cases cited by [*Wolf*] were ones in which Congress had precluded judicial review and ultra vires action served as a source of jurisdiction." Pls.' Reply at 20 n.3. But in *Wolf* itself, the D.C. Circuit applied the heightened standard even though (i) it rejected the government's argument that the relevant statute "eliminates district courts' jurisdiction" over the plaintiff's non-constitutional claims, and thus (ii) it did "not reach the . . . argument that" the court "would have jurisdiction on the ground that the [agency action] was *ultra vires*." 977 F.3d at 1261. Thus, *Wolf* makes clear that the heightened standard applies even when a party invokes a nonstatutory ultra

vires cause of action without relying upon ultra vires jurisdiction. Accordingly, the heightened "clear and obvious" standard applies to Plaintiffs' section 3661(b) ultra vires claim.

Here, in light of section 3661(b)'s ambiguous terms, Plaintiffs cannot establish a section 3661(b) claim under any standard. Under this provision, the Postal Service must seek an advisory opinion from the PRC "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). The statute, however, does not define several key terms— *e.g.*, what constitutes a "change," and when a change is in "the nature of postal services"—and Plaintiffs do not dispute that applicable case law provides little guidance on the meaning of these terms. In its PI Order, the Court acknowledged that the "terms" of section 3661(b) "are ambiguous and are susceptible to multiple interpretations," PI Order at 61, and the PRC has likewise confirmed that these terms are ambiguous, noting that "[t]here is no bright line for determining when a reduction in collection and mail processing service is a change in the nature of a postal service." Postal Rate Commission, Order No. 1307, 66 Fed. Reg. 16504, 16507 n.12 (Mar. 26, 2001). Plaintiffs assert that these terms are "not ambiguous" and "are readily subject to their 'ordinary and common meaning[s].'" Pls.' Reply at 21. But Plaintiffs offer no support for this assertion, and do not even attempt to explain what the "ordinary and common meaning[s]" are for these terms in this context.

Plaintiffs do not, and cannot, establish that the ambiguous terms of section 3661(b) apply to the alleged Trips Initiative. First, this alleged initiative did not change "the nature of postal services," as those terms have been construed by the PRC, whose decisions are "owed the highest degree of deference," PI Order at 68. The PRC has stated that a "change in the nature of postal services broadly can be defined as changes to a customer's ability to access essential postal

services that require a visit to a postal retail facility." Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), at 11, https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf (2010 PRC Opinion). Thus, as explained in detail in the Postal Service's opening brief, the Postal Service has sought a PRC advisory opinion before instituting direct and formal changes to service standards for classes of mail (*e.g.*, eliminating overnight single-piece First-Class Mail delivery) or materially changing policies for local facilities through which people access mail services nationwide (*e.g.*, changing hours of operation at, or closing down, local mail facilities). *See* Defs.' MSJ at 37-38.

Here, the alleged Trips Initiative did not formally change the postal products available to users (*e.g.*, by formally changing service standards), nor did it otherwise restrain users' ability to access essential postal services (*e.g.*, by closing down local mail facilities on a nationwide basis). Instead, the alleged initiative only affects *internal* logistical practices. Thus, the alleged Trips Initiative did not change the "nature of postal services." At a minimum, this issue is subject to debate, and thus Plaintiffs cannot establish that the alleged Trips Initiative "clearly and obviously" conflicts with section 3661(b).

In response, Plaintiffs argue that the 2010 PRC Opinion was not generally defining "change in the nature of postal services," but rather was "describ[ing] the Postal Service proposal that prompted the advisory opinion." Pls.' Reply at 22. But the PRC stated, in no uncertain terms, that the "change in the nature of postal services *broadly can be defined as* changes to a customer's ability to access essential postal services that require a visit to a postal retail facility." 2010 PRC Opinion, at 11 (emphasis added). The PRC made this statement right after looking to the Fifth Circuit's decision in *Buchanan* for guidance on "just what constitutes a change in the nature of

postal service." *Id.* at 10. Thus, the PRC was providing a general definition of the relevant statutory terms; it was not merely describing the policy proposal at issue there.

Plaintiffs also argue that the alleged Trips Initiative may have downstream effects on essential postal services (by potentially causing mail delays), and so, even under the definition set forth in the 2010 PRC Opinion, the initiative amounts to a change "in the nature of postal services." Pls.' Reply at 23. But the PRC was clearly referring to formal policy changes that *directly* limit "a customer's ability to access essential postal services." 2010 PRC Opinion, at 11. "All changes within the [Postal Service] will probably affect postal service to some extent." *Buchanan*, 508 F.2d at 262. If an indirect, downstream effect on essential postal services were sufficient to trigger section 3661(b), then the Postal Service would have to secure a PRC advisory opinion before adopting virtually *any* policy or operational change. Congress could not have intended for section 3661(b) to apply this broadly, and the PRC surely did not intend to interpret section 3661(b) this broadly either.

Plaintiffs then assert that the PRA defines "postal service" broadly to include "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5). Plaintiffs argue that the alleged Trips Initiative affects the "delivery," "collection," and "transportation" of mail, and thus it changes "postal services." But section 3661(b) does not apply to any change to "postal services," but rather changes to "*the nature of* postal services." 39 U.S.C. § 3661(b) (emphasis added). The italicized language must bear some unique meaning, otherwise Congress presumably would have excluded it altogether and simply worded section 3661(b) to apply to "a change in . . . postal services." *See Ratzlaf v. United States*, 510 U.S. 135, 140 (1994) ("Judges should hesitate . . . to treat statutory terms in any setting" as "surplusage—as words of no consequence."). The only

source cited by either party that provides a meaningful definition of the relevant language is the 2010 PRC Opinion.

Plaintiffs also cite to other PRC decisions and assert, incorrectly, that these decisions give section 3661(b) a broader interpretation. For example, Plaintiffs note that in a 2006 PRC opinion, the PRC stated that the "aspect of the [proposal at issue] that triggers the review provisions of section 3661 *is its potential to have a nationwide impact on service*." Pls.' Reply at 22-23 (quoting Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. N2006-1, at 9 (Dec. 12, 2006), https://www.prc.gov/docs/55/55431/N2006-1AdvDec.pdf (hereinafter, "2006 PRC Order")). But the PRC was obviously not suggesting that a nationwide impact on service, in itself, is sufficient to trigger section 3661(b). That is only one of three requirements on the face of section 3661(b); there must also be a "[1] change [2] in the nature of postal services." Thus, elsewhere in the 2006 PRC Order, the PRC also noted that the policy proposal at issue "triggered section 3661(b)" because it was "likely to involve *qualitative 'changes in the nature of postal services*.'" 2006 PRC Order, at 9 (emphasis added). Specifically, that policy proposal "w[ould] reconfigure [the Postal Service's] logistical network over the course of . . . several calendar years to reduce redundancy and inefficiency through *consolidation of operations and transportation links*." *Id.* at 71 (emphasis added). Thus, unlike the alleged Trips Initiative, the policy proposal there involved a formal change to the structure of the entire postal network.

Plaintiffs also briefly reference a 2011 PRC advisory opinion concerning a postal initiative that "identifies" certain "post offices, stations, branches, and retail annexes" that the Postal Service may discontinue. PRC Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1, at 6 (Dec. 23, 2011), https://www.prc.gov/Docs/78/78971/N2011-1_AdvisoryOP.pdf ("2011 Advisory Opinion). This advisory opinion, however, does not even purport to define what

it means for an initiative to amount to a change "in the nature of" postal services. Indeed, when the Postal Service sought this advisory opinion, it appeared not to contest that the initiative would cause "changes in the nature of postal service," and simply asked the PRC to determine whether the initiative "constitute[d] a substantially nationwide change in service." *Id.* at 14. In any event, this advisory opinion is consistent with the Postal Service's position that a change "in the nature of" postal services requires a material change in users' "ability to access essential postal services." In particular, the initiative at issue consisted of a "centrally-directed plan to consider whether to continue providing service at approximately 3,650 retail facilities." *Id.* Thus, unlike the alleged Trips Initiative, this initiative would *formally* and *directly* affect users' ability to access essential postal services from these retail facilities.

Accordingly, under applicable PRC precedent, the alleged Trips Initiative does not amount to a change "in the nature of postal services." And again, even if the Court is inclined to disagree with the Postal Service, that alone is insufficient. In light of the heightened standard applicable to Plaintiffs' section 3661(b) claim, Plaintiffs must show that section 3661(b) *clearly* and *obviously* applies to alleged Trips Initiative.

Plaintiffs also fail to show that the alleged Trips Initiative clearly and obviously amounts to a "change" in the nature of postal services. The Postal Service Office of the Inspector General ("OIG") has noted that, based on the relevant statutory text, which requires an advisory opinion "*[w]hen the Postal Service determines* that there should be a change in the nature of postal services," 39 U.S.C. § 3661(b) (emphasis added), "the failure to meet standards without *intentional* degradation of service does not give rise to a *de facto* change in the nature of postal services." Defs.' MSJ, Ex. 23 (USPS OIG Audit Report No. 20-292-R21) at 18 (emphasis added). The OIG reviewed the alleged Trips Initiative, and noted that there was no "clear and direct evidence"

concerning the Postal Service's intent with respect to this initiative. *Id.* at 19. The OIG thus found that the Postal Service committed no violation of section 3661(b). *See id.* Here, Plaintiffs present no evidence indicating that the Postal Service adopted the alleged Trips Initiative in order to "intentional[ly] degrad[e]" service. Thus, the OIG's legal conclusion demonstrates that the Postal Service's actions have not *clearly* and *obviously* violated section 3661(b).

In response, Plaintiffs argue that the OIG "does not have authority to issue legal interpretations of the Postal Service's legal obligations under § 3661," and that "§ 3661(b) does not have an intent requirement." Pls.' Reply at 23-24. While not binding, the OIG's legal interpretation is still persuasive and shows that no clear and obvious violation occurred. In fact, Plaintiffs have little reluctance citing the OIG's independent conclusions on other issues that they believe support their case. *See, e.g.*, Pls.' MSJ at 27 (quoting OIG report addressing "velocity and consistency" of the Do-It-Now Initiatives).

In a final effort, Plaintiffs argue that interpreting section 3661(b) to be broad enough to cover the alleged Trips Initiative would help facilitate the PRA's goal of promoting adequate and efficient postal services. *See* Pls.' Reply at 24-25. But "the proposition that the statute at hand should be liberally construed to achieve its purposes" is a "losing cause[]," since "[e]very statute proposes, not only to achieve certain ends, but also to achieve them by particular means." *Dir., Off. of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135–36 (1995). It may be that requiring a PRC advisory opinion for any and every policy change would produce certain benefits, but Congress ultimately chose to require an advisory opinion only for changes "in the nature of postal services." As explained above, based on relevant authorities that are entitled to great deference, this provision does not cover internal logistical policies like the alleged Trips Initiative. And even if the Court were to consider the

underlying statutory policies, Congress did not only seek to enhance postal efficiency; it sought also "to minimize external intrusions on the Postal Service's managerial independence." *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 800 (8th Cir. 2006). An unduly broad reading of section 3661(b) would certainly undermine that objective. The Postal Service is therefore entitled to summary judgment on the merits of Plaintiffs' section 3661(b) claim.

## III. Plaintiffs' challenge to the "Do-It-Now" strategies under 39 U.S.C. §§ 101(e) and 403(a)–(b) fails as a matter of law.

Plaintiffs' challenge to the Postal Service's 57 "Do-It-Now" strategies as exceeding the agency's statutory authority under sections 101(e) and 403(a)–(b) fails as a matter of law for at least three reasons. First, the Court lacks jurisdiction over this claim because Congress has precluded judicial review. *See* Defs.' MSJ at 43–44. Second, even if the Court had jurisdiction, Plaintiffs cannot state a cognizable nonstatutory review claim because sections 101(e) and 403(a)–(b) do not impose clear and mandatory constraints on the Postal Service's statutory authority. *See id.* at 45–48. Third, even if sections 101(e) and 403(a)–(b) imposed such enforceable constraints, Plaintiffs have not shown that the Postal Service clearly and obviously exceeded those constraints. *See id.* at 48–57. Plaintiffs' attempt to overcome each of these hurdles fails. The Court should enter summary judgment for Defendants on Count II.

### A. Congress has precluded judicial review of alleged violations of sections 101(e) and 403(a)–(b).

Plaintiffs do not cite a single case that has ever held that the Postal Service exceeded its statutory authority under sections 101(e) and 403(a)–(b). In the PRA's fifty-year history, no court has ever even held that a plaintiff can bring a claim under sections 101(e) and 403(a)–(b), let alone that the Postal Service exceeded its authority under those provisions. This is not surprising. As Defendants explained in their opening brief, the text, structure, and purpose of the PRA

demonstrate that Congress did not intend for plaintiffs to be able to invoke these provisions to meddle in the Postal Service's operational decisions. *See* Defs.' MSJ at 43–48.

First, there is no dispute that Congress declined to provide plaintiffs with either an express or implied cause of action to pursue claims under sections 101(e) and 403(a)–(b). This is strong evidence that Congress did not intend for claims under sections 101(e) and 403(a)–(b) to be judicially reviewable. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (whether cause of action exists turns on whether statute "displays an intent to create not just a private right but also a private remedy"). But Congress went even further and expressly exempted the Postal Service from the APA entirely, *see* 39 U.S.C. § 410(a), in order to create an agency that was "free to operate without the impediments that constrain typical agency action," *Reese Bros. v. U.S. Postal Serv.*, 905 F. Supp. 2d 223, 252 (D.D.C. 2012).

Second, "although the PRA generally exempts the Postal Service from APA review, it also explicitly provides for certain exceptions to that exemption, suggesting that where Congress wanted there to be judicial review, it said so." *Id.* (citing 39 U.S.C. § 503). Congress expressly allowed for potential judicial review of alleged violations of certain provisions of the PRA, but *not* the provisions that Plaintiffs invoke here. *See* Defs.' MSJ at 43 (noting that Congress provided for review for violations of sections 101(d), 401(2), 403(c), and 601, but *not* sections 101(e) or 403(a)–(b)).

Third, Congress's decision not to provide a cause of action for claims under sections 101(e) and 403(a)–(b) is consistent with the exceptionally broad authority that Congress vested in the Postal Service to manage its operations, including the authority to manage its costs. *See* Defs.' MSJ at 45 (citing 39 U.S.C. §§ 401, 404(a)). Finally, there is no dispute that the legislative history reflects that Congress intended that the Postal Service "must have the freedom given by the statute

to control costs and manage" itself consistent with its own understanding "of what is the economical and efficient thing to do." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 602 F.2d 420, 432 (D.C. Cir. 1979).

All of this suggests a "congressional intent to preclude judicial review" of Plaintiff's claims. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984); *see also United States v. Erika, Inc.*, 456 U.S. 201, 207–08 (1982). Plaintiffs argue that *Block* is distinguishable because that case involved implied preclusion of certain classes of *plaintiffs*, rather than certain classes of *claims*. *See* Pls.' Reply at 17 (citing *Block*, 467 U.S. at 349). But there is no reason why such a distinction should matter; in both cases, Congress's express provision of judicial review of some (but not all) kinds of claims impliedly precludes review of other similar claims. Similarly, in *Erika*, the Court inferred from the statute's express provision of judicial review of some (but not all) claims under the Medicare statute that Congress impliedly precluded judicial review of other similar claims. *See* 456 U.S. at 208 (no judicial review of challenges to determinations of Medicare Part B awards where statute provided for review of Part A awards and eligibility determinations, but not Part B awards). The same is true here. Congress's express provision of administrative and judicial review for violations of *certain* provisions of the PRA (including sections 101(d), 401(2), 403(c), and 601) implies that Congress did not intend for similar review of sections 101(e) or 403(a)–(b).

There is no "inconsisten[cy]" between the conclusion that the Court lacks jurisdiction over Plaintiffs' section 101(e) and 403(a)–(b) claims and the conclusion that it lacks jurisdiction over their section 3661 claim. *See* Pls.' Reply at 9. Congress allowed judicial review of section 3661 claims, but only if plaintiffs first lodge their complaint with the PRC. *See* Section II.A, *infra*. By contrast, Congress allowed no review at all for claims under sections 101(e) and 403(a)–(b). And it is easy to see why Congress would not have wanted parties to invoke those sections to challenge

operational decisions of the Postal Service. Sections 101 and 403 state broad policies that the Postal Service should give the "highest consideration" to the expeditious delivery of important letter mail and "provide adequate and efficient postal services." Such provisions are far from a specific statutory prohibition that Congress could have intended the courts to judicially enforce. *See Nat'l Ass'n of Postal Supervisors ("NAPS") v. U.S. Postal Serv.*, No. 19-cv-2236, 2020 WL 4039177, at *3–6 (D.D.C. July 17, 2020) (no judicial review of sections 101(c), 1003(a), and 1004 because provisions did not impose "clear and mandatory" limits on Postal Service but rather involved issues "better left to agency discretion"), *appeal filed*, No. 20-5280 (D.C. Cir. Sept. 15, 2020).

Accordingly, the text, structure, and purpose of the PRA suggests that Congress precluded jurisdiction over alleged violations of sections 101(e) and 403(a)–(b). Importantly, Plaintiffs make no argument for why the Court may still retain jurisdiction over this claim if it concludes that Congress intended to preclude review of the claim; *e.g.*, they do not invoke the *Leedom v. Kyne* exception, *see supra* at 28 n. 9. Thus, the Court may grant summary judgment for the Postal Service on the basis of this argument alone.

### B.  The Postal Service did not clearly and obviously exceed its statutory authority to manage its costs in prescribing the Do-It-Now strategies.

#### 1.  Plaintiffs fail to state a cognizable nonstatutory review claim.

Even if the Court had jurisdiction over Plaintiffs' section 101(e) and 403(a)–(b) claims, nonstatutory ultra vires review is only even potentially available for claims that "the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).[10] Plaintiffs

---

[10] As explained above and in Defendants' opening brief, the same "clear and mandatory standard" would apply regardless of the jurisdictional source a party relies upon. *See supra* at 28-30; Defs.' MSJ at 34–35. Were it otherwise, plaintiffs would never need a statutory cause of action to pursue

have not stated such a claim here. *See* Defs.' MSJ at 45–48. Plaintiffs do not dispute that Congress has vested the Postal Service with broad authority over its operations, including the authority to manage its costs. Defs.' MSJ at 45 (citing 39 U.S.C. §§ 401, 404). And Plaintiffs do not allege that the Postal Service "plainly act[ed]in excess of [these] delegated powers," or that sections 101(e) and 403(a)–(b) contain "*specific* prohibition[s]" that are "clear" and "mandatory." *DCH Reg'l Med. Ctr.*, 925 F.3d at 509 (emphasis added).

 Instead, Plaintiffs argue that the Postal Service did not conduct an "appropriate" analysis, that it gave inadequate "consideration" to certain issues, and that it developed the Do-It-Now Strategies "without regard for" a consistent communications strategy. Pls.' Reply at 27. But such a claim is, fundamentally, a claim that the Postal Service's action was "arbitrary and capricious," or that the agency did not engage in "reasoned decisionmaking," which are "not . . . claim[s] that the [Postal] Service exceeded its statutory authority." *Eagle Tr. Fund v. U.S. Postal Serv.*, 811 F. App'x 669, 670 (D.C. Cir. 2020), *petition for cert. denied*, No. 20-1026 (U.S. Jan. 28, 2021).

For these reasons, the district court in *NAPS* held that plaintiffs had not stated a cognizable ultra vires claim under sections 101(c), 1003(a), and 1004(a) of the PRA. *NAPS*, 2020 WL 4039177, at *4–6. Those provisions state that the Postal Service "shall" maintain compensation comparable to the private sector, 39 U.S.C. §§ 101(c), 1003(a), that it "shall be the policy" of the Postal Service to provide compensation, working conditions, and career opportunities that will attract and retain qualified supervisors, *id.* § 1004(a), and that the Postal Service "shall" provide a program for consultation with recognized organizations of postal supervisors, *id.* § 1004(b). Despite Congress's use of the term "shall" in these provisions, the court concluded that plaintiffs

---

an alleged violation of a federal statute, as they could always simply style their challenge as an "ultra vires" challenge, and it would make no difference whether Congress actually intended to "create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286.

had not stated a claim that the Postal Service had exceeded its statutory authority, as the provisions did not impose any "clear and mandatory limit" on the Postal Service's authority, but rather dealt with issues that were "better left to [the] agency's discretion." *NAPS*, 2020 WL 4039177, at *4–6.

Plaintiffs do not even address *NAPS* in their reply brief, let alone try to explain why the court's reasoning does not apply equally to sections 101(e) and 403(a)–(b). Those provisions are even broader—and leave more room for agency discretion—than the provisions at issue in *NAPS*. Instead, Plaintiffs repeat their argument that sections 101(e) and 403(a)–(b) are judicially enforceable simply because they include the word "shall." Pls.' Reply at 26–27. But Congress's use of the term "shall," in and of itself, does not indicate that Congress intended to create a mandatory, judicially-enforceable obligation. *Conoco, Inc. v. Skinner*, 970 F.2d 1206, 1225 (3d Cir. 1992) ("[W]hether the term 'shall' is construed as directory or mandatory is . . . dependent on an examination of Congressional intent."). Thus, "in a variety of contexts, courts have concluded that Congress's use of the word 'shall' in directing the discharge of a specified duty does not require that the statute be construed as mandatory rather than directory." *Friends of Aquifer, Inc. v. Mineta*, 150 F. Supp. 2d 1297, 1300 (N.D. Fla. 2001) (collecting cases), *aff'd*, 31 F. App'x 202 (11th Cir. 2001). Indeed, the PRA provisions at issue in *NAPS* also used the word "shall," and yet the court concluded that those provisions were not "susceptible to non-statutory review," as they consisted of "broad directive[s]" to establish certain policies rather than "clear and mandatory directive[s] with only a single interpretation." 2020 WL 4039177, at *4–7.

Nor do Plaintiffs ever identify a judicially manageable legal standard that a court could apply to their section 101(e) and 403(a)–(b) claims. *See* Pls.' Reply at 26. Plaintiffs suggest that the Court could construct a standard by "begin[ning] with the plain language of the text" and then "methodically" applying "traditional tools of statutory interpretation." *Id.* But Plaintiffs' attempt

41

to supply such a standard reveals the futility of such an endeavor. *See id.* at 27–28. Section 101(e) provides that "[i]n determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e). Plaintiffs maintain that the meaning of this text is "clear," but they fail to explain with any specificity how a court could ever determine as a practical matter whether the Postal Service gave the "highest consideration" to the most expeditious delivery of mail in determining a postal policy. Plaintiffs maintain that the text of sections 403(a)–(b) is similarly "clear," but the standard that they offer is that the Postal Service must "plan for and develop adequate and efficient postal services" and then "promote and provide those services." Pls.' Reply at 28. Plaintiffs do not explain what this means in any concrete way or explain how a court could balance the competing statutory priorities of ensuring "expeditious" delivery while also doing so in an "efficient" manner. *Compare* 39 U.S.C. § 101(e) *with* 39 U.S.C. § 403(b)(1). Accordingly, because Plaintiffs cannot demonstrate that the Postal Service *plainly* acted in excess of its delegated powers and contrary to a *specific* prohibition in sections 101(e) or 403(a)–(b) that is clear and mandatory, the Postal Service is entitled to judgment as a matter of law on Count II.

### 2. Even if sections 101(e) and 403(a)–(b) impose enforceable constraints, the Postal Service did not clearly and obviously exceed those constraints.

Even if sections 101(e) and 403(a)–(b) were to provide some limits on the agency's statutory authority, Plaintiffs have failed to show that any (let alone all) of the 57 Do-It-Now Strategies violated—much less *plainly* violated—those provisions. Plaintiffs do not dispute that the Postal Service identified the strategies as part of its regular annual effort to meet its annual integrated financial plan. *See* Defs.' MSJ at 49; Pls.' Reply at 30. Nor do they dispute that the vast majority of the Do-It-Now Strategies were longstanding strategies that the Postal Service has used

for years as part of its ongoing process to improve the service performance and efficiency of the Postal Service. *See* Defs.' MSJ at 50–51; Pls.' Reply at 30.

Plaintiffs contend that even though the Postal Service may have encouraged these strategies every year, sections 101(e) and 403(a)–(b) do not "exempt[] policies that may have been already tried." Pls.' Reply at 30. But the fact that the Postal Service deployed these strategies every year with little controversy or challenge shows that these strategies likely do not clearly and obviously exceed the Postal Service's statutory authority. Plaintiffs' view, by contrast, implies that the Postal Service has been acting in excess of its statutory authority for years.

Plaintiffs identify only two strategies that they contend were "new" in 2020. Pls.' Reply at 30. First, Plaintiffs contend that the Postal Service adopted a new "requirement that district managers approve certain supervisor overtime hours." *Id.* (citing Pls.' Ex. 57, Colin Dep. 210:13–211:10). But the cited portions of the deposition transcript make clear that the Postal Service has always required managers to approve supervisor overtime hours and that this was "nothing new." Pls.' Ex. 57, Colin Dep. 211:1–10 ("[T]here's always been a practice of manager approval for supervisor[s] working over eight hours or 40 hours."). The 2020 presentation made clear that this approval process was to go up "to an executive level," but Plaintiffs do not explain how such a practice could possibly contravene a specific clear and mandatory prohibition in Sections 101(e) or 403(a)–(b). Second, Plaintiffs contend that the Postal Service adopted a "new" strategy of recognizing that late and extra trips were unauthorized contractual commitments. Pls.' Reply at 30. But the Postal Service has sought to improve compliance with its transportation schedules for years, *see* Defs.' MSJ at 9–10, and, again, Plaintiffs do not explain how a recognition consistent with that longstanding policy could exceed the Postal Service's statutory authority.

Indeed, rather than challenge the *substance* of any of the actual Do-It-Now Strategies or explain how those strategies exceeded the Postal Service's statutory authority, Plaintiffs primarily focus their criticism on the *process* that the Postal Service used to communicate those strategies. Plaintiffs argue that the Postal Service's adoption of the strategies was "haphazard[]," that it implemented them too "quickly," and "poorly communicated [the strategies] to the field." Pls.' Reply at 29. Plaintiffs cite an October 2020 report from the Postal Service OIG stating that prior-year initiatives "were not executed with the same velocity and consistency." Pls.' Reply at 30 (quoting Pls.' Ex. 52, OIG Report Oct. 2020 at 13). But Plaintiffs ignore that the Postal Service communicated the strategies largely in the same manner as it had every year—through PowerPoint presentations that included aspirational target dates to ensure implementation in time for the following fiscal year. *See* Defs.' MSJ at 52–53. And, more fundamentally, Plaintiffs do not explain how such "process" objections rise to the level of a plain violation of a *specific* clear and mandatory statutory directive. Neither section 101(e) nor sections 403(a)–(b) say anything at all about the "velocity" or "consistency" with which the Postal Service must communicate its operational strategies to the field. While the OIG offered nonbinding recommendations for how the Postal Service could improve the communication of its strategies in the future, nothing in the OIG's report suggests that the Postal Service lacked the statutory authority to roll out the strategies in the manner that it did. And unlike the OIG, whose mission includes promoting effectiveness of the Postal Service generally,[11] federal courts have neither the authority nor the institutional competence to oversee the effectiveness of how the Postal Service communicates its operational strategies.

Plaintiffs also repeat their argument that the Postal Service exceeded its statutory authority because it "did no advance analysis" before rolling out the Do-It-Now Strategies. *See* Pls.' Reply

---

[11] USPS OIG, Office of Audit: Introduction, https://www.uspsoig.gov/audit.

at 31–32. But, as Defendants explained in their opening brief, the strategies resulted from a years-long, ongoing effort to improve the Postal Service's operational efficiency. *See* Defs.' MSJ at 53–54. Plaintiffs fault the Postal Service for employing the strategies in the summer of 2020 specifically, "during a pandemic and ahead of an election that would depend significantly on the mail." Pls.' Reply at 31. But, again, the Postal Service introduced the strategies as part of its regular, annual effort to ensure that its expenses would not exceed its revenues in the following fiscal year. Defs.' MSJ at 49. The financial challenges that the Postal Service faced in the summer of 2020 were particularly grave, Defs.' MSJ at 6–8, and because the Postal Service is funded solely through its revenues, it could not simply choose to ignore its budget for fiscal year 2021. Nor do Plaintiffs identify which of the 57 operational strategies they believe the Postal Service should not have implemented in light of the pandemic and upcoming election. And, even if Plaintiffs could show that the Postal Service exceeded its statutory authority (and managerial discretion) by adopting the strategies in light of the pandemic and election in the summer of 2020, that would not justify a *permanent*, forward-looking injunction prohibiting the Postal Service from adopting the strategies in the future, including the post-pandemic period. *See* Section IV, *infra*.

Finally, Plaintiffs are wrong to contend that the record "belie[s]" the Postal Service's claim that the purpose of the strategies was to improve the adequacy and efficiency of postal services. Pls.' Reply at 32. Plaintiffs cite a July 7 PowerPoint presentation for the proposition that the Do-It-Now Strategies were "cost-cutting and work hour reduction measures." Pls.' Reply at 32; *see also id.* (citing Defs.' MSJ at 49 for the proposition that the strategies were "part of [an] annual effort to meet [the] annual integrated financial plan"). But the Postal Service's efforts to cut unnecessary costs and work hours is entirely consistent with *Plaintiffs*' own definition of providing "adequate" (*i.e.*, "good enough for what is required or needed; sufficient; suitable") and "efficient"

(*i.e.*, "producing a desired effect . . . with a minimum of effort, expense, or waste") postal services. *See* Pls.' MSJ at 51 (defining "adequate" and "efficient"). Indeed, it would have been *inadequate* and *inefficient* if the Postal Service, faced with serious fiscal challenges and declining First-Class Mail volumes, had done nothing to try to reduce unnecessary costs and work hours.

Although Plaintiffs may disagree with the Postal Service's policy judgment—and the judgment of experienced postal experts—that alone is insufficient to justify an order whereby a federal court would render an abstract judgment on what it believes would be sound policy. Accordingly, Plaintiffs have not stated a cognizable nonstatutory review claim, but even if they had, Plaintiffs cannot show that the Postal Service clearly and obviously exceeded its statutory authority in prescribing the Do-It-Now strategies.

## IV. Plaintiffs are not entitled to the ambiguous and extraordinarily broad relief sought in their Proposed Order.

Plaintiffs' reply brief confirms what their opening brief implied: they are seeking expansive injunctive relief that bears little to no relationship to any injury they might be sustaining, or even their specific legal claims, and would turn this Court into the permanent overseer of every attempt to manage the Postal Service's costs or logistics. Such a sweeping order could ossify the Postal Service in a way directly contrary to Congress's direct intent, and therefore runs counter to the public interest.

*First*, the narrow injury asserted by Plaintiffs cannot justify the broad relief they seek. For a permanent injunction, Plaintiffs must demonstrate a "real and substantial" threat of future harm. *See Yung v. Garland*, Civ. No. 20-032-LIPS, 2021 WL 1027486, at *4 (D. Del. Mar. 16, 2021) (quoting *Salvation Army v. Dep't of Cmty. Affairs of N.J.*, 919 F.2d 183, 192 (3d Cir. 1990)), *appeal filed,* No. 21-1974 (3d Cir. May 26, 2021). And the relief they seek must remedy this harm, but cannot remedy actions that have not demonstrably injured plaintiffs; "[r]elief that does not

remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *see also Califano v. Yamaski*, 442 U.S. 682, 702 (1979) ("the scope of injunctive relief is dictated by the extent of the violation established"); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("Injunctive relief . . . must be tailored to remedy the specific harm alleged. . . . An overbroad injunction is an abuse of discretion.").

Here, Plaintiffs rely solely on injury (in the form of mail delays) allegedly caused by the purported Trips Initiative as the basis for both their standing and irreparable injury claims. *See* Pls.' Reply at 33-34. Plaintiffs never demonstrate how any other "Do-it-Now" initiative has caused them injury. As stated earlier, for example, they have not shown any current injury (much less future injury) even though most of these strategies are not prohibited by the preliminary injunction in this case (or the related cases) and thus those strategies have remained in place throughout this litigation. Having attempted only to show injury related to the purported Trips Initiative that occurred in the summer of 2020, Plaintiffs cannot therefore bootstrap a sweeping remedy that would affect any cost-cutting initiatives in the future. And yet that appears to be what they are attempting to do through the bulk of their requested relief. *See* Proposed Order ¶¶ 5(c), 6(a)-(c). Indeed, Plaintiffs simply ignore Defendants' arguments that they must demonstrate ongoing injury that relates to, and would be remedied by, the relief they seek. *See* Defs.' MSJ at 59-60.

*Second*, multiple provisions in the Proposed Order are either ambiguous or overbroad (or both). Plaintiffs' proposed relief is not tailored to their injury or their legal claims. For example, Paragraph 5(c)—which prohibits "[i]mplementing and enforcing any work-hour reduction strategy, 'do-it-now' strategy, or similar strategy or initiative to cut costs without first" taking a number of steps—has a litany of vague and indeterminate terms, which are improper in an

injunction. *See* Defs.' MSJ at 63 (citing *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974), *Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016), *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.3d 921, 926-27 (D.C. Cir. 1982)). Plaintiffs gloss over these concerns with two arguments: (1) that the "injunction provides sufficient notice of the prohibited or required conduct," and (2) even if it does not, Defendants can move for clarification. *See* Pls.' Reply at 37, 34. Neither argument has purchase. First, Plaintiffs do not explain how any of these terms are precisely defined for purposes of avoiding contempt. They do not explain, for example, what "highest consideration" means, nor "clearly and consistently communicat[ed]," how the Postal Service is to balance "adequate and efficient" service, what it means to "tak[e] into consideration current and near-future events that are impacting, or may impact, Postal Service operations," or any of the other related terms. Nor is it a response to simply say that Defendants can seek clarification if necessary. While Defendants have been diligent throughout these cases in seeking clarification, an order that requires pre-emptive clarification over every operational strategy, communication plan, or internal efficiency operation (with the corresponding meet-and-confer, briefing cycle, and judicial order) could paralyze Postal Service operations and slow mail delivery.

Indeed, paragraph 5(c) has further issues. Much of it simply parrots the existing statutory language. *See* Pls.' Reply at 35. This type of "follow the law" injunction does not comport with Rule 65. Plaintiffs essentially ask this Court to enjoin the Defendant from doing what Defendant is already legally prohibited from doing, notwithstanding well-established principle that such "obey the law" injunctive orders are disfavored. As courts have cautioned, "injunctions simply requiring the defendant to obey the law are too vague to satisfy [Fed. R. Civ. P.] 65." *Shook v. Bd. of Cnty. Comm'rs of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (quoting *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004)); *see also Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d

Cir. 1996) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law."). Federal appellate courts have vacated such injunctions. *See, e.g.*, *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531-32 (11th Cir. 1996) (vacating injunction that enjoined defendant from discharging stormwater if the discharge would be in violation of the Clean Water Act); *Payne v. Travenol Labs Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978) (vacating injunction prohibiting "defendants from discriminating on the basis of color, race, or sex in employment practices" because the language was the same as what is prohibited by Title VII). Such an injunction would be particularly problematic here, where broad statutory mandates (that necessarily require balancing,[12] *see supra*) would be replaced by a process whereby if the Postal Service fails to adequately balance its competing considerations in the way that the Court later approves, it will be subject to the specter of contempt.

Still more flaws plague Plaintiffs' proposed order. Paragraph 6 is an affirmative injunction requiring the Postal Service to use late and extra trips as necessary to meet service standards and service performance targets and minimize mail delays, stating that "holding a truck or ordering an extra trip no longer constitutes an unauthorized contractual commitment," and that "the use of late and extra trips is authorized, permissible, and encouraged when necessary to meet service standards and service performance targets or to minimize mail delays." Proposed Order ¶ 6(a)-(c). None of these affirmative, permanent requirements are justified by section 3661, of course, which

---

[12] Plaintiffs claim that the proposal "does not seek to balance – or ask this Court to balance – important policy objectives of an executive agency or mandate how the Postal Service completes its important charge." Pls.' Rely at 36. This is not correct – sections 101(e), 403(a), *and* 403(b) – the latter of which Plaintiffs conspicuously fail to mention – require the Postal Service to balance three things: (1) giving the highest consideration to the expeditious collection, transportation, and delivery of important letter mail, (2) providing adequate and efficient postal service at reasonable rates; and (3) maintaining an efficient system of collection, sorting, and delivery. The Postal Service must – by statutory mandate – balance efficiency and expediency, which *necessarily* involve competing tradeoffs.

speaks only about procedural requirements. Nor can they find any justification in the collective requirements of sections 101(a), 403(a), and 403(b), which require balancing the efficient and expedient delivery of mail. Under this order, the Postal Service apparently would be required to use extra and late trips if such trips would ever move any piece of mail any faster. In other words, if a single piece of mail could potentially get to its final destination even a few minutes faster, the Postal Service would be required to run a costly extra trip (as such action would be apparently necessary "to minimize mail delays"). That requirement cannot comport with the efficiency mandate imposed by Congress; but rather, would entail significant costs for minimal, if any, overall benefit. This requirement is not in the public interest, nor would it support Congress's goals for efficient and cost-effective service.[13]

*Third*, as discussed above, compliance with this injunction will require this Court to micromanage the Postal Service's operations: deciding what trips are necessary, what initiatives are adequately justified or appropriate, and signing off on the Postal Service's communication plans. Tellingly, Plaintiffs do not seriously deny that fact. *See* Pls.' Reply at 36-37. Their only response is their suggestion that this relief need not last "forever." *Id.* But they propose no deadline, other than citing a case in which an order extended for ten years. A time-limit would not cure these fundamental problems.

*Finally*, any injunction should be limited to the Plaintiff States. In response, Plaintiffs' argue that the Postal Service operates nationwide. But this does not mean that its operations must operate identically in every state. It could, for example, manage machines or internal operations

---

[13] Plaintiffs also assert that the Postal Service must be "appropriately guid[ed] . . . about its legal obligations." Pls.' Reply at 36. But the Proposed Order does far more than provide "guidance." It would impose sweeping mandates that would apply to all future initiatives broadly aimed at cutting costs.

differently on a regional or district level basis, as appropriate. Plaintiffs do not justify why *all* aspects of the injunction must be nationwide, as is their burden.

**CONCLUSION**

The Court should deny Plaintiffs' Motion for Summary Judgment, and grant Defendants' Cross-Motion for Summary Judgment.

Dated: July 16, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director, Federal Programs Branch

*/s/* Kuntal Cholera
KUNTAL V. CHOLERA
JOSEPH E. BORSON
ALEXIS J. ECHOLS
JOHN J. ROBINSON
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
kuntal.cholera@usdoj.gov

*Attorneys for Defendants*