**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : | |
| **ET AL.** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 20-4096** |
| | : | |
| **LOUIS DEJOY** | : | |
| *IN HIS OFFICIAL CAPACITY AS* | : | |
| *UNITED STATES POSTMASTER GENERAL,* | : | |
| **ET AL.** | : | |

<u>**MEMORANDUM**</u>

**McHUGH, J.**                                                    **August 25, 2021**

         This is an action brought by six states and the District of Columbia to enjoin certain changes

made by the United States Postal Service during the summer of 2020.  At issue is whether the

Postal Service exceeded its authority when it instituted dozens of cost-cutting measures, which

included restricting late and extra trips by trucks and letter carriers and instituting overtime

restrictions.  The most significant of those policies— the drastic restriction of late and extra trips—

was touted by the Postmaster General as a "transformative" change.  But that change delayed the

mail nationwide, cutting against core values of the Postal Service, "no mail left behind" and "every

piece, every day," and disrupting essential government functions of the Plaintiff-states.  Having

already granted a preliminary injunction with respect to Plaintiffs' claims under Count I—that the

Postal Service made significant, nationwide changes without consulting with the Postal Regulatory

Commission—, the parties' cross motions for summary judgment as to Counts I and II are now

ripe for disposition.[1]  Plaintiffs seek both declaratory relief and a permanent injunction, and

Defendants seek a complete dismissal of all claims.

---

[1] Plaintiffs voluntarily dismissed Counts III and IV, which raised claims relating to the November 2020 election.

For the reasons set forth below, I will require a preliminary evidentiary hearing as to Article III standing with respect to Plaintiffs' claim that Defendants' late and extra trip and overtime policies violated the statutory mandates that USPS give "highest consideration" to the expeditious delivery of important letter mail, as well as "plan . . . adequate and efficient postal services," and "maintain an efficient system of . . . delivery of the mail."  39 U.S.C. § 101(e); 39 U.S.C. §§ 403(a-b).  In all other respects, Defendants' cross-motion will be granted, and the Plaintiffs' claims dismissed.

## I.  RELEVANT FACTS AND PROCEDURAL POSTURE

### A.  Plaintiffs' Complaint

On August 21, 2020, Plaintiffs filed a Complaint seeking declaratory and injunctive relief in response to several policies enacted by the Postal Service during the summer of 2020.  *See* Compl., ECF 1.  Those policies, undertaken shortly after Louis DeJoy assumed his role as Postmaster General in June 2020, were ostensibly meant "to achieve optimal efficiency" and to address the Postal Service's financial woes.  Defs.' Memo. L. Mot. Sum. J., ECF 125-1 at 8; *see* USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery (Oct. 19, 2020), Pls.' Mot. Sum. J. Ex. 52, ECF 121-3 at 1.[2]

The policies included fifty-seven "Do-It-Now Strategies," enacted as part of an annual process wherein "Postal Service senior leadership identifies strategies that can be implemented in

---

[2] Both Plaintiffs and Defendants cite extensively to reports from the Postal Service Office of Inspector General, and reports of the Postal Regulatory Commission, including the Commission's annual reports on the operational effectiveness of the Postal Service.  The role of the Postal Service Office of Inspector General is to keep the Postal Service's Board of Governors and Congress "fully and currently informed about . . . [p]roblems and deficiencies relating to the administration of postal programs and operations." *See* 39 C.F.R. § 221.3(3)(i).  Meanwhile, the Postal Regulatory Commission, is charged with monitoring the Postal Service's compliance with its service standards.  *See* 39 U.S.C. § 3653.

short order to streamline operations and enhance postal efficiency."  Defs.' Memo. L. Mot. Sum. J. at 13; *see* USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery (Oct. 19, 2020) at 2.  The fifty-seven Do-It-Now Strategies were intended to save sixty-four million workhours, and included drastic reductions in the use of late and extra trips[3] to advance or deliver mail that, for any number of reasons, had not been transported on schedule within the Postal Service's surface transportation network.[4]  USPS OIG Report No. 21-013-R21, "Deployment of Operational Changes," (Nov. 6, 2020), Pls.' Ex. 53, ECF 121-3 at 1, 7;  USPS OIG Report No. 20-144-R20, "Transportation Network Optimization," (June 5, 2020), Defs.' Ex. 7, ECF 125-4 at 2.  The Postal Service had previously relied heavily on such late and extra trips (and overtime) to mitigate delays that regularly occur in the network, in an effort to achieve its historic commitment to a policy of excellent service, what many in the organization refer to as "every piece, every day." *Id.*; USPS OIG Report No. 20-144-R20, "Transportation Network Optimization," (June 5, 2020) at 10-11, 13; McAdams Dep. 142: 13-24, 143: 1-24, Pls.' Ex. 59, ECF 121-4 (filed under seal).

Plaintiffs' Complaint was one of several lawsuits around the country alleging that the changes slowed the delivery of mail and disrupted essential governmental functions.  *See* Compl. ¶¶ 192-194.  These disruptions, troubling enough in ordinary times, were of particular concern given the then-upcoming November 2020 election, where a record number of mail-in votes were

---

[3] According to the Postal Service's Office of Inspector General, "[l]ate trips occur when various conditions cause a delay in the arrival or departure of transportation beyond the scheduled times and result in costly delays and contract penalties."  USPS OIG Report No. 21-014-R21, "Deployment of Operational Changes," (Nov. 6, 2020), Pls.' Ex. 53, ECF 121-3 at 5.  Meanwhile, "when mail processing operations do not process mail timely or mail volume is above normal or expected levels, managers may have to call extra trips to transport this mail."  *Id.*

[4] All fifty-seven Do-It-Now Strategies are listed in an October 19, 2020 report of the USPS Office of Inspector General that scrutinized the deployment of the changes.  *See* USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 29-31.  The late and extra trip policy was of particular interest to Postmaster General DeJoy, and he participated in implementing it.  *See id.* at 2.

expected to be cast.  *Id.* ¶ 195; *see Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 855 (E.D. Pa. 2020), *order clarified*, No. CV 20-4096, 2020 WL 6580462 (E.D. Pa. Oct. 9, 2020) (in granting a preliminary injunction in September of 2020, I observed that it might be considered reckless to implement this major initiative four months before a national election).  In Count I, Plaintiffs complained that these initiatives were undertaken hastily and without seeking an advisory opinion from the Postal Regulatory Commission, as mandated by the Postal Reorganization Act (PRA) (as amended).[5]  *See* 39 U.S.C. § 3661(b).  In Count II, Plaintiffs alleged that these changes were in violation of the Postal Service's substantive obligations to "plan, develop, promote, and provide adequate and efficient postal services," 39 U.S.C. § 403(a), "to maintain an efficient system of . . . delivery of the mail," 39 U.S.C. § 403(b)(1), and to give highest consideration to the expeditious delivery of important letter mail.  39 U.S.C. § 101(e).

B.  <u>The Late and Extra Trip and Overtime Policies</u>

Because Plaintiffs' claims under Count I and II ultimately hinge on the planning and implementation of Defendants' late and extra trip and overtime policies, a more in-depth summary of the history of those policies as they relate to timely service of the mail is warranted at the outset.

The use of late and extra trips by the Postal Service is best understood as one of the primary means through which it has historically mitigated routine delays that occur within its transportation network.  According to the Postal Service Office of Inspector General, as of June of 2020, USPS had "routinely use[d]" late and extra trips to mitigate issues within the transportation network, such as misaligned scheduling or unexpected additional volume, in its attempt to provide exceptional service to the public.  *See* USPS OIG Report No. 20-144-R20, "Transportation

---

[5] In 2006, the Postal Reorganization Act, passed in 1970, P.L. 91-375, was amended as the Postal Accountability and Enhancement Act (PAEA), P.L. 109-435.  I will refer to the PRA throughout this opinion, consistent with the briefing of the parties.

Network Optimization," (June 5, 2020) at 10-11, 13 (discussing how USPS "supplement[s] regularly scheduled transportation with exceptional service" using late and extra trips); McAdams Dep. 76: 24, 77: 1-6.  For example, it was commonplace for a plant to hold a truck for a short while past its scheduled departure time (i.e., cause a "late trip") to allow the final container of processed mail to be loaded on board, or for the plant to send an extra truck (i.e., an "extra trip") with mail that missed a scheduled departure.  Cassel Decl. ¶ 30, Pls.' Ex. 61, ECF 121-4;  Cintron Dep. 40:7-15  (Sept. 22, 2020), Pls.' Ex. 55, ECF 121-3 (filed under seal); McAdams Dep. 76:17-77:16.  Likewise, "when mail missed its last scheduled transportation trip . . . management used overtime to finish processing [it]." USPS OIG Report No. 19XG013NO00)-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts," (June 16, 2020), Defs.' Ex. 2, ECF 125-3 at 2.  Letter carriers would then "go back out and deliver late mail" accordingly.[6]  Williams Dep. 185: 23-24, Pls.' Ex. 60, ECF 121-4 (filed under seal).

The use of late and extra trips and of overtime exist within a larger culture that many in the Postal Service describe as "every piece every day."  According to Kevin McAdams, Vice President of Delivery and Retail Operations, the phrase "every piece every day," which is associated with "excellent, sustainable, affordable, reliable service," has been a "mantra of the organization" for decades.  McAdams Dep. 142: 13-24, 143: 1-24.  Mr. Robert Cintron, Vice President of Logistics for the Postal Service, acknowledged that for 35 years, he has heard the policy stated in various contexts: "It's about making sure that we get every piece delivered every day, every piece on the truck every day." Cintron Dep. 106: 12-16.  To that end, Chester Cassell, a retired Transportation Manager who worked with the Postal Service for more than fifty years, explains that the primary

---

[6] As stated by then COO Dave E. Williams, "if you can imagine a delivery operation with 100 carriers and transportation from the plant to the delivery unit, the clerks would be waiting to sort mail which would delay 100 carriers from going out to his or her route on time causing them to come back late."  Williams Dep. 187:12-20.

goal behind the use of late and extra trips "was always to keep the mail moving and leave no mail piece behind." Cassel Decl. ¶ 31.

Necessarily, the use of these mitigation techniques is costly,[7] and, despite their use, "the Postal Service [still] did not meet the majority of its service performance targets in FY 2019." *See* USPS OIG Report No. 20-144-R20, "Transportation Network Optimization," (June 5, 2020), at 10.  In fact, "the Postal Service has not met their service performance targets for most products since 2015."  USPS OIG Report No. 21-014-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020), at 18-19.

In June 2020, just days prior to the start of Mr. DeJoy's active tenure with the Postal Service, the Postal Service's Office of Inspector General recommended a multi-step process whereby management should address the root causes "that impacted the optimization of the surface . . . networks," such as "misaligned scheduling, insufficient management oversight, imbalanced performance measurements, employee availability, and the inefficient allocation of mail." *See* USPS OIG Report No. 20-144-R20, "Transportation Network Optimization," (June 5, 2020), at 2. It advised that management should take a closer look at late and extra trips, by "creat[ing] . . . codes . . . for why extra trips are being ordered" and "issu[ing] . . . guidance to evaluate recurring late . . . and extra trips . . . and update, remove, or consolidate trips; and adjust transportation schedules accordingly." *Id.* at 3.[8]

---

[7] In FY 2019, the Postal Service spent at least $266 million on extra trips, $14 million on late trips, and $130 million on Postal Vehicle Service (PVS) overtime and penalty overtime. *See* USPS OIG Report No. 20-144-R20, "Transportation Network Optimization," (June 5, 2020), Defs.' Ex. 7 at 2.

[8] Although the report refers to the reduction of late and extra trips as part of a portfolio of strategies by which to reduce cost without impacting service performance, it does not specify the extent to which that could or should be done before it begins to negatively impact service performance. *Id.* at 3.  Hence its reliance on preliminary steps to evaluate why the trips are being ordered in each instance, as well as its stress on resolving underlying issues, like misaligned scheduling, that create the need for late and extra trips in the first place. *Id.*

Upon joining the Postal Service just days later, Postmaster General DeJoy emphasized that adherence to transportation schedules would be a top priority.  Defs.' Memo. L. Mot. Sum. J. at 11.  At a June 22, 2020 presentation to the Executive Leadership Team, DeJoy instructed that the Postal Service "Cannot get work done at all cost" and posed the questions: "Overtime - how to get down," and "how much for extra 1%."  ELT Presentation, June 22, 2020, Pls.' Ex. 2, ECF 121-2.  He informed the Executive Leadership team that he "d[id] not like" extra trips, nor "providing service at any cost," and expected leadership to address these and other items.  *See* Williams Dep. 73: 5-13, 74: 12-22.  But, with respect to late and extra trips, rather than take the interim steps suggested by the Postal Service Office of Inspector General, such as evaluating why the trips were being ordered in the first place, the Postmaster General and Executive leadership resolved to slash them immediately—and ask questions later.  In first presenting the new late and extra trip policy[9] to the Area Vice Presidents (AVPs)[10] on July 10, 2020, then Chief Operating Officer David E.

---

[9] Although the Postal Service argues in its briefing that adherence to transportation schedules has always been its policy, and that the extent of the change that occurred in the summer of 2020 was merely that of a "renewed emphasis," *see* Defs.' Memo. L. Mot. Sum. J. at 9, Vice President of Logistics Robert Cintron explains in his Third Declaration to the Court that "prior to July 14, 2020, Postal Service Headquarters had no written policy or guidelines concerning the use of late and extra trips."  Cintron, Third Decl., Defs.' Ex. 17 ¶ 4 (on file).  Rather, he describes a culture whereby "best practices [were] discussed during weekly calls" but where "some local divisions or facilities may have relied on . . . locally-created or locally-implemented written or unwritten criteria."  *Id.*  Moreover, the Postal Service admits that the process of creating the Do-It-Now initiatives to optimize its operations happens annually, *see* Defs.' Memo. L. Mot. Sum. J. at 55, and that the late and extra trip policy was among those initiatives for the year 2020.  Defs. Resp. at 9 (describing the "Trips Initiative" as "single aspect" of the Do-It-Now Strategies).

[10] Plaintiffs describe the Postal Service's management structure, which Defendants do not dispute, as follows:

> The Postal Service operates under a headquarters and field office structure."  USPS OIG, Report No. 19SMG011HR000-R20, Management Structure at the Postal Service, at 5 (Mar. 18, 2020). Headquarters, led by the Postmaster General and the Executive Leadership Team, determines "the overall strategic direction of the Postal Service, including setting overall policy and overseeing financial and operational functions." *Id.*; see USPS Official Organizational Chart (May 26, 2020) (Ex. 50); see also Colin Dep. 73:8-24 (Ex. 57); Williams Dep. 49:1-19 (Ex. 60). Field offices oversee and execute the day-to-day operations of more than 31,000 Postal Service facilities and

Williams drew a distinction between "Affordable, Efficient & Reliable Service" and what he characterized as "Costly & Heroic Service." *See* PowerPoint Presentation from July 10, 2020 AVP Telepresence, Pls.' Ex. 5, ECF 121-2 at 5.  He instructed that "Our *First* Test" is "No Extra Transportation [and] No Late Transportation." *Id.* at 8-9 (emphasis added).  At a July 15, 2020 meeting the following week, in which Williams and Cintron both presented to AVPs, a PowerPoint presentation instructed that "We will run our operations on time and on schedule, which will result in affordable, efficient, and reliable service."  July 15, 2020 AVP Meeting PowerPoint, Pls.' Ex. 6, ECF 121-2 at 7.  Furthermore, in Mr. Williams' view, the impact on letters carriers was "understood" and did "not need explanation." Williams Dep. 189:15-190:6.[11]

Likewise, the use of overtime was subject to additional oversight and restrictions.  For example, the Do-It-Now Strategies, first emailed to AVPs and Managers of Operations Support

633,000 employees. USPS OIG, Management Structure at the Postal Service, supra, at 5; USPS OIG Report No. 19POG001SAT000-R20, Effectiveness of the Postal Service's Efforts to Reduce Non-Career Employee Turnover, at 1 (Feb. 12, 2020).

Before August 7, 2020, the Postal Service divided its field offices into seven geographic areas and 67 geographic districts. USPS OIG, Management Structure at the Postal Service, supra, at 5; Colin Dep. 61:6-12, 64:4-8; McAdams Dep. 45:19-46:21 (Ex. 59). At that time, the Chief Operating Officer and Executive Vice President (COO) oversaw all operational aspects of the Postal Service, including the collection, processing, transportation, and delivery of mail. See USPS Official Organizational Chart (Ex. 50). Each of the seven areas was overseen by an Area Vice President (AVP), who reported directly to the COO and was responsible for all the area's operational aspects. Id.; Williams Dep. 26:3-28:20; Colin Dep. 76:16-19. A District Manager, who reported to an AVP, supervised each district and was responsible for overseeing all operational aspects within their district. Williams Dep. 96:9-22; Colin Dep. 55:11-19; Curtis Dep. 71:2-3 (Ex. 58). Within each district were numerous facilities that reported to the District Manager. Williams Dep. 202:7-203:1; Curtis Dep. 70:16-74:11. These facilities included mail processing facilities, also known as plants, which were overseen by a Plant Manager; and post offices, also known as delivery units, which were overseen by a Postmaster or Post Office Operations Manager. McAdams Dep. 20:14-18; Curtis Dep. 71:4-11.

[11] As noted by the Postal Service Office of Inspector General with respect to the policy to eliminate late and extra trips, the "Postal Service has stated that this operational change was intended to get trucks on the existing schedule and prevent carrier and delivery delays."  USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 19.

on July 14, 2020, and presented at the July 15 meeting, included "eliminating pre-tour overtime in city delivery operations." USPS OIG Report No. 21-014-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 18-19; *see* Confidential PowerPoint – Do now Strategiesv5.pptx, Pls.' Ex. 32, ECF 121-3.   There was also an increased emphasis placed on district manager approval of overtime for supervisors.[12]   *See* Do-It-Now Strategies PPT ("District Approval -8 Hours-40 Hours"), at 5; USPS OIG Report No. 21-014-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 29;  Colin Dep. 257: 18-21, Pls.' Ex. 57, ECF 121-4 (filed under seal).   Similarly, greater stress was placed on the involvement of plant managers in the approval of penalty overtime.[13] *See id.* 255:3-4.

Although these policies were "implemented quickly and were communicated primarily orally," USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020), at 2, they were not mere guidance.   For example, the late and extra trip policy was enforced by a mandate that subjected ordinary union employees, such as mail handlers, who had previously made the on-the-ground decisions either to hold trips (so that they would run late) or to send extra trips, to disciplinary action for doing so.   *See* Williams Dep. 198: 2-11, 199:10-15, 211:8-20; 213:12-17.  Accordingly, on July 10, 2020, when Williams explained to the AVPs that "effective July 13 all extra trips and Postal caused late trips are unauthorized contractual commitments," *see*

---

[12] Prior to the summer of 2020, although it was an "unwritten rule that if you need to work over eight hours, as a supervisor, you need to get approval from your manager," those decisions were often delegated to lower-level staff.  Colin Dep. 210:18- 212:6; 257:18-21, Pls.' Ex. 57, ECF 121-4 (filed under seal).

[13] Penalty overtime is paid at a higher rate than overtime and occurs after an employee works a certain amount of regular overtime.  *See* Curtis Dep. 117:17-22, Pls.' Ex. 58, ECF 121-4 (filed under seal).  "[T]hat happens after eight hours on their non-schedule[d] day or ten hours on a regular day or 60 hours in a week." *Id.*

July 10, 2020 PowerPoint at 11, he intended to strip those employees of such discretion.[14]
Williams Dep. 197:23-200:7. Williams's directive therefore aimed to shift the authority to approve
of late and extra trips higher within the chain of command, to managers, *id.* at 200: 17-24,
201: 1-24, 202: 1-6, and to the AVPs themselves. *See* July 10, 2020 PowerPoint at 12. The fact
that extra trips and Postal-caused late trips became, overnight, "unauthorized contractual
commitments," reflected a vast departure from previous practice, where, as described by Williams,
"there was no approval. The trips just went late. The trips were just called by an expediter or mail
handler technician." Williams Dep. 198:12-20.[15]

And though the Postal Service had devised and communicated a mechanism to enforce its
new late and extra trip policy, it never clearly articulated how it was to take form and be
implemented on the ground, nor how it would accommodate prevailing service standards for the
expeditious delivery of the mail. For instance, it provided the AVPs with conflicting guidance as
to whether the policy was an outright ban, or a reduction, albeit a drastic reduction, in the use of
late and extra trips. As stated above, COO Williams had introduced the policy by explaining to

---

[14] That is because an "unauthorized contractual commitment occurs when a Postal Service employee who
has not been delegated contracting or local buying authority, or who exceeds such authority, by his or her
actions causes another party to deliver or provide goods or services." USPS, Management Instruction MI
SP-G4-2006-2, at 1 (Nov. 30, 2006), Pls.' Ex. 49, ECF 121-3. Unauthorized contractual commitments must
go through a process called "ratification," which "normally involves the after-the-fact preparation and
execution of the appropriate contractual documents." *Id.* at 2. The ratification process involves an "area
vice president [who] reviews the facts of the unauthorized commitment." Williams Dep. 215:3-9. If the
contractual commitment is not ratified, then "the employee who causes an unauthorized contractual
commitment may be required to assume some or all of the liability for the commitment in addition to other
administrative sanctions." Management Instruction MI SP-G4-2006-2, at 2; *see id.* at 5; Williams Dep.
211:8-213:17. Even if the commitment is ratified, the person may still be subject to discipline. *See*
Williams Dep. 213:12-17.

[15] According to Williams, "[n]on-postal caused extra trips," as well as "non-postal caused late trips" are *not*
unauthorized contractual commitments. Williams Dep. 221: 6-12. In concept, therefore, following the
implementation of this policy, there remained "*some* instances, where . . . [the] trips were not unauthorized."
*Id.* at 222:21-23 (emphasis added).

AVPs that "Our First Test" is "No Extra Transportation [and] No Late Transportation."  *See* PowerPoint from July 10, 2020 AVP Telepresence.  Days later, his subordinate, Robert Cintron, Vice President of Logistics,[16] emailed the AVPs and explained that the "focus is to eliminate unplanned extra transportation" and to "eliminate the extras," while simultaneously allowing some by providing a list of scenarios when late and extra trips would be deemed acceptable, and when they would not.  *See* July 14, 2020 Email from Robert Cintron to AVPs, Pls.' Ex. 14-15, ECF 121-2.[17]  Two weeks later, Williams again delivered a PowerPoint Presentation, this time to both AVPs and plant managers, that returned to the original theme of a total ban.  It stated unequivocally: "No Extra Transportation," and "No Late Transportation," followed by the question "Is the Message Clear?"  Confidential PowerPoint – AVP & Plant Managers Transportation Telepresence (July 30, 2020), Pls.' Ex. 7, ECF 121-2.

Likewise, with respect to overtime, although the Postal Service later maintained that it "ha[d] not imposed . . . any nationwide changes that . . . newly restrict overtime," Clarifying Operational Instructions (Sept. 21, 2020), Defs.' Ex. 18 (on file), as late as August 7, 2020 Postmaster DeJoy stated that he was focused on taking "immediate steps to better adhere to our existing operating plans," which broadly included "not incurring unnecessary overtime or other costs."  Opening Remarks of Postmaster General Louis DeJoy at Bd. of Governor's Meeting (Aug. 7, 2020), Pls.' Ex. 39, ECF 121-3.  This message was also reflected in an August 6 letter to Congress, where Williams noted that, while the Postal Service has not eliminated overtime,

---

[16] At the time, Williams (COO) directly supervised Cintron (Logistics VP).  *See* USPS Organizational Chart, Pl.'s Ex. 50, ECF 121-3; *see also* Cintron Dep. 66: 21-24; 67:1-2.  On January 29, 2021, however, Williams retired.  *See* Williams Dep. 25: 17-21.

[17] Notably, Cintron's analytics team did not model the impact of the guidelines on service performance prior to releasing them.  Cintron Dep. 59:23-24, Pls.' Ex. 55.

leadership is "reemphasizing that operational managers must ensure that overtime is earned as the result of unexpected volume or other factors pursuant to our normal overtime analysis before it is approved."  Letter to Members of Congress from Chief Operating Officer David Williams (Aug. 6, 2020), Pls.' Ex. 38, ECF 121-3.

The conflicting messages from Headquarters about the extent to which late and extra trips and overtime should be restricted, and the absence of clear guidelines to AVPs and managers as to whether service performance should or should not factor into those decisions, reflected the fact that the Postal Service had not formally analyzed the impact these changes would have on service performance.  According to the Postal Service's Office of Inspector General, whose role it is to keep the Postal Service's Board of Governors and Congress "fully and currently informed about . . . [p]roblems and deficiencies relating to the administration of postal programs and operations," 39 C.F.R. § 221.3(b)(i), "[w]hile the Postal Service provided an estimate of workhour savings for many of the initiatives, it did not complete a study or analysis of the impact of the changes on mail service prior to implementation."  USPS OIG Report No. 21-014-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 13.  Instead, according to the Postal Regulatory Commission, which is charged with monitoring the Postal Service's compliance with meeting its service standards, *see* 39 U.S.C. § 3653, it simply "relied on the judgments of its management regarding the need to adhere to existing operating schedules and the negative impacts of late and extra trips" for the proposition that "its efforts would lead to improved service performance."  PRC Annual Compliance Determination Report FY 2020 (March. 29, 2021), Pls.' Ex. 54, ECF 121-3 at 120-21 (citing Responses of the United States Postal Service to Question No. 17 of PRC Chairman's Information Request).[18]

---

[18] In its briefing, the Postal Service distinguishes between conducting an ongoing and informal analysis over the course of years and conducting a "formal analysis" in 2020.  Defs.' Memo L. Sum. J. at 52-53.  It

Likewise, according to the Postal Service's Office of Inspector General—on whose June 2020 reports the Postal Service purportedly relied in undertaking this policy:

> [w]hile the Postal Service provided an estimate of workhour savings for many of the initiatives, it did not complete a study or analysis of the impact of the changes on mail service prior to implementation.  Further, the Postal Service did not pilot test or otherwise consider the impact of the changes even though critical employee availability issues were being felt as pandemic cases rose following the July 4, holiday weekend.

USPS OIG Report No. 21-014-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 13.  It noted that "these operational initiatives should have been analyzed and evaluated ahead of deployment to fully understand the impact of implementation." *Id.* at 24.

In the wake of this confusion, much discretion was left to the AVPs, Williams Dep. 96: 9-22, and the policies were applied inconsistently across the country.  *See* USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 2.  For example, the AVP for the Southern Region apparently conceived of the late and extra trip policy as an outright ban and promulgated the message to the entire region that "late [and extra] trips are no longer authorized or accepted."  *See* Mandatory Stand-up Talk: All Employees – Pivoting For Our Future (July 10, 2020), Pls.' Ex. 10, ECF 121-2.  Similarly, the Manager of Post Office operations in the Northern Ohio District prepared a PowerPoint Presentation, which explained that "overtime will be eliminated"—wholesale.  PMG expectations and Plan PowerPoint (July 2020), Pls.' Ex. 12, ECF 121-3.  It further explained that "[i]f the plants run late they will keep the mail for the next

---

argues that "[t]o the extent the Postal Service did not do a formal analysis for the strategies in 2020, that is because many of the strategies are routine, tried-and-true operational initiatives that the Postal Service has been using for years." *Id.* at 54; Tr. Oral Arg. at 10: 15-18, ECF 138.  But there is no dispute that no formal analysis or study was conducted with respect to the late and extra trip policy in 2020.  In his deposition, Williams could not recall "any study or analysis" with respect to the possible impact that a "dramatic decline[s]" in late and extra trips—the kind that occurred during the summer of 2020—would have. Williams Dep. 237:18-24, 238: 1-22.  Nor could Cintron, when asked whether there had been "any analysis to determine what the impact would be," recall any analysis having been done. Cintron Dep. 59:23-24. According to Cintron, "there was no . . . this was not about analysis." *Id.* at 60: 6-7.

day.  If you get mail late and your carriers are gone and you cannot get the mail out without OT it will remain for the next day." *Id.* Such decisions can hardly be considered surprising given the lack of clarity.  And there certainly was no clear communication as to whether trips and overtime needed to be approved where required to uphold current levels of service performance.

Regardless of whether the directive with respect to late and extra trips constituted a ban or simply a drastic reduction, the number of late and extra trips dropped sharply just after the policy was implemented.  The Postal Service used an average of 2,277 extra trips per day prior to July 13, 2020.  *See* PowerPoint - COO Learn and Grow Field Webinar (July 31, 2020), Pls.' Ex. 8, ECF 121-2 at 14 (filed under seal); Williams Dep. 218:6-219:24.  After July 13, the number of extra trips dropped to 731 per day.  *See id.* The Postal Service had also ran an average of 4,193 late trips per day prior to July 13, 2020.  *See* PowerPoint - COO Learn and Grow Field Webinar (July 31, 2020) at 15; Williams Dep. 229:11-230:22.  After July 13, the number of late trips dropped to 1,492 per day.  *See id.* And, as I noted in my previous opinion, even if overtime rates did not drop during the summer of 2020, one would have expected them to increase with a greater number of absences due to COVID-19, and they did not.  *See* Gibson Decl. ¶ 16, Pls.' Ex. 66, ECF 121-4 ("During the COVID-19 pandemic, more overtime has been required than usual."); Curtis Decl. ¶ 23 Defs.' Ex. 29, ECF 125-9 (observing that Postal Service incurred overtime at a rate of approximately 13% both before and after July of 2020).

It should be noted that an initiative to reduce late and extra trips and overtime does not inherently invite suspicion.  The Inspector General had previously recommended reduction in such trips as a cost saving measure.  *See* USPS OIG Report No. 20-144-R20, "Transportation Network Optimization and Service Performance," (June 5, 2020), at 3.  It had also recommended correcting issues relating to management oversight and employee availability to decrease the need for the use

of overtime.   USPS OIG Report No. 19XG013NO00)-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts," (June 16, 2020), at 2-3.  But, as it noted after the implementation of these wholesale reductions, "while our reports have identified opportunities for cost control . . . our recommendations did not prescribe implementation strategies that would have significant negative service impacts."  USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020), at 13.

Numerous observers, both within the Postal Service and outside, commented on the impacts that the policies had on service performance.  In an audit that the Inspector General undertook following the changes, it found that "mail service performance significantly dropped beginning in July 2020, directly corresponding to implementation of the operational changes and initiatives."  *Id.* at 3.  And, after visiting sites at 13 different locations, it highlighted confusion around "overtime reductions, [d]eliveries after 8:00pm, handling late mail arrivals in delivery units," and "whether to leave mail behind in delivery units if it was not ready in the morning" as factors contributing to delays as part of its "service impact analysis."  *Id.* at 13-14.  Likewise, in March 2021, after taking a close look at the late and extra trips policy, the Postal Regulatory Commission made a number of findings, including that "a significant decline in average service performance results" during the summer of 2020 was "suggestive of the impact of the late and extra trips policy."  PRC Annual Compliance Determination Report FY 2020 at 130.  Postmaster General DeJoy, himself, conceded that "this transformative initiative has had unintended consequences that impacted our overall service levels."  *See* Message from the Postmaster General, Pls.' Ex. 40, ECF 121-3.  So, too, did the Postal Service, in its response to the Inspector General's audit, where it stated that "the Postal Service recognizes that implementation of the late and extra

trips policy had a temporary and unintended impact on service performance in July . . .".  USPS OIG Report No. 21-014-R21, "Deployment of Operational Changes" (Nov. 6, 2020) at 26.

In sum, the policy that emerged from Headquarters in the summer of 2020 was one that, at the very least, sought to drastically reduce late and extra trips, and to reduce the corresponding use of overtime.  It did so without formal analysis as to the extent that this could be done without damaging service performance, and accordingly, without any clear guidelines as to how managers and AVPs should approve or deny the trips without causing mail delays.[19]  Despite the negative impact on performance, on August 13, 2020, Postmaster General DeJoy provided a glowing evaluation of the way in which the late and extra trip policy had been implemented so far.  *See* Message from the Postmaster General at 1.   For example, he called a 71% reduction in extra trips a "tremendous achievement." *Id*.  And, despite acknowledging that the initiative had "unintended consequences that impacted our overall service levels," he did not propose to walk back the rate at which late and extra trips were being slashed. *Id.* at 2.  Instead, he suggested that prospective changes needed to be made with respect to underlying deficiencies in scheduling. *Id*.

C.  Nationwide Injunctions, Criticism from the Commission and Inspector General, and USPS Response

On September 28, 2020, I granted Plaintiffs' request to preliminarily enjoin the late and extra trips and overtime policies under Count I, on the basis that the Postal Service violated statutory provisions requiring that it consult with the Postal Regulatory Commission before

---

[19] The key word here is "clear."  It is beyond dispute that Mr. Cintron distributed to the AVPs a list of scenarios when late and extra trips would be deemed acceptable, and when they would not.  *See* July 14, 2020 Email from Robert Cintron to AVPs.  But, as previously stated, his supervisor informed both the AVPs and managers just two weeks later that the standard was "No Extra Transportation" and "No Late Transportation."  Confidential PowerPoint – AVP & Plant Managers Transportation Telepresence (July 30, 2020).

undertaking changes of great magnitude.[20]  *See* section 3661(b). In September and October of 2020, three other courts issued preliminary injunctions with respect to the same alleged violations of section 3661.[21]

The first such preliminary injunction came in *Washington v. Trump* on September 17, 2020. 487 F. Supp. 3d 976 (E.D. Wash. 2020), *order clarified*, 2020 WL 6588502 (E.D. Wash. Oct. 2, 2020).  It enjoined "continued implementation or enforcement of policy changes announced in July 2020 that have slowed mail delivery."  *Id.*  In the immediate wake of that injunction, on September 21, 2020, the Postal Service issued "Clarifying Operational Instructions" with respect to the late and extra trips policy as follows:

> After the Postmaster General took office, he reemphasized the need to ensure that the Postal Service's trucks run on time and on schedule, with the goal of mitigating unnecessary late and extra trips.  This effort does not mean that mail should be left behind (it should not), but rather that processing schedules should align with transportation schedules.  Moreover, the Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted.
>
> Consistent with the court order . . . , transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments.

---

[20] Plaintiffs had originally conceived of Count I as implicating not only the late and extra trips policy but also new overtime policies.  That is no longer the case.  *See* Pls.' Memo. L. Mot. Sum. J. (addressing overtime policies solely with respect to Count II).

[21] See *Washington v. Trump*, 487 F. Supp. 3d 976 (E.D. Wash. 2020), *order clarified*, 2020 WL 6588502 (E.D. Wash. Oct. 2, 2020) (granting injunction on 39 U.S.C. § 3661 claim);  *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1 (D.D.C. 2020) (granting injunction on 39 U.S.C. § 3661 claim);  *New York v. Trump*, 490 F. Supp. 3d 225 (D.D.C. 2020) (granting injunction on 39 U.S.C. § 3661 claim), *order clarified*, 2020 WL 6572675 (D.D.C. Oct. 22, 2020).  In *Jones v. U.S. Postal Serv.*, 488 F. Supp. 3d 103 (S.D.N.Y. 2020), *order clarified*, 2020 WL 6554904 (S.D.N.Y. Sept. 29, 2020), and *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110 (D.D.C. 2020), preliminary injunctions were granted with respect to plaintiffs' constitutional claims.

At this point, three injunctions, including my own, remain in place.  *See NAACP v. U.S. Postal Serv.*, No. 20-2295 (D.D.C. 2020); *New York v. Trump*, No. 20-2340 (D.D.C. 2020).

Clarifying Operational Instructions (Sept. 21, 2020).  With respect to overtime, it stated that "overtime use has not been banned . . . Management will continue to monitor the use of work hours and overtime so that it can identify and address problems that may be the cause of work not being performed within expected work hours or managed inefficiently." *Id.*

My subsequent preliminary injunction, as clarified based on the agreement of the parties, required postal authorities to issue affirmative guidance that "[t]ransportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets." *See* Order Granting, in part, Plaintiff's Request for Prelim. Inj. (Sept. 28, 2020), ECF 63, *as clarified* on October 9, 2020, ECF 70 at 1.  It also required that the Postal Service "approve overtime . . . for the purpose of meeting service standards and service performance targets." *Id.* at 2.  But neither my injunction, nor any other injunction currently in effect, enjoined the classification of late and extra trips as "unauthorized contractual commitments." *See NAACP v. U.S. Postal Serv.*, No. 20-2295 (D.D.C. 2020); *New York v. Trump*, No. 20-2340 (D.D.C. 2020).

As stated above, both the Inspector General and the Commission, tasked with monitoring the Postal Service's compliance with its statutory directives, later chastised the Postal Service for its failure to meaningfully consider the impact that these policies would have on service performance.  They also made recommendations and issued directives pursuant thereto.  For example, in November of 2020, the Office of Inspector General recommended that the Postal Service "[c]onduct a service impact analysis to identify risks and mitigating strategies considering the effects of the pandemic . . . prior to implementing further cost-cutting strategies" and "[s]uspend ongoing and additional cost-reduction efforts until after an analysis of the service

impacts has been completed."  USPS OIG Report No. 21-014-R21, "Deployment of Operational Changes," (Nov. 6, 2020) at 3.

Similarly, in March of 2021, the Commission found that "FY 2020's late and extra trips policy demonstrated[] [that] it is highly problematic for the Postal Service to commence initiatives that are reasonably foreseeable to impact service performance results without undertaking any advance study or analysis of the service performance impact."  PRC Annual Compliance Determination Report Fiscal Year 2020 (March. 29, 2021) at 149.  It further found that "the Postal Service relied on the judgments of its management" and "did not refresh these judgments to reflect the ongoing COVID-19 pandemic or the anticipated increase in Political Mail and Election Mail." *Id.* at 120-21.  Then, out of a concern for "reoccurrence," the Commission directed that the Postal Service "file with the Commission a service performance impact analysis for initiatives that are planned for implementation on or before . . . March 29, 2022 and are reasonably foreseeable to impact service performance results."  *Id.* at 150.

Now, as of the summer of 2021, despite not having conducted such formal analysis, the stated position of the Postal Service appears to have evolved to some extent.  It maintains that it has "no intention of prohibiting, banning or generally discouraging the use of necessary late and extra trips."  Cintron, Fourth Decl. ¶ 4, Defs.' Ex. 19 (on file).  But the Postal Service is still running extra trips at an average of approximately one-third of pre-implementation levels, and late trips at about two-thirds of pre-implementation levels.  *See* Notice of Report, August 16, 2021, Ex. A, ECF 144-1 (showing an average of 838 daily extra trips and 2823 late trips used in July 2021).

D. <u>Cross Motions for Summary Judgment</u>

The parties have had the opportunity to undertake discovery and have filed cross-motions for summary judgment.  *See* ECF 119, 125.[22]  Plaintiffs argue that they are entitled to summary judgment with respect to their claims that the Postal Service acted *ultra vires* when implementing the late and extra trip policy, along with the rest of the fifty-seven Do-It-Now Strategies.  Under Count I, Plaintiffs allege that the Postal Service acted outside its authority when it drastically reduced the use of late and extra trips without first seeking an advisory opinion from the Postal Regulatory Commission (PRC), which would have allowed Plaintiffs the opportunity to comment before the changes went into effect.[23]  In Count II, Plaintiffs allege that the Postal Service, in implementing the Do-It-Now Strategies, which include both the late and extra trip and overtime policies, violated substantive obligations to the public.  Those substantive obligations include "plan[ning], promot[ing], develop[ing] and provid[ing] adequate and efficient postal services," *see* 39 U.S.C. § 403(a-b), and, when determining its policies, giving "highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail"—a category, which although not expressly defined in the statute, necessarily includes First-Class mail.[24]

---

[22] Plaintiffs' exhibits are filed at two separate locations on the docket, ECF 119 and ECF 121.  This opinion cites to the latter.  They also filed both a redacted and unredacted version of the memorandum of law.  *See* ECF 121-22.

[23] The Postal Service is required to seek an advisory opinion whenever it determines to make changes to the nature of postal services on a nationwide scale.  *See* 39 U.S.C. § 3661(b).

[24] Defendants conceded at oral argument that "there are many categories within First-Class mail that would constitute important letter mail" and that this includes "perhaps most subsets of First-Class [m]ail."  Tr. Oral Arg. at 113: 16-19; 11-13.

Defendants continue to argue that this Court does not have jurisdiction over any of the claims encompassed in Counts I and II, given that Congress created a system of administrative review for certain claims through the Postal Regulatory Commission, followed by review before the U.S. Court of Appeals for the D.C. Circuit.  They next assert that even if this Court does have jurisdiction, the Plaintiffs lack Article III standing because they have failed to show that their injuries are fairly traceable to any of the individual policies undertaken during the summer of 2020, further arguing that any such injuries are unlikely to re-occur.  Similarly, Defendants contend that the case is moot, due, in part, to developments subsequent to the entry of my injunction.  They argue that service performance has "largely returned" to pre-July 2020 levels during the summer of 2021.  Defs.' Memo. L. Sum. J. 16; *see* Service Performance of Mail, Pls.' Ex. 84, ECF 133-2. And they cite the declaration of Robert Cintron that the Postal Service has no intention of "generally discouraging the use of necessary late and extra trips" moving forward.  Cintron, Fourth Decl., Defs.' Ex. 19 at ¶ 4.  Finally, they argue that even if the claims are not moot, Plaintiffs cannot succeed on the merits under the prevailing standard of review for *ultra vires* claims, citing the stringent test recently set forth in *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020).

## II.    GOVERNING STANDARD

These motions are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment will be granted when "the movant establishes that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  *West v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (internal citations omitted).

To reiterate, Plaintiffs seek both declaratory and injunctive relief.  With respect to the injunctive relief sought by the Plaintiffs, the standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the Plaintiffs must now prevail on the merits.  *See Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 215 n.9 (3d Cir. 2014) (internal citation omitted).  In addition to success on the merits, Plaintiffs must show that they suffered an irreparable injury; that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and that the public interest would not be disserved by a permanent injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Necessarily, as a threshold matter, Plaintiffs must demonstrate Article III standing to bring claims over which the Court has jurisdiction, and Plaintiffs must continue to have a "personal stake" in the outcome of the litigation as it progresses.  *See Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (quoting *Rosetti v. Shalala*, 12 F.3d 1216, 1224 (3d Cir. 1993)).

Likewise, Courts have construed the Declaratory Judgment Act's actual controversy requirement to be synonymous with the case or controversy requirement found in Article III. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  Therefore, "a court can enter a declaratory judgment 'if, and only if, it affects the behavior of the defendant toward the plaintiff.'" *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 307 (3d Cir. 2020) (internal citations omitted).

My analysis at this stage will focus solely on preliminary jurisdictional issues, given that genuine issues of material fact as to Article III standing preclude me from awarding complete relief to either side.

### III.    DISCUSSION

    A.  Count I

At this point in the case, Plaintiffs have dropped any challenge to overtime reductions, and pursue only the reduction in late and extra trips under Count I.  *See* Pls.' Memo. L. Mot. Sum. J. 40.  Having already determined that jurisdiction otherwise exists under the statute, *see DeJoy*, 490 F. Supp. 3d at 867, I will turn to Defendants' claim of mootness, which also goes to this Court's authority to hear the case.  *See* Defs.' Mot. Sum. J. at 2, ECF 125-1; *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979) ("[J]urisdiction, properly acquired, may abate if the case becomes moot").  For the reasons set forth below, I conclude that Plaintiffs' claims under Count I are moot, and that the claims must be dismissed.

In my opinion accompanying the preliminary injunction, I determined that the Plaintiffs had standing under Article III of the U.S. Constitution to litigate their claims that Defendants' late and extra trip policy violated 39 U.S.C. § 3661(b).  *See DeJoy*, 490 F. Supp. 3d at 873.  I found standing based on the procedural right to comment created by the statute.  Under section 3661(b), when the Postal Service endeavors to make a nationwide "change in the nature of postal services," it is required to submit a proposal to the Commission requesting an advisory opinion on the change. 39 U.S.C. § 3661(b).  Then, the Commission shall not issue its opinion until it holds a hearing on the record, where opportunities to participate are provided to interested persons.  *See* 39 U.S.C. § 3661(c); 39 C.F.R. § 3010.140 (describing right to comment).  Plaintiffs had argued—and I agreed—that, because of Defendants' allegedly *ultra vires* act—they implemented the policy without first submitting a proposal to the PRC—, Plaintiffs had standing to assert their claims that they were "depriv[ed] of the right to comment" on the policy at formal Commission proceedings. *See* Pls.' Mot. Prelim. Inj. at 49, ECF 18-1; *Buchanan v. U.S. Postal Serv.*, 375 F. Supp. 1014,

23

1019 (N.D. Ala. 1974), *aff'd in part, vacated in part,* 508 F.2d 259 (5th Cir. 1975) (finding standing where Plaintiffs were denied the opportunity to comment under section 3661).

Nevertheless, the Third Circuit has observed that "if developments occurring during the course of adjudication eliminate a plaintiff's personal stake in the outcome of a suit, then a federal court must dismiss the case as moot.'" *Gayle*, 838 F.3d at 303 (internal citations omitted). That is because "[c]ourts have no license to retain jurisdiction over cases in which one or both of the parties plainly lacks a continuing interest." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000) (internal citation omitted). Stated differently, "[t]he central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007) (internal citation omitted); *see Hartnett*, 963 F.3d at 305–06 (observing the "heavy burden" faced by defendants to show there is no longer a live controversy). Here, although the Plaintiffs clearly had standing with respect to the denial of their right to comment on the late and extra trips policy during the summer of 2020, subsequent developments have mooted Plaintiffs' procedural injuries, thus "forestall[ing] any occasion for meaningful relief." *Rendell,* 484 F.3d at 240.

On March 23, 2021, approximately eight months after the changes at issue in this case, the Postal Service proposed changes to the standards for the delivery of First-Class mail— changes at least as significant as what occurred here in terms of potential impact on users of the mail.[25] As to these changes, the Postal Service properly sought an advisory opinion from the Commission,

---

[25] *See* PRC Advisory Opinion on Service Changes Associated with First-Class Mail and Periodicals, Docket No. 2021-1 at 6 (July 20, 2020), https://www.prc.gov/docs/119/119311/Docket%20No.%20N2021-1_Advisory%20Opinion.pdf.  "Specifically, the Postal Service s[ought] to increase the service standards by up to two additional days for 38.5 percent of First-Class Mail . . . in order to improve its service capabilities, achievement of service standards and reduce mail transportation costs."  *Id.* at 1-2.

which triggered a public comment period.  In response, in June of 2021, each of the Plaintiffs submitted a joint "Statement of Position."  *See* Statement of Position of 21 Attorneys General and Two Cities, PRC Docket No. N2021-2, (June 21, 2021), Pls.' Ex. 83, ECF 133-1.

Plaintiffs' Statement with respect to the Postal Service's recent proposal began with a summary of the problems that pertain to the specific policy changes at issue in this litigation.  *Id.* at 1-2.  They discussed the findings of Postal Service Office of Inspector General that "mail service performance significantly dropped beginning in July 2020, directly corresponding to implementation of the operational changes and initiatives."  *Id.* (citing USPS OIG Report No. 21-014-R21, Deployment of Operational Changes, at 7-8 (Nov. 6, 2020)).  They discussed the preliminary findings of numerous courts—including this one, with respect to the legality of those changes.  *Id.* at 1.  They commented specifically on the late and extra trip policy, characterizing it as having been "implemented virtually overnight, in the middle of a pandemic, and without any prior input from the Commission."  *Id.*  And they cautioned that the Postal Service "appears . . . poised to repeat many of these mistakes."  *Id.* at 2.

They also stressed the ways in which the proposal at issue in their statement is related to the policies undertaken during the summer of 2020.  "[R]ather than remedy its ongoing performance issues," the Plaintiffs contended, "the Postal Service is simply moving the goalposts" for what constitutes acceptable service.  *Id.* at 11-12.  They argued that "Postal Service leadership has yet to acknowledge that the cost-saving initiatives were responsible for the decline in service seen in the last half of 2020, much less gone through the arduous process of understanding exactly what occurred, correcting the errors, and figuring out how to prevent similar disasters in the future."  *Id.* at 12.

And the Plaintiffs did not simply reason by analogy that the newly proposed changes suffered from the same problems as those implemented in the summer of 2020. Instead, they requested that the Commission address *both* the new changes and the old, including the late and extra trip policy:

> [USPS] seeks to implement these changes, despite never having restored service to its prior levels following the disastrous July 2020 initiatives and while the country still recovers from the COVID-19 pandemic and accompanying economic downturn.

> There is a different approach. The Commission should urge the Postal Service to abandon this misguided effort and instead focus its attention on improving its performance in delivering First-Class Mail and other market-dominant products. It must examine the events of the past year to identify what went wrong with the implementation of its 2020 initiatives to ensure similar failures do not recur.

*Id.* at 2.[26]

In practical terms, Plaintiffs had gained an advantage by virtue of the passage of time and the discovery that took place in this case and other cases around the country. In July of 2020, Plaintiffs could, at most, have conveyed their concerns about the negative impact of the late and extra trips policy put in place in July of that year. As of June 2021, Plaintiffs had the ability to point out that the "transformative initiative" had in fact dramatically impacted timely delivery of mail, and indeed cited the Postal Service Office of Inspector general for that proposition. *Id.* (quoting USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020), at 3).

Significantly, the Commission had the power to address Plaintiffs' complaints about performance during this advisory opinion process, which took place during the spring and summer of 2021. According to the regulations that govern the process, "[i]f, in any proceeding, alternatives

---

[26] Later in the Statement, the Plaintiffs return to this exact theme, stating that "the Postal Service should abandon its current effort and refocus its energies on fixing its ongoing performance deficiencies. The Commission can play a vital role in encouraging the Postal Service to pursue this option." *Id.* at 12.

or related issues of significant importance arise, the Commission may, in its discretion, undertake an evaluation of such alternative or issues by means of special studies, public inquiry proceedings, or other appropriate means."  39 C.F.R. § 3020.102 (b)**.**

The fact that the Plaintiffs have now had the opportunity to comment on Defendants' late and extra trips policy as part of the Commission's formal advisory opinion process, and that the Commission had the authority to address those comments, leads me to the conclusion that Plaintiffs no longer have a "continuing interest" in the outcome of this litigation with respect to Count I.  *See Laidlaw*, 528 U.S. at 170.  Simply put, although Plaintiffs continue to maintain that the Postal Service's "directive to eliminate late and extra trips . . . gave neither the public nor the Postal Regulatory Commission an opportunity to comment," Pls.' Resp. at 1, ECF 131, their procedural injury has been redressed.  As this Court's injunction remained in place, Plaintiffs were heard in the very forum where the Commission acts in its advisory role.

Buttressing this conclusion is the fact that the Commission's oversight of the Postal Service extends well beyond section 3661(b).  By the time Plaintiffs submitted these comments, the Commission had already conducted an in-depth review of the late and extra trip policy and commented on it extensively by virtue of its powers under section 3653.  *See* 39 U.S.C. § 3653(b) (setting standards for Commission's "Annual Determination of [Postal Service] Compliance" with its statutory obligations with respect to rates and service).  In March 2021, the Commission made a number of findings, including that "a significant decline in average service performance results after the policy's enactment" was "suggestive of the impact of the late and extra trips policy."  *See* PRC Annual Compliance Determination Report, Fiscal Year 2020 (Mar. 29, 2021), at 130.  It also found that "the Postal Service did not complete a pilot or a formal study of the impact on . . . service performance results before implementation of this initiative."  *Id.* at 120.   And, out of a

concern for "reoccurrence," it directed that the Postal Service "file with the Commission a service performance impact analysis for initiatives that are planned for implementation on or before . . . March 29, 2022 and are reasonably foreseeable to impact service performance results." *Id.* at 149-150. The Commission has therefore taken measures to address the conduct of which Plaintiffs complain, exercising far broader powers than when it issues mere *advisory* opinions under section 3661(b).[27]

It bears emphasis that the passage of time does not, in the ordinary case, moot violations of procedural rights. The right to be heard has intrinsic value, as the Supreme Court observed in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.7 (1992). Unless procedural rights are enforced, there is a risk they could be violated with impunity. Mootness here arises out of the ongoing involvement of the Commission in oversight of the Postal Service, and the unique chronology of events in which Plaintiffs exercised the right to be heard in the relevant forum, even as this case was still pending. *See* 13B Wright & Miller, *Fed. Prac. & Proc.* § 3533 (3d ed.) ("[P]roblems [of mootness] often require a highly individualistic, and usually intuitive, appraisal of the facts of each case.").

In conclusion, Plaintiffs were ultimately able to exercise their statutory right to submit comments to the Commission with respect to the late and extra trip policy. For practical purposes, it can no longer be said that they were denied that opportunity. *See* Statement of Position (June 21, 2021). Nor can it be said that the Commission did not have the authority to address their comments. *See* 39 C.F.R. § 3020.102(b). Finally, it is clear that the Commission studied the late

---

[27] As the Commission observes, advisory opinions "do[] not give the Commission authority to veto service changes" and "the Postal Service is not required to implement or take further action with regard to the Commission's opinion[s]." Procedural Overview of the Advisory Opinion Process, March 24, 2021. https://www.prc.gov/press-releases/procedural-overview-advisory-opinion-process/5063.

and extra policy extensively and used its authority under a related statutory provision, section 3653, to issue directives to prevent reoccurrences of the harm inflicted by that policy. *See* PRC Annual Compliance Determination Report FY 2020 at 149-50.[28]  The procedural injury having been remedied for all practical purposes, these subsequent developments have "forestalled any occasion for meaningful relief" with respect to Count I. *Rendell,* 484 F.3d at 240; *see Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 700 (3d Cir. 1996) (affirming district court dismissal of claims as moot where "plaintiffs had already attained all the relief sought").

I must therefore dismiss Count I as moot.

### B. Count II

As noted above, Plaintiffs allege that the Postal Service violated section 101(e), which requires that the Postal Service give "highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail," and sections 403(a-b), which require that the Postal Service "plan, develop, promote, and provide adequate and efficient postal services," as well as "maintain an efficient system of collection, sorting, and delivery of the mail nationwide." [29]

#### 1. Jurisdiction

Defendants renew their argument, first made at the preliminary injunction stage with respect to Count I, that the PRA impliedly precludes district court review of Plaintiffs' claims.

---

[28] The Commission itself described its directive as "complement[ing] . . . the requirements of 39 U.S.C. § 3661." *See* PRC Annual Compliance Determination Report Fiscal Year 2020 at 150 n.302.

[29] *See* 39 U.S.C. § 101(e) ("In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail."); 39 U.S.C. § 403(a) ("The Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees."); 39 U.S.C. § 403(b) ("It shall be the responsibility of the Postal Service—(1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide").

Defs.' Memo. L. Mot. Sum. J. at 43.  I remain persuaded that jurisdiction exists as to all of Plaintiffs' claims under Count II, except for one aspect of their claim under Section 403(a).

Section 409(a) of the PRA states that "[e]xcept as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service."  Of lesser importance, as a general statutory provision on jurisdiction, is 28 U.S.C. § 1339, which provides that "[t]he districts courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service." In *Licata v. U.S. Postal Serv.*, the Third Circuit observed, with respect to section 409(a), "we cannot imagine how Congress could grant jurisdiction more plainly."[30] 33 F.3d 259, 261 (3d Cir. 1994).  *See also Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) (observing, in a challenge to the actions of the Postal Service, that "[i]n case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief.").

Defendants contend nonetheless that there can be no judicial review of any action taken by the Postal Service under sections 403(a-b) and section 101(e).  The Third Circuit has cautioned that "[w]hen the Government argues that a statutory scheme prohibit[s] all judicial review of agency decision making, it bears a heavy burden."  *E.O.H.C. v. Sec'y U. S. Dep't of Homeland*

---

[30] In *dicta*, *Licata* appeared to question whether Section 409(a) creates a statutory right of action.  *Id.* at 262-63. That is not an impediment to proceeding here, where Plaintiffs have asserted a legitimate non-statutory claim—that Defendants acted *ultra vires* and exceeded their statutory authority.  *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority.").  The Postal Service is often subject to judicial review on this basis.  *See, e.g., Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166, 1168 (D.C. Cir. 2003) (where plaintiff's principal claim against Postal Service is that it acted *ultra vires*, "it does not matter whether 39 U.S.C. § 410 precludes traditional APA review"); *Zirin v. McGinnes*, 282 F.2d 113, 115 (3d Cir. 1960) (affirming the availability of nonstatutory review of agency action that is *ultra vires*).

*Sec.*, 950 F.3d 177, 188 (3d Cir. 2020) (internal citations omitted).  When considering whether the statute precludes review, I look to whether "the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'"  *Id.*  "In discerning that intent," I must review the statute's "text, structure, and purpose."  *Id.* (citing *Elgin v. U.S. Dep't of Treasury,* 567 U.S. 1, 10 (2012)).

Defendants can point to nothing in the text or structure of the PRA suggesting that Plaintiffs' claims under sections 403(a-b) and section 101(e) are exempted from the general grant of jurisdiction found in section 409(a) of the PRA, which provides jurisdiction to district courts *except as otherwise provided*.  *See* 39 U.S.C. § 409(a) (emphasis added).  At argument, defense counsel was asked to point to any language within the statute that would eliminate jurisdiction over claims under sections 403(a-b) and section 101(e), but could not do so.  *See* Tr. Oral Arg. 34: 3-5.  Thus, the absence of jurisdiction must be wholly implied.  For Defendants' argument to prevail, the words "except as otherwise provided" would seem to have no meaning.

In the absence of any textual support for their position, Defendants point to cases such as *United States v. Erika, Inc.*, 456 U.S. 201 (1982) and *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984), where the Supreme Court analyzed implied preemption of jurisdiction under two statutes that contained complex administrative mechanisms, but no general grant of jurisdiction.  In *Block*, for example, the Agricultural Marketing Agreement Act of 1937 contained an explicit mechanism for review of orders by the Secretary of Agriculture that could be utilized by dairy handlers.  *See* 467 U.S. at 346.  The Court found that the existence of this explicit mechanism for certain types of litigants, the dairy handlers, impliedly precluded other types of litigants, namely consumers, from accessing these channels.  *Id.* at 346-47, 353.  Similarly, in *Erika*, the Court reviewed the provisions of the Medicare statute, which specified that certain kinds of disputes were subject to

judicial review following administrative determinations, and thus found that other types of disputes were impliedly precluded from such further review. *See* 456 U.S. at 206-08, 211. But in neither case was there a provision like section 409(a), affirmatively creating jurisdiction subject to exceptions.

Moreover, Defendants have failed to identify anything in the legislative history sufficient to overcome the PRA's text and structure. In crafting the PRA, Congress certainly desired "to minimize external intrusions on the Postal Service's managerial independence," *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262 (5th Cir. 1975), but also sought to "provid[e] to the American people a public service which is . . . responsive to their needs." *Id.* Indeed, the 1970 House Committee Report released shortly before the passage of the PRA emphasizes that "[t]he postal service is—first, last, and always—a public service." H.R. Rep. No. 91-1104 at 3668.

Defendants simply ignore the fact that the Third Circuit has reviewed claims that the Postal Service exceeded its authority under some of the same provisions at issue here. *See UPS Worldwide Forwarding v. U.S. Postal Serv.*, 66 F.3d 621, 623-24 (3d Cir. 1995) (observing that the Court had jurisdiction under sections 28 U.S.C. § 1331 and 1339, as well as 409(a) to determine whether the Postal Service exceeded its authority in violation of PRA § 403(b)); *Air Courier Conf. of Am./Int'l Comm. v. U.S. Postal Serv.*, 959 F.2d 1213, 1214, 1217 n.2 (3d Cir. 1992) (observing that the Court had jurisdiction under 28 U.S.C. § 1339 and section 409(a) to determine whether the Postal Service exceeded its authority in violation of section 403(a)). Certainly, *Air Courier* was not strictly a "drive-by" jurisdictional ruling,[31] as Defendants suggest. To the contrary, in *Air*

---

[31] *See Goldman v. Citigroup Glob. Mkts. Inc.,* 834 F.3d 242, 251 (3d Cir. 2016) (a "drive-by jurisdictional ruling, in which jurisdiction has been assumed by the parties, and assumed without discussion by the court" is not instructive).

*Courier*, the Third Circuit determined that the language of 409(a), providing for an exception to jurisdiction if "otherwise provided," did not apply to the provisions at issue. 959 F.2d at 1217 n.2.

Finally, I observe that claims of other sections are specially enumerated as falling within the jurisdiction of the Commission. *See* 39 U.S.C. § 3662 (providing interested persons the right to "lodge a complaint with the Postal Regulatory Commission" with respect to the "provisions of sections 101(d), 401(2), 403(c), 404a, or 601, or this chapter (or regulations promulgated under any of those provisions)). That is not so with the bulk of the statutory provisions Plaintiffs invoke here. Given the text, structure, and legislative history examined above, as well as previous rulings by the Third Circuit, I cannot agree with Defendants' assertion that these claims are unreviewable.

However, there is one exception. Section 403(a) imposes a duty to "develop, promote, and provide adequate and efficient postal services." To the extent that Plaintiffs wish to challenge the quality of service rendered by the Postal Service under this provision, there is a broad consensus among federal courts that exclusive jurisdiction to hear such claims lies with the Commission, with review by the D.C. Circuit. *See, e.g.*, *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 801 (8th Cir. 2006) (Plaintiff "cannot avoid the PRC's exclusive jurisdiction over . . . service complaints through artful pleading."). This conclusion is consistent with the PRA's structure, and with Congress's clear priority, as evidenced by the legislative history, to cabin claims with respect to the quality of service within the Commission's purview. *See Elgin,* 567 U.S. at 10 (requiring review of statute's text, structure, and purpose); 39 U.S.C. § 3662 (providing interested persons the right to challenge, before the Commission, the Postal Service's alleged failure to act in accordance with Chapter 36, including the requirement that it "develop and promote adequate and efficient postal services"

under Section 3661(a)); *DeJoy*, 490 F. Supp. 3d at 863 (examining Congress's expansion of the Commission's powers in 2006 to address rate and service issues promptly and effectively).[32]

In conclusion, except for their purely service-related complaints under Section 403(a), I find there is jurisdiction to hear Plaintiffs' claims under section 403(a-b) and 101(e).

### 2.   Standing

Plaintiffs argue that the "harm caused by mail delays" gives them Article III standing with respect to all of Defendants' fifty-seven Do-It-Now initiatives.  Pls.' Resp. at 3.  Defendants respond that Plaintiffs cannot show standing "because they have made no attempt to show how any particular 'Do-It-Now' initiative has slowed down the mail in a way that has injured them." Defs.' Memo. L. Mot. Sum. J. at 19.  With respect to the overwhelming majority of Do-It-Now initiatives, I agree that Plaintiffs have failed to demonstrate standing.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press.").  With respect to the late and extra trip policy, and, to a lesser extent, overtime changes, genuine disputes of fact remain. Those issues warrant holding a preliminary evidentiary hearing.  I will therefore partially grant Defendants' motion for summary judgment as to Count II.

### i.   Late and Extra Trip Policy and Overtime Reductions

In the opinion accompanying my preliminary injunction, I determined that Plaintiffs had standing to challenge Defendants' late and extra trip policy to the extent that it violated the procedural requirements laid out in section 3661(b).  A similar analysis governs standing as to the

---

[32] My conclusion as to jurisdiction over Count II is consistent with my previous opinion analyzing Plaintiffs' claims under section 3661(b), set forth in Count I, where I found that the legislative history did not demonstrate a Congressional desire to limit district court's jurisdiction.  *See Buchanan*, 375 F. Supp. at 1017 (exercising jurisdiction where plaintiffs were denied the opportunity for a hearing under Section 3661).

claims asserted under sections 403(a-b) and 101(e) in Count II. At this stage, genuine issues of material fact remain, which prevent an award of summary judgment to either side. *See Ramirez*, 141 S. Ct. at 2208 (citing *Lujan*, 504 U.S. at 561) (a plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation.").

Constitutional standing to seek injunctive relief requires a plaintiff to show: "(1) that he is under threat of suffering 'injury in fact' that is concrete and particularized; (2) the threat must be actual and imminent, not conjectural or hypothetical; (3) it must be fairly traceable to the challenged action of the defendant; and (4) it must be likely that a favorable judicial decision will prevent or redress the injury." *Free Speech Coal., Inc. v. Att'y Gen. of the U. S.*, 825 F.3d 149, 165 (3d Cir. 2016) (internal punctuation omitted) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

At the time I issued my injunction, Pennsylvania[33] had made a preliminary showing that it experienced a concrete and particularized harm to its interest in timely service as a user of the mail. *See DeJoy*, 490 F. Supp. 3d at 871;  Beverly Hudson Decl., Ex. 69 at 3–4 (explaining how mail delays interrupt the processing of income revenue, travel reimbursements, and other agency priorities), ECF 121-4;  Robert V. O'Brien Decl. Ex. 75 ¶ 19–29, ECF 121-4 (explaining how mail delays hinder the ability of the Department of Labor to schedule hearings and adjudicate benefits). Since that time, the Commission has examined the drop in service performance from July through September 2020 at a granular level, highlighting a 31.6% drop in the district of Central Pennsylvania.  *See* PRC Annual Compliance Determination Report FY 2020 at 129.   This

---

[33] As a general rule, in an injunctive case, courts need not address the standing of each plaintiff if it concludes that one plaintiff has standing. *See Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 481 n.14 (3d Cir. 2016) (citing *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 826 n.1 (2002)).

additional data provides further support for Pennsylvania's injury as of the entry of the preliminary injunction.

And, as of September of 2020, Plaintiffs made a preliminary showing that the delays harming Pennsylvania were "fairly traceable" to Defendants' late and extra trip policy. Postmaster General DeJoy himself had conceded in August of 2020 that this "transformative initiative has had unintended consequences that impacted our overall service levels." *See* Message from the Postmaster General at 2. Following the entry of my injunction, in November 2020, the Postal Service again admitted that "the implementation of the late and extra trips policy had a temporary . . . impact on service performance." USPS OIG Report No. 21-014-R21, "Deployment of Operational Changes," Appx. E, Postal Service Response to OIG Findings, at 26. In addition, the Commission found that "a significant decline in average service performance results after the policy's enactment" was "suggestive of the impact of the late and extra trips policy." PRC Annual Compliance Determination Report FY 2020 at 130.

The record is far less clear with respect to overtime. Nonetheless, in its annual report reviewing 2020 performance, overtime was the second factor the Commission highlighted for consideration. *See id.* at 132. The Inspector General's report on Operational Changes to Mail Delivery, based on site visits to 13 locations, discussed above, highlighted confusion around "overtime changes, [d]eliveries after 8:00pm, handling late mail arrivals in delivery units," and "[w]hether to leave mail behind in delivery units if it was not ready in the morning" as factors contributing to delays as part of its "service impact analysis." USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020), at 13-14. As the Commission observed, the Postal Service admits negative effects from its late and extra trip policy, while making no similar concession with respect to overtime. *See* PRC Annual Compliance Determination Report

FY 2020 at 133-34.  But the Commission goes on to state that the Postal Service's failure to conduct any impact analysis either before, or during, the implementation of the initiatives is what makes it impossible for the postal leadership to determine the precise effects of the changes.  *Id.* at 134.

I now turn to whether the threat of future harm is "actual and imminent" as opposed to "conjectural or hypothetical." *Free Speech Coal.,* 825 F.3d at 166-67.  With respect to overtime, Defendants' policies implemented during the summer of 2020 were enjoined in their entirety by my preliminary injunction, and thus I need not require Plaintiffs to show an ongoing injury.  With respect to the late and extra trip policy, the injunction was narrower.  Defendants were accorded substantial discretion in determining whether trips were "necessary," and any trips not approved at a management level remained "unauthorized," with potentially severe consequences.

Defendants contend that "any delays during the summer of 2020 were . . . likely caused by context-specific implementation issues" with the late and extra trip policy, including COVID-related absences and communication issues that occurred during the policy's roll out, which have since been addressed, as opposed to any "inherent issue" with the policy.  Defs.' Memo. L. Mot. Sum. J. at 20; *see* Defs.' Resp. 2 (explaining that, as of July 2021, "significant COVID-related employee absences and short-term communication issues . . . are no longer present today").  For the proposition that the communication issues were being addressed as early as August 2020, they point to evidence from the Office of Inspector General's fall 2020 report that, even by the end of August, "delayed mail volume at [mail processing plants] returned to rates seen earlier in the year," and the volume of "[d]elayed mail in post offices, stations, and other facilities," "significantly decreased" to rates comparable to the first half of 2020.  Defs.' Memo. L. Mot. Sum. J. at 20 (citing USPS OIG Report No. 21-014-R21, "Deployment of Operational Changes," (Nov. 6, 2020) at 10,

26).  And to support the proposition that those issues are now resolved, they assert that service performance has "largely returned" to pre-July 2020 levels during the summer of 2021.  *Id.* at 16. The phrase "largely returned" glosses over continued meaningful deficits, as average service performance for June and July 2021 was 88.6%, as compared to 91% in the four weeks leading up to implementation in 2020, and still worse than the lowest point prior to implementation—89.5 %. Service Performance of Mail, Pls.' Ex. 84.

Meanwhile, Plaintiffs argue that "the Postal Service has presented no evidence that it has abandoned its effort to eliminate late and extra trips or abandoned its designation of all late and extra trips as unauthorized contractual commitments."  *See* Pls.' Resp. 7.  That designation is important, because it places individual postal service employees at personal risk of discipline if their authorization of a late or extra trip is not approved.  And despite multiple injunctions, the general policy of a restriction on late and extra trips remains in place.[34]  *See* Cintron, Fourth Decl., Defs.' Ex. 19 ¶ 3 ("Local *managers* have the discretion to order extra trips when necessary") (emphasis added); *id.* ¶ 4. ("extra trip numbers . . . have not always reflected the same numbers seen prior to July 2020"); *see also* "Daily Late and Extra Trips October 1, 2020 – October 29, 2020" (showing continued reduced levels of late and extra trips following the entry of this Court's injunction); Notice of Report, August 16, 2021, Ex. A (showing that, as of July 2021, the Postal Service was running extra trips at an average of approximately one-third of previous levels and late trips at an average of approximately two-thirds of previous levels).  The

---

[34] None of the preliminary injunctions that remain in place include any prohibition on the classification of late and extra trips as unauthorized contractual commitments.  *See* ECF 70 (clarifying that "*[m]anagers* shall use their best business judgment to meet service commitments and to not leave mail behind") (emphasis added); *see also NAACP v. U.S. Postal Serv.*, 20-2295 (D.D.C. 2020), Order granting preliminary injunction, ECF 31, and Memo. of L., ECF 32 at 6-7; *New York v. Trump*, 20-2340 (D.D.C. 2020), Order granting preliminary injunction ECF 51, and Memo of L., ECF 52 at 6-7, as well as Clarified Order, ECF 62 at 1.

continued existence of the policy would bring this case within the ambit of *City of Los Angeles v. Lyons*. 461 U.S. 95, 106, (1983) (observing that Plaintiff could establish an actual controversy by showing that Defendant, City of Los Angeles, had a policy of authorizing police officers to act in a manner that violated the law).

Plaintiffs further stress that, despite Defendants' attempt to cast continued performance deficiencies in the best possible light, delays nevertheless persist.  Pls.' Memo. L. Mot. Sum. J. at 37.  The fact that service performance levels have never fully recovered since the initiatives were launched in July 2020, lends strong support to Plaintiffs' position, particularly with respect to the late and extra trips policy.  Further support comes from the Commission's March 2021 conclusion that the Postal Service should have assumed, in advance, that the policy would cause delays, and its concerns that such delays would continue into the future.  *See* PRC Annual Compliance Determination Report FY 2020 at 149 ("Although the Postal Service asserts that the decline caused by the late and extra trips policy was unintended and temporary, the Commission remains concerned that the gap between the expected and actual impact of management initiatives could potentially reoccur in FY 2021.").  In short, Plaintiffs have submitted substantial evidence of ongoing injury that is fairly traceable to the late and extra trips policy, but I cannot deem it so clear at to be undisputed.

I now turn to the final element of standing— redressability.  Plaintiffs must show that it is "likely that a favorable judicial decision will prevent or redress the injury."  *Free Speech Coal.*, 825 F.3d at 165 (internal punctuation omitted) (citing *Summers*, 555 U.S. at 493).  They have done so.  If I find that the ongoing mail delays are "fairly traceable" to the late and extra trip policy, or that overtime restrictions contributed to the mail delays last summer, I have the power to enjoin such policies permanently, provided, of course, that Plaintiffs prevail on the merits by meeting the

heavy burden of showing that the changes were adopted and implemented in a fashion that clearly exceeded the authority of the Postal Service under sections 403(a-b) and 101(e). *See Laidlaw*, 528 U.S. at 185–86 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress"); *Zirin*, 282 F.2d at115 (confirming the power of courts to remedy *ultra vires* agency actions).

To conclude, given that genuine issues of material fact remain as to the threshold issue of standing, I will hold a preliminary evidentiary hearing as to that issue. *See Doherty v. Rutgers Sch. of Law-Newark*, 651 F.2d 893, 898 n.6 (3d Cir. 1981) ("[T]o avoid an unnecessary trial, the district court may conduct a preliminary evidentiary hearing on standing."); *Louisiana Couns. & Fam. Serv. Inc. v. Mt. Fuji Japanese Rest.*, No. 08-6143, 2014 WL 941353, at *4-5 (D.N.J. Mar. 11, 2014), *aff'd sub nom. Brown v. Mt. Fuji Japanese Rest.*, 615 F. App'x 757 (3d Cir. 2015) (denying motions for summary judgment without prejudice pending an evidentiary hearing).

Material issues to be resolved at the hearing will necessarily include: the extent to which the overtime policy, in particular, contributed to mail delays prior to the entry of my preliminary injunction;[35] the extent to which late and extra trips continue to be classified as "unauthorized contractual commitments;" the extent to which Defendants continue to utilize late and extra trips at drastically reduced levels; the extent to which Plaintiffs continue to suffer injury as a result of ongoing mail delays; and finally, the extent to which those delays are "fairly traceable" to the late and extra trips policy.

---

[35] As the Commission and Inspector General both noted, overtime reductions have an impact that Defendants' lack of analysis makes difficult to assess. *See* USPS OIG Report No. 20-292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020) at 19; PRC Annual Compliance Determination Report FY 2020 at 134.

ii.     Remaining Do-It-Now Initiatives

With respect to the remaining Do-It-Now initiatives, I agree with Defendants that Plaintiffs lack Article III standing.  Plaintiffs have failed to point to record evidence linking any of those initiatives to the mail delays that qualify as redressable injuries.

For example, one of the many Do-It-Now Initiatives involved a "Reduction in Rural Miles Leveraging Technology."   USPS OIG Report No. 20292-R21, "Operational Changes to Mail Delivery," (Oct. 19, 2020), at 29.  That initiative did not even begin until October 2020—after my injunction went into effect.  *Id.*  And the Plaintiffs have not even explained what that initiative represents, let alone shown that such a policy injured them.  Similarly, the Plaintiffs have not attempted to articulate how an initiative to "add/expand lunch breaks based on workload" in "small offices" could have injured them.  *Id.* at 31.  The same is true of the dozens of other policies that I did not enjoin.

Because Plaintiffs have failed to demonstrate that their injuries are "fairly traceable" to any of the remaining Do-It-Now Initiatives, I will grant Defendants' motion for summary judgment with respect to those policies.

3.   Mootness

Finally, I turn to the related doctrine of mootness, another consideration in determining whether a dispute is justiciable.  The Postal Service argues that, even assuming there is standing as to the late and extra trip policy, Plaintiffs' claims are moot, by virtue of the fact that Defendants "did not (and do[] not) intend to ban the late and extra trips that are the heart of this lawsuit," and that otherwise, they voluntarily ceased the challenged behavior, by starting to make corrections to communication issues about the nature of the policy "even before any court orders were issued."

Defs.' Memo. L. at 21.[36]  This goes to their overall theory, stated above, that "any delays during the summer of 2020 were more likely caused by context-specific implementation issues . . .  rather than an inherent issue with the policies themselves." *Id.* at 20.  For the reasons set forth below, I find that Plaintiffs' Count II claims remain viable.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice . . . [I]f it did, the courts would be compelled to leave [t]he defendant ... free to return to his old ways." *Laidlaw*, 528 U.S. at 189 (internal citations omitted).  The standard for evaluating mootness with respect to a defendant's voluntary conduct is stringent.  "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*  Moreover, the "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.*  In other words, it is the burden of the Postal Service "to show that it could not reasonably be expected" to resume its allegedly wrongful behavior.  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013).

But Defendants' argument fails at the outset, primarily because it miscasts the behavior that Plaintiffs actually seek to enjoin.  Defendants frame Plaintiffs' lawsuit as merely challenging the extent to which Defendants' actions appear to have constituted an outright ban of late and extra trips.  But that is only part of the problem that the Plaintiffs have identified.  According to the Plaintiffs, ban or no ban, the policy represents a drastic reduction in the use of the late and extra trips, on which the Postal Service had relied to provide exceptional service, yet it was enacted

---

[36] Aside from "short-term communication issues," Defendants blame significant COVID-related employee absences for last summer's mail delays.  Defs.' Resp. at 2.  But the contributions of COVID-related employee absences to Plaintiffs' injuries do not create a genuine issue of material fact as to whether the challenged conduct is "reasonably expected to recur," given Defendants' multiple admissions, as least as to late and extra trips, that the policy itself caused delays.

without consideration for the impact it would have on the expeditious delivery of important letter mail. Pls.' Resp. at 6-7. According to the Plaintiffs, "the Postal Service adopted strategies and initiatives that, *in substance and implementation*, caused mail delays." *Id.* at 2 (emphasis added). And the drastic reduction in the use of late and extra trips appears to be ongoing.[37] *See* Cintron, Fourth Decl., ¶¶ 4, 6 (explaining that "extra trip numbers . . . have not always reflected the same numbers seen prior to July 2020" and that "we have seen a moderation in the need for extra trips"); *see also* Notice of Report, August 16, 2021, Ex. A (showing an average of 838 daily extra trips and 2823 late trips used in July 2021). Thus, Plaintiffs have requested that the "Postal Service . . . conduct basic analysis of the possible effect on service before implementing nationwide measures *and* communicate those measures clearly and consistently." Pls.' Resp. at 36 (emphasis added).

Therefore, to the extent that Defendants can be said to have voluntarily ceased engaging in the challenged behavior, by conveying to Postal Service employees that the polices do not constitute a ban, *see* Clarifying Operational Instructions (September 21, 2020), Defs.' Ex. 18, that communication only addresses the problem at its surface.[38] Nearly a year later, they still have not conducted the kind of formal analysis that the Plaintiffs, the Commission, and the Postal Service's own Office of Inspector General all urge is necessary to implement a transformational change whereby the utilization of such trips is drastically reduced. *See* PRC Annual Compliance

---

[37] There is no material issue of fact that the use of late and extra trips has been reduced since the policy was implemented. Mr. Cintron acknowledges the decline in his most recent declaration to the Court. Cintron, Fourth Decl., § 5.

[38] It should be noted that USPS did not actually clarify that its late and extra trip policy was not a ban until September 21, 2020, after an injunction had already been entered in *State of Washington v. Trump*. 20-3127, ECF 81 (Sept. 17, 2020). *See* "Clarifying Operational Instructions," September 21, 2020, Defs.' Ex. 18. As the Third Circuit has instructed, a "defendant's reason for changing its behavior is often probative of whether it is likely to change its behavior again. We will understandably be skeptical of a claim of mootness when a defendant yields in the face of a court order and assures us that the case is moot . . . , yet maintains that its conduct was lawful all along." *See Hartnett*, 963 F.3d at 306.

Determination Report FY 2020 at 149 ("[As] FY 2020's late and extra trips policy demonstrated, it is highly problematic or the Postal Service to commence initiatives that are reasonably foreseeable to impact service performance results without undertaking any advance study or analysis of the service performance impact"); *id.* at 150 (explaining that out of a concern for "reoccurrence," the Postal Service is directed to "file with the Commission a service performance impact analysis for initiatives that are planned for implementation on or before . . . March 29, 2022 and are reasonably foreseeable to impact service performance results."); *see also* USPS OIG Report No. 21-014-R21, "Deployment of Operational Changes," (Nov. 6, 2020), at 3 (recommending that the Postal Service "[c]onduct a service impact analysis to identify risks and mitigating strategies considering the effects of the pandemic . . . prior to implementing further cost-cutting strategies" and "[s]uspend ongoing and additional cost-reduction efforts until after an analysis of the service impacts has been completed"). Moreover, most late and extra trips apparently remain classified as unauthorized contractual commitments. *See* Cintron, Fourth Decl., ¶ 3 (explaining that presently, "*managers* have the discretion to order extra trips when necessary . . . [and] *managers* also have the discretion to make the decision to hold a truck.") (emphasis added).

It is perhaps encouraging that Robert Cintron, VP of Logistics, now informs the Court that USPS "ha[s] no [current] intention of . . . generally discouraging the use of *necessary* late trips." *Id.* ¶ 4 (emphasis added). And the reduction of overtime and late and extra trips is fiscally prudent. Nonetheless, with service still not recovered, and late and extra trips still dramatically down, the Postal Service has yet to conduct any kind of formal analysis as to how the degree to which its restrictions on late and extra trips and overtime have caused the decline in performance of First-Class mail. And that is the crux of Plaintiffs' challenge here.

The Postal Service has a statutory mandate to give "highest consideration" to the "expeditious delivery" of "important letter mail."  39 U.S.C. § 101(e).  It is certainly proper for the Postmaster General to inquire as to the cost of achieving "the extra one percent."  But Plaintiffs contend that the statute requires Defendants to have some answer to that question when implementing "transformational" changes that have a serious impact on delivery of First-Class mail.[39]  For that matter, both the Postal Regulatory Commission and Inspector General seem to be seeking such an answer as well.

Defendants have therefore failed to meet their "heavy burden" to persuade the Court that Count II is moot.  *See Laidlaw*, 528 U.S. 167, at 189.

---

[39] Whether the Defendants' failings constitute a violation of sections 101(e) and/or 403(a-b) remains an issue on the merits, but I am persuaded that Plaintiffs' claims are not moot.

## IV.     CONCLUSION

Plaintiffs' procedural claims under Count I must be dismissed as moot because the Court can no longer provide meaningful relief.[40]  With respect to Count II, the Court has jurisdiction over the majority of Plaintiffs' claims, with the exception of their claims under section 403(a) that Defendants failed to "develop, promote, and provide adequate and efficient services."  39 U.S.C. § 403(a).  Next, claims arising out of the Do-It-Now Initiatives, with the exception of those relating directly to the late and extra trips policy and overtime reductions, will be dismissed for lack of standing.  As to those remaining claims, preliminary issues of jurisdictional fact preclude awarding summary judgment to either side.  The Court will hold an evidentiary hearing to address those issues.

An appropriate order follows.

____/s/ Gerald Austin McHugh_____
United States District Judge

---

[40] Given that my preliminary injunction was predicated solely on Count I, it will be vacated accordingly.  I note, however, that injunctions from another district court remain in place.